# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Jointly Administered** |
| **KAISER ALUMINUM CORPORATION,** | : | **Case No. 02-10429 (JKF)** |
| a Delaware corporation, <u>et al.</u>, | : | |
| | : | **Chapter 11** |
| Debtors. | : | |
| | : | |

| | | |
|---|---|---|
| **MOSS LANDING COMMERCIAL** | : | |
| **PARK, LLC,** | : | |
| | : | |
| **Appellant,** | : | |
| | : | **Civil Action No. 08-233** |
| vs. | : | |
| | : | |
| **KAISER ALUMINUM CORPORATION,** | : | |
| <u>et al.</u>, | : | |
| | : | |
| **Appellees.** | : | |

## BRIEF IN RESPONSE TO MOSS LANDING COMMERCIAL PARK LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY MOTION FOR STAY PENDING APPEAL

Daniel J. DeFranceschi (DE 2732)
Jason M. Madron (DE 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR REORGANIZED DEBTORS

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ....................................... 2

SUMMARY OF ARGUMENT ........................................................................................................ 2

FACTUAL BACKGROUND ........................................................................................................... 3

I.   Background Regarding Reorganized Debtors' Chapter 11 Cases ...................................... 3

II.  Background Facts Pertinent to MLCP's Emergency Motion for Stay .............................. 4

ARGUMENT .................................................................................................................................... 7

I.   Applicable Legal Standards ............................................................................................... 7

II.  MLCP Has No Chance of Succeeding on Its Appeal ........................................................ 7

III. MLCP Will Not Suffer Irreparable Harm if Its Request to Proceed With
     Discovery Is Denied ........................................................................................................ 10

IV.  The Reorganized Debtors Will Suffer Injury If the Emergency Motion Is Granted ....... 12

V.   There Is No Public Interest That Will Be Served By Granting the Emergency Stay
     Motion ............................................................................................................................. 13

CONCLUSION .............................................................................................................................. 14

RLF1-3276739-1

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

Am International v. Datacard Corp.,
    106 F.3d 1342 (7th Cir. 1997) ............................................................................................9

In re CMC Heartland Partners,
    966 F.2d 1143 (7th Cir. 1992) .........................................................................................9

Constructors Association of W. Pa. v. Kreps,
    573 F.2d 811 (3d Cir. 1978)............................................................................................7

Del. River Port Authority v. Transamerican Trailer Transport, Inc.,
    501 F.2d 917 (3d Cir. 1974)............................................................................................7

Enron Corp. v. J.P. Morgan Securities, Inc. (In re Enron Corp.),
    2006 WL 2400411 (Bankr. S.D.N.Y. May 10, 2006)......................................................10

In re Polaroid Corp., No. Civ. A. 02-1353,
    2004 WL 253477 (D. Del. Feb. 9, 2004)..........................................................................7

In re Trans World Airlines, Inc.,
    2001 WL 1820325 (Bankr. D. Del. March 27, 2001)........................................................7

RLF1-3276739-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | : **Jointly Administered** |
| **KAISER ALUMINUM CORPORATION,** | : **Case No. 02-10429 (JKF)** |
| a Delaware corporation, <u>et al.</u>, | : |
| | : **Chapter 11** |
| **Debtors.** | : |
| | : |

| | |
|---|---|
| **MOSS LANDING COMMERCIAL PARK, LLC,** | : |
| | : |
| **Appellant,** | : |
| | : **Civil Action No. 08-233** |
| **vs.** | : |
| | : |
| **KAISER ALUMINUM CORPORATION, <u>et al.</u>,** | : |
| | : |
| **Appellees.** | : |

**BRIEF IN RESPONSE TO MOSS LANDING COMMERCIAL
PARK LLC'S MEMORANDUM OF LAW IN SUPPORT
OF ITS EMERGENCY MOTION FOR STAY PENDING APPEAL**

Kaiser Aluminum Corporation ("KAC"), Kaiser Aluminum & Chemical

Corporation LLC and their affiliated reorganized debtors (collectively, the "Reorganized

Debtors") in the chapter 11 proceedings that are being jointly administered in the United States

Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 02-

10429 (JKF) (collectively, the "Bankruptcy Cases"), hereby file, pursuant to Rules 7.1.2. and

7.1.3. of the Local Rules of Civil Practice and Procedure of the United States District Court for

the District of Delaware, this brief in response to the memorandum of law (D.I. 5) (the

"Memorandum of Law") of Moss Landing Commercial Park, LLC ("MLCP") in support of its

emergency motion for a stay (D.I. 4) (the "Emergency Stay Motion") of the Bankruptcy Court's

order (Bankruptcy Court D.I. 9690, 9713) (the "Bankruptcy Court Order Enforcing Injunctions")

enforcing the injunctions issued in connection with the Reorganized Debtors' plan of reorganization and compelling MLCP to dismiss without prejudice its lawsuit against the Reorganized Debtors. In support hereof, the Reorganized Debtors respectfully state as follows:

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This is a response to the Memorandum of Law in support of the Emergency Stay Motion, in which MLCP asks this Court to stay enforcement of the Bankruptcy Court Order Enforcing Injunctions, which compels MLCP to dismiss without prejudice a certain lawsuit MLCP filed against KAC and Kaiser Aluminum & Chemical Corporation ("KACC"), predecessor in interest to Kaiser Aluminum & Chemical Corporation LLC, which is currently pending in the United States District Court for the Northern District of California as Case No. C07-06072 (the "California Action"). The California Action seeks to compel KAC and KACC to pay damages, costs and civil penalties and remediate certain environmental conditions on a parcel of land in Moss Landing, Monterey County, California (the "Moss Landing Property") that KACC sold in 1984 and that MLCP purchased in 2003.

### SUMMARY OF ARGUMENT

The sole purported basis for MLCP's Emergency Stay Motion is that it needs to pursue discovery pending the appeal because the Reorganized Debtors, which have not owned or operated the Moss Landing Property in 24 years, possess "crucial information" necessary to proceed with remediation of the Moss Landing Property. As was the case before the Bankruptcy Court, MLCP fails to (i) offer any explanation of what type of information the Reorganized Debtors could possibly possess that would be "crucial" to proceed with remediation or (ii) provide any evidence whatsoever to support its assertion that governmental agencies are demanding action now, let alone action that requires information from a party that sold the property in 1984. This complete lack of specificity and evidence should be particularly troubling

to the Court because it was an issue at the hearing on MLCP's motion for a stay before the Bankruptcy Court, which expressed concerns that MLCP had provided no evidentiary support for its sole purported need for a stay. Nonetheless, MLCP has now come to this Court requesting a stay once again without providing any evidentiary support for its purported need for discovery. On this basis alone, the motion should be summarily denied.

As explained below, MLCP likewise fails to meet any of the four factors necessary to obtain a stay pending appeal. Indeed, with respect to the likelihood of success on the merits of its appeal, MLCP argues that the injunctive relief it seeks in the California Action does not constitute a dischargeable claim, but wholly ignores the fact that its complaint contains several counts seeking damages and penalties. Those counts of its complaint are unquestionably "claims" subject to the discharge injunction. Accordingly, MLCP has no chance of succeeding on appeal because its complaint clearly violated the discharge injunction whether or not its counts for injunctive relief constitute dischargeable claims.

## FACTUAL BACKGROUND

### I.    Background Regarding Reorganized Debtors' Chapter 11 Cases

On February 12, 2002, KAC, KACC and thirteen affiliates commenced their respective reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On March 15, 2005, two additional affiliates commenced their voluntary chapter 11 cases. The other nine debtors in the Bankruptcy Cases (collectively, the "Debtors") filed their chapter 11 petitions on January 14, 2003. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being administered jointly. Prior to, as applicable, their liquidation or emergence, the Debtors continued in possession of their respective properties and operated and managed their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

On December 20, 2005, the Bankruptcy Court entered an order (D.I. 7983) confirming the joint plans of liquidation for Debtors Kaiser Alumina Australia Corporation, Kaiser Finance Corporation, Alpart Jamaica Inc. and Kaiser Jamaica Corporation (collectively, the "Liquidating Debtors"), pursuant to which the Liquidating Debtors were dissolved.

On February 6, 2006, the Bankruptcy Court entered an order (D.I. 8225) (the "Confirmation Order") confirming the Reorganized Debtors' Second Amended Joint Plan of Reorganization (as modified and confirmed, the "Plan"). On May 11, 2006, the United States District Court for the District of Delaware entered an order affirming the Confirmation Order. The Plan became effective on July 6, 2006 (the "Effective Date").

## II.    Background Facts Pertinent to MLCP's Emergency Motion for Stay[1]

In 1984, in conjunction with KACC's decision to sell its refractories business, KACC sold a magnesium and refractory brick facility on an approximately 188-acre parcel of land located in Moss Landing, Monterrey County, California (the Moss Landing Property) to National Refractories & Minerals Corporation ("National Refractories") and certain of its affiliates. Environmental conditions at the Moss Landing Property were well known and documented at the time, and the responsibilities of the parties for the environmental conditions were the subject of a separate Agreement on Environmental Compliance (the "Environmental Agreement") that the parties entered into in connection with the sale.

In December 2003, when both National Refractories and KACC were in bankruptcy, MLCP purchased the Moss Landing Property from National Refractories. Pursuant

---

[1]    These background facts are supported by the Declaration of John M. Donnan, which was filed in support of the Reorganized Debtors' motion to enforce the injunctions issued pursuant to the Plan and compel MLCP to dismiss the California Action. A copy of the Donnan Declaration, without the voluminous exhibits attached thereto, is attached hereto as Exhibit A and incorporated herein.

-4-

to the sale agreement, MLCP assumed certain maintenance, monitoring and remediation obligations on the property, including the obligation to maintain a leachate collection system. Additionally, MLCP was given substantial information about the environmental conditions at the property, including a 2001 Phase I assessment, a 2002 soil and groundwater sampling report and all material correspondence between KACC and National Refractories regarding maintenance of the landfills on the property. MLCP was also required to make several acknowledgements related to those environmental conditions, including, with respect to the Environmental Agreement, that "KACC is in its own Chapter 11 bankruptcy proceedings and may reject any such agreements as burdensome executory contracts." Furthermore, to oversee demolition of the plant and environmental remediation, MLCP hired the same person that had been the environmental manager for the property for both KACC and then National Refractories.

Although National Refractories had filed a claim in KACC's chapter 11 case in respect of the Environmental Agreement and for environmental conditions generally at the Moss Landing Property, MLCP never took an assignment of that claim. Several months after MLCP purchased the Moss Landing Property, National Refractories and KACC entered into a settlement of their respective claims. In the settlement agreement, National Refractories represented that it was still the owner of, and had not transferred, its claim in respect of the Moss Landing Property.

On November 30, 2007, MLCP served KAC and KACC, as well as the United States Environmental Protection Agency (the "United States EPA") and certain California environmental agencies, with a notice that it intended to file suit against KAC and KACC under certain federal and state environmental statutes as well as the Environmental Agreement, seeking to compel KAC and KACC to pay costs and civil penalties and remediate the environmental

-5-

conditions at the Moss Landing Property. According to the notice, KAC and KACC created two

landfills on the property between 1946 and 1981 and have "been on notice of the potential threat

of the dumps to the environment since 1978." MLCP further alleged that discharges and releases

from these landfills "have been occurring since at least 1980." Also on November 30, 2007,

MLCP filed a Complaint for Damages and Injunctive Relief in the United States District Court

for the Northern District of California, and on December 5, 2007, MLCP filed its First Amended

Complaint for Damages and Injunctive Relief (the "Amended Complaint"). The Amended

Complaint seeks equitable relief, civil penalties, monetary damages and attorneys' fees under a

variety of federal statutes, state statutes and common law theories of liability, all of which seek

to require KACC to remediate, or otherwise compensate MLCP for, the environmental

conditions that were well known when MLCP purchased the Moss Landing Property.

Because MLCP's commencement of its lawsuit against KAC and KACC was

indisputably a violation of the injunctions the Bankruptcy Court issued in connection with

confirmation of the Plan, on December 28, 2007, the Reorganized Debtors filed a motion to

enforce the Plan injunctions and compel MLCP to dismiss its lawsuit with prejudice (the

"Motion to Enforce"). The Bankruptcy Court held a hearing on the Motion to Enforce on

February 25, 2008, and on March 27, 2008, entered an order requiring MLCP to dismiss its

lawsuit without prejudice within 10 days.

On March 31, 2008, MLCP filed a notice of appeal and an emergency motion for

a stay pending appeal in the Bankruptcy Court. On April 2, 2008, the Reorganized Debtors filed

an objection to the stay motion, and MLCP filed a reply on April 15, 2008. The Bankruptcy

Court held a hearing on MLCP's emergency stay motion on April 21, 2008. At the hearing, the

Bankruptcy Court denied MLCP's emergency motion. An order to that effect, however, has not yet been entered.

## ARGUMENT

### I.    Applicable Legal Standards

To obtain a stay pending appeal pursuant to rule 8005 of the Federal Rules of Bankruptcy Procedure, MLCP bears the burden of proof on the following four factors:

> (i) a strong likelihood of success on the merits of the appeal; (ii) irreparable harm to the movant if the stay is denied; (iii) no substantial harm to non-moving parties if the stay were to be granted; and (iv) a stay is in the public interest.

Constructors Ass'n of W. Pa. v. Kreps, 573 F.2d 811, 815 (3d Cir. 1978) (quoting Del. River Port Auth. v. Transamerican Trailer Transp., Inc., 501 F.2d 917 (3d Cir. 1974)) (additional internal cites and footnotes omitted); In re Polaroid Corp., No. Civ. A. 02-1353, 2004 WL 253477, at *1 (D. Del. Feb. 9, 2004); In re Trans World Airlines, Inc., No. 01-0056, 2001 WL 1820325, at *2 (Bankr. D. Del. March 27, 2001).[2] MLCP cannot prevail on any of these factors and, therefore, is not entitled to a stay.

### II.    MLCP Has No Chance of Succeeding on Its Appeal

MLCP's argument that it has a "compelling" basis for its appeal is meritless. (Memorandum of Law at 8.) MLCP asserts that the Bankruptcy Court Order Enforcing Injunctions "turns on the Court's determination that, injunctive relief under RCRA and CWA, if sought by a governmental agency, would not be discharged, but when brought by a private citizen can be treated as a 'claim' and discharged under Kaiser's plan." (Memorandum of Law at 5.) To the contrary, the Bankruptcy Court merely held that "the suit violates the discharge injunctions" and that MLCP should have sought leave in the bankruptcy court first. (Tr. of

---

[2]        Unpublished opinions cited herein are attached hereto collectively as Exhibit B.

Feb. 25, 2008 Hr'g at 37.) As the Bankruptcy Court explained, the limited issue before the court was whether "the suit in California violate[s], at this point, the discharge injunctions and [whether] the remedy [should] first start [in the bankruptcy court for MLCP] to show why it should be able to prosecute that suit." (Id. at 38.) The Bankruptcy Court correctly concluded that the answer to that question was yes.

Given that, in addition to seeking injunctive relief, MLCP's Amended Complaint in the California Action also includes requests for damages, penalties and attorneys' fees, there is virtually no likelihood that this Court will conclude that the Bankruptcy Court erred in (a) finding that the California Action violated the discharge injunction and (b) ruling that MLCP should have sought relief in the Bankruptcy Court first. Indeed, with respect to those portions of its Amended Complaint requesting damages, fees and penalties, MLCP had no defense to the fact that the Amended Complaint violated the discharge injunction other than to assert that MLCP is not bound by the Plan and Confirmation Order because of a purported failure to give notice.[3] On that point, however, as KACC explained and the Bankruptcy Court acknowledged, prior to selling the property to MLCP, National Refractories had filed a proof of claim for, among other things, the environmental conditions at the Moss Landing Property. MLCP never filed any notice of transfer of that claim. In fact, several months after National Refractories apparently sold the property to MLCP, KACC and National Refractories entered a settlement agreement resolving that claim, pursuant to which, National Refractories represented that it had not transferred that claim or any portion thereof. More than two years then passed before notice was given of the confirmation hearing without any indication whatsoever by MLCP, which had

---

[3]  At the hearing before the Bankruptcy Court, counsel for MLCP was forced to acknowledge that "these are separate claims that we sought money on, and quite frankly, Your Honor, I don't think we have the strongest of argument[s] to tell you here that those aren't claims . . . ." (Tr. of Feb. 25, 2008 Hr'g at 32.)

-8-

actual knowledge of the bankruptcy cases, that it believed it had a claim. MLCP's contention that it is not bound by the Plan and Confirmation Order because KACC gave notice of the confirmation hearing only to National Refractories is meritless. Under these circumstances, it is highly unlikely this Court will conclude that the Bankruptcy Court erred in its ruling on the Motion to Enforce.

Furthermore, even on the issue of the dischargeability of its citizen suit claims, MLCP's arguments are meritless. MLCP's argument is premised almost entirely on Am International v. Datacard Corp., 106 F.3d 1342 (7th Cir. 1997), which MLCP asserts "addressed almost identical facts." (Memorandum of Law at 7.) On the contrary, the facts in Datacard are distinguishable in key respects. The debtor in Datacard continued to operate a tank farm on the subject property, and to contaminate that property, after the plan of reorganization was confirmed: "[d]uring and after the bankruptcy, which was confirmed in September 1984, [the debtor] continued to mix and spill TTE, naphtha, and Blankrola. In May 1985, [the debtor] finally put the lid on its tank farm operations." Datacard, 106 F.3d at 1346. Obviously, environmental liabilities are not dischargeable if the debtor continues to operate and pollute the site after confirmation. In re CMC Heartland Partners, 966 F.2d 1143, 1146 (7th Cir. 1992.)

Moreover, it is obvious here that MLCP is attempting to emphasize its claims for injunctive relief and ignore its damage claims in a misguided effort to circumvent the discharge injunctions. Indeed, MLCP cannot possibly claim that it has no alternative for monetary damages given that MLCP has already sought damages as an alternative in its Amended Complaint. As counsel for MLCP explained it to the Bankruptcy Court: "[w]hat I've done is, I've chosen my remedy" and "we don't want to have a damage claim because what that would mean is, we've got to spend all the money, and then we've got to pursue a claim against the

debtor." (Tr. of Feb. 25, 2008 Hr'g at 36.)  The Bankruptcy Court correctly recognized that this proves the point that MLCP "can indeed do the cleanup and then sue the debtor for damages." (Id. at 31.)

MLCP has little, if any, chance of success on appeal.

## III.    MLCP Will Not Suffer Irreparable Harm if Its Request to Proceed With Discovery Is Denied

MLCP asserts that it will suffer irreparable harm if its request to proceed with discovery is denied because the remediation of the Moss Landing Property "cannot proceed effectively" until the Reorganized Debtors provide certain unspecified "crucial information" concerning past activities at the Moss Landing Property. (Memorandum of Law at 9.)  MLCP then asserts that "[t]he only way to obtain this crucial information is through discovery," and "[t]here is no question that any delay in this process irreparably injures [MLCP] as it impairs its ability to understand this ongoing and dangerous condition . . . ." (Id.)  Tellingly, MLCP offers no support for this contention, nor does it even attempt to describe what possible "crucial information" the Reorganized Debtors could possess.  For that reason alone, MLCP has clearly failed to meet its burden on this factor.  See Enron Corp. v. J.P. Morgan Securities, Inc. (In re Enron Corp.), Nos. 03-92677, 03-92682, 2006 WL 2400411, at *2 (Bankr. S.D.N.Y. May 10, 2006) (stating, in connection with irreparable-harm factor, that Bankruptcy Rule 8005 requires evidence, "and not simply allegations, in order to justify upsetting the normal processes of the courts").

The fact is that MLCP will suffer no harm at all if the Emergency Stay Motion is denied.  The Reorganized Debtors have not owned or conducted operations on the Moss Landing Property for nearly 25 years.  It is simply unfathomable that they could be in possession of any information "crucial" for the immediate remediation of the Moss Landing Property.  Moreover,

all pertinent pre-1984 information regarding the Moss Landing Property, including the

environmental conditions on the property, was given to National Refractories when it acquired

the property in 1984, and National Refractories, under its sale agreement with MLCP, was

required to provide MLCP all material documentation relating to the property, including all

material correspondence between National Refractories and the Reorganizing Debtors regarding

maintenance of the landfills as well as the environmental assessment and sampling reports

referenced in the sale agreement. (Mot. to Enforce, Exhibit F at 5-6.) And as the Reorganizing

Debtors explained in the Motion to Enforce, upon acquiring the property, MLCP also hired Sam

Bose, who had been overseeing environmental compliance at the property, for the Reorganizing

Debtors and then for National Refractories, since 1979. (Mot. to Enforce at 15.) Since 1984, as

reflected in the sale agreement between National Refractories and MLCP and in MLCP's

pleadings, both National Refractories and MLCP have engaged in extensive testing at the site

and have developed voluminous information about the nature and extent of the contamination at

the Moss Landing Property. The information needed for future remediation of the site is

information regarding current site conditions — information that is discoverable by a current site

investigation and sampling, not discovery of pre-1984 files.

   MLCP's argument that it needs discovery pending its appeal in order to proceed

with remediation is also not credible in view of its other arguments. As MLCP's counsel

essentially acknowledged (Tr. of Feb. 25, 2008 Hr'g at 36), proceeding with remediation would

only defeat MLCP's argument that it can avoid the discharge because it is only seeking injunctive

relief. If MLCP in fact intends to proceed with remediation, its appeal has absolutely no merit

and should be summarily dismissed.

-11-

Moreover, even if documents in the Reorganized Debtors' possession were somehow relevant to the remediation of the Moss Landing Property and action at the site is necessary and will proceed now, discovery would still be unnecessary. The terms of the Consent Decree require the Reorganized Debtors to comply with document requests from government agencies. (Consent Decree at 34.) If government agencies are "demanding action now," as MLCP asserts,[4] these agencies can directly request the information they need from the Reorganized Debtors.

## IV.   The Reorganized Debtors Will Suffer Injury If the Emergency Motion Is Granted

MLCP asserts that the Reorganized Debtors will not be harmed if the Emergency Motion is granted and discovery is permitted because the Reorganized Debtors will ultimately have to comply with the same discovery anyway. (Memorandum of Law at 10.) MLCP theorizes that, even if its appeal is unsuccessful, the same discovery would be necessary in any proceeding to estimate MLCP's claim in the Reorganized Debtors' bankruptcy cases.

MLCP, however, never filed a claim in the Reorganized Debtors' bankruptcy cases. Nor has MLCP filed any motion for leave to file a late proof of claim. And even if MLCP files such a motion at this late date, it is unlikely that it will be granted. MLCP will have the burden to show that its failure to file a proof of claim was the result of excusable neglect, even though MLCP knew about the environmental conditions when it purchased the property and has known for several years about the bankruptcy. And even in the unlikely event that

---

[4]     MLCP has provided no evidence — in its response to the Motion to Enforce, at the hearing on the Motion to Enforce, in its emergency motion for a stay before the Bankruptcy Court, in its reply to the Reorganized Debtors' objection to the emergency motion for stay, at the hearing on the emergency motion for stay in the Bankruptcy Court, or in its emergency motion for a stay in this Court — that any governmental agencies are demanding action to remediate the Moss Landing Property.

-12-

MLCP is permitted to file a late claim, the estimation of that claim would not require the same sort of discovery as the Reorganized Debtors would be subjected to in the California Action.

The Reorganized Debtors will be harmed if the Emergency Stay Motion is granted and the Reorganized Debtors are forced to spend time and money complying with whatever discovery MLCP may determine to seek in the California Action, especially when it is highly uncertain at this point whether MLCP will ever be permitted to proceed with the suit or any claim. In addition, the mere continuation of the California Action without discovery will impose continuing costs on the Reorganized Debtors. Just last month, the Reorganized Debtors were forced to incur attorneys' fees to appear at a case management conference in the Northern District of California, and a further status conference is scheduled in another month.

## V.    There Is No Public Interest That Will Be Served By Granting the Emergency Stay Motion

MLCP argues that the public interest would be served by granting the Emergency Stay Motion because it "is essential to begin with discovery so that the extent and danger of the contamination on the property is determined." (Memorandum of Law at 10.) According to MLCP, the issue is about "enforcement of laws to protect drinking water and threatened environments" and discovery in the California Action "is crucial in remediating Kaiser's contamination at Moss Landing." (Id.) As explained above, it is inconceivable that the Reorganized Debtors have information in 25-year old files that is somehow "crucial" to the ability to address whatever conditions currently exist at the site. Contrary to MLCP's unsupported assertions, this is a purely private dispute. The public has no interest in whether MLCP is ultimately able to require the Reorganized Debtors to foot the bill for remediating environmental conditions at the Moss Landing Property of which MLCP was well aware at the time it purchased the property.

-13-

## CONCLUSION

For all the foregoing reasons, the Court should summarily deny the Emergency

Stay Motion.

Dated:  April 24, 2008                       Respectfully submitted,
        Wilmington, Delaware

                                     */s/ Jason M. Madron* _____
                                     Daniel J. DeFranceschi (DE 2732)
                                     Jason M. Madron (DE 4431)
                                     RICHARDS, LAYTON & FINGER, P.A.
                                     One Rodney Square
                                     P.O. Box 551
                                     Wilmington, Delaware 19899
                                     Telephone:  (302) 651-7700
                                     Facsimile:  (302) 651-7701

                                       -and-

                                     Gregory M. Gordon (TX 08435300)
                                     Daniel P. Winikka (TX 00794873)
                                     JONES DAY
                                     2727 North Harwood Street
                                     Dallas, Texas  75201
                                     Telephone:  (214) 220-3939
                                     Facsimile:  (214) 969-5100

                                     ATTORNEYS FOR REORGANIZED DEBTORS

**EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | : **Jointly Administered** |
| **KAISER ALUMINUM CORPORATION,** | : **Case No. 02-10429 (JKF)** |
| a Delaware corporation, <u>et al.</u>, | : |
| | : **Chapter 11** |
| Debtors. | : |
| | : |
| | : |
| **KAISER ALUMINUM CORPORATION,** | : |
| <u>et al.</u>, | : |
| | : |
| Movants, | : |
| | : |
| v. | : |
| | : |
| **MOSS LANDING COMMERCIAL** | : |
| **PARK LLC,** | : |
| | : |
| Respondent. | : |

**DECLARATION OF JOHN M. DONNAN IN SUPPORT OF MOTION OF
REORGANIZED DEBTORS TO (A) ENFORCE INJUNCTIONS ISSUED IN
CONNECTION WITH THE SECOND AMENDED JOINT PLAN OF
REORGANIZATION AND (B) COMPEL MOSS LANDING COMMERCIAL PARK
LLC TO DISMISS WITH PREJUDICE ITS LAWSUIT AGAINST KAISER ALUMINUM
CORPORATION AND KAISER ALUMINUM & CHEMICAL CORPORATION**

JOHN M. DONNAN, declares and states, on personal knowledge:

1. I have been employed by Kaiser Aluminum Corporation ("KAC") and

Kaiser Aluminum & Chemical Corporation LLC, successor in interest to Kaiser Aluminum &

Chemical Corporation ("KACC") since 1993. During my employment, I served as Corporate

Counsel from 1993 to 2000, Assistant General Counsel from 2000 to 2002, Deputy General

Counsel from 2002 to 2005, Vice President, Secretary and General Counsel from January 2005

through November 2007, and in December 2007 I assumed my current positions as Senior Vice

President, General Counsel and Secretary

2.    I submit this declaration in support of the Motion of Reorganized Debtors to (A) Enforce Injunctions Issued in Connection with the Second Amended Joint Plan Of Reorganization and (B) Compel Moss Landing Commercial Park LLC to Dismiss with Prejudice its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical Corporation. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or my review of the relevant documents. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3.    In conjunction with the operation of its refractories business, from 1942 to 1984 KACC operated a magnesium and refractory brick facility on an approximately 188-acre parcel of land located in Moss Landing, Monterrey County, California (the "Moss Landing Property"). While in operation, the Moss Landing Property produced basic refractory brick and gum mixes, ramming mixes and mortars, chemical grade magnesium, magnesia, magnastite periclase and magnesium hydroxide.

4.    In 1984, KACC made the strategic decision to sell its refractories business, and on December 31, 1984, KACC, KACoCL and KAPI entered into an Asset Purchase Agreement (as amended, the "1984 Asset Purchase Agreement") with National Refractories & Minerals Corporation ("National Refractories"), National Refractories Holding Co ("Holdings") and National Refractories & Minerals, Inc (f/k/a 601725 Ontario Ltd ) (collectively, the "National Entities"), pursuant to which KACC, KACoCL and KAPI agreed to sell, and the National Entities agreed to purchase, certain real and personal property located in the United States, Canada and Mexico related to KACC's refractory business, including the Moss Landing Property. Pursuant to the 1984 Asset Purchase Agreement, the base purchase price for the refractory assets was $68 million. Financing of the purchase price was made via (a) a $44

million note issued under a separate loan agreement between KACC and National Refractories and guaranteed by Holdings pursuant to a guaranty and pledge agreement, (b) a $4 million subordinated note payable to KACC and (c) $20 million in National Refractories cumulative preferred stock [1]

### *The Agreement on Environmental Compliance*

5.    In conjunction with the 1984 Asset Purchase Agreement, on December 31, 1984, the parties also executed the Agreement on Environmental Compliance (the "Environmental Agreement"), which allocated responsibility among the parties for any liability imposed by federal, state or local law for any environmental conditions relating to the properties that were sold. Pursuant to the Environmental Agreement, KACC retained certain potential environmental liabilities arising from the operation of the facilities prior to the sale, with National Refractories being liable for all environmental liabilities caused by operations after the sale. Additionally, National Refractories assumed certain maintenance obligations, including certain obligations with respect to the Moss Landing Property  Specifically, National Refractories agreed to the following with respect to the Moss Landing Property:

---

[1]    In April 1985, the National Entities entered into a credit agreement with Congress Financial Corporation ("Congress"), and KACC, National Refractories and Congress entered into an Intercreditor and Subordination Agreement (as amended, the "Subordination Agreement"), pursuant to which, among other things, KACC agreed to subordinate its indebtedness against the National Entities to that of Congress. Additionally, KACC and National Refractories executed a Subordinated Note, dated April 30, 1985, for the original principal amount of $8,000,000 (the "Subordinated Note")  In September 1990, the parties entered into a Standby Revolving Credit and Security Agreement and Guaranty (the "Guaranty"), pursuant to which National Refractories issued KACC a Standby Revolving Credit Note in the original amount of $2,500,000 (the "Standby Note")  Additionally, in May 1999, KACC, National Refractories and Holding entered into an agreement whereby KACC's approved National Refractories' acquisition of CFB Industries, Inc. and the incurrence of additional indebtedness to Congress. In conjunction therewith, KACC, National Refractories and Congress entered into an Amended and Restated Intercreditor and Subordination Agreement.

(a) to maintain the existing closed brick plant waste dumps including the Dolan Road embankment .

(b) to reroute storm drains around the dump and to close off the present drain; and

(c) to maintain the leachate collection system and continue to process leachate as presently processed for so long as a hazardous waste processing permit is not required for this process

(Environmental Agreement § 3 1 )

6        In addition, in conjunction with the 1984 Asset Purchase Agreement, the Environmental Agreement provided for the transfer of all permits necessary for National Refractories to conduct the refractories business. A list of permits transferred from KACC to National Refractories was included as Exhibit A to the Environmental Agreement and specifically listed, with respect to the Moss Landing Property, National Pollutant Discharge Elimination System ("NPDES") Permit No. CA-00007005 issued by the Central Coast Regional WQCB on May 2, 1980.

### *The Put/Call Agreement*

7.        Following several years of operating the Moss Landing Property, National Refractories ceased operations there and began marketing the property for sale. Despite entering into negotiations with numerous parties, National was unable to complete the sale of the Moss Landing Property  National Refractories' financial position thereafter deteriorated, and in September 2001, National Refractories and KACC began to discuss the possible sale of the Moss Landing Property to KACC as a means of providing National Refractories with a source of liquidity and KACC with, among other things, the ability to exercise greater control over the property and its future use in a way that would minimize, if not eliminate, any potential environmental issues and maximize the value of the property to potential purchasers

8.    As a result of these discussions, KACC and National Refractories entered into a Put/Call Agreement, effective as of September 13, 2001 (the "Put/Call Agreement"), pursuant to which: (a) KACC granted National Refractories the option (the "Put Option") to require KACC to purchase the Moss Landing Property and (b) National Refractories granted KACC the option to purchase the Moss Landing Property (the "Call Option")  The purchase price for the Moss Landing Property under the Put Option and the Call Option was $5,000,000 (Put/Call Agreement § 5(a) )  The Put/Call Agreement required that proceeds from the purchase price be applied to certain indebtedness owed by National Refractories to Congress  (Id. at § 5(b) )  Pursuant to the first and second amendments to the Put/Call Agreement, the parties extended the deadline for the Put Option to April 15, 2002, and for the Call Option to June 17, 2002  (Amendments § 1 )

### The National Entities Bankruptcy Cases

9.    On October 10, 2001, the National Entities each commenced reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "National Cases") in the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "California Bankruptcy Court")

10.    On November 15, 2001, National Refractories filed a motion to assume the Put/Call Agreement, which was approved by the California Bankruptcy Court on or about March 19, 2002.  On April 5, 2002, National Refractories sent KACC notice that National Refractories was exercising the Put Option, thereby requiring KACC to purchase the Moss Landing Property.  On April 3, 2002, however, KACC had filed a motion in this Court to reject the Put/Call Agreement (D I  327), and on June 26, 2002, this Court entered an order granting the motion (D I  695)

11.    On April 17, 2003, National Refractories filed proof of claim number 1256 in the KACC chapter 11 case, in an unliquidated amount asserting claims for (a) breach of the Put/Call Agreement, (b) breach of the indemnity provisions of the Asset Purchase Agreement and the Environmental Agreement, (c) environmental costs associated with the Oakville property located in Canada, which was sold to National Refractories under the 1984 Asset Purchase Agreement, and (d) contingent environmental claims associated with the potential remediation of other properties transferred pursuant to the Asset Purchase Agreement, including the Moss Landing Property

12.    Likewise, KACC filed a proof of claim in the National Refractories chapter 11 case in the amount of $11,775,000 plus attorneys' fees, costs, and interest, comprised of (a) principal of $4,275,000 and interest from May 6, 1999 due under the Subordinated Note; (b) principal of $2.5 million and interest from May 6, 1999 due under the Standby Note; (c) amounts arising from various contractual obligations and indemnities pursuant to the Asset Purchase Agreement, the Environmental Agreement, the May 6, 1999 agreement, the Put/Call Agreement, and the Guaranty; and (d) claims pursuant to the Solid Waste Disposal Act, the Clean Water Act ("CWA"), CERCLA and related state environmental laws and regulations

### *Multi-Site Consent Decree*

13.    On or about August 18, 2003, the Debtors entered into a multi-site consent decree (the "Consent Decree") with the United States of America (on behalf of the United States Environmental Protection Agency (the "United States EPA"), the United States Department of Interior and the National Oceanic and Atmospheric Administration), the states of California (on behalf of the California Department of Toxic Substances Control and the California Department of Fish and Game), Rhode Island and Washington, and the Puyallup Tribe of Indians (collectively, the "Settling Parties")

14    The Consent Decree settled more than $727 million of environmental claims and established procedures for the resolution of the Debtors' environmental liabilities arising from prepetition operations, such as those at the Moss Landing Property. The Consent Decree categorizes each site from which the Debtors' environmental liabilities arose, or could arise in the future, as either a Liquidated Site, a Discharged Site, a Debtor-Owned Site, a Reserved Site or an Additional Site (as each such term is defined in the Consent Decree) The Consent Decree lists and identifies by name 66 Liquidated Sites, 18 Discharged Sites and 6 Reserved Sites  (Id. at ¶¶ 1 G , 1 M , 1 T )  Debtor-Owned Sites are defined in the Consent Decree as sites that are owned by the Debtors at or any time after the confirmation of a plan of reorganization that includes KACC, excluding Reserved Sites. (Id. at ¶ 1 F.)  Finally, Additional Sites is defined to include all sites and properties, including all facilities as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), other than a Liquidated Site, a Discharged Site, a Debtor-Owned Site or a Reserved Sites  (Id. at ¶ 1 A )  Because the Moss Landing Property is not a Debtor-Owned Site and is not listed in the Consent Decree as a Liquidated Site, a Discharged Site or a Reserved Site, the Moss Landing Property is an Additional Site under the terms of the Consent Decree

15.    Of particular significance, the Consent Decree provides that all environmental liabilities and obligations to the Settling Parties with respect to the Additional Sites would be discharged by confirmation of the Plan:

> With respect to all Additional Sites, all liabilities and obligations of the Debtors to the Settling Federal Agencies and the States under Sections 106 and 107 of CERCLA, 42 U S C §§ 9606 and 9607, Section 7003 of RCRA, 42 U S C. § 6973, and Similar State Laws arising from Prepetition acts, omissions or conduct of the Debtors or their predecessors, including without limitation the Prepetition generation, transportation, disposal or release of hazardous substances, wastes or materials or dangerous wastes or

> the Prepetition ownership or operation of hazardous waste or
> hazardous substance sites and/or facilities and state counterparts,
> shall be discharged under Section 1141 of the Bankruptcy Code by
> the confirmation of a Plan of Reorganization .

(Id. at ¶ 7).

16.    The Consent Decree further provides that the Settling Parties will receive

no distributions with respect to environmental liabilities associated with the Additional Sites, but

may, in the ordinary course of conducting agency enforcement activities in the future, seek a

determination of KACC's liability with respect to Additional Sites. (Id.) If KACC is determined

to be liable, KACC's liability with respect to an Additional Site will be the same as it would have

been had the liability for the Additional Site been liquidated in the chapter 11 cases and treated

as an allowed general unsecured claim under the Plan (i e , KACC's liability will be satisfied by

making a payment equivalent to what the distribution on such a claim would have been). (Id.)

17    Moreover, the Consent Decree specifically provides that the Settling

Parties will not issue a unilateral order or seek an injunction with respect to the Additional Sites

against the Debtors under Section 106 of CERCLA, 42 U S C. § 9606, Section 7006 of the

Resource Conservation Recovery Act ("RCRA"), 42 U S C. § 6973, or any similar state laws

arising from the prepetition acts, omissions or conduct of the Debtors or their predecessors with

respect to any Additional Sites  (Id. at ¶¶ 7-9.) In addition, in any action or proceeding with

respect to an Additional Site, the parties reserved all rights, claims and defenses they would have

been entitled to assert had the claim been liquidated in the ordinary course or during the course

of the chapter 11 proceedings and also agreed to attempt to negotiate fair and equitable terms in

settlement of any claims relating to Additional Sites  (Id. at ¶¶ 7-9 )

18    On August 22, 2003, the Debtors filed a motion seeking approval of the

Consent Decree, which was served on the National Entities  On August 27, 2003, the United

States published notice of the proposed Consent Decree in the Federal Register at 68 Fed. Reg. 51596 (Aug. 27, 2003). The United States received five public comments during the thirty-day public comment period. On October 27, 2003, the Court entered an order approving the Consent Decree (D.I. 3102) During the 60-day period that the Consent Decree was pending in this Court and subject to public comment, Nader Agha, who formed MLCP to acquire the Moss Landing Property, was completing due diligence and negotiating with National to purchase the Moss Landing Property.

### *Sale of Moss Landing Property to MLCP*

19.     On October 6, 2003 National Refractories entered into an Agreement of Purchase and Sale (as amended, the "APS") for the Moss Landing Property with Nader Agha, who subsequently formed MLCP to take title to the property. The APS granted Nader Agha 55 days from September 18, 2003 to conduct due diligence on the property. On October 14, 2003, National Refractories filed the Sale Motion, which the California Bankruptcy Court granted on November 3, 2003. No other party expressed interest in the property. Accordingly, on December 1, 2003, the California Bankruptcy Court entered an order approving the sale of the Moss Landing Properties, free and clear of liens and encumbrances, to Nader Agha for $7,500,000. The sale of the property closed and MLCP took title in December 2003.

20.     The APS required MLCP to agree that prior to the closing MLCP would have read a May 2001 TRC Phase I environmental assessment report (the "2001 Environmental Assessment") and a November 2002 Phase II soil and groundwater sampling report (the "2002 Sampling Report") prepared by Pacific Crest Engineering as well as a 1997 PES closure report. Additionally, the APS explicitly states that "all matters in those assessments and that report are deemed to have been disclosed to Buyer." (APS § 17 a xv.)

21.    The APS also notes that an underground storage tank ("UST 6") had been removed, which was listed in the 2001 Environmental Assessment, and that there was ongoing monitoring of the UST 6 site. (Id.) Pursuant to the APS, MLCP agreed "to pay the entire cost of any and all monitoring and remediation concerning UST 6." (Id.) Additionally, the APS required MLCP's acknowledgment that:

> [W]hile KACC removed visible asbestos in 1979-1980, there still may be asbestos on the Real Property; that the four known underground storage tanks were removed from the Real Property while Seller has owned it, and of these Seller has "no further action required" letters on three of these tanks from the Monterey County Department of Health, while the site of the fourth tank – which was behind the brick plant – is still being remediated; there is a tank on a pad in a pit containing approximately 8,000 gallons of material, including crankcase oil, on the Real Property

(Id. at § 17.a.xix (5) )

22.    The APS also required National Refractories to provide Nader Agha/MLCP with all material correspondence between KACC and National Refractories regarding maintenance of the landfills on the Moss Landing Property (Id. at § 5.a.viii.) Moreover, the APS lists the Environmental Agreement as an assigned contract but required Nader Agha's acknowledgment that "KACC is in its own Chapter 11 bankruptcy proceedings and may reject any such agreements as burdensome executory contracts "[2] (Id. at § 5.a viii.) The APS also provides that MLCP will perform all obligations of the National Entities under the Environmental Agreement with respect to the Moss Landing Property and specifically imposes an obligation on MLCP to avoid "taking any actions, including but not limited to actions regarding the Landfills on the Property, that would trigger or increase KACC's and/or Seller's liability ." (Id. at § 41 c )

---

[2]    Pursuant to Section 6 3 of the Plan, KACC rejected the Environmental Agreement on the Effective Date

23    Moreover, upon closing of the sale, MLCP hired Sam Bose to oversee the
demolition of the refractory plant and the environmental remediation that MLCP initiated
immediately after the sale closed. Mr. Bose worked for KACC from 1979 to 1984 and served as
its environmental manager ensuring environmental compliance at KACC facilities, including the
Moss Landing Property.

### Settlement Agreement Among KACC and the National Entities

24    On or about March 30, 2004, to avoid the expense and uncertainty of
litigation and the concomitant delay in the administration of their respective chapter 11 cases,
KACC and the National Entities entered into a Settlement Agreement (the "Settlement
Agreement") to resolve their respective proofs of claim and related issues. Both National
Refractories and KACC filed motions to approve the Settlement Agreement in their respective
bankruptcy cases. MLCP did not file an objection to the Settlement Agreement and the
California Bankruptcy Court entered an order approving the Settlement Agreement on April 19,
2004. This Court entered an order approving the Settlement Agreement on May 17, 2004.

25.    Pursuant to the terms of the Settlement Agreement (a) KACC agreed to
allow the National Entities a set-off in the amount of $475,000, which amount was set-off from
$1,725,000 held by the National Entities as proceeds from the sale of the Moss Landing Property
to MLCP, (b) the National Entities paid KACC the remaining proceeds of $1,250,000, (c) KACC
withdrew, with prejudice, all proofs of claim it filed in the National Cases, (d) the National
Entities withdrew, with prejudice, all proofs of claim they filed in these cases, and (e) Congress
withdrew, with prejudice, all proofs of claim it filed in these cases. Additionally, KACC
released Congress and each of the National Entities with respect to any and all claims arising
prior to the execution of the Settlement Agreement, and Congress and the National Entities
released each of the Reorganized Debtors from any and all claims arising to the execution of the

Settlement Agreement, the intent being to "release completely, absolutely and finally the Kaiser Entities. from all liability of whatsoever kind or nature, past, present and future, without regard to the nature and/or extent of the injuries . . and/or damage "

### *MLCP's Complaint and Amended Complaint for Damages and Injunctive Relief*

26.    On November 30, 2007, MLCP served KAC and KACC, as well as the United States EPA and certain California environmental agencies, with a notice (the "Notice") that it intended to file suit against KAC and KACC under certain federal and state environmental statutes as well as the Environmental Agreement, seeking to compel KAC and KACC to pay costs MLCP has incurred and will incur relating to the environmental conditions at the Moss Landing Property, to pay civil penalties and to undertake remediation activities necessary to address the environmental conditions at the Moss Landing Property. MLCP alleged in the Notice that KAC and KACC created two landfills on the property between 1946 and 1981, which are releasing pollutants and contaminants, and that KAC and KACC have "been on notice of the potential threat of the dumps to the environmental since 1978 when a release of chromium contaminated leachate occurred from one of the dumps." (Notice at 4 ) MLCP further alleged that the two landfills "have been and are partially surrounded by ditches and culverts that carry toxic pollutants into the environment" that "none of the output of these pipes, ditches or culverts is captured or treated" and that discharges and releases from these landfills "have been occurring since at least 1980 " (Id at 4-5 )

27.    Also on November 30, 2007, MLCP filed a Complaint for Damages and Injunctive Relief in the United States District Court for the Northern District of California, and thereafter, on December 5, 2007, MLCP filed its First Amended Complaint for Damages and Injunctive Relief with the United States District Court for the Northern District of California (the "Amended Complaint"), asserting claims against KACC in respect of the environmental

conditions at the Moss Landing Property. The Amended Complaint seeks equitable relief, civil penalties, monetary damages and attorneys' fees and asserts ten separate claims for relief under a variety of federal, state and common law theories of liability as well as under the Environmental Agreement. These claims for relief include: (a) failure to apply for a NPDES permit under the CWA; (b) discharge of pollutants into waters of the United States without a permit in violation of the CWA; (c) creation of an imminent and substantial endangerment to the environment in violation of RCRA; (d) continuing public nuisance and public nuisance per se; (e) continuing private nuisance and private nuisance per se; (f) negligence per se; (g) declaratory relief determining that KACC is required to remediate the environmental conditions and compensate MLCP for its past costs, damages and losses; (h) equitable indemnification and contribution for "all liabilities, claims, damages, costs, and expenses"; (i) injunctive relief under the California Civil Code requiring KACC to remediate the environmental conditions; and (j) breach of the Environmental Agreement. (Am. Compl. ¶¶ 27-115.)

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 27, 2007

John M. Donnan

**EXHIBIT B**

Westlaw.

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2004 WL 253477 (D Del )
(Cite as: Not Reported in F Supp 2d)

Page 1

▷In re Polaroid Corp
D Del ,2004
Only the Westlaw citation is currently available
United States District Court,D Delaware
In re: POLAROID CORPORATION, et al , Debtors
Stephen J MORGAN, Appellant,
v
POLAROID CORPORATION, et al , Appellees
No. Civ.A. 02-1353 JJF, 01-10864 PJW.

Feb 9, 2004

Stephen J Morgan, Appellant, pro se
Gregg M. Galardi, Mark L. Desgrosseilliers, of
Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, Delaware, Eric W. Kaup, of Skadden,
Arps, Slate, Meagher & Flom LLP, Chicago, Illinois,
for Debtors and Debtors-in-Possession, Appellees, of
counsel
Joseph Malfitano, of Young Conaway Stargatt &
Taylor LL P, Wilmington, Delaware, Nava Hazan, of
Akin Gump Strauss Hauer & Feld, LLP, New York,
New York, Co-Counsel to the Plan Administrator, of
counsel

*MEMORANDUM OPINION*

FARNAN, J
*1 Presently before the Court is the "Emergency"
Motion For Stay Pending Appeal filed by Appellant
Stephen J Morgan (D I 3 I ) For the reasons
discussed below, the Court will deny Appellant's
request for a stay pending appeal

BACKGROUND

The instant action is a bankruptcy appeal arising from
the voluntary bankruptcy filing by Polaroid
Corporation and certain of its subsidiaries and
affiliates (collectively the "Debtors") in October of
2001 By his Motion, the Appellant requests the
Court to stay the implementation of the Debtors' plan
for reorganization The Bankruptcy Court denied an
identical request for a stay by Appellant on
December 16, 2003

I Parties' Contentions

The Appellant contends that the Court should stay the
implementation of the reorganization plan because it
is not in the best interest of Polaroid shareholders
The Appellant alleges that the auction of Polaroid's
assets was fraudulent and that the value of Polaroid's
assets far exceeded their sale price Further, the
Appellant contends that his appeal is likely to be
successful because there remain unanswered
questions about value and damaged shareholder and
bondholder interests The Appellant contends that if
the Court denies his request for stay, he and other
shareholders will be deprived of their right to appeal
and their financial stakes in Polaroid The Appellant
also contends that a stay is in the public interest,
because in light of recent corporate scandals, a
resolution of the instant appeal is required

In response, the Appellee contends that the Court
should deny Appellant's request for an emergency
stay because he has not satisfied the standards for
entitlement to a stay pending appeal Further, the
Appellee contends that the Appellant's request is
equitably moot The Appellee also contends that
Appellant failed to properly serve it and its counsel as
required by the Federal Rules of Civil Procedure

DISCUSSION

Federal Bankruptcy Rule 8005 enables a reviewing
court to issue a stay pending appeal from a judgment,
order, or decree of a bankruptcy judge Courts
interpreting Federal Bankruptcy Rule 8005 have
established a four prong test for an appellant to obtain
a stay: 1) a strong likelihood of success on the merits
of the appeal; 2) the movant will suffer irreparable
harm if the stay is denied; 3) substantial harm will
not be suffered to non-moving parties if the stay is
granted; and 4) issuance of the stay will not harm the
public interest *In re 421 Willow Corp.,* 2003 WL
22318022 at *3 (E.D.Pa. Oct. 9, 2003) If a party fails
to establish one of the four prongs, a court may deny
the requested stay *In re ANC Rental Corp.,* 2002 WL
1058196 at *2 (D.Del. May 22, 2002) (citing *In re
Blackwell,* 162 B.R. 117, 120 (E.D.Pa.1993))
Because the Court concludes that Appellant has not
established a likelihood of success on the merits, the
Court will deny the request for stay pending appeal

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2004 WL 253477 (D Del )
(Cite as: Not Reported in F Supp 2d)

Likelihood of success on the merits means that a movant has a " 'substantial case,' or a strong case on appeal "*In re The Columbia Gas Sys , Inc ,* 1992 U S Dist LEXIS 3253 at *4 (D Del March 10, 1992) (quoting *In re Public Serv. Co. of N.H.,* 116 BR 347, 349 (Bankr.D.N.H.1990) Appellant contends that "unanswered questions about value once answered will favor the appeal "(D I 31 at 3 ) However, in the instant motion the Appellant does not identify for the Court any order, decree, or judgment by the Bankruptcy Court that was erroneous, and thus, potentially reversible on appeal Moreover, Appellant has not identified any potentially incorrect factual finding or legal conclusion reached by the Bankruptcy Court

*2 Absent specific challenges to actions taken by the Bankruptcy Court, the Court must conclude that Appellant has not demonstrated a strong likelihood of success on the merits The Court will not speculate as to what errors, if any, were committed by the Bankruptcy Court Therefore, because the Court concludes that Appellant has failed to establish the first prong of the test for entitlement to a stay, the Court will deny Appellant's Motion [FN1]

> FN1. Based on this conclusion, the Court will not address Appellee's remaining bases for denial

An appropriate Order will be entered

### ORDER

At Wilmington, this 9th day of February, 2004, for the reasons discussed in the Memorandum Opinion issued this date;

NOW THEREFORE, IT IS HEREBY ORDERED that the "Emergency" Motion For Stay Pending Appeal filed by Appellant Stephen J Morgan (D I 31) is *DENIED*

D Del ,2004
In re Polaroid Corp
Not Reported in F Supp 2d, 2004 WL 253477 (D Del )

END OF DOCUMENT

© 2008 Thomson/West No Claim to Orig U S Govt Works

Westlaw.

Not Reported in B R
Not Reported in B R , 2001 WL 1820325 (Bkrtcy D Del )
(Cite as: Not Reported in B.R.)

**H**In Re Trans World Airlines, Inc
Bkrtcy D Del ,2001
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D Delaware.
TRANS WORLD AIRLINES, INC
No. 01-0056(PJW).

March 27, 2001

Gwendolyn Young Reams, James N. Finney, Gerald D Letwin, Equal Employment Opportunity Commission, Washington, D C, Counsel for Equal Employment Opportunity Commission
Stuart Schiffer, Carl Schnee, Ellen W. Slights, United States Attorneys Office, Wilmington, J. Christopher Kohn, Tracy J. Whitaker, Ruth A. Harvey, Margaret Newell, Lacey R. Harwell, Jr., United States Attorneys Office, Washington, D C Counsel for United States of America
Laura Davis Jones, Bruce Grohsgal, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, Alexander Dimitrief, P C, James H.M. Sprayregen, Kirkland & Ellis, Chicago, IL, Counsel for the Debtors Trans World Airlines, Inc
Mark D. Collins, Michael Merchant, Richards, Layton & Finger, Wilmington, Alan B. Miller, Richard A. Rothman, Greg A. Danilow, Weil, Gotshal & Manges LLP, New York, NY, Counsel for AMR Corp , AMR Finance, Inc and American Airlines, Inc
WALSH, Bankruptcy J
*1 Dear Counsel:

This is my ruling on the Emergency Motion of the United States of America and Equal Employment Opportunity Commission for Stay Pending Appeal (Doc # 971) and brief in support (Doc # 972) ("Stay Brief") of the Court's March 12, 2001 order granting the motion of Transworld Airlines, Inc ("TWA" or "Debtor") for sale of substantially all of its assets to AMR Corporation ("American") The Debtor and American have filed a joint response (Doc # 1024)("Response") For the reasons set forth below, I will deny the stay motion

TWA filed its chapter 11 case on January 10, 2001 This is TWA's third chapter 11 filing in ten years Before filing, TWA and American entered into an asset purchase agreement under which TWA agreed to sell substantially all of its assets to American On January 10, 2001, TWA filed a § 363 [FN1] motion for an order authorizing the sale of substantially all of its assets ("Sale Motion") to American outside the ordinary course of business and prior to filing a plan of reorganization Even without the asset purchase agreement with American, TWA intended to file its bankruptcy petition in early January, 2001 Transcript [FN2] (vol I) at 380

> FN1. Unless otherwise indicated, all references to " § ____ " are to a section of the Bankruptcy Code, 11 U.S.C. § 101*et seq*

> FN2. "Transcript" refers to the transcripts of the March 9, 10 and 12, 2001 hearings

On March 9, 10 and 12, 2001, I held an evidentiary hearing on the Sale Motion ("Sale Hearing")and a related contract rejection motion The Equal Employment Opportunity Commission and United States (together the "EEOC") objected to the sale to the extent it permitted TWA to transfer its assets "free and clear" of the EEOC claims

The EEOC asserts two categories of what it characterizes as "successor liability" claims: (1) those arising from a settlement ("Settlement Agreement") of an EEOC lawsuit and a private class action against TWA based on alleged sexual discrimination; and (2) those based on pending prepetition charges filed with the EEOC against TWA [FN3](For convenience of reference I will use the EEOC label of "successor liability" claims) The Settlement Agreement requires TWA to provide ten travel vouchers for covered individuals and provides that the class member or his or her family member may use the vouchers for his or her lifetime ("Travel Voucher Program") Stay Brief at p 3 TWA has issued trip vouchers since the program was initiated in the latter half of 1995 *Id*

> FN3. According to the EEOC, as of March 2, 2001, there were 29 charges of employment discrimination against TWA alleging various violations of federal

Not Reported in B R
Not Reported in B R , 2001 WL 1820325 (Bkrtcy D Del )
(Cite as: Not Reported in B R )

employment discrimination statutes, including Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, and the Age Discrimination in Employment Act of 1967 Stay Brief at pp 3-4

After considering closing arguments on March 12, 2001, I overruled the EEOC's objection based on successor liability and entered an order (Doc # 887)("Sale Order") authorizing the Sale Motion pursuant to §§ 363(f), 105(a) and 106(a)

Section § 363(f) permits a debtor-in-possession to sell property of the estate outside the ordinary course of business
  free and clear of any interest in such property of an entity other than the estate, only if–
(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
*2 (4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest
11 U.S.C. § 363(f)

Section 105(a) provides that The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process
11 U.S.C. § 105(a)

The Sale Order states in relevant part: The sale of the Transferred Assets to Purchaser shall be free and clear of Liens and other claims (other than Liens created by Purchaser) pursuant to section 363(f) of the Bankruptcy Code whatsoever known or unknown including, but not limited to, Liens and claims of any of the Sellers' employees and Purchaser shall not be liable in any way (as a successor to the Debtors or otherwise) for any claims that any of the foregoing or any third party may have against any of the Sellers;

provided that, with regard to employees' claims, the free and clear delivery of the Assets shall include, but not be limited to, all asserted or unasserted, known or unknown, employment related claims and successorship liability accrued up to the date of closing of such sale
Sale Order at p 6, ¶ 4

The Sale Order also contains the following injunctive provision: Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, all Persons are enjoined from taking any action against Purchaser or Purchaser's Affiliates including, without limitation, TWA Airlines LLC, to recover any claim which such Person had solely against Sellers or Sellers' Affiliates
Sale Order at p 8, ¶ 11

On March 12, 2001 the EEOC filed a notice of appeal of the Sale Order (Doc # 890) and on March 15, 2001, it filed the present motion requesting a stay pending appeal Bankruptcy Rule 8005 governs the issue and provides in relevant part:
[n]otwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest [FN4]

> FN4. Fed.R.Bank.P. 7062 incorporates Rule 62 of the Federal Rules of Civil Procedure and lists several specific matters in which the court may issue a stay pending appeal

The granting of a motion for stay pending appeal is discretionary with the court The movant must show that: (1) it will likely succeed on the merits of the appeal; (2) it will suffer irreparable injury if the stay is not granted; (3) a stay would not substantially harm other parties in the litigation; and (4) a stay is in the public interest *Family Kingdom, Inc. v. EMIF New Jersey Ltd P'Ship (In re family Kingdom, Inc.), 225 B.R. 65, 69 (D.N.J.1998); In re Roth American, Inc., 90 B.R. 94, 95 (Bankr.M.D.Pa.1988)* No factor alone is outcome determinative *In re Roth, 90 B.R. at 95* Proper judgment under Rule 8005 "entails a 'delicate balancing of all elements' " *In re Roth, 90 B.R. at 95 quoting In re Hotel Assocs., Inc., 7 B.R. 130, 132*

Not Reported in B R
Not Reported in B R , 2001 WL 1820325 (Bkrtcy D Del )
(Cite as: Not Reported in B.R.)

(Bankr.E.D.Pa.1980)

*3 I find that a balance of the Rule 8005 factors does not favor issuing a stay pending appeal and accordingly, I will deny the stay motion I review each of the Rule 8005 elements in turn

1  Likelihood of Success on the Merits

The EEOC argues it will likely prevail on appeal because neither § 363(f) nor § 105(a) permits the sale by TWA to American of substantially all of TWA's assets free and clear of the EEOC successor liability claims It also raises the doctrine of sovereign immunity as a bar to the enforceability of the Sale Order Finally, the EEOC argues that the Sale Order is procedurally defective in that it impermissibly imposes injunctive relief outside the confines of an adversary proceeding

I am not persuaded by these arguments I previously concluded, and I reaffirm, that "under § 363(f), [TWA's] assets can be transferred free and clear of [successor liability] claims     And I find no basis in the statute for requiring that the purchaser assume those liabilities "Transcript (vol III) at p 816

Section 363(f) authorizes sales free and clear of interests in the property being sold 11 U.S.C. § 363(f); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr.N.D.Ohio 1987)citingH REP NO 595, 95TH CONG , 1ST SESS 345 (1977), U S C C A N 1978, P 5787 Even before the enactment of the Bankruptcy Code in 1978, a court sitting in bankruptcy had the authority to authorize the sale of estate assets free and clear based on its general equitable powers and its duty to distribute the debtor's assets and determine controversies relating thereto White Motor Credit, 75 B.R. at 948citing Van Huffel v. Harkelrode, 284 U.S. 225, 52 S.Ct. 115 (1931) In other words, bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f) Id

The authority to sell free and clear is broad It reflects a compelling policy to encourage bankruptcy sales subject only to claims of a specific and recognized nature in the subject property E g , Rubinstein v Alaska Pac Consortium (In re New England Fish Co.), 19 B.R. 323, 329 (Bankr.W.D.Wash.1982)

In this regard, I find the facts and reasoning of New England Fish Co persuasive In that case, the debtor, a major fish processing company with extensive facilities in Alaska, faced a management and financial crisis which forced it to cease operations New England Fish Co., 19 B.R. at 325 It filed a chapter 11 petition which converted to a chapter 7 liquidation less than a month later Id The trustee for the debtor's estate entered into an asset purchase agreement with a buyer under which the trustee agreed to sell the debtor's assets Id With a new fishing season rapidly approaching, the Governor for the State of Alaska testified that operation of the debtor's facilities for the season was critical for the economy and that a sale of the debtor's assets was urgent Id

*4 Prior to filing bankruptcy, the debtor was subject to two class action civil rights suits brought by its employees New England Fish Co., 19 B.R. at 324 In one suit, the district court found that the debtor had discriminated based on race in the allocation of jobs and in housing its employees Id The asset purchase agreement obligated the trustee to sell the debtor's assets free and clear of the $15,156,371 civil rights claims New England Fish Co., 19 B.R. at 325

The claimants objected to the sale based on the successor liability of the buyer, claiming that the court could not authorize the sale of the debtor's assets free and clear of their civil rights claims The claimants contended they were entitled to go to trial on the merits of a successor liability theory based on the buyer's substantial continuity of the debtor's business enterprise and continuity in the identity of the work force Id at 324

In overruling these objections to the sale, the New England Fish Co court reasoned as follows:
The trustee     concluded that the operation of the business was not practical He sold it to Ocean Beauty  The latter would not and will not take the business burdened with civil rights litigation No purchaser would Such a prospect would chill or render impossible any sale Those who would suffer from the uncertainty and delay would be creditors, including the    claimants themselves
The apprehension that bankruptcy will become a convenient expedient for avoiding the successorship doctrine is not well founded  The adverse

Not Reported in B R
Not Reported in B R , 2001 WL 1820325 (Bkrtcy D Del )
(Cite as: Not Reported in B.R.)

consequences of bankruptcies involving displacement of management, creditor control and liquidation hardly support the argument that employers will use bankruptcy to avoid their responsibilities under the civil rights acts

Congress has stated relative priorities for various elements of the debtor's creditor constituency in the Code It is contended there are now two court-created exceptions: NLRA and Title VII claimants Assuming this is so, if both were present, which of these would be prior to the other? Where is this to end? It is only a question of time before such a priority could and would be extended to other aggregations of claimants To allow exceptions to be created by extrapolation from one case to another would eventually subvert the specific priorities which define Congressional policy for bankruptcy distribution to creditors

We conclude that the assets of the [debtor's] estate being transferred pursuant to the Purchase Agreement may be transferred free and clear of the claims of the [civil rights claimants]

*New England Fish Co., 19 B.R. at 328-29* (citations omitted)

I find this reasoning and outcome *a propos* As in *New England Fish Co* many factors weigh in favor of granting the injunction against the EEOC successor liability claims TWA filed a good faith bankruptcy petition Pursuant to a court approved bidding procedure, TWA determined that American's offer is the highest and best, and in fact, the only available offer for the purchase of substantially all of TWA's assets TWA is unable to consummate the sale if the EEOC's claims are not extinguished No other prospective purchaser exists If the sale does not go forward, it is highly likely that TWA will be liquidated with the resultant material harm to various creditor constituencies, including its 20,000 employees and a likely significant adverse economic impact on the St Louis, Missouri region, the location of TWA's hub airport

*5 Authorizing the sale of TWA to American free and clear of the EEOC's successor liability claims achieves the purpose of § 363 intended by Congress "[T]he purpose behind the 'free-and-clear' language is to maximize the value of the asset, and thus enhance the payout made to creditors Without the 'free-and-clear' language, prospective buyers would be unwilling to pay a fair price for the property

subject to sale; instead, the price would have to be discounted, perhaps quite substantially, to account for the liabilities that the buyer would face simply as a result of acquiring the asset "*WBO P'ship v. Virginia Dep't of Med. Assistance Serv. (In re WBO P'ship), 189 B.R. 97, 108 (Bankr.E.D.Va.1995)*

I also agree with TWA and American that (1) the prospect of successor liability would deter bidders and could create a serious impediment to the ability of debtors to effect going-concern sales under § 363, *see, e g In re Leckie Smokeless Coal Co., 99 F.3d 573, 586-87 (4th Cir.1996); In re WBO P'ship, 189 B.R. at 108-09;New England Fish Co., 19 B.R. at 329;* and that (2) bidders faced with prospective successor liability claims would lower their offered purchase price thereby indirectly subverting the priority scheme of the Bankruptcy Code *See. e g . White Motor Credit, 75 B.R. at 951;New England Fish Co., 19 B.R. at 328*

The EEOC argues that the "Settlement Agreement prohibits TWA from reducing or limiting the benefits provided by the Travel Voucher Program *Id*, Section VII, ¶ A 3, at 8 As such TWA may not dispose of its assets, by sale or otherwise, without making appropriate arrangements for continuation of the voucher program "Stay Brief at p 3 I find this statement a classic non sequitur

The EEOC's conclusion would clearly not pertain in a TWA liquidation scenario TWA leases 97% of its fleet of approximately 180 airplanes Transcript (vol I) at 21 Absent the American transaction it is highly likely that TWA will not be able to satisfy its aircraft lease obligations on an ongoing basis Pursuant to § 1110 the lessors will simply repossess their planes In that situation, how can TWA make "appropriate arrangements" as the EEOC suggests TWA is required to do? TWA will have no planes and accordingly, no ability to continue the Travel Voucher Program

For similar reasons, I also reject the EEOC's argument that the Travel Voucher Program and the EEOC charges cannot be reduced to a monetary satisfaction Stay Brief at p 11 The EEOC characterizes the Travel Voucher Program as injunctive relief for which it cannot be required to accept a monetary settlement From this it concludes that the claims are not subject to § 363(f)(5) and that

© 2008 Thomson/West No Claim to Orig U S Govt Works

Not Reported in B R
Not Reported in B R , 2001 WL 1820325 (Bkrtcy D Del )
(Cite as: Not Reported in B.R.)

Page 5

the sale to TWA therefore cannot be free and clear of the EEOC successor liability claims The EEOC fails to recognize, however, that if TWA were to liquidate, the "injunctive" award made to the flight attendants in the form of travel vouchers would be converted to a dollar claim and would be treated like any other unsecured claim in this bankruptcy case In fact, it appears the Settlement Agreement itself establishes a method for valuing the travel vouchers Thus, I find no basis in the statute for requiring the purchaser to assume these liabilities

*6 The EEOC next argues that its successor liability claims are not "interests in property" within the meaning of § 363(f) I disagree TWA and American cite extensive case law which undermines the cases on which the EEOC relies The EEOC does not attempt to refute this contrary precedent *Compare* Stay Brief *citing Zerand-Bernal Group, Inc. v. Cox,* 23 F.3d 159 (7th Cir.1994); *Schwinn Cycling & Fitness, Inc. v. Benonis (In re Schwinn Bicycle, Co.),* 210 B.R. 747 (Bankr.N.D.Ill.1997)*aff'd*217 B.R. 790 (N.D.Ill.1997)*with* Response *citing Leckie Smokeless,* 99 F 3d a 582, 585 (section 363(f) authorizes bankruptcy court to extinguish statutory successor liability for employee benefit claims); *P.K.R. Convalescent Ctr. v. Virginia Dep't of Med. Assistance Serv. (In re P.K.R. Convalescent Ctrs., Inc.),* 189 B.R. 90, 96 (Bankr.E.D.Va.1995)(section 363(f) prevents state's statutory tax interest on property from passing to purchaser); *In re WBO P'ship,* 189 B.R. at 107 (same); *White Motor Credit,* 75 B.R. at 949 (section 363 sale was free and clear of prepetition tort claim against asset purchaser); *Am Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.),* 56 B.R. 186, 190-91 (Bankr.N.D.Ga.1986)(same)

I note that the leading cases which the EEOC cites in support of successor liability are from the Seventh Circuit *E g , Zerand-Bernal Group,* 23 F.3d at 163 (bankruptcy court lacks authority to enjoin all possible future lawsuits against a buyer at a bankruptcy sale); *Schwinn Bicycle,* 210 B.R. at 755 As such they are not controlling precedent for this court Equally important, these cases are factually distinguishable because they involve product liability claims against the debtors' alleged successor-in-interest that arose after the sale transaction or plan confirmation Thus, these cases hold that a sale free and clear of claims cannot divest a product liability

suit that arises after a sale of assets or plan confirmation, not that § 363(f) does not authorize a sale free and clear of successor liability based on prepetition claims against the debtor

I also am not persuaded by the EEOC's attempt to distinguish the precedent cited by TWA For example, the EEOC alleges that *Forde v. Kee-Lox Mfg. Co.,* 437 F.Supp. 631 (W.D.N.Y.1977) is no longer good law because it was decided under the Bankruptcy Act which did not have a provision authorizing asset sales free and clear of interests in property Stay Brief at p 12 As noted *supra,* it has long been established that bankruptcy courts have the equitable authority to authorize the sale of estate assets free and clear of interests even without § 363 The fact that *Forde* was decided under the Act therefore does not compromise its reasoning And as TWA and American point out, *Forde* continues to be cited as good law by courts interpreting the Bankruptcy Code *E g , Ninth Ave. Remedial Group v. Allis-Chalmers Corp.,* 195 B.R. 716, 731 (N.D.Ind.1996); *All American,* 56 B.R. at 189

*7 I disagree with the EEOC that *New England Fish Co. "defies" Folger Adam Security, Inc. v. DeMattets/MacGregor, J.V.,* 209 F.3d 252 (3d Cir.2000) Stay Brief at p 12 As noted above, I find the facts and analysis in *New England Fish Co* highly relevant to the situation here Furthermore, the EEOC's conclusion that *Folger Adam* makes a "pronouncement that general unsecured claims not arising from the ownership of property are not within section 363(f)'s ambit" is incorrect Stay Brief at p 12

In *Folger Adam,* the Court of Appeals for the Third Circuit had to "decide whether the affirmative defenses of setoff, recoupment, and other contract defenses, which arose as a consequence of alleged defaults under certain contracts with the debtors, constitute an 'interest' under section 363(f) of the Bankruptcy Code such that a sale of the debtors' assets in a consolidated Bankruptcy Court auction free and clear, extinguished such affirmative defenses and effectively transformed such contract rights into unimpeachable accounts receivable in the hands of the purchaser "209 F.3d at 253-54 The Third Circuit concluded that "affirmative defenses do not constitute an 'interest' for purposes of section 363(f) and. therefore, were not extinguished by the

Not Reported in B R
Not Reported in B R , 2001 WL 1820325 (Bkrtcy D Del )
(Cite as: Not Reported in B R.)

Page 6

Bankruptcy sale "*Id* at 254  The Court did not, however, otherwise define the scope of an "interest" for purposes of § 363(f)

In reaching its conclusion, the Court noted that "any interest" is not defined anywhere in the Bankruptcy Code *Folger Adam*, 209 F.3d at 257  After reviewing existing case law, the Third Circuit concluded that right of recoupment is a defense and not an interest and is thus not extinguished by a § 363(f) sale *Id* at 261  The Court, however, did not otherwise define or surmise what comprises an 'interest' under § 363(f)

Likewise, the Court of Appeals for the Fourth Circuit in *Leckie Smokeless* also refused to provide a full definition of interest, a case which the EEOC incorrectly cites for the proposition that the term "interests in property" is interchangeable with "lien" and that both mean a "charge against or interest in property to secure payment of a debt or performance of an obligation "Stay Brief at p 7

In *Leckie Smokeless*. two employer-sponsored benefit plans objected to the extinguishment of their right to payment of plan liabilities from a successor-in-interest by operation of § 363(f)  In determining whether the plans had "any interest in property" within the meaning of § 363(f) the Fourth Circuit rejected what it called the District Court's "unduly broad interpretation" of the phrase  The District Court had found that simply the right to demand money from the debtor gave rise to an "interest" in the debtor's property under § 363(f) *Leckie Smokeless*, 99 F.3d at 581

Rejecting this definition, the Fourth Circuit noted that while the plain meaning of the phrase "interest in such property" suggests that not all general rights to payment are encompassed by the statute, Congress did not expressly indicate that, by employing such language, it intended to limit the scope of section 363(f) to *in rem* interests, strictly defined, and we decline to adopt such a restricted reading of the statute here

*8Leckie Smokeless*. 99 F 2d at 582

The EEOC maintains that § 105(a) does not support the sale "free and clear" of its successor liability claims  A predicate of this argument is that § 363(f) does not authorize the requested relief  However, because my order authorizing the sale of TWA to

American is based on the "free and clear" language of § 363(f) as discussed above, the injunctive relief in the Sale Order is appropriate under § 105(a) because it is necessary to carry out the effect and purpose of § 363(f) 11 U.S.C. § 105(a)  It therefore follows that I am not using § 105(a) to create substantive rights or to contravene the Bankruptcy Code as the EEOC suggests

The EEOC raises two additional arguments in support of its stay request  First, it invokes the doctrine of sovereign immunity because "[i]n this matter, the effect of the Sale Order is tantamount to a suit by American against the United States and EEOC for a declaratory judgment that it has no successor liability as a result of its purchase of substantially all of TWA's assets "Stay Brief at 14  This argument mischaracterizes the facts  TWA is the debtor and moving party  The Sale Order is pursuant to TWA's motion for authority to sell substantially all of its assets in TWA's chapter 11 bankruptcy  I fail to see how the Sale Order can be characterized as a declaratory judgment by American against the EEOC  It clearly is not a suit against the EEOC  Accordingly, I conclude that the Sale Order does not implicate the sovereignty of the EEOC as a government entity

Furthermore, § 106(a) expressly abrogates the EEOC's sovereign immunity under § 363 to the extent the EEOC could invoke the doctrine against TWA  The EEOC is a federal entity charged with enforcing federal statutes  "Congress has given no indication that bankruptcy courts cannot order property sold free and clear of interests that Congress has itself created by statute "*Leckie Smokeless*, 99 F.3d at 586

Although the cases the EEOC cites in support of sovereign immunity do establish that a waiver of sovereign immunity generally must be clear and is narrowly construed, the cases are otherwise inapposite  None of the cases concern a sale under § 363(f), and indeed most do not involve a bankruptcy proceeding  See Stay Brief at 14 citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 483, 114 S.Ct. 996, 1003 (1994)(sue-and-be-sued clause of FDIC's statutory predecessor waived FDIC's sovereign immunity from suit by discharged employee of failed savings and loan association); *United States v. Nordic Village, Inc.*, 503 U.S. 30, 38, 112 S.Ct. 1011, 1017 (1992)(§

Not Reported in B.R.
Not Reported in B.R., 2001 WL 1820325 (Bkrtcy D Del.)
(Cite as: Not Reported in B.R.)

106(c) does not waive the sovereign immunity of the United States from chapter 7 trustee's action seeking monetary recovery) *superseded by statute as stated in, e.g. Field v. Montgomery County (In re Anton Motors, Inc.), 177 B.R. 58, 62 (Bankr.D.Md.1995)(in § 106(a) Congress has stated unequivocally its intention to abrogate sovereign immunity from bankruptcy causes of action for both the United States and the states, as to both nonmonetary and monetary judgments, except punitive damages); United States v. Testan, 424 U.S. 392, 96 S.Ct. 948 (1976)(nonbankruptcy suit for reclassification of federal civil service positions and for back pay involving issues regarding jurisdiction of Court of Claims and relief available in that tribunal) criticized by United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961 (1983)

*9 Second, the EEOC argues that the Sale Order may not impose injunctive relief outside the scope of an adversary proceeding I disagree An adversary proceeding is not required for an order under § 363(f), even if the order includes injunctive relief necessary to effectuate the sale "free and clear " If what the EEOC argues were true, all § 363(f) sales would have to proceed via an adversary proceeding-a procedure finding no support in the Bankruptcy Code or twenty plus years of reported decisions interpreting that Code

Section 363(f) does not contain any "notice and hearing" requirement beyond that set forth in § 363(b) Thus, courts have held that "[t]he Code contemplates that hearings will be held on sales of estate property, including sales of property free and clear of liens, 'only when there is an objection " ' In re Stogsdill, 102 B.R. 587, 589 (Bankr.W.D.Tex.1989)quoting H R REP NO. 595, 95TH CONG., 1ST SESS 315 (1977) U S C C A N 1978, PP 5787, 6272 This does not relieve the debtor-in-possession from complying with due process to interest holders Nor may the court execute an order approving the allocation or distribution of sale proceeds in the absence an adversary proceeding Fed.R.Bank.P. 7001(2); e g., In re Collins, 180 B.R. 447, 449 (Bankr.E.D.Va.1995)(propriety and validity of liens on property were not properly before the court on a motion to sell free and clear)

Current Fed.R.Bank.P. 7001 does not include a

provision requiring an adversary proceeding to sell property of the estate free and clear of liens See In re J.B. Winchells, Inc., 106 B.R. 384, 394 (Bankr.E.D.Pa.1989)discussing former Bankr R 701(3), which required an adversary proceeding to "sell property free of a lien or other interest for which the holder can be compelled to take a money satisfaction "Fed.R.Bankr.P. 7001(3) includes an adversary proceeding a request for approval of a sale under § 363(h), but no longer includes approval of a sale free and clear under § 363(f)

The cases on which the EEOC relies are not to the contrary These cases involve proceedings specified in Fed.R.Bank.P. 7001, not § 363(f) sales See Stay Brief at p 16 citing Feld v. Zale Corp. (In re Zale Corp.), 62 F.3d 746, 763 (5th Cir.1995)(injunctive relief issued as component of settlement agreement between the debtor, three of its former directors and their D & O liability insurer required adversary proceeding); Haber Oil Co. v. Swinehart (In re Haber Oil Co.), 12 F.3d 426, 437 (5th Cir.1994)(noting that claim seeking equitable interest in property such as constructive trust required an adversary proceeding because it is proceeding to recover money or property or determine interest in property); Lyons v. Lyons (In re Lyons), 995 F.2d 923, 924 (9th Cir.1993)(sale under § 363(h) required adversary proceeding); In re McKay, 732 F.2d 44, 45. 48 (3d Cir.1984)(holding that chapter 13 debtor was required to initiate adversary proceeding for lien avoidance action under § 522(f)) Not surprisingly, these cases confirm that an adversary proceeding is required for those actions listed in Fed.R.Bank.P. 7001 But a "free and clear" sale under § 363(f) is simply not such an action

*10 In sum, for the reasons discussed above, I conclude that the EEOC is not likely to succeed on the merits of its appeal

II Irreparable Injury to EEOC

The EEOC argues it faces irreparable injury because § 363(m) threatens the loss of its appellate rights if the American transaction is consummated Stay Brief at pp 17-18 It maintains that "[t]his prospect itself suffices to meet the standard of irreparable harm "Id at p 17

The EEOC does not provide any basis for concluding

that § 363(m) will render its appeal moot Although the EEOC is appealing the Sale Order *in toto*, its objection is based on an isolated provision of the Sale Order that authorizes the sale free and clear of the EEOC's successor liability claims If the EEOC is successful on appeal, presumably it may then proceed against American on the merits of its claim

Even if § 363(m) adversely impacts the EEOC's objection, "[i]t is well settled that an appeal being rendered moot does not itself constitute irreparable harm "*In re 203 North LaSalle Street P'ship*, 190 B.R. 595, 598 (N.D.Ill.1995); *see also Virginia Dep't of Med Assist Svs v Shenandoah Realty Partners, LLP (In re Shenandoah Realty Partners)*, 248 B.R. 505, 510 (W.D.Va.2000); *In re Kent*, 145 B.R. 843, 844 (Bankr.E.D.Va.1991); *In re Charter Co.*, 72 B.R. 70, 72 (Bankr.M.D.Fla.1987)

More fundamentally, however, the EEOC fails to establish irreparable injury for the simple reason that the EEOC may have no recoverable claims against TWA in the absence of a sale of substantially all of TWA's assets to American In the likely event that a stay pending appeal aborts the American transaction, the EEOC will be relegated to holding an unsecured claim in what will very likely be a piece-meal liquidation of TWA In that context, such claims are likely to have little if any value Issuing a stay pending appeal therefore cannot be said to result in any greater recovery for the EEOC or its constituencies Consequently, there is no irreparable injury to the EEOC in the absence of a stay

III  Substantial Harm to TWA and Other Litigants

The EEOC argues that a stay will not substantially harm either TWA or American The EEOC claims there is no substantial harm because (1) enforcing the Travel Voucher Program is not a burden on American as successor to TWA because travelers under the program would only use seats that would otherwise be empty; and (2) the value of the EEOC's successor liability claims is not material relative to the value of the entire sale transaction Stay Brief at p 19

The EEOC's argument misses the point The substantial harm to other litigants inquiry focuses on the harm caused by issuing a stay of the Sale Order pending appeal, not on the harm caused by preserving

or enforcing the EEOC's successor liability claims against American The evidence is overwhelming that TWA cannot be sustained as a viable business enterprise in the face of a material delay in closing the American transaction

\*11 Specifically, the uncontroverted testimony at the Sale Hearing was that TWA has a cash burn rate of $ 3,000,000 per day If the sale to American is unduly delayed there is a very serious risk of losing a sale transaction which materially benefits substantial and diverse creditor constituencies At the conclusion of the Sale Hearing, I found that there would be an immediate and precipitous decline in the financial affairs of TWA followed by a very high probability, if not certainty, of liquidation if I were to deny or reject the Sale Motion Transcript (vol III) at 810 A stay of the Sale Order poses the same threat

IV  The Public Interest

The EEOC argues that I should stay the Sale Order because it is contrary to the strong public interest in the enforcement of the federal statutes prohibiting discrimination in the workplace Recognizing the compelling objectives of saving financially troubled businesses under the Bankruptcy Code, the EEOC nevertheless maintains that these salutary objectives do not justify the suspension of usual rules of fair employment practices Stay Brief at p 20

I am somewhat puzzled by the EEOC's position in this regard The testimony at the Sale Hearing established that if the sale of TWA's assets to American does not go forward, TWA will likely liquidate Given TWA's financial condition, a liquidation would result in severe harm to all TWA's past and current employees because they would lose their jobs and retirement benefits

Although I concur with the EEOC that there is a strong public interest in the enforcement of federal statutes prohibiting discrimination in the workplace, I do not agree that the public interest favors jeopardizing the job security of 20,000 TWA employees, including those EEOC claimants still employed at TWA, at the expense of preserving successor liability claims which will be rendered unenforceable absent a sale of substantially all of TWA's assets as a going concern Stay Brief at 19

© 2008 Thomson/West No Claim to Orig U S Govt Works

Not Reported in B R
Not Reported in B R , 2001 WL 1820325 (Bkrtcy D Del )
(Cite as: Not Reported in B.R.)

Page 9

Finally, I disagree that the Sale Order prevents the
EEOC from enforcing federal statutes prohibiting
discrimination in the workplace It is TWA's failure
as a viable standalone airline that prevents the EEOC
from enforcing claims against TWA The Sale Order
is simply not the cause of any "suspension of usual
rules of fair employment practice" at TWA, as the
EEOC alleges Stay Brief at 20 There is absolutely
no evidence to suggest that TWA is availing itself of
the provisions of the Bankruptcy Code to circumvent
fair employment statutes The simple fact is that
TWA is a failing enterprise whose likely end, in my
opinion, will either be a partial survival as a part of
American or a liquidation resulting in no enterprise
value and a consequent material loss to all non-
priority general unsecured creditor classes

## CONCLUSION

The EEOC has not advanced any law or facts which I
have not already considered For the reasons set forth
above, I deny the EEOC's motion for stay pending
appeal

*12 SO ORDERED

Bkrtcy D Del ,2001
In Re Trans World Airlines, Inc
Not Reported in B R , 2001 WL 1820325
(Bkrtcy D Del )

END OF DOCUMENT

© 2008 Thomson/West No Claim to Orig U S Govt Works

Westlaw.

Not Reported in B R                                                    Page 1
Not Reported in B R , 2006 WL 2400411 (Bkrtcy S D N Y )
(Cite as: Not Reported in B R.)

**H**In re Enron Corp
Bkrtcy S D N Y ,2006
Only the Westlaw citation is currently available
   United States Bankruptcy Court,S D New York
In re ENRON CORP , et al , Reorganized Debtors
         Enron Corp , Plaintiff,
                v
J P Morgan Securities, Inc , et al , Defendants
         Enron Corp , Plaintiff,
                v
MassMutual Life Insurance Co , et al , Defendants
         **Bankruptcy No. 01-16034 AJG.**
**Adversary Proceeding Nos. 03-92677 (AJG), 03-**
         **92682 AJG.**

            May 10, 2006

Defendants' Motion for a Stay of Discovery Pending
Leave to Appeal, and Appeal, if Leave is Granted

Frederick W.H. Carter, Venable, L L P, Michael
Schatzow, Venable, Baetjer and Howard, LLP,
Baltimore, MD, Mark C. Ellenberg, Cadwalader,
Wickersham & Taft LL.P, Washington, DC, Edward
Smith, Cadwalader Wickersham & Taft LLP,
Michael P. Kessler, Brian S. Rosen, Weil, Gotshal &
Manges L L P, Albert Togut, Togut, Segal & Segal
L L P, Peter S. Goodman, Andrews Kurth LLP, James
Tecce, Robert E. Winter, Michael Earl Comerford,
Milbank, Tweed, Hadley & McCloy, LLP, William
S. Schaaf, Elizabeth Page Smith, Kathryn R.
Eiseman, Edward J. Estrada, LeBoeuf, Lamb, Greene
& MacRae, L L P , Irena M. Goldstein, Dewey
Ballantine LLP, New York, NY, Melanie Gray,
Sylvia Ann Mayer, Weil, Gotshal & Manges, L L P,
Patricia Williams Prewitt, Locke, Liddell & Sapp,
LLP, Houston, TX, Martin Sosland, Weil, Gotshal &
Manges, LLP, Dallas, TX, Herbert K. Ryder, Pitney
Hardin, LLP, Morristown, NJ, James Earl Pardo, Jr.,
King & Spalding, Atlanta, GA, Michael T. Stewart,
Klett Rooney Lieber & Schorling, Newark, NJ, for
Debtors
Christie Lyman Dowling, Balch & Bingham, LLP,
Birmingham, AL, for Defendants
ARTHUR J. GONZALEZ, Bankruptcy Judge
*1 For the reasons set forth in the decision attached
hereto as Exhibit A, the relief sought is
[] Granted X Denied

            Exhibit A

Before the Court is a Motion for a Stay of Discovery
Pending Leave to Appeal, and Appeal, if Leave is
Granted (the "Motion") filed by defendants Lehman
Commercial Paper Inc and Goldman Sachs & Co
(together, the "Defendants") related to adversary
proceedings nos 03-92677 and 03-92682 (the
"Adversary Proceedings") Various other defendants
in the adversary proceedings have joined in the
Motion Currently, the Defendants have filed motions
that are pending before the district court for leave to
file an interlocutory appeal of this Court's June 15,
2005 Memorandum Opinion Denying Defendants'
Motions to Dismiss Complaints in the Adversary
Proceedings

The parties have engaged in a number of related
disputes concerning the standards by which the Court
should judge the Motion The Defendants have
suggested that the Motion can be analyzed under
either Rule 8005 of the Federal Rules of Bankruptcy
Procedure or Rule 26(c) of the Federal Rules of Civil
Procedure The Plaintiff appears to ultimately agree
with this approach to the extent that the Plaintiff does
not deny the applicability of Rule 26(c) The Court
recognizes that these two rules are analogous in
purpose and effect The Court also recognizes that the
standards for applying these two rules are similar

Under Rule 8005, the Court considers four factors in
deciding whether to grant a motion to stay discovery:
"(1) whether the movant will suffer irreparable injury
absent a stay, (2) whether a party will suffer
substantial injury if a stay is issued, (3) whether the
movant has demonstrated 'a substantial possibility,
although less than a likelihood, of success' on appeal,
and (4) whether the public interests that may be
affected "Hirschfeld v. Board of Elections, 984 F.2d
35, 39 (2d Cir.1993) As the parties correctly note,
the Second Circuit in Mohammed v Reno recently
revised its formulation of the first factor to embrace a
more variable approach: " 'The necessary level or
degree of possibility of success will vary according to
the court's assessment of the other stay factors '" 309
F.3d 95, at 101 (2d Cir.2002) (citing Washington
Metropolitan Area Transit Commission v. Holiday

Not Reported in B R
Not Reported in B R , 2006 WL 2400411 (Bkrtcy S D N Y )
(Cite as: Not Reported in B.R.)

_Tours, Inc.,_ 559 F.2d 841, 843 (D.C.Cir.1977)). Phrased alternatively, " 'The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay  Simply stated, more of one excuses less of the other ' "_Id_ (citing _Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,_ 945 F.2d 150, 153 (6th Cir.1991))  The Court should note at this point that the relevant "possibility of success" is the possibility that the District Court will grant the Defendants' leave to file an interlocutory appeal, not the possibility that the Defendants will succeed on the merits of that appeal

*2 Rule 26(c) allows courts, in their discretion, to stay discovery upon a showing of "good cause," which courts have interpreted to require "a showing of facts militating in favor of the stay "_American Booksellers Assoc. Inc. v. Houghton Mifflin Co., Inc.,_ 1995 WL 72376, at 1 (S.D.N.Y. Feb.22, 1995)  While no definite list of factors has been developed to guide the Court's analysis of Rule 26(c), those factors that courts have recognized are similar to the four Rule 8005 factors  The recognized factors include: "(1) whether the defendant has made a strong showing that the plaintiff's claim is unmeritorious; (2) the breadth of discovery and the burden of responding to it; and (3) the risk of unfair prejudice to the party opposing the stay "_Chesney v. Valley Stream Union Free School District No. 24,_ 2006 WL 842909, at 1 (E.D.N.Y. March 28, 2006)

The Defendants focus their arguments on two factors: the probability that they will succeed in their motion for leave to appeal, and then on appeal; and the harm they would suffer if discovery proceeds  The Defendants allege in particular that they will suffer two definite injuries if discovery is allowed to proceed here  First, the Defendants argue that the marketplace is irreparably harmed by the uncertainty induced, among other ways, by this Court's denial of the motions to dismiss in the Adversary Proceedings  Second, the Defendants allege that the costs of discovery would represent a substantial and irreparable injury, as discovery in the Adversary Proceedings can be expected to be resource-intensive  The Defendants further highlight the inequity of these injuries by asserting what they characterize as the substantial possibility that they will succeed on their motion for leave to appeal and, ultimately, on the merits of their appeal

The Court concludes that the Motion must be denied under either Rule 8005 or Rule 26(c) because the Defendants have not demonstrated that they would suffer the requisite level of injury if the stay were not granted  Regarding the alleged injury to the marketplace, the Court notes that the Defendants first raised this issue in connection with their motions to dismiss the complaint, which were filed on February 19, 2004, and argued before the Court on September 21, 2004  The Defendants argued at that time that the pendency of the actions challenging the safe harbor provision as applied to the questioned transfers creates uncertainty in the marketplace to the detriment of the marketplace itself as well as market participants, and they have extended that argument to their motion here  As an initial matter, the Court is not clear as to what aspects of discovery would create any additional uncertainty that could be recognized as an injury under Rule 8005

More importantly, even assuming that injury to the marketplace would, under both Rule 26(c) and Rule 8005, be considered as injury to market participants as defendants, the Defendants have simply offered no evidence to demonstrate any quantifiable injury  The Court notes that this alleged injury has been ongoing for over two years and presumably crystallized following this Court's denial of the Defendants' motions to dismiss in June 2005  Nonetheless, though the Defendants continue to repeat their allegations that the marketplace has been injured, they have not translated those allegations into empirical evidence  One possible explanation for this lack of evidence is the irregular characteristics of the transactions at issue  It is possible that, due to the unique circumstances surrounding those transactions, the marketplace did not regard the Adversary Proceedings as representing a threat to the continued vitality of the safe harbor provision  Thus, one could hypothesize, market expectations and common business practices were not disturbed when the transactions came under scrutiny as to their bone fides as security transactions and settlements payments  This is, of course, speculation, but the Court is left to speculate given the noted absence of any evidence of quantifiable harm; moreover, this speculation is at least consistent with the lack of evidence presented regarding negative market effects  Nonetheless, regardless of why the Defendants have not presented definite evidence in support of their

© 2008 Thomson/West  No Claim to Orig  U S Govt  Works

Not Reported in B R
Not Reported in B R , 2006 WL 2400411 (Bkrtcy S D N Y )
(Cite as: Not Reported in B.R.)

allegations, Rule 8005 and Rule 26(c) require that they offer such evidence, and not simply allegations, in order to justify upsetting the normal processes of the courts This the Defendants have not done The Court notes moreover that the costs of discovery are generally not a recognizable injury under Rule 8005, which requires "irreparable injury," and nothing herein warrants the opposite result

*3 This conclusion suffices for the Rule 8005 analysis A showing of irreparable harm is a necessary threshold for a Rule 8005 motion See In re Adelphia Communications Corp., 333 B.R. 649, 659 (Bankr.S.D.N.Y.2005) ("All four criteria must be satisfied to some extent before a stay is granted ") (citing Turner v. Citizens Nat'l Bank of Hammond, 207 B.R. 373, 375 (2d Cir.BAP1997) As the Defendants have not introduced evidence showing irreparable harm, the Motion must be denied under Rule 8005

The costs of discovery, the second injury the Defendants identify, is however a recognizable injury under Rule 26(c) As the Defendants note, the court in In re Currency Conversion Fee Antitrust Litigation rested its holding in favor of the motion to stay on the movant's costs of discovery 2002 WL 88278, at 3 (S.D.N.Y. Jan.22, 2002) Similarly, the court in American Booksellers held that "[t]he discovery sought by the plaintiffs is very broad and to require defendants to respond to it at this juncture, when their motion to dismiss may be granted, would be extremely burdensome "1995 WL 72376 at 1 The Defendants do not necessarily assert that substantial discovery costs are alone sufficient to justify a finding of "good cause " Rather, they tie the costs of discovery to, what they characterize as, the substantial possibility that they will succeed on the motion for leave to appeal, and ultimately, on the merits of their appeal, and the purpose of the statute at issue in the motions to dismiss

Regarding the latter factor, the Defendants argue that the statute at issue, the safe harbor provision, serves not only to protect a transfer from the operation of other provisions of the Bankruptcy Code; they argue that it also prevents the Plaintiff from challenging, save on grounds of fraud, the application of the safe harbor provision to the questioned transfer The Defendants suggest that Congress, in enacting the safe harbor, intended to protect the marketplace from

scrutiny as to whether a security transaction was present or whether the payment at issue was a settlement payment Stated simply, the Defendants suggest that if financial institutions characterize a transaction as a security transaction, and if those institutions label a payment as a settlement payment, those characterizations and labels have effectively binding legal consequence. By implication, this argument would also hold that the safe harbor protects financial institutions from facial challenges to those characterizations and labels The Defendants are thus arguing that the costs of discovery represent a unique and irreparable harm because they had a legitimate expectation that their transactions would be subject only to challenges on grounds of fraud

The Court finds this argument to be of doubtful validity Regardless of the outcome of the appellate process, it does not appear to the Court that the protection afforded by the safe harbor was intended to immunize a party from a facial challenge to the characterizations and labels referenced previously However, the Court need not address the argument on its merits as the Court concludes that the Defendants have otherwise failed to show "good cause " While Rule 26(c) may be applied even where a motion to dismiss is not currently pending, the Court finds that where, as here, the motion to dismiss was denied and leave to appeal that decision is currently pending, the costs of discovery are not a factor to be analyzed under Rule 26(c) The purpose of Rule 26(c) is to prevent a plaintiff from leveraging the costs of discovery in settlement negotiations where the defendant has filed a meritorious motion to dismiss In applying Rule 26(c), the courts thus assume that, in those circumstances, the costs of discovery represent a degree of irreparable harm to the movant However, where the motion to dismiss has been denied, the same presumption cannot be made Simply, the Defendants have had their opportunity to challenge the complaint and have failed in their attempt to dismiss the complaint; discovery is the natural next step and therefore the costs of discovery cannot be considered an injury for the purposes of Rule 26(c)

*4 Similarly, the "possibility of success" factor must be evaluated in light of these considerations As noted previously, the "possibility of success" the Court must consider relates to the motion for leave to appeal These type of motions are, as a general

Not Reported in B R                                                                    Page 4
Not Reported in B R , 2006 WL 2400411 (Bkrtcy S D N Y )
(Cite as: Not Reported in B.R.)

matter, seldom granted, and the Court finds that there is nothing herein that would indicate that this factor would weigh in favor of Defendants As the Defendants have thus not established that either of these two factors militate in favor of a stay of discovery, the Court may arguably conclude on that ground alone that the Defendants have not shown "good cause" under Rule 26(c) However, even if the Court must still balance the various factors previously identified, a cursory review of the harms the estate would suffer if discovery were stayed (detailed more fully below) is sufficient for the Court to conclude that, on balance, the Defendants have not shown "good cause "

The Court's conclusions to this point rest upon a direct analysis of the Defendants' arguments and evidence However, for the sake of completeness, the Court will also analyze the Motion under the assumption that the Defendants have introduced evidence that could be properly considered under either Rule 8005 or Rule 26(c), which thus requires the Court to apply a balancing test Nonetheless, even with that assumption, the Court concludes that application of a balancing test similarly requires the Court to deny the Motion The Plaintiff has noted a number of injuries the estate would suffer if discovery was stayed at this stage of the litigation, including: (1) additional administrative costs if the Adversary Proceedings are unnecessarily prolonged; (2) the spoliation of evidence and the unavailability of witnesses; (3) the delay in recovery if the estate is ultimately successful in the Adversary Proceedings; and (4) the delay in distributions to creditors of the estate. These considerations all favor allowing discovery to proceed

Furthermore, consideration of the public interest does not favor granting the stay Most obviously, the public interest favors quick resolution of these adversarial actions as well as the broader bankruptcy proceeding, and to that extent, a stay in discovery pending leave to appeal would frustrate the public interest The Defendants counter that the marketplace, and by extension, the public, has an interest in the underlying substantive issues presented in the motions to dismiss, and thus, the Defendants argue, the marketplace has an interest in ensuring that the Defendants do not have to bear the costs of discovery The Court has already expressed its doubt concerning this argument and reiterates its view that

this connection is tenuous at best However, the Defendants also note that two government entities, the Securities and Exchange Commission and the Treasury Department, as well as a member of the Federal Reserve Board, have supported the Defendants' motion for leave to appeal The Defendants suggest that this fact demonstrates conclusively that the public interest favors a stay in discovery

*5 The Court notes, however, that those governmental entities did not participate in the proceedings before this Court even though they had ample opportunity to do so As well, the Court notes that those entities' views are not binding, even had they been presented here More fundamentally, though, the District Court recently considered a motion for leave to appeal, in which the same governmental entities also supported the relief sought, in another Enron proceeding and held that "these agencies have [not] offered any examples of any adverse impact on the securities markets caused by the decisions below See Enron Corp v Credit Suisse First Boston Int'l, et al , No M-47 (S D N Y May 2, 2006) (order denying motion for leave to appeal) The Court does not deny that those entities may represent the public interest, but such would not excuse them from providing evidence supporting their allegations

Second, while this Court believes that the alleged injury to the marketplace should be considered, the Court finds that, even assuming this alleged injury is real, this public interest consideration is outweighed by the public interest in a quick resolution of the issues The public interest the Defendants identify is in the eventual resolution of the substantive issues presented in the motions to dismiss, and only to a limited extent by implication is that public interest affected by the process and procedures of the litigation The Court thus finds that, on balance, the harm to the estate outweighs the alleged harm to the Defendants under either Rule 8005 or Rule 26(c)

This ruling is without prejudice to Defendants seeking similar relief, as requested herein, if their motion for leave to file an interlocutory appeal is granted

Based upon the foregoing, the Motion is DENIED

© 2008 Thomson/West No Claim to Orig U S Govt Works

Not Reported in B R                                                                      Page 5
Not Reported in B R , 2006 WL 2400411 (Bkrtcy S D N Y )
(Cite as: Not Reported in B R.)


Bkrtcy S D N Y ,2006
In re Enron Corp
Not Reported in B R , 2006 WL 2400411
(Bkrtcy S D N Y )

END OF DOCUMENT

© 2008 Thomson/West No Claim to Orig U S Govt Works

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Jason M. Madron, hereby certify that on the 25th day of April, 2008, I electronically

filed the **Brief in Response to Moss Landing Commerical Park LLC's Memorandum of**

**Law in Support of its Emergency Motion for Stay Pending Appeal** with the Clerk of the

Court using CM/ECF which will send notifications of such filing to the following :

> Mark Minuti
> mminuti@saul.com

I, Jason M. Madron, hereby certify that on the 25th day of April, 2008, I sent via Hand

Delivery Service (Local), via First Class Mail (Non-Local) or via Electronic Mail (Non-Local)

the **Brief in Response to Moss Landing Commerical Park LLC's Memorandum of Law in**

**Support of its Emergency Motion for Stay Pending Appeal** to the following participants:

| **Via Hand Delivery** | **Via First Class Mail & Electronic Mail** |
|---|---|
| Mark Minuti | Thomas H. Clarke, Jr. |
| Saul Ewing LLP | Ropers, Majeski, Kohn & Bentley |
| 222 Delaware Avenue, Suite 1200 | 201 Spear Street, Suite 1000 |
| P.O. Box 1266 | San Francisco, CA 94105 |
| Wilmington, DE 19899 | tclarke@rmkb.com |

**Via First Class Mail & Electronic Mail**

Wendy W. Smith
Binder & Malter, LLP
2775 Park Avenue
Santa Clara, CA 95050
Wendy@BinderMalter.com

> /s/ Jason M. Madron
> Jason M. Madron (No. 4431)
> RICHARDS, LAYTON & FINGER, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899
> (302) 651-7700
> Madron@rlf.com