**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **KAISER ALUMINUM CORPORATION, a** | : | **Case No. 02-10429 (JKF)** |
| **Delaware Corporation, et al.,** | : | |
| | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | |

---

| | | |
|---|---|---|
| | : | |
| **MOSS LANDING COMMERCIAL PARK LLC, et** | : | |
| **al.,** | : | |
| | : | |
| **Appellant,** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No: 08-cv-00233 (JJF)** |
| **KAISER ALUMINUM CORPORATION AND** | : | |
| **KAISER ALUMINUM & CHEMICAL** | : | |
| **CORPORATION,** | : | |
| | : | |
| **Appellees.** | : | |

## Appendix to Opening Brief of Appellant
## Moss Landing Commercial Park, LLC

| | |
|---|---|
| Mark Minuti (DE Bar No. 2659)<br>SAUL EWING LLP<br>222 Delaware Avenue, Suite 1200<br>P.O. Box 1266<br>Wilmington, DE 19899<br>(302) 421-6840 | Thomas H. Clarke, Jr. (Cal. Bar No. 47592)<br>ROPERS, MAJESKI, KOHN & BENTLEY<br>201 Spear Street, Suite 1000<br>San Francisco, CA 94105<br>(415) 543-4800 |
| Wendy W. Smith (Cal. Bar No. 133887)<br>BINDER & MALTER, LLP<br>2775 Park Avenue<br>Santa Clara, CA 95050<br>(408) 295-1700 | |

*Attorneys for Appellant Moss Landing Commercial Park, LLC*

Dated: August 15, 2008

| Exhibit | Page | Document |
|---------|------|----------|
| A | A-1 – A-384 | Motion of Reorganization Debtors to (A) Enforce Injunctions Issued in Connection with the Second Amended Joint Plan of Reorganization and (B) Compel Moss Landing Commercial Park LLC to Dismiss with Prejudice its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical Corporation [Bankr. D.I. No. 9650] |
| B | A-385 – A-411 | Declaration of Dan Giffin in Support of Opposition to Motion by Debtor Kaiser to Enforce Injunction [Bankr. D.I. No. 9671] |
| C | A-412 - A-452 | Declaration of Richard W. Day in Support of Opposition to Motion by Debtor Kaiser to Enforce Injunction [Bankr. D.I. No. 9672] |
| D | A-453 – A-495 | Declaration of Wendy W. Smith in Support of Opposition to Motion by Debtor Kaiser to Enforce Injunction [Bankr. D.I. No. 9673] |
| E | A-496 – A-497 | Declaration of Nader Agha in Support of Opposition to Motion by Debtor Kaiser to Enforce Injunction [Bankr. D.I. No. 9674] |
| F | A-498 – A-503 | Reply to Objection of Moss Landing Commercial Park LLC to Reorganized Debtors' Motion to Enforce Injunctions Issued in Connection with the Second Amended Joint Plan of Reorganization [Bankr. D.I. No. 9675] |
| G | A-504 – A-546 | Transcript of Proceedings Before the Honorable Judith K. Fitzgerald (February 25, 2008) [Bankr. D.I. No. 9679] |
| H | A-547 – A-548 | Order Enforcing Injunctions Issued in Connection with the Second Amended Joint Plan of Reorganization and Compelling Moss Landing Commercial Park LLC to Dismiss Without Prejudice its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical Corporation [Bankr. D.I. No. 9690] |
| I | A-549-550 | Modified Order Enforcing Injunctions Issued in Connection with the Second Amended Joint Plan of Reorganization and Compelling Moss Landing Commercial Park LLC to Dismiss Without Prejudice its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical Corporation [Bankr. D.I. No. 9713] |

# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Jointly Administered** |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | |
| a Delaware corporation, <u>et al.</u>, | : | **Chapter 11** |
| | : | |
| Debtors. | : | <u>Requested Dates:</u> |
| | : | **Objection deadline: 1/14/08 @ 4:00 p.m.** |
| | : | **Hearing date: 1/28/08 @ 1:30 p.m.** |

### <u>NOTICE OF MOTION AND HEARING</u>

PLEASE TAKE NOTICE that the above captioned reorganized debtors (the "Debtors") have today filed the attached **Motion of Reorganized Debtors to (A) Enforce Injunctions Issued in Connection with the Second Amended Joint Plan of Reorganization and (B) Compel Moss Landing Commercial Park LLC to Dismiss with Prejudice its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical Corporation** (the "Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that the Debtors contemporaneously filed a Motion for Order Shortening Notice (the "Notice Motion") with the Bankruptcy Court. The hearing date and objection deadline set forth herein are consistent with the dates proposed in the Notice Motion. In the event that the Court does not approve the dates proposed in the Notice Motion, the Debtors will file and serve a separate notice notifying all parties-in-interest of the revised hearing date and objection deadline.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion must be in writing, filed with the Clerk of the Bankruptcy Court, and served upon and received by the undersigned counsel and the parties on the attached list by **January 14, 2008 at 4:00 p.m. (Eastern Time).**

Date filed: _12/28/07_

Docket #: _9650_

RLF1-3239361-1

PLEASE TAKE FURTHER NOTICE that if objections are timely filed, served and received, a hearing with respect to the Motion will be held before the Honorable Judith K. Fitzgerald on **January 28, 2008 at 1:30 p.m. (Eastern Time)** at the Bankruptcy Court.

IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED, SERVED, AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: December 28, 2007  
      Wilmington, Delaware

Daniel J. DeFranceschi (No. 2732)  
Jason M. Madron (No. 4431)  
Christopher M. Samis (No. 4909)  
RICHARDS, LAYTON & FINGER, P.A.  
One Rodney Square  
P.O. Box 551  
Wilmington, Delaware  19899  
Telephone: (302) 651-7700  
Facsimile: (302) 651-7701

-and-

Gregory M. Gordon (TX 08435300)  
Daniel P. Winikka (TX 00794873)  
Debra K. Simpson (TX 24027986)  
JONES DAY  
2727 North Harwood Street  
Dallas, TX  75201  
Telephone: (214) 220-3939  
Facsimile: (214) 969-5100

ATTORNEYS FOR REORGANIZED DEBTORS

A – 2

## In Re: Kaiser Aluminum Corporation, et al.
## Amended Core Group List Dated: March 10, 2006

**Office of the United States Trustee**

David M. Klauder
Richard Schepecarter
Office of the United States Trustee
844 King Street, Room 2311
Wilmington, DE 19801
Facsimile No.: 302-573-6497
E-mail: david.klauder@usdoj.gov
E-mail: Richard.Schepacarter@usdoj.gov

**Outside Counsel to the Debtors**

Gregory M. Gordon
Jones Day
2727 North Harwood St.
Dallas, TX 75201
E-mail: gmgordon@jonesday.com

Daniel P. Winikka
Jones Day
2727 North Harwood St.
Dallas, TX 75201
E-mail: dpwinikka@jonesday.com

Nick Bowen
Jones Day
2727 North Harwood St.
Dallas, TX 75201
E-mail: nbowen@jonesday.com

**Delaware Counsel to the Debtors**

Daniel J. DeFranceschi
Kimberly D. Newmarch
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
E-mail: defranceschi@rlf.com
E-mail: newmarch@rlf.com

**The Debtors**

John Donnan
Kaiser Aluminum Corporation
27422 Portola Parkway, Suite 350
Foothill Ranch, CA 92610-2831
E-mail: john.donnan@kaiseraluminum.com

Edward F. Houff
Leigh Ann Clifford
Jennifer Kane
Emergence Strategies LLC
1200 Smith Street, Suite 1600
Houston, TX 77002
E-mail: leighann.clifford@kaiseraluminum.com
E-mail: jj.kane@kaiseraluminum.com

**Outside Counsel to the Official Committee of Unsecured Creditors**

Lisa Beckerman
Akin Gump Strauss Hauer & Feld LLP
590 Madison Ave.
New York, NY 10022
E-mail: lbeckerman@akingump.com

Brian Kilmer
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue
Suite 4100
Dallas, TX 75201-4675
E-mail: bkilmer@akingump.com

**Delaware Counsel to the Official Committee of Unsecured Creditors**

William P. Bowden
Ashby & Geddes
222 Delaware Ave.
P.O. Box 1150
Wilmington, DE 19899
E-mail: wbowden@ashby-geddes.com

A – 3

**Counsel to the DIP Lenders**

Timothy R. Pohl
Chris L. Dickerson
Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Drive
Chicago, IL 60606
E-mail: tpohl@skadden.com
E-mail: cdickers@skadden.com

**Outside Counsel to the Official Committee of Asbestos Claimants**

Elihu Inselbuch
Rita Tobin
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500
E-Mail: ei@capdale.com

Peter Van N. Lockwood
Ronald R. Reinsel
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, DC 20005-5802
E-Mail: pvnl@capdale.com
E-Mail: rer@capdale.com

**Delaware Counsel to the Official Committee of Asbestos Claimants**

Marla R. Eskin
Mark T. Hurford
Campbell & Levine, LLC
800 King Street, Suite 300
Wilmington, DE 19801
E-mail: mre@camlev.com
E-Mail: mth@camlev.com

**Outside Counsel to the Official Committee of Retired Salaried Employees**

Frederick D. Holden, Jr.
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
E-mail: fholden@orrick.com

**Delaware Counsel to the Official Committee of Retired Salaried Employees**

Laurie Polleck
Jaspan Schlesinger Hoffman LLP
913 N. Market Street, 12th Floor
Wilmington, DE 19801
E-mail: lpolleck@jshllp-de.com

**Counsel to the Legal Representative for Future Asbestos Claimants**

Sharon Zieg
Timothy P. Cairns
Erin D. Edwards
Young Conaway Stargatt & Taylor
P.O. Box 391
The Brandywine Building, 1000 West St., 17th Floor
Wilmington, DE 19801-0391
E-mail: szieg@ycst.com
E-mail: tcairns@ycst.com
E-mail: eedwards@ycst.com

**Legal Representative for Future Asbestos Claimants**

Martin J. Murphy
Davis & Young
1700 Midland Blvd. 101 Prospect Ave.
Cleveland, OH 44115-1027
E-mail: mmurphy@davisyoung.com

**Outside Counsel for MAXXAM Inc.**

Alan Gover
Dewey Ballantine LLP
700 Louisiana, Suite 1900
Houston, TX 77002-2725
E-mail: agover@dbllp.com

Lisa Hill Fenning
Dewey Ballantine LLP
333 South Grand Ave., Suite 2600
Los Angeles, CA 90071
E-mail: lfenning@dbllp.com

**Delaware Counsel for MAXXAM Inc.**

Eric D. Schwartz
Morris, Nichols, Arsht & Tunnell
1201 North Market St.
P.O. Box 1347
Wilmington, DE 19899-1347
E-mail: eschwartz@mnat.com

**The Debtors' Financial Advisors and Investment Bankers**

Ari Lefkovits
Lazard Freres & Company LLC
30 Rockefeller Plaza, 61st Floor
New York, NY 10020
E-mail: ari.lefkovits@lazard.com

**The Debtors' Claims Agent**

Kathleen M. Logan
Logan and Company
546 Valley Road
Upper Montclair, NJ 07043
E-mail: klogan@loganandco.com

**The Fee Auditor for all Professionals**

Warren H. Smith
Steve Bossay
Warren H. Smith & Associates, P.C.
Republic Center
325 N. St. Paul, Suite 1275
Dallas, TX 75201
E-mail: feeaudit@whsmithlaw.com
E-mail: slbossay@whsmithlaw.com

**Legal Representative for Future Silica Claimants**

Anne M. Ferazzi
Legal Representative for Future Silica Claimants
11923 Winwood
Houston, TX 77024
E-mail: ferazzi@mindspring.com

**Delaware Counsel to the Legal Representative for Future Silica Claimants**

Daniel K. Hogan
1311 Delaware Avenue
Wilmington, DE 19806
E-mail: dkhogan@dkhogan.com

**Outside Counsel to the Legal Representative for Future Silica Claimants**

Sander L. Esserman
Peter C. D'Apice
Stutzman, Bromberg, Esserman & Plifka
2323 Bryan Street, Suite 2200
Dallas, TX 75201
E-mail: esserman@sbep-law.com
E-mail: dapice@sbep-law.com

Steven A. Buxbaum, Esq.
Haynes & Boone, LLP
One Houston Center
1221 McKinney, Suite 2100
Houston TX 77010
E-mail: steven.buxbaum@haynesboone.com

A – 5

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | :     **Jointly Administered** |
| **KAISER ALUMINUM CORPORATION,** | :     **Case No. 02-10429 (JKF)** |
| a Delaware corporation, <u>et al.</u>, | : |
| | :     **Chapter 11** |
| Debtors. | : |

| | |
|---|---|
| **KAISER ALUMINUM CORPORATION,** | : |
| <u>et al.</u>, | : |
| | : |
| Movants, | : |
| | : |
| | : |
| v. | : |
| | : |
| | : |
| **MOSS LANDING COMMERCIAL** | : |
| **PARK LLC,** | :     Requested Dates: |
| | :     Objection deadline: 1/14/08 @ 4:00 p.m. |
| Respondent. | :     Hearing date: 1/28/08 @ 1:30 p.m. |

## MOTION OF REORGANIZED DEBTORS TO (A) ENFORCE INJUNCTIONS ISSUED IN CONNECTION WITH THE SECOND AMENDED JOINT PLAN OF REORGANIZATION AND (B) COMPEL MOSS LANDING COMMERCIAL PARK LLC TO DISMISS WITH PREJUDICE ITS LAWSUIT AGAINST KAISER ALUMINUM CORPORATION AND KAISER ALUMINUM & CHEMICAL CORPORATION

The above-captioned reorganized debtors (collectively, the "Reorganized

Debtors" and, as debtors in possession prior to emergence, the "Reorganizing Debtors"),[1] hereby

file this motion, pursuant to sections 105, 524 and 1141 of the United States Bankruptcy Code,

11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), to enforce the injunctions issued by the Court

---

[1]    The Reorganizing Debtors included the following entities: Kaiser Aluminum Corporation ("KAC"), Kaiser Aluminum & Chemical Corporation ("KACC"), Akron Holding Corporation, Kaiser Aluminum & Chemical Investment, Inc., Kaiser Aluminium International, Inc. ("KAII"), Kaiser Aluminum Properties, Inc. ("KAPI"), Kaiser Aluminum Technical Services, Inc., Kaiser Bellwood Corporation, Kaiser Micromill Holdings, LLC, Kaiser Texas Micromill Holdings, LLC, Kaiser Sierra Micromills, LLC, Kaiser Texas Sierra Micromills, LLC, Oxnard Forge Die Company, Inc., Alwis Leasing LLC, Kaiser Center, Inc., KAE Trading, Inc., Kaiser Aluminum & Chemical Investment Limited (Canada), Kaiser Aluminum & Chemical of Canada Limited (Canada) ("KACoCL"), Kaiser Bauxite Company ("KBC"), Kaiser Center Properties, Kaiser Export Company and Texada Mines Ltd. (Canada). The restructuring transactions completed in connection with consummation of the Plan (as defined herein) dissolved all Reorganizing Debtors other than KAC, KAII and KBC as of the Plan effective date.

in connection with confirmation of the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates (as modified and confirmed, the "Plan") by compelling Moss Landing Commercial Park LLC ("MLCP") to dismiss, with prejudice, a lawsuit filed against KAC and KACC in the United States District Court for the Northern District of California. In support of this Motion, the Reorganized Debtors submit the declaration of John M. Donnan (the "Donnan Declaration"), which is attached hereto as Exhibit A and incorporated herein by reference, and respectfully represent as follows:

## Introduction

1.      In 1984, in conjunction with KACC's decision to sell its refractories business, KACC sold a magnesium and refractory brick facility on an approximately 188-acre parcel of land located in Moss Landing, Monterrey County, California (the "Moss Landing Property") to National Refractories & Minerals Corporation ("National Refractories") and certain of its affiliates. Environmental conditions at the Moss Landing Property were well known and documented at the time, and the responsibilities of the parties for the environmental conditions were the subject of a separate Agreement on Environmental Compliance (the "Environmental Agreement") that the parties entered into in connection with the sale.

2.      In December 2003, when both National Refractories and KACC were in bankruptcy, MLCP purchased the Moss Landing Property from National Refractories. Pursuant to the sale agreement, MLCP assumed certain maintenance, monitoring and remediation obligations on the property, including the obligation to maintain a leachate collection system. Additionally, MLCP was given substantial information about the environmental conditions at the property, including a 2001 Phase I assessment, a 2002 soil and groundwater sampling report and all material correspondence between KACC and National Refractories regarding maintenance of

-2-      A – 7

the landfills on the property. MLCP was also required to make several acknowledgements related to those environmental conditions, including, with respect to the Environmental Agreement, that "KACC is in its own Chapter 11 bankruptcy proceedings and may reject any such agreements as burdensome executory contracts." Furthermore, to oversee demolition of the plant and environmental remediation, MLCP hired the same person that had been the environmental manager for the property for both KACC and then National Refractories.

        3.     Despite actual knowledge of KACC's bankruptcy proceeding and more than ample opportunity to do so, MLCP chose not to assert any claim against KACC in KACC's bankruptcy case, or take any other action, in the Reorganizing Debtors' bankruptcy proceedings or otherwise, to preserve any ability to pursue claims against KACC in respect of the well known environmental conditions at the Moss Landing Property. Now, several years later, and after MLCP's plans for the property apparently did not work out, MLCP seeks to assert claims against KAC and KACC. Specifically, on November 30, 2007, MLCP served KAC and KACC, as well as the United States Environmental Protection Agency (the "United States EPA") and certain California environmental agencies, with a notice that it intended to file suit against KAC and KACC under certain federal and state environmental statutes as well as the Environmental Agreement, seeking to compel KAC and KACC to pay costs and civil penalties and remediate the environmental conditions at the Moss Landing Property. According to the notice, KAC and KACC created two landfills on the property between 1946 and 1981 and have "been on notice of the potential threat of the dumps to the environment since 1978." MLCP further alleged that discharges and releases from these landfills "have been occurring since at least 1980." Also on November 30, 2007, MLCP filed a Complaint for Damages and Injunctive Relief in the United States District Court for the Northern District of California, and on December 5, 2007, MLCP

filed its First Amended Complaint for Damages and Injunctive Relief (the "Amended Complaint"). The Amended Complaint seeks equitable relief, civil penalties, monetary damages and attorneys' fees under a variety of federal statutes, state statutes and common law theories of liability, all of which seek to require KACC to remediate, or otherwise compensate MLCP for, the environmental conditions that were well known when MLCP purchased the Moss Landing Property.

4.    MLCP's commencement of its lawsuit against KAC and KACC is indisputably a violation of the injunctions the Court issued in connection with confirmation of the Plan, which permanently enjoin all entities from commencing or continuing any action or other proceeding against the Reorganized Debtors on account of any claim or liability arising on or before the effective date of the Plan. Many of MLCP's claims for relief in the Amended Complaint seek damages, attorneys' fees and penalties, all of which are "claims" under the Bankruptcy Code that unquestionably arose years before the effective date of the Plan.

5.    Furthermore, all of MLCP's requests for equitable remedies in the Amended Complaint likewise constitute claims that were discharged pursuant to the Plan and order confirming the Plan because, as evidenced by the Amended Complaint itself, MLCP has an alternative right to the payment of money damages. Moreover, in October 2003 this Court approved a multi-site consent decree (the "Consent Decree") that the Debtors entered into with the United States, on behalf of the United States EPA and certain other federal agencies, and certain states, including California. Pursuant to the Consent Decree, the United States EPA and the California agencies agreed that all liabilities and obligations of the Debtors to the United States EPA and the State of California agencies under environmental laws and regulations relating to the Moss Landing Property will be discharged upon confirmation of the Plan and that

the settling federal and state agencies will not issue a unilateral order or seek an injunction under

applicable federal and state environmental laws with respect to the Moss Landing Property.

Thus, MLCP's efforts to assert a "citizen" suit to enforce federal or California environmental

laws are barred for the additional reason that the United States EPA and the State of California

have entered into the Consent Decree and waived any right to seek injunctive relief.

## **Background**

6.      On February 12, 2002, fifteen of the Debtors commenced their respective

reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy

Code.  On March 15, 2005, two additional Debtors commenced their voluntary chapter 11 cases.

The other nine Debtors filed their chapter 11 petitions on January 14, 2003.  The Debtors'

chapter 11 cases have been consolidated for procedural purposes only and are being administered

jointly.

7.      Prior to, as applicable, their liquidation or emergence, the Debtors

continued in possession of their respective properties and operated and managed their businesses,

as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.      On December 20, 2005, the Court entered an order (D.I. 7983) confirming

the joint plans of liquidation (collectively as modified and confirmed, the "Liquidating Plans")

for Debtors Kaiser Alumina Australia Corporation, Kaiser Finance Corporation, Alpart Jamaica

Inc. and Kaiser Jamaica Corporation (collectively, the "Liquidating Debtors"), pursuant to which

the Liquidating Debtors were dissolved.

9.      On February 6, 2006, the Court entered an order (D.I. 8225) (the

"Confirmation Order") confirming the Plan.  On May 11, 2006, the United States District Court

A − 10

for the District of Delaware entered an order affirming the Confirmation Order. The Plan

became effective on July 6, 2006 (the "Effective Date").

        10.     On June 8, 2007, the Court entered an order and final decree (D.I. 9599)

closing all of the Debtors' cases other than the Liquidating Debtors' cases and the cases of KAC

and KACC.

        11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334, Article XIII of the Plan and Section XII of the Confirmation Order. This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2).

### Pertinent Facts

#### *The Moss Landing Property*

        12.     In conjunction with the operation of its refractories business, from 1942 to

1984 KACC operated a magnesium and refractory brick facility on the Moss Landing Property.

(Donnan Decl. ¶ 3.) While in operation, the Moss Landing Property produced basic refractory

brick and gum mixes, ramming mixes and mortars, chemical grade magnesium, magnesia,

magnastite periclase and magnesium hydroxide. (Id.)

        13.     In 1984, KACC made the strategic decision to sell its refractories

business, and on December 31, 1984, KACC, KACoCL and KAPI entered into an Asset

Purchase Agreement (as amended, the "1984 Asset Purchase Agreement") with National

Refractories, National Refractories Holding Co. ("Holdings") and National Refractories &

Minerals, Inc. (f/k/a 601725 Ontario Ltd.) (collectively, the "National Entities"), pursuant to

which KACC, KACoCL and KAPI agreed to sell, and the National Entities agreed to purchase,

certain real and personal property located in the United States, Canada and Mexico related to

KACC's refractory business, including the Moss Landing Property. (Donnan Decl. ¶ 4.)

Pursuant to the 1984 Asset Purchase Agreement, the base purchase price for the refractory assets

was $68 million. Financing of the purchase price was made via (a) a $44 million note issued

under a separate loan agreement between KACC and National Refractories and guaranteed by

Holdings pursuant to a guaranty and pledge agreement, (b) a $4 million subordinated note

payable to KACC and (c) $20 million in National Refractories cumulative preferred stock.[2]

## *The Agreement on Environmental Compliance*

14.     In conjunction with the 1984 Asset Purchase Agreement, on December 31,

1984, the parties also executed the Environmental Agreement, which allocated responsibility

among the parties for any liability imposed by federal, state or local law for any environmental

conditions relating to the properties that were sold. A copy of the Environmental Agreement is

attached hereto as Exhibit B and incorporated herein by reference. Pursuant to the

Environmental Agreement, KACC retained certain potential environmental liabilities arising

from the operation of the facilities prior to the sale, with National Refractories being liable for all

environmental liabilities caused by operations after the sale. (Donnan Decl. ¶ 5.) Additionally,

National Refractories assumed certain maintenance obligations, including certain obligations

with respect to the Moss Landing Property. (Id.) Specifically, National Refractories agreed to

the following with respect to the Moss Landing Property:

> (a) to maintain the existing closed brick plant waste dumps
> including the Dolan Road embankment. . . .

---

[2]     In April 1985, the National Entities entered into a credit agreement with Congress Financial Corporation ("Congress"), and KACC, National Refractories and Congress entered into an Intercreditor and Subordination Agreement (as amended, the "Subordination Agreement"), pursuant to which, among other things, KACC agreed to subordinate its indebtedness against the National Entities to that of Congress. Additionally, KACC and National Refractories executed a Subordinated Note, dated April 30, 1985, for the original principal amount of $8,000,000 (the "Subordinated Note"). In September 1990, the parties entered into a Standby Revolving Credit and Security Agreement and Guaranty (the "Guaranty"), pursuant to which National Refractories issued KACC a Standby Revolving Credit Note in the original amount of $2,500,000 (the "Standby Note"). Additionally, in May 1999, KACC, National Refractories and Holding entered into an agreement whereby KACC's approved National Refractories' acquisition of CFB Industries, Inc. and the incurrence of additional indebtedness to Congress. In conjunction therewith, KACC, National Refractories and Congress entered into an Amended and Restated Intercreditor and Subordination Agreement.

> (b) to reroute storm drains around the dump and to close off the
> present drain; and
>
> (c) to maintain the leachate collection system and continue to
> process leachate as presently processed for so long as a hazardous
> waste processing permit is not required for this process.

(Environmental Agreement § 3.1.)

15.    In addition, in conjunction with the 1984 Asset Purchase Agreement, the

Environmental Agreement provided for the transfer of all permits necessary for National

Refractories to conduct the refractories business. (Donnan Decl. ¶ 6.) A list of permits

transferred from KACC to National Refractories was included as Exhibit A to the Environmental

Agreement and specifically listed, with respect to the Moss Landing Property, National Pollutant

Discharge Elimination System ("NPDES") Permit No. CA-00007005 issued by the Central Coast

Regional WQCB on May 2, 1980. (Id.)

### *The Put/Call Agreement*

16.    Following several years of operating the Moss Landing Property, National

Refractories ceased operations there and began marketing the property for sale. (Donnan

Decl. ¶ 7.) Despite entering into negotiations with numerous parties, National was unable to

complete the sale of the Moss Landing Property. National Refractories' financial position

thereafter deteriorated, and in September 2001, National Refractories and KACC began to

discuss the possible sale of the Moss Landing Property to KACC as a means of providing

National Refractories with a source of liquidity and KACC with, among other things, the ability

to exercise greater control over the property and its future use in a way that would minimize, if

not eliminate, any potential environmental issues and maximize the value of the property to

potential purchasers. (Id.)

17.    As a result of these discussions, KACC and National Refractories entered into a Put/Call Agreement, effective as of September 13, 2001 (the "Put/Call Agreement"), pursuant to which: (a) KACC granted National Refractories the option (the "Put Option") to require KACC to purchase the Moss Landing Property and (b) National Refractories granted KACC the option to purchase the Moss Landing Property (the "Call Option"). A copy of the Put/Call Agreement, including amendments thereto, is attached hereto as Exhibit C and incorporated herein by reference. The purchase price for the Moss Landing Property under the Put Option and the Call Option was $5,000,000. (Put/Call Agreement § 5(a).) The Put/Call Agreement required that proceeds from the purchase price be applied to certain indebtedness owed by National Refractories to Congress. (Id. at § 5(b).) Pursuant to the first and second amendments to the Put/Call Agreement, the parties extended the deadline for the Put Option to April 15, 2002, and for the Call Option to June 17, 2002. (Amendments § 1.)

### The National Entities Bankruptcy Cases

18.    On October 10, 2001, the National Entities each commenced reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "National Cases") in the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "California Bankruptcy Court"). (Donnan Decl. ¶ 9.)

19.    On November 15, 2001, National Refractories filed a motion to assume the Put/Call Agreement, which was approved by the California Bankruptcy Court on or about March 19, 2002. (Donnan Decl. ¶ 10.) In the interim, National Refractories entered into an agreement with HTC Investments California, Inc. ("HTC") for the sale of the Moss Landing Property. (Notice of Motion and Motion for Order Authorizing Sale of Moss Landing Property to Nadar T. Agha or Higher Bidder (the "Sale Motion") at 9.) A copy of the Sale Motion is

A – 14

attached hereto as Exhibit D and incorporated herein by reference. And, in January 2002, the

California Bankruptcy Court entered an order approving the sale of the property to HTC. (Id.)

Following its due diligence, however, HTC exercised its right to terminate the sale agreement.

(Id.)

          20.     On April 5, 2002, National Refractories sent KACC notice that National

Refractories was exercising the Put Option, thereby requiring KACC to purchase the Moss

Landing Property. (Donnan Decl. ¶ 10.) On April 3, 2002, however, KACC had filed a motion

in this Court to reject the Put/Call Agreement (D.I. 327), and on June 26, 2002, this Court

entered an order granting the motion (D.I. 695).

          21.     On April 17, 2003, National Refractories filed proof of claim number

1256 in the KACC chapter 11 case, in an unliquidated amount asserting claims for (a) breach of

the Put/Call Agreement, (b) breach of the indemnity provisions of the Asset Purchase Agreement

and the Environmental Agreement, (c) environmental costs associated with the Oakville property

located in Canada, which was sold to National Refractories under the 1984 Asset Purchase

Agreement, and (d) contingent environmental claims associated with the potential remediation of

other properties transferred pursuant to the Asset Purchase Agreement, including the Moss

Landing Property.

          22.     Likewise, KACC filed a proof of claim in the National Refractories

chapter 11 case in the amount of $11,775,000 plus attorneys' fees, costs, and interest, comprised

of (a) principal of $4,275,000 and interest from May 6, 1999 due under the Subordinated Note;

(b) principal of $2.5 million and interest from May 6, 1999 due under the Standby Note;

(c) amounts arising from various contractual obligations and indemnities pursuant to the Asset

Purchase Agreement, the Environmental Agreement, the May 6, 1999 agreement, the Put/Call

Agreement, and the Guaranty; and (d) claims pursuant to the Solid Waste Disposal Act, the Clean Water Act ("CWA"), CERCLA and related state environmental laws and regulations.

### *Multi-Site Consent Decree*

23.    On or about August 18, 2003, the Debtors entered into the Consent Decree with the United States of America (on behalf of the United States EPA, the United States Department of Interior and the National Oceanic and Atmospheric Administration), the states of California (on behalf of the California Department of Toxic Substances Control and the California Department of Fish and Game), Rhode Island and Washington, and the Puyallup Tribe of Indians (collectively, the "Settling Parties"). A copy of the Consent Decree is attached hereto as Exhibit E and incorporated herein by reference.

24.    The Consent Decree settled more than $727 million of environmental claims and established procedures for the resolution of the Debtors' environmental liabilities arising from prepetition operations, such as those at the Moss Landing Property. The Consent Decree categorizes each site from which the Debtors' environmental liabilities arose, or could arise in the future, as either a Liquidated Site, a Discharged Site, a Debtor-Owned Site, a Reserved Site or an Additional Site (as each such term is defined in the Consent Decree). The Consent Decree lists and identifies by name 66 Liquidated Sites, 18 Discharged Sites and 6 Reserved Sites. (Id. at ¶¶ 1.G., 1.M., 1.T.) Debtor-Owned Sites are defined in the Consent Decree as sites that are owned by the Debtors at or any time after the confirmation of a plan of reorganization that includes KACC, excluding Reserved Sites. (Id. at ¶ 1.F.) Finally, Additional Sites is defined to include all sites and properties, including all facilities as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), other than a Liquidated Site, a Discharged Site, a Debtor-Owned Site or a Reserved Sites. (Id. at ¶ 1.A.) Because the Moss Landing Property is not a Debtor-Owned Site

A – 16

and is not listed in the Consent Decree as a Liquidated Site, a Discharged Site or a Reserved Site,

the Moss Landing Property is an Additional Site under the terms of the Consent Decree.

25.    Of particular significance, the Consent Decree provides that all

environmental liabilities and obligations to the Settling Parties with respect to the Additional

Sites would be discharged by confirmation of the Plan:

> With respect to all Additional Sites, all liabilities and obligations
> of the Debtors to the Settling Federal Agencies and the States
> under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and
> 9607, Section 7003 of RCRA, 42 U.S.C. § 6973, and Similar State
> Laws arising from Prepetition acts, omissions or conduct of the
> Debtors or their predecessors, including without limitation the
> Prepetition generation, transportation, disposal or release of
> hazardous substances, wastes or materials or dangerous wastes or
> the Prepetition ownership or operation of hazardous waste or
> hazardous substance sites and/or facilities and state counterparts,
> shall be discharged under Section 1141 of the Bankruptcy Code by
> the confirmation of a Plan of Reorganization . . .

(Id. at ¶ 7).

26.    The Consent Decree further provides that the Settling Parties will receive

no distributions with respect to environmental liabilities associated with the Additional Sites, but

may, in the ordinary course of conducting agency enforcement activities in the future, seek a

determination of KACC's liability with respect to Additional Sites. (Id.) If KACC is determined

to be liable, KACC's liability with respect to an Additional Site will be the same as it would have

been had the liability for the Additional Site been liquidated in the chapter 11 cases and treated

as an allowed general unsecured claim under the Plan (i.e., KACC's liability will be satisfied by

making a payment equivalent to what the distribution on such a claim would have been). (Id.)

27.    Moreover, the Consent Decree specifically provides that the Settling

Parties will not issue a unilateral order or seek an injunction with respect to the Additional Sites

against the Debtors under Section 106 of CERCLA, 42 U.S.C. § 9606, Section 7003 of the

A – 17

Resource Conservation Recovery Act ("RCRA"), 42 U.S.C. § 6973, or any similar state laws

arising from the prepetition acts, omissions or conduct of the Debtors or their predecessors with

respect to any Additional Sites. (Id. at ¶¶ 7-9.) In addition, in any action or proceeding with

respect to an Additional Site, the parties reserved all rights, claims and defenses they would have

been entitled to assert had the claim been liquidated in the ordinary course or during the course

of the chapter 11 proceedings and also agreed to attempt to negotiate fair and equitable terms in

settlement of any claims relating to Additional Sites. (Id. at ¶¶ 7-9.)

        28.    On August 22, 2003, the Debtors filed a motion seeking approval of the

Consent Decree, which was served on the National Entities. On August 27, 2003, the United

States published notice of the proposed Consent Decree in the Federal Register at 68 Fed. Reg.

51596 (Aug. 27, 2003). The United States received five public comments during the thirty-day

public comment period. On October 27, 2003, the Court entered an order approving the Consent

Decree (D.I. 3102). During the 60-day period that the Consent Decree was pending in this Court

and subject to public comment, Nader Agha, who formed MLCP to acquire the Moss Landing

Property, was completing due diligence and negotiating with National to purchase the Moss

Landing Property.

### *Sale of Moss Landing Property to MLCP*

        29.    On October 6, 2003 National Refractories entered into an Agreement of

Purchase and Sale (as amended, the "APS") for the Moss Landing Property with Nader Agha,

who subsequently formed MLCP to take title to the property. The APS granted Nader Agha 55

days from September 18, 2003 to conduct due diligence on the property. A copy of the APS is

attached hereto as Exhibit F and incorporated herein by reference. On October 14, 2003,

National Refractories filed the Sale Motion, which the California Bankruptcy Court granted on

November 3, 2003. No other party expressed interest in the property. Accordingly, on

A − 18

December 1, 2003, the California Bankruptcy Court entered an order approving the sale of the

Moss Landing Properties, free and clear of liens and encumbrances, to Nader Agha for

$7,500,000. The sale of the property closed and MLCP took title in December 2003.

     30.    As evident from the documentation, Nader Agha and MLCP had extensive

information about the environmental conditions at the Moss Landing Property prior to closing.

The APS required MLCP to agree that prior to the closing MLCP would have read a May 2001

TRC Phase I environmental assessment report (the "2001 Environmental Assessment") and a

November 2002 Phase II soil and groundwater sampling report (the "2002 Sampling Report")

prepared by Pacific Crest Engineering as well as a 1997 PES closure report. Additionally, the

APS explicitly states that "all matters in those assessments and that report are deemed to have

been disclosed to Buyer." (APS § 17.a.xv.)

     31.    The APS also notes that an underground storage tank ("UST 6") had been

removed, which was listed in the 2001 Environmental Assessment, and that there was ongoing

monitoring of the UST 6 site. (Id.) Pursuant to the APS, MLCP agreed "to pay the entire cost of

any and all monitoring and remediation concerning UST 6." (Id.) Additionally, the APS

required MLCP's acknowledgment that:

> [W]hile KACC removed visible asbestos in 1979-1980, there still
> may be asbestos on the Real Property; that the four known
> underground storage tanks were removed from the Real Property
> while Seller has owned it, and of these Seller has "no further
> action required" letters on three of these tanks from the Monterey County
> Department of Health, while the site of the fourth tank – which
> was behind the brick plant – is still being remediated; there is a
> tank on a pad in a pit containing approximately 8,000 gallons of
> material, including crankcase oil, on the Real Property.

(Id. at § 17.a.xix.(5).)

     32.    The APS also required National Refractories to transfer ownership of its

NPDES permit and to provide Nader Agha/MLCP with all material correspondence between

KACC and National Refractories regarding maintenance of the landfills on the Moss Landing Property. (Id. at §§ 1.d.; 5.a.viii.) Moreover, the APS lists the Environmental Agreement as an assigned contract but required Nader Agha's acknowledgment that "KACC is in its own Chapter 11 bankruptcy proceedings and may reject any such agreements as burdensome executory contracts."[3] (Id. at § 5.a.viii.) The APS also provides that MLCP will perform all obligations of the National Entities under the Environmental Agreement with respect to the Moss Landing Property and specifically imposes an obligation on MLCP to avoid "taking any actions, including but not limited to actions regarding the Landfills on the Property, that would trigger or increase KACC's and/or Seller's liability...." (Id. at § 41.c.)

      33.    Moreover, upon closing of the sale, MLCP hired Sam Bose to oversee the demolition of the refractory plant and the environmental remediation that MLCP initiated immediately after the sale closed. Mr. Bose worked for KACC from 1979 to 1984 and served as its environmental manager ensuring environmental compliance at KACC facilities, including the Moss Landing Property. Upon KACC's sale of the Moss Landing Property to National Refractories, Mr. Bose joined National Refractories as environmental manager and, upon the company's bankruptcy filing, was appointed by the California Bankruptcy Court to oversee the sale of National Refractories' assets, including the Moss Landing Property. See Virginia Hennessey, *Business Park Manager Know the Territory,* The Monterey County Herald, September 13, 2004, at A1, a copy of which is attached hereto as Exhibit G and incorporated herein by reference. Thus, MLCP had full knowledge of the history of the environmental conditions at the property.

---

[3]     Pursuant to Section 6.3 of the Plan, KACC rejected the Environmental Agreement on the Effective Date.

DLI-6162964v5
RLF1-3239351-1

### *Settlement Agreement Among KACC and the National Entities*

34.     On or about March 30, 2004, to avoid the expense and uncertainty of litigation and the concomitant delay in the administration of their respective chapter 11 cases, KACC and the National Entities entered into a Settlement Agreement (the "Settlement Agreement") to resolve their respective proofs of claim and related issues. Both National Refractories and KACC filed motions to approve the Settlement Agreement in their respective bankruptcy cases. The California Bankruptcy Court entered an order approving the Settlement Agreement on April 19, 2004. This Court entered an order approving the Settlement Agreement on May 17, 2004 (D.I. 4335).

35.     Pursuant to the terms of the Settlement Agreement (a) KACC agreed to allow the National Entities a set-off in the amount of $475,000, which amount was set-off from $1,725,000 held by the National Entities as proceeds from the sale of the Moss Landing Property to MLCP, (b) the National Entities paid KACC the remaining proceeds of $1,250,000, (c) KACC withdrew, with prejudice, all proofs of claim it filed in the National Cases, (d) the National Entities withdrew, with prejudice, all proofs of claim they filed in these cases, and (e) Congress withdrew, with prejudice, all proofs of claim it filed in these cases. Additionally, KACC released Congress and each of the National Entities with respect to any and all claims arising prior to the execution of the Settlement Agreement, and Congress and the National Entities released each of the Reorganized Debtors from any and all claims arising to the execution of the Settlement Agreement, the intent being to "release completely, absolutely and finally the Kaiser Entities . . .from all liability of whatsoever kind or nature, past, present and future, without regard to the nature and/or extent of the injuries . . . and/or damage."

*MLCP's Complaint and Amended Complaint for Damages and Injunctive Relief*

36.     On November 30, 2007, MLCP served KAC and KACC, as well as the

United States EPA and certain California environmental agencies, with a notice (the "Notice")

that it intended to file suit against KAC and KACC under certain federal and state environmental

statutes as well as the Environmental Agreement, seeking to compel KAC and KACC to pay

costs MLCP has incurred and will incur relating to the environmental conditions at the Moss

Landing Property, to pay civil penalties and to undertake remediation activities necessary to

address the environmental conditions at the Moss Landing Property. A copy of the Notice is

attached hereto as Exhibit H and incorporated herein by reference. MLCP alleged in the Notice

that KAC and KACC created two landfills on the property between 1946 and 1981, which are

releasing pollutants and contaminants, and that KAC and KACC have "been on notice of the

potential threat of the dumps to the environmental since 1978 when a release of chromium

contaminated leachate occurred from one of the dumps." (Notice at 4.) MLCP further alleged

that the two landfills "have been and are partially surrounded by ditches and culverts that carry

toxic pollutants into the environment" that "none of the output of these pipes, ditches or culverts

is captured or treated" and that discharges and releases from these landfills "have been occurring

since at least 1980." (Id. at 4-5.)

37.     Also on November 30, 2007, MLCP filed a Complaint for Damages and

Injunctive Relief in the United States District Court for the Northern District of California, and

thereafter, on December 5, 2007, MLCP filed the Amended Complaint, asserting claims against

KACC in respect of the environmental conditions at the Moss Landing Property. A copy of the

Amended Complaint is attached hereto as Exhibit I and incorporated herein by reference. The

Amended Complaint seeks equitable relief, civil penalties, monetary damages and attorneys' fees

and asserts ten separate claims for relief under a variety of federal, state and common law

theories of liability as well as under the Environmental Agreement. These claims for relief

include: (a) failure to apply for a NPDES permit under the CWA; (b) discharge of pollutants

into waters of the United States without a permit in violation of the CWA; (c) creation of an

imminent and substantial endangerment to the environment in violation of RCRA; (d) continuing

public nuisance and public nuisance per se; (e) continuing private nuisance and private nuisance

per se; (f) negligence per se; (g) declaratory relief determining that KACC is required to

remediate the environmental conditions and compensate MLCP for its past costs, damages and

losses; (h) equitable indemnification and contribution for "all liabilities, claims, damages, costs,

and expenses"; (i) injunctive relief under the California Civil Code requiring KACC to remediate

the environmental conditions; and (j) breach of the Environmental Agreement.

(Am. Compl. ¶¶ 27-115.)  All of these claims for relief, however, are nothing more than

alternative theories seeking to require KACC to assume the costs of remediating the

environmental conditions that were known to MLCP at the time it purchased the Moss Landing

Property.

## Request for Relief

38.     By this Motion, the Reorganized Debtors respectfully request, pursuant to

sections 105, 524 and 1141 of the Bankruptcy Code, that the Court enforce the Plan injunctions

by compelling MLCP to dismiss its lawsuit against KAC and KACC, with prejudice.

### *Authority for the Requested Relief*

39.     "It is axiomatic that a court possesses the inherent authority to enforce its

own orders." Protarga, Inc. v. Webb (In re Protarga, Inc.), 329 B.R. 451, 479 (Bankr. D. Del.

2005 (citing In re Cont'l Airlines, Inc., 236 B.R. 318, 325-26 (Bankr. D. Del. 1999), aff'd, 279

F.3d 226 (3d Cir. 2002)).  Section 105 of the Bankruptcy Code provides that "[t]he court may

issue any order, process, or judgment that is necessary or appropriate to carry out" the

Bankruptcy Code's provisions and "gives the bankruptcy court the power and the jurisdiction to enforce its valid orders." Protarga, 329 B.R. at 479 (internal quotations and citations omitted); 11 U.S.C. § 105(a). "Section 1141 of the Bankruptcy Code provides generally that a confirmed plan of reorganization binds the debtor and all creditors affected by its terms." Cont'l Airlines, 236 B.R. at 327 n.11 (citing 11 U.S.C. § 1141).

      40.    Here, the Plan and Confirmation Order discharged all claims arising on or before the Effective Date, (Plan § 12.1; Confirmation Order § IX.A.1.), and, as explained below, there is no question that all of MLCP's claims for relief constitute dischargeable claims. The Confirmation Order specifically approves the Plan's releases, provides a discharge and issues the injunctions enforcing the discharge and releases granted pursuant to the Plan. (Confirmation Order §§ VII, IX.A, IX.B.8.)⁴ The discharge injunction and the confirmation order are "critical elements" of the debtor's fresh start, and "[i]t is essential that creditors respect these court orders and permit debtors to benefit from the rights and protections to which they are entitled." Cont'l Airlines, 236 B.R. at 330. Where creditors ignore these court orders, the bankruptcy court may enforce their terms. Id.

### *MLCP's Lawsuit Violates the Plan and Confirmation Order Injunctions*

      41.    The Plan and Confirmation Order provide that "the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims . . . arising on or before the Effective Date" and that "Confirmation will, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts and Interests that arose on or before the Effective Date . . . ." (Plan

---

⁴    Relevant portions of the Plan and Confirmation Order are attached hereto collectively as Exhibit J and incorporated herein by reference.

A – 24

§ 12.1.a.; Confirmation Order § IX.A.1.) The Plan and Confirmation Order also provide that all entities that have held, or currently hold, any claims or liabilities discharged, released, waived, settled or deemed satisfied pursuant to the Plan "will be permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests, or rights: (i) commencing or continuing in any manner any action or other proceeding against the Debtors, the Reorganized Debtors or the property of any of them, other than to enforce any right pursuant to the Plan to a distribution . . . and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan." (Plan § 12.2.a; Confirmation Order § IX.8.a.)

42.     Here, there can be no question that MLCP's claims for relief in the Amended Complaint constitute dischargeable claims and, therefore, that the filing of the Amended Complaint was a violation of the Plan and Confirmation Order injunctions. Under the Plan, the term Claim means a "claim" as defined Section 101(5) of the Bankruptcy Code against one of the Reorganizing Debtors. (Plan § 1.1(56)). Section 101(5) of the Bankruptcy Code provides that a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5). Many of MLCP's claims for relief in the Amended Complaint seek damages, costs, attorneys' fees and penalties, all of which are unquestionably Claims. Moreover, given the fact that KACC sold the Moss Landing Property back in 1984 and the fact that the environmental conditions were well known (indeed KACC and National Refractories extensively negotiated the allocation of responsibilities for such conditions in the Environmental Agreement), there can be no dispute that any claims of

MLCP relating to the environmental conditions at the Moss Landing Property arose well before the Effective Date. Indeed, several portions of the Amended Complaint seek civil penalties "in light of the historical and ongoing violations" by KACC of various environmental statutes "stretching over a period in excess of 2½ decades to the present." (Am. Compl. ¶¶ 37, 48, 56).[5]

43.    Furthermore, all of MLCP's requests for equitable remedies in the Amended Complaint likewise constitute claims that were discharged pursuant to the Plan and Confirmation Order because MLCP has an alternative right to the payment of money damages. The United States Supreme Court, in <u>Ohio v. Kovacs</u>, 469 U.S. 274 (1985), held that an equitable remedy in the form of an injunction ordering the remediation of a site constituted a dischargeable claim because the state had an alternative right to payment and the injunction "had been converted into an obligation to pay money, an obligation that was dischargeable in bankruptcy." 469 U.S. at 283. As the Supreme Court pointed out in determining that Ohio's injunctive remedy in <u>Kovacs</u> had been converted into a claim for money: "Had Kovacs furnished the necessary funds, either before or after bankruptcy, there seems little doubt that the receiver and the State would have been satisfied." <u>Id.</u> The Third Circuit Court of Appeals has specifically held that an equitable remedy will "give rise to a right of payment," and therefore be deemed a "claim," when the payment of monetary damages is an alternative to the equitable remedy. <u>Air Line Pilots Association v. Continental Airlines</u>, 125 F.3d 120, 133 (3d Cir. 1997) (citing <u>In re Udell</u>, 18 F.3d 403, 407 (7th Cir. 1994) ("[O]ne example of a 'claim' is a right to an

---

[5]    Prior to closing on the acquisition of the Moss Landing Property, MLCP possessed actual knowledge of the property's environmental conditions as a result of its own due diligence obligation under the APS to read the 2001 Environmental Report, the 2002 Sampling Report and the 1997 PES closure report. Additionally, the APS required MLCP's acknowledgement of (a) the Reorganized Debtors' pending bankruptcy cases, (b) the Environmental Agreement and KACC's right under the Bankruptcy Code to reject such contracts, (c) KACC's removal of asbestos from the property and the possibility that asbestos remained on the property, and (d) issues relating to underground storage tanks and the ongoing remediation and monitoring related thereto.

equitable remedy that can be satisfied by an 'alternative' right to payment.")). Here, the Amended Complaint itself seeks damages as an alternative to the requests for equitable relief, and MLCP's requests for injunctive relief therefore constitute Claims discharged under the Plan and Confirmation Order.

44.     MLCP may argue that its claims for injunctive relief are not dischargeable pursuant to the Third Circuit Court of Appeals' holding in In re Torwico Electronics, Inc., 8 F.3d 146 (3d Cir. 1993). Torwico, however, is inapplicable. Torwico involved a state's right to force an environmental cleanup pursuant to its police powers. 8 F.3d at 151. As stated by the Torwico court: "[t]his is not a situation where the state is attempting to get money from the debtor but rather, it is an exercise of the state's inherent regulatory and police powers. We will therefore affirm the district court." Id. As recognized in Krafczek v. Exide Corp., Case No. 00-1965, 2007 WL 1199530, at *3 (E.D. Pa. April 19, 2007), where there is no state actor exercising its police powers Torwico does not apply.

45.     In Exide, the owner of property adjacent to an Exide facility filed a citizen suit under RCRA alleging that his residential property was contaminated by lead emanating from the facility. The plaintiff asked the district court to compel Exide to remediate his property. In response, Exide argued that the plaintiff's claim had been discharged in Exide's bankruptcy proceedings. The plaintiff, citing Torwico, argued that his right to injunctive relief was not a claim as that term is defined in the Bankruptcy Code and, thus, was not discharged in Exide's bankruptcy case. The District Court for the Eastern District of Pennsylvania disagreed and held that plaintiff's right to injunctive relief under the citizen suit provisions of RCRA was a dischargeable claim in bankruptcy. Specifically, the district court reasoned:

> Torwico, however, is not on all fours with this case. Torwico
> involved a state's right to force an environmental cleanup and the

> present case concerns an individual's ability to do so. The Court's
> decision in <u>Torwico</u> was grounded on the "state's inherent
> regulatory and police powers." A state can exercise its regulatory
> powers and force compliance with its laws; but individual
> plaintiffs may not. Plaintiffs in this case do not possess these
> powers and thus differ from the plaintiff in <u>Torwico</u>. Their request
> for a mandatory injunction does not fall under the narrow
> exclusion for state environmental law enforcement actions
> recognized in <u>Torwico</u>. Therefore, their decontamination request
> is a "claim" barred by the Bankruptcy Court's final injunction and
> their complaint will be dismissed.

<u>Id.</u> at *5.

46.    That is exactly the situation here. Despite MLCP's assertions that "it is

benefiting the People of the State of California by seeking remediation" at the property

(Am. Compl. ¶ 95), there is no state actor involved here. In fact, there can never be a state actor

seeking injunctive relief because the United States EPA and the State of California have already

agreed pursuant to the Consent Decree that all liabilities and obligations of the Reorganizing

Debtors to the United States EPA and the State of California under environmental laws and

regulations relating to the Moss Landing Property would be discharged under section 1141 of the

Bankruptcy Code and that the United States EPA and California agencies will not issue a

unilateral order or seek an injunction under applicable environmental laws and regulations with

respect to the Moss Landing Property, including specifically the right to seek an injunction under

RCRA.

47.    For the same reason, the entry of the United States EPA and the California

agencies into the Consent Decree bars MLCP from asserting a "citizen" suit, irrespective of

whether such suit is a claim that was discharged under the Plan. As stated by the United States

Supreme Court, citizen suits may supplement but not supplant public litigation. <u>Gwaltney of</u>

<u>Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.</u>, 484 U.S. 49, 60, 1987), *superseded by*

*statute on other grounds*, 42 U.S.C. §§ 7401-7642, *as recognized in* <u>Atlantic States Legal Found.</u>

<u>v. United Musical Instrs.</u>, 61 F.3d 473 (6th Cir. 1995).  The Court provided a telling example:

> Suppose that the Administrator identified a violator of the Act and
> issued a compliance order . . . . Suppose further that the
> Administrator agreed not to assess or otherwise seek civil penalties
> on the condition that the violator take some extreme corrective
> action, such as to install particularly effective but expensive
> machinery, that it otherwise would not be obliged to take.  If
> citizens could file suit . . . in order to seek the civil penalties that
> the Administrator chose to forgo, then the Administrator's
> discretion to enforce the Act in the public interest would be
> curtailed considerably.

<u>Id.</u> at 60-61.  Indeed, to permit MLCP to now bring a citizen enforcement suit would completely

undermine the Consent Decree.  Furthermore, it is inconceivable that a private citizen could

effectively bring an enforcement action after the applicable state or federal agency has entered

into a consent decree waiving that right.  To permit such actions would render consent decrees

largely ineffective in direct contravention of Congress' stated preference that the United States

settle with responsible parties to avoid expending resources on litigation rather than cleanup.  42

U.S.C. § 9622(a); <u>see also</u> <u>North & South Rivers Watershed Ass'n v. Scituate</u>, 949 F.2d 552,

557-58 (1st Cir. 1991) (holding that public agencies' litigation decisions may not be second-

guessed by the device of filing an independent suit, even though the public plaintiff settled for

declaratory and injunctive relief, while the private one demands damages).

48.      Despite having full knowledge of the environmental conditions and the

fact that KACC was in bankruptcy at the time it purchased the Moss Landing Property, MLCP

never filed a claim in KACC's bankruptcy case or took any other action in KACC's bankruptcy

proceedings to attempt to preserve or pursue its ability to assert a claim for the environmental

conditions.  MLCP should not be permitted to now assert claims that it effectively relinquished

years ago.

A – 29

49.    For all the foregoing reasons, MLCP should be required, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, to dismiss its lawsuit against KAC and KACC, with prejudice.

### Notice

50.    No trustee or examiner has been appointed in these chapter 11 cases. Pursuant to Local Rule 5009-1(b), notice of this Motion has been given to: (a) the U.S. Trustee; (b) counsel to the former official committee of unsecured creditors; (c) counsel to the former official committee of asbestos claimants; (d) counsel to the former official committee of retired employees; (e) counsel to MLCP; and (f) the parties that have requested notice in these chapter 11 cases. In light of the nature of the relief requested herein, KAC and KACC submit that no other or further notice is required.

### No Prior Request

51.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Reorganized Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit K: enforcing the discharge injunctions issued by the Court in connection with confirmation of the Plan by compelling MLCP to dismiss its lawsuit against KAC and KACC, with prejudice.

Dated:  December 28, 2007
          Wilmington, Delaware.

Respectfully submitted,

Daniel J. DeFranceschi (DE 2732)
Jason M. Madron (DE 4431)
Christopher M. Samis (DE 4909)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

ATTORNEYS FOR THE REORGANIZED
DEBTORS

A – 31

**Kaiser Aluminum Corp., et al.**
**Case No. 02-10429 (JKF)**

## SUMMARY SHEET OF EXHIBITS

**EXHIBIT A**
Declaration of John M. Donnan

**EXHIBIT B**
Environmental Agreement

**EXHIBIT C**
Put/Call Agreement

**EXHIBIT D**
Sale Motion

**EXHIBIT E**
Consent Decree

**EXHIBIT F**
APS

**EXHIBIT G**
Article from The Monterey County Herald

**EXHIBIT H**
Notice of intent to file suit

**EXHIBIT I**
Amended Complaint

**EXHIBIT J**
Portions of plan and confirmation order

**EXHIBIT K**
Proposed form of order

RLF1-3239363-1

# **EXHIBIT A**

DLI-6162964v5
RLF1-3239351-1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Jointly Administered** |
| **KAISER ALUMINUM CORPORATION,** | : | **Case No. 02-10429 (JKF)** |
| a Delaware corporation, <u>et al.</u>, | : | |
| | : | **Chapter 11** |
| Debtors. | : | |
| | : | |

| | |
|---|---|
| **KAISER ALUMINUM CORPORATION,** | : |
| <u>et al.</u>, | : |
| | : |
| **Movants,** | : |
| | : |
| v. | : |
| | : |
| **MOSS LANDING COMMERCIAL** | : |
| **PARK LLC,** | : |
| | : |
| Respondent. | : |

### DECLARATION OF JOHN M. DONNAN IN SUPPORT OF MOTION OF REORGANIZED DEBTORS TO (A) ENFORCE INJUNCTIONS ISSUED IN CONNECTION WITH THE SECOND AMENDED JOINT PLAN OF REORGANIZATION AND (B) COMPEL MOSS LANDING COMMERCIAL PARK LLC TO DISMISS WITH PREJUDICE ITS LAWSUIT AGAINST KAISER ALUMINUM CORPORATION AND KAISER ALUMINUM & CHEMICAL CORPORATION

JOHN M. DONNAN, declares and states, on personal knowledge:

1.    I have been employed by Kaiser Aluminum Corporation ("KAC") and Kaiser Aluminum & Chemical Corporation LLC, successor in interest to Kaiser Aluminum & Chemical Corporation ("KACC") since 1993. During my employment, I served as Corporate Counsel from 1993 to 2000, Assistant General Counsel from 2000 to 2002, Deputy General Counsel from 2002 to 2005, Vice President, Secretary and General Counsel from January 2005 through November 2007, and in December 2007 I assumed my current positions as Senior Vice President, General Counsel and Secretary.

A -- 34

2.    I submit this declaration in support of the Motion of Reorganized Debtors to (A) Enforce Injunctions Issued in Connection with the Second Amended Joint Plan Of Reorganization and (B) Compel Moss Landing Commercial Park LLC to Dismiss with Prejudice its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical Corporation. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or my review of the relevant documents. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3.    In conjunction with the operation of its refractories business, from 1942 to 1984 KACC operated a magnesium and refractory brick facility on an approximately 188-acre parcel of land located in Moss Landing, Monterrey County, California (the "Moss Landing Property"). While in operation, the Moss Landing Property produced basic refractory brick and gum mixes, ramming mixes and mortars, chemical grade magnesium, magnesia, magnastite periclase and magnesium hydroxide.

4.    In 1984, KACC made the strategic decision to sell its refractories business, and on December 31, 1984, KACC, KACoCL and KAPI entered into an Asset Purchase Agreement (as amended, the "1984 Asset Purchase Agreement") with National Refractories & Minerals Corporation ("National Refractories"), National Refractories Holding Co. ("Holdings") and National Refractories & Minerals, Inc. (f/k/a 601725 Ontario Ltd.) (collectively, the "National Entities"), pursuant to which KACC, KACoCL and KAPI agreed to sell, and the National Entities agreed to purchase, certain real and personal property located in the United States, Canada and Mexico related to KACC's refractory business, including the Moss Landing Property. Pursuant to the 1984 Asset Purchase Agreement, the base purchase price for the refractory assets was $68 million. Financing of the purchase price was made via (a) a $44

$A - 35$

million note issued under a separate loan agreement between KACC and National Refractories and guaranteed by Holdings pursuant to a guaranty and pledge agreement, (b) a $4 million subordinated note payable to KACC and (c) $20 million in National Refractories cumulative preferred stock.[1]

### *The Agreement on Environmental Compliance*

5.      In conjunction with the 1984 Asset Purchase Agreement, on December 31, 1984, the parties also executed the Agreement on Environmental Compliance (the "Environmental Agreement"), which allocated responsibility among the parties for any liability imposed by federal, state or local law for any environmental conditions relating to the properties that were sold.  Pursuant to the Environmental Agreement, KACC retained certain potential environmental liabilities arising from the operation of the facilities prior to the sale, with National Refractories being liable for all environmental liabilities caused by operations after the sale.  Additionally, National Refractories assumed certain maintenance obligations, including certain obligations with respect to the Moss Landing Property.  Specifically, National Refractories agreed to the following with respect to the Moss Landing Property:

---

[1]      In April 1985, the National Entities entered into a credit agreement with Congress Financial Corporation ("Congress"), and KACC, National Refractories and Congress entered into an Intercreditor and Subordination Agreement (as amended, the "Subordination Agreement"), pursuant to which, among other things, KACC agreed to subordinate its indebtedness against the National Entities to that of Congress. Additionally, KACC and National Refractories executed a Subordinated Note, dated April 30, 1985, for the original principal amount of $8,000,000 (the "Subordinated Note").  In September 1990, the parties entered into a Standby Revolving Credit and Security Agreement and Guaranty (the "Guaranty"), pursuant to which National Refractories issued KACC a Standby Revolving Credit Note in the original amount of $2,500,000 (the "Standby Note").  Additionally, in May 1999, KACC, National Refractories and Holding entered into an agreement whereby KACC's approved National Refractories' acquisition of CFB Industries, Inc. and the incurrence of additional indebtedness to Congress.  In conjunction therewith, KACC, National Refractories and Congress entered into an Amended and Restated Intercreditor and Subordination Agreement.

> (a)  to maintain the existing closed brick plant waste dumps including the Dolan Road embankment. . . .
>
> (b) to reroute storm drains around the dump and to close off the present drain; and
>
> (c) to maintain the leachate collection system and continue to process leachate as presently processed for so long as a hazardous waste processing permit is not required for this process.

(Environmental Agreement § 3.1.)

   6. In addition, in conjunction with the 1984 Asset Purchase Agreement, the Environmental Agreement provided for the transfer of all permits necessary for National Refractories to conduct the refractories business. A list of permits transferred from KACC to National Refractories was included as Exhibit A to the Environmental Agreement and specifically listed, with respect to the Moss Landing Property, National Pollutant Discharge Elimination System ("NPDES") Permit No. CA-00007005 issued by the Central Coast Regional WQCB on May 2, 1980.

### *The Put/Call Agreement*

   7. Following several years of operating the Moss Landing Property, National Refractories ceased operations there and began marketing the property for sale. Despite entering into negotiations with numerous parties, National was unable to complete the sale of the Moss Landing Property. National Refractories' financial position thereafter deteriorated, and in September 2001, National Refractories and KACC began to discuss the possible sale of the Moss Landing Property to KACC as a means of providing National Refractories with a source of liquidity and KACC with, among other things, the ability to exercise greater control over the property and its future use in a way that would minimize, if not eliminate, any potential environmental issues and maximize the value of the property to potential purchasers.

8.    As a result of these discussions, KACC and National Refractories entered into a Put/Call Agreement, effective as of September 13, 2001 (the "Put/Call Agreement"), pursuant to which: (a) KACC granted National Refractories the option (the "Put Option") to require KACC to purchase the Moss Landing Property and (b) National Refractories granted KACC the option to purchase the Moss Landing Property (the "Call Option"). The purchase price for the Moss Landing Property under the Put Option and the Call Option was $5,000,000. (Put/Call Agreement § 5(a).) The Put/Call Agreement required that proceeds from the purchase price be applied to certain indebtedness owed by National Refractories to Congress. (Id. at § 5(b).) Pursuant to the first and second amendments to the Put/Call Agreement, the parties extended the deadline for the Put Option to April 15, 2002, and for the Call Option to June 17, 2002. (Amendments § 1.)

### The National Entities Bankruptcy Cases

9.    On October 10, 2001, the National Entities each commenced reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "National Cases") in the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "California Bankruptcy Court").

10.    On November 15, 2001, National Refractories filed a motion to assume the Put/Call Agreement, which was approved by the California Bankruptcy Court on or about March 19, 2002. On April 5, 2002, National Refractories sent KACC notice that National Refractories was exercising the Put Option, thereby requiring KACC to purchase the Moss Landing Property. On April 3, 2002, however, KACC had filed a motion in this Court to reject the Put/Call Agreement (D.I. 327), and on June 26, 2002, this Court entered an order granting the motion (D.I. 695).

11.     On April 17, 2003, National Refractories filed proof of claim number 1256 in the KACC chapter 11 case, in an unliquidated amount asserting claims for (a) breach of the Put/Call Agreement, (b) breach of the indemnity provisions of the Asset Purchase Agreement and the Environmental Agreement, (c) environmental costs associated with the Oakville property located in Canada, which was sold to National Refractories under the 1984 Asset Purchase Agreement, and (d) contingent environmental claims associated with the potential remediation of other properties transferred pursuant to the Asset Purchase Agreement, including the Moss Landing Property.

12.     Likewise, KACC filed a proof of claim in the National Refractories chapter 11 case in the amount of $11,775,000 plus attorneys' fees, costs, and interest, comprised of (a) principal of $4,275,000 and interest from May 6, 1999 due under the Subordinated Note; (b) principal of $2.5 million and interest from May 6, 1999 due under the Standby Note; (c) amounts arising from various contractual obligations and indemnities pursuant to the Asset Purchase Agreement, the Environmental Agreement, the May 6, 1999 agreement, the Put/Call Agreement, and the Guaranty; and (d) claims pursuant to the Solid Waste Disposal Act, the Clean Water Act ("CWA"), CERCLA and related state environmental laws and regulations.

### *Multi-Site Consent Decree*

13.     On or about August 18, 2003, the Debtors entered into a multi-site consent decree (the "Consent Decree") with the United States of America (on behalf of the United States Environmental Protection Agency (the "United States EPA"), the United States Department of Interior and the National Oceanic and Atmospheric Administration), the states of California (on behalf of the California Department of Toxic Substances Control and the California Department of Fish and Game), Rhode Island and Washington, and the Puyallup Tribe of Indians (collectively, the "Settling Parties").

A – 39

14.    The Consent Decree settled more than $727 million of environmental claims and established procedures for the resolution of the Debtors' environmental liabilities arising from prepetition operations, such as those at the Moss Landing Property. The Consent Decree categorizes each site from which the Debtors' environmental liabilities arose, or could arise in the future, as either a Liquidated Site, a Discharged Site, a Debtor-Owned Site, a Reserved Site or an Additional Site (as each such term is defined in the Consent Decree). The Consent Decree lists and identifies by name 66 Liquidated Sites, 18 Discharged Sites and 6 Reserved Sites. (Id. at ¶¶ 1.G., 1.M., 1.T.) Debtor-Owned Sites are defined in the Consent Decree as sites that are owned by the Debtors at or any time after the confirmation of a plan of reorganization that includes KACC, excluding Reserved Sites. (Id. at ¶ 1.F.) Finally, Additional Sites is defined to include all sites and properties, including all facilities as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), other than a Liquidated Site, a Discharged Site, a Debtor-Owned Site or a Reserved Sites. (Id. at ¶ 1.A.) Because the Moss Landing Property is not a Debtor-Owned Site and is not listed in the Consent Decree as a Liquidated Site, a Discharged Site or a Reserved Site, the Moss Landing Property is an Additional Site under the terms of the Consent Decree.

15.    Of particular significance, the Consent Decree provides that all environmental liabilities and obligations to the Settling Parties with respect to the Additional Sites would be discharged by confirmation of the Plan:

> With respect to all Additional Sites, all liabilities and obligations of the Debtors to the Settling Federal Agencies and the States under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607, Section 7003 of RCRA, 42 U.S.C. § 6973, and Similar State Laws arising from Prepetition acts, omissions or conduct of the Debtors or their predecessors, including without limitation the Prepetition generation, transportation, disposal or release of hazardous substances, wastes or materials or dangerous wastes or

> the Prepetition ownership or operation of hazardous waste or
> hazardous substance sites and/or facilities and state counterparts,
> shall be discharged under Section 1141 of the Bankruptcy Code by
> the confirmation of a Plan of Reorganization . . .

(Id. at ¶ 7).

16.    The Consent Decree further provides that the Settling Parties will receive

no distributions with respect to environmental liabilities associated with the Additional Sites, but

may, in the ordinary course of conducting agency enforcement activities in the future, seek a

determination of KACC's liability with respect to Additional Sites.  (Id.)  If KACC is determined

to be liable, KACC's liability with respect to an Additional Site will be the same as it would have

been had the liability for the Additional Site been liquidated in the chapter 11 cases and treated

as an allowed general unsecured claim under the Plan (i.e., KACC's liability will be satisfied by

making a payment equivalent to what the distribution on such a claim would have been).  (Id.)

17.    Moreover, the Consent Decree specifically provides that the Settling

Parties will not issue a unilateral order or seek an injunction with respect to the Additional Sites

against the Debtors under Section 106 of CERCLA, 42 U.S.C. § 9606, Section 7006 of the

Resource Conservation Recovery Act ("RCRA"), 42 U.S.C. § 6973, or any similar state laws

arising from the prepetition acts, omissions or conduct of the Debtors or their predecessors with

respect to any Additional Sites.  (Id. at ¶¶ 7-9.)  In addition, in any action or proceeding with

respect to an Additional Site, the parties reserved all rights, claims and defenses they would have

been entitled to assert had the claim been liquidated in the ordinary course or during the course

of the chapter 11 proceedings and also agreed to attempt to negotiate fair and equitable terms in

settlement of any claims relating to Additional Sites.  (Id. at ¶¶ 7-9.)

18.    On August 22, 2003, the Debtors filed a motion seeking approval of the

Consent Decree, which was served on the National Entities.  On August 27, 2003, the United

States published notice of the proposed Consent Decree in the Federal Register at 68 Fed. Reg. 51596 (Aug. 27, 2003). The United States received five public comments during the thirty-day public comment period. On October 27, 2003, the Court entered an order approving the Consent Decree (D.I. 3102). During the 60-day period that the Consent Decree was pending in this Court and subject to public comment, Nader Agha, who formed MLCP to acquire the Moss Landing Property, was completing due diligence and negotiating with National to purchase the Moss Landing Property.

### *Sale of Moss Landing Property to MLCP*

19.     On October 6, 2003 National Refractories entered into an Agreement of Purchase and Sale (as amended, the "APS") for the Moss Landing Property with Nader Agha, who subsequently formed MLCP to take title to the property. The APS granted Nader Agha 55 days from September 18, 2003 to conduct due diligence on the property. On October 14, 2003, National Refractories filed the Sale Motion, which the California Bankruptcy Court granted on November 3, 2003. No other party expressed interest in the property. Accordingly, on December 1, 2003, the California Bankruptcy Court entered an order approving the sale of the Moss Landing Properties, free and clear of liens and encumbrances, to Nader Agha for $7,500,000. The sale of the property closed and MLCP took title in December 2003.

20.     The APS required MLCP to agree that prior to the closing MLCP would have read a May 2001 TRC Phase I environmental assessment report (the "2001 Environmental Assessment") and a November 2002 Phase II soil and groundwater sampling report (the "2002 Sampling Report") prepared by Pacific Crest Engineering as well as a 1997 PES closure report. Additionally, the APS explicitly states that "all matters in those assessments and that report are deemed to have been disclosed to Buyer." (APS § 17.a.xv.)

21.    The APS also notes that an underground storage tank ("UST 6") had been removed, which was listed in the 2001 Environmental Assessment, and that there was ongoing monitoring of the UST 6 site. (Id.) Pursuant to the APS, MLCP agreed "to pay the entire cost of any and all monitoring and remediation concerning UST 6." (Id.) Additionally, the APS required MLCP's acknowledgment that:

> [W]hile KACC removed visible asbestos in 1979-1980, there still may be asbestos on the Real Property; that the four known underground storage tanks were removed from the Real Property while Seller has owned it, and of these Seller has "no further action required" letters on three of these tanks from the Monterey County Department of Health, while the site of the fourth tank – which was behind the brick plant – is still being remediated; there is a tank on a pad in a pit containing approximately 8,000 gallons of material, including crankcase oil, on the Real Property.

(Id. at § 17.a.xix.(5).)

22.    The APS also required National Refractories to provide Nader Agha/MLCP with all material correspondence between KACC and National Refractories regarding maintenance of the landfills on the Moss Landing Property. (Id. at § 5.a.viii.) Moreover, the APS lists the Environmental Agreement as an assigned contract but required Nader Agha's acknowledgment that "KACC is in its own Chapter 11 bankruptcy proceedings and may reject any such agreements as burdensome executory contracts."[2] (Id. at § 5.a.viii.) The APS also provides that MLCP will perform all obligations of the National Entities under the Environmental Agreement with respect to the Moss Landing Property and specifically imposes an obligation on MLCP to avoid "taking any actions, including but not limited to actions regarding the Landfills on the Property, that would trigger or increase KACC's and/or Seller's liability...." (Id. at § 41.c.)

---

[2]    Pursuant to Section 6.3 of the Plan, KACC rejected the Environmental Agreement on the Effective Date.

23.    Moreover, upon closing of the sale, MLCP hired Sam Bose to oversee the demolition of the refractory plant and the environmental remediation that MLCP initiated immediately after the sale closed. Mr. Bose worked for KACC from 1979 to 1984 and served as its environmental manager ensuring environmental compliance at KACC facilities, including the Moss Landing Property.

## *Settlement Agreement Among KACC and the National Entities*

24.    On or about March 30, 2004, to avoid the expense and uncertainty of litigation and the concomitant delay in the administration of their respective chapter 11 cases, KACC and the National Entities entered into a Settlement Agreement (the "Settlement Agreement") to resolve their respective proofs of claim and related issues. Both National Refractories and KACC filed motions to approve the Settlement Agreement in their respective bankruptcy cases. MLCP did not file an objection to the Settlement Agreement and the California Bankruptcy Court entered an order approving the Settlement Agreement on April 19, 2004. This Court entered an order approving the Settlement Agreement on May 17, 2004.

25.    Pursuant to the terms of the Settlement Agreement (a) KACC agreed to allow the National Entities a set-off in the amount of $475,000, which amount was set-off from $1,725,000 held by the National Entities as proceeds from the sale of the Moss Landing Property to MLCP, (b) the National Entities paid KACC the remaining proceeds of $1,250,000, (c) KACC withdrew, with prejudice, all proofs of claim it filed in the National Cases, (d) the National Entities withdrew, with prejudice, all proofs of claim they filed in these cases, and (e) Congress withdrew, with prejudice, all proofs of claim it filed in these cases. Additionally, KACC released Congress and each of the National Entities with respect to any and all claims arising prior to the execution of the Settlement Agreement, and Congress and the National Entities released each of the Reorganized Debtors from any and all claims arising to the execution of the

Settlement Agreement, the intent being to "release completely, absolutely and finally the Kaiser

Entities . . .from all liability of whatsoever kind or nature, past, present and future, without

regard to the nature and/or extent of the injuries . . . and/or damage."

### *MLCP's Complaint and Amended Complaint for Damages and Injunctive Relief*

26.    On November 30, 2007, MLCP served KAC and KACC, as well as the

United States EPA and certain California environmental agencies, with a notice (the "Notice")

that it intended to file suit against KAC and KACC under certain federal and state environmental

statutes as well as the Environmental Agreement, seeking to compel KAC and KACC to pay

costs MLCP has incurred and will incur relating to the environmental conditions at the Moss

Landing Property, to pay civil penalties and to undertake remediation activities necessary to

address the environmental conditions at the Moss Landing Property. MLCP alleged in the

Notice that KAC and KACC created two landfills on the property between 1946 and 1981, which

are releasing pollutants and contaminants, and that KAC and KACC have "been on notice of the

potential threat of the dumps to the environmental since 1978 when a release of chromium

contaminated leachate occurred from one of the dumps." (Notice at 4.) MLCP further alleged

that the two landfills "have been and are partially surrounded by ditches and culverts that carry

toxic pollutants into the environment" that "none of the output of these pipes, ditches or culverts

is captured or treated" and that discharges and releases from these landfills "have been occurring

since at least 1980." (Id. at 4-5.)

27.    Also on November 30, 2007, MLCP filed a Complaint for Damages and

Injunctive Relief in the United States District Court for the Northern District of California, and

thereafter, on December 5, 2007, MLCP filed its First Amended Complaint for Damages and

Injunctive Relief with the United States District Court for the Northern District of California (the

"Amended Complaint"), asserting claims against KACC in respect of the environmental

A – 45

conditions at the Moss Landing Property. The Amended Complaint seeks equitable relief, civil penalties, monetary damages and attorneys' fees and asserts ten separate claims for relief under a variety of federal, state and common law theories of liability as well as under the Environmental Agreement. These claims for relief include: (a) failure to apply for a NPDES permit under the CWA; (b) discharge of pollutants into waters of the United States without a permit in violation of the CWA; (c) creation of an imminent and substantial endangerment to the environment in violation of RCRA; (d) continuing public nuisance and public nuisance per se; (e) continuing private nuisance and private nuisance per se; (f) negligence per se; (g) declaratory relief determining that KACC is required to remediate the environmental conditions and compensate MLCP for its past costs, damages and losses; (h) equitable indemnification and contribution for "all liabilities, claims, damages, costs, and expenses"; (i) injunctive relief under the California Civil Code requiring KACC to remediate the environmental conditions; and (j) breach of the Environmental Agreement. (Am. Compl. ¶¶ 27-115.)

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 27, 2007

_____
John M. Donnan

DLI-6164019v1

# EXHIBIT B

DLI-6162964v4

Kaiser 1984 agreement on
environmental compliance

## AGREEMENT ON ENVIRONMENTAL COMPLIANCE

This Agreement on Environmental Compliance ("Agreement") is made this 31st day of December 1984 among National Refractories Holding Co., a Delaware corporation, National Refractories & Minerals Corporation, a California corporation, and 601725 Ontario Ltd., incorporated in Ontario, Canada, all with offices at 300 Lakeside Drive, Oakland, California 94643 (collectively referred to as Buyers"), and Kaiser Aluminum & Chemical Corporation, a Delaware corporation, Kaiser Agricultural Chemicals Corporation, a Delaware corporation, and Kaiser Aluminum & Chemical of Canada Limited, incorporated in Nova Scotia, Canada, all with offices at 300 Lakeside Drive, Oakland, California 94643 (collectively referred to as Sellers").

### WITNESSETH:

WHEREAS, Buyers and Sellers have entered into an Asset Purchase Agreement, of even date ("Asset Purchase Agreement") under which Buyers have agreed to purchase and Sellers have agreed to sell certain assets and properties ("Assets") on the Closing date as "Closing" is defined in the Asset Purchase Agreement;

WHEREAS, Clause 4.2 of said Asset Purchase Agreement provides that: "All environmental, operating, use and other permits, exceptions to zoning laws or other such rights relating to the Assets in any way whatsoever shall, to the extent transferable, accompany the Lease and assignments of leases of the Real Property and Equipment to Buyers and Sellers and Buyers will execute such assignments and assumptions as may be required to transfer such rights to Buyers. Buyers and Sellers shall cooperate to obtain the consents of all parties required in connection with the assignment or transfer of such permits. All obligations to be performed and all conditions to be met under any such permit shall, after Closing, be the responsibility and obligation of Buyers."

WHEREAS, Clause 4.11 of said Asset Purchase Agreement provides that: "Subject to the provisions of the Agreement on Environmental Compliance to be entered into on the Closing date, Sellers shall retain all liability imposed on Sellers by federal, state or local law or regulation for damages to the environment as a result of events occurring prior to the Closing or for failure prior to the Closing to comply with any federal, state or local law relating to the environment."

WHEREAS, Clause 10.1 of said Asset Purchase Agreement provides that Buyers and one or more of the other parties to the Asset Purchase Agreement shall enter into an "Agreement on Environmental Compliance";

WHEREAS, Clauses 15.2, 15.3, 15.4 and 15.5 of said Asset Purchase Agreement provide for indemnity by Sellers and indemnity by Buyers for matters covered by the Asset Purchase Agreement.

NOW THEREFORE, the parties hereto agree as follows:

ARTICLE 1. - Responsibility

1.1  After Closing the respective responsibilities of Buyers and Sellers for environmental hazard, damage, condition or regulatory non-compliance arising out of or in connection with ownership and operation of the Assets shall be governed by the provisions of the Asset Purchase Agreement and this Agreement.

1.2  Except as otherwise provided in this Agreement, Sellers shall retain all liability imposed by Federal, state, provincial or local law or regulation, and resulting from third party legal actions, for (a) penalties and damages or claims for damages to the environment resulting from events which occurred prior to Closing, (b) Sellers' failure or alleged failure prior to Closing to comply with Federal, state, provincial or local laws or regulations relating to the environment, and (c) remedial actions required by governmental authorities to rectify such pre-Closing events or regulatory non-compliance, such as removing, treating or disposing of any contaminants or bringing the surface or subsurface of land comprising the Assets into compliance with regulatory requirements. Buyers shall be liable for all such matters resulting from events and regulatory

3

non-compliance which occur after Closing. Buyers and Sellers shall share the costs in proportion to their respective liabilities in cases where damages or required remedial actions address events or regulatory non-compliance occurring both before and after Closing.

1.3 Buyers shall promptly notify Sellers in writing of any claim or threatened claim for environmental damage or penalty, or any demand or threatened demand by regulatory authorities for remedial action, which Buyers assert to be Sellers' responsibility under the terms of this Agreement. In such cases Sellers shall have the right, acting in good faith and without unnecessary delay, to contest such claim or demand at its own expense with counsel of its choice, or to negotiate the terms of remedial action. Buyers shall have the right to participate in any such litigation or contest at its own expense with counsel of their choice. If Sellers do not promptly exercise their right to litigate or contest such claim or demand, Buyers shall have the right, acting in good faith and without unnecessary delay, to litigate or contest such claim at its own expense with counsel of their choice. If it is subsequently determined that Sellers have refused to assume the defense of a claim or demand for which they had liability under this Agreement, the cost of defense of such claim borne by Buyers shall constitute an additional liability for which Sellers shall be obligated. Buyers and Sellers shall cooperate fully in the defense of any such litigation or contest or the negotiation of a remedial action plan, and each shall keep each other advised of the progress and disposition thereof.

4

ARTICLE 2. – Permits; Remedial Action

2.1 Buyers are purchasing the Assets for the purpose of conducting a refractories manufacturing business. Pursuant to the Asset Purchase Agreement, Sellers have agreed to assign and Buyers have agreed to assume as of Closing (to the extent permitted by law) all permits, including air, water and waste discharge, use, operating and mining permits, associated with the Assets (the "Permits"). To the extent any such Permits cannot be assigned, Buyers shall promptly apply for replacement Permits in Buyers' name.

2.2 A list of Permits associated with the Assets which are to be assigned to Buyers by Sellers or replaced by Buyers is attached hereto as Exhibit A.

2.3 For commercial activities and uses of the Assets other than mining and processing refractory raw materials and related non-metallic minerals, and manufacturing refractory and related products, Buyers shall pay all costs associated with (a) transferring existing and obtaining new Permits, (b) carrying out environmental monitoring, sampling, analysis, remedial planning and similar activities which are required as conditions of all Permits, and (c) performing all environmental remedial work.

2.4 For commercial activities and uses of the Assets in mining and processing refractory raw materials and related non-metallic minerals, and manufacturing refractory and related products:

2.4.1 all costs associated with transferring existing and obtaining new Permits shall be paid by Buyers; and

2.4.2  all costs of carrying out environmental monitoring, sampling, analysis, remedial planning and similar activities which are required as conditions of all Permits with respect to environmental hazards or potential hazards which existed prior to December 31, 1984, shall be shared by Buyers and Sellers as follows:

(a)  for calendar years 1985 through 1989, Sellers shall reimburse Buyers for one hundred percent (100%) of all such costs incurred at Moss Landing during those years;

(b)  for calendar years 1990 through 1999 at Moss Landing, and for calendar years 1985 through 1994 at all other plant locations included in the Assets, Sellers shall reimburse Buyers fifty percent (50%) of the first $2,000,000 aggregate per year of all such costs incurred by Buyers, and one hundred percent (100%) of any balance in excess of $2,000,000.

2.5  The costs of remedial action (including monitoring, sampling, analysis, remedial planning and similar activities which are required on a permanent basis) with respect to environmental hazards or potential hazards which existed on or prior to December 31, 1984, shall be shared by Buyers and Sellers as follows:

2.5.1  except in the case of an expansion at Moss Landing as covered in Section 2.5.2 below, Sellers shall reimburse Buyers for one hundred percent (100%) of such costs at all plant locations;

6

2.5.2  where such remedial costs are incurred in connection with an expansion at Moss Landing, Sellers shall reimburse Buyers fifty percent (50%) of the first $2,000,000 of such costs, and one hundred percent (100%) of costs above $2,000,000. An "expansion" for this purpose shall mean the construction of facilities involving a significant change in the scope of current operations or in the existing capacity of the facilities as of December 31, 1984 (excluding modernization or optimization of such facilities).

2.6  At regular intervals to be agreed upon by the parties, Buyers shall furnish Sellers invoices itemizing amounts owed pursuant to this Article 2.  Payment shall be due thirty (30) days from date of invoice.  Buyers' costs used in calculating invoices shall be subject to audit at reasonable intervals.

ARTICLE 3. - Buyers Obligations

3.1  Buyers covenant and agree as follows:

3.1.1  At Moss Landing -

(a)  to maintain the existing closed brick plant waste dumps including the Dolan Road embankment. This includes all ordinary maintenance, patching, and similar repairs, but not such extraordinary maintenance as replacement of the existing surface covers at the end of their useful lives;

(b)  to reroute storm drains around the dump and to close off the present drain; and

7

A—55

(c)   to maintain the leachate collection system and continue to process leachate as presently processed for so long as a hazardous waste processing permit is not required for this process.

3.1.2  At all locations –

(a)   to avoid taking actions in areas of the Assets which Buyers knew or should have known were used prior to December 31, 1984, for the subsurface disposal of waste materials, which actions would trigger Sellers' liability or increase the scope of Sellers' liability. Such areas shall be designated in writing by mutual agreement of Buyers and Sellers. Notwithstanding any provisions of this Agreement to the contrary, all liability resulting from such actions shall be for Buyers' account. "Actions" for this purpose (i) include accidents, willful or negligent acts or omissions, and failure to observe the provisions of this Agreement; and (ii) exclude permit applications for operations filed in the ordinary course of business;

(b)   to keep Sellers fully and promptly informed of any claim or threatened claim for damages, or any demand by any governmental authority for remedial action for the removal, treatment or disposal of any contaminants from the surface or subsurface of any land purchased as a part of the Assets for which Sellers may be wholly or partially responsible;

(c)   to cooperate with Sellers (i) in developing and securing approval for remedial actions which utilize the

8

A – 56

least-cost alternatives acceptable to the regulatory authorities requiring the remedial action, and (ii) implementing all required and appropriate remedial action. In developing and implementing such least-cost alternatives, good faith efforts will be made to minimize interference with Buyers' operations.

ARTICLE 4. - <u>Reclamation</u>

4.1 Except as set forth in Section 4.2 below, Buyers shall be solely responsible for the performance of all reclamation work that may be required on or in connection with any real property forming a part of the Assets, including implementation of the reclamation plan for Natividad as set forth in Use Permit No. 2970 issued by the Planning Commission of Monterey County, California (the "Natividad Use Permit").

4.2 If as a consequence of any state or Federal reclamation legislation which is enacted after December 31, 1984, (i) the Natividad Use Permit is either revoked or mandatorily revised prior to December 31, 1989, and (ii) as a result of such revocation or revision Buyers necessarily incur increased reclamation costs at Natividad over those costs which would otherwise have been incurred under the Natividad Use Permit, Sellers shall reimburse Buyers for fifty percent (50%) of the first $6,000,000 in such cost increases. Aggregated incremental cost increases above $6,000,000 shall be entirely for Buyers' account.

9

4.3  If Sellers shall pay any amounts to Buyers pursuant to Section 4.2, and if Buyers have as a consequence of the enactment of any such legislation and resulting permit revocation or revision any right to damages for condemnation, inverse condemnation, or the like, Buyers and Sellers shall jointly pursue such rights and shall share in any recovery on the same basis as they shared in the incremental cost increases in accordance with Section 4.2.

ARTICLE 5. - <u>Offsite Disposal Claims</u>

Sellers shall be responsible for any claims by third parties arising out of or in connection with Seller' disposal prior to Closing of hazardous or non-hazardous wastes on property which is not part of the Assets.

ARTICLE 6. - <u>Indemnity</u>

6.1  Buyers shall indemnify, defend and hold harmless Sellers from and against all demands, claims, actions or causes of action, assessments, damages, liabilities, costs and expenses, including, without limitation, interest, penalties and attorneys' fees and expenses (collectively, "Damages"), asserted against, imposed upon or incurred by Sellers by reason of or resulting from any failure of Buyers to comply with the responsibility and obligation of Buyers assumed under Articles 1, 2, 3, and 4 of this Agreement.

10

6.2 Sellers shall indemnify, defend and hold harmless Buyers from and against all demands, claims, actions or causes of action, assessments, damages, liabilities, costs and expenses, including, without limitation, interest, penalties and attorneys' fees and expenses (collectively, "Damages"), asserted against, imposed upon or incurred by Buyers by reason of or resulting from any failure of Sellers to comply with the responsibility and obligation of Sellers assumed under Articles 1, 2, 4, and 5 of this Agreement.

ARTICLE 7. - <u>Miscellaneous</u>

7.1 <u>Notices</u>. All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or upon receipt, if transmitted by telecommunication or wire, and properly addressed as follows:

(a) to Sellers at the address above first written;

      Attention:   Mr. W. R. Linn
                   KB 1445

      with copy to: Mr. D. L. Perry
                   Vice President and General Counsel
                   Kaiser Aluminum & Chemical Corporation
                   300 Lakeside Drive
                   Oakland, CA  94643

(b) to Buyers at the address above first written;

      Attention:   Mr. Charles C. Smith
                   KB 1460

with copy to:  Mr. Brian J. McCarthy
Skadden, Arps, Slate, Meagher & Flom
515 South Figueroa Street
Los Angeles, CA 90071

Any party may change its address for purposes of this Article by giving the other parties written notice of the new address in the manner set forth above.

7.2  <u>Governing Law</u>.  This Agreement shall be construed in accordance with, and governed by, the laws of the State of California.

7.3  <u>Assignment</u>.  No party hereto shall assign this Agreement or any part thereof without the prior written consent of the other parties.  Except as otherwise provided herein, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7.4  <u>No Third Party Beneficiaries</u>.  Nothing in this Agreement shall entitle any person other than the parties hereto and their respective successors and permitted assigns to any claim, cause of action, remedy or right of any kind.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the day and year first above written.

NATIONAL REFRACTORIES HOLDING CO.

By: _____

12

A – 60

NATIONAL REFRACTORIES & MINERALS
   CORPORATION

By: _____


601725 ONTARIO LTD.

By: _____


KAISER ALUMINUM & CHEMICAL CORPORATION

By: _____


KAISER AGRICULTURAL CHEMICALS
   CORPORATION

By: _____


KAISER ALUMINUM & CHEMICAL OF CANADA
   LIMITED

By: _____

CURRENT ENVIRONMENTAL AND USE PERMITS

31 DECEMBER 1984


I:      AIR PERMITS

II:     WATER PERMITS

III:    USE PERMITS

IV:     OTHER

I:    AIR PERMITS


Current Ohio EPA Permits to Operate Air
Contaminant Sources Which Are Held by Kaiser
Aluminum & Chemical Corporation's Columbiana
Refractories and Are Being Transferred to
National Refractories & Minerals Corporation


| Permit Number | Date Issued | Expiration Date |
|---|---|---|
| 1715010014P001 | 02/13/84 | 02/17/87 |
| 1715010014P002 | 04/13/82 | 04/12/85 |
| 1715010014P003 | 01/24/83 | 01/23/86 |
| 1715010014P007 | 01/24/83 | 01/23/86 |
| 1715010014P008 | 01/24/83 | 01/23/86 |
| 1715010014P009 | 01/24/83 | 01/23/86 |
| 1715010014P010 | 01/24/83 | 01/23/86 |
| 1715010014P011 | 01/24/83 | 01/23/86 |
| 1715010014P012 | 01/24/83 | 01/23/86 |
| 1715010014P013 | 01/24/83 | 01/23/86 |
| 1715010014P017 | 03/14/83 | 03/13/86 |
| 1715010014P020 | 01/24/83 | 01/23/86 |
| 1715010014P021 | 01/24/83 | 01/23/86 |
| 1715010014P022 | 01/24/83 | 01/23/86 |
| 1715010014P023 | 01/24/83 | 01/23/86 |
| 1715010014P024 | 03/14/83 | 03/13/86 |
| 1715010014P025 | 03/14/83 | 03/13/86 |
| 1715010014P026 | 03/14/83 | 03/13/86 |
| 1715010014P027 | 03/14/83 | 03/13/86 |
| 1715010014P040 | 05/20/83 | 05/19/86 |
| 1715010014P041 | 05/20/83 | 05/19/86 |
| 1715010014P902 | 07/14/84 | 07/13/87 |
| 1715010014P904 | 07/14/84 | 07/13/87 |
| 1715010014P004* | 04/03/83 | 04/03/83 |
| 1715010014P005* | 02/18/77 | 02/18/77 |
| 1715010014P018* | 12/10/76 | 12/10/76 |
| 1715010014P038* | 09/15/77 | 09/15/77 |
| 1715010014P039* | 04/05/77 | 04/05/77 |
| 1715010014P042* | 03/11/77 | 03/11/77 |
| 1715010014P043* | 07/29/77 | 07/29/77 |

---

* On Registration Status Only


A-2


A – 63

Current Missouri Department of Natural Resources
Permits to Operate Air Pollutant Sources Which
Have Been Transferred to National Refractories &
Minerals Corporation's Mexico Refractories from
Kaiser Aluminum & Chemical Corporation

| Permit Number | Date Issued |
|---------------|-------------|
| #1RK-STACK    | 04/06/73    |
| #2RK-STACK    | 08/20/75    |
| 0183-001      | 01/25/83    |
| 0482-003A*    | 04/09/82    |
| 0979-23       | 09/25/79    |
| 0979-24       | 09/25/79    |
| 0979-25       | 09/25/79    |
| 0979-26       | 09/25/79    |
| 0979-27       | 09/25/79    |
| 0979-28       | 09/25/79    |
| 0979-29       | 09/25/79    |

thority to construct

A-3

Monterey Bay Unified Air Pollution Control District Permits
To Operate and Authorities to Construct Which Are Held
by Kaiser Aluminum & Chemical Corporation and Are Being
Transferred to National Refractories & Minerals Corporation

| Permit Number | Date Issued | Expiration Date |
|---|---|---|
| P-5-1(a) | 01/01/71 | -- |
| P-5-3 | 01/01/71 | -- |
| P-1057 | 02/16/78 | -- |
| P-1059 | 02/16/78 | -- |
| P-1061 | 02/16/78 | -- |
| P-1062 | 02/27/78 | -- |
| P-1063 | 02/27/78 | -- |
| P-1406 | 09/04/79 | -- |
| P-1407 | 09/04/79 | -- |
| P-1426 | 10/15/79 | -- |
| P-1466 | 04/07/80 | -- |
| P-1467 | 04/07/80 | -- |
| P-1699 | 03/08/82 | -- |
| P-1700 | 03/08/82 | -- |
| P-1701 | 03/08/82 | -- |
| P-1703 | 03/26/82 | -- |
| P-1704 | 03/26/82 | -- |
| P-1705 | 03/26/82 | -- |
| P-1706 | 03/26/82 | -- |
| P-1707 | 03/26/82 | -- |
| P-1708 | 03/26/82 | -- |
| P-1716 | 04/09/82 | -- |
| P-1837 | 01/12/84 | -- |
| P-1838 | 01/12/84 | -- |
| P-1994 | 01/12/84 | -- |
| P-1995 | 01/12/84 | -- |
| P-2076 | 04/20/84 | -- |
| P-2078 | 04/20/84 | -- |
| 653 | 11/27/78 | -- |
| 912* | 07/05/79 | -- |
| 3064* | 03/22/84 | 03/22/86 |

* Authority to Construct

A-4

A – 65

| Permit Number | Date Issued | Expiration Date |
|---|---|---|
| **Moss Landing, Magnesia Plant** | | |
| P-4-1(a) | 01/01/71 | - |
| P-4-2(a) | 01/01/71 | - |
| P-4-3(a) | 01/01/71 | - |
| P-4-5 | 01/01/71 | - |
| P-4-7 | 01/01/71 | - |
| P-4-8 | 01/01/71 | - |
| P-4-9 | 01/01/71 | - |
| P-809 | 11/27/78 | - |
| P-1052 | 02/16/78 | - |
| P-1076 | 05/11/78 | - |
| P-1410 | 02/19/79 | - |
| 1628 | 04/12/84 | - |
| P-1683 | 01/06/82 | - |
| P-1692 | 01/06/82 | - |
| P-1710 | 03/31/82 | - |
| P-1711 | 03/31/82 | - |
| P-1712 | 03/31/82 | - |
| P-1857 | 02/09/83 | - |
| P-1874(a) | 04/27/83 | - |
| P-1890 | 04/01/83 | - |
| P-1898 | 04/11/83 | - |
| P-1899(a) | 04/27/83 | - |
| P-1949 | 07/21/83 | - |
| P-1950 | 07/21/83 | - |
| P-2066 | 02/15/84 | - |
| P-2067 | 02/15/84 | - |
| P-2068 | 02/15/84 | - |
| P-2069 | 02/15/84 | - |
| P-2072 | 07/27/84 | - |
| P-2073 | 07/27/84 | - |
| P-2080 | 06/27/84 | - |
| P-2081 | 08/03/84 | - |
| 2094 | 11/13/84 | - |
| 3067 | 08/03/84 | - |
| 3112 | 05/18/84 | - |
| 1127* | 06/17/81 | 06/17/85 |
| 1536A* | 07/29/83 | 07/29/85 |
| 1624* | 11/30/82 | - |
| 3113* | 05/24/84 | 05/26/85 |
| 3055* | 04/11/84 | 04/11/85 |
| 3057* | 04/11/84 | 04/11/85 |

*Authority to Construct

A-5

| Permit<br>Number | Date<br>Issued | Expiration<br>Date |
|---|---|---|
| Natividad | | |
| P-3-1 | 01/01/71 | - |
| P-3-4 | 01/01/71 | - |
| P-3-5 | 01/01/71 | - |
| P-3-6 | 01/01/71 | - |
| P-3-8 | 01/01/71 | - |
| P-3-10 | 01/01/71 | - |
| P-3-12 | 04/21/77 | - |
| 649 | 10/25/78 | - |
| 931 | 12/11/79 | - |
| P-1549 | 10/09/80 | - |
| P-1655 | 08/10/81 | - |
| P-1713 | 04/06/82 | - |
| P-1714 | 04/06/82 | - |
| P-1715 | 04/06/82 | - |
| P-1875 | 03/31/83 | - |
| P-1876 | 03/31/83 | - |
| P-1877 | 04/04/83 | - |
| P-1888 | 04/05/83 | - |
| P-1889 | 04/05/83 | - |
| P-1891 | 04/05/83 | - |
| P-2071 | 03/30/84 | - |
| 3011 | 11/13/84 | - |
| 1770B* | 04/11/84 | 04/11/86 |
| 1980 * | 11/16/83 | 11/16/85 |

* Authority to Construct

Note:  On all (3) plant lists there may be some Authority to Construct
permits noted which have been converted to Permit to Operate
status.

A-6

II:  WATER PERMITS

Current Missouri Department of Natural.
Resources Permits to Operate Installations
Emitting Water Pollutants Which Are Held by
Kaiser Aluminum & Chemical Corporation and
Are Being Transferred to National Refractories
& Minerals Corporation

## I.  Macon Region

| Permit Number | County | Date Issued | Expiration Date |
|---|---|---|---|
| MO-0000531 | Audrain | 11/23/79 | 11/22/84* |
| MO-0000523 | Audrain | 07/20/84 | 07/19/89 |
| MO-0000507 | Audrain | 07/20/84 | 07/19/89 |
| MO-0000515 | Audrain | 07/20/84 | 07/19/89 |
| MO-0045896 | Audrain | 11/09/84 | 11/08/89 |

## II.  Jefferson City Region

| Permit Number | County | Date Issued | Expiration Date |
|---|---|---|---|
| MO-0004022 | Callaway | 11/16/79 | 11/15/84* |

## III.  St. Louis Region .

| Permit Number | County | Date Issued | Expiration Date |
|---|---|---|---|
| MO-0004014 | Montgomery | 12/09/83 | 09/20/84* |
| MO-0045900 | Gasconade | 01/04/80 | 01/03/85* |
| MO-0093921 | Gasconade | 04/15/83 | 04/19/88 |

---

* Renewal in process.

A-7

Current Ohio and California NPDES Permits to Operate
Installations Emitting Water Pollutants Which Are Held
by Kaiser Aluminum & Chemical Corporation and Are
Being Transferred to National Refractories & Minerals
Corporation

| Plant | Issuing Agency | Permit No. | Date Issued | Date Expires |
|-------|----------------|------------|-------------|--------------|
| Columbiana | Ohio EPA | 3IE C0035 | 09/30/82 | 09/28/87 |
| Moss Landing | Central Coast Regional WQCB | CA-C007005 | 05/02/80 | 05/01/85 |
| Natividad | Central Coast Regional WQCB | CA-0048993 | 10/12/84 | 10/11/89 |

A-6

III:    USE PERMITS

Current Monterey County, California, Use Permits
which are Held by Kaiser Aluminum & Chemical
Corporation (KACC) or Kaiser Refractories and Are
Being Transferred to National Refractories &
Minerals Corporation

| Permit Number | Date Issued | Grantee |
|---|---|---|
| 1576 | 08-31-66 | KACC |
| 1604 | 11-30-66 | KACC |
| 1674 | 08-30-67 | KACC |
| 2295 | 07-31-74 | Kaiser Refractories |
| 2319 | 10-30-74 | Kaiser Refractories |
| 2349 | 02-26-75 | Kaiser Refractories |
| 2360 | 03-26-75 | Kaiser Refractories |
| 2399 | 08-27-75 | Kaiser Refractories |
| 2400 | 08-27-75 | Kaiser Refractories |
| 2299 | 05-30-79 | KACC |
| 2671 | 02-27-80 | KACC |
| 2672 | 02-27-80 | KACC |
| 2673 | 02-27-80 | KACC |
| 2754 | 10-29-80 | KACC |
| A-4316 | 11-24-80 | Kaiser Refractories |
| 2802 | 05-27-81 | KACC |
| 2803 | 05-27-81 | KACC |
| 2833 | 11-12-81 | Kaiser Refractories |
| 2834 | 11-12-81 | Kaiser Refractories |
| 2835 | 11-12-81 | Kaiser Refractories |
| A-4780 | 12-10-81 | Kaiser Refractories |
| A-4781 | 12-10-81 | Kaiser Refractories |
| 2870 | 05-12-82 | Kaiser Refractories |
| 2926 | 02-23-83 | Kaiser Refractories |
| 2962 | 07-13-83 | KACC |
| 2970 | 08-10-83 | Kaiser Refractories |
| 3000 | 12-14-83 | KACC |
| 3001 | 12-14-83 | Kaiser Refractories |

A-9

IV:    OTHER

Other Permits Held by Kaiser Aluminum &
Chemical Corporation That Are Being
Transferred to National Refractories &
Minerals Corporation

| Permit Type | Issuer | Permit Number | Issue Date | Expiration Date |
|---|---|---|---|---|
| Solid/ Hazardous Waste | State of MO | 100704 | 06/23/81 | None Listed |
| Surface Mining | State of MO | 84-36 | 01/01/84 | 12/31/84 |
| Nuclear Materials | Nuclear Regulatory Commission | 24-20011-02 | 09/01/80 | 09/30/85 |

A-10

A – 71

## OAKVILLE REFRACTORIES

Oakville is Not a Domestic Facility and the
Environmental Affairs Department Does Not
Maintain Environmental Information for the
Facility.  This Facility Has No Known Air or
Water Discharge Permits.

A-11

## MERRILLVILLE REFRACTORIES

Merrillville is a Slide-gate Repair Facility.
Environmental Affairs Department Files Indicate
that in January of 1982, No Environmental
Permits Existed at This Facility, Nor Was the
Plant Planning to Apply for Permits, Due to the
Nature of the Operation.

A-12

**EXHIBIT C**

## PUT/CALL AGREEMENT REGARDING MOSS LANDING PROPERTY

1.  **Parties and Effective Date.** This Put/Call Agreement Regarding Moss Landing Property (the "Agreement") is made effective as of September 13, 2001 (the "Effective Date"), between National Refractories & Minerals Corporation ("National") and Kaiser Aluminum & Chemical Corporation ("Kaiser" or "KACC"). In addition, this Agreement shall constitute an agreement between Kaiser and Congress Financial Corporation (Western) ("Congress") as to the matters addressed in the paragraph headed "Acknowledgment and Agreement" at the foot of this Agreement.

2.  **Grant of Options.** In consideration of the grant of the Put Option (as defined below) and the Call Option (as defined below) and the other agreements contained herein, Kaiser and National hereby grant to each other the following options:

    (a)    Kaiser grants to National the option to require Kaiser to purchase the Property (as defined below) from National for the Purchase Price (as defined below) (the "Put Option"). The Put Option may be exercised by National giving written notice of exercise of the Put Option to Kaiser, which written notice must be actually received by Kaiser on or after the Effective Date and on or before November 30, 2001, in accordance with Section 4 of this Agreement.

    (b)    National grants to Kaiser the option to purchase the Property from National for the Purchase Price (the "Call Option"). The Call Option may be exercised by Kaiser giving written notice of exercise of the Call Option to National, which written notice must be actually received by National on or after December 1, 2001, and on or before January 31, 2002, in accordance with Section 4 of this Agreement.

    (c)    Notwithstanding subsections (a) or (b) of this section 2, if, on or before November 30, 2001, National has given Kaiser written notice that it has entered into a definitive written agreement with a *bona fide* third party purchaser for the sale of the Property, which agreement provides for the closing of such sale to take place on or before January 31, 2002, Kaiser concurs with the information contained in National's written notice, and such sale is pending on November 30, 2001, then (x) Kaiser may not exercise the Call Option until the earlier of (I) February 1, 2002, and (ii) the date such pending sale of the Property is terminated without closing and Kaiser actually receives written notice of such termination from National, and (y) National shall be entitled to exercise the Put Option and Kaiser shall be entitled to exercise the Call Option for a period of two weeks commencing on the date determined under clause (x) (the "Extended Term"). In such event, the Put Option and the Call Option may be exercised by National or Kaiser, respectively, giving written notice of such exercise to the other party, which written notice must be actually received within the Extended Term, in accordance with Section 4 of this Agreement.

3.  **Property.** The property subject to this Agreement (the "Property") consists of the Acquired Assets, as defined in the Agreement of Purchase and Sale (as defined below), which assets shall include all of the real property, fixtures, and improvements located in Monterey County, California, commonly known as National's Moss Landing site, constituting an approximately 188-acre manufacturing facility located at Moss Landing, California, excluding only the chrome pile owned by the federal government, and including, without limitation, the machinery, equipment, furniture, vehicles, inventories, licenses, permits, leases, and other contracts, patents, trademarks, know-how, books, records, and all other tangible and intangible property located at, or used in connection with the business conducted at, National's Moss Landing site

i

4.  Notice of Exercise of Put Option or Call Option.

(a)    Notice of the exercise of the Put Option shall be given by National to Kaiser in writing, either personally delivered or by overnight courier to Kaiser, addressed to the attention of the General Counsel, at 5847 San Felipe, Suite 2600, Houston, Texas 77057, or sent to Kaiser, addressed to the attention of the General Counsel, by facsimile to (713) 267-3710. Kaiser agrees to promptly acknowledge in writing (including by facsimile) the receipt of such notice.

(b)    Notice of the exercise of the Call Option shall be given by Kaiser to National in writing, either personally delivered or by overnight courier to National, addressed to the attention of the President, at 1852 Rutan Drive, Livermore, California, 94550, or sent to National, addressed to the attention of the President, by facsimile to (925) 294-7589. National agrees to promptly acknowledge in writing (including by facsimile) the receipt of such notice.

5.  Purchase of the Property; Payment of the Purchase Price and Certain Expenses.

(a)    Upon the giving of the notice of the exercise of the Put Option or the Call Option in accordance with this Agreement, National shall sell, and Kaiser shall purchase, the Property for Five Million Dollars ($5,000,000) (the "Purchase Price") pursuant to an agreement of purchase and sale between National and Kaiser in the form set out in Schedule 1 to this Agreement (the "Agreement of Purchase and Sale") which is incorporated herein by reference. National and Kaiser shall execute and deliver the Agreement of Purchase and Sale (including by facsimile immediately followed by the exchange of originally executed documents) promptly upon the receipt of the notice of the exercise of the Put Option or the Call Option. Kaiser agrees that it will not set off against its payment of the Purchase Price any amount owing from National or its affiliates to Kaiser other than amounts due and owing under or in connection with this Agreement, the Agreement of Purchase and Sale, and/or the transactions contemplated thereunder.

(b)    Upon the exercise of the Put Option or the Call Option, the satisfaction by National of the terms and conditions of the Agreement of Purchase and Sale and the closing of the transaction contemplated by the Agreement of Purchase and Sale, Kaiser will pay National the Purchase Price, in immediately available funds, to the following account hereby designated by National, which payment shall constitute full and complete payment by Kaiser to National for the Property:

Chase Manhattan Bank
4 New York Plaza
New York, New York 10004
ABA# 021000021
Account# 323-020-530
Congress Financial Corporation (Western)
Ref: National Refractories

for application by Congress in accordance with the Amended and Restated Revolving Credit and Term Loan Agreement, dated as of September 30, 1994, as amended, among National, certain affiliates of National, and Congress, including the Ninth Amendment of Amended and Restated Revolving Credit and Term Loan Agreement between Congress and National among others (the "Loan Agreement").

2

5. **Environmental Escrow Account.**

(a)    Within ten (10) business days after the Effective Date, National will establish an interest-bearing escrow account (the "Escrow Account") with a financial institution, and with escrow instructions, mutually acceptable to National and Kaiser. National shall deposit in the Escrow Account or pay directly to Kaiser, from the sources, in the manner, and otherwise as set out below, the aggregate sum of One Million Five Hundred Thousand Dollars ($1,500,000). Such deposits and payments shall be funded from a combination of (i) fifty percent (50%) of the Net Proceeds (as defined below) from the sale of any asset after the Effective Date by National or any of its affiliates including, without limitation, National Affiliated Technologies, Inc., National Refractories & Minerals Inc. (formerly known as Continental Refractories Company Limited), National Refractories Holding Co., and Chicago Fire Brick Company (excluding the sale of inventory in the ordinary course of business consistent with past practice and excluding the sale of accounts arising from the sale of inventory in the ordinary course of business consistent with past practice (other than any Bulk Sales of Accounts (as defined in the Loan Agreement)), but including the sale of the Property by National to Kaiser) in excess of the first Five Million Dollars ($5,000,000) of such Net Proceeds, (ii) fifty percent (50%) of National's Earnings Before Interest, Taxes, Depreciation and Amortization (computed under Generally Accepted Accounting Principles) from and after January 1, 2003, and (iii) earnings on the amount on deposit in the Escrow Account. Funds under clause (i) of the preceding sentence shall be paid into the Escrow Account or to Kaiser upon the closing of the related asset sale; funds under clause (ii) of the preceding sentence shall be paid to Kaiser on a monthly basis, on or before fourteen (14) days after the end of each calendar month for such preceding calendar month; and funds under clause (iii) of the preceding sentence shall be paid into the Escrow Account upon payment of such earnings by the financial institution.

(b)    The amount in the Escrow Account at the time of the closing of the sale of the Property by National to Kaiser pursuant to this Agreement and the Agreement of Purchase and Sale shall be paid to Kaiser at the time of the closing of such sale and, if such amount then paid to Kaiser from the Escrow Account is less than One Million Five Hundred Thousand Dollars ($1,500,000), then additional amounts from the sources described in subsection (a) of this section 6 shall be paid by National directly to Kaiser (not through the Escrow Account) as soon as possible thereafter until a total of One Million Five Hundred Thousand Dollars ($1,500,000) has been so paid by National to Kaiser. Such funds shall be paid by National to Kaiser to assist in the payment of environmental liabilities, if any, which Kaiser may pay with respect to the recycle pile on the Property and to provide and maintain caps on the landfills on the Property; provided, however, Kaiser shall be entitled to receive and retain all of such funds from National regardless of whether Kaiser shall pay any amount with respect to any such environmental liabilities.

(c)    If the Property is not sold to Kaiser by National pursuant to the exercise of the Put Option or the Call Option and the time periods during which the Put Option and the Call Option may be exercised have expired, then any funds held in the Escrow Account shall by paid to National.

(d)    As used in this Agreement, the term Net Proceeds shall mean, with respect to the sale or other disposition of any asset, the excess, if any, of (i) the aggregate amount received in cash (including any cash received by way of deferred payment pursuant to a note receivable, other non-cash consideration or otherwise, but only as and when such cash is so received) in connection with such sale or other disposition, over (ii) the sum of (x) the reasonable out-of-pocket expenses and fees incurred by the transferor of such asset with respect to legal, investment banking, brokerage, advisor, and accounting and other professional fees, sales commissions and disbursements, and all other reasonable fees, expenses and charges, in each case actually incurred by the transferor in connection with such sale or disposition, (y) all income and transfer taxes which are both (a) payable by the

3

A – 77

transferor and/or its affiliates in connection with such sale or other disposition, and (b) paid in cash by the transferor and/or its affiliates in the year of such sale or disposition or reasonably estimated to be payable in cash in a subsequent tax year but with respect to the tax year of such sale or disposition, and (2) except with respect to a sale of Property to Kaiser, reserves, required to be established in accordance with Generally Accepted Accounting Principles or the definitive agreements relating to such sale or disposition, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters, and liabilities under any indemnification obligations (excluding monies to be remitted to the Escrow Account).

7. **Sharing of Proceeds.** If neither the Put Option nor the Call Option has been exercised, but during the periods of time during which the Put Option and/or the Call Option are exercisable (including any extension of the period of exercise of the Put Option and the Call Option under Section 2.(c) of this Agreement) National enters into an agreement to sell the Property to a third party, and the Property is sold to such third party, then National shall pay to Kaiser an amount equal to twenty-five percent (25%) of the Net Proceeds of such sale in excess of $5,000,000, up to a maximum amount of Five Hundred Thousand Dollars ($500,000), which amount shall be paid to Kaiser, in immediately available funds, at the closing of the sale of the Property to such third party.

8. **Conditions Precedent.** The obligations of Kaiser under this Agreement are subject to the satisfaction of the following conditions:

(a) National, the affiliates of National which are parties to the Loan Agreement, and Congress shall have entered into an amendment to the Loan Agreement, in form and substance satisfactory to Kaiser, to permit the execution and delivery of the Agreement and the Agreement of Purchase and Sale and the consummation of the transactions described in or contemplated thereby.

(b) Congress, by executing the paragraph headed "Acknowledgment and Agreement" at the foot of this Agreement, shall have agreed that –

(1) notwithstanding any provisions of the Amended and Restated Intercreditor and Subordination Agreement, dated as of May 6, 1999, among Congress and Kaiser (the "Intercreditor Agreement") to the contrary, (i) Kaiser shall be entitled to receive and retain the payments and other benefits which may inure to Kaiser pursuant to the Agreement and the Agreement of Purchase and Sale, and (ii) Kaiser's entering into the Agreement and the Agreement of Purchase and Sale and consummating the transactions described in or contemplated thereby shall not be limited, restricted, or prohibited by, and shall not be violations of, the Intercreditor Agreement;

(2) Congress will release its lien on the Property if the Put Option or the Call Option is exercised and the Property is sold to Kaiser and the Purchase Price is paid in accordance with the Agreement; and

(3) Congress waives its rights under Paragraph 12 of that certain Deed of Trust, dated as of April 30, 1985 (as it may be amended), among National, as Trustor, Ticor Title Insurance Company of California, as Trustee, and Congress, as Beneficiary (the "Deed of Trust"), to declare the Obligations (as defined in the Deed of Trust) immediately due and payable because National enters into the Agreement or the Agreement of Purchase and Sale or because of the consummation of a sale of the Property to Kaiser pursuant to and in accordance with the terms of the Agreement and the Agreement of Purchase and Sale.

4

(c)     National's certification to Kaiser that the representations and warranties set forth in the Agreement of Purchase and Sale are true and correct in all material respects as of the date hereof.

(d)     National providing Kaiser with the access to the Property and related information as contemplated by the Agreement of Purchase and Sale during the period beginning on the date hereof and continuing until the earlier of the termination of this Agreement or the execution of the Agreement of Purchase and Sale.

(e)     National's compliance with the covenants set forth in the Agreement of Purchase and Sale during the period beginning on the date hereof and continuing until the earlier of the termination of this Agreement or the execution of the Agreement of Purchase and Sale.

9.  **Headings.**  The title and section headings of this Agreement are intended solely for reference, and are not intended to modify, explain, or otherwise aid in the construction of this Agreement.

10.  **Governing Law.**  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California.

11.  **Entire Agreement.**  This Agreement, including **Schedule 1** to this Agreement which is incorporated into this Agreement by reference, sets forth the entire agreement and understanding of Kaiser and National with respect to the grant of the Put Option, the grant of the Call Option, and any sale of the Property by National to Kaiser pursuant thereto and pursuant to the Agreement of Purchase and Sale, and supersedes all prior agreements, representations, arrangements and understandings, written or oral, with respect thereto. Notwithstanding the foregoing sentence, unless expressly modified in this Agreement, all of the terms, conditions, rights, and obligations set forth in (i) the Asset Purchase Agreement, dated December 31, 1984, among National, certain of National's affiliates, Kaiser, and certain of Kaiser's affiliates, (ii) the Agreement on Environmental Compliance, dated December 31, 1984, among National, certain of National's affiliates, Kaiser, and certain of Kaiser's affiliates, and (iii) the Agreement, dated May 6, 1999, among National, one of National's affiliates, and Kaiser in connection with National's proposed acquisition of CFB Industries, Inc., shall remain in full force and effect. This Agreement may be amended, modified, superseded or canceled only by a written instrument executed by Kaiser and National, and any of the terms, provisions, covenants, representations, warranties or conditions may be waived only by a written instrument executed by the party for whose benefit such term, provision, covenant, representation, warranty, or condition exists. Kaiser agrees that it will not, without the prior written consent of Congress, which Congress agrees will not be unreasonably withheld or delayed, enter into any agreement amending, modifying, or terminating this Agreement, including Schedule 1 to this Agreement.

12.  **Successors and Assigns.**  This Agreement shall be binding upon, and shall inure to the benefit of, Kaiser and National, and their respective successors and permitted assigns.  Kaiser hereby acknowledges that National will be assigning all of its right, title and interest in and to, and its benefits (but not its obligations) under, this Agreement to Congress as collateral security, and Kaiser hereby consents to such assignment, provided that no such assignment shall relieve National from its duties and obligations under this Agreement.

13.  **Time.**  Time is of the essence of this Agreement.

14.  **Counterparts.**  This Agreement may be executed by the parties hereto in multiple counterparts and by the different parties on separate counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

5

NATIONAL REFRACTORIES & MINERALS CORPORATION

KAISER ALUMINUM & CHEMICAL CORPORATION

By _____
[sign name]

By _____
[sign name]

_____
[print name]

John Barneson
[print name]

_____
[title]

Senior Vice President and Chief Administrative Officer
[title]

## ACKNOWLEDGMENT AND AGREEMENT

Congress hereby acknowledges that National and Kaiser have entered into the Agreement and, in consideration of Kaiser entering into the Agreement, Congress hereby –

(1)     agrees that, notwithstanding any provisions of the Intercreditor Agreement to the contrary, (i) Kaiser shall be entitled to receive and retain the payments and other benefits which may inure to Kaiser pursuant to the Agreement and the Agreement of Purchase and Sale, and (ii) Kaiser's entering into the Agreement and the Agreement of Purchase and Sale and consummating the transactions described in or contemplated thereby shall not be limited, restricted, or prohibited by, and shall not be violations of, the Intercreditor Agreement;

(2)     agrees that it will release its lien on the Property if the Put Option or the Call Option is exercised and the Property is sold to Kaiser and the Purchase Price is paid in accordance with the Agreement;

(3)     waives its rights under Paragraph 12 of the Deed of Trust to declare the Obligations (as defined in the Deed of Trust) immediately due and payable because National enters into the Agreement or the Agreement of Purchase and Sale or because of the consummation of a sale of the Property to Kaiser pursuant to and in accordance with the terms of the Agreement and the Agreement of Purchase and Sale;

(4)     agrees that any consent required of Congress under section 11 of the Agreement will not be unreasonably withheld or delayed; and

(5)     agrees that terms defined in the foregoing Agreement shall be used in this Acknowledgment and Agreement as defined in the Agreement.

CONGRESS FINANCIAL CORPORATION (WESTERN)

By: _____
[sign name]

_____
[print name]

_____
[title]

6

NATIONAL    REFRACTORIES     &    KAISER    ALUMINUM    &    CHEMICAL
MINERALS CORPORATION    CORPORATION

By _____    By: _____
    [sign name]        [sign name]

_____    _____
    [print name]        [print name]

_____    _____
    [title]        [title]

## ACKNOWLEDGMENT AND AGREEMENT

Congress hereby acknowledges that National and Kaiser have entered into the Agreement and, in consideration of Kaiser entering into the Agreement, Congress hereby --

(1) agrees that, notwithstanding any provisions of the Intercreditor Agreement to the contrary, (i) Kaiser shall be entitled to receive and retain the payments and other benefits which may inure to Kaiser pursuant to the Agreement and the Agreement of Purchase and Sale, and (ii) Kaiser's entering into the Agreement and the Agreement of Purchase and Sale and consummating the transactions described in or contemplated thereby shall not be limited, restricted, or prohibited by, and shall not be violations of, the Intercreditor Agreement;

(2) agrees that it will release its lien on the Property if the Put Option or the Call Option is exercised and the Property is sold to Kaiser and the Purchase Price is paid in accordance with the Agreement;

(3) waives its rights under Paragraph 12 of the Deed of Trust to declare the Obligations (as defined in the Deed of Trust) immediately due and payable because National enters into the Agreement or the Agreement of Purchase and Sale or because of the consummation of a sale of the Property to Kaiser pursuant to and in accordance with the terms of the Agreement and the Agreement of Purchase and Sale;

(4) agrees that any consent required of Congress under section 11 of the Agreement will not be unreasonably withheld or delayed; and

(5) agrees that terms defined in the foregoing Agreement shall be used in this Acknowledgment and Agreement as defined in the Agreement.

CONGRESS FINANCIAL CORPORATION (WESTERN)

By: _____
    [sign name]

_Gary D. Cassianni_
    [print name]

_Vice President_
    [title]

6

## AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale is made and entered into as of this 15 day of September, 2001 by and between National Refractories & Minerals Corporation, a California corporation headquartered at 1852 Rutan Drive, Livermore, California 94550 ("Seller") and Kaiser Aluminum & Chemical Corporation, a Delaware corporation headquartered at 5847 San Felipe, Suite 2600, Houston, Texas 77057, or its assigns ("Buyer").

## RECITALS

A.    Seller is the owner of that certain real property, assets and improvements commonly known as the Moss Landing site of Seller's operations, located in the County of Monterey, State of California, which property consists of approximately 188 acres with a manufacturing facility located thereon, which property and facility are more particularly described in Schedule A, a copy of which is attached hereto and by this reference incorporated herein as though set forth in full (the "Property").

B.    Seller has operated a Magnesia (as defined) manufacturing facility on the Property in addition to Seller's use of the Property for other businesses including, cellular telephone company leasing, abelone farming and storage space leasing (collectively, the "Projects").

C.    Buyer and Seller entered into that certain Put/Call Agreement Regarding Moss Landing Property (the "Put/Call Agreement") made effective as of September 15, 2001 (the "Put/Call Effective Date") giving (i) Buyer the option to cause Seller to sell the Property and Acquired Assets (as defined) to Buyer (the "Call Option") and (ii) Seller the option to cause Buyer to purchase the Property and Assets from Seller (the "Put Option"), in each case, upon the terms and conditions set forth therein and herein.

D.    Either Buyer has exercised the Call Option or Seller has exercised the Put Option.

NOW, THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, the parties hereto hereby agree as follows:

1.    Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

"Acquired Assets" has the meaning set forth in Section 2.

"Affiliate" of a Person shall mean: (i) any other Person directly, or indirectly through one or more intermediaries, controlling, controlled by or under common control with such Person; (ii) any officer, director, partner, employee or direct or indirect beneficial owner of any 10% or

greater equity or voting interest of such Person; or (iii) any other Person for which a Person described in clause (i.) acts in any such capacity.

"Agreement" means this Agreement of Purchase and Sale, as it may be amended from time to time.

"Assumed Liabilities" has the meaning set forth in Section 4.

"Business Day" means any day other than a Saturday, Sunday, a day on which banking institutions in the states of California, New York and Texas are permitted or obligated by Law to be closed.

"Buyer" has the meaning set forth in the introductory paragraph.

"Call Option" has the meaning given in the recitals.

"Closing" has the meaning set forth in Section 8.

"Closing Date" has the meaning set forth in Section 8.

"Code" means the Internal Revenue Code of 1986, as amended through the date hereof and the regulations issued by the United States Department of Treasury with respect to the Code.

"Congress" means Congress Financial Corporation (Western).

"Contract" or "Contracts" has the meaning set forth in Section 2.1.

"Contract Assignment" has the meaning set forth in Section 9.A.(iii).

"Deed" has the meaning set forth in Section 9.A.(i).

"Designated Contracts" has the meaning set forth in Section 2.1.

"Disclosure Schedule" means the Disclosure Schedule dated as of the Put/Call Effective Date and forming a part of this Agreement.

"Effective Time" has the meaning set forth in Section 8.

"Environmental Condition" shall mean any condition with respect to all or any portion of the Acquired Assets which could or has resulted in any damage, loss, cost, expense, claim, demand, order or Liability to or against Seller, including (i) conditions arising from the generation, discharge, release, spilling, dumping, leaking, burial, migration, receiving, handling,

A – 83

use, storage, treatment, disposal or transportation by or on behalf of Seller of any Hazardous Material and (ii) any violation of or noncompliance with any Environmental Law.

"Environmental Laws" means any and all federal, state or local statutes, laws, rules, regulations, ordinances, codes, policies or rules of common law now in effect and in each case as amended to date and any judicial or administrative interpretation, including any Orders, relating to human health or environment, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 1801 et seq., the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; and the Safe Drinking Water Act, 42 U.S.C. § 3808 et seq.

"Environmental Liability" shall mean all payments, obligations, actions or causes of action, claims, demands, judgments, assessments, losses, damages, Liabilities, penalties, fines, forfeitures, costs and expenses of every kind and nature (including the defenses thereof and reasonable attorneys' and other professional fees) to the extent arising out of any Environmental Condition existing or occurring prior to the Effective Time.

"Equipment" has the meaning set forth in Section 2.C.

"Excluded Assets" has the meaning set forth in Section 3

"Excluded Liabilities" has the meaning set forth in Section 5.

"Governmental Authority" means United States federal, state, county, local, or other governmental, administrative or regulatory agencies, authorities, instrumentalities, commissions, boards, bodies or any court, judicial or arbitration body having jurisdiction over a Person.

"Hazardous Material" or "Hazardous Materials" shall mean any and all chemicals, substances and wastes, defined as a pollutant or hazardous or toxic or otherwise regulated under any Environmental Law, including, without limitation, RCRA hazardous wastes, CERCLA hazardous substances, pesticides and other agricultural chemicals, oil and petroleum products or byproducts and any constituents thereof, and polychlorinated biphenyls (PCBs)

"Intellectual Property Rights" has the meaning set forth in Section 10.L

"IRS" means the Internal Revenue Service of the United States.

"KACC Agreements" means (i) that certain Asset Purchase Agreement, by and among National Holding, Seller, Buyer, Kaiser AgChem and KACC, dated December 31, 1984, (ii)

that certain Agreement on Environmental Compliance made the 31st day of December 1984 among National Holding, Seller, Buyer, Kaiser AgChem and KACCOL, and (iii) that certain Agreement executed May 6, 1999, among Buyer, Seller and National Holding.

"Kaiser AgChem" means Kaiser Agricultural Chemicals Corporation.

"KACCOL" means Kaiser Aluminum & Chemical of Canada Limited.

"Knowledge of Seller" means the actual knowledge of the officers, directors, employees, agents and consultants of Seller after reasonable investigation except for outside legal counsel.

"Law" means any and all federal, state and local statute, code, law, ordinance, regulation, ordinance, policies or rules of common law, reporting or licensing requirement or rule of any Governmental Authority applicable to a Person, its assets, liabilities or business now in effect and in each case as amended to date and any judicial or administrative interpretations, including Orders.

"Liabilities" means obligations of any nature, known or unknown, whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not required to be reflected or reserved against on a balance sheet under Generally Accepted Accounting Principles.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind, whether voluntary or involuntary, including any conditional sale or other title retention agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction, other than Permitted Encumbrances. Lien shall also have the meaning ascribed thereto in Bankruptcy Code §101.

"Litigation" means any action, arbitration, cause of action, claim, filed complaint, criminal prosecution, governmental or other examination or investigation, hearing, administrative or other proceeding relating to or affecting a Person, its business, its assets (including contracts related to it), or the transactions contemplated by this Agreement.

"Loan Agreement" means that certain Amended and Restated Revolving Credit and Term Loan Agreement, dated as of September 30, 1994, as amended, among Seller, certain Affiliates of Seller, and Congress, including the Ninth Amendment of Amended and Restated Revolving Credit and Term Loan Agreement between Congress and Seller among others.

"Magnesia" means MgO.

"Material Adverse Effect" means any circumstances, change in or effect on all or any part of the Acquired Assets that, individually or when taken together with all related circumstances, is adverse to the Property, the Projects or the condition of all or any portion of the

Acquired Assets, in each instance in an amount not less than Seventy-Five Thousand Dollars ($75,000).

"National Holding" means National Refractories Holding Co.

"NPDES Permit" has the meaning set forth in Section 2.D.

"Order" means any judicial or administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling, or writ of any federal, state, local or foreign or other court, arbitrator, mediator, tribunal, administrative agency or Governmental Authority.

"Permits" has the meaning set forth in Section 2.D.

"Permitted Encumbrances" means (i) terms and conditions of any Third Party Lease assumed by Buyer; (ii) such liens, imperfections in title, charges, easements, restrictions encumbrances or other matters filed of record that are due to zoning or subdivision laws or regulations; (iii) any and all other servitudes, licenses and/or permits identified on Schedule B attached hereto; and (iv) any other servitudes, licenses and/or permits which would not have, individually or in the aggregate, a Material Adverse Effect.

"Person" means and includes natural persons, corporations, limited liability companies, limited partnerships, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts and other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof

"Projects" has the meaning given in the recitals and consists of the business of leasing portions of the Property, the farming of abalone and the production of Magnesia.

"Property" has the meaning given in the recitals.

"Purchase Price" has the meaning set forth in Section 6.

"Put/Call Agreement" has the meaning given in the recitals.

"Put/Call Effective Date" has the meaning given in the recitals.

"Put Option" has the meaning given in the recitals.

"Recycle Pile" means the excess process materials consisting of broken brick, off-size brick and similar materials that was stored for later use (to be fed back into the manufacturing process) and is presently stockpiled on the surface of the Area 1 waste disposal area

"Remedial Action" shall mean any investigation, monitoring, testing, sampling, removal, action, clean-up, remediation or corrective action with respect to any Hazardous Material contamination or pollution, required or ordered by any Governmental Authority in accordance with applicable Environmental Law.

"Schedules" means the schedules to this Agreement, including the Disclosure Schedule.

"Seller" has the meaning set forth in the introductory paragraph.

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, occupation, franchise, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Third Party Intellectual Property Rights" has the meaning set forth in Section 10.L.

"Third Party Lease" has the meaning set forth in Section 2.I.

"Third Party Lease Assignment" has the meaning set forth in Section 9.A.(ii)

"Transaction Documents" means this Agreement and all other documents or agreements contemplated by this Agreement to be executed and delivered in connection with the transactions contemplated by this Agreement.

2    Purchase and Sale.  At the Closing subject to the terms and conditions of this Agreement, Buyer shall purchase from Seller and Seller shall sell, assign, transfer, convey and deliver to Buyer, all of Seller's right, title and interest in and to the assets and business of Seller relating to the ownership, operation or use of the Property and the Projects, including the following (collectively, the "Acquired Assets"), free and clear of all Liens, interests and encumbrances other than Permitted Encumbrances:

A.    the Property, together with the buildings, fixtures and improvements thereon, together with the Dolan Road (eastern) wells and contractual rights concerning the Tate (southern) well, all water lines, rights of way, roads, ditches, pavings, uses, licenses, easements, hereditaments, tenements and appurtenances belonging or appertaining thereto and any and all assignable warranties of third parties with respect thereto, to the extent assignable.

B.    the Projects:

C.    all equipment, machinery, tools, computers, terminals, computer equipment and systems, furniture, office equipment, business machines, telephones and telephone systems, parts, accessories, and the like, used by Seller on the Property or exclusively in connection with the conduct of the Projects or otherwise identified on **Section 2.C. of the Disclosure Schedule**, and any and all assignable warranties of third parties with respect thereto (the "Equipment").

D.    to the extent assignable under applicable Law, all licenses, franchises, permits, certificates, consents, and other governmental or quasi-governmental authorizations of Seller and related to the Property, the Projects or all or any portion of the Acquired Assets, all of which are listed on **Section 2.D. of the Disclosure Schedule**, including Seller's National Pollutant Discharge Elimination System permit ("NPDES Permit") issued by the regional office of the Environmental Protection Agency pursuant to application by Seller indicating the production of Magnesia and abalone farming on the Property (collectively, the "Permits") and related emissions credits or rights to any such credits;

E.    all intangibles used by Seller in connection with the Projects, all of the goodwill and any customer lists related to the Projects;

F.    all accounts receivable except for amounts that are due and owing for periods prior to the Closing Date arising from the Projects;

G.    any rights to any of Seller's insurance policies, premiums, premium refunds, or proceeds from insurance coverages relating to the Property, Projects or all or any portion of the Acquired Assets;

H.    all patents, art work, labels, designs, specifications, designs-in-progress, formulations, know-how, prototypes, inventions, discoveries, trademarks, trade names, logos, trade styles, service marks, together with all goodwill associated therewith, and copyrights, all registrations and applications therefore, both registered and unregistered, foreign and domestic, all trade secrets, technology or processes, all computer software (including documentation and related object and, if applicable, source codes), and all confidential or proprietary information relating solely to the Acquired Assets or Projects (it being understood that to the extent that any of the foregoing do not relate solely to the Acquired Assets or Projects, but are applicable to or otherwise necessary, Buyer shall be deemed to have received a perpetual, assignable and irrevocable license to use the same), including without limitation, all information pertaining to Magnesia products production, marketing and laboratory operations, all know how and mix recipes regarding Magnesia operations at the Property, the Seller's trademark NATIONAL MAGNESIA SALES INC, and all data regarding the abalone project at the Property;

I.    all equipment leases, leases and rental agreements, licenses or other

arrangements for the use of all or any portion of the Property or Acquired Assets by third parties, each of which is listed on **Section 2.I. of the Disclosure Schedule** (collectively the "Third Party Leases"), together with related security deposits identified thereon and/or delivered to Seller;

    J.    all other contracts, leases, warranties, commitments, agreements, arrangements, guaranties of payment and/or performance, and purchase and sales orders, whether oral or written, each of which is listed on **Section 2.J. of the Disclosure Schedule** (collectively, the "Contracts"); provided, however that the foregoing shall only apply to Contracts designated by Buyer in accordance with terms of this Agreement (the "Designated Contracts");

    K.    all data, data bases, books, records, correspondence, vendor lists, files, papers used primarily in the operation of, or otherwise relating to, all or any portion of the Acquired Assets, including Phase I and Phase II environmental reports, RI/FS studies and plans; and

    L.    all other goods customarily included in inventory under current operations and services ordered in the ordinary course of business of the Projects before the Closing Date, whether delivered prior to or after the Closing Date.

    3.    <u>Exclusions from Purchase and Acquired Assets</u>. Seller shall not sell and Buyer shall not purchase or acquire, and the Acquired Assets shall not include any of the following (collectively, the "Excluded Assets"):

    A.    any cash and cash equivalents other than the security deposits and other items specifically identified above;

    B.    the assets of any compensation and benefit plan maintained by Seller for the benefit of employees of Seller;

    C.    Seller's corporate franchise, stock record books, corporate record books containing minutes of meetings of directors and stockholders, and such other records as have to do with Seller's organization or stock capitalization, Tax Returns and records, books of account and ledgers;

    D.    claims for any federal, state, local, or foreign Tax refund;

    E.    all accounts receivable, including, without limitation, trade and miscellaneous accounts receivable arising out of the Projects on or before the Closing Date; and

    F.    the chrome pile owned by the Federal government.

4.    Assumption of Liabilities. Subject to Section 5 hereof, as of the Effective Time, Buyer shall assume responsibility for the performance and satisfaction of all of the executory obligations and Liabilities of Seller pursuant to (i) the terms of the Third Party Leases; (ii) the Designated Contracts; (iii) Seller's liability with respect to the Recycle Pile, and (iv) Seller's obligation to maintain cans on the Property in accordance with the terms of the KACC Agreements (collectively, the "Assumed Liabilities"), but in each case excluding any obligations or liabilities to the extent such obligations or liabilities arise prior to the Effective Time under the Third Party Leases and Designated Contracts. The Designated Contracts shall be designated by Buyer in writing by notice to Seller within the latter of fifteen (15) days following the execution of this Agreement or delivery of such contracts for review by Buyer.

5.    Excluded Liabilities. Buyer shall not assume or become liable for any Liabilities of Seller, whether known or unknown, arising from claims instituted but not yet served upon Seller, absolute, contingent, or otherwise, and whether or not related to the Acquired Assets, except for the Assumed Liabilities (the obligations and liabilities of Seller not assumed by Purchaser are hereinafter referred to as the "Excluded Liabilities"). The Excluded Liabilities include, without limitation:

A.    all accounts or trade payables, whether or not yet invoiced arising from the conduct of the Projects or ownership of all or any portion of the Acquired Assets on or before the Effective Time;

B.    all employee related Liabilities, including Liabilities under Seller's employee benefit plans, collective bargaining agreements, any other employment agreements or arrangements, the WARN Act or relating to or arising out of any claims by any current or former employee of Seller that he or she is entitled as a result, directly or indirectly, of the transactions contemplated by this Agreement, to severance, benefits continuation, early retirement or other benefits;

C.    all Liabilities in the form of fines or penalties, arising from Seller's operation of the Projects, use of the Property or use of all or any portion of the Acquired Assets;

D.    all Liabilities to the extent such Liabilities relate to the ownership of the Acquired Assets by Seller on or before the Closing Date or the Excluded Assets;

E.    all Liabilities associated with employment actions, omissions or events, including without limitation, employment discrimination claims, and claims for workplace related injuries by employees which occurred or were incurred or accrued after December 31, 1984 and on or before the Closing Date

F.    all Liabilities in the nature of product liability claims relating to or arising out of allegations of personal injury or property damage suffered by any third party on or

before the Closing Date or for products manufactured or sold by Seller after December 31, 1984, and on or before the Closing Date;

      G.    all Liabilities arising out of or relating to claims for personal injury attributable or alleged to be attributable to exposure to asbestos or asbestos containing materials during the period that Seller owned the Acquired Assets;

      H.    any indebtedness (except to the extent Buyer is already obligated with respect to the indebtedness by virtue of a written guarantee or similar document signed by Buyer);

      I.    all Liabilities arising from the transportation off-site or off-site disposal of materials, including Hazardous Materials, by or on behalf of Seller;

      J.    all Liabilities and costs of any and all Remedial Action concerning UST 6;

      K.    all Liabilities of Seller identified in Section 24.B; and

      L.    all Liabilities not being expressly assumed by Buyer in this Agreement.

      6.    Purchase Price and Terms of Payment.  The total consideration to be paid by Buyer to Seller or Seller's designee for the sale, transfer and conveyance of the Acquired Assets to Buyer, in addition to the assumption of the Assumed Liabilities, shall be Five Million Dollars ($5,000,000) payable at the Closing in lawful money of the United States of America (the "Purchase Price") in immediately available funds or wire transfer to the following account designated by Seller, which payment shall constitute payment in full and complete payment by Buyer to Seller for the Acquired Assets:

                Chase Manhattan Bank
                4 New York Plaza
                New York, New York 10004
                ABA# 021000021
                Account# 322-020-530
                Congress Financial Corporation (Western)
                Ref: National Refractories

for application by Congress in accordance with the Loan Agreement.

      7.    Allocation of Purchase Price.  Prior to Closing, Buyer will prepare the allocation of the consideration paid by Buyer hereunder in accordance with Code Section 1060 and Seller will approve such allocation, such approval not to be unreasonably withheld.  Buyer and Seller each agree to report the transaction under this Agreement on IRS Form 8594 Acquisition Statement under Code Section 1060, and on any other applicable federal, state, local and foreign

Tax Returns in accordance with the allocation determined in accordance with this Section. Buyer and Seller each agree to provide the other promptly with any information required to complete the required allocation.

8.    Time and Place of Closing. The closing for the purchase and sale contemplated by this Agreement (the "Closing") shall be held (i) at the offices of Kaiser Aluminum & Chemical Corporation, 5847 San Felipe, Suite 2600, Houston, Texas 77057, within two (2) Business Days after receipt of any governmental consents or approvals required by Law to consummate the transactions contemplated by this Agreement and the Put/Call Agreement, including, but not limited to, the transfers of Permits required by Law to be transferred prior to the actual transfer of title to all or any portion of the Acquired Assets, or (ii) at such other time and place as the parties hereto may agree in writing (the date on which the Closing actually occurs is hereinafter referred to as the "Closing Date"). Subject to the consummation of the Closing on the Closing Date, all of the transactions contemplated by this Agreement shall be deemed to have occurred simultaneously and to have become effective as of 12:01 AM San Francisco, California local time on the Closing Date (the "Effective Time").

9.    Closing Documents and Payment.

A.    At the Closing, Seller shall execute and deliver, or cause to be executed and delivered, to Buyer, acknowledged and in recordable form where appropriate, the following documents.

(i)    a grant deed conveying the Property and the improvements located thereon to Buyer ("Deed") free and clear of all Liens subject only to the Permitted Encumbrances in the form of Exhibit A attached hereto

(ii)    an assignment and assumption agreement with respect to the Third Party Leases in the form of Exhibit B attached hereto (the "Third Party Lease Assignment");

(iii)    an assignment and assumption agreement with respect to the Designated Contracts in the form of Exhibit C attached hereto (the "Contract Assignment");

(iv)    a bill of sale for the Equipment and any other items of personal or similar property included in the Acquired Assets in the form of Exhibit D attached hereto; provided, however, that with respect to any such property for which certificates or other evidence of title thereto exist, Seller shall also execute and deliver any instruments reasonably necessary to properly transfer such title to Buyer

(v)    a certificate of non-foreign status pursuant to Section 1445 of the

Code in the form of Exhibit E attached hereto;

(vi)    any and all other such deeds, bills of sale, endorsements, assignments and other good and sufficient instruments of conveyance, sale, transfer and assignment, and with all required federal and state documentary and revenue stamps affixed, as shall be required in order to effectively vest in Buyer all of Seller's right, title and interest in and to all or any portion of the Acquired Assets, including all applicable permits and licenses, free and clear of any and all liens and other encumbrances (other than the Permitted Encumbrances); and

(vii)    any and all other documents reasonably requested by Buyer as appropriate to carry out the provisions of this Agreement.

B.    At Closing, Buyer shall deliver the Purchase Price and execute and deliver, or cause to be executed and delivered, to Seller, acknowledged and in recordable form where appropriate, the following documents and, if applicable, make the following payments:

(i)    the Third Party Lease Assignment;

(ii)    the Contract Assignment; and

(iii)    any and all other documents reasonably requested by Seller as appropriate to carry out the provisions of this Agreement.

10.    Seller's Representations and Warranties. In addition to the representations and warranties contained elsewhere in this Agreement, Seller makes the following representations and warranties to Buyer, all of which individual representations and warranties are accurate as of the date of this Agreement and shall be true at all times through the Closing

A.    Organization, Good Standing and Qualification. Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of California and has full corporate power and authority to conduct the Projects and to own and lease the Acquired Assets. Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the ownership of all or any portion of the Acquired Assets or the conduct of the Projects requires such qualification except to the extent that the failure to be so licensed or qualified would not adversely affect the ability of the Seller to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Transaction Documents.

B    Authority. Seller has all necessary corporate power and authority and has taken all corporate action necessary to enter into this Agreement and the other Transaction Documents, to consummate the transactions contemplated hereby and hereby

and to perform its obligations hereunder and thereunder. This Agreement constitutes, and each of the other Transaction Documents executed by Seller, when executed by all of the parties thereto, will constitute valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (whether considered in an action at law or in equity) and the discretion of the court before which any proceeding therefor may be brought.

C. __No Conflict or Violation.__ Neither the execution, delivery nor performance of this Agreement nor the other Transaction Documents by Seller will (i) violate or conflict with any provision of the certificate of incorporation or bylaws of Seller; or (ii) result in a violation by Seller of any Law or Order (or an event which with notice, lapse of time or both, would result in any such violation), except with respect to (ii) for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.

D. __Consents of Third Parties.__ Except as specified in Section 10.D. of the Disclosure Schedule, no consent, approval, or authorization of any third person or Governmental Authority to Seller's execution, delivery and performance of this Agreement is required, other than consents, approvals and authorizations which have already been unconditionally given, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.

E. __Compliance.__ Except as specified in Section 10.E. of the Disclosure Schedule, the execution, delivery, and performance of this Agreement by Seller shall not violate or constitute a breach of or default under any contract, agreement, or instrument to which Seller is a party or which affects all or any portion of the Acquired Assets, and shall not result in the creation or imposition of any Lien upon all or any portion of the Acquired Assets pursuant to the terms of any contract, agreement or instrument to which Seller is a party or which affects all or any portion of the Acquired Assets, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.

F. __Ownership of the Acquired Assets.__ Except as set forth on Section 10.F. of the Disclosure Schedule, Seller has good and marketable title to the Acquired Assets, free and clear of any and all claims and interests (including but not limited to all Liens and Liabilities) of any Person, other than Permitted Encumbrances.

G. __Real Property.__ Schedule A contains a true and correct list and legal description of the Property. Seller has not received written notice from any Governmental Authority alleging, nor to the knowledge of Seller is, the Property or any improvements thereon are in violation of any applicable Laws, including state or local use or occupancy

Laws, use restrictions, building ordinances, zoning ordinances and health and safety ordinances. There are no pending or, to the Knowledge of Seller, threatened condemnations planned public improvements, annexation, special assessments, zoning or subdivision changes, or other similar adverse claims affecting or that could affect the Property, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect. To the Knowledge of Seller, all licenses, permits and approvals (excluding any renewals of permits, licenses and approvals that are not required to be obtained prior to the time of Closing) required for the occupancy and operation of the Property or any improvements thereon (with appurtenant parking uses) have been, or are in the process of being, obtained and are otherwise in full force and effect. Seller has not received notices of violations in connection with such items, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect. No revocation, termination, withdrawal or inability to renew any of such licenses, permits or approvals is pending or, to the Knowledge of Seller, threatened. Except as set forth Section 2.L of the Disclosure Schedule, (i) there are no leases under which Seller is the lessor or landlord relating to all or any portion of the Property and (ii) Seller has not entered into any other agreements, written or oral, granting any other person or entity any rights with respect to all or any portion of the Property.

H.    Utilities.  The Property is connected to and serviced by water, sewage disposal, gas and electrical facilities that are adequate for the present use of the Acquired Assets and, to the Knowledge of Seller, such utilities and services are in accordance with all applicable Laws.  Seller warrants that it is authorized to extract, transport and deliver the water supply from its well(s) to the Property with the Permits.

I.    Acquired Assets.  Section 10.I. of the Disclosure Schedule lists and accurately describes all of the material Acquired Assets.  Seller shall convey, transfer and assign to Buyer all of the Acquired Assets (other than the Property which is dealt with separately above) free and clear of all Liens other than the Permitted Exceptions.

J.    Permits and Licenses.  Seller holds all permits and licenses necessary to operate the Acquired Assets and the Projects, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.  Seller has taken no action, and no condition presently exists arising out of the Seller's activities in connection with the operation of the Projects or all or any portion of the Acquired Assets which would preclude transfer and/or issuance of such permits and licenses to Buyer.

K.    Third Party Leases and Designated Contracts.  Except as specified in Section 10.K. of the Disclosure Schedule, each of the Third Party Leases and Designated Contracts is in full force and effect and the consummation of the transactions provided for herein will not create or constitute a default or event of default under any such contract or

require the consent of any other party to any such contract in order to avoid a default or event of default, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.

L.    Intellectual Property.  To the Knowledge of Seller, Seller is not and will not be, as a result of the execution and delivery of this Agreement or the performance of its obligations hereunder, in violation of any licenses, sublicenses and other contracts to which it is a party and pursuant to which it is authorized to use any third party patents, trademarks, trade names, service marks, and copyrights ("Third Party Intellectual Property Rights"), except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of Seller there are no claims with respect to (i) the patents, registered and material unregistered trademarks and service marks, registered copyrights, trade names, and any applications therefor owned by Seller (the "Intellectual Property Rights"); (ii) any trade secret material to Seller; or (iii) Third Party Intellectual Property Rights currently pending or threatened by any Person.  There is no unauthorized use, infringement or misappropriation of any of the Intellectual Property Rights by any third party.

M.    Taxes.  Seller has paid any and all Taxes required to be paid by Seller, including, without limitation, real and personal property taxes and assessments, employee withholding taxes, and sales taxes (exclusive of prorations to be done through the Closing Date).

N.    Liabilities.  Except for the transactions contemplated by this Agreement, since the date of the most recent balance sheet relating to the Projects and Acquired Assets delivered to Buyer, Seller has not incurred any Liabilities of any nature affecting all or any portion of the Acquired Assets that would properly be reflected or reserved against in a fairly presented balance sheet other than Liabilities incurred in the ordinary course of business and except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.

O.    No Defaults.  Except as specified in Section 10.O. of the Disclosure Schedule, Seller is not in default with respect to any of its obligations or Liabilities pertaining to all or any portion of the Acquired Assets (including, without limitation, any indebtedness secured by all or any portion of the Acquired Assets other than under the Loan Agreement) nor is there any state of facts, circumstances, conditions, or events which, after notice or lapse of time or both, would constitute or result in any such default, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.

P.    Compliance With Laws, Orders and Permits.  Except as specified in Section 10.P. of the Disclosure Schedule, (i) no investigation or review by any Governmental Authority with respect to Seller or all or any portion of the Acquired

Assets is pending or, to the Knowledge of Seller, threatened, (ii) to the Knowledge of Seller, the Acquired Assets include all Permits and Orders, necessary to operate the Projects and own all or any portion of the Acquired Assets, (iii) Seller is in compliance with all Laws, Orders and Permits applicable to the Acquired Assets and/or ownership, operation and use thereof except with respect to (iii) for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect. Seller has not received notice of any noncompliance or alleged noncompliance with any Law relating or applicable to any of the Acquired Assets.

Q.   Litigation.  Except as specified in Section 10.Q. of the Disclosure Schedule, (i) there is no Litigation pending against Seller, or to the Knowledge of Seller threatened, relating to all or any portion of the Acquired Assets, and (ii) Seller is not subject to the provisions of any Order which might or could affect title to all or any portion of the Acquired Assets.  There is no Litigation by Seller or which Seller intends to initiate with respect to all or any portion of the Acquired Assets.

R.   Delivery of Certain Documents.  All of the contracts, agreements, leases, licenses, plans, arrangements or commitments by which any of the Acquired Assets or the Projects is in any way bound or obligated are identified in Section 10.R. of the Disclosure Schedule and Seller has delivered true and accurate copies of each to Buyer. Except as specified in Section 10.R. of the Disclosure Schedule, all of such contracts, agreements, leases, licenses, plans, arrangements and commitments are (i) valid, binding and in full force and effect in all respects in accordance with their terms and conditions, and (ii) either assignable without the consent of any parties to those agreements or Seller will use its best efforts to obtain any such consents.

S.   Environmental Laws and Regulation.  Except as set forth in Section 10.S. of the Disclosure Schedule and specifically limited to the period of time during which Seller owned the Property:

(i)   To the Knowledge of Seller, Seller has not violated, and is presently in compliance with all Environmental Laws applicable to all or any portion of the Acquired Assets, and there exist no Environmental Conditions with respect to the Acquired Assets, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect;

(ii)   Seller has not generated, handled, treated, stored or disposed of, or arranged for the handling, treatment, storage or disposal of any Hazardous Materials or any solid waste on the Property except in compliance with all applicable Environmental Laws, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect;

(iii)    No Lien has been imposed on all or any portion of the Acquired Assets by any Governmental Authority in connection with the presence of any Hazardous Materials;

(iv)    Seller has not (a) entered into or been subject to any consent decree or Order with respect to all or any portion of the Acquired Assets; (b) received notice under the citizens suit provision of any Environmental Laws in connection with all or any portion of the Acquired Assets; (iii) received any request for information, notice, demand letter, administrative inquiry, or formal or informal complaint or claim from any Governmental Authority with respect to any Environmental Conditions relating to all or any portion of the Acquired Assets; or (iv) been subject to or, to its knowledge, threatened with any governmental or citizen enforcement action with respect to all or any portion of the Acquired Assets; and

(v)    To the Knowledge of Seller, Seller's maintenance of the Property and the landfills thereon has been in full compliance with all Environmental Laws and the KACC Agreements, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.

F.    No Brokers. In connection with the transactions herein contemplated, Seller has dealt with no person, firm or entity in the capacity of a broker, finder, or like function or capacity giving rise, by reason of such Seller's conduct, to a claim to a commission or fee payable to such person.

11.    Buyer's Representations and Warranties. In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Seller, all of which individual representations and warranties are accurate as of the date of this Agreement and shall be true in all material respects at all times through the Closing.

A.    Organization, Good Standing and Qualification. Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the ownership of its properties or the conduct of its business requires such qualification except to the extent that the failure to be so licensed or qualified would not adversely affect the ability of the Buyer to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the other Transaction Documents.

B.    Power and Authority. Buyer has all requisite power and authority to carry on its business as now conducted and to own and operate its properties and assets now

owned and being operated by it. Buyer has the power and authority to enter into this Agreement and to carry out its obligations under this Agreement and the other Transaction Documents.

C.    Authority. Buyer has all necessary corporate power and authority and has taken all corporate action necessary to enter into this Agreement and the other Transaction Documents, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. This Agreement constitutes, and each of the other Transaction Documents executed by Buyer, when executed by all of the parties thereto, will constitute valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (whether considered in an action at law or in equity) and the discretion of the court before which any proceeding therefor may be brought.

D.    No Conflict or Violation. Neither the execution, delivery nor performance of this Agreement or the other Transaction Documents by Buyer will (i) violate or conflict with any provision of the certificate of incorporation or bylaws of Buyer; or (ii) result in a violation by Buyer of any Law or Order (or an event which with notice, lapse of time, or both, would result in any such violation).

E.    Consents of Third Parties. Except as set forth elsewhere in this Agreement, no consent, approval, or authorization of any third person or Governmental Authority to Buyer's execution, delivery and performance of this Agreement is required, other than consents, approvals and authorizations which have already been unconditionally given.

F.    No Conflict with Other Instruments. The execution and delivery of this Agreement and the consummation of its specified transactions will not result in any breach of any terms or conditions of, or constitute a default under any organizational and/or governing document of Buyer or any commitment, mortgage, note, bond, debenture, deed of trust, contract, agreement, license or other instrument or obligation to which Buyer is now a party or by which its properties or assets may be bound or affected.

G.    Litigation. There is no Litigation pending or, to the knowledge of Buyer, threatened against or affecting the validity or legality of the transactions contemplated by this Agreement.

H.    No Brokers. In connection with the transactions herein contemplated, Buyer has dealt with no person, firm or entity in the capacity of a broker, finder, or like function or capacity giving rise to or reason of Buyer's conduct, to a claim to a commission or fee payable to such person.

12.     Seller Information.  Seller acknowledges that prior to the execution of the Put/Call Agreement, Seller delivered to Buyer copies of all of the following documents and information and agrees to update and provide Buyer with any new or additional information and documents and updates to the Disclosure Schedule within five (5) days of the execution of this Agreement:

A.     all contracts, licenses, leases or agreements of any kind included within or otherwise concerning the Acquired Assets;

B.     the NPDES Permit;

C.     the full May 2001 TRC Phase I environmental assessment, as well as any other assessments prepared by, on behalf, at the direction or with the approval of Seller; and

D.     the Amended/4th Updated Preliminary Title by First American Title Company dated June 8, 2001 (Order No.178715-1D), including copies of all agreement and exceptions listed therein.

13.     Buyer Due Diligence and Condition of the Acquired Assets.  Except as otherwise set forth in this Agreement and subject to the terms and conditions hereof, Buyer is acquiring the Acquired Assets solely and exclusively in reliance upon Buyer's own knowledge, familiarity, inspection and examination and not in reliance upon any promise, warranty or representation by Seller not specifically set forth herein.  Buyer further acknowledges that THE ACQUIRED ASSETS ARE BEING SOLD TO BUYER ON AN "AS IS, WHERE IS" BASIS WITH ALL FAULTS AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, EXCEPT SUCH REPRESENTATIONS AS ARE SET FORTH EXPRESSLY IN THIS AGREEMENT OR THE TRANSACTION DOCUMENTS.

14.     Further Assurances.  From and after the Closing, Seller shall at the request of Buyer also take such action necessary to put Buyer in actual possession and operating control of the Acquired Assets and shall execute, acknowledge and deliver such further instruments of conveyance, sale, transfer and assignment, and take such other action as Buyer may reasonably request in order to more effectively convey, sell, transfer and assign to Buyer all of the Acquired Assets and to assist Buyer in exercising rights with respect to them, including without limitation, franchises, easements, and deeds concerning realty in fee.  Buyer agrees that Buyer will transfer to Seller any asset in Buyer's possession which was not intended to be sold, transferred or conveyed to Buyer pursuant to this Agreement, including any cash, checks, deposits or other form of payment for any accounts receivable retained by Seller for periods arising on or after the Closing Date.  Whenever and so often as requested so to do, Seller shall promptly execute and deliver or cause to be executed and delivered all such other and further instruments, documents and assurances, and promptly do or cause to be done all such other and further things as may be necessary or reasonably required in order to further effectuate all rights, interest, powers, benefits, privileges and advantages conferred or intended to be conferred upon Buyer by this

Agreement.

15.    Permits and Licenses.  Buyer and Seller shall cooperate and use their best efforts to obtain, prior to the Closing, the approval of any and all Government Authorities and entities with jurisdiction over all or any portion of the Acquired Assets to assign, transfer and convey all permits and licenses applicable to all of any portion of the Acquired Assets to Buyer (and, if necessary, for the issuance to Buyer of temporary permits and licenses pending final approval). Seller shall use its best efforts to cause the effective conveyance, transfer and assignment to Buyer of all other permits, licenses and other authorizations from regulatory entities that must be transferred to Buyer in order for Buyer to own and operate all or any portion of the Projects or Acquired Assets at the Closing.  Buyer shall pay all fees required by the various governmental authorities for the transfer or issuance, as the case may be, of the such permits and licenses. Seller will continue these efforts after the Closing for any permits, licenses or authorizations that are not able to be transferred prior to the Closing.

16.    Prorations.  Current real property Taxes (including without limitation, all special district levies and assessments), all personal property Taxes, any intangible or use Taxes, and all premiums on insurance policies, if any, assumed by Buyer (Seller being charged with the responsibility of canceling all other insurance policies effective as of the Closing and paying any premium surcharges or early termination payments imposed in connection with such cancellations) utilities and all other usually prorated expenses of ownership and operation of all of any portion of the Acquired Assets shall be prorated between Seller and Buyer as of the Effective Time and Seller shall pay Buyer in amount equal to the pro rata portion of any of the foregoing accruing or otherwise attributable to the period prior to and including the Closing Date.

17.    Transfer Taxes.  Buyer shall pay the cost of any County of Monterey Documentary Transfer Tax and any local transfer Taxes imposed on the sale of the Acquired Assets.  In addition, Buyer shall bear and pay all conveyancing, documentary, recording, transfer, sales, use, or similar Taxes or fees, arising out of or imposed because of the sale of the Acquired Assets, provided, however, Seller shall bear and pay any income Taxes incurred by Seller as a result of such transactions.

18.    Covenants of Seller Between the Date of this Agreement and Closing.  Between the date of this Agreement and the Closing Date, Seller covenants that:

A.    Access to Property, Books, etc.  Seller shall afford to the officers and authorized representatives of Buyer, reasonable access to the Acquired Assets and any books and records of Seller with respect solely to all or any part of the Acquired Assets, and will furnish Buyer with such additional and other information as to all or any part of the Acquired Assets as Buyer may from time to time reasonably request.

B.    Maintenance and Security.  Except as agreed to in writing by Buyer, Seller shall (i) maintain security in substantially the same manner as it has previously; (ii) use its

best efforts to maintain the Property and the plant, structures, equipment, properties and facilities comprising the Acquired Assets in good working order, repair and condition in accordance with standards generally accepted in the industry subject to ordinary wear and tear and occurrences outside the control of Seller; and (iii) perform any obligations which become due under material contracts, agreements, commitments or undertakings relating to or affecting all or any part of the Acquired Assets the Property and Projects.

C.    Operation of Business.  Seller shall operate the Projects and the Acquired Assets in the ordinary course consistent with past practices.  Except as agreed to in writing by Buyer in advance, Seller will not (i) enter into or assume any contract, agreement, obligation, lease, license, or commitment in connection with all or any portion of the Acquired Assets that exceeds one month's duration unless approved in advance by Buyer; (ii) create or assume any mortgage, pledge conditional sale or other title retention agreement, lien, encumbrance or charge of any kind upon all or any portion of the Acquired Assets whether now owned or hereafter acquired; or (iii) sell, lease, abandon, or otherwise dispose of any of all or any portion of the Acquired Assets, except processed inventory in the ordinary course of business.  Seller shall comply with all Laws applicable to the conduct of the Projects and the ownership and operation of the Acquired Assets and promptly notify Buyer in writing of any damage to or loss of any of the Acquired Assets

D.    Inventories and Supplies.  Seller shall continue, in its reasonable judgment, to contract for goods, services, and supplies in the ordinary course of business, and to maintain customary levels of inventories at the Projects in the manner currently maintained by Seller.

E.    Insurance.  Seller shall maintain in full force and effect all insurance policies carried on all of any portion of the Acquired Assets at the same level of coverage as is in effect on the date of this Agreement, and shall, as reasonably requested by Buyer, afford Buyer an opportunity to assume and continue such insurance policies or coverages as Buyer may specify prior to the Closing.

F.    Permits.  Seller shall not modify or rescind any of the permits and licenses needed to operate the Projects or all or any portion of the Acquired Assets and shall use its best efforts to obtain any renewal or extension of such permits and licenses.

G.    Cooperation with Buyer.  Seller shall cooperate in familiarizing Buyer with the operation of the Acquired Assets and in Buyer's preparations to assume operation and management of the Acquired Assets from and after the Closing  Seller shall afford Buyer access to the Acquired Assets and all information about the Acquired Assets at reasonable times and in a reasonable manner subject to the confidentiality provisions hereof  Without limiting the generality of the foregoing, Buyer and its authorized agents, employees and representatives shall be given the continuing right to reasonably inspect the books and records relating to the Acquired Assets and to make extracts from these

books and records; and Seller shall make available for Buyer's review copies of all
building plans and surveys in Seller's possession relating to all or any portion of the
Acquired Assets. and financial. credit and other information relating to all or any portion
of the Acquired Assets. and shall otherwise cooperate with Buyer through the Closing to
the end that Buyer and its agents and employees shall be afforded the opportunity to
obtain all necessary information and knowledge of the Acquired Assets and the Projects.
Buyer shall assure that its conduct, and that of its employees, agents, and representatives,
during such process is at all times unobtrusive and does not interfere with the operation of
the Acquired Assets in the ordinary course of business.

19.    Confidentiality  Buyer shall. subject to such disclosure to Buyer's experts.
consultants and lenders as necessary for Buyer to conduct and complete its investigation of the
Acquired Assets. at all times comply with the confidentiality and non-disclosure obligations
imposed by the confidentiality provisions of this Agreement. Buyer shall also obtain the
agreement of Buyer's experts. consultants and lenders to the confidentiality and non-disclosure
obligations imposed by this Agreement.

20.    Damage and Destruction.  In the event of damage or destruction of all or any
portion of the Acquired Assets after the Put/Call Effective Date and prior to the Closing in an
amount not exceeding One Hundred Thousand Dollars ($100,000). Buyer and Seller shall
consummate this Agreement without change in the Purchase Price and Seller shall assign to
Buyer its rights under any insurance policies covering such damage or destruction and pay any
applicable deductibles or self insured retentions.  In the event of damage or destruction of all or
any portion of the Acquired Assets prior to the Closing in an amount in excess of One Hundred
Thousand Dollars ($100,000). the Purchase Price to be paid by Buyer to Seller shall be reduced
by an amount equal to the amount of such damage (i) not covered by insurance policies
maintained by Seller with proceeds made payable to Buyer as an additional insured or otherwise
(provided that the insurers have agreed to pay for the full amount of the underlying claim) and/or
(ii) subject to a deductible or self-insured retention.

21.    Condemnation. In the event all or any portion of the Property is taken by
condemnation or eminent domain or is the subject of a threatened or pending condemnation or
eminent domain proceeding that has not been consummated prior to the Closing. Buyer and
Seller shall consummate this Agreement without change in the Purchase Price and Seller shall
assign to Buyer its rights to all awards for such condemnation or taking.

22.    Conditions to Obligations of Buyer.  In addition to the other conditions to Buyer's
obligations set forth elsewhere in this Agreement. the obligations of Buyer are, at the option of
Buyer. subject to the satisfaction. on or prior to the Closing Date, of the following conditions:

A.    Representations and Warranties.  The representations and warranties of
Seller contained in this Agreement shall be true in all material respects on, and as of the
Closing Date with the same effect as though such representations and warranties had been

made on and as of such date except for changes which are contemplated in this Agreement and Buyer shall have received a certificate dated as of the Closing Date executed by Seller to such effect.

     B.    Closing Documents. On or before the Closing, Buyer's receipt of the documents required to be delivered by Seller at the Closing, duly executed and, where appropriate, acknowledged by Seller.

     C.    Title Insurance. On or before the Closing, the issuance by First American Title Company of the title commitment.

     D.    Compliance. Seller shall have duly performed all of the covenants, agreements, and conditions contained in this Agreement to be performed by Seller on or prior to the Closing Date, and Buyer shall have received a certificate dated as of the Closing Date executed by Seller to such effect, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.

     E.    No Litigation, Etc. No Litigation, regulation, or legislation shall be pending or threatened which seeks to enjoin, restrain, or prohibit Buyer, or to obtain substantial damages from Buyer, in respect of the consummation of the transactions contemplated hereby, or which seeks to enjoin the operation of all or any part of the Acquired Assets which, in the reasonable judgment of Buyer, would make it inadvisable to consummate the transactions contemplated by this Agreement.

     F.    Good Standing Certificate. Buyer shall have received a certificate of good standing with respect to Seller from the Secretary of State of the State of California.

     G.    Certificate of Secretary. Buyer shall have received from Seller a certificate executed by the Secretary of Seller certifying that Seller's Board of Directors has approved and authorized this Agreement and each of the other Transaction Documents to which Seller is a party and each of the transactions contemplated thereby. The Secretary or Assistant Secretary of Seller shall also certify that such resolutions have not been rescinded, revoked, modified, or otherwise affected and remain in full force and effect.

     H.    Incumbency. Buyer shall have received a certificate of incumbency of Seller executed by the officers of Seller executing this Agreement, and attested by the Secretary or Assistant Secretary of Seller listing the officers of Seller authorized to execute this Agreement and the other Transaction Documents to which Seller is a party and all instruments on behalf of Seller and certifying the authority of each such officer to execute the agreements, documents, and instruments on behalf of Seller in connection with the consummation of the transactions contemplated herein.

I.     Transfers of Permits. The transfer of the Permits required by Law to be transferred from Seller to Buyer in order for Buyer to own all or any part of the Acquired Assets shall have either (i) been approved and effective or (ii) adequately addressed by the parties in a way that permits the Closing to occur without violating applicable Law, except for any deviations from the foregoing which would not have, individually or in the aggregate, a Material Adverse Effect.

23.    Conditions to Obligations of Seller. In addition to any other conditions to Seller's obligations set forth elsewhere herein, the obligation of Seller to sell all or any portion of the Acquired Assets as contemplated herein shall be, at the option of Seller, subject to the satisfaction on or before the Closing Date of all the following conditions:

A.     Representations, Warranties, and Covenants. All representations and warranties of Buyer contained in this Agreement shall be true in all material respects on and as of the Closing Date as if such representations and warranties were made on and as of the Closing Date and Buyer shall have delivered a certificate dated as of the Closing Date signed by its president or vice president to such effect.

B.     Purchase Price. Seller's receipt of the Purchase Price.

C.     Closing Documents. On or before the Closing, Seller's receipt of the documents required to be delivered by Buyer at the Closing, duly executed and, where appropriate, acknowledged by Buyer.

D      Compliance. Buyer shall have duly performed all of the covenants, agreements, and conditions contained in this Agreement to be performed by Buyer on or prior to the Closing Date, and Seller shall have received a certificate dated as of the Closing Date executed by Buyer to such effect.

E.     No Litigation; Etc. No Litigation, regulation, or legislation shall be pending or threatened which seeks to enjoin, restrain, or prohibit Seller, or to obtain substantial damages from Seller, in respect of the consummation of the transactions contemplated hereby.

F.     Certificate of Secretary. Seller shall have received from Buyer a certificate executed by the Secretary of Buyer certifying that Buyer's Board of Directors has approved and authorized this Agreement and each of the other Transaction Documents to which Buyer is a party and each of the transactions contemplated thereby. The Secretary or Assistant Secretary of Buyer shall also certify that such resolutions have not been rescinded, revoked, modified, or otherwise affected and remain in full force and effect.

G.     Incumbency. Seller shall have received a certificate of incumbency of Buyer executed by the officers of Buyer executing this Agreement, and attested by the

Secretary or Assistant Secretary of Buyer listing the officers of Buyer authorized to execute this Agreement and the other Transaction Documents to which Buyer is a party and all instruments on behalf of Buyer and certifying the authority of each such officer to execute the agreements, documents, and instruments on behalf of Buyer in connection with the consummation of the transactions contemplated herein.

24.     Indemnity by Seller.

A.     Seller covenants and agrees to indemnify and save and hold Buyer harmless from and against any Liabilities, Litigation, losses, costs and expenses (including reasonable attorneys' fees and expenses) to the extent they are a result of or arise, directly or indirectly, from, or which are in any way related to:

(i)     any inaccuracy in any representation or the breach of any warranty, covenant or agreement made by Seller in this Agreement;

(ii)     any debt or obligation or any contract, agreement, commitment or undertaking not assumed by Buyer pursuant to this Agreement;

(iii)     any assessments or Taxes which relate to the Property, Projects or the Acquired Assets for any period on or before the Closing Date; and

(iv)     Seller's failure or alleged failure to comply with any Law, including any Environmental Law prior to Closing.

B.     Environmental Remedial Action. Seller covenants and agrees to indemnify and save and hold Buyer harmless from and against any Liabilities, Litigation and associated costs and expenses (including reasonable attorneys' fees and expenses) as a result of or arising, directly or indirectly, from, or which are in any way related to: (i) Seller's failure or alleged failure to comply with applicable Environmental Laws; (ii) penalties and damages or claims for damages to the environment resulting from events which occurred during the period that the Property was owned by Seller; (iii) Remedial Actions required by Law or Governmental Authorities to rectify such events or regulatory non-compliance; (iv) Seller's failure to take responsibility for any environmental claims or Remedial Action except for those concerning any disposal of Hazardous Material on the Property by Buyer; (v) Seller's taking any actions, including but not limited to actions regarding the landfills on the Property, that would trigger or increase Buyer's and/or Seller's liability; and (vi) Seller's failure to perform any of Seller's obligations under the KACC Agreements. This obligation to indemnify Buyer shall include damages, costs and expenses incurred in connection with any Remedial Action related to the presence of any Hazardous Material or substance, hazardous or otherwise, located on the Property except as otherwise set forth in this Agreement to the contrary.

C.    Claims. Buyer shall, promptly after receipt by it of notice of any claim or of the commencement of an action in respect to which indemnification may be sought from Seller under this indemnity provision, notify Seller in writing. To the extent Seller is prejudiced by it, the failure to so notify Seller of any such claims or actions shall relieve Seller from liability. In any case, if any such action shall be brought against Buyer, and Buyer shall notify Seller of the commencement, Seller shall have the option of undertaking and directing the defense at its expense with its choice of legal counsel, subject to the reasonable approval of Buyer. If Seller, within a reasonable time after notice of such claim, fails to defend Buyer, Buyer will, on further notice to Seller, have the right to undertake and direct the defense of such claim. If Seller undertakes the defense, Buyer shall have the right, at its own cost and expense, to participate in the defense of such claim with its choice of legal counsel. No third party claim may be settled by Seller or Buyer hereunder without the written consent of the other (which consent shall not be unreasonably withheld) unless, with respect to settlements by the indemnifying party only, such settlement involves only the payment of monetary damages by the indemnifying party and no admission of wrongdoing or other relief and includes a complete release of all indemnified parties.

D    Survival. The foregoing indemnity obligations shall survive indefinitely.

25.    Indemnity by Buyer

A.    Indemnity. Buyer covenants and agrees to indemnify and save and hold Seller harmless from and against any Liabilities, Litigation, losses, costs and expenses (including reasonable attorneys' fees and expenses) to the extent that they are a result of or arise from or in any way relate to:

(i)    facts occurring subsequent to the Closing arising out of or relating to any liability, obligation, asset, business, personal property or real property assumed or purchased by Buyer pursuant to this Agreement except as otherwise expressly set forth herein to the contrary;

(ii)    any breach of warranty or covenant or inaccuracy of any representations made by Buyer in this Agreement;

(iii)    any breach of this Agreement by Buyer; and

(iv)    the operation of the Projects, the Property and/or all or any portion of the Acquired Assets by Buyer after the Closing Date.

B    Environmental Remedial Action. Buyer covenants and agrees to indemnify and save and hold Seller harmless from and against any Liabilities, Litigation, and associated costs and expenses (including reasonable attorneys' fees and expenses) as

a result of or arising, directly or indirectly, from. or which are in any way related to: (i) Buyer's failure or alleged failure to comply with Environmental Laws; (ii) penalties and damages or claims for damages to the environment resulting from events which occur subsequent to the Closing; (iii) Remedial Actions required by Law or Governmental Authorities to rectify such post-Closing events or regulatory non-compliance; (iv) Buyer's failure to take responsibility for any environmental claims or Remedial Action except for those concerning any disposal of Hazardous Material on the Property by Seller; (v) Buyer's taking any actions, including but not limited to actions regarding the Landfills on the Property. that would trigger or increase Buyer's and/or Seller's liability; and (vi) Buyer's failure to perform any of Buyer's obligations under the KACC Agreements. This obligation to indemnify Seller shall include damages, costs and expenses incurred in connection with any Remedial Action related to the presence of any Hazardous Material or substance. hazardous or otherwise. located on the Property except as otherwise set forth in this Agreement to the contrary.

C.    Claims. Seller shall, within fifteen (15) calendar days after receipt by it of notice of any claim or of the commencement of any action in respect to which indemnification may be sought from Buyer under the indemnification agreement contained in this indemnity provision. notify Buyer in writing. To the extent Buyer is prejudiced by it, the failure to so notify Buyer of any such claims or action shall relieve Buyer from liability which it may have to Seller under this indemnity provision. but only to the extent of the actual loss incurred and shall not relieve Buyer from any liability which it may have to Seller otherwise than under this indemnity provision. In any case, if any such action shall be brought against Seller. and Seller shall notify Buyer of the commencement. Buyer shall have the option of undertaking and directing the defense at its expense with its choice of legal counsel. subject to the reasonable approval of Seller. If Buyer within a reasonable time after notice of such claim, fails to defend Seller, Seller will, on further notice to Buyer have the right to undertake and  direct the defense of such claim.  If Buyer undertakes the defense. Seller shall have the right, at its own cost and expense, to participate in the defense of such claim with its choice of legal counsel. No third party claim may be settled by Buyer or Seller hereunder without the written consent of the other (which consent shall not be unreasonably withheld) unless. with respect to settlements by the indemnifying party only. such settlement involves only the payment of monetary damages by the indemnifying party and no admission of wrongdoing or other relief and includes a complete release of all indemnified parties.

D    Survival. The foregoing indemnity obligations shall survive indefinitely.

25.    Confidentiality of Seller's Information

A.    No Disclosure.  Except as and to the extent required by Law and except to the extent necessary to disclose information to Buyer's experts and consultants to enable Buyer to meaningfully conduct its investigation of all or any portion of the Acquired

Assets. neither Seller nor Buyer shall disclose or use, and each will direct its representatives not to disclose or use to the detriment of the other party, any Confidential Information (as defined below) furnished in connection with the transaction proposed in this Agreement. Except as and to the extent required by law, without the prior written consent of the other party, neither party will make, and each will direct its representatives not to make, directly or indirectly, any public comment, statement, or communication with respect to, or otherwise to disclose or to permit the disclosure of the existence of discussions regarding a possible transaction between the parties or any of the terms, conditions, or other aspects of the transaction proposed in this Agreement. If a party is required by Law to make any such disclosure, it must first provide to the other party the content of the proposed disclosure, the reasons that such disclosure is required by Law, and the time and place that the disclosure will be made.

B.    Exceptions. The non-disclosure restrictions imposed on each party shall not apply to any Confidential Information which a party can show by written evidence (i) is, or later becomes, part of the public domain legitimately and through no fault of that party, its officers, employees or agents: (ii) that party receives from a third party who obtained that information legitimately and who is under no obligation of confidence regarding the same; or (iii) which is already known or developed by that party and is not subject to any confidentiality agreement.

C.    Combination of Features. However, notwithstanding these exceptions, any combination of features disclosed to a party shall not fall within the foregoing exceptions merely because individual features are separately in the public domain or in its possession, unless the combination itself is in the public domain or otherwise legitimately in its possession from sources other than the owner of the Confidential Information.

D.    Confidential Information Defined. The Confidential Information includes the composition and value of all or any portion of the Acquired Assets, technical information regarding Seller's operations, the composition of Seller products, financial data, information regarding all or any portion of the Acquired Assets, and other confidential proprietary information with respect to either party and its business that derives actual or potential economic value from not being generally known to the public, to competitors or to other persons who may obtain economic value from its disclosure or use.

E.    Acknowledgment of Confidentiality. Each party acknowledges that the Confidential Information is confidential regardless of how it is gathered, discovered, accumulated, kept, recorded or stored, and regardless of whether the information was provided prior to the signing of this Agreement.

F    Continuing Obligations. The non-disclosure imposed upon the parties by this Agreement shall continue indefinitely and survive expiration of this Agreement.

whether due to rescission, breach or termination.

G.  <u>Employees Covered</u>.  Each party agrees that it and its Affiliates, and any and all of its and its Affiliates' officers, directors, partners, employees, representatives and agents, will comply with the terms of this Agreement.  Each party agrees to advise those of its officers, employees and agents who may have access to the Confidential Information of the obligations assumed under the terms of this Agreement.

H.  <u>Relief</u>.  A breach of the confidentiality provisions in this Agreement could cause irreparable harm which could not be fully compensated by money damages. Accordingly, each party agrees that, in addition to any and all remedies at Law, the other party will be entitled to pursue any and all equitable remedies, including injunctive relief, in the event of a breach of the terms and conditions of this Agreement.  In all cases, the prevailing party will be entitled to recover attorneys' fees and costs in connection with such action or proceeding, in addition to all other recovery or relief.

I.  <u>Further Exceptions</u>.  Notwithstanding any other provision of this Agreement, to the extent necessary for due diligence Buyer may contact Governmental Authorities regarding permits concerning the Projects or all or any portion of the Acquired Assets..

27.  <u>Notices</u>.  All notices to be given under this Agreement shall be in writing and

A.  Sent by United States Certified Mail, return receipt requested, in which case notice shall be deemed delivered three (3) Business Days after deposit, postage prepaid in the United States Mail, or

B.  Sent by a recognized overnight courier, in which case notice shall be deemed delivered one (1) Business Day after deposit with the courier, or

C.  Sent by telecopy or similar means, if a copy of the notice is also sent by United States Certified Mail, in which case notice shall be deemed delivered on transmittal by telecopier or other similar means, provided that a transmission report is generated that reflects the accurate transmission of the notices, as follows.

If to Buyer.

Kaiser Aluminum & Chemical Corporation
5847 San Felipe, Suite 2600
Houston, Texas 77057
Attn:  Vice President Corporate Development
phone:  (713)267-3712
fax:  (713)267-3710

With copy to:

      Kaiser Aluminum & Chemical Corporation
      5847 San Felipe, Suite 3600
      Houston, Texas 77057
      Attn:   General Counsel
      phone: (713)267-3600
      fax:    (713)267-3710

If to Seller:

      National Refractories & Minerals Corporation
      1852 Rutan Drive
      Livermore, California 94550
      Fax: (925) 294-7589
      Attention: Stan Parry

With copy to:

      Bruce E. Methven
      Methven & Associates
      2232 Sixth Street
      Berkeley, CA 94710
      Fax: (510) 649-4019

The above addresses may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of the notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notice by a party shall be deemed effectively given if given by such party's legal counsel.

28.    Termination. This Agreement may be terminated by (i) Buyer, if (a) a material default shall be made by Seller in the observance or in the due and timely performance by Seller of any of the agreements and covenants of Seller herein or if there shall have been a breach by Seller of any of the warranties and representations of Seller herein or if the conditions of this Agreement to be complied with or performed by Seller at or before the Closing Date shall not have been complied with or performed at the time required for such compliance or performance and such breach, noncompliance, nonperformance or material default shall not have been waived by Buyer and (b) such breach, noncompliance, nonperformance or material default, individually or when taken together with any other such breaches, instances of noncompliance, areas of nonperformance or material defaults, is adverse to the Property, the Projects or the condition of all or any portion of the Acquired Assets, in an amount not less than Two Hundred Fifty Thousand Dollars ($250,000), (ii) Seller, if a (a) material default shall be made by Buyer in the

observance or in the due and timely performance by Buyer of any agreements and covenants of Buyer here, or if there shall have been a breach by Buyer of any of the warranties and representations of Buyer here, or if the conditions of this Agreement to be complied with or performed by Buyer at or before the Closing Date shall not have been complied with or performed at the time required for such compliance or performance and such breach, noncompliance, nonperformance or material default shall not have been waived by Seller or if Closing does not occur as scheduled (unless Seller has agreed in writing to a later Closing Date) and (b) such breach, noncompliance, nonperformance or material default, individually or when taken together with any other such breaches, instances of noncompliance, areas of nonperformance or material defaults, is adverse to Seller in an amount not less than Two Hundred Fifty Thousand Dollars ($250,000); or (iii) by either party, if any material conditions set forth in this Agreement for the benefit of that party shall fail.  As to any damages of any party arising from the effect of termination or abandonment of this Agreement by any other party, such party shall be entitled to pursue its rights or remedies against the other party or parties to the extent such rights or remedies may be available at Law or in equity.  Similarly, even though the financial impact of a particular breach, instance of noncompliance, area or nonperformance or default hereunder, individually or when taken together with any other such breaches, instances of noncompliance, areas of nonperformance or defaults do not exceed the applicable threshold set forth above and permit either party to terminate or abandon the transactions contemplated herein, each party shall be entitled to pursue its rights or remedies against the other party or parties to the extent such rights or remedies may be available at Law or in equity despite the fact that the transactions contemplated herein shall have closed.

29.    Bulk Transfer Laws.  Without admitting the applicability of the bulk transfer laws of any jurisdiction, Seller and Buyer agree that neither party will comply with any applicable bulk transfer or similar law in connection with the sale of the Acquired Assets.  Buyer shall assume all liability under the bulk transfer laws and shall indemnify and hold Seller harmless against any and all Liabilities under such bulk transfer laws asserted by third parties against Seller as a result of such noncompliance.

30.    Attorney Fees.  If Litigation is commenced between the parties arising out of or to construe, enforce or interpret this Agreement, the prevailing party in such Litigation shall be entitled to recover from the nonprevailing party all reasonable attorney fees and costs incurred in such Litigation.

31.    Entire Agreement, Construction.  This Agreement together with the Put Call Agreement, Schedules and Exhibits (which are part of this Agreement), contains all representations and the entire understanding between the parties to this Agreement with respect to the subject matter of this Agreement.  Should any provision in this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the person who himself or through his agent prepared the same, it being agreed that all parties have participated

in the preparation hereof.

32.    **Time of the Essence.** Time is of the essence in this Agreement.

33.    **Confidentiality Regarding This Agreement.** The terms and conditions hereof and the fact that the parties have entered into this Agreement shall be absolutely confidential and neither party hereto nor their agents, employees, representatives shall disclose either the terms or existence of this Agreement to any third person, firm or entity (with the exception of Seller's and Buyer's lenders, attorneys and accountants) prior to Closing for Buyer's acquisition of the Property, Acquired Assets and the Projects, it being acknowledged, understood and agreed that any such disclosure will result in disruption of Seller's operation of the Acquired Assets and the Projects and diminution in the value thereof.

34    **Governing Law.** This Agreement and the rights of the parties shall be governed by California law. The parties consent to the exclusive jurisdiction of any state or federal court within Alameda County, California.

35.    **Fees and Expenses.** Except as specifically provided in this Agreement, Buyer and Seller each shall pay their respective fees and expenses in connection with the transactions contemplated by this Agreement.

36.    **Assignment; Binding Effect.** This Agreement shall not be assignable by any of the parties hereto without the written consent of the other party. Notwithstanding the foregoing, Buyer may, upon notice, assign its rights and obligations under this Agreement to any Affiliate or wholly-owned subsidiary provided that no such assignment releases or otherwise discharges either Buyer or Seller from any obligation, covenant, or required performance hereunder.

37.    **No Benefit to Others.** The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto, and they shall not be construed as conferring any rights on any other persons.

38.    **Headings, Gender and "Person".** All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires. Any reference to a "person" herein shall include an individual, firm, corporation, partnership, trust, Governmental Authority or body, association, unincorporated organization or any other entity.

39    **Counterparts.** This Agreement may be executed in two (2) or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one counterpart has been signed by each party and delivered to the other party hereto.

40.   Integration of Agreement.  This Agreement and the Put/Call Agreement supersede all prior agreements, oral and written, between the parties hereto with respect to the subject matter hereof, with the exception of the KACC Agreements which KACC Agreements shall remain in full force and effect without amendment or modification except as otherwise expressly set forth herein to the contrary.  Neither this Agreement nor any provision hereof, may be changed, waived, discharged, supplemented, or terminated orally, but only by an agreement in writing signed by the party against which the enforcement of such change, waiver, discharge or termination is sought.

41.   KACC Agreements.  The KACC Agreements shall be deemed to be amended to reflect Buyer's assumption of the liabilities identified in items (iii) and (iv) of Section 4 of this Agreement.  Such assumption shall neither release Seller from the underlying obligations nor entitle Seller to indemnity from Buyer with respect to those obligations, in each case unless and until Seller has fully funded the One Million Five Hundred Thousand Dollar ($1,500,000) escrow contemplated by the Put/Call Agreement and such funds have been distributed to Buyer; provided, however, that notwithstanding that the foregoing amount has not been fully funded and distributed to Buyer, Seller shall be deemed to be released and discharged on a dollar for dollar basis for any amounts actually funded and distributed to Buyer.

42.   Partial Invalidity.  Whenever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision or provisions had never been contained herein unless the deletion of such provision or provisions would result in such a material change as to cause completion of the transactions contemplated hereby to be unreasonable.

43.   Signing.  This document may be executed in counterpart copies, by faxed signatures and/or by power of attorney, which the signatories agree will have the same force and effect as original.  The counterparts and when so executed shall have the same force and effect as though all signatures appeared on one document.

WHEREFORE, the parties have executed this Agreement as of the date first above written.

KAISER ALUMINUM & CHEMICAL
CORPORATION

by: _____
name: _____
title: _____

NATIONAL REFRACTORIES &
MINERALS CORPORATION

by: _____
name: _____
title: _____

## FIRST AMENDMENT
### TO
### PUT/CALL AGREEMENT REGARDING MOSS LANDING PROPERTY

This First Amendment to the Put/Call Agreement Regarding Moss Landing Property (the "Amendment"), executed this 14 day of November, 2001, by and among National Refractories & Minerals Corporation ("National") and Kaiser Aluminum & Chemical Corporation ("Kaiser"), amends that certain Put/Call Agreement Regarding Moss Landing Property made effective September 13, 2001 (the "Agreement"). All capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Agreement.

WHEREAS, Seller and Purchaser desire to amend the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Extension of Dates.  Section 2 of the Agreement is hereby amended as follows:

(a)     Section 2(a) is amended to replace November 30, 2001, with December 17, 2001;

(b)     Section 2(b) is amended to replace (i) December 1, 2001, with December 16, 2001, and (ii) January 31, 2002, with February 15, 2002; and

(c)     Section 2(c) is amended to replace (i) November 30, 2001, with December 17, 2001, in each place it appears, (ii) January 31, 2002, with February 15, 2002, and (iii) February 1, 2002, with February 16, 2002.

2.      Effect of Amendment.  Except as otherwise specifically set forth herein to the contrary, nothing contained herein is intended to waive, modify or otherwise impair any term of the Agreement or preclude any party from taking any action or otherwise enforce any of its rights thereunder.

3.      Counterpart.  This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

4.      Amendment.  This Amendment is being executed by the parties hereto pursuant to Section 11 of the Agreement.

IN WITNESS WHEREOF, the parties to this Amendment have caused this Amendment to be executed as of the day and year first written above.

| NATIONAL REFRACTORIES & MINERALS CORPORATION | KAISER ALUMINUM & CHEMICAL CORPORATION |
|---|---|
| by: _E. S. Perry_ <br> name: PRESIDENT C.E.O. & C.F.O <br> title: _____ | by: _John Brown_ <br> name: JOHN PARNETON <br> title: SVP CFO |
| Acknowledgment and Agreement: <br><br> CONGRESS FINANCIAL CORPORATION <br><br> by: _____ <br> name: _____ <br> title: _____ | |

IN WITNESS WHEREOF, the parties to this Amendment have caused this Amendment to be executed as of the day and year first written above.

| NATIONAL REFRACTORIES & MINERALS CORPORATION | KAISER ALUMINUM & CHEMICAL CORPORATION |
|---|---|
| by:_____ name:_____ title:_____ | by:_____ name:_____ title:_____ |
| Acknowledged and Agreed: CONGRESS FINANCIAL CORPORATION by:_____ name: _GARY D. CARLSON_____ title: _Vice President_____ | |

## SECOND AMENDMENT
## TO
## PUT/CALL AGREEMENT REGARDING MOSS LANDING PROPERTY

This Second Amendment to the Put/Call Agreement Regarding Moss Landing Property (the "Second Amendment"), effective as of this 11th day of December, 2001, and executed by and among National Refractories & Minerals Corporation ("National") and Kaiser Aluminum & Chemical Corporation ("Kaiser"), amends that certain Put/Call Agreement Regarding Moss Landing Property made effective September 13, 2001 (the "Agreement"), as amended by the First Amendment to Put/Call Agreement Regarding Moss Landing Property made effective November 14, 2001 (the "First Amendment"). All capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Agreement.

WHEREAS, Seller and Purchaser desire to amend the Agreement,

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Extension of Dates: Section 2 of the Agreement is hereby amended as follows:

    (a)    Section 2(a) is amended to replace December 17, 2001, with April 15, 2002;

    (b)    Section 2(b) is amended to replace (i) December 18, 2001 with April 16, 2002, and (ii) February 15, 2002 with June 17, 2002; and

    (c)    Section 2(c) is amended to replace (i) December 17, 2001, with April 15, 2002 in each place it appears, (ii) February 15, 2002, with June 17, 2002, and (iii) February 16, 2002 with June 18, 2002.

2.    Effect of Second Amendment: Except as otherwise specifically set forth herein, nothing contained herein is intended to waive, modify or otherwise impact any term of the Agreement or the First Amendment or preclude any party from taking any action or otherwise enforcing any of its rights thereunder.

3.    Counterpart: This Second Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

4.    Amendment: This Second Amendment is being executed by the parties hereto pursuant to Section 11 of the Agreement.

IN WITNESS WHEREOF, the parties to this Second Amendment have caused this Second Amendment to be executed as of the day and year first written above.

| NATIONAL REFRACTORIES & MINERALS CORPORATION | KAISER ALUMINUM & CHEMICAL CORPORATION |
|---|---|
| by: _____ | by: _____ |
| name: E. S. Parry | name: _____ |
| title: PRESIDENT, C.O.O. & C.F.O. | title: _____ |
| Acknowledgment and Agreement<br><br>CONGRESS FINANCIAL CORPORATION<br><br>by: _____<br><br>name: _____<br><br>title: | |

IN WITNESS WHEREOF, the parties to this Amendment have caused this Amendment to be executed as of the day and year first written above.

| NATIONAL REFRACTORIES & MINERALS CORPORATION | KAISER ALUMINUM & CHEMICAL CORPORATION |
|---|---|
| by:_____ | by:_____ |
| name:_____ | name:_____ |
| title:_____ | title:_____ |
| Acknowledgment and Agreement<br><br>**CONGRESS FINANCIAL CORPORATION**<br><br>by: *[signature]*<br><br>name: *GARRY D. CASSIANNI*<br><br>title: *VICE PRESIDENT* | |

21388924.1/11543-0122

A – 121

**EXHIBIT D**

1  GOLDBERG, STINNETT, MEYERS & DAVIS
   A Professional Corporation
2  TERRANCE L. STINNETT, ESQ. CA Bar #46010
   MIRIAM KHATIBLOU, ESQ., CA Bar #178584
3  44 Montgomery Street, Suite 2900
   San Francisco, CA 94104
4  Telephone: (415) 362-5045
   Facsimile: (415) 362-2392
5
   Attorneys for National Refractories & Minerals Corporation, CFB Liquidating Corporation, fka
6  Chicago Fire Brick Company, WFB Liquidating Corporation, fka Wellsville Fire Brick Company,
   NAT Liquidation Corporation, fka National Affiliated Technologies, Inc., and National Refractories
7  & Minerals, Inc., Debtors in Possession

8

9              IN THE UNITED STATES BANKRUPTCY COURT

10             FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                        OAKLAND DIVISION

12

13  In re:                                Case No. 01-45482 T11

14  NATIONAL REFRACTORIES &               Chapter 11
    MINERALS CORPORATION, a California
15  Corporation, et al.,                  Jointly Administered

16             Debtors.                   Date:    December 1, 2003
                                          Time:    2:00 P.M.
17                                        Place:   1300 Clay Street, Room 201
                                                   Oakland, CA
18
                                | **SECURED CREDITORS** |
19                              |---|
                                | Congress Financial Corporation (Western) |
20                              |---|
                                | Kaiser Aluminum & Chemical Corporation |
21                              |---|
                                | United States of America, as lessee |
22

23  **NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SALE OF MOSS
24   LANDING PROPERTY TO NADER T. AGHA OR HIGHER BIDDER**

25                        **NOTICE OF MOTION**

26      **TO: THE TWENTY LARGEST UNSECURED CREDITORS OF EACH OF THE
27  ABOVE-NAMED DEBTORS, THE CREDITORS' COMMITTEE APPOINTED IN THE
    NATIONAL REFRACTORIES & MINERALS CORPORATION CASE, THOSE PARTIES
28  REQUESTING SPECIAL NOTICE, CONGRESS FINANCIAL CORPORATION**

                                    -1-
   NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SALE OF MOSS LANDING PROPERTY TO NADER T. AGHA OR
   HIGHER BIDDER

   64348

(WESTERN), KAISER ALUMINUM & CHEMICAL CORPORATION, THE UNITED STATES TRUSTEE, AND THEIR RESPECTIVE COUNSEL OF RECORD

NOTICE IS HEREBY GIVEN that on December 1, 2003 at 2:00 P.M. in the Courtroom of the Honorable Leslie Tchaikovsky, United States Bankruptcy Judge, 1300 Clay Street, Room 201, Oakland, California a hearing upon the motion of National Refractories & Minerals Corporation, ("National") for an order the sale by National of the real property with improvements commonly known as the Moss Landing Property located at 7697 Highway 1, Moss Landing, Monterey County, California, 95039, together with certain personal property located thereon (hereinafter collectively referred to as the "Moss Landing Property") to Nader T. Agha, or such other purchaser that submits a higher and better bid for the purchase of the Moss Landing Property.

## MOTION

National hereby moves the Court for an order authorizing the sale by National of the Moss Landing Property to Nader T. Agha ("Mr. Agha"), or such other purchaser who submits a higher and better bid for the purchase of the Moss Landing Property. Said motion is based upon the following facts, as set forth in the Declaration of Bradley D. Sharp filed herewith.

1.      National, and its subsidiaries CFB Liquidating Corporation, fka Chicago Fire Brick Company, an Illinois corporation, WFB Liquidating Corporation, fka Wellsville Fire Brick Company, a Missouri corporation, NAT Liquidation Corporation, fka National Affiliated Technologies, Inc. a Delaware corporation, and National Refractories & Minerals, Inc. an Ontario, Canada corporation, each filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code with the above-entitled Court on October 10, 2001 (the "Petition Date"). Each of said debtors remains in possession of its assets as a debtor in possession, no trustee having been appointed.

2.      Subsequent to the Petition Date National has been actively attempting to sell the Moss Landing Property. The Moss Landing Property has been marketed on a national basis for over two years. Although National has previously entered into agreements to sell the Moss Landing Property, after the prospective purchasers completed their due diligence with regard to said property they exercised their right to withdraw their offers. When National attempted to exercise its right to require

-2-

NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SALE OF MOSS LANDING PROPERTY TO NADER T. AGHA OR HIGHER BIDDER

64348

Kaiser Aluminum & Chemical Corporation ("Kaiser") to purchase the Moss Landing Property pursuant to the terms of a Put/Call Agreement between National, Kaiser and Congress Financial Corporation (Western) ("Congress"), Kaiser obtained an order in its own chapter 11 case approving the rejection of the Put/Call Agreement as a burdensome executory contract.

3.    National has recently entered into an Agreement of Purchase and Sale, dated October 6, 2003, as amended by the First Amendment dated October 9, 2003 (collectively, the "Purchase Agreement") with Nader T. Agha ("Mr. Agha"), pursuant to which Mr. Agha has agreed to purchase the Moss Landing Property for the sum of $7,500,000.00, contingent upon him completing his due diligence and determining that said property is suitable for his purposes. A copy of the Purchase Agreement is attached hereto as **Exhibit "A"** and incorporated herein by this reference. The sale to Mr. Agha is subject to the receipt of higher and better bids for the purchase of the Moss Landing Property and is also subject to the approval by this Court. An auction is scheduled to take place on November 20, 2003 in order to give any potential purchaser who is interested in acquiring the Moss Landing Property an opportunity to submit a higher and better bid for the purchase of said property. In the event that a higher and better bid is submitted for the purchase of the Moss Landing Property by a purchaser other than Mr. Agha (the "Successful Bidder"), and said bid is accepted by National, it is the intention of National that at the hearing upon this motion to request that the Court authorize the sale of the Moss Landing Property to such Successful Bidder and to also request that the Court authorize a sale to a back-up bidder (the "Alternate Bidder") in the event that the Successful Bidder fails to close the sale.

4.    The Purchase Agreement between National and Mr. Agha was entered into following extensive arms' length negotiations between the parties. Mr. Agha is not, and never has been, an officer, director or shareholder of National or any of its subsidiaries or related entities. None of the officers, directors or shareholders of National, nor any of its subsidiaries or related entities, shall have any interest whatsoever in the Moss Landing Property after its sale to Mr. Agha or his assignee. Therefore, Mr. Agha should be considered a good faith purchaser pursuant to Bankruptcy Code section 363(m).

5.    Under the terms of the Purchase Agreement, the Moss Landing Property is to be sold

-3-

1  subject to certain encumbrances as set forth in the Amended/6th Updated Preliminary Report dated

2  September 11, 2003 issued by First American Title Company, a copy of which is attached hereto as

3  **Exhibit "B"** and incorporated herein by this reference, to wit, exceptions Nos. 1 through 10, 12

4  through 21, 27 through 29, 31 through 42, and 44 through 58 and certain Rights of Way, as set forth

5  in Schedule 7 to the Purchase Agreement.

6        6.    Under the terms of the Purchase Agreement, the Moss Landing Property is to be sold

7  free and clear of the following liens and encumbrances as set forth the aforesaid Amended/6th

8  Updated Preliminary Report, to wit, exceptions 11, 22, 23, 24, 25 and 26. Said exceptions are as

9  follows:

10        a.    Exception 11 is a lease pursuant to which the United States of America is the

11  lessee, which exception relates to only two of the parcels of property that comprise the Moss

12  Landing Property, to wit, Parcels VIII and IX. Said parcels are used by the United States of

13  America to store certain material, consisting of approximately 8 – 10 tons of chrome ore, that

14  was supposed to be removed from the property in early 2002. Said lease is identified as

15  Defense Logistics Agency Lease Agreement No. GS-00P-22528 (SCM).

16        b.    Exception 22 is intentionally omitted as the holder of the lien or encumbrance

17  previously identified as Exception 22 has released said lien or encumbrance.

18        c.    Exception 23 is the lien of a deed of trust in favor of Congress Financial

19  Corporation (Western) ("Congress") recorded on May 8, 1985 in Reel 1837 of Official

20  Records, at page 190. It is expected that Congress will consent to the sale of the Moss

21  Landing Property free and clear of the lien of said deed of trust because all of the net proceeds

22  of sale are going to be paid to Congress.

23        d.    Exception 24 is intentionally omitted as the holder of the lien or encumbrance

24  previously identified as Exception 24 has released said lien or encumbrance.

25        e.    Exception 25 is the lien of a deed of trust in favor of Kaiser Aluminum &

26  Chemical Corporation ("Kaiser") recorded on May 8, 1985 in Reel 1837 of Official Records,

27  at page 401.

28

-4-

f.     Exception 26 is the lien of a UCC-1 Financing Statement in favor of Congress initially recorded on May 9, 1985 in Reel 1837 of Official Records, at page 928 and continued by the recordation of a Continuation Statement on January 19, 2000 as Recorder's Series No. 200003711. As stated above, it is expected that Congress will consent to the sale of the Moss Landing Property free and clear of the lien of said Financing Statement.

7.     Under the terms of the Purchase Agreement, Mr. Agha was required to, and did, post a deposit in the sum of $100,000.00 with First American Title Company upon the execution of the Purchase Agreement. Said deposit is refundable if Mr. Agha decides not to proceed with the purchase of the Moss Landing Property when he completes his due diligence. If Mr. Agha decides to proceed with the purchase after he completes his due diligence he will be required to increase the deposit to a total of $200,000.00, which deposit will then become non-refundable unless the sale fails to close because of a default by National or the failure to obtain Bankruptcy Court approval of the sale. Mr.Agha's due diligence period expires on November 12, 2003. The balance of the purchase price is to be paid upon the close of escrow.

8.     As set forth more fully in Paragraph 10 of the Purchase Agreement, real property taxes are to be prorated as of the close of escrow. National will be responsible for paying the County of Monterey Documentary Transfer Tax and any local transfer taxes as is the tradition in Monterey County. National shall be responsible for payment of the recording fees. The purchaser shall pay all sales, use, or similar taxes or fees arising out of or imposed because of the sale of the property. The escrow fees, and all other closing costs, shall be paid equally by National and Mr. Agha.

9.     As set forth more fully in Paragraph 25 of the Purchase Agreement, if an order approving the sale has not been entered, or any reason, on or before December 22, 2003, Mr. Agha has the right to terminate the Purchase Agreement and obtain a refund of his deposit.

10.    The Purchase Agreement is subject to the receipt of higher and better bids for the purchase of the Moss Landing Property. An auction of the Moss Landing Property is currently scheduled to take place on November 20, 2003 in the office of National's bankruptcy counsel. Paragraph 27 of the Purchase Agreement provides that in the event that the Purchase Agreement has not been earlier terminated and Mr. Agha is not the successful bidder at the auction, he will be

-5-

NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SALE OF MOSS LANDING PROPERTY TO NADER T. AGHA OR HIGHER BIDDER

64348

1    entitled to receive a Break-up Fee equal to 1.0% of the purchase price set forth in the Purchase

2    Agreement, i.e., $75,000.00. At the time of the filing of this motion, a motion by National for the

3    approval of the auction procedures, and the Break-up Fee payable to Mr. Agha if he is not the

4    successful bidder for the property, is set for hearing on November 3, 2002.

5          11.    Paragraph 6 of the Purchase Agreement provides that various service contracts,

6    equipment leases and other contracts relating to the property that are set forth in Schedule 6 to the

7    Purchase Agreement will either be terminated by the purchaser or assumed by the purchaser upon the

8    close of escrow. National has filed herewith a separate motion for an order authorizing the

9    assumption by National and the assignment to Mr. Agha, or such other successful bidder, the

10    executory agreements set forth in Schedule 6.

11          12.    Under the terms of the Purchase Agreement with Mr. Agha, escrow is to close by

12    December 5, 2003, or within eleven days following approval of the sale of the Moss Landing

13    Property to Mr. Agha if such approval occurs on or before December 5, 2003, whichever is later, with

14    each party endeavoring to close as soon as possible. Under the circumstances, National requests that

15    the Court waive the automatic ten (10) day stay of Bankruptcy Rule 6004(g) and provide that the

16    order approving the sale of the Moss Landing Property be effective immediately upon the filing of

17    said order.

18    <u>**Real Estate Brokers' Commission**</u>

19          13.    Pursuant to orders previously filed herein, National retained Hirsch & Associates and

20    Wilson Bros. Commercial, Inc. as its real estate brokers to market the Moss Landing Property.

21    Pursuant to the terms of their retention, upon the closing of the sale of the Moss Landing Property

22    said real estate brokers will be entitled to receive a commission in the sum of 4.0% of the purchase

23    price for any sale up to $7,000,000.00, 4.5% of the purchase price for any sale between

24    $7,000,001.00 and $8,000,000.00, 5.0% of the purchase price for any sale between $8,000,001.00

25    and $9,000,000.00, 5.5% for any sale between $9,000,001.00 and $10,000,000.00 and 6.0% for any

26    sale over $10,000,000.00.

27          14.    In the event that the property is sold to Mr. Agha, said real estate brokers' commission

28    is to be divided 1/3rd to Hirsch & Associates and 2/3rds to Wilson Bros Commercial, Inc. In the

-6-

1  event the property is sold to another purchaser, who is not represented by a real estate broker, the real

2  estate brokers' commission is to be divided equally between Hirsch & Associates and Wilson Bros.

3  Commercial, Inc. In the event that the property is sold to another purchaser who is represented by a

4  real estate broker, the division of the commission will be determined prior to the close of escrow and

5  will be disclosed to this Court at the time of the hearing upon this motion.

6                              **Basis for Sale Free and Clear of Liens**

7        15.    National anticipates that Congress will consent to the sale free and clear of the lien of

8  its security interest, lien, claim or other interest in the Moss Landing Property, thereby satisfying the

9  requirement of Section 363(f)(2) of the Bankruptcy Code.

10       16.    With regard to the lien of the deed of trust in favor of Kaiser, in the event that Kaiser

11 consents, or otherwise does not object, to the sale free and clear of its lien, the requirements of

12 Section 363(f)(2) of the Bankruptcy Code will be satisfied. In addition, pursuant to the terms of the

13 subordination agreement between Congress and Kaiser, Congress is entitled to have the debt due to it

14 paid in full before any payment is made on account of the debt due to Kaiser. In the event that the

15 debt due to Congress is satisfied in full from the proceeds from the sale of the Moss Landing Property

16 and there are any excess proceeds remaining, the lien in favor of Kaiser should be transferred to such

17 excess proceeds, and such excess proceeds should be held by National pending a further order of this

18 Court. National has filed a general unsecured claim in Kaiser's pending chapter 11 case, and as a

19 result of the claims being asserted by National in said claim, National has, or may have, the right to

20 set off against any claim that Kaiser has, or may have, to any such excess proceeds, if any, the

21 amounts that National asserts are due to it by Kaiser. Therefore, there is a good faith dispute between

22 National and Kaiser with regard to the right of Kaiser to any proceeds from the sale of the Moss

23 Landing Property. Therefore, pursuant to the provisions of Section 363(f)(4) of the Bankruptcy Code

24 the Moss Landing Property can be sold free and clear of the lien of Kaiser.

25       17.    With regard to the lease to the United States of America, it is the position of National

26 that said lease terminated by its own terms at least by 2002, and therefore, the United States of

27 America no longer has any lien, claim or interest of any kind in Parcels VIII and IX of the Moss

28 Landing Property. Thus, any such lien, claim or interest asserted by the United States of America is

-7-

1   subject to a bona fide dispute between National and the United States of America. Consequently,

2   said property can be sold free and clear of any lien, claim or interest of the United States of America

3   pursuant to the provisions of Section 363(f)(4) of the Bankruptcy Code. In addition, in connection

4   with its motion for an order authorizing the assumption and assignment of certain executory

5   contracts, National has also requested an order authorizing the rejection of the lease agreement

6   between National and the United States of America to cover the eventuality that it is determined that

7   said lease has not yet expired by its own terms.

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.**     Section 363(b) Authorizes the Proposed Sale And Sale Process.

Section 363(b) of the Bankruptcy Code permits a debtor in possession to sell property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. §363(b). A number of courts have held that the sale of estate property in a manner outside of the ordinary course of the debtor's business, and outside the context of a confirmed plan, is appropriate if the debtor demonstrates a "sound business purpose" for doing so. *See*, for example, *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Walters*, 83 B.R. 14 (9th Cir. BAP 1988); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15 (E.D. Pa. 1987).

In deciding whether to approve a pre-confirmation sale of substantially all of the debtor's assets under Section 363(b), courts have considered several factors, including (1) whether a sound business reason exists for the proposed transaction; (2) whether fair and reasonable consideration is provided; (3) whether the transaction has been proposed and negotiated in good faith; and (4) whether adequate and reasonable notice has been provided. *See*, *In re Lionel Corp.*, *supra*, 722 F.2d at 1071 (setting forth the "sound business purpose" test); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr.C.D.Cal.1991) (In addition to proving that the proposed transaction has a valid business justification, a debtor must also show that the sale is proposed in good faith.) "'Good faith' encompasses fair value, and further speaks to the integrity of the transaction. Typical 'bad faith' or

-8-

NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SALE OF MOSS LANDING PROPERTY TO NADER T. AGHA OR
HIGHER BIDDER

64348

1    misconduct would include collusion between the seller and buyer, or any attempt to take unfair

2    advantage of other potential purchasers." *In re Wilde Horse Enterprises, Inc* at 842.

3          Here, the proposed sale and sale process fits squarely within the parameters of the sound

4    business judgment test articulated in the above-referenced authorities.  First and foremost, National

5    has demonstrated a sound business purpose for the proposed transaction.  Specifically, the

6    manufacturing operations that were previously conducted at the Moss Landing Property ceased long

7    before National filed it petition for relief under chapter 11 of the Bankruptcy Code.  Even prior to the

8    date of bankruptcy National had engaged in a national marketing effort and continued to do so after

9    the petition for relief was filed.  National has attempted to negotiate a possible sale of the Moss

10   Landing Property with numerous potential purchases, without success.  In fact, in January of 2002,

11   almost two years ago, this Court entered an order approving a sale of the Moss Landing Property to

12   HTC Investments California, Inc.  However, said sale did not close when the purchaser exercised its

13   right to terminate the agreement following the expiration of its due diligence period.  National then

14   attempted to exercise its Put Option in order to compel Kaiser to purchase the property for the sum of

15   $5,000,000.00.  However, Kaiser, in its own chapter 11 case, rejected the Put/Call agreement as a

16   burdensome executory contract.  National and its real estate brokers have continued their efforts to

17   market the property, and the Purchase Agreement with Mr. Agha is subject to the receipt of higher

18   and better bids at the auction to be conducted on November 20, 2003.

19         Second, National and its financial advisors believe that the sales process that they have

20   implemented will elicit the best and highest offers for the Moss Landing Property in the present

21   circumstances.  As such, the consideration to be received under the terms of an offer presented by

22   Mr. Agha is reasonable and fair under the circumstances.

23         Third, because the sales process has created a fair and reasonable environment in which all

24   legitimate and qualified interests in the Moss Landing Property can be presented in a competitive,

25   open "level playing field," any offer presented in accordance with the terms of the sales process will,

26   in National's opinion, necessarily be negotiated and presented in good faith.

27         Fourth, National submits that the notice and timing of the sales process, including the auction

28   sale, are adequate and fair, and reasonably calculated to elicit the highest levels of interest in the

NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SALE OF MOSS LANDING PROPERTY TO NADER T. AGHA OR
HIGHER BIDDER

64348

1   Moss Landing Property.   National and its professionals have made, and will continue to make,
2   appropriate efforts to seek out all logical buyers.  Further, National believes that its interest in selling
3   the Moss Landing Property has been made well known to any potential purchaser of said property,
4   such that all industry and financial parties holding a legitimate and achievable interest in acquiring
5   the Moss Landing Property will have had sufficient knowledge, information and opportunity to make
6   appropriate bids within the context of the sales process.  The solicitations and marketing efforts of
7   National and its professionals support the proposed process and the reasonableness of any offer
8   ultimately presented through that process.

9          Accordingly, National submits that the sales process satisfies the requirements of Section
10  363(b) of the Bankruptcy Code.  Therefore, the sale of the Moss Landing Property pursuant to section
11  363(b) of the Bankruptcy Code is appropriate under the circumstances.

12  **B.**          **Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

13         As stated above, National requests that the Court approve the sale of the Moss Landing
14  
15  Property free and clear of all liens, claims, encumbrances and other interests of Congress and Kaiser,
16  as well as any lien, claim or other interest that may be asserted by the United States of America.
17  Such relief is consistent with the provisions of Section 363(f)(2) with regard to Congress, and Section
18  363(f)(2) if Kaiser consents or, alternatively, and Section 363(f)(4) of the Bankruptcy Code with
19  regard to Kaiser if it does not consent, and pursuant to Section 363(f)(4) with regard to the lien, claim
20  or interest of the United States of America.

21         Section 363(f) provides that a debtor in possession may sell property free and clear of any
22  lien, claim or interest of another entity in such property if any of the following circumstances pertain:
23  (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2)
24  such entity consents; (3) such interest is a lien and the price at which such property is sold is greater
25  than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5)
26  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction or
27  such interest.  11 U.S.C. §363(f).

28         As indicated by the use of the disjunctive term "or," satisfaction of any one of the five

-10-

1  requirements listed in Section 363(f) is sufficient to permit the sale of assets free and clear of liens,

2  claims, encumbrances, pledges, mortgages, security interests, charges, options and other interests.

3      In this case, National believes that Congress and Kaiser are the only entities holding any liens

4  against the Moss Landing Property.  It is expected that Congress will consent to the sale since all of

5  the net proceeds from the sale of the Moss Landing Property are to be paid to Congress until its debt

6  is paid in full.

7      The Moss Landing Property can be sold free and clear of the lien in favor of Kaiser for the

8  reasons stated in Paragraph 13 hereinabove, either pursuant to Section 363(f)(2) if Kaiser actually

9  consents, or pursuant to Section 363(f)(4) if Kaiser does not consent.

10      With regard to any lien, claim or interest that may be asserted by the United States of America

11  pursuant to the terms of the lease agreement between National and the United States of America, the

12  Moss Landing Property can be sold free and clear of such lien, claim or interest on the basis that the

13  same is subject to a good faith dispute because it is the position that said lease has terminated by its

14  own terms, and therefore, the United States of America no longer has a right to occupy Parcels VIII

15  and IX for any purpose whatsoever.  Thus, the requirements of Section 363(f)(4) of the Bankruptcy

16  Code have been met.

17                          **CONCLUSION**

18      For the foregoing reasons, National prays for entry of an order as follows:

19  1.    Authorizing the sale of the Moss Landing Property to Nader T. Agha for the sum of

20  $7,500,000.00 pursuant to the terms of the Purchase Agreement attached hereto as **Exhibit "A"**, or to

21  such other purchaser who may submit a higher and better bid at the auction to be conducted by

22  National on November 20, 2003.

23  2.    Authorizing said sale free and clear of the liens, claims or other interests of any kind

24  of (i) Congress arising pursuant to the deed of trust and the UCC-1 Financing Statement in its favor,

25  (ii) Kaiser arising pursuant to the deed of trust in its favor, and (iii) the United States of America

26  pursuant to the terms of the lease agreement between National and the United States of America.

27  3.    Authorizing payment, directly out of escrow, to Hirsch & Associates and Wilson Bros.

28  Commercial, Inc. of a real estate brokers' commission equal to 4.5% of the purchase price obtained

-11-

NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SALE OF MOSS LANDING PROPERTY TO NADER T. AGHA OR HIGHER BIDDER

64348

1  by National for the sale of the Moss Landing Property, to be divided 1/3rd to Hirsch & Associates and

2  2/3rds to Wilson Bros. Commercial, Inc. upon the closing of the sale to Mr. Agha, or payment of

3  such other commission as may be payable in the event of a sale to a difference purchaser.

4       4.    Authorizing the payment of the net proceeds of sale to Congress until the debt due to it

5  by the debtors in these jointly administered cases has been paid in full.

6       5.    Providing that to the extent that there are any excess net proceeds from the sale of the

7  Moss Landing Property remaining after the payment in full of the debt due to Congress that the lien

8  of the deed of trust in favor of Kaiser be transferred to such remaining net excess proceed, which

9  remaining net excess proceeds are to be held by National pending a further order of this Court.

10      6.    Waiving the automatic ten (10) day stay of Bankruptcy Rule 6004(g) and provide that

11  the order approving the sale of the Moss Landing Property be effective immediately upon the filing

12  of said order.

13      7.    Determining, based upon the information provided to the Court as of the hearing date,

14  that Mr. Agha is a good faith purchaser as provided in Section 363(m) of the Bankruptcy Code

15      8.    For such other and further relief as to the Court seems proper.

16  Dated: October 25, 2003

                           GOLDBERG, STINNETT, MEYERS & DAVIS
17                         A Professional Corporation

18

19                         By: _Terrance L. Stinnett_
                           Terrance L. Stinnett
20                         Attorneys for National Refractories & Minerals
                           Corporation, CFB Liquidating Corporation, fka
21                         Chicago Fire Brick Company, WFB Liquidating
                           Corporation, fka Wellsville Fire Brick
                           Company, NAT Liquidation Corporation, fka
22                         National Affiliated Technologies, Inc., and
                           National Refractories & Minerals, Inc., Debtors
23                         in Possession

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SALE OF MOSS LANDING PROPERTY TO NADER T. AGHA OR HIGHER BIDDER

64348

# EXHIBIT E

A – 134

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In Re:

KAISER ALUMINUM CORPORATION,
a Delaware corporation, et al.,

                                    Debtors.

Jointly Administered

Case No. 02-10429 (JKF)

Chapter 11

### CONSENT DECREE

WHEREAS Kaiser Aluminum Corporation ("KAC") and certain of its affiliates, including debtor-in-possession, Kaiser Aluminum & Chemical Corporation ("KACC"), (collectively the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Court" or "Bankruptcy Court") voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") on various dates as set forth in Attachment A hereto, which cases have been consolidated for procedural purposes and are being administered jointly, styled *In re Kaiser Aluminum Corporation, et al.*, Case No. 02-10429 (JKF) (the "Chapter 11 Cases");

WHEREAS the United States, on behalf of the United States Environmental Protection Agency ("EPA"), the Department of Interior ("DOI") and the National Oceanic and Atmospheric Administration ("NOAA") (collectively, the "Settling Federal Agencies"), contends that the Debtors are liable for response costs incurred and to be incurred by the United States in the course of responding to releases and threats of releases of hazardous substances into the environment for the Liquidated Sites as set forth herein and natural resource damages relating to such sites;

WHEREAS the United States, on behalf of EPA, DOI, NOAA and the Nuclear Regulatory Commission ("NRC"), has filed a proof of claim, Claim No. 7135, against the Debtors ("Claim No. 7135");

1

**FINAL AUGUST 2003**

WHEREAS the States of California, Rhode Island and Washington (the "States") contend that the Debtors are liable for response costs incurred and to be incurred by the States in the course of responding to releases and threats of releases of hazardous substances into the environment for certain of the Liquidated Sites as set forth herein and natural resource damages relating to such sites;

WHEREAS the State of California has filed a proof of claim, Claim No. 7297, against KACC ("Claim No. 7297");

WHEREAS the State of Rhode Island has filed a proof of claim, Claim No. 7111, against the Debtors ("Claim No. 7111");

WHEREAS the State of Washington has filed a proof of claim, Claim No. 7181, against KAC ("Claim No. 7181");

WHEREAS the Puyallup Tribe of Indians (the "Tribe") contends that the Debtors are liable for natural resource damages relating to a certain Liquidated Site as set forth herein and has filed a proof of claim, Claim No. 1727, against KAC ("Claim No. 1727");

WHEREAS the Debtors would dispute the United States', the States', and the Tribe's contentions and would object, in whole or in part, to their proofs of claim;

WHEREAS the Debtors seek, to the maximum extent permitted by law, to obtain protection, through the resolution of environmental liabilities for the Liquidated Sites as set forth herein, from and against all Claims that have been or may in the future be asserted for response costs or natural resource damages;

WHEREAS the Debtors, the Settling Federal Agencies, the States, and the Tribe wish to resolve their differences with respect to the Liquidated Sites and with respect to the proofs of claim of the Settling Federal Agencies, the States, and the Tribe, as well as to address other issues relating to environmental matters as provided herein;

WHEREAS in consideration of, and in exchange for, the promises and covenants herein, including, without limitation, the covenants not to sue set forth in Paragraphs 18, 20 and 24 and,

subject to the provisions of Paragraphs 28-30 and intending to be legally bound hereby, the Debtors, the Settling Federal Agencies, the States and the Tribe hereby agree to the terms and provisions of this Consent Decree;

WHEREAS settlement of the matters governed by this Consent Decree is in the public interest and an appropriate means of resolving these matters and will lead to a more expeditious cleanup of hazardous substances in compliance with federal and state laws and regulations, including cleanup standards under Wash. Rev. Code § 70.105D.030(2)(e);

NOW, THEREFORE, without the admission of liability or any adjudication on any issue of fact or law, and upon the consent and agreement of the parties to this Consent Decree by their attorneys and authorized officials, it is hereby agreed as follows:

## DEFINITIONS

1.    In this Agreement, the following terms shall have the following meanings:

A.    "Additional Sites" means all sites and properties, including, without limitation, all facilities, as that term is defined in CERCLA, other than the Liquidated Sites, the Discharged Sites, the Debtor-Owned Sites and the Reserved Sites. An "Additional Site" shall be construed to include (i) for those sites now or hereafter included on the NPL, all areas of a site as defined by EPA for purposes of the NPL, including any later expansion of such site as may be determined by EPA, and any affected natural resources, and (ii) for those sites or portions of sites not included on the NPL, all areas and natural resources affected or potentially affected by the release or threatened release of hazardous substances.

B.    "Allowed General Unsecured Claim" against a particular Debtor shall have the meaning set forth in the Plan of Reorganization.

C.    "CERCLA" refers to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 *et seq.*, as now in effect or hereafter amended.

D.    "Claims" has the meaning provided in Section 101(5) of the Bankruptcy Code.

**FINAL AUGUST 2003**

E.    "Debtors" means Kaiser Aluminum Corporation and certain of its affiliates listed on Attachment A hereto that filed voluntary petitions for relief on the respective dates set forth on Attachment A hereto, as debtors, debtors-in-possession or in a new or reorganized form as a result of the Chapter 11 Cases.

F.    "Debtor-Owned Sites" means any properties, facilities or sites owned by any of the Debtors at or at any time after the confirmation of the Plan of Reorganization, except that Debtor-Owned Sites shall not include any Reserved Sites as defined below.

G.    "Discharged Sites" means the following 18 sites (in alphabetical order) which shall have the Claims treatment set forth in Paragraph 17:

- American Barrel/ Utah Power & Light in Salt Lake City, UT
- Brantley Landfill in Island, KY
- Colorado School of Mines in Denver, CO
- Des Moines Barrel & Drum Site in Des Moines, IA
- Fike-Artel Chemical Site in Nitro, WV
- Hillyard Processing (aka Aluminum Recycling Corp.) in Spokane, WA (with respect to the State of Washington only)
- J.I.S. Landfill in Jamesburg, NJ
- Kaiser Center in Oakland, CA (with respect to the State of California only)
- Kin-Buc Landfill in Edison, NJ
- Lawrence County Landfill in Lawrence County, IN
- Many Diversified Interests in Houston, TX
- Marco of Iota in Iota, LA
- Metro Container in Trainer, PA
- Mexico Feed & Seed/ Pierce Waste Oil Services in Mexico, MO
- Miami County Incinerator in Troy, OH
- New Lyme Landfill in New Lyme, OH

4                         **FINAL AUGUST 2003**

- North American Environmental in Clearfield, UT

- Pottstown in Pottstown, PA.

A "Discharged Site" delineated above shall be construed to include (i) for those sites now or hereafter included on the NPL, all areas of a site as defined by EPA for purposes of the NPL, including any later expansion of such site as may be determined by EPA, and any affected natural resources, or (ii) for those sites or portions of sites not included on the NPL, all areas and natural resources affected or potentially affected by the release or threatened release of hazardous substances.

H.     "DOI" means the Department of the Interior of the United States of America or any legal successor thereto.

I.     "EPA" means the United States Environmental Protection Agency or any legal successor thereto.

J.     "Effective Date" means the date on which this Consent Decree is approved by the Bankruptcy Court.

K.     "Effective Date of the Plan of Reorganization" means the date on which any plan of reorganization that includes KACC and is confirmed becomes effective in accordance with its terms.

L.     "KACC" means Kaiser Aluminum & Chemical Corporation as debtor, debtor-in-possession or in a new or reorganized form as a result of the Chapter 11 Cases.

M.     "Liquidated Sites" means the following 66 sites (in alphabetical order) which shall have the Claims treatment as set forth in Paragraphs 4(A), 4(B) or 4(C) below, as noted in parentheses:

- Aberdeen Pesticide Dumps Superfund Site in Aberdeen, NC (Paragraph 4(C))

- American Chemical Services in Griffith, IN (Paragraph 4(B))

- Aqua Tech Environmental Inc. in Greer, SC (Paragraph 4(B))

- ARRCOM Corporation in Kootenai County, ID (Paragraph 4(B))

- Bay Area Drum Site in San Francisco, CA (Paragraph 4(C))

- Bay Drums (aka Peak Oil Co.) in Brandon, FL (Paragraph 4(C))

- Bayou Sorrel in Bayou Sorrell, LA (Paragraph 4(C))

- Breslube Penn Superfund Site in Coroapolis, PA (Paragraph 4(C))

- Cannons Engineering Corporation in Bridgewater, MA, Plymouth, MA and Londonderry, NH and Gilson Road, aka Sylvester's in Nashua, NH (Paragraph 4(B))

- Casmalia Disposal Site in Santa Barbara County, CA (Paragraph 4(C))

- Center for Technology (aka CFT or Pleasanton Center for Technology) in Pleasanton, CA (Paragraph 4C)) (with respect to the State of California only)

- Chemical Control Superfund Site in Elizabeth, NJ (Paragraph 4(B))

- Chemical Handling Corporation in Broomfield, CO; (Paragraph 4(B))

- Coastal Radiation Services in St. Gabriel, LA (Paragraph 4(C))

- Combustion Inc. in Livingston, LA (Paragraph 4(C))

- Commencement Bay (Hylebos Waterway) in Tacoma, WA (Paragraph 4(C))

- Commercial Oil Services in Toledo, OH (Paragraph 4B))

- Custom Distribution Services in Perth Amboy, NJ (Paragraph 4(A))

- Diamond State Salvage Yard in Wilmington, DE (Paragraph 4(A))

- Doepke-Holliday in Johnson County, KS (Paragraph 4(B))

- Douglassville Disposal/ Berks Reclamation in Douglassville, PA (Paragraph 4(C))

- Dubose Oil Products Superfund Site in Cantonment, FL (Paragraph 4(C))

- Dutchtown Refinery in Dutchtown, LA (Paragraph 4(C))

- Eastern Diversified Metals Superfund Site in Hometown, PA (Paragraph 4(C))

- Ekotek (aka Petrochem Recycling) in Salt Lake City, UT (Paragraph 4(B))

- Ellis Road in Jacksonville, FL (Paragraph 4(B))

**FINAL AUGUST 2003**

- Envirotek II in Tonawanda, NY (Paragraph 4(B))

- Ettlinger's Pit in Duval County, FL (Paragraph 4(A))

- Four County Landfill in De Long, IN (Paragraph 4(B))

- French Limited in Crosby, TX (Paragraph 4(B))

- Geigy Superfund Site in Aberdeen, NC (Paragraph 4(C))

- General Refining in Garden City, GA (Paragraph 4(A))

- Gibson Environmental, Inc. in Bakersfield, CA (Paragraph 4(C))

- Great Lakes Container in St. Louis, MO (Paragraph 4(A))

- Higgins Disposal in Somerset County, NJ (Paragraph 4(A))

- Hillsdale Drums in Hillsdale and Amite, LA (Paragraph 4(B))

- Huth Oil Services in Cleveland, OH (Paragraph 4(C))

- Laskin Poplar in Ashtabula County, OH (Paragraph 4(B))

- Liquid Disposal in Utica, MI (Paragraph 4(B))

- Liquid Dynamics in Chicago, IL (Paragraph 4(C))

- Lorentz Barrel & Drum in San Jose, CA (Paragraphs 4(B))

- Marzone in Tipton, GA (Paragraph 4(C))

- Metamora Landfill in Lapeer County, MI (Paragraph 4(A))

- Moyer's Landfill in Collegeville, PA (Paragraph 4(B))

- Operating Industries, Inc. Corporation in Monterey Park, CA (Paragraph 4(B))

- Pickettville Road Landfill Site in Jacksonville, FL (Paragraph 4(C))

- PRC Patterson in Patterson, CA (Paragraph 4(C))

- Pristine, Inc. in Reading, OH (Paragraph 4(B))

- Quicksilver Products, Inc. in Brisbane, CA (Paragraph 4(A)) (with respect to the State of California only)

- Richmond Railyard in Richmond, CA (Paragraph 4(A))

7

**FINAL AUGUST 2003**

- Richmond Shipyard No. 2 (aka Marina Bay Development) in Richmond, CA (Paragraph 4(C))

- Rouse Steel Drums in Jacksonville, FL (Paragraph 4(B))

- Sadler Drum Superfund Site in Mulberry, FL (Paragraph 4(C))

- Sand Springs Petrochemical Complex in Sand Springs, OK (Paragraph 4(B))

- Sea Cliff Marina in Richmond, CA (Paragraph 4(A)) (with respect to the State of California only)

- Spokane Junkyard in Spokane, WA (Paragraph 4(C))

- Stickney Ave. Landfill & Tyler St. Dump in Toledo, OH (Paragraph 4(A))

- Tacoma Reduction Facility in Tacoma, WA (Paragraph 4(A))

- Tex-Tin in Texas City, TX (Paragraph 4(C))

- Tremont City Landfill in Clark County, OH (Paragraph 4(C))

- Tri-County and Elgin Landfills in South Elgin, IL (Paragraph 4(C))

- Waste, Inc. Landfill in Michigan City, IN (Paragraph 4(A))

- West County Landfill Site in Contra Costa County, CA (Paragraph 4(B))

- West Virginia Ordnance Works (aka Point Pleasant Landfill) in Mason County, WV (Paragraph 4(C))

- XTRON in Blanding, UT (Paragraph 4(B))

- Yellow Water Road Superfund Site in Baldwin, FL (Paragraph 4(B))

A "Liquidated Site" delineated above shall be construed to include (i) for those sites now or hereafter included on the NPL, all areas of a site as defined by EPA for purposes of the NPL, including any later expansion of such site as may be determined by EPA, and any affected natural resources, or (ii) for those sites or portions of sites not included on the NPL, all areas and natural resources affected or potentially affected by the release or threatened release of hazardous substances.

N.    "NOAA" means the National Oceanic and Atmospheric Administration of the United States Department of Commerce of the United States of America or any legal successor thereto.

O.    "NPL" means the National Priorities List, 40 C.F.R. Part 300.

P.    "NRC" means the Nuclear Regulatory Commission of the United States or any legal successor thereto.

Q.    "Plan of Reorganization" or "Plan" means any plan of reorganization that includes KACC and is confirmed and becomes effective in the Chapter 11 Cases.

R.    "Prepetition" with respect to a Debtor refers to the time period on or prior to the date such Debtor filed a voluntary petition for relief under Title 11 of the Bankruptcy Code, as set forth in Attachment A hereto. "Postpetition" with respect to a Debtor refers to the time period from and after the date such Debtor filed a voluntary petition for relief under Title 11 of the Bankruptcy Code, as set forth in Attachment A hereto.

S.    "RCRA" refers to the Resource Conservation and Recovery Act, 42 U.S.C. §6901 *et seq.* as now in effect or hereafter amended.

T.    "Reserved Sites" means the following sites:  Mead Aluminum Reduction Works in Mead, WA; Spokane River (including Upriver Dam) in Spokane, WA; Mica Landfill in Spokane, WA; Tulsa Thorium Remediation Site # 9875 (aka Specialty Products Site) in Tulsa, OK; Ravenswood Aluminum Smelter and Rolled Products Facility in Ravenswood, WV; and Ohiopyle in Ohiopyle, PA.

U.    "Settling Federal Agencies" means, collectively, DOI, EPA and NOAA.

V.    "Similar State Laws and Tribal Laws" shall include, but not be limited to: the Hazardous Substance Account Act, Cal. Health & Safety Code section 25300 et seq ; the Rhode Island Hazardous Waste Management Act of 1978, R.I. Gen. Laws ch. 23-19.1 et seq.; the Rhode Island Groundwater Protection Act of 1985, R.I. Gen. Laws ch. 46-13.1 et seq.; the Rhode Island Water Pollution Act, R.I. Gen. Laws ch. 46-12 et seq.; the Washington State Model

**FINAL AUGUST 2003**

Toxics Control Act, RCW 70.105D; and the Puyallup Tribal Interim Hazardous Substances Control Act, Puyallup Tribal Code, Title 10, Chapter 1.

      W.     State of California means, collectively, the California Department of Toxic Substances Control ("DTSC") and the California Department of Fish and Game ("DFG").

      X.     State of Rhode Island means the Rhode Island Department of Environmental Management.

      Y.     State of Washington means, collectively, the Washington State Department of Ecology and the Washington State Department of Fish & Wildlife.

      Z.     "States" means the State of California, the State of Rhode Island and the State of Washington.

      AA.    "Tribe" means the Puyallup Tribe of Indians.

      BB.    "United States" means the United States of America, including EPA, DOI, NOAA, NRC and all of the United States' agencies, departments and instrumentalities.

## JURISDICTION

      2.     The Court has jurisdiction over the subject matter hereof pursuant to 28 U.S.C. §§157, 1331, and 1334, and 42 U.S.C. §§9607 and 9613(b).

## PARTIES BOUND; SUCCESSION AND ASSIGNMENT

      3.     This Consent Decree applies to, is binding upon, and shall inure to the benefit of the United States, the States, the Tribe, the Debtors, and the Debtors' legal successors and assigns, and any trustee, examiner or receiver appointed in the Bankruptcy Cases.

## ALLOWANCE OF CLAIMS

      4.     In settlement and satisfaction of the Claims of the Settling Federal Agencies, the States and the Tribe under CERCLA, Section 7003 of RCRA and all Similar State Laws and Tribal Laws with respect to the Liquidated Sites, the Debtors consent to Allowed General Unsecured Claims against KACC in the amounts set forth in Paragraphs 4(A), 4(B) and 4(C) below. The Settling Federal Agencies, the States and the Tribe shall receive no distributions

**FINAL AUGUST 2003**

from the Debtors in the Chapter 11 Cases with respect to any Debtor's liabilities and obligations under CERCLA, Section 7003 of RCRA and Similar State Laws and Tribal Laws for the Liquidated Sites other than as set forth in this Consent Decree. If no amount of allowed claim is listed below for EPA, DOI, NOAA, NRC, the Tribe, DTSC, DFG, or the State of Washington for a particular Liquidated Site, then the amount of the allowed claim for such entity for the Liquidated Site is zero.

   A.  With respect to the following Liquidated Sites, the following parties shall have Allowed General Unsecured Claims in the amount of zero ($ 0) because the parties agree that a settlement for no liability under CERCLA, Section 7003 of RCRA and Similar State Laws and Tribal Laws for such Liquidated Sites is appropriate:

| Site Name and Location | EPA Region | Claim Recipient | Amount of Allowed General Unsecured Claim |
|---|---|---|---|
| Custom Distribution Services, Perth Amboy, NJ | 2 | EPA | $ 0 |
| Diamond State Salvage Yard, Wilmington, DE | 3 | EPA | $ 0 |
| Ettlinger's Pit, Duval County, FL | 4 | EPA | $ 0 |
| General Refining, Garden City, GA | 4 | EPA | $ 0 |
| Great Lakes Container, St. Louis, MO | 7 | EPA | $ 0 |
| Higgins Disposal, Somerset County, NJ | 2 | EPA | $ 0 |
| Metamora Landfill, Lapeer County, MI | 5 | EPA | $ 0 |
| Quicksilver Products, Inc., Brisbane, CA (with respect to State of CA only) | 9 | CA | $ 0 |
| Richmond Railyard, Richmond, CA | 9 | CA | $ 0 |

**FINAL AUGUST 2003**

| Site Name and Location | EPA Region | Claim Recipient | Amount of Allowed General Unsecured Claim |
|---|---|---|---|
| Sea Cliff Marina, Richmond, CA (with respect to State of CA only) | 9 | CA | $ 0 |
| Stickney Ave. Landfill & Tyler St. Dump, Toledo, OH | 5 | EPA | $ 0 |
| Tacoma Reduction Facility, Tacoma, WA | 10 | WA EPA | $ 0 $ 0 |
| Waste, Inc. Landfill, Michigan City, IN | 5 | EPA | $ 0 |

B.    With respect to the following Liquidated Sites, the following parties shall have Allowed General Unsecured Claims in the amount of zero ($ 0) because the parties agree that such a settlement is appropriate on account of payments previously made by KACC, including in the amounts, on the dates and to the recipients listed below:

| Site Name and Location | Claim Recipient | Amount(s) of Payments Made | Date(s) of Payments | Recipient(s) of Payments |
|---|---|---|---|---|
| American Chemical Services, Griffith, IN | EPA | $8,726.35 | 1/17/95 | American National Bank and Trust Company of Chicago Corporate Trust Division (cc EPA 5) |
| Aqua Tech Environmental Inc., Greer, SC | EPA | $4,000 | 11/11/93 to 9/11/95 | Aqua-Tech PRP Group Trust Fund |
| ARRCOM Corporation, Kootenai County, ID | EPA | $234,600 | 4/6/92 | Mellon Bank, Superfund Accounting, US EPA Region 10 |

FINAL AUGUST 2003

| Site Name and Location | Claim Recipient | Amount(s) of Payments Made | Date(s) of Payments | Recipient(s) of Payments |
|---|---|---|---|---|
| Cannons Engineering Corporation in Bridgewater, MA, Plymouth, MA and Londonderry, NH and Gilson Road, aka Sylvester's in Nashua, NH | EPA | $41,746.80 $4,745.88 $4,005.30 | 8/88 | EPA, Massachusetts, New Hampshire |
| Chemical Control Superfund Site, Elizabeth, NJ | EPA | $250 | 5/24/89 | Chemical Control Joint Admin Fund |
| | | $2,500 | 5/24/89 | State Chem Control Joint Defense Fund |
| | | $1,000 | 5/24/89 | Fed Chem Control Joint Defense Fund |
| | | $2,475 | 8/26/91 | Chemical Control PRP Group Admin Fund |
| | | $6,000 | 8/27/90 | Richard White, Esq. Of Putnam, Hayes & Bartlett, Inc. |
| | | $160,002.07 | 11/22/91 | Chemical Control PRP Trust Fund, |
| | | $120,886.42 | 11/11/98 | Chemical Control State Settlement Escrow Account |
| Chemical Handling Corporation, Broomfield, CO | EPA | $106.10 | 9/30/96 | EPA Hazardous Substance Superfund |
| Commercial Oil Services, Toledo, OH | EPA | $61,064.42 | 6/24/88 to 3/2/94 | Commercial Oil Services Steering Committee |
| Doepke-Holliday, Johnson County, KS | EPA | $15,000 | 1/17/95 | Holliday Remediation Task Force |
| Ekotek (aka Petrochem Recycling), Salt Lake City, UT | EPA | $250 | 5/18/94 | Ekotek Site Remediation Committee |

FINAL AUGUST 2003

| Site Name and Location | Claim Recipient | Amount(s) of Payments Made | Date(s) of Payments | Recipient(s) of Payments |
|---|---|---|---|---|
| Ellis Road, Jacksonville, FL | EPA | $8,235.93 | 2/9/89 to 5/8/92 | Ellis Road Steering Committee Trust Fund |
| Envirotek II, Tonawanda, NY | EPA | $250 | 3/18/91 | Sent to Saperston & Day of Buffalo, NY - administrators of Envirotek II Escrow Fund |
| Four County Landfill, De Long, IN | EPA | $3,000 | 5/8/99 | Four County Landfill Operable Unit One RD RA Group |
| French Limited, Crosby, TX | EPA | $540 | 4/27/93 | FLTG, Inc. Coopers & Lybrand, Trustee |
| Hillsdale Drums Hillsdale and Amite, LA | EPA | $20,000

$786.87 | 6/27/94

6/27/94 | Texas Commerce Bank Nat'l Assn
Hillsdale Group Administrative Fund |
| Laskin Poplar, Ashtabula County, OH | EPA | $13,500

$4,034 | 10/27/87

11/18/94 to 6/1/00 | October 1986 Laskin Settlement Trust Fund Laskin Final Remediation Trust Fund |
| Liquid Disposal, Utica, MI | EPA | $1,250

$17,940.01 | 12/19/85 to 9/21/87 2/22/90 | LDI PRP Admin Fund

LDI De Minimis Settlement Fund |
| Lorentz Barrel & Drum, San Jose, CA | EPA CA (DTSC) | $5,447.75 $2,563.65 | 10/18/96 | Lorentz Superfund Site De minimis Escrow Acct |
| Moyer's Landfill, Collegeville, PA | EPA | $178,479 $33,996 | 11/97 11/5/97 | U.S. Dept. of Justice Hazardous Sites Cleanup Fund, Commonwealth Environmental Cleanup Program |

| Site Name and Location | Claim Recipient | Amount(s) of Payments Made | Date(s) of Payments | Recipient(s) of Payments |
|---|---|---|---|---|
| Operating Industries, Inc. Corporation, Monterey Park, CA | EPA | $122,148 | 1/14/99 | OII Fifth Partial Consent Decree Escrow Account |
| Pristine, Inc., Reading, OH | EPA | $2,000<br><br>$250 | 11/19/90<br><br>9/3/93 | Pristine Facility 468B Trust Fund<br>Pristine City Steering Committee Repository Acct |
| Rouse Steel Drums, Jacksonville, FL | EPA | $16,076.94 | 8/11/00 | Rouse Steel Drum PRP Group |
| Sand Springs Petrochemical Complex, Sand Springs, OK | EPA | $500<br><br>$5,375 | 9/21/87<br><br>2/22/91 | Sand Springs Superfund PRP Group<br>Sand Springs Superfund PRP Trust |
| West County Landfill Site, Contra Costa County, CA | CA (DTSC) | $213,000 | 2/10/97 | West County Landfill Premium Fund |
| XTRON, Blanding, UT | EPA | $20,000 | 8/27/91 | Participating Respondents Xtron Site Account |
| Yellow Water Road Superfund Site, Baldwin, FL | EPA | $41,629.50 | 5/6/94 to 5/7/94 | EPA Hazardous Substance |

C.    With respect to the following Liquidated Sites, the following parties shall have Allowed General Unsecured Claims in the amounts set forth below:

15

**FINAL AUGUST 2003**

| Site Name and Location | EPA Region | Claim Recipient | Amount of Allowed General Unsecured Claim |
|---|---|---|---|
| Aberdeen Pesticide Dumps Superfund Site, Aberdeen, NC | 4 | EPA | $323,613 |
| Bay Area Drum Site, San Francisco, CA | 9 | EPA | $2,500 |
| Bay Drums (aka Peak Oil Co.), Brandon, FL | 4 | EPA | $2,500 |
| Bayou Sorrel, Bayou Sorrel, LA | 6 | EPA | $95,400 |
| Breslube Penn Superfund Site, Coroapolis, PA | 3 | EPA | $3,480,000 |
| Casmalia Disposal Site, Santa Barbara County, CA | 9 | EPA CA (DTSC) CA (DFG) | $633,965 $25,885 $15,818 |
| Center for Technology (aka CFT or Pleasanton Center for Technology), Pleasanton, CA | 9 | CA (DTSC) | $10,000 |
| Coastal Radiation Services, St. Gabriel, LA | 6 | EPA | $2,750,000 |
| Combustion Inc., Livingston, LA | 6 | EPA | $100,000 |
| Commencement Bay (Hylebos Waterway), Tacoma, WA | 10 | EPA NOAA, DOI, WA, and Tribe | $8,900,000 $5,500,000 |
| Douglassville Disposal/ Berks Reclamation, Douglassville, PA | 3 | EPA | $5,000 |
| Dubose Oil Products Superfund Site, Cantonment, FL | 4 | EPA | $3,000 |
| Dutchtown Refinery, Dutchtown, LA | 6 | EPA | $24,000 |

16

**FINAL AUGUST 2003**

| Site Name and Location | EPA Region | Claim Recipient | Amount of Allowed General Unsecured Claim |
|---|---|---|---|
| Eastern Diversified Metals Superfund Site, Hometown, PA | 3 | EPA | $1,000,000 |
| Geigy Superfund Site, Aberdeen, NC | 4 | EPA | $119,261 |
| Gibson Environmental, Inc., Bakersfield, CA | 9 | CA (DTSC) | $3,813 |
| Huth Oil Services, Cleveland, OH | 5 | EPA | $2,500 |
| Liquid Dynamics, Chicago, IL | 5 | EPA | $2,500 |
| Marzone, Tipton, GA | 4 | EPA | $2,500 |
| Pickettville Road Landfill Site, Jacksonville, FL | 4 | EPA | $119,600 |
| PRC Patterson, Patterson, CA | 9 | CA (DTSC) | $26,666 |
| Richmond Shipyard No. 2 (aka Marina Bay Development), Richmond, CA | 9 | CA (DTSC) | $1,075,000 |
| Sadler Drum Superfund Site, Mulberry, FL | 4 | EPA | $5,000 |
| Spokane Junkyard, Spokane, WA | 10 | EPA | $2,500 |
| Tex-Tin, Texas City, TX | 6 | EPA | $100,000 |
| Tremont City Landfill, Clark County, OH | 5 | EPA | $2,500 |
| Tri-County and Elgin Landfills, South Elgin, IL | 5 | EPA | $2,500 |
| West Virginia Ordnance Works (aka Point Pleasant Landfill), Mason County, WV | 3 | EPA | $150,000 |

     D.    Summary of Total Allowed General Unsecured Claims Under Paragraph

4(C): Each of the following parties shall have an Allowed General Unsecured Claim against

KACC under Paragraph 4(C) in the total amount listed below:

**FINAL AUGUST 2003**

| Claimant | Total Allowed General Unsecured Claim |
|---|---|
| United States on behalf of EPA | $ 17,828,839 |
| For Commencement Bay (Hylebos Waterway), Tacoma, WA NRDA Claim: United States on behalf of DOI and NOAA, State of Washington and Tribe | $  5,500,000 |
| California DTSC | $  1,141,364 |
| California DFG | $      15,818 |
| TOTAL | $ 24,486,021 |

5.    With respect to the Liquidated Sites:

A.    With respect to the Allowed General Unsecured Claims set forth in Paragraph 4 for EPA, DOI, NOAA, the State of California, the State of Washington and the Tribe, only the amount of cash received by each such entity (and net cash received by each such entity on account of any non-cash distributions) from KACC under this Consent Decree for the Allowed General Unsecured Claim for a particular site, and not the total amount of the allowed claim, shall be credited by each such entity to its account for a particular site, which credit shall reduce the liability of non-settling potentially responsible parties for the particular site by the amount of the credit. Nothing in this Consent Decree shall require any agency to credit to its account for a site any distribution received by any other agency under this Consent Decree.

B.    The Claims and distributions set forth in Paragraph 4 will be deemed allocated towards all past, present and future Claims with respect to response costs, natural resource damages and cleanup costs for the Liquidated Sites, whether to address matters known or unknown, for which a Claim of any kind or nature has been or could be asserted against the Debtors pursuant to Sections 106 or 107 of CERCLA, 42 U.S.C. §§ 9606 or 9607, Section 7003 of RCRA, 42 U.S.C. § 6973, or Similar State Laws or Tribal Laws by the Settling Federal

**FINAL AUGUST 2003**

Agencies, the States, the Tribe or potentially responsible parties or potentially responsible party groups which have incurred or may incur such costs.

      C.    While none of the Debtors has nor shall have any obligation to pursue insurance recovery, including by virtue of this Consent Decree, and subject to the limitations set forth in this Paragraph, to the extent that at any time after the Effective Date of the Plan of Reorganization, KACC pursues from its insurers recovery for environmental costs or payments under liability coverage applicable to property damage liability and obtains insurance proceeds for such costs or payments from such coverage on account of any of the Liquidated Sites in excess of KACC's costs of pursuing such recovery ("Excess Recovery"), KACC may retain 60% of the Excess Recovery and KACC shall pay 40% of the Excess Recovery to the Settling Federal Agencies, the State of California, the State of Washington and the Tribe on a pro rata basis in accordance with the allocation set forth in Attachment B. KACC agrees to allocate in writing any Excess Recovery on a fair and equitable basis between Liquidated Sites and other sites based upon all of the facts and circumstances, including but not limited to any defenses asserted by insurers, and with deference to any allocation by a court or in an approved settlement document. In determining KACC's cost of pursuing recovery for environmental costs for the Liquidated Sites, KACC shall use the same percentage allocation of costs as is used in KACC's allocation of the Excess Recovery. To the extent that the Excess Recovery is allocable to sites other than the Liquidated Sites, no payment need be made to the government agencies and the Tribe from the Excess Recovery allocable to sites other than Liquidated Sites. The United States, the State of California, the State of Washington and the Tribe each reserves the right to petition the Court for an adjustment of KACC's allocation based upon all of the facts and circumstances. The payments required to be made under this Paragraph 5(C) shall be in addition to the payments required to be made under Paragraph 4. Under no circumstances may the payments required to be made under this Paragraph, when combined with any other consideration received by any of the government agencies and the Tribe for the Liquidated Sites under this Consent Decree,

      **FINAL AUGUST 2003**

exceed the amount of the Allowed General Unsecured Claims to be received by the applicable government agencies and the Tribe for the Allowed General Unsecured Claims for the Liquidated Sites under Paragraph 4 of this Consent Decree.  In the event that the Excess Recovery sharing requirements of this Paragraph would otherwise result in such an exceedance, KACC shall retain the additional amount of the Excess Recovery necessary to avoid such an exceedance.

        D.      Notwithstanding the foregoing, and as an express limitation to the foregoing, the Settling Federal Agencies, the States and the Tribe acknowledge that KACC is pursuing insurance coverage for asbestos and non-asbestos bodily injury liabilities, including in litigation styled *Kaiser Aluminum & Chemical Corporation v. Certain Underwriters at Lloyds, London, et al.*, No. 312415, and *Kaiser Aluminum & Chemical Corporation v. Insurance Company of North America, et al.*, No. 322710, pending in the San Francisco County, Superior Court of California (collectively, the "California Insurance Litigation").  The Settling Federal Agencies, the States and the Tribe recognize and agree that, except as set forth in the next two sentences, they have no right or entitlement to, the provisions of this Paragraph shall not apply to, and the Settling Federal Agencies, the States and the Tribe shall not seek, in any proceeding, to assert any right or entitlement to (a) any policies at issue in the California Insurance Litigation and/or (b) any amounts paid by an insurer or insurers in settlement or otherwise where (i) the predominant liability being resolved is bodily injury liability and/or (ii) the funds are paid by an insurer or insurers on account of asbestos and/or non-asbestos bodily injury liabilities under a trust established under section 524(g) or section 105 of the Bankruptcy Code, even if the release provided to an insurer or insurers extends to environmental liabilities or costs, either expressly or impliedly.  KACC (and any successor-in-interest) shall have no obligation to amend the California Insurance Litigation or to otherwise pursue from its insurers insurance recoveries for non-asbestos environmental costs or payments as to any specific Liquidated Site.  In the event, however, that KACC (or any successor-in-interest) amends the California Insurance Litigation to

FINAL AUGUST 2003

pursue, or otherwise specifically pursues, insurance recoveries from its insurers for non-asbestos environmental costs or payments as to any specific Liquidated Site, then KACC (or any successor-in-interest) shall allocate on a fair and equitable basis, in writing, the portion of such recoveries allocable to such specific Liquidated Sites and, then, the provisions of Paragraph 5(C) shall apply to such allocated portion only.

## NON-DISCHARGEABILITY/DEBTOR-OWNED SITES/RESERVATION OF RIGHTS

6.    A.    The following claims of or obligations to the Settling Federal Agencies and the States shall not be discharged pursuant to this Consent Decree or Section 1141 of the Bankruptcy Code by the confirmation of a Plan of Reorganization, nor shall such claims or obligations be impaired or affected in any way in the Chapter 11 Cases or by the confirmation of a Plan of Reorganization:

(i)    Claims against the Debtors by the Settling Federal Agencies or the States under Section 107 of CERCLA, 42 U.S.C. §9607, or Similar State Laws for recovery of response costs incurred Postpetition with respect to response action taken at a Debtor-Owned Site, including such response action taken to address hazardous substances that have migrated from a Debtor-Owned Site to a proximate location other than a Reserved Site;

(ii)    Actions against the Debtors by the Settling Federal Agencies or the States under CERCLA, RCRA, or Similar State Laws seeking to compel the performance of a removal action, remedial action, corrective action, closure or any other cleanup action at a Debtor-Owned Site, including actions to address hazardous substances that have migrated from a Debtor-Owned Site to a proximate location other than a Reserved Site;

(iii)    Claims against the Debtors by the Settling Federal Agencies or the States under Section 107 of CERCLA, 42 U.S.C. §9607, for recovery of natural resource damages arising as a result of Postpetition releases or ongoing releases of hazardous substances at or which migrate or leach from a Debtor-Owned Site to a proximate location other than a Reserved Site; or

(iv)    Claims against the Debtors by the Settling Federal Agencies or the States for recovery of civil penalties for violations of law resulting from Postpetition conduct of the Debtors at Debtor-Owned Sites.

Nothing in this Paragraph 6(A) shall limit or be deemed to waive any rights or defenses of any of the parties to this Consent Decree, except for any alleged defense of discharge of liabilities provided under the Bankruptcy Code, any plan of reorganization or order of confirmation.

B.    With respect to any Liquidated Site, Additional Site or Discharged Site, this Consent Decree does not address the Debtors' Postpetition conduct which would give rise to liability under 42 U.S.C. §§9606 and 9607(a)(1)-(4) and the Settling Federal Agencies, the States, the Tribe and the Debtors reserve all rights and defenses they may have with respect to such Postpetition conduct; *provided, however,* that this reservation shall not apply to any damage which arises from or is related to Prepetition acts, omissions or conduct of the Debtors or their predecessors, including without limitation any ongoing releases of hazardous substances, exacerbation (except to the extent caused by Postpetition acts of the Debtors) of pre-existing contamination, migration or leaching of hazardous substances, and natural resource damages. Nothing in this Consent Decree shall affect or limit such rights and defenses.

C.    As used in this Paragraph 6, "Postpetition conduct" shall not include a failure to satisfy or comply with any Prepetition liability or obligations, or to pay a claim (including, without limitation, a penalty claim) except as required by or resulting from the terms of the Plan of Reorganization, any provision of this Consent Decree, or a final order of the Court confirming a Plan of Reorganization.

D.    The Settling Federal Agencies or the States may pursue enforcement actions or proceedings under applicable law with respect to the Claims and obligations of the Debtors to the Settling Federal Agencies or the States, respectively, under the foregoing Paragraphs 6(A) and 6(B) in the manner, and by the administrative or judicial tribunals, in which

**FINAL AUGUST 2003**

the Settling Federal Agencies or the States could have pursued enforcement actions or proceedings if the Chapter 11 Cases had never been commenced. The Debtors reserve the right to assert any and all defenses and counterclaims available to them under applicable law with respect to any Claims and obligations of the Debtors to the Settling Federal Agencies or the States under Paragraphs A and B that are asserted by the Settling Federal Agencies or the States, respectively, except for any alleged defense of discharge of liabilities provided under the Bankruptcy Code, any plan of reorganization or order of confirmation. The Settling Federal Agencies and the States reserve all of their rights with respect to any defenses or counterclaims asserted by the Debtors under this Paragraph D.

E.    This Consent Decree does not address or apply to the Reserved Sites and the United States, the States and the Debtors reserve all rights and defenses they may have with respect to the Reserved Sites, including with respect to Debtors' conduct at the Reserved Sites. Nothing in this Consent Decree shall affect, limit or waive such rights and defenses.

## TREATMENT OF ADDITIONAL SITES

7.    With respect to all Additional Sites, all liabilities and obligations of the Debtors to the Settling Federal Agencies and the States under Sections 106 and 107 of CERCLA, 42 U.S.C. §§9606 and 9607, Section 7003 of RCRA, 42 U.S.C. § 6973, and Similar State Laws arising from Prepetition acts, omissions or conduct of the Debtors or their predecessors, including without limitation the Prepetition generation, transportation, disposal or release of hazardous substances, wastes or materials or dangerous wastes or the Prepetition ownership or operation of hazardous waste or hazardous substance sites and/or facilities and state counterparts, shall be discharged under Section 1141 of the Bankruptcy Code by the confirmation of a Plan of Reorganization, and the Settling Federal Agencies and the States shall receive no distributions in the Chapter 11 Cases with respect to such liabilities and obligations, but KACC may be required to distribute to the Settling Federal Agencies, the States or such other party as they may designate, such amounts as are provided for in this Paragraph and Paragraph 8. Such liabilities

23                    **FINAL AUGUST 2003**

and obligations shall be treated and liquidated as general unsecured Claims against KACC on the terms specified herein. If and when any Settling Federal Agencies or the States undertake(s) enforcement activities in the ordinary course with respect to any Additional Site, the Settling Federal Agencies or the States, respectively, may seek a determination of the liability, if any, of KACC and may seek to obtain and liquidate a judgment of liability of KACC or enter into a settlement with KACC with regard to any of the Additional Sites (for Prepetition acts, omissions or conduct of the Debtors or their predecessors) in the manner and before the administrative or judicial tribunal in which the Settling Federal Agencies' or the States' claims would have been resolved or adjudicated if the Chapter 11 Cases had never been commenced. However, the Settling Federal Agencies and the States shall not issue or cause to be issued any unilateral order or seek any injunction against KACC under Section 106 of CERCLA, 42 U.S.C. § 9606, Section 7003 of RCRA, 42 U.S.C. § 6973, or any Similar State Laws arising from the Prepetition acts, omissions or conduct of the Debtors or their predecessors with respect to any Additional Sites. The Settling Federal Agencies and KACC (and the States and KACC, as applicable) will attempt to settle each liability or obligation asserted by the Settling Federal Agencies (or the States, as applicable) against KACC relating to an Additional Site on a basis that is fair and equitable under the circumstances, including consideration of (i) settlement proposals made to other PRPs who are similar to KACC in the nature of their involvement with the site, (ii) the fact of KACC's bankruptcy, and (iii) the circumstances of this Agreement; but nothing in this sentence shall create an obligation of the Settling Federal Agencies or the States that is subject to judicial review. The aforesaid liquidation of liability may occur notwithstanding the terms of the Plan of Reorganization, the order confirming the Plan of Reorganization, or the terms of any order entered to effectuate the discharge received by KACC. In any action or proceeding with respect to an Additional Site, KACC, the Settling Federal Agencies and the States reserve any and all rights, claims, and defenses they would have been entitled to assert had the claim been liquidated in the ordinary course or during the course of the Chapter 11 Cases, including, without

limitation, any argument that joint and several liability should or should not be imposed upon KACC. Nothing herein shall be construed to limit the Parties' rights to assert any and all rights, claims and defenses they may have in actions or proceedings involving other parties with respect to Additional Sites.

8.       In the event any Claim is liquidated pursuant to Paragraph 7 by settlement with KACC or judgment against KACC to a determined amount (the "Determined Amount"), KACC will satisfy such Claim within thirty (30) days after the date on which the settlement or judgment is final and effective (the "Settlement/ Judgment Date") by providing the holder of the Claim the "Distribution Amount." The Distribution Amount shall be the value of the consideration which would have been distributed under the Plan of Reorganization to the holder of such Claim if the Determined Amount had been an Allowed General Unsecured Claim against KACC in such amount under the Plan of Reorganization. Except as provided in Paragraph 9(B), the Distribution Amount shall be paid in the same form (e.g., stock, cash, notes, etc.) as was distributed under the Plan of Reorganization.

9.       A.       In the event that the Plan of Reorganization provides that Allowed General Unsecured Claims against KACC will receive consideration other than cash, for purposes of determining the value of the consideration paid to the holders of Allowed General Unsecured Claims at the time of distribution(s) under the Plan of Reorganization (i.e., the Distribution Amount), notes shall have a value equal to their face value and equity securities shall have a value equal to (a) if the security is trading, the reported closing sales price for the security on the date(s) of distribution(s) under the Plan of Reorganization (or the first date thereafter on which the security trades), (i) on the New York Stock Exchange; or (ii) if the security is not listed or admitted to trade on the New York Stock Exchange, on the principal national securities exchange on which the security is listed or admitted to trading; or (iii) if the security is not listed or admitted to trading on any national securities exchange, on all transactions on the National Association of Securities Dealers Automated Quotations National Market System; or (iv) if the

security is not listed or admitted to trading on any national securities exchange or quoted on such National Market System, on all transactions in the over-the-counter market in the United States as furnished by any New York Stock Exchange member firm selected by KACC and the Settling Federal Agencies (or the States, if applicable) for that purpose; or (b) if the security is not trading in any of the foregoing markets, the value ascribed to the security in the disclosure statement pursuant to which approval of the Plan was sought. Then, for purposes of determining the number of shares of securities that have the value of the Distribution Amount on the Settlement/Judgment Date (i.e., the number of shares to be distributed in satisfaction of the Claim as provided in Paragraph 8), the fair market value per share of securities on the Settlement/Judgment Date also shall be determined as set forth in the immediately preceding sentence. To the extent, however, that the Settling Federal Agencies (or the States, if applicable) calculate that the reported closing sales price for the security is materially different than the weighted average of the reported regular way sales prices of all transactions for the security on the date(s) of distribution(s) under the Plan of Reorganization (or the first date thereafter on which the security trades), the Settling Federal Agencies (or the States, if applicable) may present this calculation to KACC prior to the date KACC must satisfy the Claim as provided in Paragraph 8 and then the weighted average of the reported regular way sales prices of all transactions for the security shall be used to value the security instead of the reported closing sales price.

        B.     Further, in the event that the Plan of Reorganization provides that Allowed General Unsecured Claims against KACC will receive consideration other than cash, Debtors may, in their sole discretion, provide the non-cash portion of the Distribution Amount to the Settling Federal Agencies (or the States, if applicable) in cash that has an aggregate value as of the Settlement/Judgment Date that is equivalent to the Distribution Amount. The terms of Paragraphs 7, 8 and this Paragraph 9 of this Consent Decree shall apply to, be binding on, and inure to the benefit of any successor or assign of KACC to the extent that, and only to the extent

26

<strong>FINAL AUGUST 2003</strong>

that, the alleged liability of the successor or assign for an Additional Site is based on its status as and in its capacity of a successor or assign of KACC.

## TREATMENT OF ALLOWED CLAIMS

10.    With respect to the Allowed General Unsecured Claims set forth in Paragraph 4 for EPA, DOI, NOAA, the State of California, the State of Washington and the Tribe, and regardless of the holder of such Claims, such Claims (A) will receive the same treatment under the Plan of Reorganization, without discrimination, as other Allowed General Unsecured Claims against KACC with all attendant rights provided by the Bankruptcy Code and other applicable law and (B) will not be entitled to any priority in distribution (although the provisions of Paragraph 5(C) shall apply in the event of excess insurance proceeds).  With respect to any Claims as may eventually be allowed pursuant to Paragraphs 7-9 for Additional Sites, such Claims shall be governed by the terms of Paragraphs 7-9.  In no event shall the General Unsecured Claims against KACC allowed or to be allowed pursuant to this Consent Decree be subordinated to any other Allowed General Unsecured Claims against KACC pursuant to any provision of the Bankruptcy Code or other applicable law that authorizes or provides for subordination of allowed Claims, including without limitation Sections 105 and 510 of the Bankruptcy Code.

11.    The Claims allowed in this Consent Decree do not constitute, nor shall they be construed as, forfeitures, fines or penalties (or payments in lieu thereof), and nothing herein is intended, or shall be construed, as an admission by Debtors of any facts (other than the fact of distributions made referred to in Paragraph 4) or any violation of law.  Notwithstanding the foregoing, Debtors do agree to comply with all terms of this Consent Decree upon the Effective Date.

12.    Notwithstanding any other provision of this Consent Decree, and except as provided under applicable law, there shall be no restrictions on the ability and right of the United States on behalf of EPA or the State of California to transfer or sell all or a portion of any

27

**FINAL AUGUST 2003**

A - 161

securities distributed to them pursuant to the Plan of Reorganization; to sell their right to all or a portion of any distributions under the Plan to one or more third parties; or to transfer or sell to one or more third parties all or a portion of any Allowed General Unsecured Claim pursuant to this Consent Decree.

## TREATMENT OF PROOFS OF CLAIM

13.     The Settling Federal Agencies, the States, and the Tribe shall be deemed to have filed proofs of claim for all matters addressed in this Consent Decree, which proofs of claim are and shall be deemed satisfied in full in accordance with the terms of this Consent Decree. Accordingly, by executing this Consent Decree but without any prejudice with respect to any of the Reserved Sites, (i) the Settling Federal Agencies agree that Claim No. 7135 shall be reduced and allowed as of the Effective Date in the amounts listed for the Settling Federal Agencies in Paragraph 4(C) of this Consent Decree; (ii) the State of California agrees that Claim No. 7297 shall be reduced and allowed as of the Effective Date in the amount listed for the State of California in Paragraph 4(C) of this Consent Decree; (iii) the State of Rhode Island agrees that Claim No. 7111 shall be withdrawn pursuant to this Consent Decree as of the Effective Date and Kaiser's claims and noticing agent, Logan & Company, is authorized and empowered to withdraw Claim No. 7111 as of the Effective Date; (iv) the State of Washington agrees that Claim No. 7181 shall be reduced and allowed as of the Effective Date in the amount listed for the State of Washington in Paragraph 4(C) of this Consent Decree; and (v) the Tribe agrees that Claim No. 1727 shall be reduced and allowed as of the Effective Date in the amount listed for the Tribe in Paragraph 4(C) of this Consent Decree.

## DISTRIBUTION INSTRUCTIONS

14.     A.     Cash distributions for the Liquidated Sites to the United States on behalf of EPA shall be made by Fed Wire Electronic Funds Transfer ("EFT" or wire transfer) to the U.S. Department of Justice account in accordance with current electronic funds transfer procedures. Payment shall be made in accordance with instructions provided to the Debtor by

FINAL AUGUST 2003

the Financial Litigation Unit of the United States Attorney's Office for the District of Delaware
and shall reference Case No. 02-10429 (JKF) and DOJ File Number 90-11-3-07769/1. The
Debtors shall transmit written confirmation of such payments to the Department of Justice at the
address specified in Paragraph 27. In the event that the United States sells or transfers its
Claims, payment will be made to a transferee only at such time as the Debtors receive written
instructions from the United States directing that payments be made to a transferee amid
instructions as to where such payments should be directed, and, prior to the closing of the
Chapter 11 Cases, after an evidence of claim transfer shall have been filed with the Court.

   B.  Other distributions with respect to the allowed Claims of the United States
for the Liquidated Sites pursuant to this Consent Decree shall be made as follows. Non-cash
Distributions to the United States on behalf of EPA shall be made to:

    U.S. EPA Superfund
    P.O. Box 371003M
    Pittsburgh, PA 15251

  Copies of all distributions and related correspondence to the United States shall be sent
to:

    Environmental Enforcement Division
    Environment & Natural Resources Division
    U.S. Department of Justice
    P.O. Box 7611
    Washington, D.C. 20044
    Ref. DOJ File No. 90-11-3-07769/1

    Helena A. Healy
    Office of Enforcement and Compliance Assurance
    U.S. Environmental Protection Agency
    1200 Pennsylvania Ave., N.W. - Mail Code 2272A
    Washington, D.C. 20460

   C.  The United States must notify the Debtors in writing of any modifications
to the foregoing addresses. In the event that the United States on behalf of EPA sells or transfers
its Claims, distributions will be made to a transferee only at such time as the Debtors receive

29      **FINAL AUGUST 2003**

written instructions from the United States on behalf of EPA directing that payments be made to a transferee and instructions as to where such payments should be made, and, prior to the closing of the Chapter 11 Cases, after an evidence of claim transfer shall have been filed with the Court.

       D.     Distributions received by EPA will either be deposited in site-specific special accounts within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with those sites, or be deposited into the EPA Hazardous Substance Superfund.

       E.     Cash distributions for the Commencement Bay (Hylebos Waterway), Tacoma, WA Liquidated Site with respect to the Allowed General Unsecured Claims of the United States on behalf of NOAA and DOI, the State of Washington and the Tribe pursuant to this Consent Decree shall be made to:

> Registry of the Court
> c/o Clerk of the Court
> U.S. District Court
> Western District of Washington
> 1010 Fifth Avenue, Room 215
> Seattle, WA 98104

The payment shall reference the Case Number U.S. Dist. Ct. D. Del (Bankr) Case No. 02-10429 (JKF) and shall request that the payment be deposited in the Commencement Bay Natural Resource Restoration Account established pursuant to W.D. Wash. Civil No. C93-5462B.

       Non-cash distributions with respect to the Commencement Bay (Hylebos Waterway), Tacoma, WA Liquidated Site with respect to the Allowed General Unsecured Claims of the United States on behalf of NOAA and DOI, the State of Washington and the Tribe shall be made to:

> United States Department of the Interior
> Natural Resource Damage Assessment and Restoration Program
> Attn:  Restoration Fund Manager
> 1849 C Street, NW, Mail Stop 4449
> Washington, DC  20240

Copies of all distributions under this Paragraph 14(E) and related correspondence shall be sent
to:

> Eric G. Williams
> Trial Attorney
> Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, D.C. 20044
> Ref. DOJ File No. 90-11-3-07769/1
>
> Robert A. Taylor
> NOAA GC Natural Resources/NW
> 7600 Sand Point Way NE
> Seattle, WA 98115-0070
>
> Steven J. Thiele
> Assistant Attorney General
> Office of the Attorney General, Ecology Division
> P.O. Box 40117
> Olympia, WA 98504-0117
>
> Cynthia P. Lyman
> Office of the Tribal Attorney
> Puyallup Tribe of Indians
> 1850 Alexander Ave.
> Tacoma, WA 98421
>
> Bill Sullivan
> Environmental Programs
> Puyallup Tribe of Indians
> 1850 Alexander Ave.
> Tacoma, WA 98421

15.    A.    Cash distributions for the Liquidated Sites to the California DTSC shall be
made by certified check, payable to: Cashier, Department of Toxic Substances Control and shall
be sent to DTSC Accounting, P.O. Box 806, Sacramento, CA 95812-0806, and shall reference
the docket number of the Chapter 11 Cases. A copy of such check shall be sent to the attention
of Jeff Mahan, DTSC, P.O. Box 806, Sacramento, CA 95812-0806.

**FINAL AUGUST 2003**

B.    Cash distributions for the Liquidated Sites to the California DFG shall be made by check, payable to: Office of Spill Prevention and Response, California Department of Fish & Game, and shall be sent in care of John Holland, Esquire, Department of Fish & Game, P.O. Box 160-362, Sacramento, CA 95816-0362.

C.    Distributions received by DTSC for a particular site will be used by DTSC to supervise, conduct or pay for environmental response activities at or for that site, or will be credited to the unreimbursed costs that DTSC has incurred at that site.

D.    In the event that the State of California sells or transfers its Claims, distributions will be made to a transferee only at such time as the Debtors receive written instructions from the State of California directing that distributions be made to a transferee and instructions as to where such distributions should be made, and, prior to the closing of the Chapter 11 Cases, after an evidence of claim transfer shall have been filed with the Court.

16.    A.    Distributions with respect to the Allowed General Unsecured Claims of the State of Washington and the Tribe for the Liquidated Sites pursuant to this Consent Decree shall be made in accordance with Paragraph 14(E).

B.    Notwithstanding anything to the contrary in this Consent Decree, in the event that the Plan of Reorganization provides that Allowed General Unsecured Claims against KACC will receive consideration in the form of equity securities and any one of the States is precluded by law from accepting a distribution under this Consent Decree in the form of equity securities, then KACC and such State shall work to cause the equity securities that otherwise would have been distributed to such State to be sold on any applicable market and the cash proceeds from such sale, less all costs and expenses associated with such sale, shall be distributed to such State instead of the equity securities.

## TREATMENT OF DISCHARGED SITES

17.    With respect to all Discharged Sites, all liabilities and obligations of the Debtors to the Settling Federal Agencies, the States and the Tribe under Sections 106 and 107 of

CERCLA, 42 U.S.C. §§9606 and 9607, Section 7003 of RCRA, 42 U.S.C. § 6973, and Similar State Laws and Tribal Law arising from Prepetition acts, omissions or conduct of the Debtors or their predecessors, including without limitation the Prepetition generation, transportation, disposal or release of hazardous substances, wastes or materials or dangerous wastes or the Prepetition ownership or operation of hazardous waste or hazardous substance sites and/or facilities, shall be discharged under Section 1141 of the Bankruptcy Code by the confirmation and effectiveness of a Plan of Reorganization, and neither the Settling Federal Agencies, the States, nor the Tribe shall receive any distributions in the Chapter 11 Cases with respect to such liabilities and obligations.

### COVENANT NOT TO SUE AND RESERVATION OF RIGHTS

18.    In consideration of all of the foregoing, including, without limitation, the distributions that will be made and the Claims allowed pursuant to the terms of this Consent Decree, and except as specifically provided in Paragraphs 21 through 23 (below), the Settling Federal Agencies, the States and the Tribe covenant not to file a civil action or to take any administrative or other action against the Debtors pursuant to Sections 106 or 107 of CERCLA, 42 U.S.C. §§9606 or 9607, Section 7003 of RCRA, 42 U.S.C. § 6973, or any Similar State Laws or Tribal Laws with respect to each of the Liquidated Sites. These covenants not to sue shall take effect on the Effective Date.

19.    This Consent Decree in no way impairs the scope and effect of the Debtors' discharge under Section 1141 of the Bankruptcy Code as to any third parties or as to any Claims that are not addressed by this Consent Decree.

20.    Without in any way limiting the covenant not to sue (and the reservations thereto) set forth in Paragraph 18 and notwithstanding any other provision of this Consent Decree, such covenant not to sue shall also apply to the Debtors' successors and assigns, officers, directors, employees, and trustees, but only to the extent that the alleged liability of the successor or assign,

**FINAL AUGUST 2003**

officer, director, employee, or trustee of any Debtor is based on its status as and in its capacity as a successor or assign, officer, director, employee, or trustee of any Debtor.

21.    The covenants not to sue contained in Paragraphs 18 and 20 of this Consent Decree extend only to the Debtors and the persons described in Paragraph 20 above and do not extend to any other person. Nothing in this Agreement is intended as a covenant not to sue or a release from liability for any person or entity other than the Debtors, the United States, the States, the Tribe and the persons described in Paragraph 20. The United States, the States, the Tribe and the Debtors expressly reserve all claims, demands and causes of action either judicial or administrative, past, present or future, in law or equity, which the United States, the States, the Tribe or the Debtors may have against all other persons, firms, corporations, entities or predecessors of the Debtors for any matter arising at, or relating in any manner to, the sites or claims addressed herein.

22.    Notwithstanding the foregoing, the covenants not to sue contained in this Consent Decree shall not apply to nor affect any action based on (i) a failure to meet a requirement of this Consent Decree; (ii) criminal liability; or (iii) matters addressed in Paragraph 6(A) through 6(D) above.

23.    Nothing in this Consent Decree shall be deemed to limit the authority of the United States or the States to take response action under Section 104 of CERCLA, 42 U.S.C. §9604, Similar State Laws or any other applicable law or regulation, or to alter the applicable legal principles governing judicial review of any action taken by the United States or the States pursuant to that authority. Nothing in this Consent Decree shall be deemed to limit the information gathering authority of the United States or the States under Sections 104 and 122 of CERCLA, 42 U.S.C. §§9604 and 9622, Similar State Laws or any other applicable federal law or regulation, or to excuse the Debtors from any disclosure or notification requirements imposed by CERCLA, RCRA, any Similar State Laws or any other applicable federal or state law or regulation.

24.     The Debtors hereby covenant not to sue and agree not to assert or pursue any claims or causes of action against the United States, the States or the Tribe with respect to the Liquidated Sites including, but not limited to, any direct or indirect claim for reimbursement from the Hazardous Substances Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507) through Sections 106(b)(2), 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9611, 9612, or 9613, any Similar State Laws or Tribal Laws or any other provision of law; any claim against the United States, including any department, agency or instrumentality of the United States, under Sections 107 or 113 of CERCLA, 42 U.S.C. § 9607 or 9613, related to the Liquidated Sites, or any claims arising out of response activities at the Liquidated Sites. The covenant not to sue set forth in this Paragraph shall not apply in the event that the Settling Federal Agencies and/or one or more of the States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 6(A) and/or 6(B), but only to the extent that the Debtors' claims arise from the same response action, response costs, or damages that the Settling Federal Agencies and/or the States is/are seeking pursuant to Paragraphs 6(A) and/or 6(B). Nothing in this Consent Decree shall be deemed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. §9611, or 40 C.F.R. § 300.700(d).

### CONTRIBUTION PROTECTION

25.     With regard to all existing or future third-party Claims against the Debtors with respect to the Liquidated Sites, including claims for contribution, the parties hereto agree that, as of the Effective Date, the Debtors are entitled to protection from actions or Claims to the maximum extent provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and Similar State Laws and Tribal Laws.

26.     The Debtors agree that with respect to any suit for contribution brought against any of them after the Effective Date for matters related to this Consent Decree in which a party challenges the applicability of Debtors' contribution protection provided under Paragraph 25, they will notify the United States within a reasonable time after service of the complaint upon

35

them. In addition, in connection with such suit, the Debtors shall notify the United States within a reasonable time after service or receipt of any Motion for Summary Judgment and within a reasonable time after receipt of any order from a court setting a case for trial (provided, however, that the failure to notify the United States pursuant to this Paragraph shall not in any way affect the protections afforded under Paragraphs 18 through 25).

## NOTICES AND SUBMISSIONS

27.    Whenever, under the terms of this Consent Decree, written notice is required to be given, or a report or other document is required to be sent by one party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change of address to the other parties in writing. All notices and submissions shall be considered effective upon receipt, unless otherwise provided. Except as otherwise provided in this Consent Decree, written notice as specified herein shall constitute complete satisfaction of any written notice requirement in this Consent Decree with respect to the United States, the States and the Debtors, respectively.

As to the United States:

Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
Ref. DOJ File No. 90-11-3-07769/1

Helena A. Healy
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W. - Mail Code 2272A
Washington, D.C. 20460

**FINAL AUGUST 2003**

<u>As to the State of California</u>:

Kevin James, Deputy Attorney General
California Department of Justice
1515 Clay Street, Suite 2000
Post Office Box 70550
Oakland, CA  94612-0550


<u>As to the State of Rhode Island</u>:

Bret W. Jedele, Esq.
RIDEM Office of Legal Services
235 Promenade Street
Providence, RI  02908


<u>As to the State of Washington</u>:

Steven J. Thiele
Assistant Attorney General
Office of the Attorney General, Ecology Division
P.O. Box 40117
Olympia, WA  98504-0117

James Pendowski
Program Manager
Toxics Cleanup Program
Washington State Department of Ecology
P.O. Box 47600
Olympia, WA  98504-76001


<u>As to the Tribe</u>:

Puyallup Tribe of Indians
1850 Alexander Avenue
Tacoma, WA  98421
ATTN:  Cynthia Lyman

Bill Sullivan
Environmental Programs
Puyallup Tribe of Indians
1850 Alexander Ave.
Tacoma, WA  98421

**FINAL AUGUST 2003**

As to the Debtors:

Kaiser Aluminum & Chemical Corporation
5847 San Felipe, Suite 2500
Houston, TX  77057
ATTN:  General Counsel

Heller, Ehrman, White & McAuliffe, LLP
701 Fifth Avenue, Suite 6100
Seattle, WA  98104-7098
ATTN:  R. Paul Beveridge

## LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

28.    This Consent Decree shall be subject to approval of the Bankruptcy Court.  The

Debtors shall promptly seek approval of this Consent Decree under Bankruptcy Rule 9019 or

other applicable provisions of the Bankruptcy Code. The hearing on Debtors' request for such

approval will not be held for at least thirty-eight days from the date of filing (the "Filing Date").

29.    Likewise, this Consent Decree shall be lodged with the Court for public notice

and comment for a period of not less than thirty days.  To the extent, if any, that such lodging

does not satisfy all public notice and comment requirements of the State of Washington laws and

regulations, the State of Washington shall take all action necessary during such thirty-day period

to satisfy all such requirements.  After the conclusion of the public comment period, the United

States (and, if applicable, the State of Washington) will file with the Court any comments

received, as well as the United States' (and the State of Washington's, as applicable) responses

to the comments, and at that time, if appropriate, the Court will be requested by motion of the

United States (and the State of Washington, as applicable) to approve this Consent Decree.  The

United States and the State of Washington reserve the right to withdraw or withhold their

consent if the comments regarding the Consent Decree disclose facts or considerations which

**FINAL AUGUST 2003**

indicate that this Consent Decree is not in the public interest.

30.    If for any reason (i) this Consent Decree is withdrawn by the United States or the State of Washington as provided in Paragraph 29, or (ii) the Bankruptcy Court issues a final order not approving this Consent Decree, or (iii) KACC's Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code before the Effective Date of a Plan of Reorganization: (a) this Consent Decree shall be null and void and the parties shall not be bound hereunder or under any documents executed in connection herewith; (b) the parties shall have no liability to one another arising out of or in connection with this Consent Decree or under any documents executed in connection herewith; (c) this Consent Decree and any documents prepared in connection herewith shall have no residual or probative effect or value and it shall be as if they had never been executed; and (d) this Consent Decree, any statements made in connection with settlement discussions, and any documents prepared in connection herewith may not be used as evidence in any litigation between or among the parties.

31.    The Debtors shall file a Plan of Reorganization that is consistent with and does not conflict with the terms and provisions of this Consent Decree. The Settling Federal Agencies and the States will not oppose any term or provision of a Plan of Reorganization filed by the Debtors that is addressed by and consistent with this Consent Decree. The parties reserve all other rights and defenses they may have with respect to any Plan of Reorganization filed by the Debtors.

## AMENDMENTS/INTEGRATION AND COUNTERPARTS

32.    This Consent Decree and any other documents to be executed in connection herewith shall constitute the sole and complete agreement of the parties hereto with respect to the matters addressed herein. This Consent Decree may not be amended except by a writing signed by all parties to this Consent Decree.

33.    This Consent Decree may be executed in counterparts each of which shall constitute an original and all of which shall constitute one and the same agreement.

FINAL AUGUST 2003

## RETENTION OF JURISDICTION

34.    Except as provided in Paragraphs 6 through 9 regarding proceedings in other administrative or judicial tribunals, the Court (or, upon withdrawal of the Court's reference, the U.S. District Court of the District of Delaware) shall retain jurisdiction over the subject matter of this Consent Decree and the parties hereto for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling any of the parties to apply to the Court at any time for such further order, direction and relief as may be necessary or appropriate for the construction or interpretation of this Consent Decree or to effectuate or enforce compliance with its terms.

**[Remainder of Page Left Intentionally Blank]**

08/19/03   TUE 16:36 FAX 202 616 6584                                    ☑002

THE UNDERSIGNED PARTIES ENTER INTO THIS CONSENT DECREE

FOR THE UNITED STATES OF AMERICA:

Date:   8.15.03

By: *Tom Sansonetti*
Thomas L. Sansonetti
Assistant Attorney General
Environment and Natural Resources
    Division
U.S. Department of Justice

Date:   8|18|03

By: *Alan f Tenenbaum*
Alan S. Tenenbaum
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources
    Division
U.S. Department of Justice

Date:   8/09/03

By: *Eric Willi*
Eric G. Williams
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources
    Division
U.S. Department of Justice

41                          **FINAL AUGUST 2003**

Date: 8/20/03

By: _____
John Peter Suarez
Assistant Administrator for Enforcement
    and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Date: 8/20/03

By: _____
John H. Wheeler
Senior Attorney
Office of Enforcement and
    Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Date: 8/20/03

By: _____
Helena A. Healy
Attorney-Advisor
Office of Enforcement and
    Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

42                      **FINAL AUGUST 2003**

FOR THE STATE OF CALIFORNIA
DEPARTMENT OF TOXIC SUBSTANCES
CONTROL:

Date: _August 12, 2003_    By: _Edwin F. Lowry_

Edwin F. Lowry
Director, State of California Department
of Toxic Substances Control
Post Office Box 806
Sacramento CA 95812-0806

FOR THE STATE OF CALIFORNIA
DEPARTMENT OF FISH AND GAME:

Date: _____    By: _____

John A. Holland
Staff Counsel III
Office of Spill Prevention and Response
State of California Department of
    Fish and Game
1700 K Street, Suite 250
Post Office Box 94420
Sacramento, CA 94244-2090

43    **FINAL AUGUST 2003**

FOR THE STATE OF CALIFORNIA
DEPARTMENT OF TOXIC SUBSTANCES
CONTROL:

Date: _____    By: _____
                                        Edwin F. Lowry
                                        Director, State of California Department
                                        of Toxic Substances Control
                                        Post Office Box 806
                                        Sacramento CA  95812-0806


FOR THE STATE OF CALIFORNIA
DEPARTMENT OF FISH AND GAME:

Date: _13 August 2003_    By: _____
                               John A. Holland
                               Staff Counsel III
                               Office of Spill Prevention and Response
                               State of California Department of
                                   Fish and Game
                               1700 K Street, Suite 250
                               Post Office Box 94420
                               Sacramento, CA  94244-2090

FOR THE STATE OF RHODE ISLAND:

Date: ___8_/_2._/_>_3____    By: _____

Ian H. Reitsma, Director
Rhode Island Department of
   Environmental Management
235 Promenade Street
Providence, RI 02908

Date: ___8/2/03____    By: _____

Bret W. Jedele, Esq.
RIDEM Office of Legal Services
235 Promenade Street
Providence, RI 02908

FOR THE PUYALLUP TRIBE OF INDIANS:

Date: _____    By: _____

Name: _____
Title: _____

44                              FINAL AUGUST 2003

FOR THE STATE OF RHODE ISLAND:

Date: _____

By: _____
     Jan H. Reitsma, Director
     Rhode Island Department of
         Environmental Management
     235 Promenade Street
     Providence, RI 02908


Date: _____

By: _____
     Bret W. Jedele, Esq.
     RIDEM Office of Legal Services
     235 Promenade Street
     Providence, RI 02908


FOR THE PUYALLUP TRIBE OF INDIANS:

Date: _8/13/03_____

By: _____
     Name: _Bill Steard_____
     Title: _Choie Ma n_____

44

FOR THE STATE OF WASHINGTON:

DEPARTMENT OF ECOLOGY

Date: _8/19/03_                    By: _____
                                       Jim Pendowski
                                       Program Manager
                                       Washington Department of Ecology
                                       Toxics Cleanup Program


CHRISTINE O. GREGOIRE
Attorney General

Date: _8/19/03_                    By: _____
                                       Steven J. Thiele, WSBA #20275
                                       Assistant Attorney General
                                       Attorney for State of Washington
                                       Department of Ecology


FOR THE DEBTORS:
Kaiser Aluminum & Chemical Corporation

Date: August 13, 2003             By: _____
                                       John Barneson
                                       Senior Vice President and
                                       Chief Administrative Officer

Date: August 13, 2003             By: _____
                                       Joseph A. Fischer, III
                                       Assistant General Counsel


45                         FINAL AUGUST 2003

## ATTACHMENT A
### List of Debtors and Petition Dates

| DEBTOR | PETITION DATE |
|---|---|
| Kaiser Aluminum Corporation | February 12, 2002 |
| Kaiser Aluminum & Chemical Corporation | February 12, 2002 |
| Akron Holding Corporation | February 12, 2002 |
| Kaiser Alumina Australia Corporation | February 12, 2002 |
| Kaiser Aluminum & Chemical Investment, Inc. | February 12, 2002 |
| Kaiser Aluminium International, Inc. | February 12, 2002 |
| Kaiser Aluminum Properties, Inc. | February 12, 2002 |
| Kaiser Aluminum Technical Services, Inc. | February 12, 2002 |
| Kaiser Bellwood Corporation | February 12, 2002 |
| Kaiser Finance Corporation | February 12, 2002 |
| Kaiser Micromill Holdings, LLC | February 12, 2002 |
| Kaiser Sierra Micromills, LLC | February 12, 2002 |
| Kaiser Texas Sierra Micromills, LLC | February 12, 2002 |
| Kaiser Texas Micromill Holdings, LLC | February 12, 2002 |
| Oxnard Forge Die Company, Inc. | February 12, 2002 |
| Alwis Leasing, LLC | March 15, 2002 |
| Kaiser Center, Inc | March 15, 2002 |
| Alpart Jamaica Inc. | January 14, 2003 |
| KAE Trading, Inc. | January 14, 2003 |
| Kaiser Aluminum & Chemical Investment Limited (Canada) | January 14, 2003 |
| Kaiser Aluminum & Chemical of Canada Limited (Canada) | January 14, 2003 |
| Kaiser Bauxite Company | January 14, 2003 |
| Kaiser Center Properties | January 14, 2003 |
| Kaiser Export Company | January 14, 2003 |
| Kaiser Jamaica Corporation | January 14, 2003 |
| Texada Mines Ltd. (Canada) | January 14, 2003 |

46                                              **FINAL AUGUST 2003**

**ATTACHMENT B**
**Pro Rata Allocation of 40% Share of Excess Recovery**

| | |
|---|---|
| United States on behalf of EPA | 72.81% |

For Commencement Bay (Hylebos Waterway),
Tacoma, WA NRDA Claim:
United States on behalf of DOI and NOAA,
State of Washington and Tribe                    22.46%

California DTSC                                            4.66%

California DFG                                             0.07%

**EXHIBIT F** (a) and
(b)

# AGREEMENT OF PURCHASE AND SALE

**between**

# NATIONAL REFRACTORIES & MINERALS CORPORATION (as "Seller")

**and**

# NADER T. AGHA (as "Buyer")

**Dated as of October 6, 2003**

# TABLE OF CONTENTS

1.  Purchase and Sale ..................................................................................2

2.  Exclusions from Purchase .......................................................................3

3.  Purchase Price and Terms of Payment ...................................................3

4.  Payment of the Purchase Price ...............................................................3

5.  Buyer's Due Diligence Contingency .......................................................4

6.  Contract and Lease Review .....................................................................7

7.  Title ..........................................................................................................7

8.  Close of Escrow .......................................................................................8

9.  Further Assurances ..................................................................................9

10. Permits and Licenses .............................................................................10

11. Prorations ...............................................................................................11

12. Covenants of Seller Between the Date of this Agreement and Closing ...........12

13. Covenant of Buyer Between the Date of this Agreement and Closing ...........15

14. Personal Property ..................................................................................16

15. Compliance With Internal Revenue Code ............................................16

16. Possession ..............................................................................................16

17. Representations and Warranties ...........................................................16

18. Damage and Destruction .......................................................................24

19. Condemnation ........................................................................................24

20. Conditions to Obligations of Both Parties ...........................................25

21. Conditions to Obligations of Buyer ......................................................25

22. Conditions to Obligations of Seller .......................................................26

i

62539.3

23. Liquidated Damages .................................................................................26

24. Notices .......................................................................................................27

25. Bankruptcy Court Approvals and Sales Procedure ...............................29

26. Termination ...............................................................................................29

27. Breakup Fee ...............................................................................................30

28. Bulk Transfer Laws ...................................................................................30

29. Headings .....................................................................................................30

30. Severability ................................................................................................30

31. Attorney Fees .............................................................................................31

32. Entire Agreement, Construction ..............................................................31

33. Successors and Assigns .............................................................................31

34. Authority ....................................................................................................31

35. Time of the Essence ...................................................................................31

36. Survival ......................................................................................................31

37. Number .......................................................................................................31

38. Governing Law and Jurisdiction .............................................................31

39. Brokers .......................................................................................................31

40. Signing ........................................................................................................32

41. Indemnity by Buyer ..................................................................................32

LIST OF SCHEDULES ....................................................................................S-1

ii

62539.3

## AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale is made and entered into by and between National Refractories & Minerals Corporation, a California corporation, ("Seller") as Debtor and a Debtor in Possession in a Chapter 11 case now pending before the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court"), Case No. 01-45484 T11, and Nader T. Agha and/or assigns ("Buyer").

### RECITALS

A.     Seller is the owner of that certain real property with improvements commonly known as the Moss Landing site of Seller's operations, located in the County of Monterey, State of California, which said real property consists of an approximate 200 acre manufacturing facility (including the associated wells and the strip of harbor land across Highway 1), with the 200 acres as more particularly described in Schedule 1-A, a copy of which is attached hereto and by this reference incorporated herein as though set forth in full ("Real Property").

B.     Seller has in the past operated a Magnesia manufacturing facility on the Real Property as well as an abalone farming test project; currently Seller uses the Real Property for other businesses including cellular telephone company leasing, and storage space leasing (collectively "Businesses").

C.     In connection with the ownership and operation of the Real Property and the Businesses, Seller owns and operates certain furniture, fixtures, licenses, permits, intangible property, materials and equipment as more particularly described in Schedule 1-B (the "Personal Property"). The Personal Property includes the title to the Dolan Road (eastern) wells and whatever contractual rights remain concerning the Tate (southern) well.

D.     Buyer desires to purchase the Real Property, the Businesses and the Personal Property from Seller as more particularly set forth herein, and Seller desires to sell the same to Buyer.

E.     Buyer wishes to perform a 1031 Tax Deferred Exchange on property he currently has in escrow and is ready to close prior to year's end. Sellers property that is the subject of this Agreement will be identified as a replacement property and the funds from the relinquished property will be used to purchase the property that is the subject of this Agreement, provided however, that the failure of Buyer to accomplish a 1031 Tax Deferred Exchange shall not constitute grounds for Buyer to terminate this Agreement after the expiration of Buyer's Due Diligence period as set forth hereinbelow.

NOW, THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt in sufficiency of which are mutually acknowledged, the parties hereto hereby agree as follows:

1

62539.3

1.      **Purchase and Sale:** On the closing date as hereinafter defined, subject to the terms and conditions of this Agreement, Buyer agrees to purchase and accept from Seller and Seller agrees to sell, assign, transfer, convey and deliver to Buyer, the Real Property, Businesses and the Personal Property owned by Seller which comprises all of the Real Property, tangible Personal Property and intangible Personal Property, except as specifically excluded, used in connection with the operation of the Real Property and the Businesses (hereinafter from time to time collectively referred to as the "Property") as follows:

a.      All Seller's right, title and interest in and to the Real Property.

b.      Seller's fixtures, furniture, appliances, equipment, vehicles, machinery, inventory and supplies and all other tangible Personal Property of Seller located at and used in connection with the operation of the Real Property or Businesses, including the Personal Property, which is listed on **Schedule 1-B.**

c.      Seller's interest in and to all intangibles used by Seller in connection with the Businesses, all of the goodwill and any customer lists related to the Businesses, all assignable licenses, including but not limited to, assignable permits and other governmental approvals required for the operation of the Businesses, which are listed on **Schedule 1-C** hereto.

d.      NPDES.  Seller shall transfer ownership of its National Pollutant Discharge Elimination System ("NPDES") permit to Buyer in connection with this Agreement.  Buyer specifically acknowledges that the NPDES permit has been issued to Seller by the regional office of the Environmental Protection Agency ("EPA") pursuant to application by Seller indicating the production of MgO ("Magnesia") and abalone farming at the Moss Landing facility, and is valid only with respect to the production of Magnesia and abalone.  Buyer further specifically acknowledges and understands that any proposed use of the Moss Landing facility other than for the production of Magnesia may render the current NPDES permit invalid, and may require Buyer to re-apply for or seek renewal of the NPDES permit, including any public review procedures as mandated by the EPA.  Buyer further understands and acknowledges that Seller is in receipt of an updated NPDES permit, reflecting compliance with the Ocean Plan which sets forth a 60 million gallons per day ("MGD") volume limit.  Seller and Buyer agree to cooperate and to take all necessary actions required of each of them in order to effect the transfer of the NPDES permit.

e.      All of the right, title and interest of Seller in and to all equipment leases, leases and rental agreements, licenses or

2

62539.3

other arrangements for others' use of the Real Property, Personal Property and Businesses (collectively the "Leases"), together with related security deposits identified thereon and/or delivered to Seller, which is listed on Schedule 6 hereto.

    f.    All rights and obligations arising on and after the closing date related to (1) the Businesses' accounts payable and receivable, and all equipment leases, which leases are listed on Schedule 6 hereto; and (2) all other goods customarily included in inventory under current operations and services ordered in the ordinary course of business of the Businesses before the closing date, whether delivered prior to or after the closing date.

    g.    All of the foregoing Property is to be sold by Seller and transferred to Buyer in its "as is, where is" condition without any warranty whatsoever, except as may be specifically provided in this Agreement, including, without limitation, any representation or guaranty from either Seller or Broker, as defined hereinbelow, as to Americans With Disability Act suitability.

2.    **Exclusions from Purchase:**  Buyer acknowledges, understands and agrees that Buyer is not acquiring Seller's cash on hand. In addition, notwithstanding any other provision of this Agreement, Seller shall not transfer any of its proprietary intellectual property ("Intellectual Property") to Buyer in connection with this Agreement except that upon Buyer's request Seller will transfer to Buyer all reasonable and material Intellectual Property and reasonable and material written information pertaining to Magnesia products production, marketing and laboratory operations including without limitation, all know-how and mix recipes that it owns regarding magnesia operations at Moss Landing, the Seller's trademark NATIONAL MAGNESIA SALES, INC., and all data (confidential or otherwise) regarding the previous abalone project at Moss Landing, including abalone know-how but subject to the FishTech agreement. With respect to these records, Buyer will make copies of whichever documents it wishes and Seller will retain the originals, except that upon Closing Buyer will take the originals of all permits and Seller will retain copies. Whichever party retains the originals will retain them until the Seller's bankruptcy case is closed except as agreed by the other party in writing.

3.    **Purchase Price and Terms of Payment:**  The total purchase price for the Real Property, Businesses and Personal Property shall be Seven Million Five Hundred Thousand Dollars ($7,500,000.00) (the "Purchase Price") payable at the closing in lawful money of the United States of America as set forth below.

4.    **Payment of the Purchase Price:**

    a.    Initial Deposit:  Upon Acceptance, Buyer shall

3

62539.3

make a refundable $100,000.00 deposit in cash with First American Title Company, Santa Cruz, California ("Escrow Agent"), to be deposited and held in a federally insured interest bearing account ("Escrow Account") at a bank designated by Seller and reasonably acceptable to the Escrow Agent. The deposit shall be held under the Buyer's employer identification and interest thereon shall accrue to Buyer's account.

b.    Financial Ability:    Upon execution of this Agreement by both parties (hereinafter referred to as "Acceptance"), Buyer shall provide Seller with proof satisfactory to Seller of Buyer's financial ability to perform this Agreement.

c.    Second Deposit:  After the expiration of Buyer's Due Diligence period an additional deposit of $100,000.00 towards the purchase price shall be deposited into the Escrow Account, thereby making the total deposit $200,000.00, which total deposit will be non-refundable unless close of escrow is due to Seller's default or failure of the Bankruptcy Court to approve this sale.

d.    Conversion and Release of Deposit:  The deposit with the Escrow Agent shall become non-refundable and will be released to Seller immediately following any auction whereby Buyer is the successful bidder unless close of escrow is due to Seller's default or failure of the Bankruptcy Court to approve this sale..

e.    Balance of Purchase Price:  If Buyer has not terminated this Agreement in accordance with the provisions of this Agreement, on or before the closing Buyer shall deposit the balance of the Purchase Price into the Escrow Account.

f.    Allocation of Purchase Price: The parties agree that the Purchase Price paid by Buyer pursuant to Section 3 shall be allocated among the Real Property, Businesses and the Personal Property in accordance with the amounts set forth in Schedule 4. Prior to Closing Buyer will prepare the allocation and Seller will approve such allocation, such approval not to be unreasonably withheld. Each party agrees to file all of its tax returns consistent with such allocations pursuant to this Agreement.

5.    **Buyer's Due Diligence Contingency:**

a.    Financial Information:    Seller and Buyer acknowledge and agree that upon five (5) days written notice from Buyer, Buyer shall be provided access to and allowed to copy the permits, contracts and leases concerning the Real Property, Personal Property and the Businesses; all Seller's material financial information as to the ownership and operation of the Real

4

62539.3

A – 191

Property, Personal Property and the Businesses for 2002, including copies of all material written information in Seller's possession with respect thereto. BUYER SHALL SATISFY ITSELF WITH THE FINANCIAL AND OTHER CONDITIONS OF THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES AND IS AGREEING TO PURCHASE THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES IN THEIR PRESENT CONDITION, FINANCIAL AND OTHERWISE. BUYER IS ACQUIRING THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES SOLELY AND EXCLUSIVELY IN RELIANCE UPON BUYER'S OWN KNOWLEDGE, FAMILIARITY, INSPECTION AND EXAMINATION AND NOT IN RELIANCE UPON ANY PROMISE, WARRANTY OR REPRESENTATION BY SELLER NOT SPECIFICALLY SET FORTH HEREIN OR IN THE INFORMATION PROVIDED BY SELLER TO BUYER PURSUANT TO THE TERMS HEREOF, WITH RELATION TO THE FINANCIAL CONDITION OF THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES AND ANY MATTERS PERTAINING TO THE PROFITABILITY OF ITS FUTURE OPERATION. BUYER FURTHER ACKNOWLEDGES THAT BUYER IS ACQUIRING THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES IN THEIR PRESENT "AS IS" FINANCIAL CONDITION AND THAT SELLER HAS MADE NO PROMISES, WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT THERETO OTHER THAN AS SET FORTH HEREIN OR IN THE FINANCIAL OR OTHER INFORMATION PROVIDED TO BUYER BY SELLER.

In that regard, Seller shall provide for Buyer's review and copying the following:

        i.    All Financial statements of the operation of the Real Property, Personal Property and Businesses for calendar year 2002;

        ii.    All leases and amendments relating to any portion of the Real Property, Personal Property and Businesses;

        iii.    Copies of all certificates of occupancy, licenses, permits, authorizations and approvals issued by any governmental authority for the Real Property, Personal Property and Businesses;

        iv.    Copies of all insurance policies affecting the Real Property, Personal Property and Businesses;

        v.    All reasonable and material documentation

5

62539.3

A – 192

of the intangible property in Seller's possession relating to the Businesses, Personal Property and Real Property ("Intangible Property");

vi.    An inventory of all material Personal Property located on the Real Property, or used in the Businesses; and

vii.    The NPDES permit and any and all other permits or licenses affecting the Real Property, Personal Property and the Businesses, the easements and any encroachments on adjoining Real Property;

viii.    All material correspondence between Seller and Kaiser Aluminum & Chemical Corporation ("KACC") regarding maintenance of the landfills; Buyer acknowledges that KACC is in its own Chapter 11 bankruptcy proceedings and may reject any such agreements as burdensome executory contracts.

ix.    The full May 2001 TRC Phase I environmental assessment and the full November 2002 Phase II soil and groundwater sampling report prepared by Pacific Crest Engineering, Inc.;

x.    Seller will make available for Buyer to inspect and copy all other material records and files relating to the ownership, operation and maintenance of the Businesses, the Personal Property and the Real Property in Seller's possession including, without limitation, all records and correspondence with relation to the Real Property, Personal Property and the Businesses, and any and all other information material to Buyer's decision to purchase the Real Property, Personal Property and the Businesses.

xi.    The full November 2002 Soil and Groundwater Sampling Report prepared by Pacific Crest Engineering.

b.    Physical    Inspection:    Physical Inspection: Notwithstanding any other provision hereof, Buyer shall have sixty (60) days from September 18, 2003 ("Acceptance") within which to conduct such inspections and obtain such reports and analyses (together, "Due Diligence") as Buyer may desire, at Buyer's expense, including, but not limited to geologic/seismic conditions, sewage disposal issues, appraisals, flood, fire, earthquake, environmental conditions, pest control, structural conditions, boundary surveys (including ALTA surveys), and Americans with Disabilities Act conditions, to determine whether or not the Real

6

Property, Personal Property and Businesses are suitable for Buyer's purposes. Upon Acceptance Buyer, at its own expense, will immediately commence and diligently pursue all steps needed to obtain acceptable ALTA surveys for the Real Property. In the event that Buyer, in Buyer's sole, subjective and absolute discretion, determines for any reason the Real or Personal Property or the Businesses are not suitable for Buyer's purposes, Buyer may terminate this Agreement by a written notice of termination given to Seller on or before the expiration of the sixty (60) day Due Diligence period referred to herein, and upon such timely written notice, neither party hereto shall have any further obligation or liability to the other hereunder and Buyer's deposit shall be returned to Buyer. In the event that Buyer does not give timely written notice of such termination to Seller within that period, the entire amount of Buyer's deposits shall become absolutely non-refundable (unless the same results from Seller's breach of the Agreement or from the failure of a condition for Buyer's benefit set forth hereinbelow) and, in that event, if Buyer fails, refuses or otherwise neglects to close the escrow for Buyer's acquisition of the Real Property Seller shall be entitled to retain the full amount of said deposits and Buyer shall have no right or entitlement to the return of the whole or any portions thereof. Notwithstanding any other provisions of this Agreement, Buyer agrees up until the close of escrow not to drill intor or conduct any Phase II investigation of the Landfills on the Real Property and further agrees that there will be no cap on any damages owed to Seller if Buyer violates this prohibition.

       c.     Copies of Reports and Investigations: If Buyer terminates this Agreement, then within 5 days of the termination Buyer shall turn over to Seller, at no cost to Seller, copies of all reports and investigations obtained pursuant to Section 5.

       6.    **Contract and Lease Review:**  Seller confirms that, within fifteen (15) days of Acceptance, Buyer will be provided access to all of the service contracts, equipment leases and other contracts relating to the Businesses, Personal Property, Real Property (collectively the "Contracts"), which are listed in the attached **Schedule 6,** which Seller will arrange to have copied for Buyer, at Buyer's expense, if Buyer desires copies thereof. Buyer agrees to cause the termination of or to assume each Contract as of the closing date (all such Contracts assumed by Buyer are referred to collectively herein as the "Assumed Contracts"). Buyer further agrees to assume all of the leases as of the closing date. Seller shall have no liability of any kind for obligations under any of the Assumed Contracts from and after the closing date. It shall be Seller's sole responsibility (but with the cooperation of Buyer which shall not be unreasonably withheld) to obtain Bankruptcy Court consent to the Assignment and Assumption of the Leases and of the Assumed Contracts.

7

62539.3

7.    **Title:** Title will be conveyed to Buyer by grant deed executed by Seller and will be subject only to items listed in this Agreement, the exceptions listed in the attached **Schedule 7** to First American Title Company's Amended/6[th] Updated Preliminary Report 178715-TD, dated as of September 11, 2003, a copy of which will be provided to Buyer upon Acceptance for Buyer's review, and the lien of any deed of trust securing any loan obtained by Buyer to fund payment of the whole or any portion of the purchase price. Evidence of title to the Real Property shall be by the commitment of First American Title Company to issue, at Buyer's expense, as of the close of escrow, an ALTA extended coverage owner's policy of title insurance with extended coverage insuring that fee title to the Real Property is vested in Buyer subject only to the exceptions hereinabove set forth.

8.    **Close of Escrow:**

a.    Unless Buyer sooner terminates this Agreement, Buyer and Seller shall close escrow not later than November 30, 2003 or 11 days after Bankruptcy Court approval if Bankruptcy Court approval occurs on or before November 30, 2003, whichever occurs later, (with both parties endeavoring to close as soon as possible) through an escrow established with Escrow Agent.

b.    On or before the close of escrow,

i.    Buyer shall deposit into escrow with Escrow Agent, funds sufficient to increase Buyer's total funds in escrow at the close of escrow (including the deposit and all accrued interest thereon) to an amount equal to the purchase price;

ii.    Seller shall deposit into escrow the following documents duly executed and, as required, acknowledged:

(1)    A Grant Deed conveying the Real Property and the improvements to Buyer ("Deed");

(2)    A Bill of Sale conveying the Personal Property to Buyer ("Bill of Sale");

(3)    An Assignment of the Assumed Contracts as conveying the Assumed Contracts to Buyer ("Assignment of Leases");

(4)    An Assignment of the intangible Personal Property conveying the Intangible Property relating to the

8

62539.3

A – 195

Businesses and Real Property to Buyer ("Assignment of Personal Property");

      (5)    The Title Policy;

      (6)    The original signed Contracts, if any;

      (7)    The original executed documents evidencing the Intangible Property, if any;

      (8)    The non-foreign Affidavit;

      (9)    Any and all other such deeds, bills of sale, endorsements, assignments and other good and sufficient instruments of conveyance, sale, transfer and assignment, and with all required federal and state documentary and revenue stamps affixed, as shall be required in order to effectively vest in Buyer all of Seller's right, title and interest in and to the Real Property, Businesses and Personal Property, including all applicable permits and licenses, free and clear of any and all liens of record and other encumbrances of record (other than the Permitted Encumbrances hereinabove defined).

      c.    When title company has notified Escrow Agent that it has prepared, subject only to the recordation of the Deed, to issue the title policy and when Escrow Agent is otherwise prepared to comply with the Escrow Instructions, it shall close escrow by recording the Deed, delivering to Seller the Purchase Price less any amount due from Seller pursuant to this Agreement, by wire transfer of funds and delivering to Buyer the Deed, the Bill of Sale, the Assignment of Leases, the Assignment of Intangible Personal Property, the Leases, the Non-Foreign Affidavit, the original documents evidencing the intangible Personal Property and causing title company to issue and deliver to Buyer the title policy. Immediately following the close of escrow, Escrow Agent shall deliver to Buyer and Seller a closing statement showing the application of all funds received and disbursed.

9.    **Further Assurances:**

      a.    Further Assurances: At the Closing and at any time or from time to time thereafter until the earlier of 90 days after the

9

62539.3

Closing Date or Seller's liquidation, Seller shall at the request of Buyer also take such action necessary to put Buyer in possession and operating control of the Real Property, Businesses and Personal Property, and shall execute, acknowledge and deliver such further instruments of conveyance, sale, transfer and assignment, and take such other action as Buyer may reasonably request in order to more effectively convey, sell, transfer and assign to Buyer all of the purchased Real Property, Businesses and Personal Property and to assist Buyer in exercising rights with respect to them, including without limitation, easements, and deeds concerning realty in fee. Buyer agrees that Buyer will transfer to Seller any asset in Buyer's possession which was not intended to be sold, transferred or conveyed to Buyer pursuant to this Agreement, including any cash, checks, deposits or other form of payment for any accounts receivable retained by Seller for periods arising on or after the closing date. Whenever and so often as requested so to do, Buyer shall promptly execute and deliver or cause to be executed and delivered all such other and further instruments, documents and assurances, and promptly do or cause to be done all such other and further things as may be necessary or reasonably required in order to further effectuate all rights, interest, powers, benefits, privileges and advantages conferred or intended to be conferred upon Seller by this Agreement.

      b.     Risk of Loss: Except as may be otherwise stated in this Agreement, the risk of loss of the Real Property, Businesses and Personal Property shall pass to Buyer on the Closing Date.

      c.     Bankruptcy Court Approval:

          i.     The Buyer acknowledges that Seller is in Chapter 11 reorganization proceedings in Oakland, California and that, notwithstanding any other provision of this Agreement, completion of the transaction contemplated herein shall comply with the Bankruptcy Code and Rules and any applicable Overbid Requirements. The Buyer further acknowledges that this Agreement will not become binding unless and until approved by the Bankruptcy Court.

          ii.     Seller agrees to use its best efforts to obtain the requisite approvals from the Bankruptcy Court.

    10.     **Permits and Licenses:** Buyer and Seller shall cooperate and use their best efforts (including compliance with all notice, escrow and other such requirements) to obtain, prior to the close of escrow, the approval of any and all government agencies and entities with jurisdiction over the Real Property, the Businesses and the Personal Property to assign, transfer and convey all permits and licenses applicable to the Real Property, the Businesses and the Personal Property to Buyer (and, if necessary, for the issuance to

10

62539.3

Buyer of temporary permits and licenses pending final approval). Seller shall use its best efforts to cause the effective conveyance, transfer and assignment to Buyer of all other permits, licenses and other authorizations from regulatory entities that must be transferred to Buyer in order for Buyer to own and operate the Real Property, Personal Property and the Businesses at the close of escrow. Buyer shall pay all fees required by the various governmental authorities for the transfer or issuance, as the case may be, of the said permits and licenses. Seller will continue these efforts after the Closing for any permits, licenses or authorizations that are not able to be transferred prior to the Closing.

11.    **Prorations:**

a.    Current Real Property taxes (including without limitation, all special district levies and assessments), all Personal Property taxes, any intangible or use taxes, and all premiums on insurance policies, if any, assumed by Buyer, Seller being charged with the responsibility of canceling all other insurance policies effective at the close of escrow and paying any premium surcharges or early termination payments imposed in connection with such cancellations, utilities and all other usually prorated expenses of ownership and operation of the Real Property, Personal Property and the Businesses, shall be prorated between Seller and Buyer as of the close of escrow.

b.    Seller shall pay the cost of any County of Monterey Documentary Transfer Tax and any local transfer taxes as is traditional in Monterey County. The escrow fees of Escrow Agent and all other closing costs shall be paid equally by Buyer and Seller. Seller shall pay the recording fees. Buyer shall bear and pay all sales, use, or similar taxes or fees, arising out of or imposed because of the sale of the Personal Property, Real Property and Businesses by Seller to the Buyer, provided, however, Seller shall bear and pay any income taxes incurred by Seller as a result of such transactions.

c.    Seller shall terminate all light and power and other such utilities for the Real Property, Personal Property and Businesses, effective at the close of escrow, and Seller shall be responsible for payment of all outstanding utility charges and termination fees through the close of escrow. Notwithstanding any other provision of this Agreement, Seller shall be entitled to receive the refund of all refundable deposits previously made by Seller for such utilities. At least 15 days prior to the close of escrow, Seller shall give Buyer written notice identifying each utility to be terminated at the close of escrow. It shall be Buyer's responsibility to contract with the various utilities for the provision of service following the close of escrow, and to make any required deposits. Alternatively, Buyer and Seller shall make mutually acceptable arrangements for the transfer of such utility services to

11

62539.3

A – 198

Buyer to be effective on close of escrow.

      d.     To the extent that after the close of escrow, the parties discover within ninety (90) days following the close of escrow, that the pro-rations (or the adjustments made under this Section) were incorrect, each party agrees to make any necessary corrective payment promptly upon the request of the other.

      e.     Seller and Buyer shall share equally the title insurance (CLTA) premium for the policy of title insurance. The Buyer shall be responsible for the cost of any additional endorsements or other coverage desired by Buyer.

      f.     Buyer shall pay the cost of any inspection or minimum mandatory government retrofit standards required as a condition of closing escrow under any applicable law.

12.     **Covenants of Seller Between the Date of this Agreement and Closing:** Between the date of this Agreement and the Closing Date, Seller covenants that:

      a.     Access to Real Property, Books, etc.: Seller shall afford to the officers and authorized representatives of Buyer, reasonable access to the plants, properties, and any books and records of Seller with respect solely to the Real Property, Businesses and Personal Property, and will furnish Buyer with such additional and other information as to the Real Property, Businesses and Personal Property as Buyer may from time to time reasonably request.

      b.     Maintenance and Security: Except as agreed to in writing by Buyer, Seller will, prior to the Effective Time of Closing or termination of this Agreement:

      i.     maintain security in substantially the same manner as it has previously;

      ii.     perform any obligations which become due under material contracts, agreements, commitments or undertakings; relating to or affecting the Real Property, Businesses and Personal Property;

      iii.     keep in full force and effect all present insurance policies or other comparable insurance coverage relating to or affecting the Real Property, Businesses and Personal Property.

      c.     Absence of Certain Changes: As of the Closing Date, there will be no material adverse change to the status or condition of the Businesses, Real Property and Personal Property

12

62539.3

of Seller as they exist as of the Acceptance of this Agreement, and Seller shall use its best efforts to preserve the same.

    d.    Operation of Business:    Except as agreed to in writing by Buyer, Seller will not:

        i.    enter into or assume any contract, agreement, obligation, lease, license, or commitment in connection with the Real Property, Businesses and Personal Property that exceeds one month's duration unless approved in advance by Buyer;

        ii.    create or assume any mortgage, pledge, conditional sale or other title retention agreement, lien, encumbrance or charge of any kind upon any of the Real Property, Businesses and Personal Property whether now owned or hereafter acquired; or

        iii.    sell, lease, abandon, or otherwise dispose of any of its Real Property or any machinery, equipment or the operating properties, (except processed inventory in the ordinary course of business) in connections with the Real Property, Businesses and Personal Property.

    e.    Transaction Protection:  Buyer will incur significant expenses in conducting Due Diligence and engaging environmental consulting and risk management firms. In consideration thereof, and pursuant to the terms of the Letter of Intent executed by Seller and Buyer, Seller has ceased actively marketing the Property and shall not solicit any offers from other prospective purchasers or joint ventures, provided however, that Seller shall be entitled to respond to such other prospective purchasers or joint ventures and to provide to such other prospective purchasers or joint ventures information requested by them regarding the Property. Buyer acknowledges that this Agreement is subject to the approval by the United States Bankruptcy Court having jurisdiction over Seller's chapter 11 bankruptcy case and that this Agreement is subject to the receipt of higher and better bids for the purchase of the Property as a public auction to be scheduled in the future, at which public auction Buyer shall be permitted to submit bids along with other potential purchasers, and the terms of which auction are set forth in the Order Authorizing Bidding Procedures For Sale Of Moss Landing Property attached hereto as Schedule 25-C.

    f.    Confidentiality:  Seller and Buyer shall maintain the terms of this transaction, including the contents of the Letter of Intent executed by them, this Agreement and any related transaction documents on a confidential basis, provided however,

13

62539.3

that each party shall be permitted to disclose such information as is necessary to its legal counsel, accountants and environmental consultants for its bona fide business purposes and to consummate this transaction, and further provided that Seller shall have the right to disclose the Letter of Intent, this Agreement and related transaction documents to the Official Creditors' Committee appointed in Seller's chapter 11 bankruptcy case, and to such other parties as Seller and Seller's legal counsel, in their sole and absolute discretion, deem necessary in order to obtain such approval of this Agreement and any other related transaction documents as Seller and its legal counsel, in their sole and absolute discretion, deem necessary in accordance with the requirements of the United States Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. Buyer acknowledges that the Property and this Agreement will be subject to the receipt of higher and better bids for the purchase of the Property as t public auction to be scheduled in the future.

g.    Maintenance:    Seller shall operate the Real Property, Personal Property and Businesses in substantially the manner in which it is being operated on the date of the Acceptance of this Agreement, unless interrupted by fire or other casualty, or by any other reason beyond control of Seller. Seller shall pay all accounts payable when due in accordance with its usual business practices.

h.    Modification of Leases: Seller shall not materially alter, amend, renew, extend, or terminate (collectively, Modification) any of the contracts or Leases, and no other such agreements shall be entered into by Seller with respect to the Real Property, Personal Property or the Businesses, except in the ordinary course of business, without the prior written consent of Buyer.

i.    Goods, Services and Supplies:    Seller shall continue, in its reasonable judgment, to contract for goods, services, and supplies in the ordinary course of business.

j.    Encumbrances: Seller shall not subject the Real Property, Personal Property and Businesses or any portion of them to any lien, encumbrance, or charge not in existence as of the date of this Agreement and which shall not be eliminated prior to the Close of Escrow at Seller's expense, without the prior written consent of Buyer.

k.    Insurance:  Seller shall maintain in full force and effect all insurance policies carried on the Real Property, Personal Property or the Businesses, or its operations, at the same level of coverage as is in effect on the date of this Agreement, and shall, as

14

62539.3

reasonably requested by Buyer, afford Buyer an opportunity to assume and continue such insurance policies or coverages as Buyer may specify prior to the Close of Escrow.

l.    Renewal of Permits: Seller shall use its best efforts to maintain and renew in full force and affect all Permits and Licenses, if required and to the extent that it is reasonably within Seller's power.

m.    Maintenance and Repairs: Seller shall keep and maintain the Real Property and Personal Property in the same manner as such Real Property and Personal Property are maintained by Seller on the date of this Agreement.

n.    Cooperation with Buyer: Seller and Buyer shall cooperate in familiarizing Buyer with the operation of the Real Property, Personal Property and Businesses and in Buyer's preparations to assume operation and management of the Real Property, Personal Property and Businesses at the Close of Escrow. Seller shall afford Buyer access to the Real Property, Personal Property and Businesses and all information about the Real Property, Personal Property and Businesses at reasonable times and in a reasonable manner subject to the confidentiality provisions hereof. Without limiting the generality of the foregoing, Buyer and its authorized agents, employees and representatives shall be given the continuing right to reasonably inspect the books and records relating to the Real Property, Personal Property and Businesses and to make extracts from these books and records; and Seller shall make available for Buyer's review copies of all building plans and surveys in Seller's possession relating to the Real Property, and financial, credit and other information relating to the Real Property, Personal Property and Businesses, and shall otherwise cooperate with Buyer through the Close of Escrow to the end that Buyer and its agents and employees shall be afforded the opportunity to obtain all necessary information and knowledge of the Real Property, Personal Property and the Businesses. Buyer shall assure that its conduct, and that of its employees, agents, and representatives, during such process is at all times unobtrusive and does not interfere with the operation of the Real Property, Personal Property and Businesses in the ordinary course of business.

13.    Covenant of Buyer Between the Date of this Agreement and Closing: Between the date of this Agreement and the Closing Date, Buyer covenants that Buyer shall, subject to such disclosure to Buyer's experts, consultants and lenders as necessary for Buyer to conduct and complete its investigation of the Real Property, Businesses and the Personal Property, at all times comply with the confidentiality and non-disclosure obligations imposed by the confidentiality provisions of this Agreement and the

15

62539.3

A – 202

provisions of any existing separate Confidentiality Agreement between the parties. Buyer shall also obtain the agreement of Buyer's experts, consultants and lenders to the confidentiality and non-disclosure obligations imposed by this Agreement.

14. **Personal Property:** At close of escrow, Buyer shall receive all of the Personal Property that remains on the Real Property as of that date.

15. **Compliance With Internal Revenue Code:** Seller represents and warrants to Buyer that Seller is not a foreign person and is a United States person as such term is defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended. Seller shall deliver to Buyer on the day of the close of escrow an Affidavit of Seller, sworn to under penalty of perjury setting forth Seller's Unites States tax identification number and stating that Seller is not a foreign person as defined in Section 1445(f)(3) of the Code (Non-Foreign Affidavit).

16. **Possession:** Possession of all the property encompassed by this Agreement shall be delivered to Buyer as of the close of escrow.

17. **Representations and Warranties:**

a. **Seller's Representations and Warranties:** In addition to the representations and warranties contained elsewhere in this Agreement, Seller makes the following representations and warranties, all of which individual representations and warranties are material and are being relied upon by Buyer, and are, to the best of Seller's knowledge, information and belief, accurate in all material respects as of the date of this Agreement and shall be true in all material respects at all times through the Close of Escrow:

i. **Authority:** Seller has all requisite power and authority to enter into this Agreement and to carry out its obligations under this Agreement.

ii. **Consents of Third Parties:** Except as set forth elsewhere in this Agreement, no consent, approval, or authorization of any third person to Seller's execution, delivery and performance of this Agreement is required, other than consents, approvals and authorizations which have already been unconditionally given, or which may be required by governmental authorities in connection with the licenses and permits for the operation of the Real Property, Personal Property and Businesses.

iii. **Compliance:** The execution, delivery, and performance of this Agreement by Seller shall not violate, to the best of Seller's knowledge, any applicable laws, regulations, or rules, shall not violate or constitute a breach

16

62539.3

A – 203

of or default under any judicial or regulatory decree or order binding on Seller or affecting the Real Property, Personal Property or the Businesses, or any contract, agreement, or instrument to which Seller is a party or which affects the Real Property, Personal Property or the Businesses, and shall not result in the creation or imposition of any lien, charge, or encumbrance upon any of the Real Property, Personal Property or Businesses pursuant to the terms of any contract, agreement or instrument to which Seller is a party or which affects the Real Property, Personal Property or the Businesses.

   iv. Valid and Binding: This Agreement and all documents to be delivered by Seller pursuant to this Agreement, when executed and delivered, shall constitute the legal, valid, and binding obligation of Seller, enforceable in accordance with their respective terms, subject to bankruptcy, insolvency, moratorium, or similar laws, or by legal or equitable principles relating to or limiting the rights of contracting parties generally.

   v. Real Property: Seller has and shall convey title to the Real Property free and clear of all liens, covenants, conditions, restrictions, rights of way, easements, and encumbrances of record, except the Permitted Title Exceptions and the contracts, rights of way and leases set out in the schedules.

   vi. Utilities: The Real Property is connected to and serviced by water, sewage disposal, gas and electrical facilities that are adequate for the present use of the Real Property and that are, to the best of Seller's knowledge, in accordance with all applicable laws, statutes, ordinances, rules, and regulations of all public or quasi-public authorities having or claiming jurisdiction over these utilities or facilities. With the possible exception of the Tate (southern) well, Seller warrants that it is authorized to extract, transport and deliver the water supply from its well(s) to the Real Property with all applicable and necessary permits and licenses.

   vii. Personal Property: Seller owns and shall convey, transfer and assign to Buyer all of the Personal Property, the Contract Rights, and the Intangible Property free and clear of all security agreements, financing statements, liens, and encumbrances of record other than the Permitted Exceptions or as otherwise set out in this Agreement or its schedules. Such conveyance, transfer and assignment shall not terminate, modify, or otherwise affect

17

62539.3

the rights conveyed, transferred or assigned to Buyer with respect to any of the Personal Property, the Contract Rights, or the Intangible Property. The Personal Property is owned by Seller free and clear of any conditional sales contracts, chattel mortgages, or security agreements or interests of record.

viii.     Corporate Existence, etc.:     Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of California and is duly authorized and qualified to carry on its business in the State of California.

ix.     Personal Property: Schedule 1-B attached to this Agreement, lists and accurately describes all of the material Personal Property.

x.     Permits and Licenses:     Seller holds all permits and licenses necessary to operate the Businesses. Seller shall not modify or rescind any of the permits and licenses prior to the Close of Escrow, and shall use its best efforts to obtain any renewal or extension of permits and licenses as may be required by law in the ordinary course of business.  Seller has taken no action, and no condition presently exists arising out of the Seller's activities in connection with the operation of the Real Property, Personal Property and Businesses, which would preclude transfer and/or issuance of the Licenses or any of the other permits or licenses which may be transferred and/or issued to Buyer.

xi.     Taxes: Seller has paid any and all federal, state, and local taxes required to be paid by Seller pursuant to this Agreement, including, without limitation, real and personal property taxes and assessments, employee withholding taxes, and sales taxes (exclusive of prorations to be done through the Close of Escrow).

xii.     Subsidiaries: Seller owns all of the Personal Property and none of the Personal Property is owned by any of Seller's subsidiaries or affiliates.

xiii.     Liabilities:     Except for the transactions contemplated by this Agreement, since the date of the most recent balance sheet relating to the Real Property, Personal Property and Businesses delivered to Buyer and other than liabilities and obligations incurred in the ordinary course of business,, Seller has not incurred any material liability or obligation (absolute, accrued, contingent, or otherwise) of

18

62539.3

A – 205

any nature affecting any of the Real Property, Personal Property or the Businesses that would properly be reflected or reserved against in a fairly presented balance sheet for them.

xiv.  No Defaults:   To the best of Seller's knowledge, Seller is not in default with respect to any of its material obligations or liabilities pertaining to the Real Property, Personal Property or the Businesses (including, without limitation, any indebtedness secured by the Real Property, Personal Property or the Businesses) nor is there any state of facts, circumstances, conditions, or events which, after notice or lapse of time or both, would constitute or result in any such default.

xv.  Violations of Law:   With the possible exception of a storage tank (UST 6) that has been removed (listed in the May 2001 TRC Phase I environmental assessment) and the related monitoring of that site, and the information contained in the November 2002 Soil and Groundwater Sampling Report prepared by Pacific Crest Engineering (Phase II environmental assessment), Seller has received no written notice of any violations of any law, rule, or regulation affecting the Real Property, Personal Property or the Businesses, which has not been rectified by Seller and which would materially and adversely affect the value or operation of the Real Property, Personal Property or the Businesses, and to the best of Seller's knowledge, no governmental authority has commenced or is contemplating any investigation regarding such possible violation. Notwithstanding any other provisions of this Agreement, Buyer agrees that prior to Closing it will have read the November 2002 Phase II environmental assessment, the May 2001 TRC Phase I environmental assessment and the 1997 PES closure report and that all matters in those assessments and that report are deemed to have been disclosed to Buyer. Buyer agrees to pay the entire cost of any and all monitoring and remediation concerning UST 6. Seller agrees to notify Buyer in a timely manner if, prior to Closing, it receives any written notices relating to Section 17-A16. Copies of the Phase II report have been provided to the appropriate agencies, and responses from those agencies are expected.

xvi.  Litigation:   There is no action, suit, proceeding, litigation, or other investigation against Seller relating to the Real Property, Businesses and Personal Property, nor is Seller aware of any threatened action, suit, proceeding, litigation or other investigation against Seller

19

62539.3

relating to the Real Property, Businesses and Personal Property. Except as set forth in Schedule 17-A16 or elsewhere in this Agreement and except for Seller's bankruptcy proceedings, Seller is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or governmental agency or instrumentality which might or could affect title to the Real Property, Businesses and Personal Property. There is no action, suit, proceeding or investigation by Seller or which Seller intends to initiate with respect to the Real Property, Businesses and Personal Property.

xvii.    Complete copies: Seller shall have provided Buyer with complete and accurate copies of each of the documents described in paragraph 5 of this Agreement pursuant to the deadlines set out in those provisions.

xviii.    Assignment of Material Contracts etc.: Seller will use its best efforts to obtain Bankruptcy Court approval of the assignment and/or transfer to Buyer of the material contracts, agreements, leases, license or other agreements identified in Schedule 6.

xix.    Environmental Laws and Regulation: Except as set forth in Schedule 17-A19 or elsewhere in this Agreement, and specifically limited to the period of time during which Seller owned or owns the Real Property, Businesses and Personal Property:

(1)    With the possible exception of a storage tank (UST 6) that has been removed (listed in the May 2001 TRC Phase I environmental assessment) and the related monitoring of that site, and the information contained in the November 2002 Soil and Groundwater Sampling Report prepared by Pacific Crest Engineering (Phase II environmental assessment), Seller, to the best of its knowledge, information and belief, has not violated, and is presently in compliance with all Environmental Laws applicable to the Real Property, Businesses and Personal Property, and there exist no Environmental Conditions (as that term is defined below) with respect to the Real Property, Businesses and Personal Property;

(2)    With the possible exception of gas and oil spills on the Real Property (which are known to the government and which are being monitored by Seller)

20

62539.3

A – 207

Seller, to the best of its knowledge, information and belief, has not disposed of any Hazardous Materials (as that terms is defined below) or any solid waste at any of the Real Property comprising the Real Property, Businesses and Personal Property except in compliance with all applicable Environmental Laws;

(3)     No lien has been imposed on the Real Property, Businesses and Personal Property by any governmental agency at the federal, state or local level in connection with the presence of any Hazardous Materials;

(4)     Seller has not: (i) entered into or been subject to any consent decree, compliance order or administrative order with respect to the Real Property, Businesses and Personal Property; (ii) received notice under the citizens suit provision of any Environmental Laws in connection with the Real Property, Businesses and Personal Property; (iii) received any request for information, notice, demand letter, administrative inquiry, or formal or informal complaint or claim from any state or federal regulatory agency with respect to any Environmental Conditions relating to the Real Property, Businesses and Personal Property; or (iv) been subject to or, to the best of its knowledge, information and belief, threatened with any governmental or citizen enforcement action with respect to the Real Property, Businesses and Personal Property.

(5)     Buyer acknowledges that: while KACC removed visible asbestos in 1979-1980, there still may be asbestos on the Real Property; that the four known underground storage tanks were removed from the Real Property while Seller has owned it, and of these Seller has "no further action required" letters on three of these tanks from the Monterey County Department of Health, while the site of the fourth tank--which was behind the brick plant--is still being remediated; there is a tank on a pad in a pit containing approximately 8,000 gallons of material, including crankcase oil, on the Real Property. (This is in no way intended to be a complete listing of all environmental issues concerning the Real Property.)

21

62539.3

xx.    Definitions:    For    purposes    of    this Agreement, the following terms shall have the following meanings:

(1)    "Environmental Laws" means any and all federal, state or local statutes, laws, rules, regulations, ordinances, codes, policies or rules of common law now in effect and in each case as amended to date and any judicial or administrative interpretation, including any judicial or administrative orders, consent decrees or judgments, relating to human health or environment, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 1801 et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 et seq.; The Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; and the Safe Drinking Water Act, 42 U.S.C. § 3808 et seq.

(2)    "Environmental Condition" shall mean any condition with respect to the Real Property, Businesses and Personal Property which could or has resulted in any damage, loss, cost, expense, claim, demand, order or liability to or against Seller.

(3)    "Hazardous Material" shall mean any "pollutant", "toxic substance", "hazardous waste", "hazardous material" and/or "hazardous substance" under any Environmental Law.

b.    Buyer's Representations and Warranties:    In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties, all of which individual representations and warranties are material and are being relied upon by Seller, and are, to the best of Buyer's knowledge, accurate in all material respects as of the date of this Agreement and shall be true in all material respects at all times through the Close of Escrow.

i.    Power and Authority:    Buyer has all

22

62539.3

requisite power and authority to carry on its business as now conducted and to own and operate its properties and Personal Property now owned and being operated by it. Buyer has the power and authority to enter into this Agreement and to carry out its obligations under this Agreement.

       ii.    Authorization:  All proceedings required to be taken by or on behalf of Buyer for the authorization, execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein shall have been taken prior to the Close of Escrow.

       iii.   Consents of Third Parties:  No consent, approval, or authorization of any third person to Buyer's execution, delivery and performance of this Agreement is required, other than consents, approvals and authorizations which have already been unconditionally given, or which may be required by governmental authorities in connection with the qualification of Buyer to hold any and all licenses and permits for the operation of the Businesses.

       iv.   Compliance:  The execution, delivery, and performance of this Agreement by Buyer (A) shall not violate any provision of the organizational documents of Buyer or Buyer's assignee or any applicable laws, regulations or rules, (B) shall not violate or constitute a breach of or default under any judicial or regulatory decree or order binding on Buyer, or any contract, agreement, or instrument to which Buyer is a party.

       v.    Valid and Binding:  This Agreement and all documents to be delivered by Buyer pursuant to this Agreement, when executed and delivered, shall constitute the legal, valid, and binding obligation of Buyer, enforceable in accordance with their respective terms, subject to bankruptcy, insolvency, moratorium, or similar laws, or by legal or equitable principles relating to or limiting the rights of contracting parties generally.

       vi.   No Conflict with Other Instruments:  The execution and delivery of this Agreement and the consummation of its specified transactions will not (i) result in any breach of any terms or conditions of, or constitute a default under any organizational and/or governing document of Buyer or any commitment, mortgage, note, bond, debenture, deed of trust, contract, agreement, license or other instrument or obligation to which Buyer is now a party or by which its properties or

23

62539.3

Personal Property may be bound or affected; or (ii) result in any violation of any law, or bylaw, rule or regulation of any administrative agency or governmental body.

vii.    Litigation:    There are no suits, actions, claims, inquiries, investigations by any private or governmental body, legal, administrative or arbitration proceedings pending or, to the knowledge of Buyer, threatened against or affecting the validity or legality of the transactions contemplated by this Agreement.

## 18.    Damage and Destruction:

a.    In the event of damage or destruction of the Real Property, Personal Property or Businesses or any portion them prior to the Close of Escrow in an amount not exceeding Two Hundred Thousand Dollars ($200,000), Buyer and Seller shall consummate this Agreement without change in the Purchase Price, provided that Seller shall assign to Buyer its rights under any insurance policy covering such damage or destruction.

b.    In the event of damage or destruction of the Real Property, Personal Property or Businesses or any portion of them prior to the Close of Escrow in an amount in excess of Two Hundred Thousand Dollars ($200,000), at Seller's option Seller may terminate this Agreement without penalty (but Buyer's deposit will be returned to Buyer) or may adjust the Purchase price to be paid by Buyer to Seller so that it is reduced by an amount equal to the replacement cost of such damage.

## 19.    Condemnation:

a.    In the event all or any portion of the Real Property is taken by condemnation or eminent domain or is the subject of a threatened or pending condemnation or eminent domain proceeding that has not been consummated prior to the Close of Escrow resulting in a decrease in the value of the Real Property in an amount not exceeding Two Hundred Thousand Dollars ($200,000), Buyer and Seller shall consummate this Agreement without change in the Purchase Price, provided that Seller shall assign to Buyer its rights to all awards for such condemnation or taking.

b.    In the event all or any portion of the Real Property is taken by condemnation or eminent domain or is the subject of a threatened or pending condemnation or eminent domain proceeding that has not been consummated prior to the Close of Escrow resulting in a decrease in the value of the Real Property in an amount in excess of Two Hundred Thousand One Dollars

24

62539.3

A – 211

($200,001), Buyer may elect either to terminate this Agreement upon written notice to Seller with the right to receive return of the full amount of Buyer's deposit, or to consummate this Agreement, in which event Seller shall assign to Buyer its rights to all awards for such condemnation or taking.

20.    **Conditions to Obligations of Both Parties:**  The obligations of Buyer and Seller to cause the transfer of the Real Property, Businesses and Personal Property to be consummated shall be subject to the fact that on the Closing Date there shall not be pending litigation in any court or any proceeding by any governmental commission, board or agency, with a view to seeking or in which it is sought to restrain or prohibit consummation of the sale and purchase of the Real Property, Businesses and Personal Property or in which it is sought to obtain divestiture, rescission or damages in connection with the consummation of the transactions here.

21.    **Conditions to Obligations of Buyer:**  In addition to the other conditions to Buyer's obligations set forth elsewhere in this Agreement, the obligations of Buyer are, at the option of Buyer, subject to the satisfaction, on or prior to the Closing Date, of the following conditions:

a.    **Representations and Warranties:**    The representations and warranties of Seller contained in this Agreement shall be true in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date except for changes which are contemplated in this Agreement. For purposes of this entire Agreement, an act, omission or item is "material" only if it has a negative financial impact of $200,000 or more.

b.    **Access to Information:**  Seller shall have delivered or made available to Buyer all material books, records and documents of Seller used solely in connection with the Real Property, Businesses and Personal Property and shall have afforded to the officers and authorized representatives of Buyer reasonable access to all properties, books, records, documents, legal and operating information and all other information of Seller solely and directly related to the Real Property, Businesses and Personal Property which has been reasonably requested or provided for in this Agreement.

c.    **No Adverse Change:**  From the date of the Agreement to the Closing Date, Seller shall not have suffered material loss or damage to the Real Property, Businesses and Personal Property, whether or not covered by insurance, which change, loss, or damage materially and adversely affects or impairs Seller's ability to conduct any business related to the Real Property, Businesses and Personal Property.

25

62539.3

A – 212

d.      The due performance by Seller of each and every material undertaking and agreement to be performed by Seller under this Agreement and the truth, to the best of Seller's knowledge, of each material representation and warranty made in this Agreement by Seller.

e.      On or before the close of escrow, Buyer's receipt of the documents required to be delivered by Seller at the close of escrow, duly executed and, where appropriate, acknowledged by Seller.

f.      The issuance by the title company of the title commitment, on or before the close of escrow.

22.     **Conditions to Obligations of Seller:** In addition to any other conditions to Seller's obligations set forth elsewhere herein, the obligation of Seller to sell the Real Property, Businesses and Personal Property as contemplated here shall be, at the option of Seller, subject to the satisfaction on or before the Closing Date of all the following conditions:

a.      Approval of Bankruptcy Court:  Seller shall have obtained the approval and consent of the United States Bankruptcy Court to the transactions contemplated by this Agreement.

b.      Representations, Warranties, and Covenants:  All representations and warranties of Buyer contained in this Agreement shall be true in all material respects on and as of the Closing Date as if such representations and warranties were made on and as of the Closing Date and Buyer shall have delivered a certificate dated as of the Closing Date signed by its president or vice president to such effect.

c.      Certificates:  Buyer shall have furnished to Seller such certificates with respect to the authorization of this Agreement as may be reasonably necessary in connection with the transactions set out here.

d.      The due performance by Buyer of each and every material undertaking and agreement to be performed by it under this Agreement and the truth, to the best of Buyer's knowledge, of each material representation and warranty made in this Agreement by Buyer.

e.      Seller's receipt of the purchase price.

23.     **Liquidated Damages:**  BUYER AND SELLER AGREE THAT THE AMOUNT OF SELLER'S DAMAGES IN THE EVENT OF BUYER'S DEFAULT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO FIX.  THEREFORE,

26

62539.3

THE PARTIES AGREE THAT IF ESCROW FAILS TO CLOSE BY REASON OF ANY DEFAULT OF BUYER WHICH IS NOT CURED PRIOR TO FIVE (5) BUSINESS DAYS AFTER WRITTEN NOTICE TO BUYER FROM SELLER, SELLER SHALL BE ENTITLED TO RETAIN AS LIQUIDATED DAMAGES AND AS ITS SOLE REMEDY THE FULL AMOUNT OF ALL ESCROW DEPOSITS PAID BY BUYER AT THE TIME OF SUCH BREACH, TOGETHER WITH THE INTEREST ACCRUED THERETO, IF ANY, WHICH AMOUNT THE PARTIES AGREE IS A REASONABLE ESTIMATE OF THE DAMAGES TO SELLER. SUCH DAMAGES INCLUDE COSTS OF NEGOTIATING AND DRAFTING THIS AGREEMENT, COSTS OF SATISFYING CONDITIONS TO CLOSING, COSTS OF SEEKING ANOTHER BUYER UPON BUYER'S DEFAULT, OPPORTUNITY COSTS IN KEEPING THE REAL PROPERTY OUT OF THE MARKETPLACE, AND OTHER COSTS INCURRED IN CONNECTION WITH THIS AGREEMENT. UPON TERMINATION OF ESCROW FOR BUYER'S DEFAULT, SELLER SHALL RETAIN DEPOSITS AND INTEREST AS SELLER'S LIQUIDATED DAMAGES AND ESCROW HOLDER SHALL RETURN TO THE PARTIES ALL THE REMAINING FUNDS AND DOCUMENTS DEPOSITED BY THEM RESPECTIVELY. BUYER SHALL PAY ESCROW HOLDER'S CANCELLATION CHARGES. THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD PROVISIONS OF THIS PARAGRAPH AND BY THEIR INITIALS IMMEDIATELY BELOW AGREE TO BE BOUND BY ITS TERMS.

BUYER:                          SELLER:

_____         _____

24.    Notices: All notices to be given under this Agreement shall be in writing and

a.    Sent by United States Certified Mail, return receipt requested, in which case notice shall be deemed delivered three (3) business days after deposit, postage prepaid in the United States Mail, or

b.    Sent by a Seller recognized overnight courier, in which case notice shall be deemed delivered one (1) business day after deposit with the courier, or

c.    Sent by telecopy or similar means, if a copy of the notice is also sent by United States Certified Mail, in which case notice shall be deemed delivered on transmittal by telecopier or other similar means, provided that a transmission report is generated that reflects the accurate transmission of the notices, as follows:

27

62539.3

THE PARTIES AGREE THAT IF ESCROW FAILS TO CLOSE BY REASON OF ANY DEFAULT OF BUYER WHICH IS NOT CURED PRIOR TO FIVE (5) BUSINESS DAYS AFTER WRITTEN NOTICE TO BUYER FROM SELLER, SELLER SHALL BE ENTITLED TO RETAIN AS LIQUIDATED DAMAGES AND AS ITS SOLE REMEDY THE FULL AMOUNT OF ALL ESCROW DEPOSITS PAID BY BUYER AT THE TIME OF SUCH BREACH, TOGETHER WITH THE INTEREST ACCRUED THERETO, IF ANY, WHICH AMOUNT THE PARTIES AGREE IS A REASONABLE ESTIMATE OF THE DAMAGES TO SELLER. SUCH DAMAGES INCLUDE COSTS OF NEGOTIATING AND DRAFTING THIS AGREEMENT, COSTS OF SATISFYING CONDITIONS TO CLOSING, COSTS OF SEEKING ANOTHER BUYER UPON BUYER'S DEFAULT, OPPORTUNITY COSTS IN KEEPING THE REAL PROPERTY OUT OF THE MARKETPLACE, AND OTHER COSTS INCURRED IN CONNECTION WITH THIS AGREEMENT. UPON TERMINATION OF ESCROW FOR BUYER'S DEFAULT, SELLER SHALL RETAIN DEPOSITS AND INTEREST AS SELLER'S LIQUIDATED DAMAGES AND ESCROW HOLDER SHALL RETURN TO THE PARTIES ALL THE REMAINING FUNDS AND DOCUMENTS DEPOSITED BY THEM RESPECTIVELY. BUYER SHALL PAY ESCROW HOLDER'S CANCELLATION CHARGES. THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD PROVISIONS OF THIS PARAGRAPH AND BY THEIR INITIALS IMMEDIATELY BELOW AGREE TO BE BOUND BY ITS TERMS.

BUYER:                          SELLER:

_____          _____

24.    **Notices:** All notices to be given under this Agreement shall be in writing and

a.    Sent by United States Certified Mail, return receipt requested, in which case notice shall be deemed delivered three (3) business days after deposit, postage prepaid in the United States Mail, or

b.    Sent by a Seller recognized overnight courier, in which case notice shall be deemed delivered one (1) business day after deposit with the courier, or

c.    Sent by telecopy or similar means, if a copy of the notice is also sent by United States Certified Mail, in which case notice shall be deemed delivered on transmittal by telecopier or other similar means, provided that a transmission report is generated that reflects the accurate transmission of the notices, as follows:

27

62539.3

If to Buyer:

    Nader T. Agha
    449 Alvarado Street
    Monterey, CA 93940
    Fax: (831) 372-2021

With copy to:

    George Schroeder, Esq.
    P.O. Box 722
    Pebble Beach, CA 93953
    Fax: (831) 625-2932

If to Seller:

    National Refractories & Minerals Corporation
    %Development Specialists, Inc.
    Wells Fargo Center
    333 South Grand Avenue
    Suite 2010
    Los Angeles, California 90071-1524
    Fax: (213) 617-2718
    Attention:  Bradley D. Sharp

With copy to:

| | |
|---|---|
| Carl Blanke | *Courier service delivery to Carl Blanke:* |
| Hirsch and Associates | *Hirsch and Associates* |
| P.O. Box 2200 | *12665 Fair Way* |
| Watsonville, CA 95077 | *Watsonville, CA 95076* |
| Fax:  (831) 728-5413 | |

    Goldberg, Stinnett, Meyers & Davis
    Suite 2900, 44 Montgomery Street
    San Francisco, California 94104
    Fax (415) 362-2392
    Attention:  Terrance L. Stinnett, Esq.

    The above addresses may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of the notice.  Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.  Notice by a party shall be deemed effectively given if given by such party's legal counsel.

28

62539.3

25.     **Bankruptcy Court Approvals and Sales Procedure:**

a.      Sale Motion:  Seller shall file a motion (the "Sale Motion") for an order (the "Approval Order") of the Bankruptcy Court (a) approving the sale of all the property to be sold to Buyer on the terms and conditions set forth in this Agreement and authorizing Seller to proceed with this transaction and (b) providing that the sale of all of the property to be sold to Buyer shall be free and clear of all Liens of record identified in the Sale Motion. Seller shall also file an appropriate motion to approve the assumption and assignment of any of the executory permits, leases etc. to be transferred to Buyer.

b.      Obligations Contingent on Timely Entry of Approval Order:  Following the filing of the Sale Motion, Seller shall use all reasonable efforts to obtain the Approval Order as promptly as reasonably possible.  Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement are expressly conditioned upon the Bankruptcy Court's entry of the Approval Order.  If (a) the Bankruptcy Court refuses to issue the Approval Order,  (b) a third party purchaser of the Personal Property or any material portion thereof is approved by the Bankruptcy Court, or (c) the Approval Order is for any reason not entered on or before December 22, 2003, then in any such event, Buyer shall have the right to terminate this Agreement, and Seller and Buyer shall be relieved of any further liability or obligation hereunder to the extent that the failure of the Approval Order to be entered does not result from the breach by such party of any of its obligations hereunder and the deposits of Buyer shall be returned to Buyer.  Upon timely entry of the Approval Order (such entry date being referred to herein as the "Entry Date"), the condition set forth in this Section 25-B shall be deemed satisfied; provided, however, that should the Closing be delayed beyond December 22, 2003 on account of the Approval Order having been stayed, Buyer may, in its sole discretion, deem the condition not satisfied and shall be excused from any further obligations hereunder.

c.      Bidding Procedures Order: Seller shall file a motion for an order of the Bankruptcy Court in the form attached hereto as Schedule 25-C (the "Bidding Procedures Order") approving the bidding procedures that will govern any auction with respect to the Real Property, Personal Property and Businesses.

26.     **Termination:  This Agreement may be terminated by:**

a.      Buyer, if a material default shall be made by Seller

29

62539.3

in the observance or in the due and timely performance by Seller of any of the agreements and covenants of Seller here or if there shall have been a material breach by Seller of any of the warranties and representations of Seller here or if the conditions of this Agreement to be complied with or performed by Seller at or before the Closing Date shall not have been complied with or performed at the time required for such compliance or performance and such noncompliance or nonperformance shall not have been waived by Buyer, in which case, Buyer shall be entitled to the return of the full amount of the deposit and all accrued interest thereon;

b.      Seller, if a material default shall be made by Buyer in the observance or in the due and timely performance by Buyer of any agreements and covenants of Buyer here, or if there shall have been a material breach by Buyer of any of the warranties and representations of Buyer here, or if the conditions of this Agreement to be complied with or performed by Buyer at or before the Closing Date shall not have been complied with or performed at the time required for such compliance or performance and such noncompliance and nonperformance shall not have been waived by Seller or if Closing does not occur as scheduled (unless Seller has agreed in writing to a later Closing date).

c.      By either party, if any conditions set forth in this Agreement for the benefit of that party shall fail, in which case, Buyer shall be entitled to the return of the full amount of the deposit and all accrued interest thereon.

27.     **Breakup Fee:** In the event Seller elects to accept and the Bankruptcy Court approves any offer other than the Buyer's offer as detailed in this Agreement, then Seller agrees to pay a break up fee in the amount of one percent (1%) of the Purchase Price to the Purchaser provided that this Agreement has not otherwise been terminated, with said amount to be paid at the time any other such sale is closed.

28.     **Bulk Transfer Laws:** Without admitting the applicability of the bulk transfer laws of any jurisdiction, Seller and Buyer agree that neither party will comply with any applicable bulk transfer or similar law in connection with the sale of the Real Property, Businesses and Personal Property. Buyer shall assume all liability under the bulk transfer laws and shall indemnify and hold Seller harmless against any and all liabilities under such bulk transfer laws asserted by third parties against Seller as a result of such noncompliance.

29.     **Headings:** The title and headings in this Agreement are intended solely for reference and are not intended to modify, explain, or otherwise aid in the construction of this Agreement.

30.     **Severability:** If any provision of this Agreement shall be invalid or

30

62539.3

unenforceable, the remaining provisions shall not be affected, and every other provision of this Agreement shall be enforceable to the fullest extent permitted by law.

31. **Attorney Fees:** If litigation is commenced between the parties arising out of or to construe, enforce or interpret this Agreement, the Prevailing Party in such litigation shall be entitled to recover from the non-prevailing party all reasonable attorney fees and costs incurred in such litigation.

32. **Entire Agreement, Construction:** This Agreement, together with the Schedules (which are part of this Agreement), contains all representations and the entire understanding between the parties to this Agreement with respect to the subject matter of this Agreement. Should any provision in this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the person who himself or through his agent prepared the same, it being agreed that all parties have participated in the preparation hereof.

33. **Successors and Assigns:** This Agreement shall inure to the benefit of and be binding upon the parties to this Agreement and their respective successors. This Agreement may not be assigned by Buyer without the prior written permission of Seller.

34. **Authority:** The parties represent that the persons executing this Agreement on their behalf are authorized to do so, and upon execution of this Agreement, this Agreement shall be valid and binding on and enforceable against Buyer and Seller.

35. **Time of the Essence:** Time is of the essence in this Agreement.

36. **Survival:** The obligations, representations, and warranties, and the remedies for breach of this Agreement shall not survive the Closing except to the extent expressly provided in this Agreement.

37. **Number:** Whenever required by the context of this Agreement, the singular shall include the plural, and vice versa, and the word person shall include a corporation, partnership, firm, or other form of association.

38. **Governing Law and Jurisdiction:** This Agreement and the rights of the parties shall be governed by California law. Any dispute arising under this Agreement which the parties are unable to resolve between themselves shall be conclusively resolved by the Bankruptcy Court in Oakland, California, which will retain permanent jurisdiction over this Agreement. Each party irrevocably and unconditionally agrees that any suit, action or other legal proceeding arising out of or related to this Agreement shall be brought and heard in the Bankruptcy Court, and each party irrevocably consents to personal jurisdiction in the Bankruptcy Court for this purpose.

31

62539.3

39.    **Brokers:** Seller is employing the services of Hirsch and Associates and Wilson Bros. Commercial, Inc. as brokers. Seller is responsible for the fees due to its brokers. If any other broker(s) make any claim for fees or commissions, then the party such brokers claim to have been representing shall indemnify, defend and hold harmless the other party and its brokers from and against any claims, demands, causes of action, liability, damages, losses, and expenses (including reasonable attorney fees). The indemnity provided in this provision shall survive the Close of Escrow.

40.    **Signing:** This document may be executed in counterpart copies, by faxed signatures and/or by power of attorney, which the signatories agree will have the same force and effect as original. The counterparts and when so executed shall have the same force and effect as though all signatures appeared on one document.

41.    **Indemnity by Buyer:**

a.    Indemnity:    Buyer covenants and agrees to indemnify and save and hold Seller harmless from and against any liability, claims, demands, causes of action, action, loss, cost or expense (including reasonable attorneys' fees and expenses) to the extent that they are a result of or arising from (a) facts occurring subsequent to the Closing arising out of or relating to any liability, obligation, asset, business, personal property or real property assumed or purchased by Buyer pursuant to this Agreement, (b) any breach of warranty or falsity of any representations made by Buyer in this Agreement, (c) any material breach of this Agreement by Buyer, or (d) the operation of the Moss Landing facility and/or the Assets and/or the Project by Buyer after the Closing Date.

b.    Claims:    Seller shall, within fifteen (15) calendar days after receipt by it of notice of any claim or of the commencement of any action in respect to which indemnification may be sought from Buyer under the indemnification agreement contained in this indemnity provision, notify Buyer in writing. To the extent Buyer is prejudiced by it, the failure to so notify Buyer of any such claims or action shall relieve Buyer from liability which it may have to Seller under this indemnity provision, but only to the extent of the actual loss incurred and shall not relieve Buyer from any liability which it may have to Seller otherwise than under this indemnity provision. In any case, if any such action shall be brought against Seller, and Seller shall notify Buyer of the commencement, Buyer shall have the option of undertaking and directing the defense at its expense with its choice of legal counsel, subject to the reasonable approval of Seller. If Buyer within a reasonable time after notice of such claim, fails to defend Seller, Seller will, on further notice to Buyer have the right to undertake and direct the defense of such claim. If Buyer

32

62539.3

A – 220

undertakes the defense, Seller shall have the right, at its own cost and expense, to participate in the defense of such claim with its choice of legal counsel, subject to the reasonable approval of Buyer.

c.    KACC    Agreement:    Buyer    specifically acknowledges and understands that National and KACC are parties to an Agreement on Environmental Compliance, dated December 31, 1984 (the "KACC Agreement"), which provides for the indemnification by KACC in favor of National for certain costs, liabilities, expenses or damages arising out of required remedial action with respect to environmental hazards or potential hazards existing on the Moss Landing property prior to December 31, 1984. Buyer agrees that it will perform all of Seller's obligations under the KACC Agreement with respect to those portions of the Property it is purchasing. Buyer agrees that Buyer will avoid—both before and after Closing—taking any actions, including but not limited to actions regarding the Landfills on the Property, that would trigger or increase KACC's and/or Seller's liability and that Buyer will fulfill Seller's obligations under the KACC Agreement with respect to those portions of the Property it is purchasing. Buyer agrees that after the date of close of escrow, Buyer is responsible for all environmental claims, remedial action and monitoring with respect to those portions of the Property it is purchasing except for those responsibilities which are Seller's under this Agreement and which are KACC's under the KACC Agreement. Seller shall be responsible for enforcing any KACC indemnification obligations and shall indemnify and defend Buyer in connection therewith in accordance with the indemnification provisions set forth in this Agreement.

WHEREFORE, the parties have executed this Agreement as of the date first above written.

BUYER:

_____
Nader T. Agha

Date:    October 6 , 2003

SELLER:    NATIONAL REFRACTORIES & MINERALS CORPORATION

By: _____
Name: Bradley D. Sharp
Title: Its Court Appointed Responsible Individual

Date:    October 8 , 2003

33

62539.3

A -- 221

## LIST OF SCHEDULES

Schedule 1          Real Property, Personal Property and permits

Schedule 1-A        Legal Real Property descriptions

Schedule 1-B        Improvements, Materials and Equipment

Schedule 1-C        Permits

Schedule 4          Allocation of purchase price

Schedule 6          Material contracts, agreements, leases, licenses

Schedule 7          Permitted encumbrances

Schedule 17-A16     Litigation; judgments etc. affecting title

Schedule 17-A19     Exceptions to environmental compliance

Schedule 25-C       Bidding Procedures Order

S-1

62539.3

## Schedule 1

### (Real Property, Personal Property and permits)

**Real Property:**  See Schedule 1-A for legal Real Property descriptions.

**Improvements,**

**Materials and**

**Equipment:**  See Schedule 1-B. The Chrome Pile, which belongs to Federal Government and is stored on the Real Property pursuant to Strategic Stockpile Initiative, is NOT an Asset as defined by this Agreement.

**Permits:**  See Schedule 1-C.

S-2

62539.3

A – 223

# Schedule 1-A

## (Legal Real Property descriptions)

S-3

**62539.3**

IF YOU HAVE ANY QUESTIONS AS TO THE ABOVE PLEASE CONTACT EITHER YOUR ESCROW OFFICER OR TITLE OFFICER.

Legal description:

Parcel I:

A portion of Rancho Bolsa Nueva Y Moro Cojo, in the County of Monterey, State of California, being a part of that certain 1.50 acre tract of land conveyed by Saron N. Laughlin, et ux, to John Gehring, by Deed dated April 7, 1903, recorded in Book 80 of Deeds, at Page 257, particularly described as follows:

Beginning at a point in the Westerly boundary of said 1.50 acre tract of land, from which the Southerly corner thereof bears South 30.0 feet distant, said point being also on the Northwesterly corner of that certain 0.04 acre parcel of land conveyed by John Gehring to County of Monterey by Deed dated September 27, 1924, recorded in Book 47 of Official Records, at Page 95; thence along boundary of said 0.04 acre parcel of land, following the arc of a circular curve to the left, the center of which bears North 29° 35' West, 155.0 feet distant, for a distance of 72.0 feet to a point in the Easterly boundary of said 1.50 acre tract; thence along last named boundary, North 1° 25' East, 90.1 feet; thence leaving said boundary and running North 88° 30' West 54.5 feet to a 1" diameter steel bar driven flush with the ground, from which the Southwest corner of a garage bears North 1° 00' West 8.2 feet distant, said bar being in the Westerly boundary of said 1.50 acre tract of land; thence along last named boundary, South 140.0 feet to the place of beginning.

APN: 133-173-002 (Portion)

Parcel II:

All that portion of the Rancho Bolsa Nueva Y Moro Cojo described as follows:

Commencing at an iron pipe standing where the so called "Poole Line", on the Southwest side of the Dolan County Road, intersects the Eastern side of the State Highway, Route No. 1, and at the Northwest corner of that certain 170.95 acre tract conveyed by J.P. Sandholdt, et ux, to the Permanente Metals Corporation, a corporation, by Deed dated March 6, 1942, recorded March 9, 1942, in Book 758 of Official Records, at Page 221, Monterey County Records; and running thence along the Westerly side of the Permanente Metals Corporation 170.95 acre tract and the Eastern side of the State Highway, Route No. 1 with the following described ten courses, distances, and curvatures:

(1) S. 3° 24' W., 84 feet to station; thence

<u>6TH UPDATED</u>                    Order No. 178715-TD

(2) On the arc of circular curve to the left, the center of which bears S. 86° 36' E., 1960 feet distant, for an arc distance of 389.97 feet, said arc having a central angle of 11° 24' and the long chord of which arc bears S. 2° 18' E., 389.34 feet to station and end of curve; thence tangent with said curve

<u>Legal description -- page 2:</u>

(3) S. 8° 0' E., 1044.4 feet to station; thence

(4) On the arc of a circular curve to the right, the center of which bears S. 82° 00' W., 2040 feet distant, for an arc distance of 76.97 feet, to the intersection with the Easterly prolongation of the Southerly boundary of the county road crossing over the Moro Cojo Slough, being also the Easterly prolongation of that certain course and distance described as "N. 84° 45' W., 60 feet" in that certain Deed from J.P. Sandholdt et ux to the County of Monterey, dated October 1, 1930 and recorded October 7, 1930 in Volume 260 of Official Records of Monterey County at Page 480, thence

(5) Along said prolongation, to and along said course and distance and said Southerly boundary of said county road and continuing along said Southerly boundary, N. 84° 45' W., 390 feet, more or less to the intersection of said Southerly boundary with the centerline of said Moro Cojo Slough; thence along said centerline

(6) N. 18° 40' E., crossing said road 30.84 feet, thence

(7) N. 3° 02' W., continuing along said centerline 588.8 feet more or less to the intersection with the boundary line described in that certain Agreement (Arbitrating Ordinary High Water Mark) by and between the State of California, the Moss Landing Harbor District, and J.P. Sandholdt et ux, dated March 25, 1954 and recorded October 21, 1955 in Volume 1653 of Official Records of Monterey County at Page 546, thence leaving said centerline and running along said boundary line,

(8) N. 50° 21' 09" E., 91.89 feet to an angle point thereon, thence

(9) N. 4° 14' W., 915.5 feet more or less to the intersection thereof with said Poole Line, thence along said Poole Line

(10) S. 74° 3', 275.68 feet to the point of beginning

Excepting therefrom, the following:

(A) All that portion thereof lying within said county road,

(B) That certain 0.14 acre tract, conveyed by Irene E. Myers to Thelma May, by Deed dated February 4, 1936, recorded April 24, 1945, in Volume 863 Official Records at Page 480 therein,

A – 226

<u>6TH UPDATED</u>                    Order No. 178715-TD

Easterly bank of the Moro Cojo Slough South 79° 00' West 1306.80 feet, South 13° 30' West 1254.00 feet, South 65° 30' West 396.00 feet, and North 49° 50' West 1677.53 feet to a point in the Easterly line of the State Highway leading from Watsonville to Castroville; thence on and along the Easterly line of said highway North 4° 12' East 585.78 feet; thence on the arc of a curve to the left, tangent to the last mentioned course, said curve having a radius of 2040 feet and a central angle of 12° 12' a distance of 434.38 feet; thence North 8° 00' West 1044.40 feet; thence on the arc of curve to the right tangent to the last

Order No. 178715-TD

Monterey County Records, California.

(C) The interest of the County of Monterey, and the State of California, in and to that certain 5.06 acre tract, conveyed by J.P. Sandholdt et ux, to the County of Monterey, by conveyance dated October 1, 1930, recorded October 7, 1930, in Volume 260 of Official Records at Page 480 therein, Monterey County Records, California, of and for the sole purpose of a public highway and county road.

Legal description -- page 3:

(D) The interest of the County of Monterey, in and to that certain 0.04 of an acre tract, conveyed by John Gehring to the County of Monterey, by conveyance dated September 27, 1924, recorded October 27, 1924, in Volume 47 of Official Records at Page 95 therein, Monterey County Records, California, of and for sole purposes of a public highway and county road.

(E) The interest of the County of Monterey in and to that certain strip or parcel of land, conveyed by S.N. Laughlin to Monterey County, by conveyance dated May 18, 1886, recorded May 18, 1886, in Volume 11 of Deeds at Page 269 therein, Monterey County Records, California, for the right of way for a county road.

(F) The interest of the County of Monterey, in and to that portion of the Old Ferry Road, lying within the limits of the above described parcel of land, according to Viewers Report, recorded in Supervisors Minutes, in Book A, at Page 438, and dated May 26, 1865.

Also excepting any portion of the land below the ordinary high water mark of Moro Cojo Slough or the Salinas River where it was located prior to any artificial or avulsive changes in the location of the shoreline.

APNs: 133-173-002 (Portion) and 133-173-005

Parcel III:

All that certain real property situate in the County of Monterey, State of California, more particularly described as follows:

Beginning at a point in the Southwesterly line of the county road commonly called Dolan Road, said Southwesterly line also being called the "Poole Line", where said line is intersected by the line dividing the said Parcel XIV as conveyed, to Sandholdt from the lands conveyed to Francis J. Dolan, and designated "Third" in that certain Deed from John P. Dolan, recorded August 18, 1924 in Book 43 of Official Records of Monterey County, California at Page 232 thereof,

Running thence from said point of beginning on and along said dividing line South 27° 00' West 1016.40 feet to a point on the Northerly bank of Moro Cojo Slough, thence along the Northerly and

<u>6TH UPDATED</u>                Order No. 178715-TD

<u>Legal description – page 4</u>:

mentioned course, said curve having a radius of 1960 feet and a central angle of 11° 24' a distance of 389.97 feet; thence North 3° 24' East 84.00 feet to the intersection of the Easterly line of said State Highway with the said Southwesterly line of Dolan Road, or "Poole Line", thence on and along said last mentioned line South 74° 00' East 3942.42 feet to the point of beginning.

"Excepting and reserving any property which may hereafter be acquired by reason of any abandonment of the Old County Road running along, adjacent to and Westerly of the existing State Highway forming the Westerly boundary of the premises conveyed herein", as contained in the Deed from J.P. Sandholt and Katherine K. Sandholt, husband and wife to the Permanente Metals Corporation, a corporation, recorded March 9, 1942 in Volume 758, Page 221, Official Records.

Also excepting therefrom those two parcels conveyed to Kaiser Aluminum and Chemical Sales, Inc., a California corporation by Deed recorded January 20, 1959 in Book 1926, Page 11, Official Records.

Also excepting therefrom the interest of the County of Monterey, a political subdivision of the State of California in and to that portion conveyed by Deed recorded February 4, 1972 in Reel 751, Page 389, Official Records.

Also excepting any portion of the land below the ordinary high water mark of Moro Cojo Slough or the Salinas River where it was located prior to any artificial or avulsive changes in the location of the shoreline.

APN: 133–172-013 (Portion)

<u>Parcel IV</u>:

All that certain real property situate in the County of Monterey, State of California, more particularly described as follows:

Beginning at an iron pipe standing at the Southwest corner of that tract described in Deed from J.P. Sandholdt, et ux, to the Permanente Metals Corporation, a corporation, recorded March 9, 1942, in Book 758, of Official Records at Page 221, Monterey County Records, said iron pipe standing also on the Easterly line of the State Highway Route No. 1, 80 feet wide; thence along the exterior boundaries of said Permanente Metals Corporation tract with the following four courses and distances:

(1) S. 49° 0' E., 1677.53 feet to an iron pipe; thence

(2) N. 65° 30' E., 396 feet to station; thence

A – 229

<u>6TH UPDATED</u>                    Order No. 178715-TD

<u>Legal description -- page 5:</u>

(3) N. 13° 30' E., 1250.09 feet to an iron pipe; thence

(4) N. 79° 0' E., 1238.24 feet to station, from which an old 4 x 4 survey post marked J.F.W.P.2, standing in fence, bears N. 29° 47' E., 69.13 feet distant, and also from which point a concrete monument standing at the Northeast corner of the said tract of the Permanente Metals Corporation, on the Southwesterly side of the Dolan County Road, bears N. 29° 47' E., 1016.4 feet distant; thence leaving the exterior boundaries of the Permanente Metals Corporation tract,

(5) S. 29° 47' W., 430.44 feet to station in the 26th course and distance, as set forth in the description of that certain tract in Judgment to Quiet Title, Action No. 28714, in the Superior Court of the County of Monterey, State of California, entitled Jennie Tate, Plaintiff, vs. the Permanente Metals Corporation, a corporation, et al, Defendants, dated April 12, 1948, recorded April 12, 1948, in Book 1051 of Official Records, at Page 329, Monterey County Records; thence along the exterior boundaries of last mentioned tract down the center of the Moro Cojo Slough, with the following described seven courses and distances:

(6) S. 64° 35' W., 47.51 feet to station; thence

(7) N. 83° 47' W., 813.78 feet to station; thence

(8) S. 16° 18' W., 1297.56 feet to station; thence

(9) S. 44° 18' W., 233.64 feet to station; thence

(10) S. 80° 28' W., 340.56 feet to station; thence

(11) N. 76° 32' W., 412.50 feet to station; thence

(12) N. 30° 22' W., 145.86 feet to station, from which an iron pipe and a 4 x 4 survey post standing near end of fence line on the Southerly bank of the Moro Cojo Slough, bears S. 54° 48' W., 125.96 feet distant; thence leave last mentioned tract and along the Northeastern boundary of that certain tract described under Parcel 11 in the Decree in Suit to Quiet Title, Action No. 10777. In the Superior Court of the County of Monterey, State of California, dated January 15, 1929, recorded January 15, 1929, in Book 174 of Official Records, at Page 474, Monterey County Records, entitled Louis Gomez vs. California Sea Products Co., et al, with the following described two courses and distances, in the center of the Moro Cojo Slough;

(13) N. 30° 31' W., 471.24 feet to station; thence

(14) N. 59° 46' W., 596.01 feet to station on the Eastern line of said State Highway Route

<u>6TH UPDATED</u>    Order No. 178715-TD

No. 1; thence along said Eastern line,

<u>Legal description – page 6:</u>

(15) N. 4° 12' E., 332.31 feet to the place of beginning, being a portion of the Rancho Bolsa Nueva Y Moro Cojo.

Excepting any portion of the land below the ordinary high water mark of Moro Cojo Slough or the Salinas River where it was located prior to any artificial or avulsive changes in the location of the shoreline.

APN: 133-172-013 (Portion)

<u>Parcel V:</u>

Certain real property situate, lying and being in the Rancho Bolsa Nueva y Moro Cojo in the County of Monterey State of California, and being a part of that certain 338.756 acre tract of land (net area) conveyed from Walter Rodriguez, et al to James Rodriguez by deed dated February 14, 1949 and recorded in Volume 1121 of Official Records at page 381, Monterey County Records, said part being particularly described as follows, to-wit:

Beginning at a 4" x 4" post marked "R" "E.G.C." standing at a fence corner at the Northwest corner of said 338.756 acre tract of land and running thence along the Northerly boundary thereof

(1)    S. 82° 40' E., 139.50 feet to a 1 inch diameter iron pipe; thence leave the Northerly boundary of said 338.756 acre tract of land and running

(2)    S. 1° 24' W., 1,617.23 feet to a 1 1/2 inch diameter iron pipe standing in the Northeasterly line of Dolan Road (a county road 40.0 feet wide); thence running along last mentioned road line

(3)    N. 39° 16' W., 198.85 feet to a 1 1/2 inch diameter iron pipe; thence

(4)    N. 82° 44' W., 9.12 feet to a 1 1/2 inch diameter iron pipe standing in the Westerly boundary of said 338.756 acre tract of land; thence leave said Northeasterly line of Dolan Road and running along last mentioned boundary

(5)    N. 1° 15' E., 272.92 feet to a 1 1/2 inch diameter iron pipe; thence

(6)    N. 0° 42' E., 394.77 feet to a 1 1/2 inch diameter iron pipe; thence

(7)    N. 1° 47' E., 812.24 feet to the place of beginning.

6TH UPDATED          Order No. 178715-TD

APN: 131-054-008

<u>6TH UPDATED</u>                    Order No. 178715-TD

<u>Legal description — page 7:</u>

<u>Parcel VI:</u>

An exclusive easement for well lot purposes, over, upon and across the following described tract of land as the same was reserved by National Refractories and Mineral Corporation in Corporation Grant Deed recorded December 31, 1986 in Reel 2046, page 61 and as more clearly set forth in that Agreement of Easement recorded June 23, 1989 in Reel 2379, page 587 and re-recorded May 18th, 1990 in Reel 2510, page 7, Official Records and being more particularly described as follows:

Beginning at the point of intersection of the Northerly line of Dolan Road (a 40 foot wide county road) with the Westerly boundary of the tract of land described as Parcel One in Deed to Carey Tankersley, et ux, recorded December 31, 1986 in Reel 2046, page 61, Official Records and running thence, along said Westerly boundary,

(1)    N. 1° 37' E., 60.0 feet; thence leave said Westerly boundary,

(2)    S. 88° 23' E., 40.0 feet; thence

(3)    S. 1° 37' W., 60.0 feet to said Northerly road line; thence along said road line,

(4)    N. 88° 23' W., 40.0 feet to the place of beginning.

<u>Parcel VII:</u>

A right of way for pipeline purposes over, upon and across a strip of land 15 feet wide, lying along, contiguous to and Northeasterly, Northerly, Westerly, Northerly, Easterly and Northerly from the following described line:

Beginning in the Northeast line of Dolan Road (a county road 40 feet wide) at the Southerly corner of that certain 5.00 acre tract of land shown on Map entitled "Record of Survey" filed October 7, 1952 in Volume 4 of Surveys at page 99, Records of Monterey County, and running thence along the Northeasterly and Northerly lines of Dolan Road as shown on Map entitled, "Record of Survey" filed December 29, 1948 in Volume 4 of Surveys at page 53, Records of said County.

<u>6TH UPDATED</u>         Order No. 178715-TD

<u>Legal description — page 8:</u>

(1)    South 39° 16' East, 287.99 feet; thence

(2)    South 88° 23' East, 1,769.13 feet to a point from which the Southwest corner of that certain 0.23 acre tract of land described in Deed from James Rodriguez, et ux to Pacific Gas and Electric Company (a California corporation) dated November 29, 1951 and recorded in Volume 1352 of Official Records at page 40, Records of said County, bears South 88° 23' East, 50.0 feet distant; thence leaving said road line and running parallel to the Westerly line of last mentioned tract of land

(3)    North 2° 59' West, 100.0 feet; thence

(4)    South 88° 23' East, 200.0 feet, at 50.0 feet the Northwesterly corner of said 0.23 acre tract of land, at 150.0 feet the Northeasterly corner of said tract of land, 200.0 feet; thence parallel to the Easterly line of said tract of land

(5)    South 2° 59' East, 100.0 feet to the Northerly line of said Dolan Road, thence along said road line

(6)    South 88° 23' East, 1,220.7 feet to a point in the Westerly boundary of the hereinbefore described Parcel VI.

<u>Parcel VIII:</u>

All that real property in the County of Monterey, State of California, described as follows:

Beginning at the most Easterly corner of that tract described in a Deed from J. P. Sandholdt, et ux, to the Permanente Metals Corporation, dated March 6, 1942, and recorded March 9, 1942 in Book 758 of Official Records, at page 221, Records of Monterey County, thence S. 66° 44' 03" W. a distance of 1282.21 feet to a point of beginning of the land to be described as follows:

thence S. 75° 18' 30" E., a distance of 255 feet; thence S. 14° 41' 30" W. a distance of 305 feet; thence N. 75° 18' 30" W. a distance of 255 feet; thence N. 14° 41' 30" E. a distance of 305 feet to the place of beginning.

**APN: 133-172-004 (Portion)**

6TH UPDATED          Order No. 178715-TD

Legal description — page 9:

Parcel IX:

All that real property in the County of Monterey, State of California, described as follows:

Beginning at the most Easterly corner of that tract described in a Deed from J. P. Sandholdt, et ux, to the Permanente Metals Corporation, dated March 6, 1942 and recorded March 9, 1942 in Book 758 of Official Records, at page 221, Records of Monterey County, thence S. 66° 44' 03" W. a distance of 1282.21 feet to a point of beginning of the land to be described as follows:

thence N. 25° 04' 50" E. a distance of 305 feet; thence N. 78° 07' 36" E. a distance of 223.61 feet; thence S. 22° 10' 42" E., a distance of 125 feet; thence S. 28° 43' 41" W. a distance of 309.23 feet, to the Northeasterly corner of Parcel 3 above; thence along the Northerly boundary of said Parcel 3, N. 75° 18' 30" W., a distance of 255 feet to the point of beginning.

APN: 133-172-004 (Portion)

Parcel X:

Certain real property in a portion of Monterey City Lands, Tract No. 3, Monterey County, California, being a portion of that certain 2.31 acre tract shown on map filed in Volume 15 of Surveys at page 149, Records of said County, more particularly described as follows:

An easement 25 feet wide, lying along, contiguous to and Southerly of the following described line:

Beginning at a ¾" iron pipe tagged LS 3880 in the Northwesterly line of Sandholdt Road, a county road, said point being also the most Southerly corner of the lands of General Fish Company described in Deed recorded in Reel 662 of Official Records at page 973, Records of said County, thence along the Southwesterly boundary thereof

(1)    N. 66° 23' 50" W., 324.74 feet, more or less, at 251.00 feet a 1" pipe tagged LS 3880 at the most Westerly corner of said lands, 324.74 feet, more or less, to a point in the Westerly boundary of said 2.31 acre tract.

PARCEL XI:

A non-exclusive easement for the right to install, maintain, repair and replace such pipeline or lines of initial or other size as it shall from time to time elect, for the conveyance of water to the existing plant at Moss Landing, over and upon a strip of land ten (10) feet in width, the center line of which is particularly described as follows:

A – 235

6TH UPDATED    Order No. 178715-TD

Legal description — page 10:

Commencing at Wellsite No.1, as described in the Agreement between Jennie Tate and The Permanente Metals Corporation, recorded December 21, 1942 in Volume 787 of Official Records at page 65, thence in a direct line North 10 degrees, 33' 30" West 6550 feet, more or less.

Excepting therefrom any portion lying within the lines of Parcels III and IV above described.

Parcel XII:

Non-exclusive easements for wellsites and pipelines as described in the agreements between Mary J. Gomez and The Permanente Metals Corporation, recorded October 28, 1942 in Volume 781 of Official Records at page 101 and between Jennie Tate and The Permanente Metals Corporation recorded December 21, 1942 in Volume 787 of Official Records at page 65.

Excepting therefrom all that portion described in Parcel XI above described.

Parcel XII hereabove described should be contained on all conveyances, but will not be insured on any Policy of Title Insurance issued by this company, as the exact location of said parcel is not disclosed of record.

Parcel XIII:

A non-exclusive easement for the purpose of trenching, installing, constructing, maintaining and removing a subterranean outfall line as established by a Grant of Easement executed by Moss Landing Harbor District to Kaiser Aluminum and Chemical Corporation, recorded August 17, 1972 in Reel 791 of Official Records at page 843. An extension and continuation of said easement is disclosed by an unrecorded "Grant of Easement (Outfall Line)" executed by Moss Landing Harbor District.

Parcel XIII hereabove described should be contained on all conveyances, but will not be insured on any Policy of Title Insurance issued by this Company, as the exact location of said parcel is not disclosed of record.

**Schedule 1-B**

(Improvements, Materials and Equipment)

S-4

**Schedule 1-B**
**(Improvements, Materials and Equipment)**

**EXHIBIT F**

# AGREEMENT OF PURCHASE AND SALE

**between**

## NATIONAL REFRACTORIES & MINERALS CORPORATION (as "Seller")

**and**

### NADER T. AGHA (as "Buyer")

**Dated as of October 6, 2003**

62539.3

## TABLE OF CONTENTS

1. Purchase and Sale ...................................................................................................2

2. Exclusions from Purchase .......................................................................................3

3. Purchase Price and Terms of Payment ....................................................................3

4. Payment of the Purchase Price ...............................................................................3

5. Buyer's Due Diligence Contingency .......................................................................4

6. Contract and Lease Review .....................................................................................7

7. Title..........................................................................................................................7

8. Close of Escrow .......................................................................................................8

9. Further Assurances..................................................................................................9

10. Permits and Licenses ............................................................................................10

11. Prorations ..............................................................................................................11

12. Covenants of Seller Between the Date of this Agreement and Closing................12

13. Covenant of Buyer Between the Date of this Agreement and Closing..................15

14. Personal Property ..................................................................................................16

15. Compliance With Internal Revenue Code.............................................................16

16. Possession ..............................................................................................................16

17. Representations and Warranties ...........................................................................16

18. Damage and Destruction .......................................................................................24

19. Condemnation ........................................................................................................24

20. Conditions to Obligations of Both Parties ...........................................................25

21. Conditions to Obligations of Buyer ......................................................................25

22. Conditions to Obligations of Seller.......................................................................26

i

62539.3

23. Liquidated Damages .............................................................................26

24. Notices .................................................................................................27

25. Bankruptcy Court Approvals and Sales Procedure ..............................29

26. Termination ..........................................................................................29

27. Breakup Fee ..........................................................................................30

28. Bulk Transfer Laws ..............................................................................30

29. Headings ...............................................................................................30

30. Severability ..........................................................................................30

31. Attorney Fees .......................................................................................31

32. Entire Agreement, Construction ..........................................................31

33. Successors and Assigns ........................................................................31

34. Authority ..............................................................................................31

35. Time of the Essence .............................................................................31

36. Survival ................................................................................................31

37. Number .................................................................................................31

38. Governing Law and Jurisdiction ..........................................................31

39. Brokers .................................................................................................31

40. Signing .................................................................................................32

41. Indemnity by Buyer .............................................................................32

LIST OF SCHEDULES ...............................................................................S-1

ii

62539.3

## AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale is made and entered into by and between National Refractories & Minerals Corporation, a California corporation, ("Seller") as Debtor and a Debtor in Possession in a Chapter 11 case now pending before the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court"), Case No. 01-45484 T11, and Nader T. Agha and/or assigns ("Buyer").

### RECITALS

A.    Seller is the owner of that certain real property with improvements commonly known as the Moss Landing site of Seller's operations, located in the County of Monterey, State of California, which said real property consists of an approximate 200 acre manufacturing facility (including the associated wells and the strip of harbor land across Highway 1), with the 200 acres as more particularly described in Schedule 1-A, a copy of which is attached hereto and by this reference incorporated herein as though set forth in full ("Real Property").

B.    Seller has in the past operated a Magnesia manufacturing facility on the Real Property as well as an abalone farming test project; currently Seller uses the Real Property for other businesses including cellular telephone company leasing, and storage space leasing (collectively "Businesses").

C.    In connection with the ownership and operation of the Real Property and the Businesses, Seller owns and operates certain furniture, fixtures, licenses, permits, intangible property, materials and equipment as more particularly described in Schedule 1-B (the "Personal Property"). The Personal Property includes the title to the Dolan Road (eastern) wells and whatever contractual rights remain concerning the Tate (southern) well.

D.    Buyer desires to purchase the Real Property, the Businesses and the Personal Property from Seller as more particularly set forth herein, and Seller desires to sell the same to Buyer.

E.    Buyer wishes to perform a 1031 Tax Deferred Exchange on property he currently has in escrow and is ready to close prior to year's end. Sellers property that is the subject of this Agreement will be identified as a replacement property and the funds from the relinquished property will be used to purchase the property that is the subject of this Agreement, provided however, that the failure of Buyer to accomplish a 1031 Tax Deferred Exchange shall not constitute grounds for Buyer to terminate this Agreement after the expiration of Buyer's Due Diligence period as set forth hereinbelow.

NOW, THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt in sufficiency of which are mutually acknowledged, the parties hereto hereby agree as follows:

1

62539.3

1.    **Purchase and Sale:** On the closing date as hereinafter defined, subject to the terms and conditions of this Agreement, Buyer agrees to purchase and accept from Seller and Seller agrees to sell, assign, transfer, convey and deliver to Buyer, the Real Property, Businesses and the Personal Property owned by Seller which comprises all of the Real Property, tangible Personal Property and intangible Personal Property, except as specifically excluded, used in connection with the operation of the Real Property and the Businesses (hereinafter from time to time collectively referred to as the "Property") as follows:

a.    All Seller's right, title and interest in and to the Real Property.

b.    Seller's fixtures, furniture, appliances, equipment, vehicles, machinery, inventory and supplies and all other tangible Personal Property of Seller located at and used in connection with the operation of the Real Property or Businesses, including the Personal Property, which is listed on **Schedule 1-B.**

c.    Seller's interest in and to all intangibles used by Seller in connection with the Businesses, all of the goodwill and any customer lists related to the Businesses, all assignable licenses, including but not limited to, assignable permits and other governmental approvals required for the operation of the Businesses, which are listed on **Schedule 1-C** hereto.

d.    NPDES.    Seller shall transfer ownership of its National Pollutant Discharge Elimination System ("NPDES") permit to Buyer in connection with this Agreement.    Buyer specifically acknowledges that the NPDES permit has been issued to Seller by the regional office of the Environmental Protection Agency ("EPA") pursuant to application by Seller indicating the production of MgO ("Magnesia") and abalone farming at the Moss Landing facility, and is valid only with respect to the production of Magnesia and abalone.    Buyer further specifically acknowledges and understands that any proposed use of the Moss Landing facility other than for the production of Magnesia may render the current NPDES permit invalid, and may require Buyer to re-apply for or seek renewal of the NPDES permit, including any public review procedures as mandated by the EPA.    Buyer further understands and acknowledges that Seller is in receipt of an updated NPDES permit, reflecting compliance with the Ocean Plan which sets forth a 60 million gallons per day ("MGD") volume limit.    Seller and Buyer agree to cooperate and to take all necessary actions required of each of them in order to effect the transfer of the NPDES permit.

e.    All of the right, title and interest of Seller in and to all equipment leases, leases and rental agreements, licenses or

2

62539.3

other arrangements for others' use of the Real Property, Personal Property and Businesses (collectively the "Leases"), together with related security deposits identified thereon and/or delivered to Seller, which is listed on Schedule 6 hereto.

f.    All rights and obligations arising on and after the closing date related to (1) the Businesses' accounts payable and receivable, and all equipment leases, which leases are listed on Schedule 6 hereto; and (2) all other goods customarily included in inventory under current operations and services ordered in the ordinary course of business of the Businesses before the closing date, whether delivered prior to or after the closing date.

g.    All of the foregoing Property is to be sold by Seller and transferred to Buyer in its "as is, where is" condition without any warranty whatsoever, except as may be specifically provided in this Agreement, including, without limitation, any representation or guaranty from either Seller or Broker, as defined hereinbelow, as to Americans With Disability Act suitability.

2.    **Exclusions from Purchase:**  Buyer acknowledges, understands and agrees that Buyer is not acquiring Seller's cash on hand. In addition, notwithstanding any other provision of this Agreement, Seller shall not transfer any of its proprietary intellectual property ("Intellectual Property") to Buyer in connection with this Agreement except that upon Buyer's request Seller will transfer to Buyer all reasonable and material Intellectual Property and reasonable and material written information pertaining to Magnesia products production, marketing and laboratory operations including without limitation, all know-how and mix recipes that it owns regarding magnesia operations at Moss Landing, the Seller's trademark NATIONAL MAGNESIA SALES, INC., and all data (confidential or otherwise) regarding the previous abalone project at Moss Landing, including abalone know-how but subject to the FishTech agreement. With respect to these records, Buyer will make copies of whichever documents it wishes and Seller will retain the originals, except that upon Closing Buyer will take the originals of all permits and Seller will retain copies. Whichever party retains the originals will retain them until the Seller's bankruptcy case is closed except as agreed by the other party in writing.

3.    **Purchase Price and Terms of Payment:** The total purchase price for the Real Property, Businesses and Personal Property shall be Seven Million Five Hundred Thousand Dollars ($7,500,000.00)  (the "Purchase Price") payable at the closing in lawful money of the United States of America as set forth below.

4.    **Payment of the Purchase Price:**

a.    Initial Deposit:  Upon Acceptance, Buyer shall

3

62539.3

A – 245

make a refundable $100,000.00 deposit in cash with First American Title Company, Santa Cruz, California ("Escrow Agent"), to be deposited and held in a federally insured interest bearing account ("Escrow Account") at a bank designated by Seller and reasonably acceptable to the Escrow Agent. The deposit shall be held under the Buyer's employer identification and interest thereon shall accrue to Buyer's account.

b.      Financial Ability:    Upon execution of this Agreement by both parties (hereinafter referred to as "Acceptance"), Buyer shall provide Seller with proof satisfactory to Seller of Buyer's financial ability to perform this Agreement.

c.      Second Deposit:  After the expiration of Buyer's Due Diligence period an additional deposit of $100,000.00 towards the purchase price shall be deposited into the Escrow Account, thereby making the total deposit $200,000.00, which total deposit will be non-refundable unless close of escrow is due to Seller's default or failure of the Bankruptcy Court to approve this sale.

d.      Conversion and Release of Deposit:  The deposit with the Escrow Agent shall become non-refundable and will be released to Seller immediately following any auction whereby Buyer is the successful bidder unless close of escrow is due to Seller's default or failure of the Bankruptcy Court to approve this sale..

e.      Balance of Purchase Price: If Buyer has not terminated this Agreement in accordance with the provisions of this Agreement, on or before the closing Buyer shall deposit the balance of the Purchase Price into the Escrow Account.

f.      Allocation of Purchase Price: The parties agree that the Purchase Price paid by Buyer pursuant to Section 3 shall be allocated among the Real Property, Businesses and the Personal Property in accordance with the amounts set forth in Schedule 4. Prior to Closing Buyer will prepare the allocation and Seller will approve such allocation, such approval not to be unreasonably withheld. Each party agrees to file all of its tax returns consistent with such allocations pursuant to this Agreement.

5.      **Buyer's Due Diligence Contingency:**

a.      Financial Information:    Seller and Buyer acknowledge and agree that upon five (5) days written notice from Buyer, Buyer shall be provided access to and allowed to copy the permits, contracts and leases concerning the Real Property, Personal Property and the Businesses; all Seller's material financial information as to the ownership and operation of the Real

4

62539.3

Property, Personal Property and the Businesses for 2002, including copies of all material written information in Seller's possession with respect thereto. BUYER SHALL SATISFY ITSELF WITH THE FINANCIAL AND OTHER CONDITIONS OF THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES AND IS AGREEING TO PURCHASE THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES IN THEIR PRESENT CONDITION, FINANCIAL AND OTHERWISE. BUYER IS ACQUIRING THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES SOLELY AND EXCLUSIVELY IN RELIANCE UPON BUYER'S OWN KNOWLEDGE, FAMILIARITY, INSPECTION AND EXAMINATION AND NOT IN RELIANCE UPON ANY PROMISE, WARRANTY OR REPRESENTATION BY SELLER NOT SPECIFICALLY SET FORTH HEREIN OR IN THE INFORMATION PROVIDED BY SELLER TO BUYER PURSUANT TO THE TERMS HEREOF, WITH RELATION TO THE FINANCIAL CONDITION OF THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES AND ANY MATTERS PERTAINING TO THE PROFITABILITY OF ITS FUTURE OPERATION. BUYER FURTHER ACKNOWLEDGES THAT BUYER IS ACQUIRING THE REAL PROPERTY, PERSONAL PROPERTY AND BUSINESSES IN THEIR PRESENT "AS IS" FINANCIAL CONDITION AND THAT SELLER HAS MADE NO PROMISES, WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT THERETO OTHER THAN AS SET FORTH HEREIN OR IN THE FINANCIAL OR OTHER INFORMATION PROVIDED TO BUYER BY SELLER.

In that regard, Seller shall provide for Buyer's review and copying the following:

    i.    All Financial statements of the operation of the Real Property, Personal Property and Businesses for calendar year 2002;

    ii.    All leases and amendments relating to any portion of the Real Property, Personal Property and Businesses;

    iii.    Copies of all certificates of occupancy, licenses, permits, authorizations and approvals issued by any governmental authority for the Real Property, Personal Property and Businesses;

    iv.    Copies of all insurance policies affecting the Real Property, Personal Property and Businesses;

    v.    All reasonable and material documentation

5

62539.3

of the intangible property in Seller's possession relating to the Businesses, Personal Property and Real Property ("Intangible Property");

vi.    An inventory of all material Personal Property located on the Real Property, or used in the Businesses; and

vii.    The NPDES permit and any and all other permits or licenses affecting the Real Property, Personal Property and the Businesses, the easements and any encroachments on adjoining Real Property;

viii.    All material correspondence between Seller and Kaiser Aluminum & Chemical Corporation ("KACC") regarding maintenance of the landfills; Buyer acknowledges that KACC is in its own Chapter 11 bankruptcy proceedings and may reject any such agreements as burdensome executory contracts.

ix.    The full May 2001 TRC Phase I environmental assessment and the full November 2002 Phase II soil and groundwater sampling report prepared by Pacific Crest Engineering, Inc.;

x.    Seller will make available for Buyer to inspect and copy all other material records and files relating to the ownership, operation and maintenance of the Businesses, the Personal Property and the Real Property in Seller's possession including, without limitation, all records and correspondence with relation to the Real Property, Personal Property and the Businesses, and any and all other information material to Buyer's decision to purchase the Real Property, Personal Property and the Businesses.

xi.    The full November 2002 Soil and Groundwater Sampling Report prepared by Pacific Crest Engineering.

b.    Physical Inspection:    Physical Inspection: Notwithstanding any other provision hereof, Buyer shall have sixty (60) days from September 18, 2003 ("Acceptance") within which to conduct such inspections and obtain such reports and analyses (together, "Due Diligence") as Buyer may desire, at Buyer's expense, including, but not limited to geologic/seismic conditions, sewage disposal issues, appraisals, flood, fire, earthquake, environmental conditions, pest control, structural conditions, boundary surveys (including ALTA surveys), and Americans with Disabilities Act conditions, to determine whether or not the Real

6

62539.3

Property, Personal Property and Businesses are suitable for Buyer's purposes. Upon Acceptance Buyer, at its own expense, will immediately commence and diligently pursue all steps needed to obtain acceptable ALTA surveys for the Real Property. In the event that Buyer, in Buyer's sole, subjective and absolute discretion, determines for any reason the Real or Personal Property or the Businesses are not suitable for Buyer's purposes, Buyer may terminate this Agreement by a written notice of termination given to Seller on or before the expiration of the sixty (60) day Due Diligence period referred to herein, and upon such timely written notice, neither party hereto shall have any further obligation or liability to the other hereunder and Buyer's deposit shall be returned to Buyer. In the event that Buyer does not give timely written notice of such termination to Seller within that period, the entire amount of Buyer's deposits shall become absolutely non-refundable (unless the same results from Seller's breach of the Agreement or from the failure of a condition for Buyer's benefit set forth hereinbelow) and, in that event, if Buyer fails, refuses or otherwise neglects to close the escrow for Buyer's acquisition of the Real Property Seller shall be entitled to retain the full amount of said deposits and Buyer shall have no right or entitlement to the return of the whole or any portions thereof. Nothwithstanding any other provisions of this Agreement, Buyer agrees up until the close of escrow not to drill intor or conduct any Phase II investigation of the Landfills on the Real Property and further agrees that there will be no cap on any damages owed to Seller if Buyer violates this prohibition.

c.      Copies of Reports and Investigations:  If Buyer terminates this Agreement, then within 5 days of the termination Buyer shall turn over to Seller, at no cost to Seller, copies of all reports and investigations obtained pursuant to Section 5.

6.      **Contract and Lease Review:**  Seller confirms that, within fifteen (15) days of Acceptance, Buyer will be provided access to all of the service contracts, equipment leases and other contracts relating to the Businesses, Personal Property, Real Property (collectively the "Contracts"), which are listed in the attached Schedule 6, which Seller will arrange to have copied for Buyer, at Buyer's expense, if Buyer desires copies thereof. Buyer agrees to cause the termination of or to assume each Contract as of the closing date (all such Contracts assumed by Buyer are referred to collectively herein as the "Assumed Contracts"). Buyer further agrees to assume all of the leases as of the closing date. Seller shall have no liability of any kind for obligations under any of the Assumed Contracts from and after the closing date. It shall be Seller's sole responsibility (but with the cooperation of Buyer which shall not be unreasonably withheld) to obtain Bankruptcy Court consent to the Assignment and Assumption of the Leases and of the Assumed Contracts.

7

7.    **Title:** Title will be conveyed to Buyer by grant deed executed by Seller and will be subject only to items listed in this Agreement, the exceptions listed in the attached **Schedule 7** to First American Title Company's Amended/6[th] Updated Preliminary Report 178715-TD, dated as of September 11, 2003, a copy of which will be provided to Buyer upon Acceptance for Buyer's review, and the lien of any deed of trust securing any loan obtained by Buyer to fund payment of the whole or any portion of the purchase price. Evidence of title to the Real Property shall be by the commitment of First American Title Company to issue, at Buyer's expense, as of the close of escrow, an ALTA extended coverage owner's policy of title insurance with extended coverage insuring that fee title to the Real Property is vested in Buyer subject only to the exceptions hereinabove set forth.

8.    **Close of Escrow:**

a.    Unless Buyer sooner terminates this Agreement, Buyer and Seller shall close escrow not later than November 30, 2003 or 11 days after Bankruptcy Court approval if Bankruptcy Court approval occurs on or before November 30, 2003, whichever occurs later, (with both parties endeavoring to close as soon as possible) through an escrow established with Escrow Agent.

b.    On or before the close of escrow,

i.    Buyer shall deposit into escrow with Escrow Agent, funds sufficient to increase Buyer's total funds in escrow at the close of escrow (including the deposit and all accrued interest thereon) to an amount equal to the purchase price;

ii.    Seller shall deposit into escrow the following documents duly executed and, as required, acknowledged:

(1)    A Grant Deed conveying the Real Property and the improvements to Buyer ("Deed");

(2)    A Bill of Sale conveying the Personal Property to Buyer ("Bill of Sale");

(3)    An Assignment of the Assumed Contracts as conveying the Assumed Contracts to Buyer ("Assignment of Leases");

(4)    An Assignment of the intangible Personal Property conveying the Intangible Property relating to the

8

62539.3

A – 250

Businesses and Real Property to Buyer ("Assignment of Personal Property");

(5)     The Title Policy;

(6)     The original signed Contracts, if any;

(7)     The original executed documents evidencing the Intangible Property, if any;

(8)     The non-foreign Affidavit;

(9)     Any and all other such deeds, bills of sale, endorsements, assignments and other good and sufficient instruments of conveyance, sale, transfer and assignment, and with all required federal and state documentary and revenue stamps affixed, as shall be required in order to effectively vest in Buyer all of Seller's right, title and interest in and to the Real Property, Businesses and Personal Property, including all applicable permits and licenses, free and clear of any and all liens of record and other encumbrances of record (other than the Permitted Encumbrances hereinabove defined).

c.     When title company has notified Escrow Agent that it has prepared, subject only to the recordation of the Deed, to issue the title policy and when Escrow Agent is otherwise prepared to comply with the Escrow Instructions, it shall close escrow by recording the Deed, delivering to Seller the Purchase Price less any amount due from Seller pursuant to this Agreement, by wire transfer of funds and delivering to Buyer the Deed, the Bill of Sale, the Assignment of Leases, the Assignment of Intangible Personal Property, the Leases, the Non-Foreign Affidavit, the original documents evidencing the intangible Personal Property and causing title company to issue and deliver to Buyer the title policy. Immediately following the close of escrow, Escrow Agent shall deliver to Buyer and Seller a closing statement showing the application of all funds received and disbursed.

9.     **Further Assurances:**

a.     Further Assurances: At the Closing and at any time or from time to time thereafter until the earlier of 90 days after the

9

62539.3

A – 251

Closing Date or Seller's liquidation, Seller shall at the request of Buyer also take such action necessary to put Buyer in possession and operating control of the Real Property, Businesses and Personal Property, and shall execute, acknowledge and deliver such further instruments of conveyance, sale, transfer and assignment, and take such other action as Buyer may reasonably request in order to more effectively convey, sell, transfer and assign to Buyer all of the purchased Real Property, Businesses and Personal Property and to assist Buyer in exercising rights with respect to them, including without limitation, easements, and deeds concerning realty in fee. Buyer agrees that Buyer will transfer to Seller any asset in Buyer's possession which was not intended to be sold, transferred or conveyed to Buyer pursuant to this Agreement, including any cash, checks, deposits or other form of payment for any accounts receivable retained by Seller for periods arising on or after the closing date. Whenever and so often as requested so to do, Buyer shall promptly execute and deliver or cause to be executed and delivered all such other and further instruments, documents and assurances, and promptly do or cause to be done all such other and further things as may be necessary or reasonably required in order to further effectuate all rights, interest, powers, benefits, privileges and advantages conferred or intended to be conferred upon Seller by this Agreement.

b.    Risk of Loss: Except as may be otherwise stated in this Agreement, the risk of loss of the Real Property, Businesses and Personal Property shall pass to Buyer on the Closing Date.

c.    Bankruptcy Court Approval:

i.    The Buyer acknowledges that Seller is in Chapter 11 reorganization proceedings in Oakland, California and that, notwithstanding any other provision of this Agreement, completion of the transaction contemplated herein shall comply with the Bankruptcy Code and Rules and any applicable Overbid Requirements. The Buyer further acknowledges that this Agreement will not become binding unless and until approved by the Bankruptcy Court.

ii.    Seller agrees to use its best efforts to obtain the requisite approvals from the Bankruptcy Court.

10.    **Permits and Licenses:** Buyer and Seller shall cooperate and use their best efforts (including compliance with all notice, escrow and other such requirements) to obtain, prior to the close of escrow, the approval of any and all government agencies and entities with jurisdiction over the Real Property, the Businesses and the Personal Property to assign, transfer and convey all permits and licenses applicable to the Real Property, the Businesses and the Personal Property to Buyer (and, if necessary, for the issuance to

10

62539.3

A – 252

Buyer of temporary permits and licenses pending final approval). Seller shall use its best efforts to cause the effective conveyance, transfer and assignment to Buyer of all other permits, licenses and other authorizations from regulatory entities that must be transferred to Buyer in order for Buyer to own and operate the Real Property, Personal Property and the Businesses at the close of escrow. Buyer shall pay all fees required by the various governmental authorities for the transfer or issuance, as the case may be, of the said permits and licenses. Seller will continue these efforts after the Closing for any permits, licenses or authorizations that are not able to be transferred prior to the Closing.

## 11. Prorations:

a.    Current Real Property taxes (including without limitation, all special district levies and assessments), all Personal Property taxes, any intangible or use taxes, and all premiums on insurance policies, if any, assumed by Buyer, Seller being charged with the responsibility of canceling all other insurance policies effective at the close of escrow and paying any premium surcharges or early termination payments imposed in connection with such cancellations, utilities and all other usually prorated expenses of ownership and operation of the Real Property, Personal Property and the Businesses, shall be prorated between Seller and Buyer as of the close of escrow.

b.    Seller shall pay the cost of any County of Monterey Documentary Transfer Tax and any local transfer taxes as -is traditional in Monterey County. The escrow fees of Escrow Agent and all other closing costs shall be paid equally by Buyer and Seller. Seller shall pay the recording fees. Buyer shall bear and pay all sales, use, or similar taxes or fees, arising out of or imposed because of the sale of the Personal Property, Real Property and Businesses by Seller to the Buyer, provided, however, Seller shall bear and pay any income taxes incurred by Seller as a result of such transactions.

c.    Seller shall terminate all light and power and other such utilities for the Real Property, Personal Property and Businesses, effective at the close of escrow, and Seller shall be responsible for payment of all outstanding utility charges and termination fees through the close of escrow. Notwithstanding any other provision of this Agreement, Seller shall be entitled to receive the refund of all refundable deposits previously made by Seller for such utilities. At least 15 days prior to the close of escrow, Seller shall give Buyer written notice identifying each utility to be terminated at the close of escrow. It shall be Buyer's responsibility to contract with the various utilities for the provision of service following the close of escrow, and to make any required deposits. Alternatively, Buyer and Seller shall make mutually acceptable arrangements for the transfer of such utility services to

11

62539.3

A – 253

Buyer to be effective on close of escrow.

d.      To the extent that after the close of escrow, the parties discover within ninety (90) days following the close of escrow, that the pro-rations (or the adjustments made under this Section) were incorrect, each party agrees to make any necessary corrective payment promptly upon the request of the other.

e.      Seller and Buyer shall share equally the title insurance (CLTA) premium for the policy of title insurance. The Buyer shall be responsible for the cost of any additional endorsements or other coverage desired by Buyer.

f.      Buyer shall pay the cost of any inspection or minimum mandatory government retrofit standards required as a condition of closing escrow under any applicable law.

12.     **Covenants of Seller Between the Date of this Agreement and Closing:** Between the date of this Agreement and the Closing Date, Seller covenants that:

a.      Access to Real Property, Books, etc.: Seller shall afford to the officers and authorized representatives of Buyer, reasonable access to the plants, properties, and any books and records of Seller with respect solely to the Real Property, Businesses and Personal Property, and will furnish Buyer with such additional and other information as to the Real Property, Businesses and Personal Property as Buyer may from time to time reasonably request.

b.      Maintenance and Security: Except as agreed to in writing by Buyer, Seller will, prior to the Effective Time of Closing or termination of this Agreement:

i.      maintain security in substantially the same manner as it has previously;

ii.     perform any obligations which become due under material contracts, agreements, commitments or undertakings; relating to or affecting the Real Property, Businesses and Personal Property;

iii.    keep in full force and effect all present insurance policies or other comparable insurance coverage relating to or affecting the Real Property, Businesses and Personal Property.

c.      Absence of Certain Changes:  As of the Closing Date, there will be no material adverse change to the status or condition of the Businesses, Real Property and Personal Property

12

62539.3

A – 254

of Seller as they exist as of the Acceptance of this Agreement, and Seller shall use its best efforts to preserve the same.

    d.    Operation of Business:  Except as agreed to in writing by Buyer, Seller will not:

    i.    enter into or assume any contract, agreement, obligation, lease, license, or commitment in connection with the Real Property, Businesses and Personal Property that exceeds one month's duration unless approved in advance by Buyer;

    ii.    create or assume any mortgage, pledge, conditional sale or other title retention agreement, lien, encumbrance or charge of any kind upon any of the Real Property, Businesses and Personal Property whether now owned or hereafter acquired; or

    iii.    sell, lease, abandon, or otherwise dispose of any of its Real Property or any machinery, equipment or the operating properties, (except processed inventory in the ordinary course of business) in connections with the Real Property, Businesses and Personal Property.

    e.    Transaction Protection:  Buyer will incur significant expenses in conducting Due Diligence and engaging environmental consulting and risk management firms.  . In consideration thereof, and pursuant to the terms of the Letter of Intent executed by Seller and Buyer, Seller has ceased actively marketing the Property and shall not solicit any offers from other prospective purchasers or joint ventures, provided however, that Seller shall be entitled to respond to such other prospective purchasers or joint ventures and to provide to such other prospective purchasers or joint ventures information requested by them regarding the Property.  Buyer acknowledges that this Agreement is subject to the approval by the United States Bankruptcy Court having jurisdiction over Seller's chapter 11 bankruptcy case and that this Agreement is subject to the receipt of higher and better bids for the purchase of the Property as a public auction to be scheduled in the future, at which public auction Buyer shall be permitted to submit bids along with other potential purchasers, and the terms of which auction are set forth in the Order Authorizing Bidding Procedures For Sale Of Moss Landing Property attached hereto as Schedule 25-C.

    f.    Confidentiality:  Seller and Buyer shall maintain the terms of this transaction, including the contents of the Letter of Intent executed by them, this Agreement and any related transaction documents on a confidential basis, provided however,

13

62539.3

that each party shall be permitted to disclose such information as is necessary to its legal counsel, accountants and environmental consultants for its bona fide business purposes and to consummate this transaction, and further provided that Seller shall have the right to disclose the Letter of Intent, this Agreement and related transaction documents to the Official Creditors' Committee appointed in Seller's chapter 11 bankruptcy case, and to such other parties as Seller and Seller's legal counsel, in their sole and absolute discretion, deem necessary in order to obtain such approval of this Agreement and any other related transaction documents as Seller and its legal counsel, in their sole and absolute discretion, deem necessary in accordance with the requirements of the United States Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. Buyer acknowledges that the Property and this Agreement will be subject to the receipt of higher and better bids for the purchase of the Property as t public auction to be scheduled in the future.

g.      Maintenance:      Seller shall operate the Real Property, Personal Property and Businesses in substantially the manner in which it is being operated on the date of the Acceptance of this Agreement, unless interrupted by fire or other casualty, or by any other reason beyond control of Seller. Seller shall pay all accounts payable when due in accordance with its usual business practices.

h.      Modification of Leases: Seller shall not materially alter, amend, renew, extend, or terminate (collectively, Modification) any of the contracts or Leases, and no other such agreements shall be entered into by Seller with respect to the Real Property, Personal Property or the Businesses, except in the ordinary course of business, without the prior written consent of Buyer.

i.      Goods, Services and Supplies:      Seller shall continue, in its reasonable judgment, to contract for goods, services, and supplies in the ordinary course of business.

j.      Encumbrances:  Seller shall not subject the Real Property, Personal Property and Businesses or any portion of them to any lien, encumbrance, or charge not in existence as of the date of this Agreement and which shall not be eliminated prior to the Close of Escrow at Seller's expense, without the prior written consent of Buyer.

k.      Insurance:  Seller shall maintain in full force and effect all insurance policies carried on the Real Property, Personal Property or the Businesses, or its operations, at the same level of coverage as is in effect on the date of this Agreement, and shall, as

14

62539.3

A – 256

reasonably requested by Buyer, afford Buyer an opportunity to assume and continue such insurance policies or coverages as Buyer may specify prior to the Close of Escrow.

l.     Renewal of Permits:  Seller shall use its best efforts to maintain and renew in full force and affect all Permits and Licenses, if required and to the extent that it is reasonably within Seller's power.

m.     Maintenance and Repairs:  Seller shall keep and maintain the Real Property and Personal Property in the same manner as such Real Property and Personal Property are maintained by Seller on the date of this Agreement.

n.     Cooperation with Buyer:  Seller and Buyer shall cooperate in familiarizing Buyer with the operation of the Real Property, Personal Property and Businesses and in Buyer's preparations to assume operation and management of the Real Property, Personal Property and Businesses at the Close of Escrow. Seller shall afford Buyer access to the Real Property, Personal Property and Businesses and all information about the Real Property, Personal Property and Businesses at reasonable times and in a reasonable manner subject to the confidentiality provisions hereof.  Without limiting the generality of the foregoing, Buyer and its authorized agents, employees and representatives shall be given the continuing right to reasonably inspect the books and records relating to the Real Property, Personal Property and Businesses and to make extracts from these books and records; and Seller shall make available for Buyer's review copies of all building plans and surveys in Seller's possession relating to the Real Property, and financial, credit and other information relating to the Real Property, Personal Property and Businesses, and shall otherwise cooperate with Buyer through the Close of Escrow to the end that Buyer and its agents and employees shall be afforded the opportunity to obtain all necessary information and knowledge of the Real Property, Personal Property and the Businesses.  Buyer shall assure that its conduct, and that of its employees, agents, and representatives, during such process is at all times unobtrusive and does not interfere with the operation of the Real Property, Personal Property and Businesses in the ordinary course of business.

13.     **Covenant of Buyer Between the Date of this Agreement and Closing:** Between the date of this Agreement and the Closing Date, Buyer covenants that Buyer shall, subject to such disclosure to Buyer's experts, consultants and lenders as necessary for Buyer to conduct and complete its investigation of the Real Property, Businesses and the Personal Property, at all times comply with the confidentiality and non-disclosure obligations imposed by the confidentiality provisions of this Agreement and the

15

62539.3

A – 257

provisions of any existing separate Confidentiality Agreement between the parties. Buyer shall also obtain the agreement of Buyer's experts, consultants and lenders to the confidentiality and non-disclosure obligations imposed by this Agreement.

14.    **Personal Property:**    At close of escrow, Buyer shall receive all of the Personal Property that remains on the Real Property as of that date.

15.    **Compliance With Internal Revenue Code:**    Seller represents and warrants to Buyer that Seller is not a foreign person and is a United States person as such term is defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended. Seller shall deliver to Buyer on the day of the close of escrow an Affidavit of Seller, sworn to under penalty of perjury setting forth Seller's Unites States tax identification number and stating that Seller is not a foreign person as defined in Section 1445(f)(3) of the Code (Non-Foreign Affidavit).

16.    **Possession:**    Possession of all the property encompassed by this Agreement shall be delivered to Buyer as of the close of escrow.

17.    **Representations and Warranties:**

a.    Seller's Representations and Warranties:    In addition to the representations and warranties contained elsewhere in this Agreement, Seller makes the following representations and warranties, all of which individual representations and warranties are material and are being relied upon by Buyer, and are, to the best of Seller's knowledge, information and belief, accurate in all material respects as of the date of this Agreement and shall be true in all material respects at all times through the Close of Escrow:

i.    Authority:  Seller has all requisite power and authority to enter into this Agreement and to carry out its obligations under this Agreement.

ii.    Consents of Third Parties:  Except as set forth elsewhere in this Agreement, no consent, approval, or authorization of any third person to Seller's execution, delivery and performance of this Agreement is required, other than consents, approvals and authorizations which have already been unconditionally given, or which may be required by governmental authorities in connection with the licenses and permits for the operation of the Real Property, Personal Property and Businesses.

iii.    Compliance:  The execution, delivery, and performance of this Agreement by Seller shall not violate, to the best of Seller's knowledge, any applicable laws, regulations, or rules, shall not violate or constitute a breach

16

62539.3

of or default under any judicial or regulatory decree or order binding on Seller or affecting the Real Property, Personal Property or the Businesses, or any contract, agreement, or instrument to which Seller is a party or which affects the Real Property, Personal Property or the Businesses, and shall not result in the creation or imposition of any lien, charge, or encumbrance upon any of the Real Property, Personal Property or Businesses pursuant to the terms of any contract, agreement or instrument to which Seller is a party or which affects the Real Property, Personal Property or the Businesses.

iv.    Valid and Binding:  This Agreement and all documents to be delivered by Seller pursuant to this Agreement, when executed and delivered, shall constitute the legal, valid, and binding obligation of Seller, enforceable in accordance with their respective terms, subject to bankruptcy, insolvency, moratorium, or similar laws, or by legal or equitable principles relating to or limiting the rights of contracting parties generally.

v.    Real Property:  Seller has and shall convey title to the Real Property free and clear of all liens, covenants, conditions, restrictions, rights of way, easements, and encumbrances of record, except the Permitted Title Exceptions and the contracts, rights of way and leases set out in the schedules.

vi.    Utilities:  The Real Property is connected to and serviced by water, sewage disposal, gas and electrical facilities that are adequate for the present use of the Real Property and that are, to the best of Seller's knowledge, in accordance with all applicable laws, statutes, ordinances, rules, and regulations of all public or quasi-public authorities having or claiming jurisdiction over these utilities or facilities.   With the possible exception of the Tate (southern) well, Seller warrants that it is authorized to extract, transport and deliver the water supply from its well(s) to the Real Property with all applicable and necessary permits and licenses.

vii.    Personal Property:  Seller owns and shall convey, transfer and assign to Buyer all of the Personal Property, the Contract Rights, and the Intangible Property free and clear of all security agreements, financing statements, liens, and encumbrances of record other than the Permitted Exceptions or as otherwise set out in this Agreement or its schedules.  Such conveyance, transfer and assignment shall not terminate, modify, or otherwise affect

17

the rights conveyed, transferred or assigned to Buyer with respect to any of the Personal Property, the Contract Rights, or the Intangible Property. The Personal Property is owned by Seller free and clear of any conditional sales contracts, chattel mortgages, or security agreements or interests of record.

       viii.    Corporate Existence, etc.:   Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of California and is duly authorized and qualified to carry on its business in the State of California.

       ix.    Personal Property: **Schedule 1-B** attached to this Agreement, lists and accurately describes all of the material Personal Property.

       x.    Permits and Licenses:  Seller holds all permits and licenses necessary to operate the Businesses. Seller shall not modify or rescind any of the permits and licenses prior to the Close of Escrow, and shall use its best efforts to obtain any renewal or extension of permits and licenses as may be required by law in the ordinary course of business. Seller has taken no action, and no condition presently exists arising out of the Seller's activities in connection with the operation of the Real Property, Personal Property and Businesses, which would preclude transfer and/or issuance of the Licenses or any of the other permits or licenses which may be transferred and/or issued to Buyer.

       xi.    Taxes: Seller has paid any and all federal, state, and local taxes required to be paid by Seller pursuant to this Agreement, including, without limitation, real and personal property taxes and assessments, employee withholding taxes, and sales taxes (exclusive of prorations to be done through the Close of Escrow).

       xii.    Subsidiaries: Seller owns all of the Personal Property and none of the Personal Property is owned by any of Seller's subsidiaries or affiliates.

       xiii.    Liabilities:   Except for the transactions contemplated by this Agreement, since the date of the most recent balance sheet relating to the Real Property, Personal Property and Businesses delivered to Buyer and other than liabilities and obligations incurred in the ordinary course of business,, Seller has not incurred any material liability or obligation (absolute, accrued, contingent, or otherwise) of

18

62539.3

any nature affecting any of the Real Property, Personal Property or the Businesses that would properly be reflected or reserved against in a fairly presented balance sheet for them.

xiv.   No Defaults:   To the best of Seller's knowledge, Seller is not in default with respect to any of its material obligations or liabilities pertaining to the Real Property, Personal Property or the Businesses (including, without limitation, any indebtedness secured by the Real Property, Personal Property or the Businesses) nor is there any state of facts, circumstances, conditions, or events which, after notice or lapse of time or both, would constitute or result in any such default.

xv.   Violations of Law:   With the possible exception of a storage tank (UST 6) that has been removed (listed in the May 2001 TRC Phase I environmental assessment) and the related monitoring of that site, and the information contained in the November 2002 Soil and Groundwater Sampling Report prepared by Pacific Crest Engineering (Phase II environmental assessment), Seller has received no written notice of any violations of any law, rule, or regulation affecting the Real Property, Personal Property or the Businesses, which has not been rectified by Seller and which would materially and adversely affect the value or operation of the Real Property, Personal Property or the Businesses, and to the best of Seller's knowledge, no governmental authority has commenced or is contemplating any investigation regarding such possible violation. Notwithstanding any other provisions of this Agreement, Buyer agrees that prior to Closing it will have read the November 2002 Phase II environmental assessment, the May 2001 TRC Phase I environmental assessment and the 1997 PES closure report and that all matters in those assessments and that report  are deemed to have been disclosed to Buyer. Buyer agrees to pay the entire cost of any and all monitoring and remediation concerning UST 6. Seller agrees to notify Buyer in a timely manner if, prior to Closing, it receives any written notices relating to Section 17-A16. Copies of the Phase II report have been provided to the appropriate agencies, and responses from those agencies are expected.

xvi.   Litigation:   There is no action, suit, proceeding, litigation, or other investigation against Seller relating to the Real Property, Businesses and Personal Property, nor is Seller aware of any threatened action, suit, proceeding, litigation or other investigation against Seller

19

62539.3

A – 261

relating to the Real Property, Businesses and Personal Property. Except as set forth in Schedule 17-A16 or elsewhere in this Agreement and except for Seller's bankruptcy proceedings, Seller is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or governmental agency or instrumentality which might or could affect title to the Real Property, Businesses and Personal Property. There is no action, suit, proceeding or investigation by Seller or which Seller intends to initiate with respect to the Real Property, Businesses and Personal Property.

xvii.    Complete copies: Seller shall have provided Buyer with complete and accurate copies of each of the documents described in paragraph 5 of this Agreement pursuant to the deadlines set out in those provisions.

xviii.    Assignment of Material Contracts etc.: Seller will use its best efforts to obtain Bankruptcy Court approval of the assignment and/or transfer to Buyer of the material contracts, agreements, leases, license or other agreements identified in Schedule 6.

xix.    Environmental Laws and Regulation: Except as set forth in Schedule 17-A19 or elsewhere in this Agreement, and specifically limited to the period of time during which Seller owned or owns the Real Property, Businesses and Personal Property:

(1)    With the possible exception of a storage tank (UST 6) that has been removed (listed in the May 2001 TRC Phase I environmental assessment) and the related monitoring of that site, and the information contained in the November 2002 Soil and Groundwater Sampling Report prepared by Pacific Crest Engineering (Phase II environmental assessment), Seller, to the best of its knowledge, information and belief, has not violated, and is presently in compliance with all Environmental Laws applicable to the Real Property, Businesses and Personal Property, and there exist no Environmental Conditions (as that term is defined below) with respect to the Real Property, Businesses and Personal Property;

(2)    With the possible exception of gas and oil spills on the Real Property (which are known to the government and which are being monitored by Seller)

20

62539.3

A – 262

Seller, to the best of its knowledge, information and belief, has not disposed of any Hazardous Materials (as that terms is defined below) or any solid waste at any of the Real Property comprising the Real Property, Businesses and Personal Property except in compliance with all applicable Environmental Laws;

(3)     No lien has been imposed on the Real Property, Businesses and Personal Property by any governmental agency at the federal, state or local level in connection with the presence of any Hazardous Materials;

(4)     Seller has not: (i) entered into or been subject to any consent decree, compliance order or administrative order with respect to the Real Property, Businesses and Personal Property; (ii) received notice under the citizens suit provision of any Environmental Laws in connection with the Real Property, Businesses and Personal Property; (iii) received any request for information, notice, demand letter, administrative inquiry, or formal or informal complaint or claim from any state or federal regulatory agency with respect to any Environmental Conditions relating to the Real Property, Businesses and Personal Property; or (iv) been subject to or, to the best of its knowledge, information and belief, threatened with any governmental or citizen enforcement action with respect to the Real Property, Businesses and Personal Property.

(5)     Buyer acknowledges that: while KACC removed visible asbestos in 1979-1980, there still may be asbestos on the Real Property; that the four known underground storage tanks were removed from the Real Property while Seller has owned it, and of these Seller has "no further action required" letters on three of these tanks from the Monterey County Department of Health, while the site of the fourth tank—which was behind the brick plant—is still being remediated; there is a tank on a pad in a pit containing approximately 8,000 gallons of material, including crankcase oil, on the Real Property. (This is in no way intended to be a complete listing of all environmental issues concerning the Real Property.)

21

62539.3

A – 263

xx.    Definitions:    For   purposes   of   this Agreement, the following terms shall have the following meanings:

(1)    "Environmental Laws" means any and all federal, state or local statutes, laws, rules, regulations, ordinances, codes, policies or rules of common law now in effect and in each case as amended to date and any judicial or administrative interpretation, including any judicial or administrative orders, consent decrees or judgments, relating to human health or environment, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.  §  9601  et  seq.;  the  Hazardous  Materials Transportation Act, as amended, 49 U.S.C. § 1801 et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 et seq.; The Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; and the Safe Drinking Water Act, 42 U.S.C. § 3808 et seq.

(2)    "Environmental Condition" shall mean any condition with respect to the Real Property, Businesses and Personal Property which could or has resulted in any damage, loss, cost, expense, claim, demand, order or liability to or against Seller.

(3)    "Hazardous Material" shall mean any "pollutant", "toxic substance", "hazardous waste", "hazardous material" and/or "hazardous substance" under any Environmental Law.

b.    Buyer's  Representations  and  Warranties:    In addition to the representations and warranties contained elsewhere in  this  Agreement,  Buyer  hereby  makes  the  following representations  and  warranties,  all  of  which  individual representations and warranties are material and are being relied upon by Seller, and are, to the best of Buyer's knowledge, accurate in all material respects as of the date of this Agreement and shall be true in all material respects at all times through the Close of Escrow.

i.    Power   and   Authority:    Buyer   has   all

22

62539.3

A -- 264

requisite power and authority to carry on its business as now conducted and to own and operate its properties and Personal Property now owned and being operated by it. Buyer has the power and authority to enter into this Agreement and to carry out its obligations under this Agreement.

ii.    Authorization:  All proceedings required to be taken by or on behalf of Buyer for the authorization, execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein shall have been taken prior to the Close of Escrow.

iii.    Consents of Third Parties:  No consent, approval, or authorization of any third person to Buyer's execution, delivery and performance of this Agreement is required, other than consents, approvals and authorizations which have already been unconditionally given, or which may be required by governmental authorities in connection with the qualification of Buyer to hold any and all licenses and permits for the operation of the Businesses.

iv.    Compliance:  The execution, delivery, and performance of this Agreement by Buyer (A) shall not violate any provision of the organizational documents of Buyer or Buyer's assignee or any applicable laws, regulations or rules, (B) shall not violate or constitute a breach of or default under any judicial or regulatory decree or order binding on Buyer, or any contract, agreement, or instrument to which Buyer is a party.

v.    Valid and Binding:  This Agreement and all documents to be delivered by Buyer pursuant to this Agreement, when executed and delivered, shall constitute the legal, valid, and binding obligation of Buyer, enforceable in accordance with their respective terms, subject to bankruptcy, insolvency, moratorium, or similar laws, or by legal or equitable principles relating to or limiting the rights of contracting parties generally.

vi.    No Conflict with Other Instruments:  The execution and delivery of this Agreement and the consummation of its specified transactions will not (i) result in any breach of any terms or conditions of, or constitute a default under any organizational and/or governing document of Buyer or any commitment, mortgage, note, bond, debenture, deed of trust, contract, agreement, license or other instrument or obligation to which Buyer is now a party or by which its properties or

23

62539.3

A – 265

Personal Property may be bound or affected; or (ii) result in any violation of any law, or bylaw, rule or regulation of any administrative agency or governmental body.

vii.    Litigation:    There are no suits, actions, claims, inquiries, investigations by any private or governmental body, legal, administrative or arbitration proceedings pending or, to the knowledge of Buyer, threatened against or affecting the validity or legality of the transactions contemplated by this Agreement.

18.    **Damage and Destruction:**

a.    In the event of damage or destruction of the Real Property, Personal Property or Businesses or any portion them prior to the Close of Escrow in an amount not exceeding Two Hundred Thousand Dollars ($200,000), Buyer and Seller shall consummate this Agreement without change in the Purchase Price, provided that Seller shall assign to Buyer its rights under any insurance policy covering such damage or destruction.

b.    In the event of damage or destruction of the Real Property, Personal Property or Businesses or any portion of them prior to the Close of Escrow in an amount in excess of Two Hundred Thousand Dollars ($200,000), at Seller's option Seller may terminate this Agreement without penalty (but Buyer's deposit will be returned to Buyer) or may adjust the Purchase price to be paid by Buyer to Seller so that it is reduced by an amount equal to the replacement cost of such damage.

19.    **Condemnation:**

a.    In the event all or any portion of the Real Property is taken by condemnation or eminent domain or is the subject of a threatened or pending condemnation or eminent domain proceeding that has not been consummated prior to the Close of Escrow resulting in a decrease in the value of the Real Property in an amount not exceeding Two Hundred Thousand Dollars ($200,000), Buyer and Seller shall consummate this Agreement without change in the Purchase Price, provided that Seller shall assign to Buyer its rights to all awards for such condemnation or taking.

b.    In the event all or any portion of the Real Property is taken by condemnation or eminent domain or is the subject of a threatened or pending condemnation or eminent domain proceeding that has not been consummated prior to the Close of Escrow resulting in a decrease in the value of the Real Property in an amount in excess of Two Hundred Thousand One Dollars

24

62539.3

($200,001), Buyer may elect either to terminate this Agreement upon written notice to Seller with the right to receive return of the full amount of Buyer's deposit, or to consummate this Agreement, in which event Seller shall assign to Buyer its rights to all awards for such condemnation or taking.

20.    **Conditions to Obligations of Both Parties:**  The obligations of Buyer and Seller to cause the transfer of the Real Property, Businesses and Personal Property to be consummated shall be subject to the fact that on the Closing Date there shall not be pending litigation in any court or any proceeding by any governmental commission, board or agency, with a view to seeking or in which it is sought to restrain or prohibit consummation of the sale and purchase of the Real Property, Businesses and Personal Property or in which it is sought to obtain divestiture, rescission or damages in connection with the consummation of the transactions here.

21.    **Conditions to Obligations of Buyer:**  In addition to the other conditions to Buyer's obligations set forth elsewhere in this Agreement, the obligations of Buyer are, at the option of Buyer, subject to the satisfaction, on or prior to the Closing Date, of the following conditions:

a.    Representations and    Warranties:    The representations and warranties of Seller contained in this Agreement shall be true in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date except for changes which are contemplated in this Agreement.  For purposes of this entire Agreement, an act, omission or item is "material" only if it has a negative financial impact of $200,000 or more.

b.    Access to Information:  Seller shall have delivered or made available to Buyer all material books, records and documents of Seller used solely in connection with the Real Property, Businesses and Personal Property and shall have afforded to the officers and authorized representatives of Buyer reasonable access to all properties, books, records, documents, legal and operating information and all other information of Seller solely and directly related to the Real Property, Businesses and Personal Property which has been reasonably requested or provided for in this Agreement.

c.    No Adverse Change:    From the date of the Agreement to the Closing Date, Seller shall not have suffered material loss or damage to the Real Property, Businesses and Personal Property, whether or not covered by insurance, which change, loss, or damage materially and adversely affects or impairs Seller's ability to conduct any business related to the Real Property, Businesses and Personal Property.

25

62539.3

A – 267

d. The due performance by Seller of each and every material undertaking and agreement to be performed by Seller under this Agreement and the truth, to the best of Seller's knowledge, of each material representation and warranty made in this Agreement by Seller.

e. On or before the close of escrow, Buyer's receipt of the documents required to be delivered by Seller at the close of escrow, duly executed and, where appropriate, acknowledged by Seller.

f. The issuance by the title company of the title commitment, on or before the close of escrow.

22. **Conditions to Obligations of Seller:** In addition to any other conditions to Seller's obligations set forth elsewhere herein, the obligation of Seller to sell the Real Property, Businesses and Personal Property as contemplated here shall be, at the option of Seller, subject to the satisfaction on or before the Closing Date of all the following conditions:

a. Approval of Bankruptcy Court: Seller shall have obtained the approval and consent of the United States Bankruptcy Court to the transactions contemplated by this Agreement.

b. Representations, Warranties, and Covenants: All representations and warranties of Buyer contained in this Agreement shall be true in all material respects on and as of the Closing Date as if such representations and warranties were made on and as of the Closing Date and Buyer shall have delivered a certificate dated as of the Closing Date signed by its president or vice president to such effect.

c. Certificates: Buyer shall have furnished to Seller such certificates with respect to the authorization of this Agreement as may be reasonably necessary in connection with the transactions set out here.

d. The due performance by Buyer of each and every material undertaking and agreement to be performed by it under this Agreement and the truth, to the best of Buyer's knowledge, of each material representation and warranty made in this Agreement by Buyer.

e. Seller's receipt of the purchase price.

23. **Liquidated Damages:** BUYER AND SELLER AGREE THAT THE AMOUNT OF SELLER'S DAMAGES IN THE EVENT OF BUYER'S DEFAULT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO FIX. THEREFORE,

26

62539.3

THE PARTIES AGREE THAT IF ESCROW FAILS TO CLOSE BY REASON OF ANY DEFAULT OF BUYER WHICH IS NOT CURED PRIOR TO FIVE (5) BUSINESS DAYS AFTER WRITTEN NOTICE TO BUYER FROM SELLER, SELLER SHALL BE ENTITLED TO RETAIN AS LIQUIDATED DAMAGES AND AS ITS SOLE REMEDY THE FULL AMOUNT OF ALL ESCROW DEPOSITS PAID BY BUYER AT THE TIME OF SUCH BREACH, TOGETHER WITH THE INTEREST ACCRUED THERETO, IF ANY, WHICH AMOUNT THE PARTIES AGREE IS A REASONABLE ESTIMATE OF THE DAMAGES TO SELLER. SUCH DAMAGES INCLUDE COSTS OF NEGOTIATING AND DRAFTING THIS AGREEMENT, COSTS OF SATISFYING CONDITIONS TO CLOSING, COSTS OF SEEKING ANOTHER BUYER UPON BUYER'S DEFAULT, OPPORTUNITY COSTS IN KEEPING THE REAL PROPERTY OUT OF THE MARKETPLACE, AND OTHER COSTS INCURRED IN CONNECTION WITH THIS AGREEMENT. UPON TERMINATION OF ESCROW FOR BUYER'S DEFAULT, SELLER SHALL RETAIN DEPOSITS AND INTEREST AS SELLER'S LIQUIDATED DAMAGES AND ESCROW HOLDER SHALL RETURN TO THE PARTIES ALL THE REMAINING FUNDS AND DOCUMENTS DEPOSITED BY THEM RESPECTIVELY. BUYER SHALL PAY ESCROW HOLDER'S CANCELLATION CHARGES. THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD PROVISIONS OF THIS PARAGRAPH AND BY THEIR INITIALS IMMEDIATELY BELOW AGREE TO BE BOUND BY ITS TERMS.

BUYER:                         SELLER:

_____        _____

24.    Notices: All notices to be given under this Agreement shall be in writing and

a.    Sent by United States Certified Mail, return receipt requested, in which case notice shall be deemed delivered three (3) business days after deposit, postage prepaid in the United States Mail, or

b.    Sent by a Seller recognized overnight courier, in which case notice shall be deemed delivered one (1) business day after deposit with the courier, or

c.    Sent by telecopy or similar means, if a copy of the notice is also sent by United States Certified Mail, in which case notice shall be deemed delivered on transmittal by telecopier or other similar means, provided that a transmission report is generated that reflects the accurate transmission of the notices, as follows:

27

62539.3

A -- 269

THE PARTIES AGREE THAT IF ESCROW FAILS TO CLOSE BY REASON OF ANY DEFAULT OF BUYER WHICH IS NOT CURED PRIOR TO FIVE (5) BUSINESS DAYS AFTER WRITTEN NOTICE TO BUYER FROM SELLER, SELLER SHALL BE ENTITLED TO RETAIN AS LIQUIDATED DAMAGES AND AS ITS SOLE REMEDY THE FULL AMOUNT OF ALL ESCROW DEPOSITS PAID BY BUYER AT THE TIME OF SUCH BREACH, TOGETHER WITH THE INTEREST ACCRUED THERETO, IF ANY, WHICH AMOUNT THE PARTIES AGREE IS A REASONABLE ESTIMATE OF THE DAMAGES TO SELLER. SUCH DAMAGES INCLUDE COSTS OF NEGOTIATING AND DRAFTING THIS AGREEMENT, COSTS OF SATISFYING CONDITIONS TO CLOSING, COSTS OF SEEKING ANOTHER BUYER UPON BUYER'S DEFAULT, OPPORTUNITY COSTS IN KEEPING THE REAL PROPERTY OUT OF THE MARKETPLACE, AND OTHER COSTS INCURRED IN CONNECTION WITH THIS AGREEMENT. UPON TERMINATION OF ESCROW FOR BUYER'S DEFAULT, SELLER SHALL RETAIN DEPOSITS AND INTEREST AS SELLER'S LIQUIDATED DAMAGES AND ESCROW HOLDER SHALL RETURN TO THE PARTIES ALL THE REMAINING FUNDS AND DOCUMENTS DEPOSITED BY THEM RESPECTIVELY. BUYER SHALL PAY ESCROW HOLDER'S CANCELLATION CHARGES. THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD PROVISIONS OF THIS PARAGRAPH AND BY THEIR INITIALS IMMEDIATELY BELOW AGREE TO BE BOUND BY ITS TERMS.

BUYER:                    SELLER:

_____          _____

24.  **Notices:** All notices to be given under this Agreement shall be in writing and

a.   Sent by United States Certified Mail, return receipt requested, in which case notice shall be deemed delivered three (3) business days after deposit, postage prepaid in the United States Mail, or

b.   Sent by a Seller recognized overnight courier, in which case notice shall be deemed delivered one (1) business day after deposit with the courier, or

c.   Sent by telecopy or similar means, if a copy of the notice is also sent by United States Certified Mail, in which case notice shall be deemed delivered on transmittal by telecopier or other similar means, provided that a transmission report is generated that reflects the accurate transmission of the notices, as follows:

27

62539.3

If to Buyer:

> Nader T. Agha
> 449 Alvarado Street
> Monterey, CA 93940
> Fax: (831) 372-2021

With copy to:

> George Schroeder, Esq.
> P.O. Box 722
> Pebble Beach, CA 93953
> Fax: (831) 625-2932

If to Seller:

> National Refractories & Minerals Corporation
> %Development Specialists, Inc.
> Wells Fargo Center
> 333 South Grand Avenue
> Suite 2010
> Los Angeles, California 90071-1524
> Fax: (213) 617-2718
> Attention: Bradley D. Sharp

With copy to:

> Carl Blanke                    *Courier service delivery to Carl Blanke:*
>
> Hirsch and Associates          *Hirsch and Associates*
> P.O. Box 2200                  *12665 Fair Way*
> Watsonville, CA 95077          *Watsonville, CA 95076*
> Fax: (831) 728-5413

> Goldberg, Stinnett, Meyers & Davis
> Suite 2900, 44 Montgomery Street
> San Francisco, California 94104
> Fax (415) 362-2392
> Attention: Terrance L. Stinnett, Esq.

The above addresses may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of the notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notice by a party shall be deemed effectively given if given by such party's legal counsel.

28

62539.3

A – 271

25.   **Bankruptcy Court Approvals and Sales Procedure:**

a.   Sale Motion: Seller shall file a motion (the "Sale Motion") for an order (the "Approval Order") of the Bankruptcy Court (a) approving the sale of all the property to be sold to Buyer on the terms and conditions set forth in this Agreement and authorizing Seller to proceed with this transaction and (b) providing that the sale of all of the property to be sold to Buyer shall be free and clear of all Liens of record identified in the Sale Motion. Seller shall also file an appropriate motion to approve the assumption and assignment of any of the executory permits, leases etc. to be transferred to Buyer.

b.   Obligations Contingent on Timely Entry of Approval Order: Following the filing of the Sale Motion, Seller shall use all reasonable efforts to obtain the Approval Order as promptly as reasonably possible. Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement are expressly conditioned upon the Bankruptcy Court's entry of the Approval Order. If (a) the Bankruptcy Court refuses to issue the Approval Order, (b) a third party purchaser of the Personal Property or any material portion thereof is approved by the Bankruptcy Court, or (c) the Approval Order is for any reason not entered on or before December 22, 2003, then in any such event, Buyer shall have the right to terminate this Agreement, and Seller and Buyer shall be relieved of any further liability or obligation hereunder to the extent that the failure of the Approval Order to be entered does not result from the breach by such party of any of its obligations hereunder and the deposits of Buyer shall be returned to Buyer. Upon timely entry of the Approval Order (such entry date being referred to herein as the "Entry Date"), the condition set forth in this Section 25-B shall be deemed satisfied; provided, however, that should the Closing be delayed beyond December 22, 2003 on account of the Approval Order having been stayed, Buyer may, in its sole discretion, deem the condition not satisfied and shall be excused from any further obligations hereunder.

c.   Bidding Procedures Order: Seller shall file a motion for an order of the Bankruptcy Court in the form attached hereto as Schedule 25-C (the "Bidding Procedures Order") approving the bidding procedures that will govern any auction with respect to the Real Property, Personal Property and Businesses.

26.   **Termination: This Agreement may be terminated by:**

a.   Buyer, if a material default shall be made by Seller

29

62539.3

A – 272

in the observance or in the due and timely performance by Seller of any of the agreements and covenants of Seller here or if there shall have been a material breach by Seller of any of the warranties and representations of Seller here or if the conditions of this Agreement to be complied with or performed by Seller at or before the Closing Date shall not have been complied with or performed at the time required for such compliance or performance and such noncompliance or nonperformance shall not have been waived by Buyer, in which case, Buyer shall be entitled to the return of the full amount of the deposit and all accrued interest thereon;

b.    Seller, if a material default shall be made by Buyer in the observance or in the due and timely performance by Buyer of any agreements and covenants of Buyer here, or if there shall have been a material breach by Buyer of any of the warranties and representations of Buyer here, or if the conditions of this Agreement to be complied with or performed by Buyer at or before the Closing Date shall not have been complied with or performed at the time required for such compliance or performance and such noncompliance and nonperformance shall not have been waived by Seller or if Closing does not occur as scheduled (unless Seller has agreed in writing to a later Closing date).

c.    By either party, if any conditions set forth in this Agreement for the benefit of that party shall fail, in which case, Buyer shall be entitled to the return of the full amount of the deposit and all accrued interest thereon.

27.    **Breakup Fee:**  In the event Seller elects to accept and the Bankruptcy Court approves any offer other than the Buyer's offer as detailed in this Agreement, then Seller agrees to pay a break up fee in the amount of one percent (1%) of the Purchase Price to the Purchaser provided that this Agreement has not otherwise been terminated, with said amount to be paid at the time any other such sale is closed.

28.    **Bulk Transfer Laws:**  Without admitting the applicability of the bulk transfer laws of any jurisdiction, Seller and Buyer agree that neither party will comply with any applicable bulk transfer or similar law in connection with the sale of the Real Property, Businesses and Personal Property.  Buyer shall assume all liability under the bulk transfer laws and shall indemnify and hold Seller harmless against any and all liabilities under such bulk transfer laws asserted by third parties against Seller as a result of such noncompliance.

29.    **Headings:**  The title and headings in this Agreement are intended solely for reference and are not intended to modify, explain, or otherwise aid in the construction of this Agreement.

30.    **Severability:**  If any provision of this Agreement shall be invalid or

30

62539.3

unenforceable, the remaining provisions shall not be affected, and every other provision of this Agreement shall be enforceable to the fullest extent permitted by law.

31.    **Attorney Fees:** If litigation is commenced between the parties arising out of or to construe, enforce or interpret this Agreement, the Prevailing Party in such litigation shall be entitled to recover from the non-prevailing party all reasonable attorney fees and costs incurred in such litigation.

32.    **Entire Agreement, Construction:** This Agreement, together with the Schedules (which are part of this Agreement), contains all representations and the entire understanding between the parties to this Agreement with respect to the subject matter of this Agreement. Should any provision in this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the person who himself or through his agent prepared the same, it being agreed that all parties have participated in the preparation hereof.

33.    **Successors and Assigns:** This Agreement shall inure to the benefit of and be binding upon the parties to this Agreement and their respective successors. This Agreement may not be assigned by Buyer without the prior written permission of Seller.

34.    **Authority:**   The parties represent that the persons executing this Agreement on their behalf are authorized to do so, and upon execution of this Agreement, this Agreement shall be valid and binding on and enforceable against Buyer and Seller.

35.    **Time of the Essence:** Time is of the essence in this Agreement.

36.    **Survival:**   The obligations, representations, and warranties, and the remedies for breach of this Agreement shall not survive the Closing except to the extent expressly provided in this Agreement.

37.    **Number:**   Whenever required by the context of this Agreement, the singular shall include the plural, and vice versa, and the word person shall include a corporation, partnership, firm, or other form of association.

38.    **Governing Law and Jurisdiction:** This Agreement and the rights of the parties shall be governed by California law. Any dispute arising under this Agreement which the parties are unable to resolve between themselves shall be conclusively resolved by the Bankruptcy Court in Oakland, California, which will retain permanent jurisdiction over this Agreement. Each party irrevocably and unconditionally agrees that any suit, action or other legal proceeding arising out of or related to this Agreement shall be brought and heard in the Bankruptcy Court, and each party irrevocably consents to personal jurisdiction in the Bankruptcy Court for this purpose.

31

62539.3

39.     **Brokers:** Seller is employing the services of Hirsch and Associates and Wilson Bros. Commercial, Inc. as brokers. Seller is responsible for the fees due to its brokers. If any other broker(s) make any claim for fees or commissions, then the party such brokers claim to have been representing shall indemnify, defend and hold harmless the other party and its brokers from and against any claims, demands, causes of action, liability, damages, losses, and expenses (including reasonable attorney fees). The indemnity provided in this provision shall survive the Close of Escrow.

40.     **Signing:** This document may be executed in counterpart copies, by faxed signatures and/or by power of attorney, which the signatories agree will have the same force and effect as original. The counterparts and when so executed shall have the same force and effect as though all signatures appeared on one document.

41.     **Indemnity by Buyer:**

a.     **Indemnity:** Buyer covenants and agrees to indemnify and save and hold Seller harmless from and against any liability, claims, demands, causes of action, action, loss, cost or expense (including reasonable attorneys' fees and expenses) to the extent that they are a result of or arising from (a) facts occurring subsequent to the Closing arising out of or relating to any liability, obligation, asset, business, personal property or real property assumed or purchased by Buyer pursuant to this Agreement, (b) any breach of warranty or falsity of any representations made by Buyer in this Agreement, (c) any material breach of this Agreement by Buyer, or (d) the operation of the Moss Landing facility and/or the Assets and/or the Project by Buyer after the Closing Date.

b.     **Claims:** Seller shall, within fifteen (15) calendar days after receipt by it of notice of any claim or of the commencement of any action in respect to which indemnification may be sought from Buyer under the indemnification agreement contained in this indemnity provision, notify Buyer in writing. To the extent Buyer is prejudiced by it, the failure to so notify Buyer of any such claims or action shall relieve Buyer from liability which it may have to Seller under this indemnity provision, but only to the extent of the actual loss incurred and shall not relieve Buyer from any liability which it may have to Seller otherwise than under this indemnity provision. In any case, if any such action shall be brought against Seller, and Seller shall notify Buyer of the commencement, Buyer shall have the option of undertaking and directing the defense at its expense with its choice of legal counsel, subject to the reasonable approval of Seller. If Buyer within a reasonable time after notice of such claim, fails to defend Seller, Seller will, on further notice to Buyer have the right to undertake and direct the defense of such claim. If Buyer

32

62539.3

undertakes the defense, Seller shall have the right, at its own cost and expense, to participate in the defense of such claim with its choice of legal counsel, subject to the reasonable approval of Buyer.

c.    KACC    Agreement:    Buyer    specifically acknowledges and understands that National and KACC are parties to an Agreement on Environmental Compliance, dated December 31, 1984 (the "KACC Agreement"), which provides for the indemnification by KACC in favor of National for certain costs, liabilities, expenses or damages arising out of required remedial action with respect to environmental hazards or potential hazards existing on the Moss Landing property prior to December 31, 1984. Buyer agrees that it will perform all of Seller's obligations under the KACC Agreement with respect to those portions of the Property it is purchasing. Buyer agrees that Buyer will avoid—both before and after Closing—taking any actions, including but not limited to actions regarding the Landfills on the Property, that would trigger or increase KACC's and/or Seller's liability and that Buyer will fulfill Seller's obligations under the KACC Agreement with respect to those portions of the Property it is purchasing. Buyer agrees that after the date of close of escrow, Buyer is responsible for all environmental claims, remedial action and monitoring with respect to those portions of the Property it is purchasing except for those responsibilities which are Seller's under this Agreement and which are KACC's under the KACC Agreement. Seller shall be responsible for enforcing any KACC indemnification obligations and shall indemnify and defend Buyer in connection therewith in accordance with the indemnification provisions set forth in this Agreement.

WHEREFORE, the parties have executed this Agreement as of the date first above written.

BUYER:

Nader T. Agha

Date:    October 6 , 2003

SELLER:    NATIONAL REFRACTORIES & MINERALS CORPORATION

By:    _____
Name: Bradley D. Sharp
Title: Its Court Appointed Responsible Individual

Date:    October 8 , 2003

33

62539.3

## LIST OF SCHEDULES

Schedule 1          Real Property, Personal Property and permits

Schedule 1-A        Legal Real Property descriptions

Schedule 1-B        Improvements, Materials and Equipment

Schedule 1-C        Permits

Schedule 4          Allocation of purchase price

Schedule 6          Material contracts, agreements, leases, licenses

Schedule 7          Permitted encumbrances

Schedule 17-A16     Litigation; judgments etc. affecting title

Schedule 17-A19     Exceptions to environmental compliance

Schedule 25-C       Bidding Procedures Order

S-1

62539.3

A – 277

**Schedule 1**

(Real Property, Personal Property and permits)


Real Property:            See Schedule 1-A for legal Real Property descriptions.


Improvements,

Materials and

Equipment:               See Schedule 1-B.  The Chrome Pile, which belongs to Federal
                         Government and is stored on the Real Property pursuant to Strategic
                         Stockpile Initiative, is NOT an Asset as defined by this Agreement.


Permits:                 See Schedule 1-C.


S-2

62539.3

**Schedule 1-A**

(Legal Real Property descriptions)

S-3

62539.3

A -- 279

IF YOU HAVE ANY QUESTIONS AS TO THE ABOVE PLEASE CONTACT EITHER YOUR
ESCROW OFFICER OR TITLE OFFICER.

<u>Legal description:</u>

<u>Parcel I:</u>

A portion of Rancho Bolsa Nueva Y Moro Cojo, in the County of Monterey, State of California,
being a part of that certain 1.50 acre tract of land conveyed by Saron N. Laughlin, et ux, to John
Gehring, by Deed dated April 7, 1903, recorded in Book 80 of Deeds, at Page 257, particularly
described as follows:

Beginning at a point in the Westerly boundary of said 1.50 acre tract of land, from which the
Southerly corner thereof bears South 30.0 feet distant, said point being also on the Northwesterly
corner of that certain 0.04 acre parcel of land conveyed by John Gehring to County of Monterey by
Deed dated September 27, 1924, recorded in Book 47 of Official Records, at Page 95; thence along
boundary of said 0.04 acre parcel of land, following the arc of a circular curve to the left, the center
of which bears North 29° 35' West, 155.0 feet distant, for a distance of 72.0 feet to a point in the
Easterly boundary of said 1.50 acre tract; thence along last named boundary, North 1° 25' East, 90.1
feet; thence leaving said boundary and running North 88° 30' West 54.5 feet to a 1" diameter steel
bar driven flush with the ground, from which the Southwest corner of a garage bears North 1° 00'
West 8.2 feet distant, said bar being in the Westerly boundary of said 1.50 acre tract of land; thence
along last named boundary, South 140.0 feet to the place of beginning.

APN: 133-173-002 (Portion)

<u>Parcel II:</u>

All that portion of the Rancho Bolsa Nueva Y Moro Cojo described as follows:

Commencing at an iron pipe standing where the so called "Poole Line", on the Southwest side of
the Dolan County Road, intersects the Eastern side of the State Highway, Route No. 1, and at the
Northwest corner of that certain 170.95 acre tract conveyed by J.P. Sandholdt, et ux, to the
Permanente Metals Corporation, a corporation, by Deed dated March 6, 1942, recorded March 9,
1942, in Book 758 of Official Records, at Page 221, Monterey County Records; and running thence
along the Westerly side of the Permanente Metals Corporation 170.95 acre tract and the Eastern
side of the State Highway, Route No. 1 with the following described ten courses, distances, and
curvatures:

(1) S. 3° 24' W., 84 feet to station; thence

(2) On the arc of circular curve to the left, the center of which bears S. 86° 36' E., 1960 feet distant, for an arc distance of 389.97 feet, said arc having a central angle of 11° 24' and the long chord of which arc bears S. 2° 18' E., 389.34 feet to station and end of curve; thence tangent with said curve

Legal description — page 2:

(3) S. 8° 0' E., 1044.4 feet to station; thence

(4) On the arc of a circular curve to the right, the center of which bears S. 82° 00' W., 2040 feet distant, for an arc distance of 76.97 feet, to the intersection with the Easterly prolongation of the Southerly boundary of the county road crossing over the Moro Cojo Slough, being also the Easterly prolongation of that certain course and distance described as "N. 84° 45' W., 60 feet" in that certain Deed from J.P. Sandholdt et ux to the County of Monterey, dated October 1, 1930 and recorded October 7, 1930 in Volume 260 of Official Records of Monterey County at Page 480, thence

(5) Along said prolongation, to and along said course and distance and said Southerly boundary of said county road and continuing along said Southerly boundary, N. 84° 45' W., 390 feet, more or less to the intersection of said Southerly boundary with the centerline of said Moro Cojo Slough; thence along said centerline

(6) N. 18° 40' E., crossing said road 30.84 feet, thence

(7) N. 3° 02' W., continuing along said centerline 588.8 feet more or less to the intersection with the boundary line described in that certain Agreement (Arbitrating Ordinary High Water Mark) by and between the State of California, the Moss Landing Harbor District, and J.P. Sandholdt et ux, dated March 25, 1954 and recorded October 21, 1955 in Volume 1653 of Official Records of Monterey County at Page 546, thence leaving said centerline and running along said boundary line,

(8) N. 50° 21' 09" E., 91.89 feet to an angle point thereon, thence

(9) N. 4° 14' W., 915.5 feet more or less to the intersection thereof with said Poole Line, thence along said Poole Line

(10) S. 74° 3', 275.68 feet to the point of beginning

Excepting therefrom, the following:

(A) All that portion thereof lying within said county road,

(B) That certain 0.14 acre tract, conveyed by Irene E. Myers to Thelma May, by Deed dated February 4, 1936, recorded April 24, 1945, in Volume 863 Official Records at Page 480 therein,

Easterly bank of the Moro Cojo Slough South 79° 00' West 1306.80 feet, South 13° 30' West 1254.00 feet, South 65° 30' West 396.00 feet, and North 49° 50' West 1677.53 feet to a point in the Easterly line of the State Highway leading from Watsonville to Castroville; thence on and along the Easterly line of said highway North 4° 12' East 585.78 feet; thence on the arc of a curve to the left, tangent to the last mentioned course, said curve having a radius of 2040 feet and a central angle of 12° 12' a distance of 434.38 feet; thence North 8° 00' West 1044.40 feet; thence on the arc of curve to the right tangent to the last

Order No. 178715-TD

Monterey County Records, California.

(C) The interest of the County of Monterey, and the State of California, in and to that certain 5.06 acre tract, conveyed by J.P. Sandholdt et ux, to the County of Monterey, by conveyance dated October 1, 1930, recorded October 7, 1930, in Volume 260 of Official Records at Page 480 therein, Monterey County Records, California, of and for the sole purpose of a public highway and county road.
Legal description -- page 3:

(D) The interest of the County of Monterey, in and to that certain 0.04 of an acre tract, conveyed by John Gehring to the County of Monterey, by conveyance dated September 27, 1924, recorded October 27, 1924, in Volume 47 of Official Records at Page 95 therein, Monterey County Records, California, of and for sole purposes of a public highway and county road.

(E) The interest of the County of Monterey in and to that certain strip or parcel of land, conveyed by S.N. Laughlin to Monterey County, by conveyance dated May 18, 1886, recorded May 18, 1886, in Volume 11 of Deeds at Page 269 therein, Monterey County Records, California, for the right of way for a county road.

(F) The interest of the County of Monterey, in and to that portion of the Old Ferry Road, lying within the limits of the above described parcel of land, according to Viewers Report, recorded in Supervisors Minutes, in Book A, at Page 438, and dated May 26, 1865.

Also excepting any portion of the land below the ordinary high water mark of Moro Cojo Slough or the Salinas River where it was located prior to any artificial or avulsive changes in the location of the shoreline.

APNs: 133-173-002 (Portion) and 133-173-005

Parcel III:

All that certain real property situate in the County of Monterey, State of California, more particularly described as follows:

Beginning at a point in the Southwesterly line of the county road commonly called Dolan Road, said Southwesterly line also being called the "Poole Line", where said line is intersected by the line dividing the said Parcel XIV as conveyed, to Sandholdt from the lands conveyed to Francis J. Dolan, and designated "Third" in that certain Deed from John P. Dolan, recorded August 18, 1924 in Book 43 of Official Records of Monterey County, California at Page 232 thereof,

Running thence from said point of beginning on and along said dividing line South 27° 00' West 1016.40 feet to a point on the Northerly bank of Moro Cojo Slough, thence along the Northerly and

<u>6TH UPDATED</u>          Order No. 178715-TD

<u>Legal description – page 4:</u>

mentioned course, said curve having a radius of 1960 feet and a central angle of 11° 24' a distance of 389.97 feet; thence North 3° 24' East 84.00 feet to the intersection of the Easterly line of said State Highway with the said Southwesterly line of Dolan Road, or "Poole Line", thence on and along said last mentioned line South 74° 00' East 3942.42 feet to the point of beginning.

"Excepting and reserving any property which may hereafter be acquired by reason of any abandonment of the Old County Road running along, adjacent to and Westerly of the existing State Highway forming the Westerly boundary of the premises conveyed herein", as contained in the Deed from J.P. Sandholt and Katherine K. Sandholt, husband and wife to the Permanente Metals Corporation, a corporation, recorded March 9, 1942 in Volume 758, Page 221, Official Records.

Also excepting therefrom those two parcels conveyed to Kaiser Aluminum and Chemical Sales, Inc., a California corporation by Deed recorded January 20, 1959 in Book 1926, Page 11, Official Records.

Also excepting therefrom the interest of the County of Monterey, a political subdivision of the State of California in and to that portion conveyed by Deed recorded February 4, 1972 in Reel 751, Page 389, Official Records.

Also excepting any portion of the land below the ordinary high water mark of Moro Cojo Slough or the Salinas River where it was located prior to any artificial or avulsive changes in the location of the shoreline.

APN: 133-172-013 (Portion)

<u>Parcel IV:</u>

All that certain real property situate in the County of Monterey, State of California, more particularly described as follows:

Beginning at an iron pipe standing at the Southwest corner of that tract described in Deed from J.P. Sandholdt, et ux, to the Permanente Metals Corporation, a corporation, recorded March 9, 1942, in Book 758, of Official Records at Page 221, Monterey County Records, said iron pipe standing also on the Easterly line of the State Highway Route No. 1, 80 feet wide; thence along the exterior boundaries of said Permanente Metals Corporation tract with the following four courses and distances:

(1) S. 49° 0' E., 1677.53 feet to an iron pipe; thence

(2) N. 65° 30' E., 396 feet to station; thence

A – 284

**6TH UPDATED**        Order No. 178715-TD

Legal description — page 5:

(3) N. 13° 30' E., 1250.09 feet to an iron pipe; thence

(4) N. 79° 0' E., 1238.24 feet to station, from which an old 4 x 4 survey post marked J.F.W.P.2, standing in fence, bears N. 29° 47' E., 69.13 feet distant, and also from which point a concrete monument standing at the Northeast corner of the said tract of the Permanente Metals Corporation, on the Southwesterly side of the Dolan County Road, bears N. 29° 47' E., 1016.4 feet distant; thence leaving the exterior boundaries of the Permanente Metals Corporation tract,

(5) S. 29° 47' W., 430.44 feet to station in the 26th course and distance, as set forth in the description of that certain tract in Judgment to Quiet Title, Action No. 28714, in the Superior Court of the County of Monterey, State of California, entitled Jennie Tate, Plaintiff, vs. the Permanente Metals Corporation, a corporation, et al, Defendants, dated April 12, 1948, recorded April 12, 1948, in Book 1051 of Official Records, at Page 329, Monterey County Records; thence along the exterior boundaries of last mentioned tract down the center of the Moro Cojo Slough, with the following described seven courses and distances:

(6) S. 64° 35' W., 47.51 feet to station; thence

(7) N. 83° 47' W., 813.78 feet to station; thence

(8) S. 16° 18' W., 1297.56 feet to station; thence

(9) S. 44° 18' W., 233.64 feet to station; thence

(10) S. 80° 28' W., 340.56 feet to station; thence

(11) N. 76° 32' W., 412.50 feet to station; thence

(12) N. 30° 22' W., 145.86 feet to station, from which an iron pipe and a 4 x 4 survey post standing near end of fence line on the Southerly bank of the Moro Cojo Slough, bears S. 54° 48' W., 125.96 feet distant; thence leave last mentioned tract and along the Northeastern boundary of that certain tract described under Parcel 11 in the Decree in Suit to Quiet Title, Action No. 10777. In the Superior Court of the County of Monterey, State of California, dated January 15, 1929, recorded January 15, 1929, in Book 174 of Official Records, at Page 474, Monterey County Records, entitled Louis Gomez vs. California Sea Products Co., et al, with the following described two courses and distances, in the center of the Moro Cojo Slough;

(13) N. 30° 31' W., 471.24 feet to station; thence

(14) N. 59° 46' W., 596.01 feet to station on the Eastern line of said State Highway Route

<u>6TH UPDATED</u>          Order No. 178715-TD

No. 1; thence along said Eastern line,

<u>Legal description – page 6:</u>

(15) N. 4° 12' E., 332.31 feet to the place of beginning, being a portion of the Rancho Bolsa Nueva Y Moro Cojo.

Excepting any portion of the land below the ordinary high water mark of Moro Cojo Slough or the Salinas River where it was located prior to any artificial or avulsive changes in the location of the shoreline.

APN: 133-172-013 (Portion)

<u>Parcel V:</u>

Certain real property situate, lying and being in the Rancho Bolsa Nueva y Moro Cojo in the County of Monterey State of California, and being a part of that certain 338.756 acre tract of land (net area) conveyed from Walter Rodriguez, et al to James Rodriguez by deed dated February 14, 1949 and recorded in Volume 1121 of Official Records at page 381, Monterey County Records; said part being particularly described as follows, to-wit:

Beginning at a 4" x 4" post marked "R" "E.G.C." standing at a fence corner at the Northwest corner of said 338.756 acre tract of land and running thence along the Northerly boundary thereof

(1)     S. 82° 40' E., 139.50 feet to a 1 inch diameter iron pipe; thence leave the Northerly boundary of said 338.756 acre tract of land and running

(2)     S. 1° 24' W., 1,617.23 feet to a 1 1/2 inch diameter iron pipe standing in the Northeasterly line of Dolan Road (a county road 40.0 feet wide); thence running along last mentioned road line

(3)     N. 39° 16' W., 198.85 feet to a 1 1/2 inch diameter iron pipe; thence

(4)     N. 82° 44' W., 9.12 feet to a 1 1/2 inch diameter iron pipe standing in the Westerly boundary of said 338.756 acre tract of land; thence leave said Northeasterly line of Dolan Road and running along last mentioned boundary

(5)     N. 1° 15' E., 272.92 feet to a 1 1/2 inch diameter iron pipe; thence

(6)     N. 0° 42' E., 394.77 feet to a 1 1/2 inch diameter iron pipe; thence

(7)     N. 1° 47' E., 812.24 feet to the place of beginning.

**6TH UPDATED**                    Order No. 178715-TD

APN: 131-054-008

<u>6TH UPDATED</u>          Order No. 178715-TD

<u>Legal description -- page 7:</u>

<u>Parcel VI:</u>

An exclusive easement for well lot purposes, over, upon and across the following described tract of land as the same was reserved by National Refractories and Mineral Corporation in Corporation Grant Deed recorded December 31, 1986 in Reel 2046, page 61 and as more clearly set forth in that Agreement of Easement recorded June 23, 1989 in Reel 2379, page 587 and re-recorded May 18th, 1990 in Reel 2510, page 7, Official Records and being more particularly described as follows:

Beginning at the point of intersection of the Northerly line of Dolan Road (a 40 foot wide county road) with the Westerly boundary of the tract of land described as Parcel One in Deed to Carey Tankersley, et ux, recorded December 31, 1986 in Reel 2046, page 61, Official Records and running thence, along said Westerly boundary,

(1)     N. 1° 37' E., 60.0 feet; thence leave said Westerly boundary,

(2)     S. 88° 23' E., 40.0 feet; thence

(3)     S. 1° 37' W., 60.0 feet to said Northerly road line; thence along said road line,

(4)     N. 88° 23' W., 40.0 feet to the place of beginning.

<u>Parcel VII:</u>

A right of way for pipeline purposes over, upon and across a strip of land 15 feet wide, lying along, contiguous to and Northeasterly, Northerly, Westerly, Northerly, Easterly and Northerly from the following described line:

Beginning in the Northeast line of Dolan Road (a county road 40 feet wide) at the Southerly corner of that certain 5.00 acre tract of land shown on Map entitled "Record of Survey" filed October 7, 1952 in Volume 4 of Surveys at page 99, Records of Monterey County, and running thence along the Northeasterly and Northerly lines of Dolan Road as shown on Map entitled, "Record of Survey" filed December 29, 1948 in Volume 4 of Surveys at page 53, Records of said County.

<u>6TH UPDATED</u>          Order No. 178715-TD

<u>Legal description -- page 8:</u>

(1)     South 39° 16' East, 287.99 feet; thence

(2)     South 88° 23' East, 1,769.13 feet to a point from which the Southwest corner of that certain
0.23 acre tract of land described in Deed from James Rodriguez, et ux to Pacific Gas and Electric
Company (a California corporation) dated November 29, 1951 and recorded in Volume 1352 of
Official Records at page 40, Records of said County, bears South 88° 23' East, 50.0 feet distant;
thence leaving said road line and running parallel to the Westerly line of last mentioned tract of land

(3)     North 2° 59' West, 100.0 feet; thence

(4)     South 88° 23' East, 200.0 feet, at 50.0 feet the Northwesterly corner of said 0.23 acre tract
of land, at 150.0 feet the Northeasterly corner of said tract of land, 200.0 feet; thence parallel to the
Easterly line of said tract of land

(5)     South 2° 59' East, 100.0 feet to the Northerly line of said Dolan Road, thence along said
road line

(6)     South 88° 23' East, 1,220.7 feet to a point in the Westerly boundary of the hereinbefore
described Parcel VI.

<u>Parcel VIII:</u>

All that real property in the County of Monterey, State of California, described as follows:

Beginning at the most Easterly corner of that tract described in a Deed from J. P. Sandholdt, et ux,
to the Permanente Metals Corporation, dated March 6, 1942, and recorded March 9, 1942 in Book
758 of Official Records, at page 221, Records of Monterey County, thence S. 66° 44' 03" W. a
distance of 1282.21 feet to a point of beginning of the land to be described as follows:

thence S. 75° 18' 30" E., a distance of 255 feet; thence S. 14° 41' 30" W. a distance of 305 feet;
thence N. 75° 18' 30" W. a distance of 255 feet; thence N. 14° 41' 30" E. a distance of 305 feet to
the place of beginning.

**APN: 133-172-004 (Portion)**

Legal description -- page 9:

Parcel IX:

All that real property in the County of Monterey, State of California, described as follows:

Beginning at the most Easterly corner of that tract described in a Deed from J. P. Sandholdt, et ux, to the Permanente Metals Corporation, dated March 6, 1942 and recorded March 9, 1942 in Book 758 of Official Records, at page 221, Records of Monterey County, thence S. 66° 44' 03" W. a distance of 1282.21 feet to a point of beginning of the land to be described as follows:

thence N. 25° 04' 50" E. a distance of 305 feet; thence N. 78° 07' 36" E. a distance of 223.61 feet; thence S. 22° 10' 42" E., a distance of 125 feet; thence S. 28° 43' 41" W. a distance of 309.23 feet, to the Northeasterly corner of Parcel 3 above; thence along the Northerly boundary of said Parcel 3, N. 75° 18' 30" W., a distance of 255 feet to the point of beginning.

APN: 133-172-004 (Portion)

Parcel X:

Certain real property in a portion of Monterey City Lands, Tract No. 3, Monterey County, California, being a portion of that certain 2.31 acre tract shown on map filed in Volume 15 of Surveys at page 149, Records of said County, more particularly described as follows:

An easement 25 feet wide, lying along, contiguous to and Southerly of the following described line:

Beginning at a ¾" iron pipe tagged LS 3880 in the Northwesterly line of Sandholdt Road, a county road, said point being also the most Southerly corner of the lands of General Fish Company described in Deed recorded in Reel 662 of Official Records at page 973, Records of said County, thence along the Southwesterly boundary thereof

(1)    N. 66° 23' 50" W., 324.74 feet, more or less, at 251.00 feet a 1" pipe tagged LS 3880 at the most Westerly corner of said lands, 324.74 feet, more or less, to a point in the Westerly boundary of said 2.31 acre tract.

PARCEL XI:

A non-exclusive easement for the right to install, maintain, repair and replace such pipeline or lines of initial or other size as it shall from time to time elect, for the conveyance of water to the existing plant at Moss Landing, over and upon a strip of land ten (10) feet in width, the center line of which is particularly described as follows:

A – 290

<u>6TH UPDATED</u>    Order No. 178715-TD

<u>Legal description – page 10:</u>

Commencing at Wellsite No.1, as described in the Agreement between Jennie Tate and The Permanente Metals Corporation, recorded December 21, 1942 in Volume 787 of Official Records at page 65, thence in a direct line North 10 degrees, 33' 30" West 6550 feet, more or less.

Excepting therefrom any portion lying within the lines of Parcels III and IV above described.

<u>Parcel XII:</u>

Non-exclusive easements for wellsites and pipelines as described in the agreements between Mary J. Gomez and The Permanente Metals Corporation, recorded October 28, 1942 in Volume 781 of Official Records at page 101 and between Jennie Tate and The Permanente Metals Corporation recorded December 21, 1942 in Volume 787 of Official Records at page 65.

Excepting therefrom all that portion described in Parcel XI above described.

**Parcel XII hereabove described should be contained on all conveyances, but will not be insured on any Policy of Title Insurance issued by this company, as the exact location of said parcel is not disclosed of record.**

<u>Parcel XIII:</u>

A non-exclusive easement for the purpose of trenching, installing, constructing, maintaining and removing a subterranean outfall line as established by a Grant of Easement executed by Moss Landing Harbor District to Kaiser Aluminum and Chemical Corporation, recorded August 17, 1972 in Reel 791 of Official Records at page 843. An extension and continuation of said easement is disclosed by an unrecorded "Grant of Easement (Outfall Line)" executed by Moss Landing Harbor District.

**Parcel XIII hereabove described should be contained on all conveyances, but will not be insured on any Policy of Title Insurance issued by this Company, as the exact location of said parcel is not disclosed of record.**

**Schedule 1-B**

(Improvements, Materials and Equipment)

S-4

62539.3

**Schedule 1-B**
**(Improvements, Materials and Equipment)**

C:\NATIONAL\Asset Landing\schedules list Dec.2001.wpd

KAISER MAGNESIA PLANT

MOSS LANDING, CA

*EQUIP. SALES LISTING*

STRUCTURES

&

LAND IMPROVEMENTS

-114-

## STRUCTURES

| Qty. | Description |
|---|---|
| 1 | Group of structures consisting of: paint shop, wd fab, 1,000 sf carpenter shop, mtl fab, 2,000 sf machine shop, mtl fab, 2,000 sf electrical shop, mtl fab, 3,000 sf storage/off, wd fab, 2,000 sf storage/off, wd fab, 2,000 sf substation, conc. fab filter bldg, mtl fab, 5,000 sf storage, mtl fab, 8,000 sf storage, mtl fab, 4,000 sf mfg HPPF, mtl fab, 5,000 sf mfg APF, mtl fab, 6,000 sf mfg Filter, mtl fab, 5,000 sf mfg Kiln, mtl/conc, 1,000 sf mfg Burner, mtl fab, 6,000 sf office, wd fab, 6,000 sf including foundations, supports, interior metal walks, lighting, etc. |
| 1 | Group of yard improvements consisting of paving, railroad track, fencing |

-115-

A – 295

KAISER MAGNESIA PLANT

MOSS LANDING, CA

EQUIPMENT

LISTING

-116-

EQUIPMENT LISTING

| Qty. | Description |
|------|-------------|

Intake water system consisting of:
1 – Pier, reinforced concrete including
    piling and equipment shelters
8 – Pumps, Peerless, Size 20 EXP, 4000
    GPM, 100 HP w/electrical controls
1 – Pipe, infeed line, 2-300 yd. 30".
    diameter steel and wood including
    saddles, supports, trenching

Hydrotreater system consisting of:
3 – concrete tanks, 2,300,000 gallons,
    w/agitators, thickener rakes and
    hydrotractor including piping and
    electrical controls

-117-

A – 297

| Qty. | Description |
|---|---|

Stripping tower system consisting of:
2 - Cooling tower structures, wood
4 - Pumps, Johnson, 3000 GPM, 60 HP
1 - Pump, DurPion, 6000 GPM, 75 HP
2 - Pumps, Peerless, 500 GPM, 100 HP
4 - Acid tank, 12' diameter x 45'
1 - Air compressor
3 - Acid pumps
including piping and electrical
controls

Reactor system consisting of
4 - Tanks, 25,000 gallon capacity,
2 - Tanks, 510,000 gallon capacity
1 - Tank, 350,000 gallon capacity, w/
4 -
20 - Pumps, 5 to 40 HP w/gear, including
piping and electrical controls

Thickener system consisting of
7 - Tanks, 1,050,200 gallon capacity
1 - Tank, 233,000 gallon capacity
40 - Pumps, w/2 to 25 HP motors
including gear drives, piping and
electrical controls

Calcined dolomite feed system consisting
of
1 - Dolomite bin, 500 ton
1 - Dolomite bin, 350 ton, including
material handling
7 - Belt conveyors, w/controls
8 - Screw conveyors, w/controls
5 - Bucket elevators, w/controls
1 - Dolomite bin, 700 ton, including
hangers, supports and electrical controls

A – 298

Qty.                          Description

Fresh water system consisting of
1 - Pipe, 10", approx. 3 miles
1 - Pump, Peerless, 50 HP, 900 GPH
1 - Pump, Peerless, 100 HP, 2000 GPH
2 - Tanks, concrete, approx. 100,000
      gallons
1 - Pump, Peerless, 20 HP
20- Pumps, process, ⅛ to 30 HP
2 - Pumps, seawater, 12x12x30, 125 HP
including piping, electrical controls

Vacuum filter system consisting of
4 8 - Filters, United Oliver, 14' dia.
      x 18'
2 - Compressors, Ingersoll-Rand, 150
      HP
15- Pumps, 2 to 20 HP
3 - Tanks, concrete, 12' diameter x
      50'
including piping, electrical controls

Process air consisting of
 3 - Air compressors, Ingersoll-Rand,
      Type ES-1, 75 HP
1 - Air compressor, Ingersoll-Rand,
      Type 12X9 ESV, 100 HP
1 - Air compressor, Ingersoll-Rand,
      Type 14X11 ESV-1, 125 HP
including tank controls, piping and
electricals

Pressure filter system and cake
transfer consisting of                    KF"
2 - Leaf presses, Ingersoll-Rand,
      50 leaf, md 1500
2 - Compressors, Worthington, 75 HP
20 - Pumps and mixers, 1 to 20 HP
3 - Pumps, Krough, 125 HP
10 - Belt conveyors, 1 to 7½ HP
3 - Live bottom bins w/6 - 25 HP
      motors
including structure supports, electrical
and controls

-119-

| Qty. | Description |
|------|-------------|

Additive system for kiln 1, 2, 3,
consisting of                                    1FM1
12 - bins, 50 ton
 1 - bin, 550 ton
67 - bucket elevators, 2 to 10 HP
 6 - belt conveyors, 1 to 5 HP
13 - screw conveyors, 2 to 15 HP
 1 - Pump, Consolidated Fluid Flo
 1 - Compressor, Ingersoll-Rand, 40 HP
 1 - Crusher, Rolls M-8, w/2 - 20 HP
     motors

RFD-663       1 - ball mill, Hardinge, 4x10, 150 HP
SCRAP 1981 ─── 1 - ball mill, Patterson, 5x10, 100 HP
Including steel supports, concrete
foundation, piping, electrical controls

Kiln #1 consisting of
 1 - Kiln, El Smidth w/Coon controls,
     9' dia. x 202' long and burner
     including Unax coolers, 40 HP motor,
     Pacific reducer, Buffalo fan, 200 HP,
     Peabody scrubber system
 1 - Screen, Seco, 2x4'
 1 - Crusher, Allis Chalmers, 40 HP
 2 - Screw conveyors, 10 and 15 HP
 2 - Bucket elevators, 15 and 20 HP
 1 - Storage bin, 30 ton
 1 - Storage bin, 120 ton
 1 - Storage bin, 1050 ton
 1 - Auxiliary engine, Ford, Model 300 GF
including electrical controls, foundation
and supports

-120-

A – 300

| Qty. | Description |
|---|---|

Kiln #2 consisting of
1 - Extruder, Bonnot Greyhound, 125 HP
1 - Kiln, Traylor Engineering, 9'6"
      diameter x 250' long, including 75
      HP drive, reducer, 250 HP motor fan,
      scrubber, filter, cooler, 30 HP
      motor
1 - Auxiliary engine
1 - Screen, Seco, 2x6'
1 - Crusher, Allis Chalmers
4 - Bucket elevators, 7½ to 10 HP
2 - Belt conveyors, 2 to 5 HP
3 - Screw conveyors, 7½ to 20 HP
4 - Bins, 550 ton
2 - Bins, 60 ton
1 - Bin, 1000 ton
including steel supports, concrete
foundations, Coen controls and electricals

Kiln #3 consisting of
1 - Pug mill, J.C. Steele, Model E,
      5 HP
1 - Kiln, F.L. Smidth, 10' diameter x
      235' long including coen controls,
      Pillard burner, Onax cooler,
      reducer w/60 HP motor, 250 HP fan,
      scrubber w/filter
1 - Screw conveyor, 15 HP
1 - Screen
3 - Bucket elevators, 7 to 10 HP
3 - Belt conveyors, 1 HP
2 - Bins, 60 ton
1 - Bin, 125 ton
2 - Bins, 1100 tons
1 - Cooling fan, 100 HP
including steel supports, concrete
foundation and electricals

−121−

A − 301

| Qty. | Description |
| --- | --- |

Boilers and oil system, consisting of
1 – Ocean shore booster, 75 HP x 120 lb.
1 – Boiler, Cleaver Brooks, Model CB-400-80, 3,347,000 BTU, w/ deaerator, heat exchanger, 6 oil pumps, 10 to 30 HP
1 – Oil storage tank, 270,000 gallons
including concrete foundations, piping and controls

Emergency generator system consisting of
1 – Marathon Electric Magna, Model 360, 85 KW
1 – Electro Nation, Model 250, 200 KW
1 – Onan Electric, Model 160WE, 150 KW
including silencer, stand, cooling systems, controls and electrical

Kiln #4 consisting of
1 – Hearth furnace, Bartlett Snow Pacific, 10 hearth, 18' diameter x 36" furnace
1 – Pug mill, 10 HP
1 – Electrostatic precipitator
1 – Pulverizer, 30 HP
1 – Fan, 15 HP
1 – Blower, 30 HP
2 – Bucket elevators, 5 HP
7 – Screw conveyors, 3 to 10 HP
1 – Bag packer, Durant, Model 100 E
1 – Bin, 10 ton
3 – Bins, 25 ton
including steel supports, concrete foundations, electrical controls

-122-

| Qty. | Description |
|---|---|

Kiln #5 consisting of

RFD-665

1 - Kiln, Kennedy, 6' diameter x 90'
     long including drive, cooler, 5'
     diameter x 45' long, fan, 60 HP
     motor

PELLET PRESS REMOVED <5/52    2 - Pellet presses w/100 HP motor
PELLET PRESS SOLD LATE 1997?

2 - Bucket elevators, 5 HP
1 - Pug mill, 20 HP motor
1 - Scrubber, w/2 pumps, 10 HP
1 - Bin, 60 ton
3 - Bins, 50 ton
4 - Bucket elevators, 5 to 15 HP
3 - Belt conveyors, 2 to 3 HP
including steel supports, concrete
foundations, electrical controls

Kiln #6 consisting of
1 - Vacuum filter, Dorr Oliver,
    14x14' including
    5 - pumps, 10 HP
    1 - screw conveyor
    1 - vacuum pump, 50 HP
1 - Kiln, Bartlett Snow Pacific, 10'
    hearth, 18' diameter x 36" furnace
    including
    1 - rake and drive, 10 HP
    2 - blowers, 25 HP
    1 - pug mill, 20 HP
    1 - electrostatic precipitator
    1 - fan, 30 HP
1 - Pulverizer, 40 HP
4 - bins, 35 ton
1 - bin, 5 ton
3 - bucket elevators, 5 HP
10- screw conveyors, 3 to 8 HP
8 - pumps, 7 to 20 HP
1 - bag packer
including steel supports, concrete
foundation, electrical controls

| Qty. | Description |
|------|-------------|

High purity briquette circuit,
3 - presses, 75 HP
1 - mixer, 30 HP
9 - screw conveyors, 2 to 10 HP
3 - bucket elevators, 5 to 7½ HP
8 - feeders, 2 to 10 HP
including steel supports, concrete
foundation, electrical controls

Kilns #7 and #8, consisting of
4 - blowers, 50 HP motor
1 - Fan, 75 HP motor
2 - Kilns, shaft type, shop fab.,
    40 ton/day
1 - scrubber, w/2 pumps, 10 hp
1 - scrubber, shop fabricated
6 - pumps, 5 to 10 HP
2 - screens, vibrating, 2x4'
2 - bucket elevators, 7½ HP
3 - feeders
8 - screw conveyors, 2 to 7½ HP
2 - bins, 130 ton
1 - bin, 10 ton
including steel supports, concrete
foundation, electrical controls

1    Dust collector system consisting of
     5 - Wheelabrators
    22 - D.C.E. Vokes
     1 - Dracco
     1 - Reese
     1 - Micro-Pulse
     2 - Dynaclone
     3 - Fuller
     2 - Mikropul
     1 - Flex-Clean
     2 - Norblo
     3 - Enelco
     1 - Inviro-Elem.
including bin, steel supports, ducting,
fan w/motor, electricals, installed

-124-

A - 304

CRC ADMINISTRATION → 415 362 2392                    NO.663    P14
4 NRMC MOSS LANDING CA 408 63.    487                    P. 13

| Qty. | Description |
|------|-------------|
| 1 | Electrical system consisting of |

    10 - Transformers,
       3 - 2000 KVA
       2 - 1150 KVA
       4 - 1288 KVA
       1 - 1000 KVA
    1 - Capacitor bank, 2400 KVAR
    2 - Main breakers, primary vacuum
       type
    21 - Fuse load interruptor switches
    17 - 600 amp power breakers
    41 - 800 amp power breakers
    6 - 1600 amp power breakers
    16 - 600 amp molder case breakers
    1 - 500 HP starter, 2400 volt
    1 - 250 HP starter, 2400 volt
    1 - 480 volt motor control center,
       112 connected, 14,652 connected
       KVA, 695 A @ 12,000 volts, 3
       phase, 60 HZ, 17,383 A @ 480
       volts, 3 phase, 60 HZ

-125-

KAISER REFRACTORY

MOSS LANDING, CA.

STRUCTURES

&

LAND IMPROVEMENTS

~128~

A – 306

STRUCTURES

| Qty. | Description |
|---|---|
| 1 | Batching, grinding and sacking building No. 1, 225x110' steel frame metal clad, 24,750 sq.ft. gross area |
| 1 | No. 1 kiln building No. 2, 380x70' steel frame metal clad, 26,600 sq. ft. gross area |
| 1 | Warehouse building No. 3, 170x120' steel frame metal clad, 20,400 sq. ft. gross area |
| 1 | Tunnel dryer building No. 4, 210x55' steel frame metal clad, 11,550 sq. ft. gross area |
| 1 | Press/cladding building No. 5, 380x65' steel frame metal clad, 24,700 sq. ft. gross area |
| 1 | Loading dock, laboratory and lunch room building No. 6, 320x40' steel frame metal clad, 12,800 sq. ft. gross area |
| 1 | Lubrication building No. 7, 50x15', 40x15' and 10x10' steel frame metal clad, 1,450 sq. ft. gross area |
| 1 | North warehouse building No. 8, 260x80' steel frame metal clad, 20,800 sq. ft. gross area |
| 1 | High fire kiln building No. 9, 420x80' steel frame metal clad, 33,600 sq. ft. gross area |

A – 307

| Qty. | Description |
|------|-------------|
| 1 | Maintenance/castables building No. 10, 240x70' steel frame metal clad, 16,800 sq. ft. gross area |
| 1 | Specialty products building No. 11, 160x70' steel frame metal clad, 11,200 sq. ft. gross area |
| 1 | Bulk storage building No. 12, 190x70' steel frame metal clad, 13,300 sq. ft. gross area |
| 1 | Kaiser warehouse building No. 13, 100x70' steel frame metal clad, 7,000 sq. ft. gross area |
| 1 | DB80 storage building No. 14, 70x40' steel frame metal clad, 2,800 sq. ft. gross area |
| 1 | Brick shelter building No. 15, 150x75' pole construction, 11,250 sq. ft. gross area |
| 1 | Brick plant office building No. 16, 55x25' and 50x15' wood frame, 2,125 sq. ft. gross area |
| 1 | Item, miscellaneous construction including masonry power distribution equipment building and wood frame carpentry shop |

-130-

LAND IMPROVEMENTS

| QTY. | Description |
|------|-------------|
| 1. | Item, land improvements including asphalt/concrete paved parking areas, roads and storage pads, railroad siding, site lighting and storm drains |

-151-

KAISER REFRACTORY

MOSS LANDING, CA

EQUIPMENT

LISTING

—132—

EQUIPMENT LISTING

| Qty. | Description |
|------|-------------|
| 1 | Primary jaw crusher, Pacific, size 15x38, Type 61, 80-95 tons/hr., 60 HP motor drive |
| 1 | Group, unloading and primary crushing minor equipment including track hopper and 2 belt conveyors |
| 1 | Chrome dryer, Ruggles-Coles, est., 5' x 50' natural gas-fired rotary drum type, 10-12 tons/hr., 25 HP Gearmotor drive |
| 1 | Chrome roll crusher, Colorado Iron Works, size 14x27, 1-1½ tons/hr., 25 HP motor drive |

*I BEST COPY* FOR FILED RFD-666

-133-

A - 311

| Qty. | Description |
|---|---|
| 1 | Group, primary drying minor equipment including dryer feed hopper, 2 bucket elevators, dust collector, truck surge storage bin, chrome storage bin - 145 cu. ft. capacity and chrome bin - 118 cu. ft. capacity |
| 1 | ~~Periclase sand roll, Chambers Bros., size 16x30, 7 tons/hr., 40 HP motor drive~~ |
| 1 | Chrome hummer screen, Tyler, Type 38, 4x8' single surface, 18 tons/hr. |
| 1 | Chrome hummer screen, Tyler, Type 38, 3x10' three surface, 20-35 tons/hr. |
| 1 | Periclase hummer screen, Tyler, Type 38, 3x10' three surface, 20-35 tons/hr. |
| 1 | Periclase hummer screen, Tyler, Type 38, 3x10' two surface, 20-25 tons/hr. |
| 1 | Group, screening-brick minor equipment including truck hopper, 28 chrome/periclase batch storage bins/tanks - 27,367 cu. ft. capacity, 4 belt conveyors, screw conveyor, 3 Hardinge feeders, hoist, & dust collectors and 3 bucket elevators |
| 1 | Ball mill, Allis-Chalmers, 15x6' shell, 4.8 tons/hr., 250 HP motor drive, 25 RPM |
| 1 | Ball mill, Marcy, 6x5' shell, 1 - 2 tons/hr., 60 HP motor drive, 30 RPM |
| 1 | Ball mill, Hardy, 12x5.5' shell, 2 - 3 tons/hr., 150 HP motor drive, 24 RPM |

TO CALA

11/19/ *SNC TPL W/ MOTOR* *SOLD TO CHEMLIME*

*2 CHP STORAGE* *SOLD TO CHEMLIME* 11/03 - 12941

-134-

A - 312

| Qty. | Description |
|------|-------------|
| 1 | Ball mill, Traylor, 26x7' shell, 8 tons/hr., 500 HP motor drive, 20 RPM |
| 1 | Group, ball milling minor equipment, including 7 belt conveyors, 6 screw conveyors, 3 air pad conveyors, 5 feed tanks - 2,875 cu. ft. capacity, 3 hoists, 7 dust collectors and 5 bucket elevators |
| 2 | Muller mixers, Simpson style UD, Type 3, 7½ HP Gearmotor drive, 20 RPM |
| 1 | Group, batch and mix-brick minor equipment including suspended feed hopper - 90-100 cu. ft. capacity w/ Fairbanks-Morse 8 ton hopper scale, 2 belt conveyors, flow bin stand, bucket elevator, 2 skip hoists and bond elevator |
| 4 | Brick presses, International Clay Machinery Co., 1000 ton air clutch toggle action type, 8 cycles/min., 4,200 brick/shift with two-mold setup and 2,200 brick/shift with one-mold setup |
| 1 | Tunnel dryer, Ferro-Allied, 17½' x 54'9" x 8' 3 compartment natural gas fired, 13 cars/compartment capacity including circulation and combustion blowers |
| 1 | Group, brick pressing and drying minor equipment including 3 belt conveyors, brick drying cars, 4 press batt crushers, 4 press belt feeders and 4 brick weighing press scales |

-135-

A – 313

| Qty. | Description |
|------|-------------|
| 1 | Group, brick pressing mold/die room minor equipment including etcher, 3 double end grinders, 2 surface grinders, welder, power hacksaw, 2 drills, punch press, oven and die room hoists |
| 1 | Crusher, Traylor, Type TY, 3' short head, 40-45 tons/hr., 100 HP motor drive |
| 2 | Crushers, Symons, Type 2'1'2C, 2' short head, 25-30 tons/hr., 40 HP motor drive |
| 1 | Screen, Symons, Type F, 4' x 10' four surface, 10 HP Gearmotor drive |
| 1 | Group, raw materials, primary and secondary crushing minor equipment including 9 belt conveyors, 3 truck hoppers, 9 dust collectors and 4 bucket elevators |
| 1 | Screen, Symons, Type F, 4' x 10', two surface, 7½ HP Gearmotor drive |
| 1 | Hummer screen, Tyler, Type 38, 4' x 10', three surface w/V-50 vibrator |
| 1 | Hummer screen, Tyler, Type 38, 4' x 10', two surface, w/V-50 vibrator |
| 1 | Roll crusher, Chambers Bros., size 16x30, 7 tons/hr., 40 HP motor drive |
| 1 | Crusher, Symons, Type 2112C, 2' short head, 25-30 tons/hr., 30 HP motor drive |

Handwritten annotations: "No. 674 TO ZEBRIWSKI", "RFD-612 TO ZEBROWSKI"

-136-

A - 314

| Qty. | Description |
|---|---|
| 1 | Group, screening – sack minor equipment including air separator, truck loadout, 6 belt conveyors, 3 screw conveyors, 20 storage bins – 500 tons capacity, 8 dust collectors and 5 bucket elevators |
| 1 | Group, batch and mix – sack minor equipment including weigh hopper, bond station, Modicon batching controller, screw conveyor, 2 bucket elevators, dust collector, 2 surge tanks – 260 cu. ft. capacity and Sturtevant size 9 blender, 150 cu. ft. mixing capacity, 25 HP Gearmotor drive |
| 1 | Group, sacking – N.S.F. minor equipment including scalping screen, sacker surge bin – 120 cu. ft. capacity with live bottom, carton surge bin – 88 cu. ft. capacity, dust collector, 2 belt conveyors, 2 screw conveyors, bucket elevator and sacker |
| 1 | Tunnel kiln #1, Ferro-Allied, 8x170x8' refractory construction, natural gas fired, low fire – 2600-2800 degrees F., 30 tons/day capacity |
| 1 | Tunnel kiln #2, Ferro-Allied, 10x190x8' refractory construction, natural gas fired, low/high fire – 2600/2800-3200/3400 degrees F., 60 tons/day, low fire, 50 tons/day high fire |
| 1 | Tunnel kiln #3, Ferro-Allied, 12½x335x8' refractory construction, natural gas fired, low/high fire – 2600/2800 – 3200/3400 degrees F., 120 tons/day low fire, 81 tons/day high fire |

-137-

A – 315

| Qty. | Description |
|------|-------------|
| 1 | Group, brick finishing/packaging minor equipment including Christensen brick grinder, brick drill, 2 Felker abrasive cutoff saws, 2j S4-Man masonry saw, OSI shrink wrap tunnel, Interlake wire stitcher and band strapper and Stanley compression sealer |
| 1 | Group, castables minor equipment including 2 flow bin stands w/vibrators, 2 Simpson muller mixers, 1 Cleveland muller mixer, 3 castables forming presses, 2 dust collectors, curing oven and vibrating table |
| 1 | Crusher, Chambers Bros., size 16x30, 7 tons/hr., 40 HP motor drive |
| 1 | Group, special products minor equipment including truck hopper, belt conveyor, 6 storage bins - 50 tons capacity, bucket elevator, 3 dust collectors, 2 Denver 5x5 ball mills, tumbler mixer, batching station with 8 fraction bins/scales and bond station, Symons 3' x 10' three surface vibrating screen, 3 Dyno 42" circular vibratory screens, drum filler with scale and 2 pressure flow packers |
| 1 | Group, metal case minor equipment including Rousselle No. 2G press, Cincinnati No. 1006R shear, D&K No. 46-8 press brake, 2 double dimplers, Federal 54 ton press, Warco 60 ton press, D&K No. 136 press brake, Weldtronic welder, Bliss No. 21½ press, Minster 60 ton press, glue applicator, Kenco 1½ ton press and Acmo spotwelder |

-138-

| Qty. | Description |
|---|---|
| 1 | Group, maintenance minor equipment including ~~1 boll-house jib crane,~~ Graymills parts washer, ~~Warrison lathe, Manley shop press, Solberga drill, Walker-Turner drill,~~ Wilton ~~drill, Rockwell tool saw, Dill grinder,~~ Lincoln 250 amp mg welders, 2 Ridgid 535 pipe threaders, ~~Hercules shop crane, Dayton drill, Phoenix rod drying oven,~~ Queen City grinder, 2 Lincoln 400 amp stat. welders, Fabtek 600# mobile maintenance platform, Lincoln 200 amp gasoline engine driven welder and Miller 200 amp gasoline engine driven welder |
| 1 | Group, mobile equipment including ~~Caterpillar Model 930 Diesel engine driven front end loader, 10 Hyster 9,000# propane engine driven fork lifts, 2 Clark 2,000# propane pusher tractors, 3 Chevrolet C-10 pickup trucks, 3 Chevrolet C-60 dump trucks and~~ Tennant Model 280 propane engine driven sweeper |
| 1 | Item, plant compressed air system including 2 Ingersoll-Rand 100 HP horizontal reciprocating air compressors, 1 Ingersoll-Rand 125 HP rotary screw air compressor, 2 Ingersoll-Rand 40 HP two stage air compressors, Wilkerson Model A12 air dryer, Wilkerson Model A15 air dryer, 5 air receivers, pipe, fittings, valves and miscellaneous specialties with an allowance for hangers and supports |

| Qty. | Description |
|------|-------------|
| 1 | Item, power feed wiring including motor control centers, power panels, transformers, conduit, fittings, wire and other miscellaneous specialties required to provide electrical service for the operation of production machinery and equipment |
| 1 | Item, general plant equipment including shop furniture, racks, shelving, fire extinguishers, hand trucks, hand tools, laboratory equipment and other miscellaneous minor equipment |
| 1 | Item, brick press dies/molds |
| 1 | Item, office furniture and equipment |

-140-

A – 318

KAISER REFRACTORY

MOSS LANDING, CA

VEHICLES

EQUIP. LIST.

## MOBILE EQUIPMENT LIST NOV. 1999

| EQUIP. # | | CONDITION |
|---|---|---|
| 0.005 | M.F. FRONT END LOADER (1985) ( MODEL M.F.50E ) (S/N 810340287) | GOOD |
| 0.006 | CHEV. PICKUP (1985) ( MODEL SER. 10 ) (S/N 1GCDC14FTGJ177139) (LICENSE #2W33470) | JUNK |
| 0.008 | CHEV. PICKUP (1987) ( MODEL SER. 10 ) (S/N 1GCER14H3HJ106465) (LICENSE #2X09154) | POOR |
| 0.017 | DODGE PICKUP (1992) (MODEL 131WB) S/N 1B7JE2822N5585008) (LICENSE #4M13501) | POOR |
| 114 | RAYMOND ELECT. FORKLIFT(1974)(MODEL W2RTN-42-33-15D-6)(S/N 851-M2 RTN-851) | JUNK |
| 120 | DIESEL HIVAC SUPER SUCKER(1982)(MODEL 2500)(S/N HV-1084-2500) | POOR |
| 301 | TENNANT SWEEPER (1985)(MODEL 965E)(S/N SE2836)X BRICK PLANT) | GOOD |
| 312 | HYSTER ELECT. FORKLIFT (1989)(MODEL N40CR)(S/N B13HU02267-D) | GOOD |
| 316 | TENNANT SWEEPER (1987)(MODEL 965E)(S/N SE3340)(MAG. PLANT) | GOOD |
| 324 | HYSTER FORKLIFT (1983)(MODEL H50J)(S/N F003D01986C) | GOOD |
| 330 | HYSTER FORKLIFT (1981)(MODEL S50E)(S/N D002D09861B) | GOOD |
| 331 | HYSTER FORKLIFT (1988)(MODEL H80XLS)(S/N F005A07576J) | GOOD |
| 333 | MANLIFT-FABTEK(1982)(MODEL T-50)(S/N 6200) | GOOD |
| 343 | MICH. LOADER&RR-CAR MOVER(1988)(MODEL L70VME)(S/N 60417) | GOOD |
| 369 | FORD PICKUP(1987)(MODEL F100)(S/N 1FTEF15N8JPA33529)(LICENSE #3K38190) | JUNK |
| 375 | INTL. DUMP TRUCK(1989)(MODEL IHG)(S/N 1HTLD25P5KH655808)(LICENSE #3U80533) | FAIR |
| 376 | CHEV. PICKUP (1989)(MODEL C-10)... | JUNK |
| 378 | CHEV. PICKUP (1989)(MODEL C-10)(S/N 1GCDC14Z2KR113979)(LICENSE #3U52349) | GOOD |
| 385 | CHEV. BOOM TRUCK(1975)(MODEL C-60)(S/N CCS565147165887)(LICENSE #Z19035) | POOR |
| 397 | HYSTER FORKLIFT(1989)(MODEL H-80XLS)(S/N F005-D01814K) | GOOD |
| 699 | I.R. PORTABLE AIR COMPRESSOR(1975)(MODEL P-175)(S/N 1049487?8919) | JUNK |
| ? | I.R. PORTABLE AIR COMPRESSOR(1997)(MODEL P-185FWJD)(S/N 280480UHH221) | EXCELLENT |
| ? | ELECT. HIVAC(1978)(MODEL 230)(S/N HV631) | FAIR |

_(handwritten annotations: "Low Boy", "Hard Tick", "V-6", "Dualy", "Here")_



2/15/00

Joe & Rob—
Please verify below for the mortgage. Fax back

Thanks 2-16-00
Joe Tyler
2 pgs.

NATIONAL REFRACTORIES HOLDING CO.

AUTO SCHEDULE AS OF MARCH 31, 2000.

| DRIVER | DESCRIPTION | VEHICLE ID# | GARAGED CITY | STATE |
|--------|-------------|-------------|--------------|-------|
| PLANT | 1987 CHEVROLET GSR 10 | 1GCER14H3HU104485 | MOSS LANDING | CA |
| PLANT | 1985 M/C DUMP TRUCK | 402225 | MOSS LANDING | CA |
| PLANT | 1946 FORD F150 | 1FTEF15N3JPA5506H | MOSS LANDING | CA |
| PLANT | 1980 CHEVROLET G10/COC/(K2.5.G | 913979 | MOSS LANDING | CA |
| PLANT | 1988 HG DUMP TRUCK | 1HTLDZ6F0XH060088 | MOSS LANDING | CA |
| POOL | 1981 GMC/CHEVROLET SIERRA | 1GSAJ54K4M0000762 | MOSS LANDING | CA |
| PLANT | 1992 DODGE RAM D250 | 1B7JE26Z1N5063965 | MOSS LANDING | CA |

n. monterey sales office

2-16-00 correct equip (vehicle) list

Exc is current

# Schedule 1-C

## (Permits)

NPDES

Use permit (related to zoning)

weigh masters scale list

See also the attached list of air permits

# Current Moss Landing Air Permits

| Permit No. | Equipment |
|---|---|
| **Brick Plant** | |
| 3321 | Primary periclase receiving hopper #4 |
| 3322 | Primary periclase receiving hopper #5 |
| 3323 | Primary periclase receiving hopper #13 |
| 3326 | Secondary chrome circuit |
| 3327 | Secondary periclase, crushing, screening & storage |
| 3328 | Secondary periclase - roll crusher |
| 3329 | Secondary periclase - Mary Mill |
| 3331 | Secondary periclase - Hendy Mill |
| 3332 | Allis chalmer ball mill, conveying & storage |
| 3334 | Sacking facility |
| 3335 | Tunnel dryer |
| 3336 | Tunnel kiln #1 |
| 3337 | Tunnel kiln #2 |
| 3338 | Tunnel kiln #3 |
| 3339 | Refractory packaging shrink film oven |
| 3342 | Special products plant |
| 3343 | Special products facility - screening & sacking |
| 3344 | Special products facility - crushing, storage & loadout |
| 3346 | Chrome ore truck loadout & dust collection system |
| 3347 | Bulk storage area dust containment barrier |
| 4019 | Simpson 2F mixer |
| 4202 | Primary chrome receiving hopper #3, conveying facility |
| 4983 | Reject brick crushing, conveying & storage |
| 4986 | Castable dryer |
| 5410 | Secondary periclase - traylor mill |
| 6435 | Chrome ore/magnesia periclase receiving, conveying, drying & truck loadout |
| 6792 | Hopper truck unloading system |
| | |
| **Magnesia Plant** | |
| 3281 | Kiln #1 product loadout |
| 3282 | Kiln 2 & 3 additive receiving & storage |
| 3284 | Celite receiving & storage |
| 3285 | Reject periclase crushing & handling facility |
| 3286 | Chrome ball mill conveying & grinding & d/c 28 |
| 3287 | Kiln #2 feed additives system |
| 3288 | Kiln #3 feed additives system |
| 3290 | Kiln #2 product conveying & storage |
| 3291 | Kiln #2 product conveying & loadout |
| 3293 | Kiln #3 conveying, crushing, screening & storage |
| 3294 | Kiln #3 conveying & loadout |
| 3297 | Kiln #4 conveying, sacking & railcar loadout |
| 3298 | Kiln #5 advanced product facility briquetting circuit |
| 3299 | Kiln #5 |
| 3300 | Kiln #5 conveying & loadout |
| 3302 | Kiln #6 product conveying and storage |
| 3303 | Kiln #6 railcar & truck loadout |
| 3304 | Kiln #7 high purity periclase briquetting circuit |
| 3307 | Product shipping |
| 3308 | Ocean shore boiler |
| 3309 | Cleaver brooks boiler |

Page No. 1

A – 323

# Current Moss Landing Air Permits

| Permit No. | Equipment |
|---|---|
| 3312 | Paint spray booth |
| 3317 | Kiln #1 product conveying, sizing, storage, & loadout |
| 3318 | Kiln #6 lightburn convey, storage, & sacking facility |
| 3403 | Bin #500 loadout |
| 4467 | Railcar unloading to kiln #4 storage bins |
| 5060 | Kiln #6 hearth furnace |
| 5765 | Kiln #2 |
| 5930 | Celite premix facility & dust collection system (DC 19) |
| 6885 | Abrasive blasting equipment #1 |
| 6886 | Abrasive blasting equipment #2 |
| 7046 | Dolomite receiving and slaking |
| 7390 | Kiln #1 prilled magnesia storage, sacking, and loadout |
| 7494 | Additives storage facility and dust collection system |
| 7614 | Kiln #4 product tote sack loadout system |
| 8526 | Emergency I.C. diesel engine-generator set (auxiliary #3) |
| 9431 | Kiln #4 storage |
| 9698 | Gasoline dispensing facility (1) |
| 10651 | Kiln #1 |
| 10652 | Kiln #3 |
| 10653 | Kiln #4 |

## Schedule 4

(Allocation of purchase price)


Real Property                        _____%


Personal Property                    _____%


Businesses                           _____%


S-6

62539.3

A – 325

**Schedule 6**

(Material contracts, agreements, leases, licenses)

1.      Communications Site Lease Agreement, dated December 6, 1995, by and between Pacific Bell Mobile Services and National Refractories & Minerals Corporation, pursuant to which Pacific Bell has located telecommunications transmission/reception equipment on the Real Property, as amended by the First Amendment to Communications Site Lease Agreement effective June 20, 2003.

2.      Cell Site Lease, dated July 11, 1996, by and between Salinas Cellular Telephone Company and National Refractories & Minerals Corporation, pursuant to which Salinas Cellular Telephone Company dba Cellular One has located telecommunications transmission/reception equipment on the Real Property.

3.      Option and Lease Agreement for Telecommunications Site, Dated:_____ ___, 2000 by and between GTE Mobilnet of California and National Refractories & Minerals Corporation, pursuant to which GTE Mobilnet has located telecommunications transmission/reception equipment on the Real Property.

4.      License Agreement, dated September 18, 2000, by and between Verizon Wireless and Salinas Cellular Telephone Company dba Cellular One, pursuant to which Cellular One has granted a license to Verizon Wireless for the location of telecommunications transmission/reception equipment on the Real Property, such license consented to by National Refractories & Minerals Corporation, the lessor of the subject Real Property, a portion of which is sublet to Cingular Wireless per letter dated July 17, 2003 from AT&T Wireless Services.

5.      Option and License Agreement for Telecommunications Site, dated February 28, 2001, by and between National Refractories & Minerals Corporation and Sprint Spectrum, LLC, pursuant to which National Refractories has granted a license to Sprint Spectrum for the location of telecommunications transmission/reception equipment on the Real Property.

6.      Extended Pilot Study Agreement, originally dated May 15, 2000, and extended through June 30, 2001 by and between National Refractories & Minerals Corporation and FishTech, Inc., pursuant to which National Refractories has granted FishTech access to and use of various equipment and facilities at the Moss Landing facility for the purpose of growing and evaluating the growth and survival parameters of red abalone.

7.      1988 ALISAL water agreement.

8.      Note that in a 3/12/93 outfall study made after the earthquake Seller made a submission to the Coastal Commission stating that Seller planned to operate the outfall

S-7

62539.3

9.     Note that the Tate well has been capped and that as a result Seller may have no further rights under the agreement relating to the Tate well.

10.     Note that the lease concerning the government chrome pile has expired and no lease is currently in effect.

S-8

62539.3

Schedule 6 (Continued).

**Leases/Rentals (perhaps some duplication)**

| | | |
|---|---|---|
| NRMC | PacBell | cell phone site |
| NRMC | ATT/Cell One | cell phone site |
| NRMC | GTE/Verison | cell phone site |
| NRMC | M.L. Harbor Dist. | berthing spaces |
| Harbor Dist. | NRMC | outfall line |
| Harbor Dist. | NRMC | pump pier |
| NRMC | USGSA | storage area |
| NRMC | ML Marine Lab | layout space |
| NRMC | Duke ML LLC | layout space |
| NRMC | Fluor Const. | layout space |
| NRMC | Pacific Propane | business rental |
| NRMC | Glen Dolan | land use lease |
| NRMC | Melonie Mayer | layout space |

**Franchise**

| | | |
|---|---|---|
| Monterey Co. | NRMC | pipeline rights of way |

**Contracts (perhaps some duplication)**

| | | |
|---|---|---|
| MBUAPCD | NRMC | emissions banking (sale of these requires govt. approval) |
| Mont. Co. | NRMC | re use permit |
| KACC | NRMC | environmental agreement |

S-9

62539.3

A − 328

| | | |
|---|---|---|
| ChemLime | NRMC | supply agreement |

**Letter Agreements**

| | | |
|---|---|---|
| NRMC | ML Chamber | sign placement |
| NRMC | ML Marine Lab | outflow use |
| NRMC | MBARI | outflow use |
| NRMC | Alco H2O | reserve well/pump |
| NRMC | Isadora Duncan's | sign placement |
| NRMC | Tom's Sport Fishing | sign placement |
| NRMC | Phil Di Girolamo | sign placement |
| NRMC | Sea Products | outflow use |
| NRMC | General Fish | outflow use |

**Rights of Way (perhaps some duplication)**

| | | |
|---|---|---|
| NRMC | ATT | fiber optic pull box |
| NRMC | PG&E | transmission line |
| NRMC | PG&E/Duke | street lights |
| Prop Owners | NRMC | well line right of way |
| Cal St Hwy | NRMC | encroachment permit |
| Mont. Co. | NRMC | encroachment permit |
| UP/SP Rail | NRMC | rail right of way |
| NRMC | PG&E | gas line right of way |
| Monterey Co. | NRMC | pipeline right of way |

S-10

62539.3

A – 329

Schedule 7

(Permitted encumbrances)

See attached Amended/6th Updated Preliminary Title Report (the "Title Report"). Exceptions Nos. 1 through 10, 12 through 21, 27 through 29, 31 through 42, and 44 through 58 on the Title Report are Permitted Encumbrances pursuant to this Agreement.

Exceptions Nos. 11, 22, 23, 24, 25, and 26 on the Title Report are NOT Permitted Encumbrances pursuant to this Agreement, and National Refractories & Minerals Corporation is in the process of removing and/or releasing the encumbrances to which said Exceptions refer, such removal and/or release to be effected by the time of Closing of this Transaction.

**Rights of Way**

| | | |
|---|---|---|
| NRMC | ATT | fiber optic pull box |
| NRMC | PG&E | transmission line |
| NRMC | PG&E/Duke | street lights |
| Prop Owners | NRMC | well line right of way |
| Cal St Hwy | NRMC | encroachment permit |
| Mont. Co. | NRMC | encroachment permit |
| UP/SP Rail | NRMC | rail right of way |
| NRMC | PG&E | gas line right of way |
| Monterey Co. | NRMC | pipeline right of way |

S-11

62539.3

A – 330

**Schedule 17-A16**

(Litigation; judgments etc. affecting title)

None.

S-12

62539.3

**Schedule 17-A19**

(Exceptions to environmental compliance)

None.

S-13

62539.3

A -- 332

**Schedule 25-C**

(Form of Bidding Procedures Order)

**S-14**

**EXHIBIT G**

**About your archives purchase:**
Your purchase of articles expires on

Monterey County Herald, The (CA)
September 13, 2004
Section: Top Story
Page: A1

## Business park manager knows the territory
### *VIRGINIA HENNESSEY*

Sam Bose has conflicting feelings as he watches the former National Refractories plant in Moss Landing get chewed to pieces by giant steel-eating machines.
On the one hand, the demolition clears the path for the new Moss Landing Commercial Park, which is to include a proposed desalination plant and over which he will rule as general manager.

On the other, the machines are ripping down the last vestiges of a company and a way of life that supported him for 25 years.

"It's very bittersweet," Bose said this week as he watched equipment being mangled.

"The first day (of demolition) was very hard, to see the plant that was my bread and butter disappear," he said. "But change has to happen. Hopefully we can bring some of the people who lost their jobs from here, bring them back (to) do something new."

More than 350 people lost their jobs when National Refractories and Mineral Corp. went bankrupt in 2001, a victim of globalization and the near-death of the steel industry in the United States.

Ironically, even the steel that is being ripped out and chewed up from the Moss Landing site will be sent overseas to be melted down and recycled before it is resold in the United States.

The plant, which produced refractory bricks for high-temperature production such as steel, had been a mainstay on the Central Coast for decades, first as Kaiser Refractories. As corporate environmental manager, Bose ensured environmental compliance among all of the company's plants, including the one at Moss Landing.

Bose was headquartered in Livermore, but "I was at Moss Landing once or twice a week."

Up the ladder

Bose, 53, joined Kaiser Aluminum and Chemical Corp. as a young process engineer in 1979. He moved up the ladder to his corporate position. Then, in 1984, Kaiser's refractories division spun off into the employee-owned National Refractories and Bose followed.

When the company declared bankruptcy 11 years later, Bose went from safeguarding its environmental standards to shepherding its demise, appointed by the bankruptcy court to oversee the sale of the company's assets.

The first of National's refractories to close, Moss Landing was the last to sell.

Out of necessity, but over the strident objections of his school-aged children, Bose had lined up a job with RHI Refractories Inc. in Pittsburgh, the largest refractory company in the world.

"Having kids in high school, it would have been a drastic change for the kids," he said. "I really didn't want to go, but if that was the offer I had, I had to go."

When the Moss Landing deal closed, his work for National was done and Bose began packing boxes with six days remaining before he started his new job.

Not so fast, said Peninsula developer and entrepreneur Nader Agha, who had outbid seven others for ownership of the site. To the joy of Bose's children, Agha offered Bose a job as general manager of what he envisions as a diverse commercial and light-industry park that will bring life back to the refractory site and boost the area's economy.

"Sam is a great guy," said Marc del Piero, legal counsel to the Pajaro-Sunny Mesa Community Services District, which is planning a regional desalination plant on the site. "Nobody knows the equipment out there like Sam."

Solar plant possible

Bose said the desalination plant would use only about 20 of the site's 200 acres. The rest will host various businesses and possibly a solar power plant.

It is already home to two large sculptures that Agha has moved in to beautify the site — two whales and three dolphins peering off the hill like sentries over Moro Cojo Slough.

Tenants who have already moved in include Pacific Propane and Pacific Star, a cement and concrete manufacturing company.

Bose said many of the original buildings on the site will be renovated for use, and the rail system that runs through the property will be restored for use by tenants who require rail shipping.

Because the plant is more than 50 years old, he said, they are required to maintain some of it for historical purposes. A tower with three storage tanks, most visible from Highway 1, will be kept standing, and a museum about the refractory process will be erected in the company's original offices.

Environmental cleanup

For now, Bose is preoccupied with the demolition of his old haunt. So far the equipment is being demolished and he is awaiting permits to begin tearing down the old buildings.

A – 336

There is also considerable environmental cleanup that needs to be done, he said, noting that there is some chrome contamination in groundwater, the source of which is unknown.

"It could be from us, it could be from Duke (Energy) and it could be natural," he said. "PG&E, Duke, Kaiser and National Refractories all have used chrome for many, many years."

That cleanup will not delay progress on the desalination project, which will be in another area of the property, said Bose, who's excited about desalination.

"We talked about putting desal in here 20 years ago," he said. "We've got the (state) permit, we have the intake and outfall. What better location could you have?

"The beauty about the desal is that it's going to be done at cost, and most people don't really know that the water is going to be affordable," he added.

And so life has come full circle for Sam Bose. He got someone to listen to him about desalination at the National Refractories site, and he's come home to roost at a site he called home for 25 years.

For the time being, he's commuting from Livermore a few days a week and working from his house the rest of the time. But he's looking forward to moving to the Peninsula when his son graduates from high school in two years.

Virginia Hennessey can be reached at 646-4355 or vhennessey@ montereyherald.com.

----

All contents ©2004 MONTEREY COUNTY HERALD and may not be republished without written permission.

Copyright (c) 2004 The Monterey County Herald

**EXHIBIT H**

SAN FRANCISCO | 201 Spear Street
Los Angeles | Suite 1000
New York | San Francisco, CA 94105
Redwood City | Telephone (415) 543-4800
San Jose | Facsimile (415) 972-6301
| www.ropers.com



Thomas H. Clarke, Jr.
(415) 972-6387

tclarke@rmkb.com

November 29, 2007

**VIA REGISTERED MAIL**
**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

**RCRA CITIZEN SUIT NOTICE**
**CWA CITIZEN SUIT NOTICE**
**PROPOSITION 65 DISCHARGE-TO-GROUNDWATER NOTICE**
**NOTICE PURSUANT TO AGREEMENT ON ENVIRONMENTAL COMPLIANCE**

Administrator
U. S. ENVIRONMENTAL PROTECTION
AGENCY
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Regional Administrator
U. S. ENVIRONMENTAL PROTECTION
AGENCY, Region 9
75 Hawthorne Street
San Francisco, CA 94105

U. S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Secretary
CALIFORNIA ENVIRONMENTAL
PROTECTION AGENCY
1001 I Street
Sacramento, CA 95812-2815

Executive Director
CALIFORNIA DEPARTMENT OF TOXIC
SUBSTANCES CONTROL
1001 I Street
Sacramento, CA 95814-2828

Chair
CALIFORNIA STATE WATER
RESOURCES CONTROL BOARD
1001 I Street
Sacramento, CA 95814

Executive Officer
REGIONAL WATER QUALITY CONTROL
BOARD
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93402-7906

Chairman & Executive Director
CALIFORNIA INTEGRATED WASTE
MANAGEMENT BOARD
1001 I Street
Sacramento, CA 95814

Attorney General
CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Ave., Ste. 14800
San Francisco, CA 94102

District Attorney
COUNTY OF MONTEREY
1200 Aguajito Road, Room 301
Monterey, CA 93940

RC1/5034761.1/THC

A – 339



Mr. Jack A. Hockema, CEO
Kaiser Aluminum & Chemical Corporation
27422 Portola Parkway, Suite 350
Foothill Ranch, CA 92610

Mr. Jack A. Hockema, CEO
Kaiser Aluminum Corporation
27422 Portola Parkway, Suite 350
Foothill Ranch, CA 92610

Mr. John M. Donnan, V.P. & General Counsel
Kaiser Aluminum & Chemical Corporation
5847 San Felipe St., Suite 2500
Houston, TX 77057

Kaiser Aluminum Corporation
c/o C T Corporation System
818 W. Seventh Street
Los Angeles, CA 90017

Mr. Jack A. Hockema, CEO
Kaiser Aluminum & Chemical Corporation
5847 San Felipe St., Suite 2500
Houston, TX 77057

Mr. John M. Donnan, V.P. & General Counsel
Kaiser Aluminum & Chemical Corporation
27422 Portola Parkway, Suite 350
Foothill Ranch, CA 92610

Mr. John M. Donnan, V.P. & General Counsel
Kaiser Aluminum Corporation
27422 Portola Parkway, Suite 350
Foothill Ranch, CA 92610

Kaiser Aluminum & Chemical Corporation
c/o C T Corporation System
818 W. Seventh Street
Los Angeles, CA 90017

**Re:  Moss Landing Commercial Park, Moss Landing, California[1]**

To whom it may concern:

    NOTICE IS HEREBY GIVEN that on or after the date of this notice, MOSS LANDING COMMERCIAL PARK LLC (hereinafter "MLCP"), owner of real property commonly known as Moss Landing Commercial Park, Moss Landing, California, intends to file suit under the Resource Conservation Recovery Act ("RCRA"), 42. U.S.C. Section 6972(a)(1)(B), against those entities above noted (to wit, Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical Corporation [collectively "KAISER"]) who owned and operated a manufacturing business at the above noted location ("The Site") from approximately 1941 until approximately 1985. Between approximately 1946 and 1981, KAISER created two dumps on said property.[2] A

---

[1] That real property with improvements thereon located adjacent to Highway 1, Dolan Road, and Moro Cojo Slough, Moss Landing, California.  See Exhibit A attached hereto.  The property is comprised of approximately 200 acres and is further described by Monterey County Assessor's Parcel Numbers 131-054-008, 133-173-002, 133-172-004, and 133-172-013.

[2] See Exhibit B hereto for a map submitted by KAISER to EPA in 1981 showing the location of the two dumps.

RC1/5034761.1/THC



variety of toxic pollutants and contaminants, including hexavalent chromium, antimony, nickel, and lead have been found in the soil, surface water, and groundwater of the property ("The Contamination"). These pollutants and contaminants are being released and discharged by the dumps.

The two dumps created by KAISER contain hazardous wastes within the meaning of "subchapter III" of RCRA (aka Subtitle C of the Act, 42 U.S.C. sections 6921 et seq.) and 42 C.F.R. § 261.3. MLCP further alleges that the wastes contained in the two dumps are California hazardous wastes.

The Contamination at The Site poses an imminent and substantial endangerment to the environment. The endangerment includes a substantial threat to the environment about The Site, including without limitation Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about the property. The Contamination also threatens the beneficial uses of the groundwater beneath and about The Site. Hexavalent chromium levels in various monitoring wells at The Site have varied over time up to a maximum of 673 ppb (micrograms per liter); antimony levels, to a maximum of 51 ppb; nickel levels, to a maximum of 679 ppb; and, lead levels, to a maximum of 58 ppb. The plume of these metals (hexavalent chromium, lead, antimony, and nickel) is moving across The Property from the dumps toward Moss Landing Harbor and the Moro Cojo Slough. Several of the monitoring wells detecting these metals are located just across Highway One from the Moss Landing Harbor.

Waste-containing soils, soils contaminated by the discharge and release of hexavalent chromium and other metals from the dumps, and the waste itself are eroding into nearby surface waters and are moving downward into groundwater and also moving through ditches and channels on the property and off the property to impact nearby surface and ground waters, including Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property.

MLCP is informed and believes that KAISER has undertaken neither timely and appropriate site characterization and closure activities, nor has KAISER characterized or remedied any pollutant or contaminant releases or discharges which may have occurred and adversely impacted the soil, surface waters, and groundwater as described herein. Such impacts have adversely impacted the beneficial uses of said groundwater, and have adversely impacted the natural resources on and about the property. Under the applicable Basin Plan, the groundwater beneath The Site is classified as a potential drinking water resource, and hexavalent chromium, antimony, lead, and nickel are present above the MCLs. These levels thus create an imminent and substantial endangerment to the beneficial use of the groundwater as designated by the Basin Plan.

The full and complete extent of these releases and discharges has not yet been determined.

RCI/5034761.1/THC



The full and complete extent of these releases and discharges has not yet been determined.

Additionally, KAISER has delayed implementation of characterization of and corrective action for The Site, and MLCP believes that the failure of KAISER to so do is likely to continue and/or recur, resulting in further adverse impacts to the environment.

KAISER has been on notice of the potential threat of the dumps to the environment since 1978 when a release of chromium contaminated leachate occurred from one of the dumps and moved across and about the property. KAISER even mentioned this release in a 1981 filing with EPA, and as such clearly appreciated the potential for such releases in the future. KAISER clearly understood the potential for harm from these dumps when, in approximately 1981, it "capped" one dump with asphalt and one with gravel. However, the bottoms of the dumps are not insulated from the environment, and the sides of the dumps are covered merely with dirt. As such, rainwater, surface water, and groundwater can intrude into the dumps and move pollutants and contaminants out of the dumps and into the environment. The releases and discharges are ongoing.

Accordingly, pursuant to 42 U.S.C. § 6972(a)(1)(B) and state and federal law, MLCP will seek judgment requiring KAISER to pay for all costs which MLCP has incurred and will incur henceforth in identifying, characterizing, analyzing, monitoring, and investigating the soil or groundwater contamination on the property. In addition, MLCP will seek declaratory relief and an injunction ordering KAISER to undertake all further characterization and all remediation activities necessary concerning any soil, surface water, or groundwater contamination at, on, beneath and about The Site. MLCP will also seek the imposition of civil penalties and recovery of its costs, according to law.

NOTICE IS FURTHER HEREBY GIVEN that on or after the date of this notice, MLCP, owner of real property commonly known as Moss Landing Commercial Park, Moss Landing, California, intends to file suit under the Clean Water Act, 33 U.S.C. section 1365(a)(1)(A), based on KAISER's failure to obtain an NPDES permit and for thus allowing an unpermitted discharge of toxic pollutants to the waters of the United States in violation of 33 U.S.C. sections 1311(a) and 1342. Hexavalent chromium, lead, antimony, and nickel are each a toxic pollutant within the meaning of 33 U.S.C. sections 1365(b) and 1317(a).

KAISER caused to be installed the two dumps, as noted herein. At the two dumps, KAISER caused to be installed in approximately 1980 drainage pipes that discharge and release toxic pollutants into the environment. Further, the two dumps have been and are partially surrounded by ditches and culverts that carry toxic pollutants into the environment. None of the output of these pipes, ditches, or culverts is captured or treated. On information and belief,



MLCP alleges that discharges and releases from these pipes, ditches, and culverts have been occurring since at least 1980.

As noted above, the discharges and releases of toxic pollutants have adversely impacted the environment on, beneath, and about the property. The failure of KAISER to capture and treat these discharges and releases and to obtain the requisite NPDES permit has contributed to the adverse environmental impacts noted herein.

Accordingly, pursuant to 33 U.S.C. § 1365(a)(1)(A) and state and federal law, MLCP will seek judgment requiring KAISER to pay for all costs which MLCP has incurred and will incur henceforth in identifying, characterizing, analyzing, monitoring, and investigating the soil, surface water, and groundwater contamination on the property. In addition, MLCP will seek declaratory relief and an injunction ordering KAISER to obtain an NPDES permit and to undertake all further characterization and all remediation activities necessary concerning any soil or groundwater contamination at, on, beneath and about The Site. MLCP will also seek the imposition of civil penalties and recovery of its costs, according to law.

NOTICE IS FURTHER HEREBY GIVEN that KAISER is in violation of California's Proposition 65 (which can be found at Sections 25249.5 et seq. of the Health & Safety Code). Attached to this letter is a copy of "Proposition 65: A Summary", which has been prepared by the State of California, Office of Environmental Health Hazard Assessment ("OEHHA"). OEHHA may be contacted at 916-445-6900. OEHHA's web site pertaining to Proposition 65 may be found at: http://www.oehha.ca.gov/prop65.html.

MLCP hereby gives notice that KAISER has been, is currently, and threatens to be in violation of California Health & Safety Code § 25249.5; this sixty-day notice is sent to KAISER in compliance with § 25249.7(d) California Health & Safety Code. MLCP is a private enforcer of Proposition 65, as provided by California Health & Safety Code § 25249.7(d). KAISER may contact MLCP at the above listed address and telephone number for its counsel; I am counsel for and represent MLCP in this matter.

The above-referenced violations occur when discharges and releases occur from the two dumps located on the property. The discharges and releases are ongoing. The Basin Plan classifies the impacted groundwater beneath the property as a potential drinking water resource. The discharges and releases contain hexavalent chromium, lead, and nickel, chemicals known to the State of California to cause cancer and reproductive toxicity.

These violations have occurred every day for at least the last 2½ decades, and will continue every day until the discharges and releases are terminated. The Proposition 65 violations noted herein occur in Monterey County.



NOTICE IS FURTHER HEREBY GIVEN pursuant to the Agreement on Environmental Compliance that discharges and releases of toxic pollutants and contaminants from the two dumps, as described herein, are occurring, and that these releases and discharges pose an imminent and substantial endangerment to the environment of the property and Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about the property.

Pursuant to Para. 2.5 of the Agreement, KAISER is requested to undertake and fund all corrective action necessary to characterize the pollutants and contamination, and to remediate the adverse environmental effects of the two dumps, including removing these source zones from the property.

In conclusion, KAISER and the federal, state and local governmental entities noticed above are hereby placed on written notice of MLCP's intention to forthwith commence suit upon this matter. MLCP's action will seek all RCRA, CWA, Proposition 65, statutory, equitable, and common law remedies available against KAISER.

The address and telephone number for MLCP is as follows:

> P.O. Box 310
> Moss Landing, CA 95039
> (831) 594-9711

MLCP may be contacted through its counsel, Thomas H. Clarke, Jr., Ropers, Majeski, Kohn & Bentley, 201 Spear Street, Suite 1000, San Francisco, CA 94105; (415) 543-4800.

Sincerely,

Thomas H. Clarke, Jr.

**EXHIBIT I**

DLI-6162964v4

THOMAS H. CLARKE, JR. (SBN 47592)
TIMOTHY A. DOLAN (SBN 209674)
ROPERS, MAJESKI, KOHN & BENTLEY
201 Spear Street, Suite 1000
San Francisco, CA 94105
Telephone:    (415) 543-4800
Facsimile:    (415) 972-6301
tclarke@rmkb.com
tdolan@rmkb.com

Attorneys for Plaintiff
MOSS LANDING COMMERCIAL PARK LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| MOSS LANDING COMMERCIAL PARK LLC,<br><br>Plaintiff,<br><br>v.<br><br>KAISER ALUMINUM CORPORATION, KAISER ALUMINUM AND CHEMICAL CORPORATION, and DOES 1 through 100,<br><br>Defendants. | CASE NO. C07 06072 RMW/PVT<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>• CWA 1365(a)(1)(A)<br>• RCRA 6972(a)(1)(B)<br>• Continuing Public Nuisance & Public Nuisance Per Se<br>• Continuing Private Nuisance & Private Nuisance Per Se<br>• Negligence Per Se<br>• Declaratory Relief<br>• Equitable Indemnity & Contribution<br>• Section 1428 C.C.<br>• Breach of contract<br><br>**DEMAND FOR JURY TRIAL** |

### JURISDICTION AND VENUE

1.    This court has subject matter jurisdiction under 28 U.S.C. section 1331, in that this case arises under the laws of the United States, 42 U.S.C. section 6972, 33 U.S.C. section 1365, and 28 U.S.C. sections 2201 and 2202.

2.    The court has supplemental jurisdiction under 28 U.S.C. section 1367(a) in that the state law claims of plaintiff MOSS LANDING COMMERCIAL PARK LLC ("MLCP") are so related to the claims over which the Court exercises original jurisdiction that they form part of the

1   same case or controversy under Article III of the United States Constitution.

2   3.    Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391(b, c)

3   and 42 U.S.C. section 6972(c) because the events giving rise to the claims of MLCP occurred

4   within the District, because the property which is the subject of the action is situated within the

5   District, and because defendants KAISER ALUMINUM CORPORATION and KAISER

6   ALUMINUM & CHEMICAL CORPORATION (hereinafter jointly referred to as "KACC")

7   conducted activities within the District giving rise to the claims of MLCP.

8   4.    On November 30, 2007, MLCP served a Notice Letter on KACC regarding the

9   violations of Clean Water Act ("CWA") and Resource Conservation and Recovery Act

10  ("RCRA"), as set forth herein, and the intention of MLCP to file suit against KACC. Copies of

11  the Notice Letter were sent to the Administrator of the U.S. Environmental Protection Agency

12  ("EPA"), the Regional Administrator of EPA Region IX, the Executive Director of the State

13  Water Resources Control Board ("SWRCB"), the Executive Office of the Central Coast Regional

14  Water Quality Control Board ("RWQCB"), the Secretary of the California Environmental

15  Protection Agency ("Cal-EPA"), the Director of the California Department of Toxic Substances

16  Control ("DTSC"), and the Chairman and Executive Officer of the California Integrated

17  Management Board ("IWMB") as required by 33 U.S.C. section 1365(b)(1) and 42 U.S.C. section

18  6972(b)(1). On information and belief MLCP alleges that the CWA actions set forth herein

19  involve toxic pollutants within the meaning of 33 U.S.C. sections 1365(b) and 1317(a) and also

20  that the RCRA actions set forth herein involve "subchapter III" violations (aka Subtitle C of the

21  Act, 42 U.S.C. sections 6921 et seq.).

22  5.    Neither EPA nor any agency of the State of California has commenced or is

23  diligently prosecuting an action to redress the violations of the CWA alleged in the Notice Letter.

24  Claims for civil penalties asserted in this action are not barred by any prior administrative penalty

25  under section 309(g) of the CWA, 33 U.S.C. section 1319(g).

26  6.    Neither EPA nor any agency of the State of California has commenced or is

27  diligently prosecuting an action to redress the violations of RCRA alleged in the Notice Letter.

28

USDC NDCA No. C07 06072 RMW/PVT         - 2 -         FIRST AMENDED COMPLAINT FOR
                                                     DAMAGES AND INJUNCTIVE RELIEF

1   Neither EPA nor any agency of the State of California is engaging in a removal action pursuant to

2   42 U.S.C. section 9604. Neither EPA nor any agency of the State of California has incurred costs

3   to initiate a Remedial Investigation and Feasibility Study pursuant to 42 U.S.C. section 9604, or

4   is diligently proceeding with a remedial action pursuant to 42 U.S.C. sections 9601 et seq. EPA

5   has not obtained a court order or issued an administrative order pursuant to 42 U.S.C. section

6   9606 or 42 U.S.C. section 6973 pursuant to which a responsible party is diligently conducting a

7   removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial

8   action.

### INTRADISTRICT ASSIGNMENT

10  7.       Intradistrict assignment of this matter to the San Jose Division of this Court is

11  appropriate pursuant to Civil Local Rule 3-2(c,e). The events, action, and omissions which give

12  rise to the claims of plaintiff MLCP occurred in Monterey County, and the property at issue is

13  located in Monterey County.

### THE PARTIES

15  8.       Plaintiff MLCP is a California LLC with its headquarters and principal place of

16  business located at 7695 Highway 1, Moss Landing, CA 95039.

17  9.       Defendant Kaiser Aluminum & Chemical Corporation is a Delaware corporation

18  with its headquarters located at 27422 Portola Pkwy., Ste. 350, Foothill Ranch, CA 92610-2831

19  and its principal place of business located at 5847 San Felipe St., Suite 2500, Houston, TX

20  71326-3777. At all times relevant, Kaiser Aluminum & Chemical Corporation has been and is a

21  wholly owned subsidiary of Kaiser Aluminum Corporation. One hundred percent of the equity of

22  Defendant Kaiser Aluminum & Chemical Corporation is owned by Defendant Kaiser Aluminum

23  Corporation; on information and belief, MLCP alleges that all officers and directors of Kaiser

24  Aluminum & Chemical Corporation are officers and directors of Kaiser Aluminum Corporation.

25  10.      Defendant Kaiser Aluminum Corporation is a Delaware corporation with its

26  headquarters and principal place of business located at 27422 Portola Pkwy., Ste. 350, Foothill

27  Ranch, CA 92610-2831. Defendant Kaiser Aluminum Corporation is the parent of Defendant

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

USDC NDCA No. C07 06072 RMW/PVT        - 3 -        FIRST AMENDED COMPLAINT FOR
                                                     DAMAGES AND INJUNCTIVE RELIEF

Ropers M... iki Kohn & Bentley
A P...essional Corporation
San Francisco

1    Kaiser Aluminum & Chemical Corporation and owns 100% of its equity; Defendant Kaiser

2    Aluminum & Chemical Corporation is a subsidiary of Defendant Kaiser Aluminum Corporation.

3    On information and belief, MLCP alleges that all of the acts and omissions of Defendant Kaiser

4    Aluminum & Chemical Corporation, as alleged herein, were done at the request or direction of

5    Defendant Kaiser Aluminum Corporation, were done as a matter of corporate policy established

6    by Defendant Kaiser Aluminum Corporation, or were ratified or approved after-the-fact by

7    Defendant Kaiser Aluminum Corporation. MLCP alleges that Defendant Kaiser Aluminum

8    Corporation did aid, abet, and encourage and has contributed to the creation, existence, or

9    maintenance of the two dumps, as noted herein, that contain hazardous waste and create and have

10   created toxic soil and water pollutants and contaminants, as noted herein. MLCP further alleges

11   that Defendant Kaiser Aluminum Corporation did aid, abet, and encourage and has contributed to

12   the creation, existence, and maintenance of the imminent and substantial danger to the

13   environment posed by the two dumps even after being on notice of the hazardous and toxic nature

14   of the dumps and their effluent following the 1978 release of chromium contaminated leachate, as

15   noted herein, and was and is additionally reflected in the written statement made to EPA in 1981

16   that the two dumps may contain hazardous waste.

17       11.    On information and belief MLCP alleges that Defendants DOES 1 through 100 did

18   act or failed to act in a manner that aided, abetted, and encouraged and has contributed to the

19   creation, existence, or maintenance of the two dumps, the toxic soil and water pollutants and

20   contaminants noted herein, and the imminent and substantial endangerment created thereby. The

21   true names of DOES 1 through 100 are unknown to MLCP at this time. When their identities are

22   ascertained, the complaint shall be amended to reflect their true names.

23                    **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

24       12.    The property impacted by the discharges, releases, hazardous wastes, and toxic

25   pollutants described herein is located adjacent to Highway 1, Dolan Road, and Moro Cojo

26   Slough. See Exhibit A attached hereto. The property is comprised of approximately 200 acres

27   and is further described by Assessor's Parcel Numbers 131-054-008, 133-173-002, 133-172-004,

28

1    and 133-172-013. Hereinafter this site is referred to as "The Property". MLCP is the current

2    owner of The Property.

3         13.    Immediately across Highway 1 to the west of The Property is the Moss Landing

4    Harbor, which is directly connected to Monterey Bay. See Exhibit A. Monterey Bay is part of

5    the Monterey Bay National Marine Sanctuary. See Exhibit B attached hereto for a map showing

6    the boundaries of the Sanctuary. The Moro Cojo Slough also runs into the Moss Landing Harbor.

7    See Exhibit A. The groundwater gradient for the shallow groundwater immediately beneath The

8    Property is generally to the West and also to the South, toward the Harbor and Monterey Bay on

9    the one hand and toward the Moro Cojo Slough on the other.

10        14.    During World War II (starting in 1942) and thereafter until 1985, KACC

11   established, built, owned, and operated various industrial operations at The Property. Initially

12   KACC constructed various facilities for the production of magnesium oxide for magnesia metal

13   production at a nearby plant located in Permanente, California. After World War II this market

14   ceased, and starting in approximately 1946 operations at The Property were converted to a

15   magnesia plant and a refractory plant for the production of magnesium oxide, production of

16   products containing magnesium oxide, and production of refractory brick. The production of

17   refractory (or high-temperature tolerant) brick involved the use of chromite ore as an input to the

18   process. Chromite ore is a brownish-black mineral that is a major source of chromium.

19        15.    During these operations, KACC and DOES 1-100 created two dumps on The

20   Property, referred to as Landfill #1 and Landfill #2. See Exhibit C hereto. These so-called

21   landfills do not meet modern standards for landfills. The two dumps were used for many decades

22   and were the depository for a wide variety of waste products, including (without limitation) used

23   refractory linings from kilns, materials from the clean-up of spills of chromite ore, periclase (the

24   cubic form of magnesium oxide), magnesium oxide, dolomite, plant sweepings from various

25   spills, and dusts from baghouse dust collectors.

26        16.    In a 1981 filing with EPA, KACC notes that in 1978 chromium-contaminated

27   leachate was being released and discharged from Landfill #1 and running into a ditch along Dolan

28

USDC NDCA No. C07 06072 RMW/PVT         - 5 -        FIRST AMENDED COMPLAINT FOR
                                                     DAMAGES AND INJUNCTIVE RELIEF

Ropers M··  ski Kohn & Bentley
A.  .sional Corporation
San Francisco

1    Road (see Exhibit A). Thereafter, the top of Landfill #1 was paved and allegedly no more wastes

2    were deposited therein. The 1981 filing notes that a collection drain pipe was also installed "at

3    the base of the pile for collection of the leachate being produced from the pile." Landfill #2 then

4    allegedly, according to the filing, became the sole dump at The Property for land filling wastes.

5    (See Exhibit C for a diagram from the 1981 filing with EPA by KACC showing the location of

6    the two dumps.) KACC notes in the 1981 filing that materials containing soluble chromium

7    compounds were deposited in the two dumps. Landfill #2 was allegedly closed in 1980. MLCP

8    believes that Landfill #2 has only a permeable gravel cap, and that one or more collection drain

9    pipes were also installed at the base of Landfill #2 for the collection of leachate and its

10   conveyance into the swampland adjacent thereto. The two dumps contain only highly permeable

11   dirt sides which allow the infiltration of rainwater and the exfiltration of leachate from the dumps.

12   Further, the dumps contain no liners or other physical impediments on the bottom aspect of the

13   dumps to prevent the infiltration of groundwater or the movement of leachate from within the

14   dumps into the groundwater.

15        17.    In the 1981 filing with EPA, KACC notes that the dumps "may contain material

16   that would be defined by the EPA today as hazardous waste." On information and belief, MLCP

17   alleges that between 1980 and its sale of The Property in 1985 KACC took no steps to assess

18   whether discharges or releases from the two dumps were having an adverse impact on the

19   environment, including whether they were causing contamination of surface or ground waters.

20   MLCP further alleges that KACC did not undertake any steps to obtain an NPDES permit for any

21   of the drain pipes that were placed within the dumps or for the drainage ditches and culverts about

22   the dumps, or to establish any treatment systems for leachate that was exiting the dumps into the

23   environment through said conveyances.

24        18.    On information and belief, MLCP alleges that the wastes contained within the

25   two dumps known as Landfill #1 and Landfill #2 are a hazardous waste within the meaning of

26   "subchapter III" of RCRA (aka Subtitle C of the Act, 42 U.S.C. sections 6921 et seq.) and 40

27   C.F.R. § 261.3. MLCP further alleges that the wastes contained in the two dumps are California

28

*(left margin, vertical)* Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  hazardous wastes.

2      19.    Monitoring wells across The Property have established the continuing, ongoing

3  release and discharge of toxic and other pollutants from the dumps, and the presence of

4  hexavalent chromium, antimony, lead, and nickel in the groundwater at concentrations well above

5  the drinking water levels established under California and Federal law.  These drinking water

6  standards are known as the maximum contaminant level ("MCL"); in the case of lead, it is known

7  as an "action level" ("AL").  The adverse health impacts of chrome compounds, antimony, lead,

8  and nickel upon humans are set forth in Exhibit D (monograms by the Department of Health &

9  Human Services, Agency for Toxic Substances and Disease Registry).

10      20.    Three of the many monitoring wells on The Property in which hexavalent

11  chromium, antimony, and nickel have been detected are immediately across Highway One from

12  the Moss Landing Harbor, and thus only several hundred feet from the Moss Landing Harbor.

13  Hexavalent chromium levels at various monitoring wells at the site have varied over time up to a

14  maximum of 673 ppb (micrograms per liter); antimony levels, to a maximum of 51 ppb; nickel

15  levels, to a maximum of 679 ppb; and, lead levels, to a maximum of 58 ppb.  The plume of these

16  metals (hexavalent chromium, lead, antimony, and nickel) is moving across The Property from

17  the dumps toward Moss Landing Harbor and the Moro Cojo Slough. The MCL for chrome is

18  based on "total chrome", of which hexavalent chromium is but one component; the California

19  MCL is 50 ppb, and the EPA MCL is 100 ppb.  The California and EPA MCL for antimony is 6

20  ppb; for nickel, 100 ppb.  The California and EPA AL for lead is 15 ppb.  Hexavalent chromium,

21  lead, antimony, and nickel are each a toxic pollutant within the meaning of 33 U.S.C. sections

22  1365(b) and 1317(a).

23      21.    On information and belief, MLCP alleges that the adversely impacted groundwater

24  beneath The Property is recharging and adversely impacting nearby surface water, including

25  Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The

26  Property.    Further, MLCP alleges that waste-containing soils, soils contaminated by the

27  discharge and release of hexavalent chromium and other metals from the dumps, and the waste

28

USDC NDCA No. C07 06072 RMW/PVT        - 7 -        FIRST AMENDED COMPLAINT FOR
                                                    DAMAGES AND INJUNCTIVE RELIEF

A – 352

1   itself are eroding into nearby surface waters and are moving downward into groundwater and also

2   moving through ditches and channels on The Property and off The Property to impact nearby

3   surface and ground waters, including Monterey Bay, Moss Landing Harbor, Moro Cojo Slough,

4   and the swamplands in and about The Property.

5       22.     The RWQCB has adopted the September 8, 1994 Water Quality Control Plan

6   ("Basin Plan") for Central Coast groundwater. The Basin Plan mandates that all Central Coast

7   groundwater, except the Soda Lake Sub-Basin (which is not applicable herein), has a beneficial

8   use as drinking water. As such, the MCLs determine whether groundwater meets the criteria of

9   the Basin Plan. The discharges and releases from the dumps impair the drinking water beneficial

10  use of the groundwater.

11      23.     The Basin Plan also states that the beneficial uses of Moro Cojo Slough adjacent to

12  The Property includes, without limitation, cold and warm fresh water habitat, and applies the

13  chromium MCL standard to those uses. MLCP alleges on information and belief that the

14  discharges and releases from the dumps impair these beneficial uses of the Moro Cojo Slough.

15      24.     The discharge of wastes without a permit into the waters of the State of California

16  is a violation of the prohibitions contained in the Basin Plan, and creates, or threatens to create, a

17  condition of degradation, nuisance, pollution, and contamination as defined by the California

18  Water Code.

19      25.     The financial and ownership interests in The Property of MLCP and its members

20  and managers has been impaired and degraded by the contaminant conditions noted herein. The

21  contaminant conditions have exposed them to enforcement actions by regulatory agencies and

22  caused them to incur costs and expenses.

23      26.     In December, 1984 KACC sold The Property with improvements thereon to

24  National Refractories & Minerals Corporation ("NFMC"). In December, 2003 NFMC sold The

25  Property with improvements thereon to MLCP. As part of the KACC-NFMC transaction, KACC

26  and NFMC entered into an Agreement on Environmental Compliance. See Exhibit E.

27  ///

28

USDC NDCA No. C07 06072 RMW/PVT         - 8 -         FIRST AMENDED COMPLAINT FOR
                                                     DAMAGES AND INJUNCTIVE RELIEF

Ropers M··· ski Kohn & Bentley
A··· sional Corporation
San Francisco

## FIRST CLAIM FOR RELIEF

### Violation of Duty to Apply for a NPDES Permit in Violation of the Clean Water Act Alleged Against KACC and DOES 1-100
### (Violations of 33 U.S.C. §§ 1311, 1342)

27.    MLCP incorporates the allegations set forth in Paragraphs 1 through 26, inclusive, as though fully set forth herein.

28.    33 U.S.C. section 1365(a)(1)(A) provides that any citizen may commence a civil action on his, her, or its own behalf against any "person" alleged to be in violation of an effluent standard or limitation under the CWA. KACC is a "person" as defined by 33 U.S.C. section 1362(5).

29.    33 U.S.C. section 1311(a) states: "Illegality of pollutant discharges except in compliance with law. Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful."

30.    The CWA prohibits the discharge of a pollutant to waters of the United States without an NPDES permit. 33 U.S.C. section 1342. At no time relevant herein has KACC applied for or obtained an NPDES permit for the collection drain pipes that convey contaminated leachate from the dumps or for the ditches and culverts that convey contaminated leachate, waste-containing soils, soils contaminated by the discharge and release of hexavalent chromium and other metals from the dumps, and the waste itself related to the dumps.

31.    KACC and DOES 1-100 have discharged and continue to permit to discharge toxic pollutants from the dumps to waters of the United States since at least October, 1980.

32.    KACC and DOES 1-100 have been in violation of 33 U.S.C. section 1311(a) due to its failure to submit an application for an NPDES permit for its discharges and releases from the dumps to the waters of the United States every day since at least October, 1980.

33.    KACC and DOES 1-100 will continue to be in violation of 33 U.S.C. section 1311 each day that it fails to submit an application for an NPDES permit pursuant to 33 U.S.S. section 1342.

34.    Failure to submit an application for an NPDES permit is an ongoing violation of

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    the CWA.

2        35.    Each day that KACC and DOES 1-100 allow the dumps to release and discharge

3    pollutants as noted herein without submitting an application for an NPDES permit for the

4    discharge of pollutants to waters of the United States is a separate and distinct violation of 33

5    U.S.C. section 1311(a).

6        36.    An action for relief under the CWA is authorized by 33 U.S.C. section 1365(a).

7    MLCP seeks injunctive relief requiring KACC and DOES 1-100 to forthwith obtain an NPDES

8    permit for the dumps, as noted herein, and to implement such pollution control requirements as

9    are mandated by said NPDES permit. Further, MLCP seeks an injunction requiring KACC to

10   characterize and remediate the toxic pollutants and contamination that has resulted from its

11   violation of sections 1311(a) and 1342. The acts and omissions of KACC and DOES 1-100 are

12   ongoing and continuous and, if allowed to continue, do and will irreparably harm MLCP.

13       37.    MLCP seeks the imposition of civil penalties pursuant to 33 U.S.C. section 1319

14   in light of the historical and ongoing violations of 33 U.S.C. sections 1311 and 1342 by KACC

15   and DOES 1-100 stretching over a period in excess of 2½ decades to the present.

16       38.    MLCP seeks an award of its costs, including reasonable attorney's fees and expert

17   witness fees, pursuant to 33 U.S.C. section 1365(d).

18                         **SECOND CLAIM FOR RELIEF**

19   **Unpermitted Discharge of Pollutants to Waters of the United States in Violation of the
     Clean Water Act Alleged Against KACC and DOES 1-100**
20   **(Violations of 33 U.S.C. §§ 1311, 1342)**

21       39.    MLCP incorporates the allegations set forth in Paragraphs 1 through 26 and 28

22   through 35, inclusive, as though fully set forth herein.

23       40.    33 U.S.C. section 1365(a)(1)(A) provides that any citizen may commence a civil

24   action on his, her, or its own behalf against any "person" alleged to be in violation of an effluent

25   standard or limitation under the CWA. KACC and DOES 1-100 are a "person" as defined by 33

26   U.S.C. section 1362(5).

27       41.    33 U.S.C. section 1311(a) states: "Illegality of pollutant discharges except in

28

USDC NDCA No. C07 06072 RMW/PVT        - 10 -        FIRST AMENDED COMPLAINT FOR
                                                    DAMAGES AND INJUNCTIVE RELIEF

1    compliance with law. Except as in compliance with this section and sections 302, 306, 307, 318,

2    402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful."

3        42.    KACC and DOES 1-100 have discharged and continue to discharge pollutants

4    from the dumps, from groundwater that discharges into surface waters (including Monterey Bay,

5    Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property), and

6    from surface waters that discharge into groundwater, Monterey Bay, Moss Landing Harbor, Moro

7    Cojo Slough, and the swamplands in and about The Property, as noted herein.

8        43.    KACC and DOES 1-100 have been in violation of 33 U.S.C. section 1311(a), due

9    to its discharges of pollutants every day since at least October, 1980. The violation is ongoing.

10        44.    KACC and DOES 1-100 will continue to be in violation of 33 U.S.C. section

11    1311(a) each day KACC and DOES 1 through 100 allow the release and discharge pollutants to

12    waters of the United States without an NPDES permit.

13        45.    The failure of KACC and DOES 1-100 to obtain an NPDES permit for the

14    discharge of pollutants noted herein is an ongoing violation of 33 U.S.C. section 1342.

15        46.    Each day that KACC and DOES 1-100 allow the discharge of pollutants, as noted

16    herein, and fails to obtain an NPDES permit, as noted herein, is a separate and distinct violation

17    of 33 U.S.C. sections 1311 and 1342.

18        47.    An action for relief under the CWA is authorized by 33 U.S.C. section 1365(a).

19    MLCP seeks injunctive relief requiring KACC and DOES 1-100 to forthwith obtain an NPDES

20    permit for the dumps, as noted herein, to implement such pollution control requirements as are

21    mandated by said NPDES permit, and to cease all discharges and releases of pollutants in

22    violation of 33 U.S.C. section 1311(a). Further, MLCP seeks an injunction requiring KACC to

23    characterize and remediate the toxic pollutants and contamination that has resulted from its

24    violation of sections 1311(a) and 1342. The acts and omissions of KACC and DOES 1-100 are

25    ongoing and continuous and, if allowed to continue, do and will irreparably harm MLCP.

26        48.    MLCP seeks the imposition of civil penalties pursuant to 33 U.S.C. section 1319

27    in light of the historical and ongoing violations of 33 U.S.C. sections 1311 and 1342 by KACC

28

USDC NDCA No. C07 06072 RMW/PVT    - 11 -    FIRST AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    and DOES 1-100 stretching over a period in excess of 2½ decades to the present.

2         49.    MLCP seeks an award of its costs, including reasonable attorney's fees and expert

3    witness fees, pursuant to 33 U.S.C. section 1365(d).

4                              **THIRD CLAIM FOR RELIEF**

5    **Creation of an Imminent and Substantial Endangerment to the Environment Alleged
     Against KACC and DOES 1-100**

6    **(Violations of 42 U.S.C. § 6972(a)(1)(B))**

7         50.    MLCP incorporates the allegations set forth in Paragraphs 1 through 26, inclusive,

8    as though fully set forth herein.

9         51.    42 U.S.C. section 6972(a)(1)(B) provides that any "person" may commence a civil

10   action on his, her, or its own behalf against any "person" alleged to be a past generator or

11   transporter who has contributed to the disposal of any solid or hazardous waste which presents an

12   imminent and substantial endangerment to the environment. MLCP, KACC, and DOES 1

13   through 100 are each a "person" as defined by 42 U.S.C. section 6903(15).

14        52.    KACC and DOES 1-100 are both a past generator and a past transporter that has

15   contributed to the disposal of solid and hazardous waste which presents an imminent and

16   substantial endangerment to the environment, as noted herein. Further, by their acts and

17   omissions KACC and DOES 1-100 have contributed to the creation of an imminent and

18   substantial endangerment to the environment, as noted herein. The releases and discharges from

19   the dumps constitute a disposal of both a solid and hazardous waste as described by 42 U.S.C.

20   sections 6903(3), 6903(5)(B), and 6903(27).

21        53.    The adverse impacts to soil, surface water, and groundwater from the discharges

22   from the dumps presents an imminent and substantial endangerment to the environment, as noted

23   herein, including The Property.

24        54.    Additionally, the migration of the wastes and the impacted soils, surface waters,

25   and groundwaters, as noted herein, pose an imminent and substantial endangerment to Monterey

26   Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property.

27        55.    MLCP seeks injunctive relief from the ongoing imminent and substantial

28

USDC NDCA No. C07 06072 RMW/PVT          - 12 -          FIRST AMENDED COMPLAINT FOR
                                                         DAMAGES AND INJUNCTIVE RELIEF

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  endangerment which requires KACC and DOES 1-100 to forthwith characterize and remediate

2  the contamination, including without limitation removing the two dumps from The Property. The

3  presence of unconfined and uncontrolled hazardous waste, as well as the leaching, discharges,

4  and releases as noted herein, will irreparably harm MLCP and further harm the environment,

5  including biota upon and ground and surface waters of The Property, Monterey Bay, Moss

6  Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property.

7       56.    MLCP seeks the imposition of civil penalties pursuant to 42 U.S.C. section

8  6928(g) in light of the historical and ongoing creation of an imminent and substantial

9  endangerment to the environment by and DOES 1-100 over a period in excess of 2½ decades to

10  the present. KACC and DOES 1-100 have been on notice since 1978, as noted in its filing with

11  EPA in 1981, that contaminated leachate from the dumps can escape and poses an imminent and

12  substantial threat to the environment.

13      57.    MLCP seeks an award of its costs, including reasonable attorney's fees and expert

14  witness fees, pursuant to 42 U.S.C. section 6972(e).

15                          **FOURTH CLAIM FOR RELIEF**

16  **Continuing Public Nuisance and Public Nuisance Per Se Alleged Against KACC and DOES**
                                        **1-100**

17

18      58.    MLCP incorporates the allegations set forth in Paragraphs 1 through 26, 29

19  through 35, and 42 through 46, inclusive, as though fully set forth herein.

20      59.    In permitting and continuing to permit the release and discharge of pollutions and

21  contaminants into the soil, surface water, and groundwater, as noted herein, KACC and DOES 1-

22  100 have created a condition that is harmful to health, offensive to the senses, and an obstruction

23  to the free use and enjoyment of property and the waters of the State. The conduct of KACC and

24  DOES 1-100 was and is unreasonable.

25      60.    In doing the acts and omissions alleged herein, KACC and DOES 1-100 violated

26  and failed to comply with statutes, ordinances, and regulations of public entities and agencies

27  relating to health, safety, and environmental protection.

28

USDC NDCA No. C07 06072 RMW/PVT        - 13 -        FIRST AMENDED COMPLAINT FOR
                                                    DAMAGES AND INJUNCTIVE RELIEF

Ropers M   ski Kohn & Bentley
A+....ssional Corporation
San Francisco

61.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100 violated and continue to violate State law, including but not limited to Section 5411 of the California Health & Safety Code. Section 5411 is, and at all times was, valid, in effect, and applicable to the dumps created by KACC and DOES 1-100; pursuant to Section 5461, violation of 5411 is a misdemeanor.

62.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100 violated and continue to violate State law, including but not limited to Sections 370 and 371 of the California Penal Code. Sections 370 and 371 are, and at all times were, valid, in effect, and applicable to the dumps created by KACC and DOES 1-100; pursuant to Section 372, violation of Section 370 is a misdemeanor.

63.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100 violated and continue to violate Federal law, including but not limited to 33 U.S.C. sections 1311(a) and 1345. Sections 1311 and 1345 are, and at all times were, valid, in effect, and applicable to the dumps, releases, and discharges created by KACC; pursuant to 33 U.S.C. section 1319(c), violation of either section 1311 or 1345 is a felony. KACC and DOES 1-100 were on notice as a result of the 1978 release of chromium contaminated leachate that ongoing releases could be reasonably anticipated, and that its failure to obtain an NPDES permit would allow such releases to continue in the future.

64.    The pollution and contaminants created or abetted by KACC and DOES 1-100 not only adversely impacts MLCP but also the People of the State of California who own all surface water and groundwater, including the groundwater beneath and surface water of The Property, Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the swamplands in and about The Property, pursuant to §§ 102 and 104 Water Code.

65.    The seriousness of the resulting harm outweighs the social utility of the conduct of KACC and DOES 1-100.

66.    MLCP's injury is separate and distinct from that of the public because contaminants and pollutants impacting The Property are migrating in surface waters and

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    groundwater and have adversely impacted both the soils and the surface and ground waters of The

2    Property, and separately and independently because MLCP has expended monies to characterize

3    the contamination.

4        67.    The pollution causing the continuing nuisance can be abated at a reasonable cost.

5        68.    MLCP has not consented to the discharge of pollutants or contaminants into the

6    soil, surface waters, and groundwater of The Property.

7        69.    As a proximate cause of the continuing nuisance created by KACC and DOES 1-

8    100, MLCP has incurred costs and suffered damages, and will continue to incur costs and suffer

9    damages until the soil, surface waters, and groundwater of The Property are remediated. MLCP

10   has incurred costs and expenses in an amount to be proven at trial; the amount incurred to date is

11   in excess of $1 million.

12       70.    MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately

13   cease all releases and discharges and forthwith characterize and remediate the contamination and

14   pollution. The continued commission and omissions of the alleged acts by KACC and DOES 1-

15   100 will irreparably harm MLCP. MLCP has no speedy or adequate remedy at law for this

16   irreparable harm.

17       71.    Because MLCP is in part benefiting the People of the State of California by

18   seeking remediation of surface water and groundwater owned by the People, and seeking to

19   benefit and prevent the further impairment of Monterey Bay, Moss Landing Harbor, Moro Cojo

20   Slough, and the swamplands in and about The Property, MLCP requests its attorney's fees

21   pursuant to Section 1021.5 C.C.P.

### FIFTH CLAIM FOR RELIEF

**Continuing Private Nuisance and Private Nuisance Per Se Alleged Against KACC and
DOES 1-100**

25       72.    MLCP incorporates the allegations set forth in Paragraphs 1 through 26, 29

     through 35, and 42 through 46, inclusive, as though fully set forth herein.

27       73.    As a result of the acts and omissions of KACC and DOES 1-100 as set forth herein

Ropers ' ski Kohn & Bentley
fessional Corporation
San Francisco

1    the soil, surface waters, and groundwater of The Property are now polluted and contaminated.

2        74.    The presence of pollutants and contaminants in the soil, surface water, and

3    groundwater of The Property constitutes a continuing nuisance in that it is injurious to health, or

4    is indecent or offensive to the senses, or an obstruction to the free use of property so as to

5    interfere with the comfortable enjoyment of life or property.

6        75.    The nuisance created by KACC and DOES 1-100 is substantial and unreasonably

7    interferes with the use and enjoyment of The Property by MLCP.

8        76.    In permitting and continuing to permit the release and discharge of pollutions and

9    contaminants into the soil, surface water, and groundwater, as noted herein, KACC and DOES 1-

10   100 have created a condition that is harmful to health, offensive to the senses, and an obstruction

11   to the free use and enjoyment of property. The conduct of KACC and DOES 1-100 were and is

12   unreasonable.

13       77.    In doing the acts and omissions alleged herein, KACC and DOES 1-100 violated

14   and failed to comply with statutes, ordinances, and regulations of public entities and agencies

15   relating to health, safety, and environmental protection.

16       78.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100

17   violated and continues to violate State law, including but not limited to Section 5411 of the

18   California Health & Safety Code. Section 5411 is, and at all times was, valid, in effect, and

19   applicable to the dumps created by KACC and DOES 1-100; pursuant to Section 5461, violation

20   of 5411 is a misdemeanor.

21       79.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100

22   violated and continues to violate Federal law, including but not limited to 33 U.S.C. sections

23   1311(a) and 1345. Sections 1311 and 1345 are, and at all times were, valid, in effect, and

24   applicable to the dumps, releases, and discharges created by KACC and DOES 1-100; pursuant to

25   33 U.S.C. section 1319(c), violation of either section 1311 or 1345 is a felony. KACC and DOES

26   1-100 were on notice as a result of the 1978 release of chromium contaminated leachate that

27   ongoing releases could be reasonably anticipated, and that its failure to obtain an NPDES permit

28

USDC NDCA No. C07 06072 RMW/PVT        - 16 -        FIRST AMENDED COMPLAINT FOR
                                                     DAMAGES AND INJUNCTIVE RELIEF

A – 361

1    would allow such releases to continue in the future.

2        80.    The injury of MLCP is separate and distinct from that of the public because

3    contaminants and pollutants impacting the soil of The Property and migrating in surface waters

4    and groundwater have impacted the soils, surface waters, and groundwater of The Property, and

5    separately and independently because MLCP has expended monies to characterize the pollution

6    and contamination. MLCP has incurred costs and expenses in an amount to be proven at trial; the

7    amount incurred to date is in excess of $1 million.

8        81.    The nuisance condition created by KACC and DOES 1-100 can be abated at a

9    reasonable cost.

10        82.    As a proximate cause of the continuing nuisance created by KACC and DOES 1-

11    100, MLCP has incurred costs and suffered damages, and will continue to incur costs and suffer

12    damages until the soil, surface waters, and groundwater of The Property are remediated. MLCP

13    has incurred costs and expenses in an amount to be proven at trial; the amount incurred to date is

14    in excess of $1 million.

15        83.    MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately

16    cease all discharges and releases and forthwith characterize and remediate the contamination and

17    pollution. The continued commission and omissions of the alleged acts by KACC and DOES 1-

18    100 will irreparably harm MLCP. MLCP has no speedy or adequate remedy at law for this

19    irreparable harm.

20        84.    Because MLCP is in part benefiting the People of the State of California by

21    seeking remediation of surface water and groundwater owned by the People, and seeking to

22    benefit and prevent the further impairment of Monterey Bay, Moss Landing Harbor, Moro Cojo

23    Slough, and the swamplands in and about The Property, MLCP requests its attorney's fees

24    pursuant to Section 1021.5 C.C.P.

## SIXTH CLAIM FOR RELIEF

### Negligence Per Se Alleged Against KACC and DOES 1-100

27        85.    MLCP incorporates the allegations set forth in Paragraphs 1 through 26, 29

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  through 35, 42 through 46, 59 through 60, and 64 through 69, inclusive, as though fully set forth

2  herein.

3      86.    At all times KACC and DOES 1-100 had a duty to conduct their disposal

4  operations associated with their manufacturing activities in such a manner so as to avoid

5  discharging and releasing pollutants and contaminants into the soil, surface waters, and

6  groundwater of The Property, and to immediately characterize and remediate any spills, releases,

7  and discharges that occurred or occur.

8      87.    KACC and DOES 1-100 have failed to satisfy their duty.

9      88.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100

10  violated and continues to violate State law, including but not limited to Section 5411 of the

11  California Health & Safety Code. Section 5411 is, and at all times was, valid, in effect, and

12  applicable to the dumps created by KACC; pursuant to Section 5461, violation of 5411 is a

13  misdemeanor.

14      89.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100

15  violated and continue to violate State law, including but not limited to Sections 370 and 371 of

16  the California Penal Code. Sections 370 and 371 are, and at all times were, valid, in effect, and

17  applicable to the dumps created by KACC and DOES 1-100; pursuant to Section 372, violation of

18  370 is a misdemeanor.

19      90.    By undertaking the acts and omissions alleged herein, KACC and DOES 1-100

20  violated and continues to violate Federal law, including but not limited to 33 U.S.C. sections

21  1311(a) and 1345. Sections 1311 and 1345 are, and at all times were, valid, in effect, and

22  applicable to the dumps, releases, and discharges created by KACC and DOES 1-100; pursuant to

23  33 U.S.C. section 1319(c), violation of either section 1311 or 1345 is a felony. KACC and DOES

24  1-100 were on notice as a result of the 1978 release of chromium contaminated leachate that

25  ongoing releases could be reasonably anticipated, and that its failure to obtain an NPDES permit

26  would allow such releases to continue in the future.

27      91.    MLCP is among the class of entities for whom the statutes KACC and DOES 1-

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

USDC NDCA No. C07 06072 RMW/PVT        - 18 -        FIRST AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF

1    100 violated were intended to protect.

2    92.    The damages and harm suffered by MLCP are the result of the statutory violations

3    of KACC and DOES 1-100 and the statutes in question were intended to protect against the type

4    of harm and damages that MLCP has suffered.

5    · 93.    As a proximate cause of the statutory violations by KACC and DOES 1-100,

6    MLCP has incurred costs and suffered damage and harm, and will continue to incur costs and

7    suffer damage and harm until the pollutants and contaminants adversely impacting the soil,

8    surface waters, and groundwater of The Property, Monterey Bay, Moss Landing Harbor, Moro

9    Cojo Slough, and the swamplands in and about The Property are characterized and remediated.

10    MLCP has incurred costs and expenses in an amount to be proven at trial; the amount incurred to

11    date is in excess of $1 million.

12    94.    MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately

13    cease all discharges and releases and forthwith characterize and remediate the contamination.

14    The continued commission and omissions of the alleged acts by KACC and DOES 1-100 will

15    irreparably harm MLCP.  MLCP has no speedy or adequate remedy at law for this irreparable

16    harm.

17    95.    Because MLCP is in part benefiting the People of the State of California by

18    seeking remediation of surface water and groundwater owned by the People, and seeking to

19    benefit and prevent the further impairment of Monterey Bay, Moss Landing Harbor, Moro Cojo

20    Slough, and the swamplands in and about The Property, MLCP requests its attorney's fees

21    pursuant to Section 1021.5 C.C.P.

22    ## SEVENTH CLAIM FOR RELIEF

23    **Declaratory Relief Alleged Against KACC and DOES 1-100 Pursuant to 28 U.S.C. § 2201
24    and California Code of Civil Procedure § 1060**

25    96.    MLCP incorporates the allegations set forth in Paragraphs 1 through 26, 28

26    through 38, 40 through 49, 51 through 57, 59 through 71, 73 through 84, 86 through 95, 106

27    through 109, and 111 through 115, inclusive, as though fully set forth herein.

28

USDC NDCA No. C07 06072 RMW/PVT    - 19 -    FIRST AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    97.    An actual controversy has arisen and now exists between MLCP and KACC and

2    DOES 1-100 concerning their respective rights and duties in that MLCP contends that KACC and

3    DOES 1-100 are responsible both at law and by contract for halting all discharges and releases of

4    contaminants and pollutants, obtaining an NPDES permit, immediately engaging in remedial

5    activities to clean-up the soil, surface waters, and groundwater contamination which MLCP

6    contends KACC and DOES 1-100 have created, reimbursing MLCP for its past costs,

7    compensating MLCP for its damages and losses, and paying any and all costs, fines, and penalties

8    imposed on MLCP or any other third party as a result of the contamination and pollution.  In

9    contrast KACC and DOES 1-100 disputes these contentions and contends that it has no duty at

10    law or by contract to halt discharges and releases or obtain an NPDES permit, remediate the

11    contamination and pollution, reimburse MLCP for its past costs, compensate MLCP for its

12    damages and losses, or pay any costs, fines, and penalties imposed on MLCP or any other third

13    party as a result of the contamination.

14    98.    MLCP desires a judicial determination of its rights and duties, and a declaration as

15    to the liability of KACC and DOES 1-100 under law and pursuant to contract to halt discharges

16    and releases, obtain an NPDES permit, remediate the contamination and pollution, reimburse

17    MLCP for its past costs, compensate MLCP for its damages and losses, and pay any and all costs,

18    fines, and penalties imposed on MLCP or any other third party as a result of the contamination.

19    99.    A judicial determination is appropriate and necessary at this time under the

20    circumstances in order that MLCP may ascertain its rights and duties, be relieved of the financial

21    and other burdens as set forth herein, and receive compensation for the detriment and damages

22    noted.

23    100.    Further, MLCP seeks injunctive relief pursuant to 28 U.S.C. § 2202 and §§ 525 et

24    seq. C.C.P. MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately

25    cease all discharges and releases, obtain an NPDES permit, and forthwith characterize and

26    remediate the contamination and pollution.

27    101.    In addition, MLCP, in bringing this action, acts within the public interest for the

28

1   protection of the citizens of California by seeking injunctive relief for the purpose of preventing

2   KACC and DOES 1-100 from discharging contaminants and pollutants, polluting soil, surface

3   waters, and groundwater, and failing to characterize and remediate their contamination. As such

4   MLCP requests its attorney's fees pursuant to Section 1021.5 C.C.P., 33 U.S.C. section 1365(d),

5   and 42 U.S.C. section 6972(e).

6                              **EIGHTH CLAIM FOR RELIEF**

7       **Equitable Indemnity and Contribution Against KACC and DOES 1-100 Pursuant to
                                    California Law**

8

9       102.    MLCP incorporates the allegations set forth in Paragraphs 1 through 26, 59

10  through 71, and 73 through 84, inclusive, as though fully set forth herein.

11      103.    As a result of the improper use of The Property by KACC and DOES 1-100, the

12  releases and discharges of contaminants and pollutants from the two dumps, and the improper

13  acts and omissions of KACC and DOES 1-100 as noted herein, MLCP has suffered and will

14  continue to suffer liability, damages, costs, and expenses for which MLCP is entitled to

15  indemnification and contribution from KACC and DOES 1-100 in an amount according to proof,

16  but not less than $1 million.

17      104.    Accordingly, MLCP is entitled to indemnity and contribution from KACC and

18  DOES 1-100 for all liabilities, claims, damages, costs, and expenses, as set forth herein, in an

19  amount to be proven at trial, but not less than $1 million.

20                              **NINTH CLAIM FOR RELIEF**

21          **Section 1428 California Civil Code Against KACC and DOES 1-100**

22      105.    MLCP incorporates the allegations set forth in Paragraphs 1 through 26, 28

23  through 38, 40 through 49, 51 through 57, 59 through 71, and 73 through 84, inclusive, as though

24  fully set forth herein.

25      106.    KACC and DOES 1-100 have an obligation at law, pursuant to Section 3479 Civil

26  Code, Section 5411 Health & Safety Code, 33 U.S.C. section 1311, 33 U.S.C. section 1345, and

27  42 U.S.C. section 6972(a)(1)(B), among other laws, to (a) not create conditions of contamination

28

Ropers ⋯ ⋯ski Kohn & Bentley
A ⋯ ⋯ressional Corporation
San Francisco

1   and pollution as a result of its industrial and manufacturing operations, including the creation of

2   the two dumps in a manner that they discharge and release contaminants and pollutants into the

3   soil, surface waters, and groundwater of The Property; (b) take affirmative steps to obtain an

4   NPDES permit and to prevent the release and discharge of pollutants and contaminants that

5   adversely impact The Property, Monterey Bay, Moss Landing Harbor, Moro Cojo Slough, and the

6   swamplands in and about The Property; and, (c) characterize and remediate the contamination

7   and pollution that has resulted and is resulting from the two dumps.

8        107.   KACC and DOES 1-100 have failed to undertake and implement its obligations at

9   law.

10       108.   MLCP seeks injunctive relief requiring KACC and DOES 1-100 to immediately

11   cease all discharges and releases, obtain an NPDES permit, and forthwith characterize and

12   remediate the contamination and pollution. The continued commission and omissions of the

13   alleged acts by KACC and DOES 1-100 will irreparably harm MLCP. MLCP has no speedy or

14   adequate remedy at law for this irreparable harm.

15       109.   Because MLCP is in part benefiting the People of the State of California by

16   seeking remediation of surface water and groundwater owned by the People, and seeking to

17   benefit and prevent the further impairment of Monterey Bay, Moss Landing Harbor, Moro Cojo

18   Slough, and the swamplands in and about The Property, MLCP requests its attorney's fees

19   pursuant to Section 1021.5 C.C.P.

20                   **TENTH CLAIM FOR RELIEF**

21             **Breach of Contract Against KACC and DOES 1-100**

22       110.   MLCP incorporates the allegations set forth in Paragraphs 1 through 26, 59

23   through 71, and 73 through 84, inclusive, as though fully set forth herein.

24       111.   As part of its purchase of The Property from NRMC, MLCP alleges on

25   information and belief that it took assignment of the Agreement for Environmental Compliance

26   set forth as Exhibit E hereto. As a separate and independent basis for this Claim, MLCP alleges

27   that the Agreement for Environmental Compliance runs with the land.

28

USDC NDCA No. C07 06072 RMW/PVT     -22-     FIRST AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF

Ropers ^ .:ski Kohn & Bentley
A . .fessional Corporation
San Francisco

1    112.    MLCP has performed all conditions, covenants, and promises required of its part

2    in accordance with the terms of the Agreement on Environmental Compliance.

3    113.    On or about November 30, 2007 MLCP requested KACC perform its obligations

4    under Section 2.5.

5    114.    On information and belief, MLCP alleges that KACC has breached the Agreement

6    by refusing to reimburse MLCP for its costs and expenses.

7    115.    As a result of the breach by KACC, MLCP has incurred costs and expenses that

8    are costs and expenses for which KACC has an obligation to pay 100%. MLCP has been

9    damaged in an amount to be proven at trial, but not less than $1 million.

10                            **PRAYER FOR RELIEF**

11    Wherefore, MLCP prays for relief against KACC and DOES 1-100 as follows:

12    1.    With respect to the First, Second, Seventh, and Ninth causes of action, for an

13    injunction requiring KACC and DOES 1-100 to obtain an NPDES permit as noted herein and

14    implement the pollution control requirements thereof.

15    2.    With respect to the First through Seventh and Ninth causes of action, for an

16    injunction requiring KACC and DOES 1-100 cease all discharges and releases of contaminants

17    and pollutants, and to characterize and remediate the contamination and pollution as noted herein.

18    3.    With respect to the First, Second, and Third causes of action, for the imposition of

19    civil penalties pursuant to 33 U.S.C. section 1319 and 42 U.S.C. section 6928(g).

20    4.    With respect to the First through Seventh and Ninth causes of action, for costs,

21    including attorney's fees and expert witness fees, pursuant to 33 U.S.C. section 1365(d), 42

22    U.S.C. section 6972(e), and Section 1021.5 California Code of Civil Procedure.

23    5.    With respect to the Seventh Cause of Action, for a declaration that KACC and

24    DOES 1-100 are obligated to halt all discharges and releases of contaminants and pollutants, to

25    obtain an NPDES permit, to characterize and remediate the adverse impact of the contaminants

26    and pollutants, to compensate MLCP for its damages, costs, and losses in an amount to be proven

27    at trial, but not less than $1 million, and to pay any and all costs, fines, and penalties imposed on

28

USDC NDCA No. C07 06072 RMW/PVT        - 23 -        FIRST AMENDED COMPLAINT FOR
                                                    ~ ' MAGES AND INJUNCTIVE RELIEF

Ropers M  ski Kohn & Bentley
ssional Corporation
A    San Francisco

1    MLCP or any other third party as a result of the contamination and pollution.

2        6.    With respect to the Fourth through Sixth, Eighth, and Tenth causes of action, for

3    an award for the damages and losses of MLCP in an amount to be proven at trial, but not less than

4    $1 million.

5        7.    For costs of suit incurred herein.

6        8.    For prejudgment interest on all damages as authorized by law.

7        9.    For such other and further relief as this Court deems just and proper.

8    Dated:  November 30, 2007                    ROPERS, MAJESKI, KOHN & BENTLEY

9

10                                         By:_____/s/ Thomas H. Clarke, Jr._____
                                              THOMAS H. CLARKE, JR.
11                                            Attorneys for Plaintiff
                                              MOSS LANDING COMMERCIAL PARK
12                                            LLC

13

14                            **DEMAND FOR JURY TRIAL**

15        Pursuant to FRCP 38(b), MLCP demands a jury trial in this matter.

16    Dated:  November 30, 2007                    ROPERS, MAJESKI, KOHN & BENTLEY

17

18                                         By:_____/s/ Thomas H. Clarke, Jr._____
                                              THOMAS H. CLARKE, JR.
19                                            TIMOTHY A. DOLAN
                                              Attorneys for Plaintiff
20                                            MOSS LANDING COMMERCIAL PARK
                                              LLC
21

22

23

24

25

26

27

28
    USDC NDCA No. C07 06072 RMW/PVT          - 24 -          FIRST AMENDED COMPLAINT FOR
                                                            DAMAGES AND INJUNCTIVE RELIEF

Ropers ^ A · ˌessional Corporation San Francisco ˌski Kohn & Bentley

1   Exhibits:

2   A: Aerial of property showing harbor, slough etc.

3   B: Map showing boundaries of Monterey Bay Nat. Marine Sanctuary.

4   http://montereybay.noaa.gov/intro/maps/mbfound_lg.jpg

5   C: Diagram from 1981 filing showing two dumps.

6   D: ATSDR monogram on Chromium, Antimony, Nickel, lead

7   http://www.atsdr.cdc.gov/tfacts13.html

8   http://www.atsdr.cdc.gov/tfacts15.html

9   http://www.atsdr.cdc.gov/tfacts7.pdf

10   http://www.atsdr.cdc.gov/tfacts23.html

11   E: Enviro Indemnity Agreement

12   RC1/5033579.3/CB12

Ropers N·   ski Kohn & Bentley
A . .cssional Corporation
San Francisco

**EXHIBIT J**

k.       All other actions, documents, consents and agreements necessary to implement the Plan will have been effected, obtained and/or executed.

### 10.3    Waiver of Conditions to the Confirmation or Effective Date

The conditions to Confirmation set forth in Section 10.1 and the conditions to the Effective Date set forth in Section 10.2 may be waived in whole or part by the Debtors at any time and without an order of the Bankruptcy Court with consent of the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative; *provided, however*, that in the event the Retirees' Committee fails to consent and all other such consents have been given, a condition may be waived pursuant to an order of the Bankruptcy Court.

### 10.4    Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 10.3, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided, however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section 10.4: (a) the Plan will be null and void in all respects including with respect to (i) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code and (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Sections 6.1 and 6.3; and (b) nothing contained in the Plan will (i) constitute a waiver or release of any claims by or against, or any Interest in, the Debtors or (ii) prejudice in any manner the rights of the Debtors or any other party in interest.

### ARTICLE XI

### CRAMDOWN

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code with respect to: (a) any impaired Class other than Class 5 that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code; and (b) any Class that is deemed to have not accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### ARTICLE XII

### DISCHARGE, TERMINATION AND INJUNCTION

### 12.1    Discharge of Claims and Termination of Interests

a.       Except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan, in the Confirmation Order or the Environmental Settlement Agreement, Confirmation will, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts and Interests that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code, or (C) the holder of a Claim based on such debt has accepted the Plan; and (ii) terminate all Interests and other rights of equity security holders in the Debtors.

b.     In accordance with the foregoing, except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors and a termination of all Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest. The foregoing will not limit any rights that the United States of America or the individual States may have under environmental laws to seek to enforce equitable remedies against the Debtors, the Reorganized Debtors or the successors thereto to the extent such equitable remedies are not considered Claims under applicable bankruptcy law and relate to matters that have not been resolved by the Environmental Settlement Agreement or other settlements; *provided, however,* that the Debtors, the Reorganized Debtors or the successors thereto may raise any and all available defenses (including defenses under bankruptcy law) in any action by the United States of America or an individual State to enforce such equitable remedies. Under the Plan, all rights and defenses (including defenses under bankruptcy law) of the Debtors, the Reorganized Debtors and the successors thereto and the United States of America with regard to the Reserved Sites (as such term is defined in the Environmental Settlement Agreement) for which the Debtors and the United States of America have not reached settlement as of the Confirmation Date will be preserved. Notwithstanding any provision of the Plan, the rights of the United States of America or the individual States party to the Environmental Settlement Agreement with respect to Debtor-Owned Sites (as such term is defined in the Environmental Settlement Agreement) will be governed by the Environmental Settlement Agreement.

c.     Nothing in this Section 12.1 shall affect the right of any PI Insurance Company to assert any PI Insurer Coverage Defense.

**12.2    Injunctions**

a.     **In addition to the injunctions provided in the PI Channeling Injunctions, except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, as of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability of the Debtors, or an Interest or other right of an equity security holder with respect to the Debtors, that is discharged, released, waived, settled or deemed satisfied in accordance with the Plan will be permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests or rights:  (i) commencing or continuing in any manner any action or other proceeding against the Debtors, the Reorganized Debtors or the property of any of them, other than to enforce any right pursuant to the Plan to a distribution; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors or the property of any of them, other than as permitted pursuant to (i) above; (iii) creating, perfecting or enforcing any lien or encumbrance of any kind against the Debtors, the Reorganized Debtors or the property of any of them; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.**

b.     **In addition to the injunctions provided in the PI Channeling Injunctions, as of the Effective Date, all entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Plan, including pursuant to Section 4.5, will be permanently enjoined from taking any of the following actions against any released entity or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities:  (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.**

c.     **Channeled PI Insurance Entity Injunction**

A – 373

(i)     Purpose.  In order to protect the Funding Vehicle Trust and each PI Trust and to preserve the PI Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue as part of the Confirmation Order the Channeled PI Insurance Entity Injunction; *provided, however*, that:  (A) the Funding Vehicle Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the Channeled PI Insurance Entity Injunction with respect to any PI Insurance Company upon express written notice to such PI Insurance Company; and (B) the Channeled PI Insurance Entity Injunction is not issued for the benefit of any PI Insurance Company, and no PI Insurance Company is a third-party beneficiary of the Channeled PI Insurance Entity Injunction.

(ii)    Terms.  Subject to the provision of Section 12.2.c(i) of the Plan, all Entities (excluding, however, the Funding Vehicle Trust, the Asbestos PI Trust, the Silica PI Trust, the CTPV PI Trust, the NIHL PI Trust and the Reorganized Debtors to the extent they are permitted or required to pursue claims relating to any PI Insurance Coverage Action and/or the PI Insurance Assets) that have held or asserted, that hold or assert or that may in the future hold or assert any claim, demand or cause of action (including any Channeled Personal Injury Claim or respecting any Trust Expense) against any PI Insurance Company based upon, attributable to, arising out of or in any way connected with any such Channeled Personal Injury Claim, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction or recovery with respect to any such Claim, Demand or cause of action including, but not limited to:

(A)     commencing, conducting or continuing, in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including a judicial, arbitration, administrative or other proceeding) in any forum with respect to any such Claim, Demand or cause of action against any PI Insurance Company, or against the property of any PI Insurance Company, with respect to any such claim, demand or cause of action;

(B)     enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any PI Insurance Company, with respect to any such claim, demand or cause of action;

(C)     creating, perfecting or enforcing in any manner, directly or indirectly, any encumbrance against any PI Insurance Company, or the property of any PI Insurance Company, with respect to any such claim, demand or cause of action; and

(D)     except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, directly or indirectly, against any obligation of any PI Insurance Company, or against the property of any PI Insurance Company, with respect to any such claim, demand or cause of action;

*provided, however*, that:  (x) the Channeled PI Insurance Entity Injunction shall not impair in any way any actions brought by the Funding Vehicle Trust and/or the Reorganized Debtors against any PI Insurance Company; (y) the Funding Vehicle Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the Channeled PI Insurance Entity Injunction with respect to any PI Insurance Company upon express written notice to such PI Insurance Company; and (z) the Channeled PI Insurance Entity Injunction is not issued for the benefit of any PI Insurance Company, and no PI Insurance Company is a third-party beneficiary of the Channeled PI Insurance Entity Injunction.

(iii)   Reservations.  Notwithstanding anything to the contrary above, this Channeled PI Insurance Entity Injunction shall not enjoin:

A – 374

(A)    the rights of entities to the treatment accorded them under the Plan, as applicable, including the rights of holders of Channeled Personal Injury Claims to assert such Claims, as applicable, in accordance with the applicable PI Trust Distribution Procedures;

(B)    the rights of entities to assert any claim, debt, obligation, cause of action or liability for payment of Trust Expenses against the Funding Vehicle Trust or a PI Trust;

(C)    the rights of the Funding Vehicle Trust and the Reorganized Debtors (to the extent permitted or required under the Plan) to prosecute any action based on or arising from the Included PI Trust Insurance Policies;

(D)    the rights of the Funding Vehicle Trust and the Reorganized Debtors to assert any claim, debt, obligation, cause of action or liability for payment against a PI Insurance Company based on or arising from the Included PI Trust Insurance Policies;

(E)    the rights of any PI Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other PI Insurance Company that is not a Protected Party; and

(F)    the rights of any PI Insurance Company to assert any PI Insurer Coverage Defense.

## ARTICLE XIII

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Reorganization Cases after the Effective Date as is legally permissible, including jurisdiction to:

a.    Interpret, enforce and administer the Funding Vehicle Trust Agreement, the PI Trust Funding Agreement or a PI Trust Agreement (including all annexes and Exhibits thereto);

b.    Hear and determine any proceeding that involves the validity, application, construction, enforceability or modification of the PI Channeling Injunctions or of the application of section 105 or section 524(g) of the Bankruptcy Code to any of the PI Channeling Injunctions;

c.    Hear and determine all objections to the termination of the Funding Vehicle Trust and any PI Trust;

d.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim (other than Channeled Personal Injury Claims) or Interest, including the resolution of any request for payment of any Administrative Claim, the resolution of any objections to the allowance, priority or classification of Claims (other than Channeled Personal Injury Claims) or Interests;

e.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

f.    Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

A – 375

## IX.   DISCHARGE, TERMINATION AND INJUNCTIONS.

### A.   DISCHARGE OF CLAIMS AND SATISFACTION AND TERMINATION OF INTERESTS.

1.     Except as provided in the Plan, this Confirmation Order or the Environmental Settlement Agreement, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date.  Except as provided in the Plan, this Confirmation Order or the Environmental Settlement Agreement, Confirmation shall, as of the Effective Date:  (a) discharge the Reorganizing Debtors from all Claims or other debts and Interests that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Interests and other rights of equity security holders in the Reorganizing Debtors.

2.     In accordance with the foregoing, except as provided in the Plan, this Confirmation Order or the Environmental Settlement Agreement, as of the Effective Date, all Claims and other debts and liabilities against the Reorganizing Debtors shall be discharged and all Interests and other rights of equity security holders in the Reorganizing Debtors shall be terminated, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against a Reorganizing Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.  The foregoing shall not limit any rights that the United States of America or the individual States may have under environmental

38

A – 376

laws to seek to enforce equitable remedies against the Reorganizing Debtors, the Reorganized

Debtors or the successors thereto to the extent such equitable remedies are not considered Claims

under applicable bankruptcy law and relate to matters that have not been resolved by the

Environmental Settlement Agreement or other settlements; *provided, however,* that the

Reorganizing Debtors, the Reorganized Debtors or the successors thereto may raise any and all

available defenses (including defenses under bankruptcy law) in any action by the United States

of America or an individual State to enforce such equitable remedies.  Under the Plan, all rights

and defenses (including defenses under bankruptcy law) of the Reorganizing Debtors, the

Reorganized Debtors and the successors thereto and the United States of America with regard to

the Reserved Sites (as such term is defined in the Environmental Settlement Agreement) for

which the Reorganizing Debtors and the United States of America have not reached settlement as

of the Confirmation Date shall be preserved.  Notwithstanding any provision of the Plan, the

rights of the United States of America or the individual States party to the Environmental

Settlement Agreement with respect to Debtor-Owned Sites (as such term is defined in the

Environmental Settlement Agreement) shall be governed by the Environmental Settlement

Agreement.

   3.  Nothing in Section IX.A of this Confirmation Order or in Section 12.1 of

the Plan shall affect the right of any PI Insurance Company to assert any PI Insurer Coverage

Defense.

  **B.**  **INJUNCTIONS.**

    **1.**  **Issuance of the PI Channeling Injunctions and the Channeled PI Insurance Entity Injunction**

   In connection with the creation of the PI Trusts, and to supplement the injunctive

relief of a discharge under section 524 of the Bankruptcy Code, the PI Channeling Injunctions,

(iii)    the rights of the Funding Vehicle Trust and the Reorganized Debtors (to the extent permitted or required under the Plan) to prosecute any action based on or arising from the Included PI Trust Insurance Policies;

(iv)    the rights of the Funding Vehicle Trust and the Reorganized Debtors to assert any claim, debt, obligation, cause of action or liability for payment against a PI Insurance Company based on or arising from the Included PI Trust Insurance Policies;

(v)    the rights of any PI Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other PI Insurance Company that is not a Protected Party; and

(vi)    the rights of any PI Insurance Company to assert any PI Insurer Coverage Defense.

**8.    Injunctions Related to Discharge or Releases Granted Pursuant to the Plan**

a.    In addition to the PI Channeling Injunctions set forth above, except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, as of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability of the Reorganizing Debtors, or an Interest or other right of an equity security holder with respect to the Reorganizing Debtors, that is discharged, released, waived, settled or deemed satisfied in accordance with the Plan will be permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Reorganizing Debtors, the Reorganized Debtors or the property of any of them, other than to enforce any right pursuant to the Plan to a distribution; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Reorganizing Debtors, the

Reorganized Debtors or the property of any of them, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or encumbrance of any kind against the Reorganizing Debtors, the Reorganized Debtors or the property of any of them; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Reorganizing Debtors or the Reorganized Debtors; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.

        b.     In addition to the PI Channeling Injunctions set forth above, except as provided in the Plan, this Confirmation Order or the environmental Settlement Agreement, as of the Effective Date, all entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Plan, including pursuant to Section 4.5 of the Plan, will be permanently enjoined from taking any of the following actions against any released entity or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to any released entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.

**EXHIBIT K**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | : **Jointly Administered** |
| **KAISER ALUMINUM CORPORATION,** | : **Case No. 02-10429 (JKF)** |
| a Delaware corporation, <u>et al.,</u> | : |
| | : **Chapter 11** |
| Debtors. | : |
| | : |

| | |
|---|---|
| | : |
| **KAISER ALUMINUM CORPORATION,** | : |
| <u>et al.,</u> | : |
| | : |
| Movants, | : |
| | : |
| **v.** | : |
| | : |
| **MOSS LANDING COMMERCIAL** | : |
| **PARK LLC,** | : |
| | : |
| Respondent. | : |

## ORDER ENFORCING INJUNCTIONS ISSUED IN CONNECTION WITH THE SECOND AMENDED JOINT PLAN OF REORGANIZATION AND COMPELLING MOSS LANDING COMMERCIAL PARK LLC TO DISMISS WITH PREJUDICE ITS LAWSUIT AGAINST KAISER ALUMINUM <u>CORPORATION AND KAISER ALUMINUM & CHEMICAL CORPORATION</u>

This matter coming before the Court on the Motion of Reorganized Debtors to

(A) Enforce Injunctions Issued in Connection with the Second Amended Joint Plan Of

Reorganization and (B) Compel Moss Landing Commercial Park LLC to Dismiss, with

Prejudice, its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical

Corporation (the "Motion"), filed by the above-captioned Reorganized Debtors;[1] the Court

having (a) entered an order approving the Consent Decree, (b) entered the Confirmation Order

and (c) reviewed the Motion and all other related pleadings; the Court finding that (a) the Court

---

[1]    All capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, Article XIII of the Plan

and Section XII of the Confirmation Order, (b) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2) and (c) notice of the Motion was sufficient under the circumstances; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    In accordance with the Consent Decree and the injunctions issued pursuant to the

Plan in the Confirmation Order, within ten days after entry of this Order, MLCP shall dismiss its

lawsuit against KAC and KACC.

3.    This Court shall retain jurisdiction over the Reorganized Debtors and MLCP with

respect to any matters relating to or arising from the Motion or the implementation of this Order.

Dated: _____, 2008        _____

                    THE HONORABLE JUDITH K. FITZGERALD
                    UNITED STATES BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| **KAISER ALUMINUM CORPORATION,** | : | **Jointly Administered** |
| a Delaware corporation, <u>et al.</u>, | : | **Case No. 02-10429 (JKF)** |
| | : | |
| Debtors. | : | **Chapter 11** |
| | : | |
| | : | |

## CERTIFICATE OF SERVICE

   I, Christopher M. Samis, do hereby certify that on December 28, 2007, I caused copies of the below listed document to be served upon the All Notices list as such term is defined in the Third Amended Order Establishing Case Management Procedures and Hearing Schedule [Docket No. 8353], via electronic mail and any list attached hereto referencing special parties in the manner indicated.[1]

> - **Motion of Reorganized Debtors to (A) Enforce Injunctions Issued in Connection with the Second Amended Joint Plan of Reorganization and (B) Compel Moss Landing Commercial Park LLC to Dismiss with Prejudice its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical Corporation**

Dated: December 28, 2007

             _____
             Christopher M. Samis (No. 4909)

---

[1] All parties have been served via electronic mail unless such party has notified the Debtors that they do not have access to electronic mail.

**Special Service**

*Via Fed Ex*
Thomas H. Clarke, Jr.
Timothy A. Dolan
ROPERS, MAJESKI, KOHN & BENTLEY
201 Spear Street, Suite 1000
San Francisco, CA 94105

# Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    :    Jointly Administered
                                          :    Case No. 02-10429 (JKF)
KAISER ALUMINUM CORPORATION, a            :
Delaware Corporation, et al.,             :    Chapter 11
                                          :
          Debtors.                        :
                                          :

**DECLARATION OF DAN GIFFIN IN SUPPORT OF OPPOSITION TO MOTION
BY DEBTOR KAISER TO ENFORCE INJUNCTION**

I, Daniel A. Giffin, PhD, PG, declare the following:

1.    I am an environmental consultant and sole owner of Giffin Consulting,
      specializing in advising clients on technical issues related to soils and
      sediments, groundwater, and surface water contamination. The factual
      matters that follow are based on data and facts obtained from an extensive
      review of environmental reports pertaining to the site, combined with the
      use of my education and twenty-four years of experience, and the review
      of pertinent Federal and State of California environmental regulations and
      guidance. The documents relied on are listed in the reference section at
      the end of this declaration. These expert opinions have been made to a
      reasonable degree of scientific certainty.

**Qualifications and Experience**

2.    I have 24 years of continuous experience as a consultant in hydrogeology
      and subsurface contamination. I have a Bachelors Degree in Geology
      from West Virginia University, graduating Summa Cum Laude in 1984,
      and a Doctorate in Coastal Resources Management: Geosciences from
      East Carolina University in 2003. I have been a registered geologist in
      several states, and a Registered Environmental Assessor in California. I

RCI/5064793.2/THC

currently hold professional registrations in North Carolina (#1594) and
Tennessee (TN1244).

3.   I have given numerous presentations on groundwater, soils, sediments, and
surface water, and authored seven technical journal articles in various
refereed scientific publications. I was co-author of the EPA manual
Basics of Pump-and-Treat Groundwater Remediation Technology
(EPA/600/8-90/003).

4.   As an environmental consultant, I have been involved in Federal
Superfund projects as varied as Love Canal, Savannah River Plant, and
Rocky Mountain Arsenal. I have served as an expert witness on solvent
contamination and groundwater issues, and as a consultant for litigation
support on hydrocarbon and solvent sites and on sites with complex
hydrogeology. I have also provided clients with research and
recommendations regarding remedial alternatives and risk-based remedial
strategies, and have successfully negotiated to date with six EPA regions
and over 20 state-level agencies.

5.   My recent dissertation (2003) entitled Impacts of Sediment Resuspension
on Water Quality in the Pamlico and Neuse River Estuaries evaluated the
impact of contaminants on estuaries using radionuclides to assess and
develop the total maximum daily load (TMDL). This TMDL process
involves ascertaining the maximum amount of a chemical or material that
can be placed in a body of water (such as a river) without causing the body
of water to be in violation of applicable water quality standards.

6.   I was a Board member of the Carolina Estuary Research Foundation from
2003-2004.

7.   I have performed pro bono environmental consulting services to C-Cape, a
citizen's group, regarding the analysis of environmental impacts from
proposed projects for the installation of an Ethanol Plant on Radio Island,
North Carolina and the installation of a Liquefied Nitrogen Gas (LNG)
Plant at North Carolina's Morehead City Port. I have been an advisor on

environmental issues to a former mayor in Beaufort, North Carolina and to the director of the North Carolina Maritime Museum.

8.    A complete copy of my curriculum vitae is provided in Attachment A, which outlines my education, employment history, in-depth environmental experience, and publications.

## The Source for Subsurface Soil and Groundwater Contamination at the Moss Landing Commercial Park (MLCP) is the Waste Piles ("Landfills 1 and 2").

9.    Soils and groundwater beneath Moss Landing Commercial Park (MLCP or "the site") have been contaminated with heavy metals, especially chromium, hexavalent chrome, antimony, lead, and nickel. These contaminants are the result of leaching from waste materials from industrial operations that were deposited in what were called Landfills 1 and 2, which are located on real property currently owned by MLCP. It should be noted these "landfills" were not then and are not now constructed using engineering standards that would be in compliance with Subtitle C of the Resource Conservation and Recovery Act (40 C.F.R., Parts 264 & 265). These RCRA regulations require certain design standards in order for a waste depository to be properly designated as a "landfill." 40 C.F.R., Part 264, Subpart N, Section 264.30 outlines the following requirements for landfill design: Design standards for hazardous waste landfills require a double liner; double leachate collection and removal systems (LCRS); leak detection system; run on, runoff, and wind dispersal controls; construction quality assurance (CQA) program. Therefore, these "landfills," which were created by Kaiser, should more appropriately be called "waste piles" because they are piles of waste that do not conform to landfill standards.

10.    A Phase-1 Environmental Site Assessment performed by TRC in 2001 details the operations at the site starting from the 1940s. Kaiser Aluminum and Chemical Corporation (Kaiser) constructed a magnesia

RC1/5064793.2/THC

plant and refractory brick plant in 1946-47, and installed and utilized various ovens, kilns, etc. from then through the 1980s. The magnesia plant produced magnesium hydroxide, magnesium oxide, by-products, and solutions. The brick plant operations consisted of the production of refractory brick and other specialties. Chrome ore, specifically chromite, was used in the process of making refractory brick. In a 1981 EPA Notification of Hazardous Waste Site made by Kaiser to the U.S. EPA, the source of the wastes from the manufacture of refractories that were deposited in "Landfills" 1 and 2 on the then Kaiser site was listed as heavy metals, formally identified as a D007 waste pursuant to the Resource Conservation and Recovery Act (RCRA), section 3001.

11.     In the 1981 EPA Notification, a description of the wastes at the site notes that these heavy metals contain soluble chromium compounds, meaning they are capable of being dissolved by and in water. This document also described the placement of these wastes as occurring up to 1978 in Landfill 1 and that, as of 1981, 5 million (5,000,000) cubic feet of waste had been deposited in the landfills. The Notice also states that in 1978 leachate (liquids from inside the waste piles), containing chromium, was observed discharging (being emitted) to a runoff ditch along Dolan Road. Subsequently, both the California State Health Department, Hazardous Waste Section, and the Regional Water Quality Control Board (RWQCB) became aware of the site activities. The California State Health Department allegedly (according to the Notification) told Kaiser that the site did not meet the regulatory requirements for disposal sites and that RWQCB had jurisdiction over the leachate production issue. Remedial work, consisting of paving over the top surface area of Landfill 1 and installing a collection pipe was performed; Kaiser ceased use of this waste pile. Thereafter, only "Landfill" 2 as a site for waste disposal; Landfill 2 was used until approximately 1980. It bears repeating that these "landfills" were not constructed using engineering standards that would be

in compliance with Subtitle C of RCRA (40 C.F.R., Parts 264 & 265), and thus should more appropriately be called waste piles.

12.   The lack of liners (impermeable barriers) at Landfills 1 and 2 has had two consequences. It allowed heavy metal-containing leachate both to be created and to be released to the site area in 1978. It has also allowed ongoing contamination of surface waters at the site.

13.   Rainwater, surface water, and groundwater have infiltrated the waste piles and impacted groundwater since there was not then and is not now a liner on the sides or bottom of the waste piles to retard the flow of water into the waste piles. There also was no surficial barrier whatsoever on the waste piles to prevent rainwater, surface water, and groundwater infiltration from producing leachate until the placement of an asphalt cap in 1978 on Landfill 1 and what apparently was a partial cap on Landfill 2 in approximately 1980 (see Paragraph 15 regarding this partial cap). However, these caps only covered the tops of the waste piles (though see Paragraph 15 below), and did not prevent the infiltration of rainwater, surface water, and groundwater into the waste piles from the sides and bottoms of the waste piles.

14.   In 1984 National Refractories and Minerals Corp. (NRM) purchased the facility.

15.   In 1996 Geomatrix Consultants performed a site inspection at the request of NRM to determine the condition of the waste piles and the asphalt caps that were put on the waste piles (Landfill 1 in 1978 and Landfill 2 at a later date). Geomatrix noted that some areas of the cap on Landfill 1 had heaved (swollen upwards, creating a large bulge or dome) and cracked, and in some places these heaves were up to 3 feet higher than the adjacent surface of the landfill, and that there were cracks up to 1-inch wide. It was proposed at the time that the heaving was the result of expansion resulting from hydration, the chemical combination of water with materials in the waste pile, probably magnesium hydroxide. Hydration, resulting in expansion and the resultant heaving, can usually only occur through the

following mechanisms: surface infiltration of water through the cracks in the top of the waste piles, infiltration of water through the unprotected sides of the waste piles, and/or from the intrusion of shallow groundwater into the waste piles, all of which occur at this site; these actions cause water to flow through the waste piles. Geomatrix concluded that "the landfill has been subject to high groundwater and side-slope infiltration since it was built over 20 years ago." The side-slopes of Landfill 1 were described as not being capped or treated with asphalt or any other material. They also noted that the area where the largest heave occurred could have surface water runoff infiltrating into the waste pile. No heaving was noted at Landfill 2; however, they described this waste pile as only one-third paved while one-third had only a gravel cover and another third, beneath an equipment "boneyard" (storage area), had no surfacing or cap at all. There is no record of any cap ever being placed over the two-thirds of Landfill 2 that remained uncovered at the time of Geomatrix's 1996 inspection. No mention of ever paving the area in Landfill 2 was ever made in the 1981 EPA filing either. This means that this waste pile was subject to ongoing surficial infiltration of surface water and precipitation, thus more likely producing a higher amount of leachate over the intervening years. All three sources of infiltration (precipitation, surface water runoff, and a shallow groundwater table) eventually led to the ongoing production of a heavy metal leachate contamination from both waste piles that is found in both surface water and groundwater at the site.

16.    In 2002, Pacific Crest Engineering Inc. performed the first known subsurface investigation of soil and groundwater at the site for NRM. They drilled a total of 21 soil borings ranging from 13.5 to 39 feet below surface and 14 hand-augered borings ranging from 1.5 to 15.5 feet below surface; they analyzed 37 soil samples and 20 groundwater samples. All of the seven borings on the perimeter of the waste piles that were analyzed detected chromium. Eight of the groundwater samples taken on the perimeter of Landfills 1 and 2 were found to contain hexavalent

RCl/5064793.2/THC

chromium, of which five of these were above the Maximum Contaminant
Level (MCL) for total chromium in groundwater.  Groundwater within the
borings was encountered at depths ranging from 2 to 24 feet below surface
in the vicinity of Landfill 1.  At Landfill 2 groundwater ranged from 17.5
to 24.5 feet below surface.  Figure 1 (Figure 3 from Pacific Crest
Engineering Inc., 2002) to this Declaration shows the location of the
borings that directly surrounded the waste piles.  Hexavalent chromium
was detected in borings B-2, B-3, and B-9 at concentrations up to 520
parts per billion (ppb) at Landfill 1.  Total chromium was also found and
exceeded the MCL in both borings B-2 and B-3 with concentrations up to
450 ppb.  In the vicinity of Landfill 2, borings B-5, B-6, and B-7 all
showed the presence of hexavalent chromium with a concentration up to
1900 ppb at B-7.  All three borings detected total chromium above MCLs
with concentrations ranging up to 1700 ppb.  It should be noted that
borings B-1, B-8, and HA-13 all showed nondetect for both hexavalent
chromium and total chromium.  It was later shown by subsequent site
studies that these were all emplaced on the upgradient sides of the waste
piles, thereby showing that the down-gradient borings, those cited above
as contaminated, have all been impacted from leachate flowing from their
respective waste pile.  The direction of groundwater flow was not
determined at this time, and it was recommended that wells be installed to
gather this information.

17.     The Pacific Crest 2002 site investigation contained a topographic map of
the site shown as Figure 2 (Figure 2 from Pacific Crest Engineering Inc.,
2002) to this Declaration.  This map shows the area of the waste piles at an
elevation of 37 feet above sea level, which is higher than all the
surrounding terrain.  Also, aerial photos dating from 1950 show wetlands
immediately to the southeast of the waste piles; these wetlands connect
with Moro Cojo Slough.  Elevations on the site decrease most rapidly
away from the waste piles to the west, towards Monterey Bay, and to the
southeast, towards the wetlands and eventually Moro Cojo Slough.  This

RC1/5064793.2/THC

A – 391

means that overland flow from precipitation and the resultant stormwater will predominantly flow in these directions. Monterey Bay is a National Marine Sanctuary; Moro Cojo Slough is a State Marine Reserve, a Central California Marine Protected Area under the Marine Life Protection Act Initiative.

18.     The Central Coast Regional Water Quality Control Board (RWQCB) is the California regulatory agency with jurisdiction over threats and impacts to surface and groundwaters in the part of California in which the site is located. The RWQCB Basin Plan, which classifies the beneficial uses of surface and groundwater in this part of California, designates Moro Cojo Slough as a groundwater recharge area and an estuarine habitat with a "RARE" use; this classification means that the Moro Cojo Slough is a habitat supporting rare, threatened, or endangered plant or animal species. Therefore, overland stormwater flow that commingles with wastes in the waste piles or derives from leachate produced in the waste piles has migrated and will continue to migrate through the uncapped sidewalls of the waste piles, and has flowed and still flows to marine protected areas.

19.     The installation of groundwater wells began in 2004 at the site and there are now currently 13 groundwater monitoring wells on the MLCP property. The wells are all 35 feet deep, with the exception of MW-9 at only 20 feet deep, and all are screened either from 15 to 35 feet below surface or 20 to 35 feet below surface, again with the exception of MW-9, which is screened from 7 to 20 feet. These wells and their screening demonstrates how shallow and close to the surface groundwater is at the site, thus making the groundwater very vulnerable to environmental impact. Quarterly monitoring has been performed by MLCP for water levels and water quality from mid-2004 until present. Groundwater levels for the shallow aquifer underlying the site have consistently indicated a flow moving away from the waste piles in a direction to the west toward Monterey Bay and the south-southeast toward Moro Cojo Slough for all the quarterly reports reviewed, with gradients ranging from a high of

0.0035 to the west and a low of 0.0001 to the south-southeast. The gradient shows the overall depth to groundwater surface and is used to express the potential rate of groundwater movement from one point to another. In this instance, it is a measure of feet over feet showing a drop, for instance, of 0.0035 feet per linear foot across the site. As seen in Figure 3 (Figure 2 from CapRock's Second Quarter 2007 Groundwater Monitoring Report) to this Declaration, this groundwater flow pattern generally mimics the surface flow, with recipient waters again being Monterey Bay, a National Marine Sanctuary, to the west, and Moro Cojo Slough, a State Marine Reserve, to the south-southeast.

20.    It is a fundamental finding of hydrogeology that contaminated water flows away from a release area in the direction of groundwater flow. Using the groundwater gradient maps and the cumulative analytical results for metals in groundwater, presented in Table 1 (Table 11 from CapRock's Second Quarter 2007 Groundwater Monitoring Report) to this Declaration, it is clearly shown that heavy metal contamination is transported away from the waste piles (Landfill 1 and 2 areas). That is, concentrations generally are highest adjacent to the waste piles and gradually diminish proceeding in westerly and south-southeasterly directions away from the waste piles. Graphs of MW-4 and MW-5, in CapRock's Second Quarter 2007 Groundwater Monitoring Report, also show how the plume is moving over time away from the waste piles by the increasing concentrations with time at these more distant wells. MW-5 is roughly 900 feet from the waste piles and had a total chromium concentration of 130 ug/l by the 1st quarter of 2007, and has shown a steadily increasing concentration over time. Since the groundwater gradient is predominantly steeper to the west, it follows that there are greater concentrations further from the waste piles in this direction.

21.    The Central Coast RWQCB Basin Plan, cited earlier, states in Chapter 2, Section I, "Ground water throughout the Central Coastal Basin, except for that found in the Soda Lake Sub-basin, is suitable for agricultural water

RCI/5064793.2/THC

supply, municipal and domestic water supply, and industrial use." In a telephone conversation with the staff of the Central Coast RWQCB it was verified that the groundwater underlying the site is considered to be a drinking water resource. RWQCB correspondence from 2006 and 2007 concerning the adjoining Defense National Stockpile reiterate the fact that all groundwater under this area "is considered drinking water and must be protected as such."

22. Drinking water standards are referred to as the Maximum Contaminant Level (MCL); this is the maximum concentration of a contaminant that is permitting in drinking water, such as that beneath the site. The site's underlying contaminated groundwater has numerous occurrences of MCL exceedances for total chromium, antimony, lead, and nickel. Chromium above the MCL of 50 micrograms per liter (ug/l) has been found in all onsite wells, except MW-13, with the highest concentration being 446 ug/l in well MW-9, almost nine times the MCL. Lead has been found above the MCL of 15 ug/l in wells MW-3, MW-8, MW-9, MW-10, and MW-11 with the highest concentration being 58 ug/l in well MW-9. Nickel has been found above the MCL of 100 ug/l in wells MW-4 through MW-11 with the highest concentration being 679 ug/l in MW-9, almost 7 times the MCL. Antimony has been found above the MCL of 6 ug/l in wells MW-3, MW-4, MW-6, MW-7, MW-8, MW-9, and MW-11 with the highest concentration being 51 ug/l in well MW-6, greater than 8 times the MCL.

23. Hexavalent chromium, a known human carcinogen if inhaled, has been found in all wells with the exception of MW-10, with a maximum concentration of 673 ug/l in well MW-7. A Public Health Goal (PHG) of 2.5 ppb (essentially 2.5 ug/l) was proposed in 1998 by the State of California's Office of Environmental Health Hazard Assessment (OEHHA) for hexavalent chromium in drinking water. The concentrations of hexavalent chromium found in the groundwater underlying the site and originating from the waste piles are several hundred times this proposed PHG. The development of a PHG is the first

step in the development of an MCL; a PHG is the concentration of a contaminant in drinking water below which that contaminant does not pose a significant health risk to humans if consumed over a lifetime using current risk assessment principles, practices, and methods. Recently, on December 26, 2007, President Bush signed HR 2764, the fiscal 2008 omnibus spending bill. In that legislation Congress directed EPA to develop a Federal PHG for hexavalent chromium in drinking water. Figure 4 (Figure 5 from CapRock's Second Quarter 2007 Groundwater Monitoring Report) of this Declaration shows the most recent concentrations of hexavalent chromium in the groundwater at the site.

24.     In summary, all available data show that the result of disposal of refractory and chromite ore waste in unlined, uncovered waste piles at the site resulted in leachate containing dissolved heavy metals from hazardous waste. This heavy metal-containing leachate eventually percolated through the overburden into the shallow groundwater underlying the site, and also was released through the uncovered sidewalls to flow and commingle with storm water runoff across the surface. The presence of this uncontrolled subsurface and surface contamination raises significant public and environmental health concerns. For the groundwater, a drinking water resource, several heavy metals have been consistently above their relevant MCLs over the course of the monitoring program. For surficial water, there is a threat to marine and aquatic organisms and habitat in both the Monterey Bay, a National Marine Sanctuary, and to Moro Cojo Slough, a State Marine Reserve. Additionally, the subsurface flows are a threat to marine and aquatic organisms and habitat in both the Monterey Bay and Moro Cojo Slough because the groundwater will eventually, if it has not already, flow into these bodies of water.

RCI/5064793.2/THC

A – 395

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this _5th_ day of February, 2008, at Beaufort, North Carolina.

Daniel A.  Giffin

# Attachment A

## Curriculum Vitae

**DANIEL A. GIFFIN JR.**

**1815 Lennoxville Rd.,    Beaufort, N.C. 28516      252-728-4657**

## EDUCATION AND PROFESSIONAL QUALIFICATIONS

**PhD in Coastal Resources Management/Geosciences, East Carolina University, 2003.**
B.S. Degree .    Geology, Magna Cum Laude; West Virginia University. 1984.
Graduate Studies, Hydrogeology, University of South Florida, 1987.
**Licensed Geologist - North Carolina - #1594**
Professional Geologist - Tennessee - TN1244

## CAREER SUMMARY
2003 -- 2004      Board Member for Carolina Estuary Research Foundation
1995 - Present   *Self-employed*: Providing environmental consulting services
1995 - 2000      *Clayton Environmental*: Technical Associate
1994 - 1995      *Mittelhauser Corporation*: Senior Project Hydrogeologist
1989 - 1994      *USPCI, Inc.*: Senior Hydrogeologist
1984 -- 1989     *GeoTrans, Inc.*: Senior Geologist

## ENVIRONMENTAL EXPERIENCE

*State and Federal (RCRA) Hazardous Waste Management Regulations*
- Developed RCRA site facility design and was responsible for all environmental aspects.
- Prepared and negotiated Permits/Modifications at three Subtitle C facilities and two Subtitle D facilities.
- Successful negotiations with six EPA regions and over 20 state-level agencies to date.
- Scopes and prepares technical workplans for RCRA field studies and remedial goals.
- Managed facility investigations for RFI's at solvent recyclers, Subtitle C facilities, refineries, and chemical manufacturers.

*State and Federal (CERCLA) Hazardous Waste Regulations and Toxic Substances Control Act (TSCA) / PCB Regulations*
- Served as Project Manager on numerous full-scale RI/FS investigations and studies at aerospace manufacturing, railroad, chemical manufacturers, and utilities.
- Performed investigations on a sole-source aquifer for a major utility on a Superfund site, which included kriging to delimit areas of fixation, aquifer characterization (Biscayne), and the development, design, and installation of a monitoring network.
- Developed and managed field investigations to determine geology and hydrogeology portions of several TSCA cell permits.

*Groundwater Resources*
- Coordinated and conducted major water supply study field program including fracture trace analysis, tri-potential geophysics, slug testing, pump testing, and all analyses. Performed benchmarking of a dual-porosity discrete fracture model (FRACFLOW) and performed modeling and design of a well capture system.

*Site Hydrogeological Assessments and Environmental Impact Studies (EIS)*
- Performed numerous hydrogeological assessments on refineries, utilities, chemical companies, waste facilities, railyards, etc., encompassing all field techniques including drilling and well construction, monitoring, and geophysics.
- Developed a new technique for analyzing pump test early time data to possibly limit the duration of the pump test.
- Trained personnel in field techniques applicable to hydrogeological assessments.
- Performed analytical, numerical, statistical, and geochemical analysis of data.
- Performed environmental impact (possible dewatering) study for a quarry site in Virginia.

*Remedial Investigation / Feasibility Studies*
- Interfaced with various agencies and water boards in the development of remedial strategies.
- Evaluated the performance of remedial systems to minimize economic impact to clients.
- Developed and prepared RI's and FS's for several CERCLA sites. Has been involved with both field activities, data analysis, and reporting on over 20 CERCLA sites to date including Love Canal and Peppers Steel Superfund sites.

*Site Investigations*
- Project Manager and developer of complete RFI workplans for a major refinery, 2 hazardous waste facilities and a railyard. Instructed personnel in various tasks to complete these workplans.

*Health Risk Assessments*
- Performed a health risk assessment on the Airside Industrial site in Louisville, KY.
- Performed geostatistical risk analysis on PCB soil contamination for a major aircraft producer in Florida.

*Groundwater Modeling and Development*
- Performed hydrogeologic and geochemical analysis and two-dimensional computer modeling of the Conservation Chemical Superfund site in Kansas City, Missouri.
- Performed benchmarking of a dual-porosity discrete fracture model (FRACFLOW).
- Performed modeling and design of numerous well capture systems.
- Helped develop the model FRACFLOW.
- Developed a technique and process for analyzing transient groundwater data.
- Performed groundwater flow modeling on Hanford and Savannah River Plant sites.

*Permitting Applications*
- Prepared successful application for air permit at a soil bioremediation project in Donaldsonville, LA.
- Developed permit strategies and groundwater monitoring plans at three Subtitle C and two Subtitle D facilities.

*Remediation Management / Oversight*
- Performed oversight and geotechnical assessment of the first in-situ soil (PCB's and lead) solidification cleanup at the Pepper Steel Superfund site in Medley, FL.
- Managed and assessed a state mandated groundwater cleanup of a PCE spill using combined SVE and pump-and-treat in Cheyenne, WY.

*Remedial Design and Construction*
- Developed and designed numerous alternative remedial technologies including air stripping, soil venting, recovery trenches, capture wells, bioremediation, and others.
- Performs capture zone analysis to evaluate free product and groundwater movement for design purposes. Evaluates the performance of remedial systems using various analytical techniques.

*Litigation Support / Expert Testimony*
- Prepared reports and testimony for lawsuits involving a major railroad.
- Prepared reports and presentations for public hearings of two Subtitle D facilities and two Subtitle C facilities.
- Acts as expert witness in solvent contamination and groundwater issues in current position.
- Acts as consultant for litigation support on hydrocarbon, solvent, and complex hydrogeological sites. Also provides research into remedial alternatives and risk-based approaches.

*Technology Evaluation*

- Performed evaluation of impacts and appropriateness of the remedy selection at the Pepper Steel Superfund Site.

*Project Management*
- Managed numerous projects ranging from $5,000 to $ 5,000,000 involving practically all aspects of environmental management.

*Underground Storage Tanks (UST's)*
- Instructed entry-level personnel in the completion of UST investigations and preliminary environmental assessments.

## PUBLICATIONS  AND  PRESENTATIONS

Blizzard, A., E. Crutchlow, D. Giffin, E. Selby, L. Clough, and T. West, 2000, Looking for Mr. Good-data: Establishing a Baseline to Interpret Hurricane Impacts. Presentation at Benthic Ecology 2000 Annual Meeting.

Corbett.D.R., D.A. Giffin and S. Riggs, 2003, Sediment Resuspension in the Pamlico and Neuse River Estuaries: A Potential Source of Nutrients, Water Resources Research Institute (in review).

Giffin, D.A., 2002, Hydrologic and Biogeochemical Implications for Ecological Indicators, Proceedings of the 18th International Conference of The Coastal Society, Galveston, TX USA.

Giffin, D.A., and J.H. Borgersen, 1988.  On the importance of environmental assessments.  Valuation, American Society of Appraisers, 1st Quarter of 1989.

Giffin, D.A., and D.R Corbett, 2003. Evaluation of Sediment Dynamics in Coastal Systems via Short-lived Radioisotopes, Journal of Marine Systems, Vol.42/3-4, pp 83-96.

Giffin, D.A., and D.S. Ward, 1989.  Analysis of early-time oscillatory aquifer response.  Proceedings of New Field Techniques, Dallas, Texas, March 20 to 23.

Mercer, J.W., D.C. Skipp, and D. Giffin, 1990.  Basics of Pump-and-Treat Groundwater Remediation Technology. U.S. Environmental Protection Agency, EPA/600/8-90/003, Ada, Oklahoma.

Mercer, J.W., D.A. Giffin, Jr., J.C. Herweijer, and P. Srinivasan, 1989.  Groundwater contamination: Processes, characterization, analysis, and remediation.  International Workshop on Appropriate Methodologies for Development and Management of Groundwater Resources in Developing Countries, Hyderabad, India, February 28 to March 4, 1989.

Ward, D.S., D.C. Skipp, D.A. Giffin, and M.D. Barcelo, 1989.  Dual-porosity and discrete fracture simulation of groundwater flow in west-central Florida.  Proceedings of Solving Groundwater Problems with Models, Indianapolis, Indiana, February 7 to 9.

# Attachment B

## Document List

Aerial Photos, 1950, Stereo-pair at 1:11,400 dated 6/30/50, Pacific Aerial Surveys.

Central Coast RWQCB, 1994, Water Quality Control Plan (Basin Plan)

CapRock Geology, Inc., 2006, Groundwater Monitoring Report Fourth Quarter 2005, Moss Landing Commercial Park

CapRock Geology, Inc., 2006, Groundwater Monitoring Report First Quarter 2006, Moss Landing Commercial Park

CapRock Geology, Inc., 2006, Draft Workplan Implementation Progress Report, Moss Landing Commercial Park

CapRock Geology, Inc., 2006, Groundwater Monitoring Report Second Quarter 2006, Moss Landing Commercial Park

CapRock Geology, Inc., 2006, Groundwater Monitoring Report Third Quarter 2006, Moss Landing Commercial Park

CapRock Geology, Inc., 2007, Groundwater Monitoring Report Fourth Quarter 2006, Moss Landing Commercial Park

CapRock Geology, Inc., 2007, Groundwater Monitoring Report First Quarter 2007, Moss Landing Commercial Park

CapRock Geology, Inc., 2007, Groundwater Monitoring Report Second Quarter 2007, Moss Landing Commercial Park

Central Coast RWQCB, 2006, memo to Ms. Jennifer Iribarren, Defense National Stockpile Center dated January 12, 2006.

Central Coast RWQCB, 2007, memo to Mr. Stephen W. Surface, Defense National Stockpile Center dated July 20, 2007.

Geomatrix Consultants, 1996, Memo to Mr. C.E. Matens, Kaiser Aluminum and Chemical Corporation, Subject: Chromium Ore Pile/Asphalt Cap Repair and Maintenance

Kaiser, May 26, 1981, Interoffice Memo, Subject: Superfund Notification.

Pacific Crest Engineering Inc., 2002, Soil and Groundwater Sampling Report, National Refractories and Minerals, moss Landing, California.

TRC, June 2001, Phase 1 Environmental Assessment, National Refractories and Minerals, Highway 1 and Dolan Road, Moss Landing, California.

# Attachment C

# Table of Cumulative Metals in Groundwater

**TABLE 11**

**CUMULATIVE GROUNDWATER ANALYTIC DATA**

Dolan Rd. & Highway 1, Moss Landing, CA

**UNFILTERED SAMPLES**

Method 9010B/7470A, CCR Title 22 Metals(TTLC)

mg/L

| Monitoring | Date | EPA 7199 ug/L (Chromium VI) | Antimony | Barium | Chromium | Cobalt | Copper | Lead | Molybdenum | Nickel | Selenium | Vanadium | Zinc | All Other Analytes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW-5 | 07/09/03 | 119 | ND | ND | 0.199 | ND | 0.073 | ND | 0.014 | 0.020 | ND | ND | ND | ND |
| MW-5 | 05/04/03 | 4.33 | 0.083 | 0.481 | 0.041 | 0.053 | 0.076 | 0.011 | ND | 0.017 | ND | 0.151 | 0.014 | ND |
| MW-5 | 01/12/03 | 2.46 | ND | 0.401 | 0.194 | ND | ND | ND | ND | 0.138 | ND | 0.151 | 0.016 | ND |
| MW-4 | 11/01/04 | 14.4 | ND | 0.158 | 0.102 | ND | ND | ND | ND | 0.239 | ND | 0.152 | 0.163 | ND |
| MW-4 | 07/01/04 | 14.7 | ND | 0.408 | 0.115 | ND | ND | 0.006 | ND | 0.234 | ND | 0.201 | 0.022 | ND |
| MW-4 | 01/19/04 | 35.8 | ND | 0.153 | 0.002 | ND | 0.013 | ND | ND | 0.216 | ND | 0.029 | 0.185 | ND |
| MW-4 | 10/16/03 | 21.8 | ND | 0.130 | 0.284 | ND | 0.011 | ND | ND | 0.210 | ND | 0.049 | ND | 0.016 mg/L Selenium |
| MW-4 | 07/18/03 | 61.1 | ND | 0.120 | ND | ND | 0.013 | ND | ND | 0.215 | ND | 0.009 | ND | 0.018 mg/L Selenium |
| MW-4 | 01/08/03 | 66.0 | NA | 0.129 | NA | ND | NA | ND | NA | NA | NA | NA | NA | 10 mg/L |
| MW-4 | 09/04/04 | 26.2 | 0.146 | 0.094 | 0.045 | NA | 0.014 | ND | ND | 0.191 | NA | ND | ND | ND |
| MW-4 | 11/00/04 | 40.4 | 0.147 | 0.083 | 0.193 | 0.017 | ND | ND | ND | 0.193 | NA | 0.082 | 0.162 | ND |
| MW-4 | 07/01/04 | 35.4 | 0.127 | 0.086 | ND | ND | ND | ND | ND | 0.196 | 0.011 | 0.036 | 0.144 | ND |
| MW-3 | 01/19/04 | ND | NA | 0.083 | 0.207 | ND | 0.073 | ND | ND | 0.199 | NA | 0.082 | 0.110 | 0.031 mg/L Silver |
| MW-3 | 07/08/03 | 8.8 | 0.118 | 0.087 | 0.014 | ND | ND | 0.008 | ND | 0.228 | ND | 0.039 | 0.118 | ND |
| MW-3 | 01/16/03 | ND | NA | 0.082 | NA | NA | NA | ND | ND | NA | NA | NA | NA | NA |
| MW-3 | 11/00/04 | ND | 0.098 | 0.089 | 0.082 | ND | ND | ND | ND | 0.191 | ND | 0.052 | ND | NA |
| MW-3 | 09/04/04 | ND | 0.079 | 0.146 | 0.169 | ND | 0.014 | ND | ND | ND | ND | ND | ND | NA |
| MW-3 | 07/01/04 | 179 | NA | 0.120 | ND | ND | ND | ND | 0.013 | 0.116 | NA | ND | ND | NA |
| MW-2 | 01/08/07 | 199 | ND | 0.290 | ND | ND | 0.041 | ND | ND | 0.215 | 0.015 | 0.173 | ND | ND |
| MW-2 | 07/09/03 | 156 | ND | 0.095 | 0.224 | ND | 0.073 | ND | ND | 0.018 | ND | 0.011 | ND | ND |
| MW-2 | 01/16/03 | 153 | ND | 0.172 | 0.148 | ND | ND | ND | ND | 0.014 | ND | 0.012 | ND | ND |
| MW-2 | 11/00/04 | 191 | ND | 0.058 | 0.223 | ND | ND | 0.013 | ND | 0.028 | ND | 0.017 | 0.004 | ND |
| MW-2 | 09/04/04 | 251 | ND | 0.807 | 0.232 | ND | ND | ND | ND | 0.023 | ND | ND | ND | ND |
| MW-4 | 07/01/04 | 7.48 | ND | 0.080 | 0.041 | ND | ND | ND | ND | 0.015 | ND | 0.028 | ND | ND |
| MW-4 | 19/08/03 | 6.43 | ND | 0.113 | ND | ND | ND | ND | ND | 0.195 | ND | ND | ND | ND |
| MW-4 | 27/00/03 | 8.26 | ND | 0.243 | 0.041 | ND | 0.016 | ND | ND | 0.200 | ND | 0.018 | ND | ND |
| MW-4 | 01/13/08 | ND | ND | 0.099 | NO | ND | NA | ND | ND | NA | NA | ND | NA | ND |
| MW-4 | 11/00/06 | 168 | ND | 0.086 | 0.193 | ND | 0.092 | ND | ND | ND | ND | ND | 0.048 | ND |
| MW-4 | 09/02/04 | 2.24 | ND | 0.174 | 0.082 | ND | ND | ND | ND | 0.018 | ND | ND | 0.041 | ND |
| MW-5 | 01/26/04 | ND | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |

## TABLE 11
### CUMULATIVE GROUNDWATER ANALYTIC DATA
### Dolan Rd. & Highway 1, Moss Landing, CA
### UNFILTERED SAMPLES
Method 6010B/7470A, CCR Title 22 Metals (TCLP)
mg/L

| Monitoring Well I.D. | Date | EPA 7199 ug/L | Antimony | Barium | Chromium | Cobalt | Copper | Lead | Molybdenum | Nickel | Selenium | Vanadium | Zinc | All Other Analytes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW4 | 7/19/05 | 128 | ND | 0.289 | 0.110 | ND | ND | ND | ND | ND | ND | ND | 0.013 | ND |
| MW4 | 7/18/05 | 198 | 0.058 | 0.045 | 0.152 | ND | ND | ND | ND | ND | ND | ND | 0.014 | ND |
| MW4 | 10/18/05 | 129 | 0.070 | 0.070 | 0.130 | ND | ND | ND | ND | ND | ND | ND | 0.040 | ND |
| MW4 | 1/16/07 | 520 | 0.081 | 0.327 | 0.197 | 0.029 | 0.033 | ND | ND | 0.167 | ND | 0.119 | 0.128 | ND |
| MW4 | 4/17/07 | 1.94 | 0.018 | 0.115 | 0.197 | 0.018 | 0.035 | ND | ND | 0.117 | ND | ND | 0.123 | ND |
| MW4 | 7/12/06 | 1.94 | ND | 0.182 | 0.194 | 0.044 | 0.048 | ND | ND | 0.295 | ND | 0.127 | 0.174 | ND |
| MW4 | 10/18/06 | ND | 0.356 | 0.197 | 0.208 | ND | 0.048 | ND | ND | 0.251 | ND | 0.014 | 0.127 | 0.150 mg/L, Silver |
| MW4 | 7/25/05 | 12 | ND | 0.517 | 0.051 | ND | ND | ND | ND | 0.116 | ND | ND | ND | ND |
| MW4 | 10/19/05 | 14.4 | 0.512 | 0.518 | 0.054 | ND | 0.017 | ND | ND | 0.126 | ND | 0.024 | 0.170 | 0.150 mg/L, Silver |
| MW4 | 1/16/06 | 30.2 | ND | 0.104 | 0.151 | ND | ND | ND | ND | 0.118 | ND | ND | 0.360 | ND |
| MW4 | 4/17/07 | 8.44 | 0.047 | 0.047 | ND | 0.036 | 0.053 | ND | 0.011 | 0.033 | ND | 0.058 | 0.060 | ND |
| MW4 | 7/25/06 | 231 | 0.043 | 0.219 | 0.392 | 0.338 | 0.057 | ND | ND | 0.133 | ND | 0.023 | 0.061 | ND |
| MW7 | 10/19/04 | 203 | 0.059 | 0.152 | 0.530 | ND | 0.057 | ND | 0.014 | 0.087 | ND | 0.033 | 0.029 | ND |
| MW7 | 1/16/06 | 212 | 0.117 | 0.117 | 0.441 | ND | 0.046 | ND | ND | 0.017 | ND | 0.028 | 0.010 | ND |
| MW7 | 7/15/06 | 22.9 | 0.048 | ND | 0.400 | ND | 0.072 | ND | ND | 0.077 | ND | 0.033 | 0.010 | ND |
| MW7 | 10/18/06 | ND | 0.035 | 0.023 | 0.441 | 0.074 | ND | ND | ND | ND | ND | ND | ND | ND |
| MW7 | 1/17/07 | ND | 0.170 | ND | 0.600 | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW7 | 12/26/05 | 402 | 0.072 | 0.364 | 0.350 | ND | ND | ND | ND | ND | ND | ND | 0.113 | ND |
| MW7 | 1/16/06 | 330 | 0.074 | 0.152 | 0.350 | ND | ND | ND | ND | ND | ND | ND | 0.054 | ND |
| MW7 | 12/26/05 | 508 | 0.352 | 0.360 | 0.361 | ND | ND | ND | ND | ND | ND | ND | 0.144 | 0.200 mg/L, Silver |
| MW7 | 1/18/06 | 385 | 0.070 | 0.360 | 0.363 | 0.106 | ND | ND | ND | ND | ND | 0.022 | 0.150 | ND |
| MW7 | 1/16/07 | 222 | 0.048 | 0.418 | 0.360 | 0.154 | ND | ND | 0.012 | 0.288 | ND | 0.018 | ND | ND |
| MW7 | 10/23/04 | ND | 0.071 | 0.516 | 0.340 | 0.065 | ND | ND | 0.015 | 0.152 | ND | 0.103 | 0.181 | ND |
| MW8 | 1/16/06 | 250 | 0.068 | 0.561 | 0.293 | 0.054 | 0.021 | ND | ND | 0.097 | ND | 0.102 | 0.352 | ND |
| MW8 | 7/15/06 | 28.4 | NA | 0.584 | 0.283 | NA | 0.296 | NA | 0.012 | 0.177 | NA | 0.096 | 0.663 | NA |
| MW8 | 10/18/06 | 223 | 0.056 | 0.659 | 0.377 | 0.003 | 0.023 | ND | 0.015 | 0.177 | ND | 0.181 | ND | ND |
| MW8 | 1/17/07 | 444 | 0.048 | 0.456 | 0.333 | NA | 0.292 | NA | ND | 0.133 | ND | 0.096 | 0.083 | ND |
| MW9 | 10/24/05 | 210 | 0.222 | 0.229 | ND | ND | 0.070 | ND | 0.010 | 0.023 | ND | ND | ND | NA |
| MW9 | 7/25/05 | 202 | 0.040 | 0.480 | ND | ND | 0.022 | ND | ND | 0.087 | ND | ND | 0.010 | ND |
| MW9 | 10/18/05 | 220 | ND | 0.036 | ND | ND | 0.041 | ND | 0.014 | 0.577 | ND | ND | 0.010 | ND |
| MW9 | 1/17/07 | ND | 0.029 | 0.170 | 0.172 | 0.025 | 0.041 | ND | ND | 0.179 | ND | 0.444 | 0.152 | ND |
| MW9 | 1/16/07 | ND | 0.031 | 0.546 | 0.177 | 0.033 | 0.033 | ND | 0.021 | ND | ND | 0.152 | 0.405 | ND |
| MW9 | 4/17/07 | NA | 0.040 | 0.446 | ND | ND | 0.005 | ND | 0.017 | 0.098 | NA | 0.096 | ND | NA |
| MW9 | 7/12/06 | ND | 0.041 | 0.291 | 0.160 | NA | 0.009 | ND | ND | 0.025 | NA | 0.050 | ND | NA |
| MW-9 | 10/18/06 | ND | 0.020 | 0.223 | 0.039 | ND | 0.004 | ND | ND | 0.020 | ND | 0.020 | ND | NA |
| MW-4 | 4/17/07 | 2.19 | ND | 0.150 | 0.110 | ND | 0.020 | ND | ND | 0.020 | ND | 0.020 | ND | ND |
| MW-4 | 10/18/06 | 1.74 | ND | 0.150 | 0.140 | ND | 0.035 | ND | ND | 0.020 | ND | 0.140 | ND | ND |
| MW-4 | 1/17/07 | ND | 0.128 | 0.172 | ND | 0.038 | 1.63 | ND | ND | 0.405 | ND | 0.353 | ND | NA |
| MW-9 | 7/12/05 | ND | 0.123 | 0.172 | 0.029 | NA | 0.006 | ND | ND | 0.030 | ND | 0.024 | ND | ND |
| MW-10 | 10/24/05 | ND | 0.190 | 0.190 | ND | ND | 0.008 | ND | 0.013 | ND | ND | 0.208 | ND | ND |
| MW-10 | 7/18/05 | ND | ND | 0.213 | ND | 0.020 | 0.023 | ND | ND | ND | ND | ND | ND | 0.150 mg/L, Silver |

TABLE 11
CUMULATIVE GROUNDWATER ANALYTIC DATA
Dolan Rd. & Highway 1, Moss Landing, CA
UNFILTERED SAMPLES
Method 6010B/7470A, CCR Title 22 Metals(TTLC)
mg/L

| Monitoring Well I.D. | Date | EPA 7199 Chromium (VI) ug/L | Antimony | Barium | Chromium | Cobalt | Copper | Lead | Molybdenum | Nickel | Selenium | Vanadium | Zinc | All Other Analytes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW-09 | 12/13/2008 | ND | ND | 0.070 | ND | ND | ND | ND | 0.014 | ND | ND | 0.024 | 0.030 | ND |
| MW-10 | 1/7/07 | ND | ND | 0.080 | ND | ND | ND | ND | 0.015 | ND | ND | ND | 0.033 | ND |
| MW-10 | 01/17/06 | NA | 0.032 | 0.277 | 0.098 | 0.024 | 1.170 | 0.021 | 0.025 | 0.121 | ND | 0.059 | 0.148 | ND |
| MW-11 | 01/17/06 | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| MW-11 | 03/04/03 | 1.26 | ND | 0.079 | 0.046 | ND | 0.008 | ND | 0.031 | 0.012 | ND | NA | NA | NA |
| MW-11 | 07/09/05 | 3.02 | ND | 0.052 | 0.052 | ND | ND | ND | ND | ND | ND | NA | ND | NA |
| MW-11 | 7/18/08 | 28.0 | ND | ND | ND | ND | ND | ND | 0.016 | 0.012 | ND | ND | ND | ND |
| MW-11 | 10/16/08 | 29.0 | ND | 0.200 | 0.040 | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-11 | 1/16/07 | 1.25 | ND | 0.040 | 0.040 | ND | ND | ND | 0.015 | ND | ND | ND | ND | ND |
| MW-11 | 1/16/07 | 16.5 | ND | 0.090 | 0.090 | ND | ND | ND | 0.041 | 0.082 | ND | 0.071 | 0.072 | ND |
| MW-12 | 7/18/08 | 9.32 | ND | 0.124 | ND | ND | ND | ND | 0.040 | ND | ND | ND | ND | ND |
| MW-12 | 10/16/08 | 8.99 | ND | 0.041 | 0.071 | ND | ND | ND | 0.013 | 0.024 | ND | 0.007 | 0.020 | ND |
| MW-12 | 7/18/08 | 42.0 | ND | 0.210 | 0.071 | ND | ND | ND | 0.013 | 0.021 | 0.011 | 0.040 | 0.040 | ND |
| MW-12 | 1/7/07 | 24.8 | ND | 0.079 | 0.030 | ND | ND | ND | 0.014 | 0.012 | 0.018 | 0.043 | 0.043 | ND |
| MW-13 | 7/18/08 | 19.8 | ND | 0.071 | ND | ND | ND | ND | 0.050 | 0.012 | ND | ND | ND | 0.036 mg/L Silver |
| MW-13 | 10/28/08 | ND | ND | 0.183 | ND | ND | ND | ND | 0.050 | 0.010 | 0.012 | ND | 0.180 | ND |
| MW-13 | 1/7/07 | 2.24 | ND | 0.050 | ND | ND | ND | ND | 0.043 | ND | 0.014 | ND | 0.020 | ND |

ND - Not Detected
NA - Not Analyzed

# Attachment D

# Figures



LEGEND:
- ○ LANDFILL TEST BORING LOCATION
- ○ TEST BORING LOCATION FOR OTHER ANALYSIS
- ○ SURFACE WATER SAMPLE

GRAPHIC SCALE: 1"= 170'

| PACIFIC CREST ENGINEERING INC. | NATIONAL REFRACTORIES & MINERALS INC. MOSS LANDING, CALIFORNIA | 11/19/02 REV. 0 | 02107 JFW |
| --- | --- | --- | --- |
| 185 AVIATION WAY, SUITE 203    TEL (831) 763-8181 WATSONVILLE, CA 95076    FAX (831) 763-8185 | AREA 1 AND AREA 2 LANDFILLS | FIGURE 3 | |



ENLARGED SITE MAP,
SEE FIGURE 2A

| PACIFIC CREST ENGINEERING INC. | NATIONAL REFRACTORIES & MINERALS INC. MOSS LANDING, CALIFORNIA | 11/19/02 02107 REV. 0 JFW |
| 195 AVIATION WAY, SUITE 203   TEL (831) 763-5181 WATSONVILLE, CA 95076        FAX (831) 763-5185 | SITE MAP | FIGURE 2 |

0    350'   700'         1,400'
GRAPHIC SCALE: 1"=700'





**CAPROCK**

Figure 5

Highway 1 & Dolan Road
Moss Landing, California
Chromium(VI) in Groundwater
ym2005 ( mg/L )

# Exhibit C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : **Jointly Administered** |
| | : **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION, a** | : |
| **Delaware Corporation, et al.,** | : **Chapter 11** |
| | : |
| Debtors. | : |
| | : |

DECLARATION OF RICHARD W. DAY IN SUPPORT OF OPPOSITION TO
MOTION BY DEBTOR KAISER TO ENFORCE INJUNCTION

I, RICHARD W. DAY, declare:

1.      I am a Vice President of Geocon Consultants, Inc. and the Regional
Manager of Geocon's Livermore, California office. If called as a witness, I could
competently testify of my own personal knowledge to the matters set forth herein.

2.      I have a Bachelor of Science Degree / Geology – Ground Water Option
from the University of Wyoming and 22 years of experience on hydrogeological and
environmental projects in Northern California. I am currently licensed by the State of
California as a Professional Geologist (#5479), Certified Engineering Geologist (#1849),
and Certified Hydrogeologist (#74); I am also licensed by the Contractors State Licensing
Board for Water Well Drilling. My work has included environmental consulting services
for clients with sites under California Regional Water Quality Control Board
("RWQCB") jurisdiction, including sites where undocumented fill and wastes have been
deposited. Over the past 12 years, I have provided litigation support regarding solvent
release sites. I have also provided an expert opinion on remedial costs related to an illegal
dump site impacted by heavy metals and petroleum hydrocarbons.

3.      I have reviewed the environmental reports and other documents relevant to
my analysis of the former Kaiser Aluminum and Chemical Corporation ("KACC") site at
Moss Landing, California. A true and correct copy of the list of the reports and

DKT. NO. 9672

DT. FILED 2-8-08

documents I reviewed is attached as Exhibit A. Based on my review of this material, I conclude that the operations of KACC at the site, specifically their former waste disposal activities, constitutes a continuing source of heavy metals present in the groundwater at the site.

4.    According to the Description of Waste Activity at Moss Landing Magnesia and Brick Plant Site ("Description of Waste Activity") included in the 1981 KACC Notice to EPA ("Notice"), the dumping of waste at the site began in the 1940s. Beginning in approximately 1942, the area commonly called Landfill Area 2 was used as a waste dump site for byproducts from the Magnesia Plant, including refractory linings from kilns and cleanup of spills of calcined dolomite, magnesium hydroxide, magnesium oxide, periclase and chromite ore. Beginning in approximately 1946, the area commonly referred to as Landfill Area 1 was used was a waste dump site for byproducts from the production of refractory brick for the Brick Plant, including used refractory linings and plant sweepings from spills containing periclase, chromite ore, and chromic acid. The materials from the Brick Plant were deposited in Landfill Area 1 until 1978. In 1978 "this site was noted to be producing chromium-contaminated leachate, which was being discharged into a runoff ditch along Dolan Road." The Description of Waste Activity indicates that the California State Health Department, Hazardous Waste Section advised KACC that "the production of leachate from the waste site was a matter under the jurisdiction of the RWQCB." KACC stated in the Notice that they developed a plan that included "paving the waste pile and therefore closing off all waste activity in that area, and the installation of a collection drain pipe at the base of the pile for collection of the leachate being produced by the pile." The plan was reportedly approved by the RWQCB "as a suitable control method to abate the discharge of chromium to the Dolan Road ditch." The Landfill Area 1 was reportedly then "paved and officially closed." Landfill Area 2 was then used for waste disposal until it was closed in October 1980. The Description of Waste Activity states "Due to the age of this land filling area, the

regulation of waste dumping during the early period of its use, and the nature of materials historically land filled at Moss Landing, this site may contain material that would be defined by the EPA today as hazardous waste." The location of the landfill areas is presented in the Soil and Groundwater Sampling Report prepared by Pacific Crest Engineering, Inc. ("PCEI") in their Figure 3. A true and correct copy of Figure 3 from the Soil and Groundwater Sampling Report is attached as Exhibit B.

     5.    On April 24, 1996, Geomatrix Consultants, Inc. ("Geomatrix") performed a site walk and observed the condition of the landfill areas. Geomatrix described the landfill as two areas, northern and southern. Geomatrix observed several areas of asphalt in the northern landfill, identified as Landfill Area 1 in Exhibit B, which were heaved and cracked. The southern landfill, identified as Landfill Area 2 in Exhibit B, was reported as being "largely unpaved." For the northern landfill, Geomatrix reported "the asphalt appears to have cracked in response to heaving." Most of the heaved areas were in the northwest portion of the landfill and the largest heaved area was "a mound at the southeast edge of the northern landfill that is up 2 to 3 feet higher than the adjacent grade." Cracks in the asphalt were "as large as 1-inch wide" and the sideslope next to the mound was bulging. Geomatrix concluded the cause of the heaving was due to expansion resulting from the hydration of the landfill materials. Geomatrix indicated that "Sources of water could include the shallow groundwater table at the site, infiltration into the sideslope, and infiltration through cracks in the asphalt." Geomatrix further indicated that "surface water runoff also may be entering the landfill materials through fissures and cracks that have opened in the sideslopes of the landfill in response to the heaving."

     6.    CapRock Geology, Inc. ("CapRock") has been performing quarterly groundwater monitoring at the site since at least the Fourth Quarter 2005. Based on the Second Quarter 2007 groundwater elevation contours (which are contained in the Draft Groundwater Monitoring Report, Second Quarter 2007, Figure 2) the predominant groundwater flow direction is to the west (towards Moss Landing Harbor). There is also

groundwater flow toward the Moro Cojo Slough. These conclusions are presented in the Draft Groundwater Monitoring Report, Second Quarter 2007, prepared by CapRock. A true and correct copy of Figure 2 from the Draft Groundwater Monitoring Report, Second Quarter 2007, is attached as Exhibit C.

7.    Heavy metals, specifically antimony, chromium, lead, and nickel, have been reported in groundwater samples collected from the site at concentrations that exceed their respective State of California Maximum Contaminant Level ("MCL"). Total antimony has been detected at concentrations above its MCL of 6 micrograms per liter (ug/l) in seven of the 13 monitoring wells at the site, with a maximum reported concentration of 51 ug/l. Total chromium has been detected above its MCL of 50 ug/l in 12 of the 13 monitoring wells, with a maximum reported concentration of 446 ug/l. Total lead has been detected above its MCL of 15 ug/l in five of the 13 wells, with a maximum reported concentration of 58 ug/l. Total nickel has been detected above its MCL of 100 ug/l in eight of the 13 wells, with a maximum reported concentration of 679 ug/l.

8.    The total and hexavalent chromium concentrations in groundwater are generally higher in samples collected from monitoring wells located adjacent to the landfill areas. The highest reported hexavalent chromium concentration in groundwater of 673 ug/l in First Quarter 2006 was from monitoring well MW-7, which is located immediately adjacent to Landfill Area 1.

9.    The reported concentrations of hexavalent chromium in groundwater at the site continue to exceed the MCL for chromium. The hexavalent chromium concentrations and isoconcentration contours on Figure 5 from the Draft Groundwater Monitoring Report, Second Quarter 2007, show the highest hexavalent chromium groundwater concentration continues to be in monitoring well MW-7. A true and correct copy of Figure 5 from the Draft Groundwater Monitoring Report, Second Quarter 2007, is attached as Exhibit D.

10.    The isoconcentration contours shown on Figure 5 (Exhibit D) also indicate that hexavalent chromium in groundwater is migrating from Landfill Area 1 predominantly to the west toward Moss Landing Harbor. The groundwater sample collected from monitoring well MW-5 in the Second Quarter 2007 contained 124 ug/l of hexavalent chromium. Monitoring well MW-5 is located towards the western site boundary, in the predominant downgradient groundwater flow direction, approximately 850 feet from Landfill Area 1. As shown on Figure 5 (Exhibit D), the downgradient extent of hexavalent chromium in groundwater (west of monitoring well MW-5) has not been defined. It is further noted that monitoring well MW-5 is located only approximately 350 feet from the Moss Landing Harbor. Moss Landing Harbor connects to and is part of Monterey Bay; Monterey Bay is part of the Monterey Bay National Marine Sanctuary.

11.    I plotted the cumulative hexavalent chromium concentrations for monitoring well MW-5 reported in Table 10 from the Draft Groundwater Monitoring Report, Second Quarter 2007. The plot clearly shows that the hexavalent chromium concentrations in monitoring well MW-5 have increased since the first reported monitoring event in July 2004. A true and correct copy of Table 10 from the Draft Groundwater Monitoring Report, Second Quarter 2007, is attached as Exhibit E. A true and correct copy of my plot of Dissolved Hexavalent Chromium Concentrations in Well MW-5 is attached as Exhibit F.

12.    Based on the deteriorated site conditions reported by Geomatrix, the continued detection of hexavalent chromium in groundwater adjacent to Landfill Area 1, and the increasing hexavalent chromium concentrations observed in monitoring well MW-5, I conclude that the former landfill activities at the site constitute a continuing source of heavy metals being released to groundwater from the waste dumps commonly referred to as Landfill Area 1 and Landfill Area 2. The heavy

metals that are being released to the environment include antimony, chromium, lead, and nickel.

13.    The landfill areas allegedly received regulatory closure from the RWQCB in the early 1980s, according to the Notice sent to EPA by KACC. Regulatory agencies, including the RWQCB, base case closure decisions on site information provided to them by the responsible parties and rely upon that information as if it is true and correct. Accordingly, after case closure is granted, regulatory agencies may require further work if site conditions change, additional contamination is identified, or information provided to the agency was not accurate and representative of site conditions, then or currently. These contingencies to require further work are written into case closure letters, as shown on the attached example of RWQCB Case Closure Letters. A true and correct copy of the example RWQCB Case Closure Letters is attached as Exhibit G. As an additional example, an underground storage tank ("UST") site located in Vallejo, California, which received regulatory closure on February 14, 2003 (with concurrence from the RWQCB), was ordered on January 22, 2008 to resume source characterization (ascertain the scope and nature of the contamination) at the site. A true and correct copy of the February 14, 2003, Case Closure and the January 22, 2008, Notice of Corrective Action and Responsibility is attached as Exhibit H. Thus, a "closure" is not a permanent designation; it is an interim designation that may be later changed based on new data or understanding of a site, a change in site conditions, the identification of additional contamination, or a finding by an agency that the information originally provided to the agency was not accurate and representative of site conditions.

14.    Based on the deteriorated site conditions observed and reported by Geomatrix and the fact that heavy metals releases to the environment are continuing from the waste dump areas, I conclude that any regulatory closure, if granted in the early 1980s, is meaningless in terms of the current site conditions. Heavy metal releases

are continuing from the waste dump areas.  Further, adjacent natural resources are

threatened, as noted by Dr. Daniel A. Giffin in his declaration.


    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.  Executed on this 7th day of February, 2008, at

Livermore, California.

RICHARD W. DAY
No. 5479
Exp. 09-30-09
PROFESSIONAL GEOLOGIST
STATE OF CALIFORNIA

_____
Richard W. Day

**EXHIBIT A TO R.W. DAY DECLARATION**

CapRock Geology, Inc. Draft Groundwater Monitoring Report, Fourth Quarter 2005, Moss Landing Commercial Park, Highway One and Dolan Road, Moss Landing, California. January 15, 2006.

CapRock Geology, Inc. Draft Groundwater Monitoring Report, First Quarter 2006, Moss Landing Commercial Park, Highway One and Dolan Road, Moss Landing, California. April 15, 2006.

CapRock Geology, Inc. Draft Workplan Implementation Progress Report, Highway 1 and Dolan Road, Moss Landing Commercial Park, Moss Landing, California. May 15, 2006.

CapRock Geology, Inc. Draft Groundwater Monitoring Report, Second Quarter 2006, Moss Landing Commercial Park, Highway One and Dolan Road, Moss Landing, California. July 14, 2006.

CapRock Geology, Inc. Draft Groundwater Monitoring Report, Third Quarter 2006, Moss Landing Commercial Park, Highway One and Dolan Road, Moss Landing, California. October 1, 2006.

CapRock Geology, Inc. Draft Groundwater Monitoring Report, Fourth Quarter 2006, Moss Landing Commercial Park, Highway One and Dolan Road, Moss Landing, California. January 10, 2007.

CapRock Geology, Inc. Draft Groundwater Monitoring Report, First Quarter 2007, Moss Landing Commercial Park, Highway One and Dolan Road, Moss Landing, California. April 1, 2007.

CapRock Geology, Inc. Draft Groundwater Monitoring Report, Second Quarter 2007, Moss Landing Commercial Park, Highway One and Dolan Road, Moss Landing, California. July 12, 2007

CapRock Geology, Inc. Soil Vapor Extraction Pilot Test Report, Moss Landing Commercial Park, Moss Landing, California. September 1, 2007.

California Regional Water Quality Control Board, Central Valley Region. A Compilation of Water Quality Goals, August 2003 with tables updated August 2007.

California Regional Water Quality Control Board, Central Valley Region. Moss Landing Commercial Park, (Former National Refractories & Minerals Corporation), Moss Landing, Monterey County, CA (Site). January 12, 2006.

California Regional Water Quality Control Board Central Valley Region. Site Cleanup Program: Moss Landing Commercial Park (Former National Refractories & Minerals Corporation), Moss Landing, Monterey County – Residual Chromite. July 20, 2007.

Geomatrix Consultants, Inc. Chromium Ore Pile/Asphalt Cap Repair and Maintenance, Former Kaiser Aluminum Site, Moss Landing, California. July 9, 1996.

Kaiser Aluminum & Chemical Corporation. Superfund Notification. May 26, 1981.

Pacific Crest Engineering Inc. Soil and Groundwater Sampling Report, National Refractories and Minerals, Moss Landing, California. November 19, 2002.

Parsons Engineering Science. Final Preliminary Assessment, Moss Landing Remote Site, California. July 2001

TRC. Phase I Environmental Site Assessment, National Refractories and Minerals, Highway 1 and Dolan Road, Moss Landing, California. June 2001.

**EXHIBIT B TO R.W. DAY DECLARATION**



**EXHIBIT C TO R.W. DAY DECLARATION**



**EXHIBIT D TO R.W. DAY DECLARATION**



Figure 5

CapRock
Environmental & Engineering Geology

Highway 1 & Dolan Road
Moss Landing, California
Chromium(VI) in Groundwater
[FILTERED] ( mg/L )

Updated: April 18, 2007
CapRock Ref : 4324-43

**EXHIBIT E TO R.W. DAY DECLARATION**

TABLE.10
CUMULATIVE GROUNDWATER ANALYTIC DATA
Dolan Rd. & Highway 1, Moss Landing, CA
FILTERED SAMPLES
Method 6010B/7470A, CCR Title 22 Metals (TTLC)
mg/L

| Monitoring Well I.D. | Date | EPA 7354 Chromium (VI) mg/L | Antimony | Barium | Chromium | Cobalt | Copper | Lead | Molybdenum | Nickel | Selenium | Vanadium | Zinc | All Other Analytes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW-1 | 07/13/04 | 2.96 | ND | 0.093 | ND | ND | ND | ND | ND | ND | ND | ND | 0.020 | ND |
| MW-1 | 11/05/04 | 166 | ND | 0.108 | 0.160 | ND | 0.025 | ND | ND | ND | ND | ND | 0.054 | ND |
| MW-1 | 01/13/05 | ND | ND | 0.079 | ND | ND | 0.017 | ND | ND | 0.021 | ND | 0.015 | 0.039 | ND |
| MW-1 | 05/05/05 | 28.10 | ND | 0.102 | 0.205 | ND | ND | ND | ND | ND | ND | ND | 0.035 | ND |
| MW-1 | 07/06/05 | 16.09 | ND | 0.104 | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-1 | 12/09/05 | 1.69 | ND | 0.104 | ND | ND | 0.019 | ND | ND | 0.014 | 0.016 | ND | 0.040 | ND |
| MW-1 | 2-15-06 / 2-16-06 | 4.35 | ND | 0.076 | 0.011 | ND | ND | ND | ND | ND | ND | 0.012 | ND | ND |
| MW-1 | 4/2/06 | 4.24 | ND | 0.096 | 0.014 | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-1 | 7/16/06 | 9.51 | ND | 0.220 | 0.024 | ND | ND | ND | ND | ND | ND | ND | ND | 0.020 mg/L Silver |
| MW-1 | 10/16/06 | 4.23 | ND | 0.083 | ND | ND | ND | ND | ND | ND | ND | ND | 0.040 | ND |
| MW-1 | 1/18/07 | 5.43 | ND | 0.093 | 0.012 | ND | ND | ND | ND | ND | ND | ND | 0.020 | ND |
| MW-1 | 4/17/07 | 8.52 | ND | 0.896 | ND | ND | ND | ND | ND | ND | ND | ND | 0.135 | ND |
| MW-2 | 09/24/04 | 217 | ND | 0.102 | 0.227 | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-2 | 02/13/04 | 184 | ND | 0.099 | 0.212 | ND | ND | ND | ND | ND | ND | ND | 0.017 | ND |
| MW-2 | 11/05/04 | ND | ND | 0.069 | 0.214 | ND | 0.016 | ND | ND | 0.011 | ND | ND | 0.019 | ND |
| MW-2 | 01/13/05 | 11.2 | ND | 0.093 | 0.139 | ND | 0.021 | ND | ND | 0.012 | ND | ND | 0.024 | ND |
| MW-2 | 05/05/05 | ND | ND | 0.082 | 0.019 | ND | 0.013 | ND | ND | 0.029 | ND | ND | 0.211 | ND |
| MW-2 | 07/06/05 | 160.0 | ND | 0.109 | 0.220 | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-2 | 12/09/05 | 250 | ND | 0.111 | 0.225 | ND | 0.016 | ND | ND | ND | 0.017 | ND | 0.013 | ND |
| MW-2 | 2-15-06 / 2-16-06 | 267 | ND | 0.089 | 0.198 | ND | ND | ND | ND | ND | 0.015 | ND | ND | ND |
| MW-2 | 4/2/06 | 219 | ND | 0.104 | 0.170 | ND | 0.016 | ND | ND | ND | ND | 0.013 | ND | 0.020 mg/L Silver |
| MW-2 | 7/16/06 | 195 | ND | 0.240 | 0.182 | ND | ND | ND | ND | ND | ND | ND | 0.080 | ND |
| MW-2 | 10/23/06 | 161 | ND | 0.122 | 0.170 | ND | ND | ND | ND | ND | 0.014 | ND | 0.072 | ND |
| MW-2 | 1/16/07 | 189 | ND | 0.122 | 0.173 | ND | ND | ND | ND | ND | ND | 0.012 | 0.037 | ND |
| MW-2 | 4/18/07 | 142 | ND | 0.169 | 0.147 | ND | 0.014 | 0.014 | ND | ND | ND | ND | 0.017 | ND |
| MW-3 | 05/24/04 | ND | ND | 0.073 | ND | ND | 0.013 | 0.015 | ND | ND | ND | ND | 0.017 | ND |
| MW-3 | 07/13/04 | ND | ND | 0.017 | ND | ND | ND | 0.019 | ND | ND | ND | ND | ND | ND |
| MW-3 | 11/05/04 | ND | ND | 0.041 | ND | ND | ND | 0.021 | 0.011 | ND | ND | ND | 0.029 | ND |
| MW-3 | 01/13/05 | ND | ND | 0.098 | ND | 0.012 | ND | 0.021 | ND | ND | ND | ND | 0.035 | ND |
| MW-3 | 05/05/05 | ND | ND | 0.099 | ND | ND | ND | 0.010 | ND | ND | ND | ND | ND | ND |
| MW-3 | 07/06/05 | 7.200 | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND |

Ref. No.: 4291-43

**TABLE 10**
**CUMULATIVE GROUNDWATER ANALYTIC DATA**
Dolan Rd. & Highway 1, Moss Landing, CA
FILTERED SAMPLES

Method 6010B/6740A, CCR Title 22 Metals(TTLC), mg/L

| Monitoring Well I.D. | Date | EPA 7196A mg/L Chromium (VI) | Antimony | Barium | Chromium | Cobalt | Copper | Lead | Molybdenum | Nickel | Selenium | Vanadium | Zinc | All Other Analytes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW-3 | 12/28/05 | ND | ND | 0.095 | 0.031 | ND | ND | 0.028 | ND | 0.214 | 0.018 | 0.215 | 0.182 | ND |
| MW-3 | 2-15-06 / 2-16-06 | ND | ND | 0.153 | 0.040 | ND | ND | 0.022 | ND | 0.241 | 0.222 | 0.058 | 0.040 | ND |
| MW-3 | 4/2/06 | 1.84 | ND | 0.152 | ND | ND | ND | ND | ND | ND | 0.016 | ND | ND | ND |
| MW-3 | 7/19/09 | ND | ND | 0.212 | 0.030 | ND | ND | ND | ND | ND | 0.025 | ND | ND | 0.020 mg/L Silver |
| MW-3 | 10/23/09 | ND | ND | 0.080 | ND | ND | ND | ND | ND | ND | ND | ND | 0.070 | ND |
| MW-3 | 1/18/07 | ND | ND | 0.070 | ND | ND | ND | ND | ND | ND | 0.022 | ND | ND | ND |
| MW-3 | 4/18/07 | ND | ND | 0.078 | 0.036 | ND | ND | ND | ND | 0.010 | ND | ND | 0.015 | ND |
| MW-4 | 07/13/04 | 32.9 | ND | 0.157 | 0.036 | ND | ND | ND | ND | 0.010 | ND | ND | 0.028 | ND |
| MW-4 | 11/29/04 | 38.6 | ND | 0.191 | 0.044 | ND | 0.055 | ND | ND | 0.031 | ND | ND | 0.083 | ND |
| MW-4 | 01/13/05 | ND | ND | 0.128 | 0.049 | ND | 0.296 | ND | ND | 0.020 | ND | ND | 0.028 | ND |
| MW-4 | 05/05/05 | 11.8 | ND | 0.151 | 0.087 | ND | 0.022 | ND | ND | 0.022 | ND | ND | 0.087 | ND |
| MW-4* | 07/06/05 | 63.0 | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| MW-4 | 12/07/05 | 192 | ND | 0.464 | 0.225 | 0.021 | 0.182 | ND | ND | 0.130 | 0.022 | 0.069 | 0.127 | ND |
| MW-4 | 2-15-06 / 2-16-06 | 73.4 | ND | 0.119 | 0.075 | ND | ND | ND | ND | 0.017 | 0.016 | ND | ND | ND |
| MW-4 | 4/2/06 | 48.7 | ND | 0.120 | 0.036 | ND | ND | ND | ND | 0.016 | 0.016 | ND | 0.027 | ND |
| MW-4 | 7/19/06 | 101 | ND | 0.264 | 0.110 | ND | ND | ND | ND | 0.213 | 0.020 | ND | ND | 0.012 mg/L Silver |
| MW-4 | 10/19/06 | 315 | ND | 0.130 | 0.270 | ND | ND | ND | ND | ND | 0.013 | 0.012 | 0.050 | ND |
| MW-4 | 1/18/07 | 35.2 | ND | 0.111 | 0.244 | ND | ND | ND | ND | 0.020 | 0.014 | ND | 0.013 | ND |
| MW-4 | 4/18/07 | 54.1 | ND | 0.109 | 0.057 | ND | ND | ND | ND | 0.077 | ND | ND | 0.022 | ND |
| MW-5 | 07/13/04 | 15.1 | ND | 0.206 | 0.017 | ND | ND | ND | ND | ND | ND | 0.029 | 0.012 | ND |
| MW-5 | 11/21/04 | 16.5 | ND | 0.031 | 0.017 | ND | ND | ND | ND | 0.012 | ND | ND | 0.031 | ND |
| MW-5 | 01/13/05 | 2.69 | ND | 0.087 | 0.247 | ND | 0.013 | ND | ND | 0.030 | ND | 0.019 | 0.032 | ND |
| MW-5 | 05/05/05 | 4.47 | ND | 0.075 | 0.242 | ND | ND | ND | 0.214 | ND | ND | ND | 0.013 | ND |
| MW-5 | 07/06/05 | 110.00 | ND | ND | 0.169 | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-5 | 12/09/05 | 25 | ND | 0.328 | 0.431 | 0.080 | 0.054 | ND | ND | 0.177 | 0.214 | 0.088 | 0.321 | ND |
| MW-5 | 2-15-06 / 2-16-06 | 13.4 | ND | 0.098 | 0.027 | ND | ND | ND | 0.012 | 0.019 | ND | 0.015 | 0.012 | ND |
| MW-5 | 4/2/06 | 35.4 | ND | 0.106 | 0.030 | ND | ND | ND | ND | 0.015 | 0.016 | ND | 0.012 | ND |
| MW-5 | 7/19/06 | 116 | ND | 0.250 | 0.100 | ND | ND | ND | ND | ND | ND | ND | ND | 0.030 mg/L Silver |
| MW-5 | 10/19/06 | 198 | ND | 0.053 | 0.191 | ND | ND | ND | ND | ND | ND | 0.012 | 0.033 | ND |
| MW-5 | 1/18/07 | 128 | ND | 0.091 | 0.321 | ND | ND | ND | ND | ND | ND | 0.012 | 0.013 | ND |
| MW-5 | 4/18/07 | 124 | ND | 0.354 | 0.128 | ND | ND | ND | ND | ND | ND | 0.012 | 0.018 | ND |

TABLE 10
CUMULATIVE GROUNDWATER ANALYTIC DATA
Dolan Rd. & Highway 1, Moss Landing, CA
FILTERED SAMPLES

Method 6010B/7470A, CCR Title 22 Metals (TTLC)
mg/L

| Monitoring Well I.D. | Date | EPA 7196A Chromium (VI) | Antimony | Barium | Chromium | Cobalt | Copper | Lead | Molybdenum | Nickel | Selenium | Vanadium | Zinc | All Other Analytes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW-5 | 07/13/04 | ND | ND | 0.085 | ND | ND | ND | ND | ND | 0.010 | ND | 0.035 | 0.073 | ND |
| MW-5 | 11/01/04 | ND | ND | 0.073 | 0.017 | ND | ND | ND | ND | 0.027 | ND | 0.011 | 0.077 | ND |
| MW-5 | 01/13/05 | ND | ND | 0.096 | 0.031 | ND | 0.024 | ND | ND | 0.043 | ND | 0.020 | 0.096 | ND |
| MW-5 | 05/04/05 | ND | ND | 0.118 | 0.028 | ND | 0.098 | ND | ND | 0.052 | ND | 0.072 | ND | ND |
| MW-5 | 07/05/05 | 15.009 | ND | ND | 0.028 | ND | 0.018 | ND | ND | ND | ND | ND | 0.083 | ND |
| MW-5 | 12/07/05 | ND | ND | 0.054 | 0.028 | ND | 0.019 | ND | ND | 0.017 | ND | ND | 0.020 | 0.020 moL Silver |
| MW-5 | 2-15-06 / 2-15-06 | 9.81 | ND | 0.052 | 0.014 | ND | ND | ND | ND | 0.011 | ND | ND | 0.013 | ND |
| MW-5 | 4/02/06 | 15.7 | ND | 0.088 | 0.022 | ND | ND | ND | ND | 0.016 | 0.016 | ND | ND | ND |
| MW-5 | 7/19/06 | 12.7 | ND | 0.240 | 0.030 | ND | 0.020 | ND | ND | 0.023 | ND | 0.014 | 0.020 | 0.020 moL Silver |
| MW-5 | 10/19/06 | 8.08 | ND | 0.093 | 0.040 | ND | 0.010 | ND | ND | 0.050 | ND | 0.054 | 0.083 | ND |
| MW-5 | 1/17/07 | 8.58 | ND | 0.041 | 0.020 | ND | 0.020 | ND | ND | ND | ND | ND | 0.030 | ND |
| MW-5 | 4/19/07 | 5.16 | ND | 0.049 | ND | ND | ND | ND | ND | 0.011 | ND | 0.023 | 0.019 | ND |
| MW-7 | 07/21/04 | 215 | ND | 0.072 | 0.202 | ND | ND | ND | 0.013 | ND | ND | ND | ND | ND |
| MW-7 | 11/03/04 | 82.2 | ND | 0.108 | 0.210 | ND | ND | ND | ND | 0.019 | ND | 0.012 | 0.018 | ND |
| MW-7 | 01/13/05 | 22.7 | ND | 0.105 | 0.203 | ND | 0.090 | ND | 0.017 | 0.011 | ND | ND | 0.016 | ND |
| MW-7 | 05/04/05 | 95.1 | ND | 0.079 | 0.633 | ND | 0.020 | ND | ND | ND | ND | ND | ND | ND |
| MW-7 | 07/05/05 | 330.0 | ND | ND | 0.460 | ND | ND | ND | ND | 0.011 | ND | 0.023 | 0.019 | ND |
| MW-7 | 12/06/05 | 472 | ND | 0.075 | 0.361 | ND | ND | ND | ND | ND | ND | ND | 0.044 | ND |
| MW-7 | 2-15-06 / 2-15-06 | 673 | ND | 0.059 | 0.369 | ND | ND | ND | ND | ND | 0.012 | 0.013 | ND | ND |
| MW-7 | 4/02/06 | 516 | ND | 0.052 | 0.378 | ND | ND | ND | ND | 0.015 | 0.016 | ND | ND | ND |
| MW-7 | 7/19/06 | 360 | ND | 0.173 | 0.312 | ND | ND | ND | ND | ND | ND | 0.025 | ND | ND |
| MW-7 | 10/20/06 | 287 | ND | 0.044 | 0.250 | ND | ND | ND | ND | ND | ND | ND | 0.090 | ND |
| MW-7 | 1/18/07 | 225 | ND | 0.031 | 0.224 | ND | ND | ND | 0.013 | 0.012 | ND | ND | ND | ND |
| MW-7 | 4/17/07 | 206 | ND | 0.238 | 0.218 | ND | ND | ND | 0.019 | ND | ND | ND | 0.012 | ND |
| MW-8 | 07/12/04 | 149 | ND | 0.101 | 0.200 | ND | ND | ND | ND | 0.012 | ND | 0.018 | 0.017 | ND |
| MW-8 | 11/01/04 | 200 | ND | 0.098 | 0.214 | ND | ND | ND | ND | 0.011 | ND | ND | 0.013 | ND |
| MW-8 | 01/11/05 | NA | 0.016 | 0.187 | 0.132 | 0.017 | 0.070 | ND | NA | 0.051 | ND | 0.021 | 0.054 | NA |
| MW-8 | 01/17/05 | 25.6 | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| MW-8 | 05/04/05 | 41.9 | ND | 0.121 | 0.338 | 0.073 | ND | ND | ND | 0.024 | ND | ND | ND | ND |
| MW-8 | 07/05/05 | 200.0 | ND | 0.200 | 0.259 | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-8 | 12/07/05 | 224 | ND | 0.164 | 0.189 | ND | 0.024 | ND | ND | 0.030 | ND | ND | 0.250 | ND |

Seacoast Charter 2007 MLCP Groundwater Monitoring Report

Ref. Met. 21024-43

TABLE 10
CUMULATIVE GROUNDWATER ANALYTIC DATA
Delta Rd. & Highway 1, Moss Landing, CA
FILTERED SAMPLES
Method 6010B/7470A, CCR Title 22 Metals (TTLC)
mg/L

| Monitoring Well I.D. | Date | EPA 7196A mg/L Chromium (VI) | Antimony | Barium | Chromium | Cobalt | Copper | Lead | Molybdenum | Nickel | Selenium | Vanadium | Zinc | All Other Analytes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW-5 | 2-15-06 / 2-16-06 | 401 | ND | 0.123 | 0.260 | ND | ND | ND | ND | 0.012 | 0.017 | 0.017 | 0.212 | ND |
| MW-5 | 4/20/06 | ND | ND | 0.301 | 0.024 | 0.039 | ND | ND | ND | 0.064 | 0.018 | 0.018 | 0.022 | ND |
| MW-5 | 7/18/06 | ND | ND | 0.454 | 0.030 | 0.020 | 0.020 | ND | ND | 0.020 | 0.032 | ND | ND | 0.020 mg/L Silver |
| MW-5 | 10/18/06 | ND | ND | 0.210 | ND | ND | ND | ND | ND | 0.020 | 0.030 | ND | 0.090 | ND |
| MW-5 | 1/17/07 | ND | ND | 0.170 | ND | ND | 0.013 | ND | ND | ND | 0.018 | ND | 0.011 | ND |
| MW-5 | 4/18/07 | ND | ND | 0.199 | 0.012 | ND | ND | ND | ND | 0.016 | ND | 0.021 | 0.046 | ND |
| MW-9 | 07/13/04 | ND | ND | 0.171 | ND | ND | ND | ND | 0.013 | 0.014 | ND | ND | 0.028 | ND |
| MW-9 | 11/01/04 | ND | ND | 0.182 | 0.014 | ND | ND | ND | ND | 0.027 | ND | 0.019 | 0.017 | 0.013 mg/L Silver |
| MW-9 | 01/31/05 | NA | ND | 0.109 | 0.051 | 0.011 | 0.059 | 0.011 | 0.014 | 0.100 | ND | 0.072 | 0.080 | ND |
| MW-9 | 01/17/05 | ND | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| MW-9 | 05/04/05 | ND | 0.017 | 0.095 | 0.055 | ND | 0.055 | ND | ND | 0.081 | ND | 0.033 | ND | NA |
| MW-9 | 07/25/05 | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND | NA |
| MW-9 | 12/07/05 | 3.11 | ND | 0.061 | 0.016 | ND | ND | ND | ND | ND | ND | 0.014 | 0.017 | 0.015 mg/L Silver |
| MW-9 | 2-15-06 / 2-16-06 | 2.31 | ND | 0.032 | ND | ND | ND | ND | ND | 0.011 | ND | 0.016 | 0.017 | ND |
| MW-9 | 4/20/06 | ND | ND | 0.070 | 0.032 | ND | ND | ND | ND | 0.038 | ND | 0.023 | 0.023 | ND |
| MW-9 | 7/18/06 | 1.60 | ND | 0.200 | 0.200 | ND | ND | ND | ND | 0.012 | ND | ND | ND | 0.024 mg/L Silver |
| MW-9 | 10/18/06 | 2.05 | ND | 0.080 | ND | ND | ND | ND | ND | ND | ND | 0.016 | 0.033 | ND |
| MW-9 | 1/17/07 | ND | ND | 0.078 | ND | ND | ND | ND | ND | ND | ND | ND | 0.040 | ND |
| MW-9 | 4/17/07 | ND | ND | 0.073 | 0.032 | 0.021 | ND | ND | ND | 0.022 | ND | ND | 0.048 | ND |
| MW-10 | 01/31/05 | NA | ND | 0.122 | 0.021 | ND | 0.098 | ND | 0.017 | 0.032 | ND | 0.019 | 0.051 | ND |
| MW-10 | 01/17/05 | ND | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| MW-10 | 05/04/05 | ND | ND | 0.451 | 0.023 | ND | 0.029 | ND | ND | 0.020 | ND | ND | ND | NA |
| MW-10 | 07/25/05 | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-10 | 12/07/05 | ND | ND | 0.078 | 0.015 | ND | 0.020 | ND | 0.012 | 0.011 | ND | 0.016 | 0.010 | 0.017 mg/L Silver |
| MW-10 | 2-15-06 / 2-16-06 | ND | ND | 0.181 | 0.059 | ND | ND | ND | 0.013 | ND | ND | 0.031 | 0.020 | ND |
| MW-10 | 4/20/06 | ND | ND | 0.074 | ND | ND | ND | ND | 0.011 | ND | ND | 0.020 | ND | ND |
| MW-10 | 7/18/06 | ND | ND | 0.212 | ND | 0.070 | ND | ND | 0.013 | ND | ND | 0.052 | 0.033 | 0.022 mg/L Silver |
| MW-10 | 10/18/06 | ND | ND | 0.072 | ND | ND | ND | ND | 0.014 | ND | ND | 0.023 | 0.033 | ND |
| MW-10 | 1/17/07 | ND | ND | 0.080 | ND | ND | ND | ND | 0.014 | ND | ND | 0.012 | 0.045 | ND |
| MW-10 | 4/18/07 | ND | ND | 0.092 | 0.011 | ND | ND | ND | 0.015 | ND | ND | 0.018 | 0.029 | ND |
| MW-11 | 01/11/05 | NA | ND | 0.078 | 0.024 | ND | 0.034 | ND | 0.032 | 0.033 | ND | ND | 0.202 | ND |

**TABLE 10**
**CUMULATIVE GROUNDWATER ANALYTIC DATA**
Dodan Rd. & Highway 4, Mount Landfill, CA
**FILTERED SAMPLES**
Method 6010B/7470A, CCR Title 22 Metals(TTLC)
mg/L

| Monitoring Well I.D. | Date | EPA 7196A mg/L Chromium (VI) | Antimony | Barium | Chromium | Cobalt | Copper | Lead | Molybdenum | Nickel | Selenium | Vanadium | Zinc | All Other Analytes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW-11 | 01/17/05 | 1.22 | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| MW-11 | 03/24/05 | 3.45 | ND | 0.071 | 0.053 | ND | 0.029 | ND | 0.027 | ND | ND | ND | ND | NA |
| MW-11 | 07/06/05 | 23.00 | ND | ND | 0.037 | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-11 | 12/07/05 | 4.27 | ND | 0.070 | 0.029 | ND | ND | ND | 0.014 | ND | ND | ND | 0.016 | ND |
| MW-11 | 2-15-06/2-16-06 | 13.2 | ND | 0.091 | 0.034 | ND | ND | ND | 0.014 | 0.027 | ND | 0.020 | 0.015 | ND |
| MW-11 | 4/20/06 | 16.6 | ND | 0.146 | 0.089 | 0.011 | 0.012 | ND | 0.014 | 0.072 | ND | 0.059 | 0.054 | ND |
| MW-11 | 7/19/05 | 19.3 | ND | 0.200 | 0.080 | ND | ND | ND | 0.020 | ND | ND | 0.014 | ND | 0.050 mg/L Silver |
| MW-11 | 10/16/06 | 9.83 | ND | 0.144 | 0.052 | 0.019 | 0.013 | ND | 0.240 | 0.074 | ND | 0.081 | 0.093 | ND |
| MW-11 | 1/15/07 | 8.43 | ND | 0.035 | 0.015 | ND | ND | ND | 0.249 | ND | ND | ND | 0.040 | ND |
| MW-11 | 4/18/07 | 8.37 | ND | 0.037 | 0.216 | ND | ND | ND | 0.038 | ND | ND | 0.014 | 0.015 | ND |
| MW-12 | 12/07/05 | 43.1 | ND | 0.081 | 0.052 | ND | 0.219 | ND | 0.024 | 0.015 | ND | 0.011 | 0.011 | 0.013 mg/L Silver |
| MW-12 | 2-15-06/2-16-06 | 35.2 | ND | 0.241 | 0.152 | 0.034 | 0.018 | 0.009 | 0.017 | 0.159 | 0.012 | 0.052 | 0.098 | ND |
| MW-12 | 4/20/06 | 38.9 | ND | 0.031 | 0.048 | ND | ND | ND | 0.017 | ND | ND | ND | ND | ND |
| MW-12 | 7/19/06 | 57.7 | ND | 0.210 | 0.500 | 0.072 | ND | ND | 0.030 | 0.079 | ND | 0.073 | 0.020 | 0.040 mg/L Silver |
| MW-12 | 10/16/06 | 28.2 | ND | 0.150 | ND | ND | ND | ND | ND | 0.020 | ND | ND | 0.024 | ND |
| MW-12 | 1/17/07 | 18.1 | ND | 0.061 | 0.030 | ND | ND | ND | 0.018 | 0.012 | ND | 0.079 | 0.030 | ND |
| MW-12 | 4/19/07 | 20 | ND | 0.041 | 0.032 | ND | 0.012 | ND | 0.011 | 0.012 | ND | ND | 0.020 | ND |
| MW-13 | 2-15-06/2-16-06 | ND | ND | ND | 0.035 | ND | ND | ND | 0.043 | 0.034 | 0.017 | 0.024 | 0.028 | ND |
| MW-13 | 4/20/06 | 5.08 | ND | 0.028 | ND | ND | ND | ND | 0.265 | ND | 0.016 | ND | ND | ND |
| MW-13 | 7/18/06 | 2.61 | ND | 0.200 | 0.013 | 0.033 | ND | ND | 0.059 | 0.014 | ND | ND | ND | 0.013 mg/L Silver |
| MW-13 | 10/22/06 | ND | ND | 0.041 | ND | ND | ND | ND | ND | ND | ND | ND | ND | ND |
| MW-13 | 1/17/07 | 2.31 | ND | 0.092 | ND | ND | ND | ND | 0.044 | 0.013 | 0.013 | ND | 0.024 | ND |
| MW-13 | 4/18/07 | 2.78 | ND | 0.078 | ND | ND | ND | ND | 0.041 | ND | ND | ND | 0.046 | ND |

ND = Non Detect
NA = Not Analyzed

Second Quarter 2007 MLCP Comprehensive Monitoring Report

Ref. No.: 4231-43

**EXHIBIT F TO R.W. DAY DECLARATION**



| Date | Chromium (VI) |
|------|---------------|
| 13-Jul-04 | 10.1 |
| 1-Nov-04 | 16.5 |
| 13-Jan-05 | 2.59 |
| 5-May-05 | 4.47 |
| 6-Jul-05 | 110.00 |
| 8-Dec-05 | 25 |
| 15-Feb-06 | 13.4 |
| 20-Apr-06 | 36.4 |
| 18-Jul-06 | 116 |
| 19-Oct-06 | 198 |
| 18-Jan-07 | 128 |
| 18-Apr-07 | 124 |

Hexavalent chromium concentrations reported in micrograms per liter (ug/l) on Table 10 of *Draft Groundwater Monitoring Report, Second Quarter 2007, Moss Landing Commercial Park, Highway One and Dolan Road, Moss Landing, California*, dated July 12, 2007.

A – 435

**EXHIBIT G TO R.W. DAY DECLARATION**



# California Regional Water Quality Control Board
## Central Coast Region



Terry Tamminen
*Secretary for
Environmental
Protection*

Arnold Schwarzenegger
*Governor*

Internet Address: http://www.swrcb.ca.gov/rwqcb3
895 Aerovista Place, Suite 101, San Luis Obispo, California 93401
Phone (805) 549-3147 • FAX (805) 543-0397

July 15, 2004

Mr. Bill Makel
2597 Gary Drive
Soquel, CA 95073

Dear Mr. Makel:

**SLIC: FORMER EUROTECH AUTO GARAGE, 211 CEDAR STREET, SANTA CRUZ, SANTA CRUZ COUNTY; CASE CLOSURE (RWQCB CASE NO. S-345)**

This letter confirms the completion of site investigation and corrective action for the underground storage tanks formerly located at the above-described location. Thank you for your cooperation throughout this investigation. Your willingness and promptness in responding to our inquiries concerning the former underground storage tanks are greatly appreciated.

Based on the information in the above-referenced file and with the provision that the information provided to this agency was accurate and representative of site conditions, this agency finds that the site investigation and corrective action carried out at your underground storage tanks site is in compliance with the requirements of subdivisions (a) and (b) of Section 25296.10 of the Health and Safety Code and with corrective action regulations adopted pursuant to Section 25299.3 of the Health and Safety Code and that no further action related to the petroleum release at the site is required.

This notice is issued pursuant to subdivision (g) of Section 25296.10 of the Health and Safety Code.

If you have questions regarding this matter, please call <u>Tom Sayles at (805) 542-4640</u>.

Sincerely,


*ORIGINAL SIGNED BY*

Roger W. Briggs
Executive Officer

S:\UST\Regulated Sites\Santa Cruz Co\Santa Cruz\211 Cedar Street\ClosureLetter.doc


---

*California Environmental Protection Agency*

♻ *Recycled Paper*



# California Regional Water Quality Control Board
## Central Coast Region



Terry Tamminen
*Secretary for*
*Environmental*
*Protection*

Internet Address http://www.swrcb.ca.gov/rwqcb3
895 Aerovista Place, Suite 101, San Luis Obispo, California 93401
Phone (805) 549-3147 • FAX (805) 543-0397

Arnold Schwarzenegger
*Governor*

November 10, 2004

Mr. H. Brad Boschetto
Shell Oil Company
PO Box 219
Lake Forest, CA 92609-0219

Dear Mr. Boschetto:

**SLIC: WFS WATSONVILLE FACILITY, 405 WEST BEACH STREET, WATSONVILLE, SANTA CRUZ COUNTY; CASE CLOSURE**

Regional Board staff has reviewed ENSR International's November 8, 2004, *Well Abandonment Report*. The report documents the proper destruction of six onsite and two offsite monitoring wells as required by my September 14, 2004, letter to you. Thank you for submitting the report. You have now met the requirements for case closure. Enclosed is the Case Closure Summary for your records.

This concludes the Regional Board's regulatory oversight for the investigation and cleanup of the former release of petroleum hydrocarbons, spray oil, and organochlorine pesticides in soil and groundwater. This letter does not relieve you of other agency's requirements, which may continue to have jurisdiction or require further work. As with any real property, additional or previously unidentified contamination at the site may require additional investigation and cleanup.

If you have any questions, please call John Mijares at 805-549-3696 or Burton Chadwick at 805-542-4786.

Sincerely,

Roger W. Briggs
Executive Officer

s/m/s/slic/regulated sites/santa cruz co/Watsonville/405 w beach street/boschetto case closure 10nov04

Enclosure: Case Closure Summary

cc:

Ms. Nancy Bishop
Western Farm Service, Inc.
3650 Mt. Diablo Blvd., Suite 260
Lafayette, CA 94549

Mr. Pablo Camacho and JT Berteliza
447 Watson Street
Watsonville, CA 95076

Mr. Blas Aguirre
427 Watson Street
Watsonville, CA 95076

Mr. Carlos Elvira
443 Watson street
Watsonville, CA 95076

*California Environmental Protection Agency*

♻ *Recycled Paper*



# California Regional Water Quality Control Board
### Central Coast Region



Dan Skopec
*Acting Secretary*

Internet Address:http://www.waterboards.ca.gov/centralcoast
895 Aerovista Place, Suite 101 San Luis Obispo, CA 93401-7906
Phone (805) 549-3147 • FAX (805) 543-0397

Arnold
Schwarzenegge
*Governor .*

May 31, 2006

Mr. Chris Garwood
Santa Cruz Shaffer Road Investors
675 Hartz Avenue, Suite 300
Danville, CA  94526

Dear Mr. Garwood:

## SLIC: FORMER GRANITE CONSTRUCTION FACILITY, 1280 SHAFFER ROAD SANTA CRUZ, CALIFORNIA; CASE CLOSURE (SLIC CASE NO. 299)

Central Coast Water Board (Water Board) staff has reviewed the November 29, 2005, *Monitoring Well Abandonment Report* and the *Deed Restriction* recorded with the County of Santa Cruz on May 15, 2006. Thank you for the submittals. The requirements for case closure have been met. This case is now closed as certified by the enclosed Case Closure letter and Case Closure Summary form.

This concludes the Water Board's regulatory oversight for the subject site. This letter does not relieve you of other agency's requirements, which may continue to have jurisdiction or require further work. As with any real property, additional or previously unidentified contamination at the site may require additional investigation and cleanup.

Thank you for your diligence in addressing your water quality issues and your continued commitment to water quality protection. If you have any questions regarding this matter, please call <u>Tom Sayles at (805) 542-4640</u> or <u>Karyn Steckling at (805) 542-4642</u>.

Sincerely,

Roger W. Briggs
Executive Officer

S:\SLIC\Regulated Sites\Santa Cruz Co\Santa Cruz\1280 Shaffer Road\closureletterretransmittal.doc

Enclosure:    Case Closure letter
              Closure Summary

cc: (next page)

*California Environmental Protection Agency*

♻  *Recycled Paper*

A – 439



# California Regional Water Quality Control Board
## Central Coast Region



**Dan Skopec**
*Acting Secretary*

Internet Address:http://www.waterboards.ca.gov/centralcoast
895 Aerovista Place, Suite 101 San Luis Obispo, CA 93401-7906
Phone (805) 549-3147 • FAX (805) 543-0397

**Arnold
Schwarzenegger**
*Governor*

May 31, 2006

Mr. Chris Garwood
Santa Cruz Shaffer Road Investors
675 Hartz Avenue, Suite 300
Danville, CA  94526

Dear Mr. Garwood:

**SLIC: FORMER GRANITE CONSTRUCTION FACILITY, 1280 SHAFFER ROAD
SANTA CRUZ, CALIFORNIA; CASE CLOSURE (SLIC CASE NO. 299)**

This letter confirms the completion of site investigation and corrective action for the the
Spills, Leaks, Investigations and Cleanup (SLIC) case located at the above-described
location.  Thank you for your cooperation throughout this investigation.  Your willingness
and promptness in responding to our inquiries concerning the former underground storage
tanks are greatly appreciated.

Based on the available information in the above-referenced file, and with the provision that
the information provided to this agency was accurate and representative of site conditions,
no further action related to the SLIC case is required.

If you have any questions regarding this matter, please call Tom Sayles at (805) 542-4640
or Karyn Steckling at (805) 542-4642.

Sincerely,

Roger W. Briggs
Executive Officer

S:\SLIC\Regulated Sites\Santa Cruz Co\Santa Cruz\1280 Shaffer Road\closureletter.doc

*California Environmental Protection Agency*

♻  *Recycled Paper*

A – 440

**EXHIBIT H TO R.W. DAY DECLARATION**



**Environmental Health Services**
**(707) 421-6765  FAX (707) 421-4805**

Department of
**Environmental Management,**
470 CHADBOURNE ROAD, SUITE 200
FAIRFIELD, CALIFORNIA  94534-9605
www.solanocounty.com

Dennis Kalson, REHS
Program Manager

February 14, 2003

GASAMAT OIL CORP OF COLORADO
·MIKE GALLAGHER
PO BOX 18690
BOULDER, CO 80308-1690

MR. SOROUSH HAJIAN
43 EAST MAIN STREET, SUITE BK
LOS GATOS, CA 95032

RE:    **TRANSMITTAL LETTER, UNDERGROUND STORAGE TANK (UST) CASE CLOSURE,**
Unauthorized Release, Former Gasamat Station No. 958, 990 Redwood Street, Vallejo, CA, Solano County
File # **10830,** State LUSTIS File # **48-0273.**

Dear Sirs:

·Enclosed, please find one copy each of the Remedial Action Completion Certification and Case Closure
Summary for your files. Please be advised that the attached information does not relieve you of any liability
under the California Health and Safety Code or Water Code for past, present, or future operations at the site.

Nor does it relieve you of the responsibility to clean up existing, additional or·previously unidentified
conditions at the·site which cause or threaten to cause pollution or nuisance or otherwise pose a threat to water
quality or public·health. This information shall be disclosed to future property owners. Please contact me at
(707)·421-6765 if you have any questions regarding this matter.

Sincerely,

Misty C. Kaltreider, CHMM, R.G.
Geologist ·

Enclosures:  Remedial Action Completion Certification
              Case Closure Summary

.cc:        Ms. Mary Rose Cassa, San Francisco Bay – RWQCB
            Mr. Al Patton, Fund Manager, UST Cleanup Fund Program
            Mr. John Love, ATC



Department of
## Environmental Management
470 CHADBOURNE ROAD, SUITE 200
FAIRFIELD, CALIFORNIA 94534-9605
www.solanocounty.com

Environmental Health Services
(707) 421-6765  FAX (707) 421-4805

Dennis Kalson, REHS
Program Manager

### REMEDIAL ACTION COMPLETION CERTIFICATION

February 14, 2003

GASAMAT OIL CORP OF COLORADO
MIKE GALLAGHER
PO BOX 18690
BOULDER, CO 80308-1690

MR. SOROUSH HAJIAN
43 EAST MAIN STREET, SUITE BK
LOS GATOS, CA 95032

RE:  **UNDERGROUND STORAGE TANK (UST) CASE CLOSURE**, Unauthorized Release, Former Gasamat Station No. 958, 990 Redwood Street, Vallejo, CA, Solano County File # 10830, State LUSTIS File # 48-0273.

Dear Sirs:

This letter confirms the completion of site investigation and corrective action for the underground storage tank(s) formerly located at the above-described location. Thank you for your cooperation throughout this investigation. Your willingness and promptness in responding to our inquiries concerning the former underground storage tank(s) are greatly appreciated.

Based on information in the above-referenced file and with the provision that the information provided to this agency was accurate and representative of site conditions, this agency finds that the site investigation and corrective action carried out at your underground storage tank site is in compliance with the requirements of subdivisions (a) and (b) of Section 25299.37 of the Health and Safety Code and with corrective action regulations adopted pursuant to Section 25299.77 of the Health and Safety Code and that no further action related to the petroleum release(s) at the site is required.

This notice is issued pursuant to subdivision (h) of Section 25299.37 of the Health and Safety Code. Please contact our office at (707) 421-6765 if you have any questions regarding this matter.

Sincerely,

Dennis Kalson, REHS
Program Manager, Environmental Health

A – 443

# CASE CLOSURE SUMMARY
## Leaking Underground Fuel Storage Tank Program          Page 1

**I.    AGENCY INFORMATION**                                    Date: 7/16/2002

Agency Name: Solano County DEM          Address: 601 Texas Street
City/State/Zip: Fairfield, CA 94533      Phone: 707/421-6765
Project Lead: Misty C. Kaltreider, CHMM, R.G.    Title: Geologist

**II.   CASE INFORMATION**

Site Name: Gasamat Station No. 958
Site Address: 990 Redwood Street, Vallejo
RB Lustis case no: 48-0273        SWEEPS no: 10830    LOP case no: 10830
URF filing date: 10-1-91

**Responsible Party Info.**

| Responsible Party | Address | Phone Number |
|---|---|---|
| Connie Wertzbaugher | P.O. Box 18690 | |
| Gasamat Oil Corporation | Boulder, CO 80308 | |
| Soroush Hajian | 990 Redwood St. | |
| Road Runner Gas | Vallejo, CA 94590 | |

**Tank Info.**

| Tank No. | Size (gal.) | Contents | Closed? | Closure Method | Date |
|---|---|---|---|---|---|
| 1 | 15,000 | gasoline | Yes | Removal | 4/10/2002 |
| 2 | 15,000 | gasoline | Yes | Removal | 4/10/2002 |
| 3 | 5,000 | gasoline | Yes | Removal | 4/10/2002 |
| 4 | 15,000 | gasoline | No | NA | NA |
| 5 | 15,000 | gasoline | No | NA | NA |

**III.  RELEASE AND SITE CHARACTERIZATION INFORMATION**

Cause and type of release: overfilling, overspilling
Is site characterization complete? Yes          Date approved by oversight agency: 7/16/02
How many monitoring wells installed? 4          Proper screened interval? yes
Highest gw depth below grade: 6.5 (stabilized)   Lowest depth: 20 ft bgs (encountered)
Groundwater flow direction:  varies from west to east *
Most sensitive current use: Commercial (active gasoline station)
Are drinking wells affected?  No          Drinking water aquifer name: N/A
Is surface water affected? No          Nearest surface water body name: White's Slough
Address/location of off-site impact: None
Are report(s) on file?  Yes          Where? SCDEM

*Notes:*\*Water in the wells is under pressure. If not enough time is allowed for the water to stabilize, then conflicting groundwater elevations may result. Water levels were allowed to stabilize for approximately 2 hours during the March 9, 1999 sampling event. Groundwater flow direction for the March 1999 event was calculated to be predominantly east. It is unknown if the water levels were allowed to stabilize during the previous sampling events. Therefore, the groundwater flow directions reported are not considered conclusive.

# CASE CLOSURE SUMMARY
## Leaking Underground Fuel Storage Tank Program

Page 2

### III.   RELEASE AND SITE CHARACTERIZATION INFORMATION (Continued)

**Treatment and Disposal of Affected Materials**

| Material | Amount | Disposal/treatment/destination | Date |
|----------|--------|-------------------------------|------|
| Tanks | 3 | Removed, disposed at Ecology Control, Richmond, CA | April 2002 |
| Soil | 1,165 Tons | Removed, disposed at Hay Road Landfill, Vacaville, CA | April 2002 |
| Water | 165 gallons | Removed, disposed undisclosed location | April 2002 |

**Maximum Documented Contaminant Concentrations - before and after cleanup**

| Constituent | Soil (ppm) | | Water (ppm) | | Constituent | Soil (ppm) | | Water (ppm) | |
|-------------|-----------|-------|------------|-------|-------------|-----------|-------|------------|-------|
| | Before | After | Before | After | | Before | After | Before | After |
| TPH (gas) | 14,000 | 1,300 | 430 | <0.05 | Xylene | 750 | 30.4 | 16[1] | <0.0005 |
| TPH (diesel) | 4,900 | NA | NA | NA | Ethylbenzene | 260 | 28 | 12[1] | <0.0005 |
| Benzene | 40 | 9.1 | 40[1] | <0.0005 | Oxygenates[2] | NA | NA | NA | <0.005 |
| Toluene | 99 | 24 | 13[1] | <0.0005 | Lead | 21 | NA | NA | NA |
| MTBE | 12 | 9.1 | 0.510 | 0.098 | 1,2 – DCA | NA | NA | 0.06 | NA |

*Notes:*
1. *Laboratory results from grab water samples collected in borings.*
2. *TBA, DIPE, ETBE, TAME, and EDB*

**Comments (depth of remediation, etc.):**
According to reports and records, the USTs have passed all tightness tests since 1986. However, inventory records reportedly exceeded allowable limits on a quarterly basis prior to 1993. In August 1991, Western Geo Engineers performed a limited soil and groundwater investigation on the property. The investigation included drilling 11 borings in the vicinity of the underground storage tanks (USTs) and collecting soil and grab groundwater samples. A total of 10 soil samples were collected at 5, 8, and 11 feet below ground surface (bgs), and 3 water samples were collected at 3, 4, and 8 feet bgs. The main type of soil encountered was stiff clay. Due to the low hydraulic conductivity within the clay, only 3 borings reported observable free water. A thin film of separate-phase product was reported on the groundwater within two borings located adjacent to the dispenser islands.

In August 1997, On-site Technologies installed four groundwater-monitoring wells in the vicinity of the dispenser island and the USTs. During drilling, product odor was reported in the shallow soil to 7 feet bgs in boring MW-1. Analysis results indicated detectable concentrations of constituents up to 110 ppm TPHg and 1.6 ppm benzene at 5 feet bgs in MW-1. Soil sample results from the other borings indicated below laboratory reporting limits for TPHg and BTEX and up to 0.089 ppm MTBE at 10 feet bgs. Initial groundwater sample results indicated detectable concentrations of TPHg, benzene, and MTBE in monitoring wells MW-1 and MW-2 and low concentration of TPHg and toluene in the groundwater collected from MW-3.

The site was accepted for closure in 1999 based on decreasing concentrations in the groundwater monitoring wells and low residual concentrations in the soil. However, submittal of the no further action closure letter was pending product piping upgrade work and destruction of the monitoring wells.

A – 445

# CASE CLOSURE SUMMARY
## Leaking Underground Fuel Storage Tank Program          Page 3

In 2002, the station was upgraded which included removal of three USTs, dispensers, and equipment and installation of two new USTs and equipment. Impacted soil was encountered around the dispensers, former fuel lines and adjacent to the USTs. Overexcavation was conducted in the former tank pit to 15 feet below ground surface (bgs) and under the dispenser islands to approximately 4 – 4.5 feet bgs. Approximately 1,165 tons of soil was excavated and removed for off site disposal. During excavation around the dispensers, shallow perched water and floating product was observed within the trench. The water/product was removed via pump and disposed off site. Water did not recharge into the trench after removal; therefore, the water observed is likely perched water within gravelly fill material on site.

Accessible impacted soil was removed from the site. Based on the laboratory analyses of confirmation samples collected after overexcavation, results indicated below the RWQCB risk-based screening levels (RBSLs, December 2001), of 0.39 mg/kg benzene, for commercial usage in areas where groundwater is greater than 3 meters deep and is not used for drinking water purposes. However, two areas illustrated elevated residual soil concentrations above the RBSLs which remain isolated beneath the site at approximately 3 to 5 feet bgs. The two areas are located adjacent to the remote fill and in the northeast corner of the canopy area. The aerial extent of residual impacted soil appears to be limited and isolated on site. The maximum concentrations that remain on site are summarized in the above table within the "Soil After Remediation" column.

A minimum of yearly groundwater monitoring was conducted on the property from August 1997 through February 1999. After UST removal and overexcavation, an additional groundwater monitoring event was conducted in May 2002. Laboratory results indicated below reporting limits for TPHg and BTEX in all 4 wells and decreasing concentrations of MtBE. Based on the groundwater monitoring conducted from 1997 through 1999, MtBE concentrations reported 310 µg/L. Whereas, the most recent groundwater monitoring results in 2002 indicated up to 98 µg/L MtBE which is a 68% decrease after overexcavation.

Soil on site consists of 3-5 feet of gravelly clay fill material over stiff clay to approximately 20 feet bgs. Groundwater is encountered in the borings between 15 to 20 feet bgs and stabilizes up to 6.5 feet bgs under confined to semi-confined conditions. Historical groundwater flow direction and gradient varies from west to east. The variance in the groundwater flow is likely due to lack of allowance for groundwater levels to stabilize prior measuring the water elevations.

IV.     **CLOSURE**

Are existing beneficial uses protected per RB Basin Plan? Yes
Are potential beneficial uses protected per RB Basin Plan? Yes
Is public health protected for current land use? Yes
Describe site management requirements: None
Should corrective action be reviewed if site use changes? No
Are MWs decommissioned? No Yes          How many? 4        Number remaining: 4-0   mck 10/15/
Describe enforcement actions taken: None
Describe enforcement actions rescinded: None

# CASE CLOSURE SUMMARY
## Leaking Underground Fuel Storage Tank Program

Page 4

**V.     LOCAL AGENCY REPRESENTATIVE DATA**

Name: Dennis Kalson                                     Title: Program Manager, Environmental Health
Signature: *Dennis Kalson*                              Date: 7/16/02

**VI.     RWQCB NOTIFICATION**

Date submitted to RB: 7/16/02                           RB response: *Concur*
RWQCB Staff Name: Mary Rose Cassa                       Title: *AEG*
Signature: *Mary Rose Cassa*                            Date: 7/16/03

**VII.     ADDITIONAL COMMENTS (attach pages as necessary)**

Based on historical data for the site, the subsurface impact is likely due to overspill and overfills. The tanks and station equipment was removed and upgraded in 2002. Accessible impacted soil was removed during station upgrading. The site has been adequately characterized, the residual contamination remains localized in the soil in the vicinity of the northeast corner of the canopy area and around the former remote fill. Groundwater in this area was encountered at approximately 15 to 20 feet below ground surface (bgs) and exists in very expansive clay with low hydraulic conductivity. During well installation, water in the borings was reported to be 15 feet bgs, then stabilized at 6.5 feet bgs. Groundwater at the site is likely under confined or semi-confined conditions. The groundwater in this area typically is high salinity. There are no known domestic or municipal water wells within 2,000 feet of the site. The surrounding area is commercial. Based on the results of the subsurface investigation, this case does not represent a significant threat to the human health or the environment and therefore should be closed.

A – 447



**SOLANO COUNTY**
**Department of Resource Management**
675 Texas Street, Suite 5500
Fairfield, CA 94533
www.solanocounty.com

RECEIVED
JAN 25 2008
By_____

Birgitta Corsello, Director
Cliff Covey, Asst Director

Telephone No: (707) 784-6765
Fax: (707) 784-4805

---

## NOTICE OF CORRECTIVE ACTION AND RESPONSIBILITY

January 22, 2008                                          **Certified Mail**

SOROUSH HAJIAN                              GREG O'DONNELL
ROADRUNNER GAS                             GASAMAT
990 REDWOOD ROAD                           5303 SPINE RD., # 101
VALLEJO, CA 94590                          BOULDER, CO 80301

RE: **Notice of Corrective Action and Responsibility,** Unauthorized Release, Roadrunner Gas, 990
Redwood Road, Vallejo, CA, SCDRM File # 29-10830.

Dear Sirs:

The County of Solano, Department of Resource Management (SCDRM) has determined that an
**Unauthorized Release** of hazardous substance has occurred from the underground storage tank system
(tank), at the location referenced above. This determination is based on the following information:

In 1991, a limited subsurface investigation was conducted around the underground storage
tanks and dispensers. Results of the investigation indicated up to 480 mg/Kg Total
Petroleum Hydrocarbons as gasoline (TPHg) in the soil at five feet below ground surface
(bgs) near a remote fill line for the USTs. Additional subsurface investigation was
conducted in 1997 which included the installation of four monitoring wells. Shallow
impacted soil was reported during drilling of one monitoring well. Quarterly groundwater
monitoring and sampling indicated low to below detection limits of constituents and the
site was pending closure following station upgrading.

In 2002, three USTs were removed and replaced by two 15,000-gallon gasoline tanks.
During the station upgrading project, impacted shallow soil up to 14,000 mg/Kg TPHg
was encountered under the dispensers at 3 feet bgs. The accessible impacted soil under the
dispensers was removed to approximately 4.5 feet bgs. Residual impact remains under the
remote fill and under the northeaster corner of the dispenser island canopy at 3 to 5 feet
bgs. Due to the limited residual impact, the site was closed on February 14, 2003.

---

| Building & Safety | Planning Services | Environmental Health | Administrative | Public Works | Public Works-Operations |
|---|---|---|---|---|---|
| David Cliche, Chief | Mike Yankovich | Terry Schmidtbauer | Services | Engineering | Steve Hiles |
| Building Official | Program Manager | Program Manager | Daniel Bellem | Paul Wiese | Operations Manager |
| | | | Staff Analyst | Engineering Manager | |

Roadrunner Gas, 990 Redwood St., Vallejo
SCDRM File #29-10830
January 22, 2008
Page 2

In November 2007, as part of the station upgrading project, stained soil and a two-inch diameter metal pipe was uncovered in the northern portion of the property. This portion of the property was not previously investigated, therefore additional investigation and impacted soil removal was warranted by SCDRM. Reportedly, fuel dispenser(s) previously existed on the northern portion of the property prior to 1970. A geophysical survey was conducted in December 2007. No evidence of USTs or additional piping was found during the survey. A subsurface investigation was conducted in December 2007. Results of the soil and groundwater sampling indicted up to 646 mg/Kg TPHg in the soil and 2,430 µg/L TPHg in the groundwater. Based on the results of the investigation conducted in 2007, an unauthorized release occurred.

This Notice has been prepared because the nature and extent of the release is not fully defined and/or the site has not been adequately cleaned up. As a result, Corrective Action must be performed.

The term "Corrective Action" means all environmental investigation and cleanup work performed from the time an Unauthorized Release is reported to the issuance of the case closure letter. Corrective Action requirements are set forth in Title 23, of the California Code of Regulations (CCR), Article 11.

The purpose of this letter is to present the following information:

A.     Responsible Party Identification and Notification

B.     Introduction to the Local Oversight Program

C.     Corrective Action Requirements

A.     **RESPONSIBLE PARTY IDENTIFICATION AND NOTIFICATION**

Title 23, CCR, Article 11, offers four categories defining responsible parties. The SCDRM must identify all parties that meet the responsible party definitions, based on the information provided. The four definitions are:

1.     Any person who owns or operates an underground storage tank used for the storage of any hazardous substance (such as petroleum);

2.     In the case of any underground storage tank no longer in use, any person who owned or operated the underground storage tank immediately before the discontinuation of its use;

3.     Any owner of property where an Unauthorized Release of a hazardous substance from an underground storage tank has occurred; and

4.     Any person who had or has control over an underground storage tank at the time of or following an Unauthorized Release of a hazardous substance.

A – 449

Roadrunner Gas, 990 Redwood St., Vallejo
SCDRM File #29-10830
January 22, 2008
Page 3

Based on information provided, the SCDRM has identified the following party(ies) as meeting at least one responsible party definition:

Greg O'Donnell                           Definitions 1, 3 and 4
Gasamat
5303 Spine Rd, #101
Boulder, CO 80301

Soroush Hajian                           Definitions 1, 2, and 3
Roadrunner Gas
990 Redwood Road
Vallejo, CA 94590

Pursuant to Section 25297.1 and 27297.15 of the California Health and Safety Code, you are hereby notified that the above site has been placed in the Local Oversight Program of SCDRM and the individual(s) or entity(ies) shown above has(have) been identified as the party(ies) responsible for investigation and cleanup of the above site. Section 25297.1 further requires the primary or active responsible party to notify all current record owners of fee title (land owners) before the local agency considers cleanup or site closure proposals or issues a closure letter. For purposes of implementing Section 2597.15, SCDRM has identified **Gasamat** as the primary or active Responsible Party. **It is the responsibility of the primary or active Responsible Party to submit a letter to SCDRM within 20 calendar days of receipt of this notice which identifies all current record owners of fee title.** It is also the responsibility of the primary or active Responsible Party to certify to SCDRM that the required notifications have been made at the time of cleanup or site closure proposal is made or before SCDRM makes determination that no further action is required. If property ownership changes in the future, you must notify SCDRM within 20 calendar days from when you are informed of the change.

The above listed party(s) are responsible for the Corrective Action requirements. In order to be removed from the responsible party list, the SCDRM must receive written information that clearly shows a party does not meet one of the responsible party definitions. Written information will be evaluated by the SCDRM on a case by case basis.

The SCDRM decision to name the above party(s) responsible for Corrective Action is subject to petition to the State Water Resources Control Board. Any action or inaction by this local agency associated with corrective action, including responsible party identification, is subject to petition to the State Water Resources Control Board. Petitions must be filed within 30 days from the date of the action/inaction. To obtain petition procedures, please fax your request to the State Water Resources Control Board at (916) 341-5711 or telephone (916) 341-5650.

## B.    INTRODUCTION TO THE LOCAL OVERSIGHT PROGRAM

The SCDRM has entered into an agreement with the State of California Water Resources Control Board to oversee. Corrective Action of Unauthorized Releases from UST systems for sites placed within the Local Oversight Program. SCDRM will oversee the Corrective Action of the Unauthorized Release referenced above. This oversight will include, but not be limited to, site specific work such as:

Roadrunner Gas, 990 Redwood St., Vallejo
SCDRM File #29-10830
January 22, 2008
Page 4

report/correspondence review, report/correspondence preparation, site inspections, meetings, agency consultation, comments on reports and workplans, and enforcement action.

Pursuant to Section 25299.37 (c)(7) of the Health and Safety Code, a responsible party may request the designation of an administering agency when required to conduct corrective action. Please contact this office for further information about the site designation process.

SCDRM will evaluate all available reports and information concerning the Unauthorized Release. Upon consultation with the Regional Water Quality Control Board (RWQCB) and other appropriate agencies, SCDRM will determine the need for further Corrective Action.

## C.    CORRECTIVE ACTION REQUIREMENTS

Described below are general and specific requirements of the SCDRM and the Regional Water Quality Control Board (RWQCB) regarding further Corrective Action.

### General Requirements:

California law requires that responsible parties investigate, abate, and remedy soil and groundwater contamination resulting from Unauthorized Releases. These activities must be performed in accordance with Title 23, CCR, Articles 5 and 11.

### Specific Requirements/Responsibilities:

1. Based on the results of the samples collected during subsurface investigation work and during station remodeling, further investigation is necessary to characterize the vertical and lateral extent of soil impact and evaluate groundwater conditions and impact through borings and monitoring wells. Previous investigations conducted prior to 2007 focused on the southern portion of the property around the USTs. Additional work is warranted to evaluate all potential source(s) and impact areas throughout the property.

2. By **February 29, 2008**, provide a work plan to evaluate the extent and magnitude of impact and characterize the source(s). In addition, a copy of the Phase 1 dated May 13, 2003, prepared by SOMA, and copies of historical Sanborn Fire Insurance Maps for the area shall be submitted with the required Work Plan.

3. Soil and/or groundwater samples must be analyzed for the following constituents:
   Total Petroleum Hydrocarbons as diesel (TPHd);
   Total Petroleum Hydrocarbons ad gasoline (TPHg)
   Benzene, toluene, ethylbenzene, and xylenes (BTEX);
   MtBE;
   Lead scavengers (1,2-DCA, EDB); and
   Total recoverable petroleum hydrocarbons.

Roadrunner Gas, 990 Redwood St., Vallejo
SCDRM File #29-10830
January 22, 2008
Page 5

4.  Under the authority of Section 13196 and 13198 (c) of the Water Code, a Responsible Party is required to submit analytical and site data electronically to the State Water Resources Control Board Geographic Environmental Information Management System database GeoTracker along with the customary paper reports. Data to be submitted through Electronic Deliverable Format (EDF) includes; all sample results, latitude, longitude, and elevations of monitoring wells, groundwater information, and a site plan illustrating sample, boring, well locations, and .pdf copies of reports and well logs. Hardcopy reports will not be accepted if the EDF reporting has not been submitted. The State Water Resources Control Board web site at https://geotracker.waterboards.ca.gov can assist with questions regarding the EDF requirements. The global identification number for the site is:T0609515915.

5.  As previously mentioned, for purposes of implementing Section 2597.15, it is the responsibility of the primary or active Responsible Party to submit a letter to SCDRM within 20 calendar days of receipt of this notice. The letter shall identify all current record owners of fee title and certify that all record owners have been identified.

6.  A subsurface utility survey and sensitive receptor survey shall be completed for the site. The subsurface utility survey shall include locating all subsurface utilities on and surrounding the site. Findings from the utility survey shall be presented in a report on a scaled site plan illustrating the each utility, depth, and flow direction.

SCDRM and RWQCB staff personnel are available to meet with you and/or your environmental consultant to discuss agency guidelines and requirements for the resolution of this case. Failure to comply with SCDRM or RWQCB directives may jeopardize your eligibility for cost reimbursement under the state's Underground Storage Tank Cleanup Fund (Senate Bill 2004) and the Underground Storage Tank Reform Act (Senate Bill 562).

Please address all written submittals to my attention at the SCDRM. If you have any questions concerning this notice, require additional information, or would like to schedule a meeting to discuss this site in greater detail, please contact me at (707) 784-6765.

Sincerely,

Misty C. Kaltreider, CHMM, PG, CEG.
Engineering Geologist

Enclosures:    Corrective Action Requirement Guidelines

Cc:    Mr. Kent Au, RWQCB (without enclosures)
       John Love, Geocon, 6671 Brisa St, Livermore, CA 94550
       Richard McKinney, SOMA, 6620 Owens Dr., Suite A, Pleasanton, CA 94588

A – 452

# Exhibit D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Jointly Administered** |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION, a** | : | |
| **Delaware Corporation, <u>et al.</u>,** | : | **Chapter 11** |
| | : | |
| **Debtors.** | : | |
| | : | |
| | : | |
| **KAISER ALUMINUM CORPORATION,** | : | |
| **<u>et al.</u>,** | : | |
| | : | |
| **Movants,** | : | |
| **v.** | : | |
| | : | |
| **MOSS LANDING COMMERCIAL** | : | |
| **PARK LLC,** | : | |
| | : | |
| **Respondent.** | : | |

### DECLARATION OF WENDY W. SMITH IN SUPPORT OF OPPOSTION TO
### MOTION BY DEBTOR KAISER TO ENFORCE INJUNCTION

1.      I am an attorney authorized to practice by the State of California and I am
admitted to practice before the above-entitled Court. I am a partner of the law firm of
Binder & Malter, LLP, co-counsel of record for Moss Landing Commercial Park LLC
("Moss Landing").

2.      I have personal knowledge of the facts set forth in this declaration, except
as to those matters alleged on information and belief, and as to those matters, I believe
them to be true. If called upon as a witness, I could and would competently testify to the
following

3.      Over the dates of February 4th through 6th, 2008, I reviewed the docket of
the jointly-administered case entitled Kaiser Aluminum Corporation, Case number 02-
10429-JKF as posted on the CM/ECF Live Database – Docket Report. On January 30,
2008, I printed from the Internet the entire docket. Attached hereto as Exhibit A is a true

DKT. NO. **9673**

DT. FILED **2-8-08**

and correct copy of the first page of that print-out; the URL is set forth on the bottom left hand side of the page (the "Docket"). The Docket is 804 pages long and contains over 9600 entries.

4.    Because of the length of the Docket, it is impractical to attempt to review every affidavit of service that, pursuant to Federal Bankruptcy Rule 2002, is required to be noticed to all creditors and interested parties.

5.    In an effort to confirm that the debtors in this action (the "Debtors") did not provide formal notice to Moss Landing or to its predecessor, Nader Agha, of any hearing on a disclosure statement or confirmation of a plan, I reviewed the Docket beginning with entries dated February 28, 2005. This review did not reveal any evidence that the Debtors gave notice of any event to Moss Landing or to Nader Agha. The docket reflects the following:

6.    Docket number 6098, dated, February 7, 2005, is the Second Amended Order Establishing Case Management Procedures and Hearing Schedule. It sets forth limited service rules for the Debtors' case, including identifying a "Core Group" and an "All Notice List." The Core Group is a short list of 22 parties including the Debtors, Debtors' counsel, and counsel for various committees. The order identifies the "All Notices List" as the Core Group, plus those who have requested notice and met other requirements. The Order modifies the rule that motions of compromise of controversy be served on all creditors as set forth in Bankruptcy Rule 2002(a)(3), and provides that the Debtor need serve only the All Notices List and the parties to the agreement (with exceptions regarding insurance matters). A true and correct copy of the Second Amended Order Establishing Case Management Procedures and Hearing Schedule is attached as Exhibit B, including the exhibit showing the "Core Group" but excluding remaining exhibits.

7.    Dockets Numbers 6372 through 6381, inclusive, are affidavits of service

- 2 -

A – 454

of voting-solicitation packages for the confirmation of the joint Third Amended Plan for certain of the Kaiser debtors, known as the "Liquidating Debtors". Docket numbers 6372, 6374, 6375, 6376, 6377, 6380, and 6381 show service on specific identified classes of claims, classes that do not include Moss Landing or Nader Agha. Docket number 6373 is an affidavit of service of solicitation materials on "non-voters." This service list does not include Moss Landing or Nader Agha. Docket numbers 6376, 6378, and 6379 are affidavits of service of solicitation materials on unsecured creditors. I reviewed the service lists attached to these three affidavits, and none showed service on Moss Landing or Nader Agha.

8.      According to the Docket, on June 29, 2005, the Kaiser entities intending to reorganize, the "Reorganizing Debtors" filed a Disclosure Statement and a Joint Plan of Reorganization. [Docket numbers 6970 and 6971.]

9.      On July 27, 2005, the Debtors filed an updated service list for the "All Notices List. [Docket number 7091] Neither Moss Landing nor Nader Agha were included in that list.

10.     Docket number 7099, filed July 28, 2005, is an "Affidavit for Service: Notice of Hearing to Consider Approval of Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Joint Plan of Reorganization and Certain of Their Debtor Affiliates." I reviewed the extensive list of service using a search tool. The names of "Moss Landing", "Nader" and "Agha" are not on this notice list.

11.     The Docket reflects that, through the month of August 2005 and into September, various pleadings regarding the proposed disclosure and a filing by the Debtors of a First Amended Joint Plan of Reorganization, but no further service to the general creditor population. Docket number 7320, dated September 8, 2005, reflects that the disclosure statement was approved.

12.     Docket Number 7323 is a notice of hearing on confirmation and deadline

- 3 -

for casting votes. The notice is not filed with an affidavit of service.

13.    Dockets Number 7390 through 7393, dated September 19, 2005, are affidavits of service of the confirmation hearing on four identified groups of personal-injury claimants.

14.    Docket number 7522, dated October 15, 2005, is an affidavit of service of solicitation materials to "non-voters" regarding the "Second Amended Joint Plan of Reorganization." I reviewed the extensive list of service using a search tool. The names of "Moss Landing", "Nader" and "Agha" are not on this notice list.

15.    Docket numbers 7523 and 7524, dated October 15, 2005 are affidavits of service of solicitation materials regarding the Second Amended Joint Plan of Reorganization to identified classes of claimants. Docket number 7526 is an affidavit of solicitation materials to "other unsecured claims." I reviewed this list of service using a search tool. The names of "Moss Landing", "Nader" and "Agha" are not on this notice list.

16.    Docket number 7604, dated October 27, 2005, is an affidavit of service "Supplemental" of solicitation materials on non-voters. Neither Moss Landing nor Nader Agha is on this list.

17.    Docket number 7607, dated October 27, 2005, is an affidavit of service "Supplemental" of solicitation materials on unsecured creditors. Neither Moss Landing nor Nader Agha is on this list.

18.    Docket numbers 7603, 7606, 7608, and 7609, dated October 26, 2005 are all affidavits of supplemental service of solicitation materials on specific identified classes of claimants, class that do not include Moss Landing and Nader Agha.

19.    Docket number 8027, dated December 27, 2005, is an affidavit of service on general unsecured creditors of certain modifications to the Second Amended Plan. Neither Moss Landing nor Nader Agha is on this service list.

- 4 -

A – 456

20.    My review of the Docket did not reveal any affidavit of service or other filing that reflects that the Debtors provided any formal notice to either Moss Landing or Nader Agha of a hearing on a disclosure statement, or a plan confirmation, or of the opportunity to object to either.

21.    Docket number 2761, dated August 22, 2003, is the Debtors' motion for approval of the Consent Decree with various governmental agencies. Attached as Exhibit C is a true and correct copy of the motion with its affidavit of service on the "All Notices List." The affidavit does not reflect any service on Moss Landing or on Nader Agha.

I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed this 8th day of February, 2007 at Santa Clara, California.

Wendy W. Smith

- 5 -

# Exhibit "A"

LEAD, MEGA, APPEAL, CLMSAGNT, Sealed Doc(s), CONFIRMED

**U.S. Bankruptcy Court**
**District of Delaware (Delaware)**
**Bankruptcy Petition #: 02-10429-JKF**

*Assigned to:* Judith K. Fitzgerald                          *Date Filed:* 02/12/2002
Chapter 11
Voluntary
Asset

**Debtor**
**Kaiser Aluminum Corporation,** *A Delaware Corporation*
5847 San Felipe, Suite 2600
Houston, TX 77057
Tax id: 94-3030279

represented by Daniel J. DeFranceschi
Richards Layton & Finger
One Rodney Square
PO Box 551
Wilmington, DE 19899
302-651-6541
Fax : 302-651-7701
Email: defranceschi@rlf.com

**Daniel J. DeFranceschi**
Richards, Layton & Finger
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
usa
302 651-7700
Fax : 302-651-7701
Email: defranceschi@rlf.com

**Ian Connor Bifferato**
Bifferato Gentilotti LLC
800 N. King Street
Plaza Level
Wilmington, DE 19801
usa
302 429-1900
Fax : 302-429-8600
Email: cbifferato@bglawdc.com

**James L. Patton**
Young, Conaway, Stargatt & Taylor
The Brandywine Bldg.
1000 West Street, 17th Floor
PO Box 391
WILMINGTON, DE 19899-0391
302-571-6684
Email: bankruptcy@ycst.com

**Jason M. Madron**
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
302-651-7595
Fax : 302-651-7701
Email: madron@rlf.com

**Jason M. Madron**
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
302-651-7595
Fax : 302-651-7701
Email: madron@rlf.com

# Exhibit "B"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                          :
                                                :    Jointly Administered
KAISER ALUMINUM CORPORATION,    :
a Delaware corporation, et al.,                :    Case No. 02-10429 (JKF)
                                                :
            Debtors.                           :    Chapter 11

## SECOND AMENDED ORDER ESTABLISHING CASE MANAGEMENT PROCEDURES AND HEARING SCHEDULE[1]

On, as applicable, February 12, 2002, March 15, 2002 and January 14, 2003,

Kaiser Aluminum Corporation and twenty-seven of its affiliates (collectively, the "Debtors")

commenced their respective reorganization cases in Wilmington, Delaware by filing voluntary

petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U S C

§§ 101-1330 (the "Bankruptcy Code"). By orders of this Court (Docket Nos 33 and 383 in Case

No 02-10429, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), these cases are being jointly administered under the caption "In re Kaiser

Aluminum Corporation" (the "Kaiser Chapter 11 Cases").

Because of the great number of creditors and other parties in interest in the Kaiser

Chapter 11 Cases, burdensome expense and unnecessary delay will result unless certain

procedures for copying, noticing and motion practice are implemented.

The caption of this Order is the official caption to be used in these cases and shall

hereafter be used on all filings in the Kaiser Chapter 11 Cases

Pursuant to sections 102(1) and 105(a) of the Bankruptcy Code, Bankruptcy Rules

2002, 7016, 9007 and 9014 and Rule 1001-1(b) of the Local Rules of Bankruptcy Practice and

---

[1]    This Order shall supercede any and all prior case management orders entered by the
Court in the Kaiser Chapter 11 Cases (as defined herein), including, but not limited to,
Docket Nos. 455, 647, 1686, 2825 and 4856.

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Delaware

Local Rules"), it is hereby ORDERED as follows:

## A.    Service of Filings

        1.      Notices required to be given pursuant to paragraphs A.5-A.9 of this Order

shall be limited (except as provided below) to (a) those parties listed on Exhibit A hereto and

counsel to any other official committees appointed in the Kaiser Chapter 11 Cases (collectively,

the "Core Group Service List"), and (b) each party-in-interest who (i) serves Delaware counsel

for the Debtors (at the address listed on Exhibit A) a request that the party-in-interest receive all

pleadings served in the Kaiser Chapter 11 Cases, and (ii) files such request with the Office of the

Clerk of the Court (such parties, together with the Core Group Service List, the "All Notices

List"). If a party wishes to substitute a name on Exhibit A (as a result of, for instance, a change

in the appropriate contact person at a firm), such party shall file an appropriate notice of such

change with the Court and shall advise Delaware counsel for the Debtors of such change in

writing, and Delaware counsel for the Debtors shall file an amended service list with the Court

and serve such amended service list on all other parties on the current list at the addresses set

forth therein  Each amended Exhibit A shall be deemed effective and amended upon filing and

service of such writing and shall specify the filing date thereon. The Debtors' Delaware counsel

shall monitor the Core Group Service List and the All Notices List and ensure that such lists are

appropriately updated (and dated) as each amendment is filed

        2      Service by E-Mail.  Whenever a party on the Core Group Service List is

required to serve a motion, application, complaint, objection, notice, brief, memorandum,

affidavit, declaration or any other writing filed in these cases (collectively, the "Filings")

pursuant to this Order, the Delaware Local Rules, the Bankruptcy Rules or another order of this

-2-

A − 462

Court, such party on the Core Group Service List is <u>authorized</u> to effectuate service by e-mail; <u>provided, however,</u> that a party on the Core Group Service List is not <u>required</u> to effectuate service by e-mail except as required by Delaware Local Rule 9036-1 and on the Core Group Service List; <u>provided, further,</u> that plans of reorganization, disclosure statements and plan-related solicitation materials (collectively, the "Plan Solicitation Materials") shall not be served by e-mail without further order of the Court. As a result, all Filings, other than Plan Solicitation Materials, must be served by parties on the Core Group Service List by e-mail. All documents served by parties on the Core Group Service List by e-mail shall (a) include access to an attached computer file containing the entire document, including the proposed form of order and any exhibits, attachments or other materials in " pdf" format, readable by Adobe Acrobat or other equivalent document reader programs commonly available without cost  The relevant Filing shall either be attached to the e-mail in the format specified above or the e-mail shall contain a link to such Filing in such format  Notwithstanding the requirement to serve the Core Group Service List by e-mail, if a party on the Core Group Service List is unable to serve a Filing by e-mail due to technological difficulties (<u>e.g.,</u> the electronic file is too large to send by e-mail or the party's e-mail system is not functioning at the time of service), service by such party on the Core Group Service List shall be adequate if by U.S. mail, hand or overnight delivery or facsimile, but service by facsimile for Motions shall not be permitted.

        3    <u>Information Requests on the All Notices List</u>  Within 10 calendar days of the entry of this Order, counsel to the Debtors shall send each party on the All Notices List a written letter (the "Letter") requesting that each party (a) indicate whether it would like to remain on the All Notices List and (b) provide counsel with its current e-mail address  Any party wishing to remain on the All Notices List shall provide the information requested by the Letter

RLF1-2770900-2

A – 463

and shall cause Delaware counsel to the Debtors to have received a return of the Letter within 20 calendar days of the date thereof (the "Letter Deadline")  Any party on the All Notices List that was served with a Letter will be removed from the All Notices List if (a) such party returns the Letter consenting to removal from the All Notices List, (b) such party fails to return the Letter by the Letter Deadline or (c) such party fails to provide Delaware Counsel with a current e-mail address by the Letter Deadline.  Any party remaining on the All Notices List on the 30th day after entry of this Order shall be deemed to have consented to service by e-mail in these cases by the parties on the All Notices List.  The removal of a party from the All Notices List pursuant to this paragraph shall not prevent such party from filing a Notice Request pursuant to the terms of this Order.

           4.     Requests for Notice of All Moving Papers and Deemed Consent to Service by E-Mail.  Any creditor or party in interest may enter an appearance and request receipt of all motions, applications and similar requests, together with any supporting memoranda of law (collectively, "Motions"), in these cases by filing a written request with the Court (a "Notice Request") and providing a copy of the Notice Request to counsel to the Debtors at each of the addresses set forth on Exhibit A hereto.  A Notice Request must include (a) the name, organization (if any), full street address (no P.O. boxes), phone number, fax number (if any) and e-mail address of the party requesting service, (b) if an attorney, the party which such attorney represents and (c) a certification that the Notice Request has been served upon counsel to the Debtors at each of the addresses set forth on Exhibit A hereto and the date and manner of service  Any party filing a Notice Request shall be deemed to consent to service by e-mail in these cases  A Notice Request shall be deemed granted unless the Debtors file and serve a written objection to such Notice Request within 10 days of receipt thereof  Promptly after

c.    when the notice is of a proposed compromise or settlement or of a

hearing thereon, upon those parties to the proposed compromise or settlement,

and, if the compromise or settlement involves claims subject to insurance

coverage, notice shall also be given to the insurance company providing coverage,

any additional insured, and other insurance companies that are known to the

Debtors and that have issued policies whose coverage may be affected by the

motion;

d.    when the notice relates to motions to assume, reject, or assign an

executory contract or unexpired lease, upon each contracting party to the contract

or lease; and

e    when the notice is of a hearing on an application for compensation

or reimbursement of expenses, upon each professional person who is seeking

compensation or reimbursement at such hearing.

7    Notices required by Bankruptcy Rule 2002(a)(1), (a)(5), and (a)(7), (b)

and (f) shall be mailed only to each entity on the All Notices List and to all creditors, indenture

trustees, and equity security holders.

8    Upon the filing of a disclosure statement and plan, or an amended

disclosure statement and plan, the proponent immediately shall mail a paper copy of same, in a

binder to:

> The Honorable Judith K. Fitzgerald
> 5490 US Steel Tower
> 600 Grant Street
> Pittsburgh, PA 15219

9    When a party electronically files a motion under seal that relates to a

matter that will be heard on an expedited basis, counsel for such party shall simultaneously

RLF1-2770900-2

deliver paper copies of the documents to be sealed, in an appropriately marked and sealed envelope, to:

Rachel Bello
U.S. Bankruptcy Court
824 Market Street, 5th Floor
Wilmington, DE 19801

and

The Honorable Judith K. Fitzgerald
5490 US Steel Tower
600 Grant Street
Pittsburgh, PA 15219

If a party files documents under seal that relate to a matter to be heard at an omnibus hearing, such documents shall be placed in an appropriately marked and sealed envelope, which shall be three-holed punched and included in the hearing binders required in paragraph C.2 and C.3.

10.     All other notices not addressed in paragraphs A.5-A.9 of this Order shall be served upon each entity on the All Notices List and to any entity known to have a particularized interest in the subject of the notice.

11.     Notice in accordance with the provisions of this Order shall be deemed adequate pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Delaware Local Rules.

12      Certificates or affidavits of service shall state the docket number, full title of the motion, notice, application, objection, or other document to which it relates, as well as the date of service, the means of service (e.g., email, regular mail, Federal Express, hand delivery, facsimile, etc.) and the parties served. Certificates or affidavits of service shall not restate the names and addresses of each party listed on the Core Group Service List or the All Notices List, but need only state the effective date of such list or lists and that all parties on such list or lists (as applicable pursuant to this Order) have been served. All other parties not on such lists who

have been served in accordance with this Order must be identified by name and address
Certificates of No Objection and Certifications of Counsel also must identify the number from
the Agenda (defined below) to which it relates

**B.    Hearing Dates**

       1      Unless otherwise ordered by the Court, regular omnibus hearings will be
scheduled in these cases on a date certain each month. A list of the hearing dates and times for
the remainder of calendar year 2005 is attached hereto as Exhibit B, which schedule shall
supercede the schedule established by the Order Scheduling Omnibus Hearing Dates and
Corresponding Filing and Objection Deadlines entered by the Court on February 9, 2004 (D I.
3681). Each omnibus hearing shall be conducted at the United States Bankruptcy Court for the
District of Delaware in Wilmington, Delaware unless otherwise noted on Exhibit B

       2      Additional hearings may be scheduled by the Court on its own accord or
upon the request of a party in interest in accordance with the procedures below  The Debtors or
a party with a particularized interest in a matter may request a separate or additional hearing on
such matter (an "Additional Hearing") by providing a written request for an Additional Hearing
to the Court (a "Hearing Request") and serving such Hearing Request on counsel to the Debtors,
counsel to all official committees in the Kaiser Chapter 11 Cases, including the Official
Committee of Unsecured Creditors (the "Creditors Committee"), the Official Committee of
Asbestos Claimants (the "Asbestos Committee"), the Official Committee of Retired Salaried
Employees (the "Retirees Committee") and the Legal Representative for Future Asbestos
Claimants, the Legal Representative for Future Silica and Coal Tar Pitch Volatiles Claimants and
to the Office of the United States Trustee (the "U.S. Trustee") (for each, at the address set forth
on Exhibit A). The party requesting an Additional Hearing must identify in the Hearing Request

the nature of the matter or matters to be heard and the total estimated time necessary to present such matter or matters. In addition, the Debtors may request that the Court schedule additional omnibus hearings (or treat an Additional Hearing as an omnibus hearing) by describing the need for an additional omnibus hearing in a Hearing Request. The Court will issue an appropriate order

**C.    Agendas and Binders**

          1.    Counsel for the Debtors, with the cooperation of all parties that have matters pending, shall prepare a hearing agenda  Counsel for the Debtors shall submit via e-mail, to Ms Rachel Bello, the undersigned's courtroom deputy in Delaware (the "Delaware Courtroom Deputy") and to the Honorable Judith K Fitzgerald, a final agenda (the "Final Agenda") at least seven (7) calendar days prior to each scheduled hearing date. The Final Agenda shall indicate which matters, if any, will go forward at such omnibus hearing  Unless otherwise ordered by the Court (see paragraph F.1 below), all matters set forth on the Final Agenda that require a hearing (see paragraph D.4 below) shall be heard at such omnibus hearing. The Final Agenda shall be served by email or facsimile upon the Core Group Service List and any other party with a particularized interest in a matter set forth on the Final Agenda [2]  The Final Agenda shall not be amended except to change the status line of matters already listed on the Agenda.[3]

---

[2]    Where the Debtors are not aware of an email address or a facsimile number for a particular party, service of the Final Agenda may be made by hand delivery or overnight carrier.

[3]    For any agenda item for which the status line is amended, the Debtors may add documents under the "related documents" or "objections/responses received" headings, if such documents are related to the change in status  All such changes should be set forth in boldface type.

2      Additionally, at least fourteen (14) calendar days prior to the hearing date, counsel for the Debtors shall submit by e-mail to Judge Judith K Fitzgerald a draft of the hearing agenda (the "Draft Agenda")   Counsel to the Debtors shall not file the Draft Agenda, but shall serve a copy of it upon the Core Group Service List   On or before 13 calendar days prior to the omnibus hearing date, counsel to the Debtors shall provide to Judge Judith K Fitzgerald in Pittsburgh a hearing binder containing a hard copy of the Draft Agenda and all documents set forth on the Draft Agenda   Counsel for the Debtors shall supplement such hearing binder by providing Judge Judith K. Fitzgerald with copies of any revised forms of proposed orders or pleadings or documents subsequently listed in the Final Agenda but not listed in the Draft Agenda, together with appropriate tabs indicating the agenda item to which the revision or addition applies   Certificates of service shall not be included in the hearing binders unless the Court directs otherwise   If any agenda item includes documents filed under seal, such documents shall be included in the binder an appropriately marked and sealed envelope

3      At the time that the Final Agenda is delivered to the Delaware Courtroom Deputy, counsel to the Debtors shall also deliver to the Delaware Courtroom Deputy a hearing binder containing all documents for the omnibus hearing that were filed by the day prior to the Final Agenda Document Deadline (as defined below). All documents included in such hearing binder shall include a notation, on the lower right hand corner of the first page of each such document, of the date such document was filed with the Court and the docket number of such document.

4      Matters such as certifications of counsel or certificates of no objection relating to matters that are not otherwise scheduled for an upcoming omnibus hearing as well as any other administrative matters proposed to be addressed with the Court, may be listed in the

-10-

Draft Agenda or the Final Agenda under the separate heading of "Additional Matters to be

Addressed " Counsel to the Debtors shall include in the hearing binder any documents (other

than certificates of service) related to such proposed Additional Matters to be Addressed by the

Court.

     5.     Notwithstanding the requirements of Rule 3007-1 of the Delaware Local

Rules, the Debtors shall <u>not</u> provide the Court with copies of the proofs of claim and all

supporting documentation relating to an omnibus claims objection unless the claimant has filed a

response opposing the relief requested, or otherwise informally advised the Debtors of such

claimants' opposition to the relief requested. To the extent that a claimant has filed a response,

the Debtor shall submit such proofs of claim to the Delaware Courtroom Deputy as set forth in

Rule 3007-1 of the Delaware Local Rules and shall attach a copy of the proof of claim and

supporting documentation to the response that is included in the hearing binders submitted to

Judge Judith K. Fitzgerald pursuant to paragraph C 2 herein

**D.**     **Procedures for Filing Motions, Objections and Replies**

     1     Any document relating to any matter scheduled for a hearing that is filed

and served later than eight (8) calendar days before the hearing, shall not be included on the

Final Agenda Notwithstanding Bankruptcy Rule 9006(a), to the extent that such day (the "Final

Agenda Document Deadline") is a Saturday, Sunday or a legal holiday, the Final Agenda

Document Deadline shall <u>not</u> be continued to the next business day and if such document cannot

be filed on the day that is eight calendar days before the hearing because that day is a Saturday,

Sunday or legal holiday, it must be filed on the immediately preceding day that is not a Saturday,

Sunday or legal holiday Absent Court approval for cause shown, any document not filed and

served by the Final Agenda Document Deadline shall not be considered by the Court for purposes of the corresponding omnibus hearing

2    All Motions ("Motions") shall be filed with the Court and served on all entities that are required to be served pursuant to Paragraph A 1 of this Order at least 35 days prior to the date of the omnibus hearing set by the Court  All Motions served as set forth above shall be served on the All Notices List and any party with a particularized interest in the Motion by email, overnight mail or hand delivery  In accordance with Delaware Local Rules 9004-1(b) and 9013-1(d), each Motion and notice thereof shall contain the objection deadline and hearing date and time for such Motion

3    Any objections to a Motion must be filed and served upon the moving party and the Core Group Service List so as to be received by such parties no later than 4:00 p m. (Wilmington, Delaware time) on the 15th day after the date of the filing of the Motion  Where a Motion has been filed on shortened notice pursuant to Delaware Local Rule 9006-1(a), the parties shall have a reasonable period to respond, with the intent that parties shall be afforded no less than ten (10) days to respond if possible.

4    Parties may not extend any deadline related to a hearing, including, but not limited to, the deadline for filing motions, objections, responses, or exhibits, to a date that is less than 8 calendar days prior to the scheduled hearing unless there is an order of the Court granting such an extension.  If there is no such order granting an extension, the matter as to which an extension is granted automatically will be continued to the next-scheduled omnibus hearing date. Bankruptcy Rule 9006(a) shall not be applicable to this paragraph.

5    The moving party shall file a Certification of No Objection as soon as practicable after the period to object has passed, if no objection has been timely filed and

received or no informal objection has been received by the moving party  Upon the filing of an appropriate Certification of No Objection in accordance with Delaware Local Rule 9013-1(i), the Debtors shall specify on the Draft and Final Agenda the Motions for which the period to object has passed without such an objection.

6.    Unless otherwise ordered by the Court, replies are not permitted to be filed later than eight (8) calendar days prior to the hearing. Absent leave of Court, no reply or reply brief may exceed five (5) pages, not including any exhibits. Bankruptcy Rule 9006(a) is not applicable to this paragraph.

7    If an emergency hearing is unavoidable and essential, the Court in its discretion may hear the Motion at the regularly scheduled hearing date or any other date scheduled by the Court.

E.    **Procedures for Filing of Papers and Request for Copies**

1    All pleadings in the Kaiser Chapter 11 Cases shall be filed in the place and manner as specified by the Delaware Local Rules and the guidelines and directives of the Clerk of the Court, including the requirements set forth for electronic filing.

2    **Parcel's Document Retrieval** has been designated to respond to all copy requests in the Kaiser Chapter 11 Cases. All copy requests for filed documents or the case docket must be made to **Parcel's Document Retrieval via telephone at (302) 658-9971 or via facsimile at (302) 658-9951.** For a schedule of copy fees and postage and handling charges, please contact Parcel's Document Retrieval. **Copy fees and handling charges must be paid in advance by check or money order payable to Parcel's Document Retrieval, unless prior arrangements have been made.**

-13-

**F.**    **Continuances**

      1.      Subject to the provisions of paragraph D 6 above, a motion for the continuance of any matters scheduled for a particular omnibus hearing must be in writing and must be filed with the Court no later than ten (10) calendar days in advance of the hearing. Any such motion for the continuance of a hearing must be accompanied by a proposed form of order, and the party to whom the proposed continuance is to be granted shall serve a copy of the continuance request and proposed order on all affected parties required to be served by the terms of this Order. Unless an order granting a continuance has been entered, counsel for the moving and any responding party must appear at the hearing

      2      To the extent that the Debtors and other parties in interest agree to continue a particular matter scheduled for a hearing, no stipulation or request for continuance need be filed with the Court, unless the Court has previously indicated that such matter may not be further continued without permission of the Court  Any such continuance agreed to by the parties should be reflected in the status line of the appropriate Draft and Final Agenda item(s) by the Debtors

**G.**    **Telephonic Appearances**

      Any party wishing to appear telephonically at a hearing, must make arrangements with CourtCall by phone (866-582-6878) or facsimile (866-533-2946) no later than 12:00 p m two business days prior to the hearing   All parties must provide CourtCall with the following information (a) case name and number, (b) the name of Judge conducting the hearing, (c) the hearing date and time, (d) the participant's name, address and telephone number, (e) the party whom the participant represents and (f) the matter on which the participant wishes to be heard or whether the participant intends to monitor the proceedings in "listen-only" mode

RLFI-2770900-2

Additionally, all parties participating via telephone, including those participating in "listen-only" mode, must send notification to Debtors' local counsel of (i) their intention to participate in the hearing and (ii) the information set forth in (a) through (f) above. Such notice should be sent to Kimberly Newmarch of Richards, Layton & Finger, P.A , via e-mail (Newmarch@rlf.com) or facsimile (302-498-7689).

Any party filing a motion, application or other pleading, including without limitation, an objection or response thereto, may participate telephonically  Any party not submitting a pleading, but interested in monitoring the proceeding, may participate by telephone in "listen-only" mode  Local counsel must appear in person for hearings held in Delaware.

Telephonic appearances will <u>not</u> be allowed for counsel or witnesses at evidentiary hearings or for oral arguments during an omnibus hearing  All such counsel and witnesses must appear in person, unless otherwise ordered by the Court. Any party appearing via telephone for a trial or evidentiary hearing will not be allowed to speak or otherwise participate in such trial or evidentiary hearing

Parties appearing via telephone, including those participating in "listen-only" mode may not call from a car phone, cellular phone, or phones located in public places and must use their "mute" buttons when not speaking  Further, no party may place the call with the Court on hold

All parties appearing telephonically must dial-in to the call fifteen (15) minutes prior to the scheduled start time for such hearing  Calling in 15 minutes prior to the scheduled start time is required even though the Court, based on its docket for that day, may not start the hearing until after the scheduled time

RLF1-2770900-2

A – 474

Attorneys must comply with Rule 83 5 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware in order to participate telephonically at any hearing in this case

**H.   Disposition of Matters**

Omnibus hearing dates will not be used for presentation of testimony, unless otherwise permitted by the Court. Most matters presented to the Court at a hearing will be resolved on the papers, following argument from counsel as the Court deems appropriate. If a matter presented to the Court cannot be resolved on the papers, then the matter will be scheduled for a further hearing at an appropriate date and time

**I.   Proposed Order**

1      A proposed form of order (the "Proposed Order") shall be submitted in the hearing binders and shall be separately tabbed and identified, and shall be separately listed on the Draft and Final Agenda   The party seeking relief pursuant to a Proposed Order shall bring a copy of such Proposed Order to the hearing (if any). The caption of the Proposed Order must include the docket number of the Motion, the hearing date and the Agenda item number to which it relates

2      If the parties have negotiated a different form of order, to which all parties in interest agree, that order shall be submitted (in final and black-lined versions) with a Certification of Counsel.

**J.   Application of this Order to Adversary Proceedings**

This Order, as amended from time to time, shall apply to motions filed in adversary proceedings except that motions in limine filed with respect to scheduled trials and

-16-

initial pleadings responsive to complaints, counterclaims and cross-claims are not subject to this Order.

**K.    Caption of Pleadings**

Caption requirements are governed by the Official forms and those stated in the undersigned's Chambers Procedures. Note that any party against which relief is sought or whose rights or obligations will be affected if the motion is granted must be listed as a Respondent and served with the pleading, objection deadline and notice of hearing. In addition, as part of the caption, all pleadings after the initial pleading, including but not limited to objections, Certifications of No Objection, Certifications of Counsel, certificates of service, and exhibits, must have the hearing date and agenda number (if one has been assigned yet) to which the pleading pertains.

**L.    Bankruptcy Rule 9006(a) and Delaware Local Rules**

Except as set forth in paragraphs D 1, D 5 and D 7 above, all time periods and deadlines set forth herein shall be computed in accordance with Bankruptcy Rule 9006(a). In addition, the Delaware Local Rules shall apply to all proceedings in the Kaiser Chapter 11 Cases; provided, however, to the extent that this Order, as amended from time to time, is inconsistent with the Delaware Local Rules, this Order shall govern. Without limiting the generality of the foregoing, nothing in this Order is intended or shall be deemed to modify Delaware Local Rule 9006-2.

**M.    Court Procedures and Other Matters**

This Order incorporates by reference the Chambers' Procedures, appended hereto as Exhibit C, as such procedures may be amended by the Court from time to time. Any amendments to such procedures will be posted on the website for the Bankruptcy Court for the

District of Delaware under Chambers Procedures for Judge Judith K. Fitzgerald at

www deb uscourts gov. To the extent that there are any inconsistencies between the

above-referenced Chambers Procedures and this Order, the terms of this Order shall apply.

N.    **Notice of this Order**

        To help ensure that all parties who may participate in the Kaiser Chapter 11 Cases

are aware of the terms of this Order, (a) this Order will be available on the CM/ECF docket for

these cases at the Kaiser Aluminum Corp. Docket No 02-10429 (JKF); (b) counsel for the

Debtors shall serve a copy of this Order on all parties on the All Notices List and shall notify,

and serve a copy of this Order on, any other party that hereafter makes an appearance before this

Court or is otherwise placed on the All Notices List; (c) counsel for the moving party shall serve

this Order on all parties in interest (to the extent such parties have not already been served with a

copy of this order); (d) the Clerk of the Court is hereby directed to make a conspicuous notation

in the docket for the Kaiser Chapter 11 Cases indicating the existence of this Order and docket

number assigned to this Order;[4] and (e) Kaiser shall post this Order under the "Restructuring

News" tab on its website (www.kaiseral.com)

O.    **Term of this Order**

        1.    Any party in interest in the Kaiser Chapter 11 Cases may at any time apply

for reconsideration or modification of this Order, and the Court may amend this Order at any

time  Without modifying or amending this Order, the Court may, on request of a party or on its

own motion, add or delete parties from the All Notices List.

        2    This Order supercedes any and all prior case management orders

previously entered by the Court in the Kaiser Chapter 11 Cases, including, but not limited to,

-18-

Docket Nos. 455, 647, 1686, 2825 and 4856   This Order shall continue in effect until modified

by further order of this Court.

Dated: _____

Wilmington, Delaware

*Judith K. Fitzgerald*
                                          mdb

Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

---

(continued ..)

[4]      Counsel to the Debtors shall consult with the Clerk of the Court regarding the exact
         language of such citation and its place in the docket

-19-

# EXHIBIT A

### Office of the United States Trustee

Frank J. Perch, III
Office of the United States Trustee
844 King Street.
Suite 2207
Lockbox 35
Wilmington, DE 19801-3519

### Counsel to the Debtors

Gregory M. Gordon
Jones Day
2727 North Harwood St
Dallas, TX 75201

Daniel P Winikka
Jones Day
2727 North Harwood St.
Dallas, TX 75201

### Delaware Counsel to the Debtors

Daniel J. DeFranceschi
Kimberly D. Newmarch
Richards, Layton & Finger, P A
One Rodney Square
P.O Box 551
Wilmington, DE 19899

### The Debtors

Edward F Houff
Kaiser Aluminum Corporation
5847 San Felipe, Suite 2400
Houston, TX 77057

### Counsel to the Official Committee of Unsecured Creditors

Lisa Beckerman
Akin Gump Strauss Hauer & Feld LLP
590 Madison Ave
New York, NY 10022

Brian Kilmer
Akin Gump Strauss Hauer & Feld LLP
Pennzoil Place-South Tower
1111 Louisiana Street, 44th Floor
Houston, TX 77002

**Delaware Counsel to the Official Committee of Unsecured Creditors**

William P Bowden
Ashby & Geddes
222 Delaware Ave
P O Box 1150
Wilmington, DE 19899

**Counsel to the DIP Lenders**

Timothy R Pohl
Chris L. Dickerson
Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Dr
Chicago, Illinois 60606

**Counsel to the Official Committee of Asbestos Claimants**

Elihu Inselbuch
Caplin & Drysdale, Chartered
399 Park Ave.
New York, NY 10022-4614

Peter Van N Lockwood
Ronald Reinsel
Caplin & Drysdale, Chartered
One Thomas Circle, N W
Washington, DC 20005-5802

**Delaware Counsel to the Official Committee of Asbestos Claimants**

Marla R. Eskin
Mark T Hurford
Campbell & Levine, LLC
800 King Street, Suite 300
Wilmington, DE 19801

**Counsel to the Official Committee of Retired Salaried Employees**

Frederick D. Holden, Jr.
Orrick, Herrington & Sutcliffe LLP
Old Federal Reserve Bank Building

-2-

A – 480

400 Sansome Street
San Francisco, CA 94111-3143

**Delaware Counsel to the Official Committee of Retired Salaried Employees**

Frederick B. Rosner
Jaspan Schlesinger Hoffman LLP
1201 N. Orange Street, Suite 1001
Wilmington, DE 19801

**Counsel to the Legal Representative for Future Asbestos Claimants**

James L. Patton
Edwin J. Harron
Sharon Zieg
Young Conaway Stargatt & Taylor
P.O. Box 391
The Brandywine Building, 1000 West St, 17th Floor
Wilmington, DE 19801-0391

**Counsel to the Legal Representative for Future Silica and Coal Tar Pitch Volatiles Claimants**

Sander L. Esserman
Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation
2323 Bryan Street
Suite 2200
Dallas, TX 75201

**Delaware Counsel to the Legal Representative for Future Silica and Coal Tar Pitch Volatiles Claimants**

Daniel K. Hogan
Law Offices of Daniel K. Hogan
1311 Delaware Avenue
Wilmington, DE 19806

**Counsel for MAXXAM Inc.**

A. Grant McCrea
Carol A. Polizzi
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019-6092

Lisa Hill Fenning
Dewey Ballantine LLP

-3-

333 S. Grand Ave., 26th Floor
Los Angeles, CA 90071

## Delaware Counsel for MAXXAM Inc.

William H. Sudell, Jr.
Bric D. Schwartz
Michael G. Busenkell
Morris, Nichols, Arsht & Tunnell
1201 North Market St.
P.O. Box 1347
Wilmington, DE 19899-1347

## The Debtors' Financial Advisors and Investment Bankers

Ari Lefkovits
Lazard Freres & Company LLC
30 Rockefeller Plaza, 61st Floor
New York, NY 10020

## The Debtors' Claims Agent

Kathleen M. Logan
Logan and Company
546 Valley Road
Upper Montclair, NJ 07043

## The Fee Auditor for all Professionals

Warren H. Smith & Associates, P.C.
Republic Center
325 N. St. Paul, Suite 4080
Dallas, TX 75201

RLF1-2770900-2

# Exhibit "C"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Jointly Administered** |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | |
| a Delaware corporation, <u>et al</u>, | : | **Chapter 11** |
| | : | |
| **Debtors.** | : | **Hearing Date: 10/27/03 @ 3:00 p.m.** |
| | : | **Response Date: 09/08/03 @ 4:00 p.m.** |

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR APPROVAL OF CONSENT DECREE SETTLING ENVIRONMENTAL CLAIMS OF THE UNITED STATES, THE STATES OF CALIFORNIA, <u>RHODE ISLAND AND WASHINGTON AND THE PUYALLUP TRIBE OF INDIANS</u>

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move this Court, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order approving a consent decree settling certain environmental claims of (i) the United States of America (on behalf of the U.S. Environmental Protection Agency (the "EPA"), the U.S. Department of Interior (the "DOI") and the National Oceanic and Atmospheric Administration (the "NOAA"), collectively, the "Settling Federal Agencies"), (ii) the State of California, (iii) the State of Rhode Island, (iv) the State of Washington and (v) the Puyallup Tribe of Indians (the "Tribe" and together with the Settling Federal Agencies and the States, the "Settling Parties"). In support of this motion, KACC respectfully represents as follows:

### <u>Background</u>

1.     On February 12, 2002, fifteen of the Debtors commenced their respective reorganization cases by filing voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101-1330 (the "Bankruptcy Code"). On March 15, 2002, two additional Debtors commenced their voluntary chapter 11 cases. The nine other Debtors

DLI-5784015v4

A – 484

commenced their voluntary chapter 11 cases on January 14, 2003. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being administered jointly.

2.     The Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.     On February 25, 2002, the United States trustee for the District of Delaware (the "U.S. Trustee") appointed a statutory committee of unsecured creditors (the "Creditors' Committee") and a statutory committee of asbestos claimants (the "Asbestos Committee") in these chapter 11 cases, pursuant to section 1102 of the Bankruptcy Code. On January 27, 2003, the Court entered an order appointing Martin J. Murphy as the legal representative for future asbestos claimants (the "Futures Representative") (D.I. 1685).

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### The Environmental Claims

5.     As a result of their extensive operations throughout the United States, the Debtors are subject to regulation under certain state, federal and tribal environmental laws, including the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Pursuant to these environmental laws, the Settling Parties, over the course of numerous years, initiated multiple, unrelated regulatory actions contending that the Debtors were jointly and severally liable, along with other private parties, as potentially responsible parties ("PRPs") for past and future costs incurred by the federal government and/or the States in the clean-up and remediation of environmental conditions at various sites.

A – 485

6.      Generally, although CERCLA and other environmental laws provide for joint and several liability among PRPs, environmental regulatory actions are settled equitably among the PRPs based on such factors as the relative volume or toxicity of a particular PRP's waste delivered to the applicable disposal site. Accordingly, prior to the Petition Date, the Debtors had entered into various settlements and consent decrees that allocated remediation and clean-up costs between the respective PRPs on an equitable basis. Despite these various settlements, as of the Petition Date, multiple lawsuits and regulatory actions remained pending against the Debtors. To preserve their rights related to these pending lawsuits and regulatory actions, the United States, the states of Washington, California and Rhode Island (collectively, the "States") and the Tribe all filed proofs of claim in these chapter 11 proceedings.

7.      Specifically, the United States (on behalf of the Nuclear Regulatory Commission and the Settling Federal Agencies) filed proof of claim number 7135 against the Debtors asserting a general unsecured claim in the amount of $467,975,062.73 ("Claim No. 7135"); the State of California filed proof of claim number 7297 against Debtor Kaiser Aluminum & Chemical Corporation ("KACC") asserting a general unsecured, unliquidated claim ("Claim No. 7297"); the State of Rhode Island filed proof of claim number 7111 against multiple Debtors asserting a general unsecured claim in the amount of $30,000,000.00 ("Claim No. 7111"); the State of Washington filed proof of claim number 7181 against Debtor Kaiser Aluminum Corporation ("KAC") asserting a general unsecured claim in the amount of $152,219,574 33 ("Claim No. 7181"); and the Tribe filed proof of claim number 1727 against KAC asserting a general unsecured claim in the amount of $78,287,373.04 ("Claim No. 1727") (collectively, the "Environmental Claims").

A – 486

8.    A substantial portion of the Environmental Claims relate to third-party disposal or treatment sites to which the Debtors may have sent industrial waste containing hazardous substances and, consequently, could be jointly and severally liable under CERCLA and similar state, federal and tribal laws for response costs and natural resource damages. As reflected in the Environmental Claims, response costs and natural resource damages related to such claims could total in the hundreds of millions of dollars. Moreover, in light of the Debtors' long history of manufacturing operations, there is the potential that additional sites may be identified in the future for which the Debtors could be held liable for response costs or natural resource damages.

## The Consent Decree[1]

9.    By this motion, the Debtors seek Court approval of a consent decree among the Debtors and the Settling Parties entered into on or about August 18, 2003 (the "Consent Decree"), which settles, without admission of liability, a substantial portion of the Environmental Claims and the Debtors' prepetition environmental liabilities at numerous specified sites. A copy of the Consent Decree is attached hereto as Exhibit A and incorporated by reference. Significant terms of the Consent Decree are as follows:

   a.    The Debtors, the United States, the States and the Tribe agree to the terms of the Consent Decree without admission of any liability. Consent Decree p. 3.

   b.    The Consent Decree lists 66 third-party disposal or treatment sites (not owned by Debtors), referred to as "Liquidated Sites," with respect to which a Debtor has been alleged by the United States and/or one of the States to be a PRP. Of the Liquidated Sites, there are 38 sites for which the Settling Parties will essentially have no claim (an allowed general unsecured claim in the amount of

---

[1]    The summary of the terms of the Consent Decree herein is provided for convenience of the Court and parties in interest. Nothing in this motion is intended to modify or otherwise alter the terms of the Consent Decree. The summary is limited to this motion and shall not be considered for purposes of interpreting the Consent Decree.

A -- 487

zero) either because the parties agree that a settlement for no liability is appropriate or because KACC previously made sufficient payments with respect to the site, in which case the Consent Decree specifies the amounts previously paid and the recipients of those payments. Id, at ¶¶ 1(M), 4.

c.     With respect to the remaining 28 Liquidated Sites, the Consent Decree specifies the dollar amount that will constitute allowed general unsecured claims under any confirmed plan of reorganization that includes KACC. These amounts were determined based upon the equitable factors that are typically used to settle PRP liability at multi-party sites. With respect to these 28 sites, unsecured claims will be allowed as follows: (i) the United States, on behalf of EPA, will be allowed a general unsecured claim against KACC in the total amount of $17,828,839; (ii) the State of Washington, the Tribe and the United States, on behalf of DOI and NOAA, are jointly and severally allowed a general unsecured claim against KACC in the total amount of $5,500,000; (iii) the State of California Department of Toxic Substances Control is allowed a general unsecured claim against KACC in the total amount of $1,141,364; and (iv) the State of California Department of Fish and Game is allowed a general unsecured claim against KACC in the total amount of $15,818. Distributions with respect to these allowed claims will be made pursuant to any confirmed plan of reorganization that includes KACC and will receive the same treatment as other allowed general unsecured claims against KACC. Id, ¶ 4.

d.     The Consent Decree does not allow the State of Rhode Island a monetary claim in any amount. Because Rhode Island is a signatory to the Consent Decree, however, any future claims it makes or future environmental liabilities it alleges against the Debtors based on prepetition acts or conduct with respect to sites other than Liquidated Sites or the Discharged Sites referred to below will be governed and resolved by the process described below relating to "Additional Sites." Id, ¶ 4(D).

e.     In addition to the Liquidated Sites, the Consent Decree also lists 18 third-party disposal or treatment sites (not owned by Debtors), referred to as "Discharged Sites" and provides that all prepetition environmental liabilities and obligations of the Debtors to the Settling Parties related to the Discharged Sites will be discharged pursuant to section 1141 of the Bankruptcy Code upon the confirmation and effectiveness of a plan of reorganization that includes KACC and no distribution will be provided with respect to such liabilities or obligations. Id, ¶¶ 1(G), 17.

f.     Under the provisions of the Consent Decree, the Settling Parties have covenanted not to sue the Debtors or their successors, assigns, officers, directors, employees and trustees with respect to the Liquidated Sites, subject only to a limited reservation of rights to bring an action based on (i) postpetition environmental liabilities of the Debtors, (ii) criminal liability or (iii) failure to meet a requirement of the Consent Decree. Id, ¶¶ 18-23.

g.      The Debtors will be entitled to protection to the maximum extent provided by CERCLA and similar state laws against any actions or claims for contribution by other liable parties for any existing or future response costs or natural resource damages with respect to the Liquidated Sites. Id. ¶ 25.

h.      Although the Debtors are not obligated to pursue insurance recovery for environmental liabilities or property damage, by virtue of the Consent Decree or otherwise, if after the effective date of a plan of reorganization KACC pursues and recovers insurance proceeds for property damage insurance coverage for environmental costs incurred or to be incurred in respect of one of the Liquidated Sites, KACC will retain 60% of such recovery in excess of KACC's costs of pursuing the recovery and the remaining 40% will be allocated to the Settling Parties on a pro rata basis as set forth in the Consent Decree. The Consent Decree provides a mechanism for the equitable allocation of any such recovery between the Liquidated Sites. Additionally, payments of insurance recoveries to the Settling Parties shall not be made in excess of each respective party's general unsecured claim as allowed under the Consent Decree. Id. ¶ 5(C).

i.      With respect to environmental liabilities in respect of "Debtor-Owned Sites," which are defined as sites that are owned by the Debtors at or any time after the confirmation of a plan of reorganization that includes KACC (but excluding "Reserved Sites," as discussed in more detail below), the Consent Decree provides that such liabilities will not be discharged by the Consent Decree or by a plan of reorganization. In addition, except as provided with respect to Debtor-Owned Sites, the Consent Decree does not address postpetition conduct that may give rise to environmental liability, and the rights and defenses of all parties are preserved with respect to any postpetition liabilities. Id. ¶ 1(F), 6.

j.      The Consent Decree reserves all the parties' rights and defenses with respect to six named "Reserved Sites" (four of which are Debtor-owned and two of which are third-party owned), including any discharge defense under the Bankruptcy Code or any plan of reorganization or confirmation order. Id. ¶ 6(E).

k.      The Consent Decree provides that claims by the United States and the States relating to the Debtors' prepetition environmental liabilities at sites referred to as "Additional Sites," defined as any site other than Liquidated Sites, Debtor-Owned Sites and Reserved Sites (e.g., sites where the Debtors have not yet been identified as PRPs, or with respect to which the Debtors' equitable share cannot be determined) will be discharged under section 1141 of the Bankruptcy Code upon the confirmation of a plan of reorganization that includes KACC and no distribution will be provided with respect to any claims in respect of the Additional Sites. However, the Settling Parties may in the future, in the ordinary course of conducting agency enforcement activities, seek a determination of KACC's liability with respect to Additional Sites. If KACC is determined to be liable, KACC's liability with respect to an Additional Site will be the same as it would have been had the liability for the Additional Site been liquidated in the

DLI-5784015v4                                           -6-

A – 489

chapter 11 cases and treated as an allowed general unsecured claim under the confirmed plan of reorganization for KACC (i.e., KACC's liability will be satisfied by making a payment equivalent to what the distribution on such a claim would have been). The government agencies will not issue a unilateral order or seek an injunction with respect to the Additional Sites against the Debtors. In addition, in any action or proceeding with respect to an Additional Site, KACC, the Settling Federal Agencies and the States reserve all rights, claims and defenses they would have been entitled to assert had the claim been liquidated in the ordinary course or during the course of the chapter 11 proceedings. The Settling Parties have also agreed to attempt to negotiate fair and equitable terms in settlement of any claims relating to Additional Sites. Id. ¶¶ 7-9.

l.      The Settling Federal Agencies, the States and the Tribe are deemed to have filed proofs of claim for all matters addressed in the Consent Decree, which proofs of claim shall be deemed satisfied in full in accordance with the terms of the Consent Decree, but without any prejudice to any claims filed for the Reserved Sites. The parties to the Consent Decree agree that the Settling Federal Agencies' Claim No. 7135, the State of California's Claim No. 7297, the State of Washington's Claim No. 7181 and the Tribe's Claim No. 1727 shall be reduced and allowed as of the effective date of the Consent Decree in the amounts specified in the Consent Decree. In addition, the parties agree that the State of Rhode Island's Claim No. 7111 shall be withdrawn and the Debtors' claims and noticing agent is authorized and empowered to withdraw such Claim. Id. ¶ 13.

### Public Notice and Comment Period

10.    To comply with federal and State of Washington environmental laws, the Consent Decree must be lodged with the Court for a period not less than thirty days for public notice and comment. The United States and the State of Washington reserve the right to withdraw or withhold consent if comments disclose facts or considerations that indicate that the Consent Decree is not in the public interest. At the conclusion of the public comment period, the United States and, if applicable, the State of Washington, will file with the Court any comments received, as well as responses to the comments, and at that time, if appropriate, file a motion requesting the Court to approve and enter the Consent Decree. See Consent Decree ¶¶ 28, 29.

### Request for Relief

11.    "To minimize litigation and expedite the administration of a bankruptcy estate, [compromises] are favored in bankruptcy." Myers v. Martin (In re Martin), 91 F.3d 389,

393 (3d Cir. 1996) (quoting Collier on Bankruptcy, 9019.03[1] (15th ed. 1993)). Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Before approving a settlement under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interests of the debtor's estate. Martin, 91 F.3d at 394; In re Marvel Entm't. Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry is whether 'the compromise is fair, reasonable, and in the interest of the estate.'"). To reach this determination, a court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." Martin, 91 F.3d at 393.

      12.    The standard by which courts should evaluate the reasonableness of a proposed compromise and settlement is well established. This standard includes consideration of the following four factors: "(a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interests of the creditors." Id.; see also, Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); Depoister v. Mary M. Holloway Found., 36 F.3d 582, 587 (7th Cir. 1994) (affirming an order approving a compromise and settlement of claims against the estate where it was "unlikely" that the debtor would succeed on the claims, litigation of the claims would involve considerable expense and the claimant would withdraw all claims upon approval of the settlement). Settlements should be rejected only if they fall "below the lowest point in the range of reasonableness." Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)).

13.    The Consent Decree satisfies the standards set forth above.  The Consent Decree was negotiated at arm's-length and in good faith, and the Debtors believe that the Consent Decree is fair and reasonable and in the best interest of their estates because:  (a) it resolves a substantial portion of all claims against the Debtors in respect of the Debtors' prepetition environmental liability; (b) with respect to the allowance of the unsecured claims as agreed upon in the Consent Decree, the estimation of the amounts of such claims is reasonable and avoids any risk of potentially larger claims in litigation; and (c) certain of the allegations in the claims resolved by the Consent Decree are factually complex, and would require significant litigation among the parties to resolve, absent consensual agreement, and could cause the Debtors to incur substantial additional legal fees, costs and other expenses, without the benefit of certainty as to the outcome.

14.    Moreover, by resolving their liability at these sites based upon an allowable share, the Debtors avoid potential claims for the full cost of environmental remediation at each of these sites, which could total in the hundreds of millions of dollars.  Further, the Consent Decree provides a procedure for KACC to address currently unknown claims on the same terms that such claims would have been treated under any plan of reorganization for KACC if they were currently known and liquidated, thereby permitting KACC to avoid costly estimation proceedings or litigation over whether such claims constitute dischargeable "claims" in the chapter 11 cases.

15.    The Debtors believe, in the exercise of their sound business judgment, that approval of the Consent Decree is in the best interests of their estates and the creditors.

16.    Accordingly, for all the foregoing reasons, the Court should approve the Consent Decree pursuant to Bankruptcy Rule 9019.

**Notice**

17.    No trustee or examiner has been appointed in these chapter 11 cases.

Notice of this Motion is being given to:  (a) the U.S. Trustee; (b) counsel to the Creditors'

Committee; (c) counsel to the Asbestos Committee; (d) counsel to the Debtors' postpetition

lenders; (e) counsel to MAXXAM Inc., the Debtors' principal equity holder; (f) counsel for the

Legal Representative; (g) counsel for the Settling Federal Agencies; (h) counsel for the States;

(i) counsel for the Tribe; (j) all parties that the Debtors have identified as potentially having

liability with respect to any of the sites addressed in the Consent Decree; and (k) the parties that

have requested notice in these chapter 11 cases.  In light of the nature of the relief requested

herein, the Debtors submit that no other or further notice is required.

**No Prior Request**

18.    No prior request for the relief sought in this Motion has been made to this

or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order

substantially in the form attached hereto as Exhibit B approving the Consent Decree and granting

such other and further relief to which the Debtors may be entitled.

Dated:  August 22, 2003
       Wilmington, Delaware.

Respectfully submitted,

_Patrick Leathem_

Daniel J. DeFranceschi (DE 2732)
Patrick M. Leathem (DE 4114)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
David G. Adams (TX 00793227)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

DLI-5784015v4

-11-

A – 494

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Jointly Administered |
| | : |
| KAISER ALUMINUM CORPORATION, | : Case No. 02-10429 (JKF) |
| a Delaware corporation, et al., | : |
| | : Chapter 11 |
| Debtors. | : |

### CERTIFICATE OF SERVICE

I, Patrick M. Leathem, do hereby certify that on the 22nd day of August, 2003, I caused copies of the foregoing to be served upon the parties referenced as the core group accompanying the attached notice, the All Notices list as applicable pursuant to the Order Establishing Case Management Procedures and Hearing Schedule [Docket No. 455], and any list so attached referencing special parties by first class mail or hand delivery or as indicated.

- *Motion of Debtors and Debtors in Possession for Approval of Consent Decree Settling Environmental Claims of the United States, the States of California, Rhone Island and Washington and the Puyallup Tribe of Indians*

Dated: August 22, 2003

_____
Patrick M. Leathem (Atty No. 4114)

RLF1-2560625-1

A – 495



# SOLANO COUNTY
# Department of Resource Management
675 Texas Street, Suite 5500
Fairfield, CA 94533
www.solanocounty.com

**RECEIVED**
JAN 2 5 2008
By_____

Birgitta Corsello, Director
Cliff Covey, Asst Director

Telephone No: (707) 784-6765
Fax: (707) 784-4805

## NOTICE OF CORRECTIVE ACTION AND RESPONSIBILITY

January 22, 2008                                              **Certified Mail**

SOROUSH HAJIAN                          GREG O'DONNELL
ROADRUNNER GAS                          GASAMAT
990 REDWOOD ROAD                        5303 SPINE RD., # 101
VALLEJO, CA 94590                       BOULDER, CO 80301

RE: **Notice of Corrective Action and Responsibility,** Unauthorized Release, Roadrunner Gas, 990 Redwood Road, Vallejo, CA, SCDRM File # 29-10830.

Dear Sirs:

The County of Solano, Department of Resource Management (SCDRM) has determined that an **Unauthorized Release** of hazardous substance has occurred from the underground storage tank system (tank), at the location referenced above. This determination is based on the following information:

> In 1991, a limited subsurface investigation was conducted around the underground storage tanks and dispensers. Results of the investigation indicated up to 480 mg/Kg Total Petroleum Hydrocarbons as gasoline (TPHg) in the soil at five feet below ground surface (bgs) near a remote fill line for the USTs. Additional subsurface investigation was conducted in 1997 which included the installation of four monitoring wells. Shallow impacted soil was reported during drilling of one monitoring well. Quarterly groundwater monitoring and sampling indicated low to below detection limits of constituents and the site was pending closure following station upgrading.

> In 2002, three USTs were removed and replaced by two 15,000-gallon gasoline tanks. During the station upgrading project, impacted shallow soil up to 14,000 mg/Kg TPHg was encountered under the dispensers at 3 feet bgs. The accessible impacted soil under the dispensers was removed to approximately 4.5 feet bgs. Residual impact remains under the remote fill and under the northeaster corner of the dispenser island canopy at 3 to 5 feet bgs. Due to the limited residual impact, the site was closed on February 14, 2003.

Building & Safety          Planning Services       Environmental Health      Administrative          Public Works-            Public Works-Operations
David Cliche, Chief        Mike Yankovich          Terry Schmidtbauer        Services                Engineering              Steve Hilas
Building Official          Program Manager         Program Manager           Daniel Bellem           Paul Wiese               Operations Manager
                                                                             Staff Analyst           Engineering Manager

A – 4448

Roadrunner Gas, 990 Redwood St., Vallejo
SCDRM File #29-10830
January 22, 2008
Page 2

In November 2007, as part of the station upgrading project, stained soil and a two-inch diameter metal pipe was uncovered in the northern portion of the property. This portion of the property was not previously investigated, therefore additional investigation and impacted soil removal was warranted by SCDRM. Reportedly, fuel dispenser(s) previously existed on the northern portion of the property prior to 1970. A geophysical survey was conducted in December 2007. No evidence of USTs or additional piping was found during the survey. A subsurface investigation was conducted in December 2007. Results of the soil and groundwater sampling indicted up to 646 mg/Kg TPHg in the soil and 2,430 µg/L TPHg in the groundwater. Based on the results of the investigation conducted in 2007, an unauthorized release occurred.

This Notice has been prepared because the nature and extent of the release is not fully defined and/or the site has not been adequately cleaned up. As a result, Corrective Action must be performed.

The term "Corrective Action" means all environmental investigation and cleanup work performed from the time an Unauthorized Release is reported to the issuance of the case closure letter. Corrective Action requirements are set forth in Title 23, of the California Code of Regulations (CCR), Article 11.

The purpose of this letter is to present the following information:

A.    Responsible Party Identification and Notification

B.    Introduction to the Local Oversight Program

C.    Corrective Action Requirements

A.    **RESPONSIBLE PARTY IDENTIFICATION AND NOTIFICATION**

Title 23, CCR, Article 11, offers four categories defining responsible parties. The SCDRM must identify all parties that meet the responsible party definitions, based on the information provided. The four definitions are:

1.    Any person who owns or operates an underground storage tank used for the storage of any hazardous substance (such as petroleum);

2.    In the case of any underground storage tank no longer in use, any person who owned or operated the underground storage tank immediately before the discontinuation of its use;

3.    Any owner of property where an Unauthorized Release of a hazardous substance from an underground storage tank has occurred; and

4.    Any person who had or has control over an underground storage tank at the time of or following an Unauthorized Release of a hazardous substance.

Roadrunner Gas, 990 Redwood St., Vallejo
SCDRM File #29-10830
January 22, 2008
Page 3

Based on information provided, the SCDRM has identified the following party(ies) as meeting at least one responsible party definition:

Greg O'Donnell                          Definitions 1, 3 and 4
Gasamat
5303 Spine Rd, #101
Boulder, CO 80301

Soroush Hajian                          Definitions 1, 2, and 3
Roadrunner Gas
990 Redwood Road
Vallejo, CA 94590

Pursuant to Section 25297.1 and 27297.15 of the California Health and Safety Code, you are hereby notified that the above site has been placed in the Local Oversight Program of SCDRM and the individual(s) or entity(ies) shown above has(have) been identified as the party(ies) responsible for investigation and cleanup of the above site. Section 25297.15 further requires the primary or active responsible party to notify all current record owners of fee title (land owners) before the local agency considers cleanup or site closure proposals or issues a closure letter. For purposes of implementing Section 2597.15, SCDRM has identified <u>Gasamat</u> as the primary or active Responsible Party. It is the **responsibility of the primary or active Responsible Party to submit a letter to SCDRM within 20 calendar days of receipt of this notice which identifies all current record owners of fee title.** It is also the responsibility of the primary or active Responsible Party to certify to SCDRM that the required notifications have been made at the time of cleanup or site closure proposal is made or before SCDRM makes determination that no further action is required. If property ownership changes in the future, you must notify SCDRM within 20 calendar days from when you are informed of the change.

The above listed party(s) are responsible for the Corrective Action requirements. In order to be removed from the responsible party list, the SCDRM must receive written information that <u>clearly</u> shows a party does not meet one of the responsible party definitions. Written information will be evaluated by the SCDRM on a case by case basis.

The SCDRM decision to name the above party(s) responsible for Corrective Action is subject to petition to the State Water Resources Control Board. Any action or inaction by this local agency associated with corrective action, including responsible party identification, is subject to petition to the State Water Resources Control Board. Petitions must be filed within 30 days from the date of the action/inaction. To obtain petition procedures, please fax your request to the State Water Resources Control Board at (916) 341-5711 or telephone (916) 341-5650.

**B.    INTRODUCTION TO THE LOCAL OVERSIGHT PROGRAM**

The SCDRM has entered into an agreement with the State of California Water Resources Control Board to oversee. Corrective Action of Unauthorized Releases from UST systems for sites placed within the Local Oversight Program. SCDRM will oversee the Corrective Action of the Unauthorized Release referenced above. This oversight will include, but not be limited to, site specific work such as:

Roadrunner Gas, 990 Redwood St., Vallejo
SCDRM File #29-10830
January 22, 2008
Page 4

report/correspondence review, report/correspondence preparation, site inspections, meetings, agency consultation, comments on reports and workplans, and enforcement action.

Pursuant to Section 25299.37 (c)(7) of the Health and Safety Code, a responsible party may request the designation of an administering agency when required to conduct corrective action. Please contact this office for further information about the site designation process.

SCDRM will evaluate all available reports and information concerning the Unauthorized Release. Upon consultation with the Regional Water Quality Control Board (RWQCB) and other appropriate agencies, SCDRM will determine the need for further Corrective Action.

## C.    <u>CORRECTIVE ACTION REQUIREMENTS</u>

Described below are general and specific requirements of the SCDRM and the Regional Water Quality Control Board (RWQCB) regarding further Corrective Action.

### <u>General Requirements:</u>

California law requires that responsible parties investigate, abate, and remedy soil and groundwater contamination resulting from Unauthorized Releases. These activities must be performed in accordance with Title 23, CCR, Articles 5 and 11.

### <u>Specific Requirements/Responsibilities:</u>

1. Based on the results of the samples collected during subsurface investigation work and during station remodeling, further investigation is necessary to characterize the vertical and lateral extent of soil impact and evaluate groundwater conditions and impact through borings and monitoring wells. Previous investigations conducted prior to 2007 focused on the southern portion of the property around the USTs. Additional work is warranted to evaluate all potential source(s) and impact areas throughout the property.

2. By **February 29, 2008**, provide a work plan to evaluate the extent and magnitude of impact and characterize the source(s). In addition, a copy of the Phase 1 dated May 13, 2003, prepared by SOMA, and copies of historical Sanborn Fire Insurance Maps for the area shall be submitted with the required Work Plan.

3. Soil and/or groundwater samples must be analyzed for the following constituents:
   Total Petroleum Hydrocarbons as diesel (TPHd);
   Total Petroleum Hydrocarbons ad gasoline (TPHg)
   Benzene, toluene, ethylbenzene, and xylenes (BTEX);
   MtBE;
   Lead scavengers (1,2-DCA, EDB); and
   Total recoverable petroleum hydrocarbons.

Roadrunner Gas, 990 Redwood St., Vallejo
SCDRM File #29-10830
January 22, 2008
Page 5

4. Under the authority of Section 13196 and 13198 (c) of the Water Code, a Responsible Party is required to submit analytical and site data electronically to the State Water Resources Control Board Geographic Environmental Information Management System database GeoTracker along with the customary paper reports. Data to be submitted through Electronic Deliverable Format (EDF) includes; all sample results, latitude, longitude, and elevations of monitoring wells, groundwater information, and a site plan illustrating sample, boring, well locations, and .pdf copies of reports and well logs. Hardcopy reports will not be accepted if the EDF reporting has not been submitted. The State Water Resources Control Board web site at https://geotracker.waterboards.ca.gov can assist with questions regarding the EDF requirements. The global identification number for the site is: T0609515915.

5. As previously mentioned, for purposes of implementing Section 2597.15, it is the responsibility of the primary or active Responsible Party to submit a letter to SCDRM within 20 calendar days of receipt of this notice. The letter shall identify all current record owners of fee title and certify that all record owners have been identified.

6. A subsurface utility survey and sensitive receptor survey shall be completed for the site. The subsurface utility survey shall include locating all subsurface utilities on and surrounding the site. Findings from the utility survey shall be presented in a report on a scaled site plan illustrating the each utility, depth, and flow direction.

SCDRM and RWQCB staff personnel are available to meet with you and/or your environmental consultant to discuss agency guidelines and requirements for the resolution of this case. Failure to comply with SCDRM or RWQCB directives may jeopardize your eligibility for cost reimbursement under the state's Underground Storage Tank Cleanup Fund (Senate Bill 2004) and the Underground Storage Tank Reform Act (Senate Bill 562).

Please address all written submittals to my attention at the SCDRM. If you have any questions concerning this notice, require additional information, or would like to schedule a meeting to discuss this site in greater detail, please contact me at (707) 784-6765.

Sincerely,

Misty C. Kaltreider, CHMM, PG, CEG.
Engineering Geologist

Enclosures:    Corrective Action Requirement Guidelines

Cc:    Mr. Kent Au, RWQCB (without enclosures)
       John Love, Geocon, 6671 Brisa St, Livermore, CA 94550
       Richard McKinney, SOMA, 6620 Owens Dr., Suite A, Pleasanton, CA 94588

A – 452

# Exhibit E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    :    Jointly Administered
                                          :    Case No. 02-10429 (JKF)
KAISER ALUMINUM CORPORATION, a            :
Delaware Corporation, et al.,             :    Chapter 11
                                          :
          Debtors.                        :
                                          :

## DECLARATION OF NADER AGHA IN SUPPORT OF OPPOSITION TO MOTION BY DEBTOR KAISER TO ENFORCE INJUNCTION

I, Nader Agha, declare:

1. I am an adult, a resident of the State of California, and a citizen of the United States. I make this declaration of my own personal knowledge, and if called as a witness, I could and would testify competently thereto.

2. On or about April, 2003, I entered into negotiations with National Refractories and Minerals Corporation ("NRMC"), a company then in bankruptcy, for the purchase of that real property now known as Moss Landing Commercial Park in Moss Landing, California. An agreement was signed on October 3, 2003. The transaction did not close until December 10, 2003, because of two factors. First, I was informed by Brent Clark of Diversified Specialist, Inc. (DSI), who represented NRMC in the purchase and sale negotiations, that the sales agreement had to be approved by the bankruptcy court, an approval that occurred after October 3, 2003. I understand that the approval was given because the agreement was signed by NRMC. Second, as part of the transaction with NRMC, I engaged in a 1031 Exchange, and it took time to put that transaction together.

3. I was unaware, until the Debtor filed their motion to enforce the injunction, that Debtor had filed an opposition in the NRMC bankruptcy court opposing the sale to me of the

DKT. NO. 9674
DT. FILED 2-11-08

Moss Landing, California property by NRMC. I never received any notice of such opposition by the Debtor Kaiser, nor of any hearing that may have addressed Debtor's opposition.

4. I never received any notice from Debtor or from NRMC of any hearing in the Delaware bankruptcy court or of any deadline regarding the proceedings of Debtor related to the Debtor's bankruptcy, including notice of the Consent Decree with the United States, certain States, and certain Indian Tribes, notice of any hearing regarding the confirmation of a plan or the opportunity to vote on a plan, or any deadline to file any proof of claim.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the 5th day of February, 2008, at Monterey, California.

Nader Agha

# Exhibit F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Jointly Administered** |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | |
| a Delaware corporation, et al., | : | **Chapter 11** |
| | : | |
| Debtors. | : | |
| | : | |
| | : | |
| **KAISER ALUMINUM CORPORATION,** | : | |
| et al., | : | |
| | : | |
| Movants, | : | **Hearing Date: 02/25/08 @ 11:15 a.m.** |
| | : | **Re: Docket Nos. 9650, 9670, 9671, 9672,** |
| v. | : | **9673 and 9674** |
| | : | **Agenda Item No. 5** |
| **MOSS LANDING COMMERCIAL** | : | |
| **PARK LLC,** | : | |
| | : | |
| Respondent. | : | |

**REPLY TO OBJECTION OF MOSS LANDING COMMERCIAL
PARK LLC TO REORGANIZED DEBTORS' MOTION TO
ENFORCE INJUNCTIONS ISSUED IN CONNECTION WITH
THE SECOND AMENDED JOINT PLAN OF REORGANIZATION**

The above-captioned reorganized debtors (collectively, the "Reorganized Debtors") file

this reply to the Objection of Moss Landing Commercial Park LLC ("MLCP") to the

Reorganized Debtors' motion to (A) enforce injunctions issued in connection with their Second

Amended Joint Plan of Reorganization and (B) compel MLCP to dismiss with prejudice its

lawsuit against KAC[1] and KACC (the "Motion to Enforce ") (D.I. 9650). In support of this

reply, the Reorganized Debtors respectfully represent as follows:

*An Alleged Confirmation Notice Defect Does Not Convert MLCP's Prepetition Claim Into a
Postpetition or Post-Effective Date Claim*

1.    MLCP argues that because it did not receive notice of the confirmation hearing, it

should be permitted to treat its claims, in effect, as administrative or post-effective date claims.

(Obj. at 8-10). As an initial matter, notice of the confirmation hearing was adequate under the

circumstances. The Debtors served notice of the claims bar date on National Refractories, the

---

[1]     Capitalized terms not otherwise defined herein have the meaning given to them in the Motion to Enforce

DLI-6171737v3

DKT. NO. 9675

DT. FILED 2-15-08

owner of the Moss Landing Property at that time, and National Refractories filed a proof of claim, which included allegations that liabilities were owed in respect of the Moss Landing Property.[2] Despite actual knowledge of the bankruptcy cases (see Mot. to Enforce at 15), MLCP never filed any notice of transfer of the National Refractories claim nor did it assert any claim of its own. As a result, the Debtors resolved the Moss Landing claim with, and served notice of the confirmation hearing on, the only party that asserted the claim in their chapter 11 cases.

2.    Even if there was a notice defect, however, there is no basis for MLCP to seek payment in full on alleged liabilities that unquestionably arose decades before the Debtors' bankruptcy cases. It would be grossly inequitable to the Reorganized Debtors' unsecured creditors to grant MLCP such a windfall solely because National Refractories, and not MLCP, received notice of the confirmation hearing.[3] Although MLCP cites three cases that purportedly support its argument, none of those cases involved a situation where the holder of an unsecured, prepetition claim was permitted to recover in full from the debtor when it was still possible to allow and make a distribution on a late proof of claim.[4] In fact, no court, to the Reorganized

---

[2]    MLCP contends that the Reorganized Debtors "cannot show that it (sic) satisfied their notice requirement . . . as to the 'claims bar date,'" and then states that the claims bar date passed nearly a year before MLCP acquired the Moss Landing Property. (Obj. at 9-10). Because MLCP was an unknown creditor at the time notices of the claims bar date were given, however, MLCP was entitled only to publication notice. Berger v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 96 F.3d 687, 689 (3d Cir. 1996) ("When TWA gave notice of the claims bar date, the Bergers were unknown creditors entitled solely to publication notice."). The Debtors implemented an extensive nationwide publication program, publishing notice of the claims bar date in the national editions of USA Today, The Wall Street Journal and The New York Times as well as in the newspaper supplement Parade magazine, USA Weekend magazine and a host of regional newspapers, including San Francisco Chronicle, ContraCosta Times, Sacramento Bee and Oakland Tribune. Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (D.I. 1301). MLCP cannot credibly assert that notice of the claims bar date was inadequate

[3]    In fact, MLCP has not explained how it was harmed by its failure to receive notice of the confirmation hearing. Based on the overwhelming votes in favor of the Plan, it is clear that even if MLCP had been permitted to vote it would have made no difference. Moreover, MLCP has made no contention that it had any basis to object to any provisions of the Plan.

[4]    See New York v. New York, New Haven & Hartford R.R. Co., 344 U.S. 293 (1953) (holding that liens of known, secured prepetition creditor could not be destroyed where creditor not given actual notice of bar date); Monster Content, LLC v. Homes.com, Inc., 331 B.R. 438 (N.D. Cal. 2005) (holding that known creditor's postpetition, preconfirmation claim could not be discharged where creditor was not given actual notice of confirmation); Berger v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 96 F.3d 687 (3d Cir. 1996) (holding that (i) prepetition claims of creditor that was unknown at the time notice was given of the claims bar date were discharged because publication notice was adequate and the creditor did not file a claim by bar date or establish excusable neglect, and (ii) postpetition, preconfirmation claim of known creditor could not be discharged where creditor was not given actual notice of confirmation hearing))

Debtors' knowledge, has ever permitted such a windfall. If MLCP believes there was in fact a notice defect, its remedy is to move for permission to file a late proof of claim.

### *Moss Landing's Claims for Injunctive Relief Are Dischargeable*

3.     MLCP argues that its citizen suit claims under RCRA and the Clean Water Act ("CWA") are not dischargeable because injunctive relief under those statutes "does not allow a party forced to clean up a site to sue for those response costs in lieu of seeking an injunction." (Obj. at 10). MLCP emphasizes that the Supreme Court's decision in Kovacs "requires that the injunction be susceptible to *conversion* to a monetary obligation" in order to constitute a claim. (Id. at 11). This argument is fundamentally flawed, however, because no injunctive clean-up order currently exists.[5] Rather, MLCP is simply electing to pursue injunctive relief rather than damages to circumvent the discharge. Indeed, MLCP cannot possibly claim that it has no alternative for monetary damages given that MLCP has already sought damages as an alternative in its complaint. Moreover, as the Third Circuit in Torwico Elecs., Inc. v. State of New Jersey, Dep't. of Envtl. Prot. (In re Torwico Elecs., Inc.), 8 F.3d 146 (3d Cir. 1993) recognized, an injunctive order that "does not facially require payment of money . . . still may present a claim" where it is "merely the repackaging of a forfeited claim for damages." 8 F.3d at 150. Here, while MLCP may assert that the environmental conditions pose a continuing threat, there can be no question that MLCP's attempt to assert injunctive relief to circumvent the discharge constitutes a repackaging of a claim for damages given that the alleged continuing threat, by MLCP's own admission, has existed and was known for years prior to MLCP's acquisition of the Moss Landing Property.

4.     As sole support for its position, MLCP cites AM Int'l, Inc. v. Datacard Corp., 106 F.3d 1342 (7th Cir. 1997). Datacard, however, is clearly distinguishable from this case. In Datacard, the debtor continued to operate a tank farm on the subject property, and to contaminate

---

[5]     Had MLCP commenced a RCRA citizen suit and obtained a clean-up order prior to the filing of the bankruptcy cases, MLCP might have an argument that the ordered injunctive relief does not constitute a claim because at that point there may be no alternative for monetary damages

that property, after the plan of reorganization was confirmed: "[d]uring and after the bankruptcy, which was confirmed in September 1984, [the debtor] continued to mix and spill TTE, naphtha, and Blankrola. In May 1985, [the debtor] finally put the lid on its tank farm operations." Datacard, 106 F.3d at 1346. Of course environmental liabilities are not dischargeable if the debtor continues to operate and pollute the site after confirmation. In re CMC Heartland Partners, 966 F.2d 1143, 1146 (7th Cir. 1992). Here, KACC has not owned or operated the Moss Landing Property since 1984.

5.    The more analogous case to the facts here is Krafczek v. Exide Corp., Case No. 00-1965, 2007 WL 1199530, at *3 (E.D. Pa. April 19, 2007), which expressly held that the plaintiff's right to injunctive relief under the citizen suit provisions of RCRA was a dischargeable claim. MLCP suggests that Exide was wrongly decided because the court "profoundly misapprehend[ed] the statutory provisions for standing under RCRA."[6] (Obj. at 13.) Nothing in the Exide opinion, however, suggests that Judge O'Neill did not understand that the statutory provisions for standing under RCRA allowed private citizens to bring private suits to enforce state and federal law. The Exide court simply concluded that the Third Circuit's narrow holding in Torwico was "grounded on the 'state's inherent regulatory and police powers'," inherent powers that individuals clearly do not possess. Exide, 2007 WL 1199530, at *3 (citing to Torwico, 8 F.3d at 151). Indeed, the rationale in Exide applies with even greater force here, where not only does MLCP not possess the state's inherent regulatory and police powers, but the state with those powers has affirmatively agreed not to assert an enforcement action.

### *The Consent Decree Is Binding on MLCP*

6.    MLCP argues that the Debtors did not give Mr. Agha notice of the motion to approve the Consent Decree and that the failure to do so means that the Consent Decree "cannot

---

[6]    MLCP also erroneously asserts that Exide "cannot be reconciled" with the Supreme Court's decision in Meghrig v. KFC W. Inc., 516 U.S 479 (1996). (Obj. at 13.) In Meghrig, the Supreme Court held that the citizen suit provision of RCRA does not allow plaintiffs to recover damages, specifically prior response costs. Meghrig, 516 U.S. at 1256. The Meghrig decision does not involve a bankruptcy and says nothing about the dischargeability of a claim for injunctive relief under the citizen suit provisions of RCRA. There is nothing in Meghrig that is inconsistent with Exide.

be viewed as imposing any additional limitation on Mr. Agha's rights to recovery." (Obj. at 14-15). This argument is wholly without merit because the United States EPA and the California agencies filed notice of the proposed Consent Decree in the Federal Register at 68 Fed. Reg. 51596 (Aug. 27, 2003).[7] Filing notice in the Federal Register is, as a matter of law, deemed notice to all interested parties and is "sufficient to give notice of the contents of the document to a person subject to or affected by it." 44 U.S.C. § 1507; see also United States v. Pitney Bowes, Inc., 25 F.3d 66, 71 (2d Cir. 1994) ("Notice published in the Federal Register charges all interested parties with notice of proposed action by the United States.") (citing Government of Guam v. United States, 744 F.2d 699, 701 (9th Cir. 1984)). Courts have universally rejected arguments, such as MLCP's, that a consent decree is not binding on a party that did not receive actual notice of the settlement. See United States v. Lackawanna Refuse Removal, 781 F. Supp. 336, 339 (M.D. Pa. 1992).

      7.    MLCP also argues that it is not subject to the Consent Decree in the first place because the provisions restricting the right to seek an injunction with respect to the Moss Landing Property only apply to the settling governmental agencies and not to the rights of third parties. (Obj. at 16-17). MLCP misses the point. Its right to bring a citizen suit is essentially derivative of the enforcement rights of the settling governmental agencies. The Consent Decree operates to bar MLCP's ability to assert a citizen suit with respect to the Moss Landing Property because the applicable governmental agencies have exercised their discretion in enforcing the environmental statutes and waived the right to seek a unilateral order or injunction. As the cases the Reorganized Debtors cited in the Motion to Enforce make clear, permitting a citizen enforcement suit in these circumstances would completely undermine governmental agencies'

---

[7]    Moreover, as MLCP acknowledges, the Debtors gave National Refractories, the owner of the Moss Landing Property at the time the Consent Decree was approved, notice of the motion. There is no basis for MLCP's assertion that the Debtors should have served the motion on a party that the Debtors purportedly learned, seven weeks after notices had gone out and less than two weeks before the hearing, might become owner of the Moss Landing Property. While MLCP was apparently conducting due diligence and seeking to buy the Moss Landing Property during the public comment period on the Consent Decree, MLCP did not in fact become the owner until several weeks after this Court approved the Consent Decree.

discretion to enter into settlements. MLCP has not cited and cannot cite any authority to suggest

that it can continue its citizen suit in the face of the Consent Decree.

Dated: February 15, 2008
Wilmington, Delaware.

Respectfully submitted,

Daniel J. DeFranceschi (DE 2732)
Jason M. Madron (DE 4431)
Christopher M. Samis (DE 4909)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR THE REORGANIZED
DEBTORS

# Exhibit G

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
KAISER ALUMINUM CORPORATION,        .    Case No. 02-10429(JKF)
a Delaware corporation, *et al.,*.       (Jointly Administered)
                                    .
          Debtors.                  .    Feb. 25, 2008 (1:13 p.m.)
                                    .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

DKT. NO. 9679
DT. FILED 3-4-08

A – 504

1          THE CLERK: All rise.

2          THE COURT: Good afternoon.  Please be seated.  This

3  is the matter of Kaiser Aluminum, 02-10429.  I have

4  participants by phone: Thomas Clarke and Wendy Smith.  Good

5  afternoon.

6          MS. SMITH (TELEPHONIC): Good afternoon.  This is

7  Wendy Smith appearing on behalf of Moss Landing.  Thomas

8  Clarke was not able to make it today.

9          THE COURT: All right, thank you.

10          MR. GORDON: Good afternoon, Your Honor.

11          THE COURT: Good afternoon.

12          MR. GORDON: Greg Gordon, Jones Day on behalf of the

13  reorganized debtors.  Also Dan Winikka is with me from Jones

14  Day and Dan DeFranceschi from Richards, Layton.  Your Honor,

15  I had planned, initially to give a bit of background about

16  this, because I do think the facts are pretty critical, but I

17  also know that you're running very late today, and if you'd

18  like me to cut through that, I could.

19          THE COURT: No, I would actually like a little bit

20  of background.

21          MR. GORDON: Okay.

22          THE COURT: I have read the materials that are in

23  the binder, but I think it would still summarize it.

24          MR. GORDON: Right.

25          THE COURT:  It's a little complex.

1    MR. GORDON: It is, and it's a fairly long history,

2  but I think the history is important, Your Honor.  Just to

3  start out, this matter relates to a property that Kaiser sold

4  back in 1984, and I think that's a very important fact to

5  keep in mind as we go forward with this hearing.  This is a

6  property that was sold more than 17 years before Kaiser's

7  Chapter 11 filing, and because of that, Your Honor, we think

8  that if the plaintiff here has any claim against Kaiser, what

9  it has is a pre-petition unsecured claim, and it should be

10  directed to dismiss its complaint that's been filed out of

11  the Northern District of California, and instead, if it

12  wants, be directed to file a motion for permission to file a

13  late-filed claim in the case.  That's fundamentally our

14  position, but having said that, Your Honor, I'd like give you

15  an overview of the facts and then lay out the arguments in a

16  bit more detail.  Many years ago, Your Honor, Kaiser operated

17  a refractories business, and in connection with that

18  business, from 1942 to 1984 it operated a magnesium and

19  refractory brick facility on the Moss Landing property, and

20  this is a property, as Your Honor knows, is in Northern

21  California.  In 1984, Kaiser decided to sell its refractories

22  business in its entirety, and on December 31st, 1984, certain

23  Kaiser entities actually entered into an asset purchase

24  agreement with an entity by the name of National Refractories

25  to sell the entire business, and that included the sale of

4

1    the Moss Landing property.   Kaiser financed that purchase

2    price in part taking back two notes in connection with that

3    transaction.   Now, in conjunction with the asset purchase

4    agreement, Your Honor, the parties also entered into a so-

5    called environmental agreement, and at bottom, that agreement

6    essentially allocated between the parties a responsibility

7    for various environmental conditions for all the properties

8    that were part of this purchase, and fundamentally, Your

9    Honor, Kaiser retained certain potential environmental

10   liabilities arising from the operation of the business prior

11   to the sale.   National Refractories then undertook to assume

12   responsibilities for environmental obligations that arose or

13   were caused from operations after the sale.   Importantly,

14   however, National Refractories also assumed certain

15   maintenance obligations with respect to environmental

16   conditions including obligations with respect to the Moss

17   Landing property, and those included things like maintaining

18   two waste dumps on the property that had been closed by

19   Kaiser, rerouting certain storm drains around the dumps and

20   closing off a present drain and maintaining a collection

21   system.   It's all related to conditions that the parties were

22   aware of back in 1984 when that transaction was undertaken.

23   The environmental agreement, Your Honor, also provided for

24   the transfer of all necessary permits to National

25   Refractories in connection with environmental conditions for

1  all the properties, and again, with respect to this

2  particular property, it dealt with or it transferred the

3  national pollutant discharge elimination system permit.

4  Again, that's for the Moss Landing property.  Now, after

5  operating the property itself for several years, National

6  Refractories ceased operations on the property and began

7  marketing it for sale.  Nothing could be completed, however,

8  despite its efforts, and in September of 2001, after a

9  deterioration in National Refractories' financial condition,

10 it engaged Kaiser in discussions about possibly selling the

11 property back to Kaiser, and that was really under

12 consideration for two reasons, Your Honor.  One is it could

13 potentially provide liquidity in the National Refractories,

14 which it needed at the time, and two, it would provide Kaiser

15 potentially with greater control over this property and a

16 better ability to address any potential environmental issues

17 that might arise with the property.  So based on those

18 agreements, the parties actually entered into an agreement

19 which we refer to as the foot-call agreement.  That was

20 effective as of September 13, 2001, and in effect, Your

21 Honor, it granted - under that agreement Kaiser granted

22 National Refractories the option to foot the property to

23 Kaiser, and National Refractories granted Kaiser the option

24 to call or purchase the property, and the price in either

25 case was $5 million.  Thereafter, Your Honor, on October the

1   10th, 2001, National Refractories and certain of its

2   affiliates filed for Chapter 11 in Oakland, California.  On

3   November 15, 2001, after the filing, National Refractories

4   filed a motion to assume the foot-call agreement which was

5   granted by the Court in that case in 2002.  I should mention,

6   Your Honor, as well, in the meantime, National Refractories

7   filed a motion in its Chapter 11 case to sell the Moss

8   Landing property to another entity, an entity by the name of

9   HTC Investments California, Inc.  That transaction was

10  actually approved in January of 2002, but after due diligence

11  that buyer pulled out of the deal and essentially exercising

12  its option to terminate the sale agreement.  On April the 5th,

13  2002, National Refractories sent to Kaiser a notice

14  indicating it was exercising its option to put this property,

15  the Moss Landing property to Kaiser, but by that time Kaiser

16  was already in its own Chapter 11 case, as I'm sure Your

17  Honor has been trying to forget, and had already filed a

18  motion to reject the foot-call agreement, and in fact, in

19  June of 2002, this Court entered an order approving the

20  rejection of that agreement.  In April of 2002, National

21  Refractories filed a proof of claim in this case.  It was

22  filed in an unliquidated amount, and it was filed for, among

23  other things: breach of the foot-call agreement, breach of

24  indemnity provisions in the asset purchase agreement for

25  contingent environmental claims associated with potential

1  remediation of properties it acquired in the purchase

2  transaction, including the Moss Landing property.  Kaiser,

3  likewise, filed a proof of claim in the National Refractories

4  bankruptcy case for liquidated amounts due under the notes,

5  the financing notes, and there had been some additional

6  financing subsequent to the sale as well as other amounts

7  arising under the asset purchase agreement, the environmental

8  agreement, the foot-call agreement, other agreements and

9  generally under environmental laws.  Now in addition to all

10  of that, Your Honor, in August of 2003, and Your Honor may

11  recall this, Kaiser and its debtor affiliates entered into a

12  consent decree with the United States on behalf of the

13  Environmental Protection Agency and other federal agencies on

14  behalf of the State of California, other states, and an

15  Indian tribe, and Your Honor may recall that that was a very

16  comprehensive global settlement that dealt with many, many

17  properties and numerous environmental claims, and it

18  established procedures for the resolution of those

19  liabilities, in particular, those arising from pre-petition

20  operations, and Your Honor may recall that the consent decree

21  divided the sites into numerous categories, and this

22  particular site, the Moss Landing property, fell within the

23  additional site category, and with respect to those sites,

24  the consent decree provided that all obligations of the

25  debtors to these settling parties under CERCLA, under RICRA,

1   under similar state laws arising from pre-petition acts,

2   omissions, or conduct of the debtors would be discharged by

3   confirmation of the plan in that case.  The consent to create

4   further provides that the settling parties would receive no

5   distributions with respect to the additional sites, but

6   could, in the ordinary course of conducting agency

7   enforcement activities in the future seek a determination of

8   the debtors' liability with respect to those sites.  If in

9   fact that process occurred and Kaiser was determined to be

10  liable in the future, its liability would be treated then the

11  same as an unsecured creditor's liability was treated in the

12  case.  In other words, it would receive a payment equal to

13  the amount of distributions, the value of distributions

14  received by unsecured creditors under the plan of

15  reorganization in the case.  The consent decree also provides

16  that the settling parties will not issue a unilateral order

17  or seek an injunction with respect to the additional sites,

18  again, including the Moss Landing site, under CERCLA, under

19  RICRA, under similar state laws for any liabilities arising

20  from pre-petition acts, omissions, or conduct.  Now, on

21  August 22, 2003 the debtors filed a motion for approval of a

22  consent decree.  That motion was served on National

23  Refractories.  On August 27, 2003, the United States

24  published notice of the proposed consent decree in the

25  Federal Register as it's required to do.  In October of 2003,

1  October 27, 2003, the Court approved the consent decree.

2  That's the consent decree, now to come back to this property

3  and the National Refractories bankruptcy.  On October the 6th,

4  2003, so this is during the pendency of the consent decree,

5  National Refractories entered into another agreement to sell

6  the Moss Landing property to a different party, Mr. Agha, and

7  I probably didn't pronounce that properly, it A-g-h-a, either

8  to  him or a higher bidder.  He's the individual who later

9  formed this entity we refer to as MLCP who is the plaintiff

10  in the litigation, and that's the entity that actually will

11  take title to the property.  On October 14th, 2003, National

12  Refractories filed a motion to approve the sale to Mr. Agha

13  or the highest bidder in its bankruptcy case.  That motion

14  was granted by the California Bankruptcy Court in November of

15  2003.  As it turned out, Your Honor, no other parties

16  expressed interest in the property.  The Court, as a result,

17  approved the sale to MLCP on December 1st, 2003, and that sale

18  was closed later in the month, again December 2003.  As is

19  evident, Your Honor, from the sale documentation, and we

20  provided a fair amount of this in connection with our motion

21  or it was attached to the motion, Mr. Agha and MLCP had

22  extensive information about the existing environmental

23  conditions at the Moss Landing property.  In fact, MLCP was

24  required, in a purchase agreement, to specifically

25  acknowledge it had read a Phase I environmental report for

1   the property.  It had read a Phase II soil and ground water

2   sampling report.  It had read a 1997 closure report with

3   respect to the closure of these landfills which are the items

4   at issue here.  The agreement went on to specifically provide

5   that all matters in those reports, all information disclosed

6   in those reports was deemed to have been disclosed to MLCP.

7   The purchase agreement contained a number of other details

8   about the existing environmental conditions.  For example, it

9   talked about the underground storage tanks, the fact that at

10  least one of those was still being remediated, and the like.

11  Also under the agreement, National Refractories was required

12  to forward to MLCP all material correspondence between Kaiser

13  and National Refractories with respect to maintenance of the

14  landfills at issue here.  The environmental agreement that I

15  touched on earlier was listed as an assigned contract under

16  that purchase agreement, but it carried with it an expressed

17  acknowledgment by the buyer here that Kaiser was in its own

18  Chapter 11 proceeding and may reject the environmental

19  agreement as a burdensome executory contract.  That language

20  is right in the purchase agreement.  MLCP was also required

21  to perform all of National Refractories' obligations under

22  the environmental agreement, and the purchase agreement

23  obligated MLCP to avoid taking any actions with respect to

24  the landfills that would trigger or increase Kaiser's or

25  National Refractories' liability.  In addition, Your Honor,

1   on the closing of the sale, MLCP hired an individual, his

2   name was Sam Bowes, to oversee the remediation of the

3   property that had already been commenced by National

4   Refractories.  We think he's significant here because he's

5   the individual who served as Kaiser's environmental manager

6   from 1979 to 1984.  His responsibility in that role with

7   Kaiser was to insure environmental compliance at all of

8   Kaiser's facilities including the Moss Landing facility.  He

9   also worked as the environmental manager for National

10   Refractories starting there after Kaiser's sale of the

11   refractories business to National Refractories.  And, after

12   National Refractories bankruptcy filing, Mr. Bowes was

13   appointed by the California Bankruptcy Court to oversee the

14   sale of National Refractories' assets, including the Moss

15   Landing property.  We think all this shows, Your Honor, that

16   MLCP undeniably had full knowledge, had extensive knowledge

17   of the environmental conditions at the Moss Landing property

18   at the time it purchased the property.  And I think I have

19   one other fact I need to mention – maybe a couple others in

20   this long history.  In March of 2004, Kaiser and National

21   Refractories entered into a comprehensive settlement

22   agreement to address the proofs of claim they had filed in

23   the respective Chapter 11 cases.  That settlement was

24   approved in 2004 by both Bankruptcy Courts, by the California

25   Court in April, by this Court in May of 2004.  It provided

PENGAD • 1-800-631-6989   FORM FED

$A - 514$

12

1   for the payment of proceeds from the Moss Landing property to

2   Kaiser, net of a setoff that had been negotiated.  It called

3   for the withdrawal of all proofs of claim filed by both

4   parties in each of the two cases.  It contained mutual

5   releases and there were other provisions.  Now almost four

6   years after MLCP purchased the property, and almost a year

7   and a half after Kaiser's emergence, MLCP comes forward,

8   files its complaint for damages and injunctive relief for

9   environmental conditions at the Moss Landing property.  At

10  the same time it served a notice on the EPA, certain

11  California environmental agencies and the like, indicating

12  that it intended to sue Kaiser, which it already had, under

13  certain federal and state environmental statutes as well as

14  under the environmental agreement seeking to compel Kaiser to

15  pay costs MLCP had incurred or would incur in the future

16  relating to environmental conditions at the Moss Landing

17  property and also that they intended to seek civil penalties

18  in connection with these efforts.  The initial complaint and

19  the notice were filed on November 30th, 2007.  As far as I

20  know, Your Honor, the initial complaint, however, wasn't

21  served on Kaiser, but a amended complaint was filed on

22  December the 5th, 2007, that was served.  That complaint was

23  filed in the U.S. District Court, Northern District of

24  California.  It seeks injunctive relief, civil penalties,

25  monetary damages, attorney's fees.  It contains 10 separate

1  claims for relief.  We attached it to our papers.  All of

2  them, however, in our view, are nothing more than alternative

3  theories seeking to require Kaiser to assume the cost of

4  remediating conditions at the property, conditions that this

5  entity was well-aware of at the time it purchased the

6  property, conditions that were well-known in 1984 when Kaiser

7  sold the property to National Refractories.  I don't think

8  any of those facts, Your Honor, can be disputed.  That's the

9  history of that as briefly as I can do it, Your Honor.

10           THE COURT: Okay.

11           MR. GORDON: The plan and confirmation order in this

12  case contain, in my view, what I would consider to be

13  standard provisions that provide for the discharge of pre-

14  petition claims and also provide for a permanent injunction

15  enjoining parties from commencing any actions in respect to a

16  claim.  Here, Your Honor, it's our position that all of the

17  claims asserted in this amended complaint are dischargeable

18  claims.  As an initial matter, many of them seek damages,

19  costs, attroney's fees, and penalties.  I don't think it can

20  be seriously disputed, and I don't think the plaintiff

21  actually disputes that those are dischargeable claims.  Also,

22  Your Honor, because Kaiser sold the property in 1984, and as

23  I've indicated, the environmental conditions were well-known

24  then, they were well-known when this entity purchased the

25  property.  There can't be any serious dispute that any claim

1  that this entity would have against Kaiser arose well before

2  the effective date of Kaiser's reorganization plan, which was

3  in July of 2006, indeed, well before Kaiser's Chapter 11 case

4  in February of 2002, if I recall the dates correctly.

5  Additionally, Your Honor, all of the requests for equitable

6  remedies or injunctive relief are dischargeable, in our view,

7  because this entity had an alternative right to payment of

8  damages, and that's clear to us from the face of the

9  complaint where those alternative requests for relief are

10  laid out one by one by one.  Now, we did note in our initial

11  brief the Toriko case, the Third Circuit Toriko case, which

12  I'm sure Your Honor is well aware of and probably knows the

13  ins and outs of better than I do.  We felt duty bound to

14  bring that to the Court's attention.  Now, interestingly,

15  that case has not been cited by MLCP in its response brief.

16  And that's a case where the Court ultimately held that an

17  environmental claim was a non-dischargeable claim, but there,

18  Your Honor, that was a state's effort to enforce an

19  environmental cleanup pursuant to its beliefs and regulatory

20  powers, and we think that's the key difference in that case

21  that makes that case distinguishable from the case at bar

22  here, and it's interesting because that difference was the

23  focus of another case, the Excide case, which we cited in our

24  cases, which is a decision by the U.S. District Court for the

25  Eastern District of Pennsylvania, and the Excide case is very

 1   much, Your Honor, on fours with our case.  There the owner of

 2   a property adjacent to an Excide facility, like the plaintiff

 3   here, filed a citizens suit under RICRA asking the Court to

 4   compel Excide to clean up the property.  Now like us, like

 5   Kaiser, Excide came back and said, No, that claim was

 6   discharged under our plan when we emerged from Chapter 11,

 7   but the property owner there, like the plaintiff here, argued

 8   that his right to injunctive relief was not a claim or was

 9   not a dischargeable claim.  Well, the District Court for the

10   Eastern District of Pennsylvania, Judge O'Neill, he

11   disagreed.  He held that the claim was dischargeable, and

12   that _Torico_ was distinguishable, and essentially what he held

13   was that the adjacent property owner, in effect, wasn't

14   exercising the state's regulatory power and didn't have the

15   right to force compliance with the state's laws, and he

16   viewed _Torico_, the _Torico_ exception as only applying to a

17   state actor.  He didn't see that it was appropriate to expand

18   that exception to a private citizen trying to proceed under a

19   RICRA citizen's suit.  Now, just like _Excide_, Your Honor, we

20   don't have a state actor here.  We don't have a state

21   regulatory agency.  We don't have the EPA here.  We have a

22   citizen and a party to a commercial agreement that apparently

23   this party doesn't like anymore.  Additionally, Your Honor,

24   and I will come back to this, it's significant here that not

25   only is there no state actor but there can't be a state actor

1  because of the consent decree, and that's a further fact, we

2  think, that supports our position that wasn't present in

3  Excide.  Now, MLCP says, nonetheless, that its lawsuit hasn't

4  been discharged because it's request for injunctive relief

5  cannot, in and of themselves be, quote/unquote, "converted to

6  money damages".  But, Your Honor, even in Torico the Third

7  Circuit recognized an injunctive order could still present a

8  claim or constitute a claim if it was merely the repackaging

9  of a claim for damages.  And that's clearly what we have

10  here.  MLCP is simply attempting to repackage a claim that

11  has, under the environmental agreement or indemnity claims

12  under the purchase agreement, whatever it is against Kaiser

13  and turn it into an injunctive-relief type claim in order to

14  get past the discharge.  We think those efforts are

15  completely belied by, as I said before, by its own complaint,

16  which in the alternative seeks damages, civil penalties, and

17  attorney's fees.  Now, the only support we could see that

18  MLCP cited for this position is the Seventh Circuit Data Card

19  case, but in our view, Your Honor, that's a completely

20  distinguishable case because there the debtor continued to

21  operate the facility at issue, and I think it was a tank

22  farm, both during the - and this as a facility that was

23  clearly, as it was being operated, was contaminating the

24  area.  They continued to operate that facility during the

25  bankruptcy and after emergence.  It's hardly surprising, at

1  least to me, that the Seventh Circuit concluded that the

2  environmental claims relating to tht facility were not

3  dischargeable.  Here, in stark contrast to that, Kaiser

4  hadn't owned or operated the property since 1984.  Now, with

5  respect to the consent decree, Your Honor, it's our view that

6  the consent decree is binding, it's unquestionably binding on

7  MLCP, and we cited a couple of cases in our brief where we

8  thought that point was made very clear.  One was the - and I

9  won't pronounce this correctly, the Gualtney case, G-u-a-l-t-

10  n-e-y, I believe.  That was a 1987 Supreme Court case where

11  the Court was basically saying, If citizens could file suit

12  following an agency settlement of environmental claims, it's

13  the agency's discretion to enforce the laws - it would

14  undermine the discretion of the agency to enforce the laws in

15  the public interest.  Or as the Court said, that discretion,

16  quote, "would be considerably curtailed", close quote.  We

17  also cited the North and South Rivers Watershed Association

18  case, a First Circuit 1991 case.  Same type of thinking

19  there.  The Court held that the public agency's litigation

20  decisions may not be secondguessed through the device of

21  filing a separate lawsuit even where the plaintiffs sought

22  different relief.  Here, Your Honor, under the consent

23  decree, the federal and state agencies made a decision with

24  respect to Moss Landing.  They basically agreed initially not

25  to take a distribution but reserved their right to pursue, in

1    the ordinary course of their regulatory activities, a claim

2    in the future that in effect would be treated as an unsecured

3    claim.   Now, MLCP arues that, No, the consent decree is not

4    binding on us because Mr. Agha was not served with notice of

5    a motion to approve the consent decree.   That just misses the

6    entire point, Your Honor.   The fact is that the U.S. and the

7    California agencies filed notice of the consent decree in the

8    Federal Register.   That notice, as a matter of law, is deemed

9    notice to all interested parties, and it's deemed sufficient

10   to give notice of the contents of the document, in this case

11   the consent decree, to a person subject to or affected by it.

12   MLCP makes the further argument that the consent decree can't

13   be binding because the provisions prohibiting the pursuit of

14   injunctive relief only apply to the settling parties.   Again,

15   MLCP misses the point.   The whole idea here, Your Honor, is

16   these citizen suits are, in effect, derivative of the

17   enforcement rights of the settling governmental agencies.

18   This citizen is barred because the applicable governmental

19   agencies have exercised their discretion with respect to Moss

20   Landing and that exercise is now embodied in the consent

21   decree.   That in our view is clearly supported by the two

22   cases I mentioned, the ones we cite, and those cases were not

23   - there was no commentary at all by MLCP with respect to

24   those cases.   Let me see if I can skip ahead here, Your

25   Honor.   I know you're running late - or we're all running

 1  late, I guess.  I guess one last thing I would mention, Your

 2  Honor, before I take my seat is that MLCP seems to make much

 3  of the fact that neither it nor Mr. Agha received notice of

 4  the bar date in our case or notice of the confirmation

 5  hearing, and then based on this notice defect or alleged

 6  notice defect, they say that the claim in effect should be

 7  treated as non-dischargeable or treated as a post-effective

 8  date claim.  The first thing is, remember that National

 9  Refractories did receive a bar date notice, and in fact, it

10  did file a proof of claim with respect to this business

11  including the Moss Landing property.  Also, keep in mind that

12  MLCP did not acquire the Moss Landing property until well

13  after the bar date, and I think it's also important to note

14  that Moss Landing or the plaintiff here never filed any

15  notice of transfer or any documentation indicating that any

16  part of that claim, proof of claim filed by National

17  Refractories had been transferred to it.  So, from the

18  perspective of the debtor, we had a claim on file that dealt

19  with that property and other properties sold to National

20  Refractories, and that claim was ultimately addressed in the

21  case, and, Your Honor, I think it's also important to keep in

22  mind with respect to the notice, there's no doubt, just based

23  on the documentation, that this entity, MLCP, had knowledge

24  of Kaiser's Chapter 11 case.  I mean, it's reflected right in

25  the purchase agreement or not, but having said all that,

1   whether the notice was defective or not, it still doesn't

2   give them the ability to argue, Well, I don't have an

3   unsecured pre-petition claim anymore.  My claim is priority,

4   has now been changed as a result of failure of notice.  If

5   they think notice was defective, their remedy is to file a

6   motion for permission to file a late claim, and we can take

7   it up there if there's an issue about notice.  Thank you,

8   Your Honor.

9           THE COURT: Mr. Minuti, did you enter an appearance,

10  I'm sorry -

11          MR. MINUTI: Your Honor -

12          THE COURT: Did you enter an appearance, I'm sorry -

13          MR. MINUTI: Do you mean earlier today, Your Honor?

14          THE COURT: Yes.

15          MR. MINUTI: I did not, Your Honor, I apologize,

16  sure.  Your Honor, Mark Minuti from Saul Ewing.  I'm here

17  today for Moss Landing Commercial Park LLC.  With me at

18  counsel table, Your Honor, is Tim Dolan.  He's with the

19  Ropers, Majeski, Kohn & Bentley firm that is environmental

20  counsel to Moss Landing, and as Your Honor knows, on the

21  phone is Wendy Smith from the Binder & Malter firm, also

22  bankruptcy counsel for Moss Landing.  Your Honor, I guess

23  I'll start where the debtors' counsel left off because I

24  think that's the fundamental issue before Your Honor today.

25  We are here today because the debtor is trying to enforce the

1 | plan injunction against my client, and the fundamental issue
2 | or the fundamental question today before Your Honor is
3 | whether or how can a plan injunction impact the remedies of a
4 | known creditor when the debtors failed to provide that
5 | creditor with actual notice of the plan.  And, Your Honor,
6 | that question was answered by the United States Supreme Court
7 | in 1953 in the <u>City of New York vs. New York NH and RH</u>
8 | <u>Company</u> case wherein the Supreme Court said is, If you're
9 | dealing with a known creditor, that creditor is entitled to
10 | actual notice.

11 | THE COURT: How did the debtor know that Moss
12 | Landing was the creditor when it had a proof of claim filed
13 | by National Refractories?

14 | MR. MINUTI: Well, Your Honor, you have to put it in
15 | context, and I won't - obviously all the facts are in the
16 | pleadings, Your Honor, but a key fact that wasn't mentioned
17 | by debtors' counsel was the following: That when National
18 | Refractories transferred the property to my client, it filed
19 | a motion in its bankruptcy case to do so.  The debtor
20 | objected to the transfer.  So the debtor knew in October of
21 | 2003 that my client was going to be buying this property, a
22 | property that it knew had environmental issues with it, and I
23 | would submit, Your Honor, that the debtors knew at that time
24 | that my client was a creditor of theirs because they - you
25 | know, obviously, this is a debtor, given the business they

1    were in and the other properties they have, I would submit

2    they were sophisticated parties when it comes to

3    environmental matters.  I would submit that in 2003, Your

4    Honor, they knew that my client was going to be a creditor of

5    them with respect to these environmental issues.

6            THE COURT: Well, they knew that your client may be

7    a creditor if the sale went through, but were they given

8    notice of the sale and were they advised that in fact Moss

9    had purchased the property?

10           MR. MINUTI: Your Honor, I don't know the answer to

11   that, all -

12           THE COURT: Well, Moss didn't transfer the claim.

13           MR. MINUTI: Here's what I do know, Your Honor.

14   What I do know is that they objected to the sale in the

15   Bankruptcy Court.  I have been unable to find the docket -

16           THE COURT: I'm sorry, they objected to the sale in

17   California?

18           MR. MINUTI: In California, correct.  They objected

19   when National Refractories filed a motion to transfer the

20   property to my client.  They appeared in California

21   Bankruptcy Court and objected to the transfer.  So, Your

22   Honor, I believe they knew the transfer occurred.  They knew

23   my client was buying the property, and that's why I submit

24   that my client was a known creditor to them.

25           THE COURT: And they knew that the closing occurred.

A - 525

1    Because knowing that somebody is going to purchase and

2    knowing that the closing occurred are two different things,

3    especially when National Refractories has filed a proof of

4    claim and your client, that does know about the debtors'

5    bankruptcy, is obligated under the law to monitor the case,

6    to pay attention to the bar date, and doesn't file a transfer

7    of claim.

8            MR. MINUTI: Well, Your Honor, I guess I'll answer

9    it this way: Obviously this is a preliminary hearing.

10           THE COURT: Uh-huh.

11           MR. MINUTI: We've submitted declarations.  There's

12   not been an opportunity to take discovery, so I can't come

13   before Your Honor and say for a fact that I knew that the

14   transfer took place.  All I can tell Your Honor is that we

15   filed a response.  In our response to the debtors' motion, we

16   asserted this argument, and the debtor has never refuted it,

17   Your Honor.  They do not refute the fact that we were a known

18   creditor and that they failed to give us notice, and I think

19   that's sufficient, Your Honor, for today to say that they're

20   not entitled to enforce the plan injunction against my

21   client.  I think that argument, Your Honor - unless they're

22   prepared to say today that they didn't know that my client

23   actually purchased the property, and at that point, Your

24   Honor, we'd like an opportunity to take some discovery to

25   find out exactly what they knew.  But I don't think they're

1  going to say that, Your Honor.

2  THE COURT: Okay, well, I understood their papers to

3  be saying that they didn't know because National Refractories

4  filed a proof and claim, and your client never transferred

5  it.

6  MR. MINUTI: But -

7  THE COURT: Now, as far as I'm concerned, that means

8  that National Refractories holds the claim.  That's the

9  entity that's entitled to notice.  Your client never filed a

10  notice of transfer.  National Refractories never notified the

11  debtor that the claim should be transferred, so the debtor

12  notified the entity that filed the proof of claim.  I don't

13  know what more the debtor's supposed to do, and on top of

14  that, the debtor went out with a publication notice that hit

15  the world.

16  MR. MINUTI: Well, except, Your Honor, that the

17  claims that my client is asserting against the debtor right

18  now, the application for injunctive relief is not a claim tht

19  it took assignment from National Refractories.  It's a claim

20  that they are entitled, in their own right, as the owner of

21  the property under RICRA and the Clean Water Act.  So this is

22  an independent claim that they have that I believe the

23  debtors knew or should have known at the time, and again, the

24  debtors don't dispute that.

25  THE COURT: Well, sure, they did know about it.

1    They knew about it in 1984 when they transferred the property

2    to National.   They knew about it when they entered into a

3    consent decree with the Environmental Protection Agency and

4    others.   They knew about it at the time that they made sure

5    that they were going to be discharged of this liability when

6    their plan was confirmed, and in fact, they were discharged

7    of this liability when their plan was confirmed.  I really

8    don't see how your client's not stuck.

9              MR. MINUTI: Well, Your Honor, I guess it depends

10   upon - I mean it sort of gets to the heart of the issue,

11   which is, are we talking about a claim here or are we talking

12   about injunctive rights under RICRA and the Clean Water Act

13   that my client has.

14             THE COURT: Oh, I don't think your client does have

15   those rights because there's a consent decree that relieves

16   the debtor of those rights, and I don't think under the case

17   law that your client can bootstrap itself into rights after

18   there has been a consent decree entered into by the

19   environmental agencies that are responsible for litigating

20   those issues.

21             MR. MINUTI: Well, let's talk about that for a

22   minute, Your Honor.

23             THE COURT: And on top of that, National

24   Refractories, from which you take your standing, your client

25   that is, takes its standing isn't going to have any rights

1   that are higher than National Refractories' rights.

2            MR. MINUTI: But, Your Honor -

3            THE COURT: And it has settled with the debtor.

4            MR. MINUTI: Your Honor, I would respectfully

5   dispute that or disagree with the last point -

6            THE COURT: So I think you need -

7            MR. MINUTI:  - because I think -

8            THE COURT: All right, I think you need to go

9   against National, but -

10            MR. MINUTI: Your Honor, I think these are

11   individual claims, but let me address the argument that Your

12   Honor's raising about the consent decree.  The consent decree

13   itself, Your Honor, does not in any way preclude my client

14   from bringing these claims.  It doesn't talk about my client.

15   It doesn't specifically even mention this property, and

16   there's nothing specifically in the consent decree that says,

17   third parties, like my client, can't bring these claims.

18   Now, how does the debtor get to this argument?  The debtor

19   gets to this argument because within RICRA and within the

20   Clean Water Act itself, there are prohibitions of when you

21   bring - when a citizen can bring a citizen suit, and let's

22   focus on that for a minute, Your Honor.  When you look at

23   RICRA and you look at the Clean Water Act, and let's start

24   with RICRA, and bear with me one moment, Your Honor.  The

25   section we're dealing with is 6972(a)(1)(b), and what

1   6972(a)(1)(b) essentially says is that, "Citizens can bring
2   claims in factual circumstances like this", and then it goes
3   on to say, "However, there are some circumstances when you
4   can't bring a citizen claim". And what are those
5   circumstances? Those circumstances, Your Honor, are
6   contained in 42 U.S.C. 6972(b)(2)(b), and what that section
7   basically says is, A citizen suit cannot be brought if the
8   administrator, that's the EPA or RICRA, is doing any of the
9   following: Number one, they've commenced and are diligently
10  prosecuting an action. That never happened here, Your Honor.
11  The EPA was in negotiations with the debtor. There was no
12  action related to this particular property. There was no
13  diligent prosecution of anything related to this specific
14  property. Number two -

15          THE COURT: It was settled. There was a consent
16  decree. They published a notice of a consent decree.

17          MR. MINUTI: Well, Your Honor, but no – but this
18  property, Your Honor, was a throwaway. It's not even
19  specifically mentioned – no action was specifically taken, as
20  I understand it, by the EPA with respect to this property,
21  and let's move on, Your Honor. Point number two, when can't
22  you bring a civil suit? If the EPA is actually engaged in a
23  removal action, and that's important, Your Honor, because you
24  have to look at the difference between CERCLA and RICRA.
25  What CERCLA primarily focuses on, financial responsibility

PENGAD • 1-800-631-6989

FORM FED

A – 530

1   for the cleanup.  What RICRA focuses on is the cleanup

2   itself, and the prohibition's against a citizen suit, Your

3   Honor, the focus there really is, somebody is actually moving

4   forward to clean up the property, and it makes perfect sense,

5   if the govenment is on the debtor and the debtor is taking

6   steps, whatever the government agreed to to clean up the

7   property, you wouldn't want to have another citizen or any

8   citizen bring another suit that would piggyback on exactly

9   what's happening with what the government is doing.  But

10   that's not what's happening here.  There's no diligent

11   pursuit of the government against the debtor to take remedial

12   action at this specific site.  What we have is a general

13   settlement of a number of things which the debtor wants to

14   argue sweeps this in, and I'm submitting to Your Honor when

15   you look at the specific provisions of RICRA and you look at

16   the specific provisions that prevent the civil pursuit of

17   actions by citizens, they all focus on the fact that the

18   government is taking action or the target is taking action to

19   remediate the site.  And that's not what's happening here,

20   Your Honor.  The government has never asked the debtor to

21   remediate this site.  The debtor's never remediated this

22   site, and in fact, that's what this motion is all about.  We

23   brought the citizen suit to have them remediate the hazardous

24   condition at the site, and they don't want to do it, Your

25   Honor.  So I would submit the provisions of RICRA - again,

$A - 531$

1    it's not the consent decree.  If you go back to RICRA it's
2    determined whether under the reading of RICRA in fact those
3    prohibitions prevent the suit.

4              THE COURT: Regardless of all of this though, I
5    think at this point in time your lawsuit violates the
6    discharge injunction.  No matter how you want to slice it,
7    this is an unsecured pre-petition claim because in any event
8    it relates to an activity that this debtor finished in 1984,
9    and there is no way that you bootstrap yourself into an
10   administrative claim simply because your client owns the
11   property post-petition when the debtor hasn't operated, owned
12   it, done anything to it since 1984.  So at best, your client,
13   if it has anything, has an unsecured claim against this
14   estate, which I think may have been discharged, but if it
15   wasn't discharged, your remedy is to file something here to
16   prove your claim, not a lawsuit against the debtor in another
17   state or federal court, I guess this is a federal court suit,
18   post-discharge.  So, I think that Mr. Gordon is correct that
19   the remedy is not to have the suit there, it's to file a
20   motion to file a late proof of claim.  If in fact your client
21   can establish what you said, that in fact the debtor knew
22   that you had - that the debtor had actual notice of your
23   client's claim and didn't make service, then your client
24   ought to be able to have the opportunity to file a late proof
25   of claim.  And if in fact you can prove that it's injunctive

$A - 532$

1   relief that can't be converted into money damages, although

2   I'm a little confused as to why not because even the state

3   converts its remediation efforts for the most part into money

4   damages, for the most part, so I'm not quite clear why that

5   wouldn't be a claim, but even if you can prove that it isn't,

6   at that point maybe you get relief from the discharge and go

7   into state court, but your first remedy, I think, is here.

8   So, I don't see how the lawsuit itself doesn't violate the

9   discharge injunction at this point in time, and that your

10  remedy isn't to be here showing why you shouldn't file a late

11  proof of claim.

12         MR. MINUTI: Well, Your Honor, your position, Your

13  Honor, assumes that what we're talking about is a claim, and

14  I respectfully disagree and let me tell you why.  It is

15  crystal clear that when you look at the complaint that my

16  client filed, the initial counts of those complaints are for

17  injunctive relief under RICRA and the Clean Water Act.  We

18  cited case law in our papers that also make it clear, and

19  these are United States Supreme Court cases, Your Honor, is

20  that there is no private right of damages under RICRA or the

21  Clean Water Act.  So what we are pursuing is injunctive

22  relief.  Now, I don't think the debtor quarrels with the fact

23  that if what you're talking about is an injunction.  It's not

24  a claim that's discharged, now.-

25         THE COURT: Excuse me.  I thought the debtor said

A – 533

1  | you had in the alternative pled claims for civil penalty,

2  | damages, and attorney's fees.

3  | MR. MINUTI: Well, not in the alternative, Your

4  | Honor.  We have brought separate claims for damages, and I

5  | would -

6  | THE COURT: Well, then you've got a claim.

7  | MR. MINUTI: But well -

8  | THE COURT: And by your own theory, in the

9  | alternative, you've got a claim, so -

10 | MR. MINUTI: But different, Your Honor.

11 | THE COURT: Well, how?

12 | MR. MINUTI: This is how it's different, Your Honor.

13 | The claims for damages that we have pled are claims for the

14 | costs that we've incurred to date.  The injunctive relief

15 | we're seeking under RICRA and the Clean Water Act will be

16 | asking the Court to enter an order requiring the debtor to do

17 | future cleanup.  So it is different.  It is not a substitute

18 | or an alternative theory that we're pursuing the debtor

19 | under.  It's a separate and complete theory -

20 | THE COURT: But that proved -

21 | MR. MINUTI:  - and well, I would agree, Your Honor.

22 | THE COURT: But that proves the very point that you

23 | can indeed do the cleanup and then sue the debtor for

24 | damages.  It proves the very point that in fact this

25 | injunctive suit can in fact be converted into a claim for

1    money damages as the Bankruptcy Code defines a claim.

2            MR. MINUTI: Well, I would respectfully disagree

3    with Your Honor because RICRA and the Clean Water Act don't

4    give me the right under RICRA and the Clean Water Act to get

5    those damages, and again, Your Honor, I appreciate that you

6    disagree, but I think these are separate claims that we

7    sought money on, and quite frankly, Your Honor, I don't think

8    we have the strongest of argument to tell you here that those

9    aren't claims, but let me focus on the injunctive relief and

10   tell you why it's not a claim.  I don't think the debtor

11   disputes the notion that if you're talking about injunctive

12   relief under a statute, it's not a claim.  Now, how have

13   cases interpreted these things and how does it get to a

14   claim?  Well, you have to go back to the first case was a

15   Supreme Court case of Ohio vs. Kovacks, and I think this may

16   even be cited by both parties.  Now what happened in that

17   case, Your Honor, is Ohio had obtained an order, a court

18   order requiring Kovacks to clean up their property and

19   Kovacks did not clean up their property.  So the next step

20   they took was to have a receiver appointed.  Then Kovacks

21   filed for bankruptcy.  In the bankruptcy case, what Ohio did

22   at that point then was try to take action to get some of

23   Kovacks' future income to apply to the cleanup costs, and the

24   Supreme Court in that case essentially said that you started

25   out with an injunctive action and it sort of morphed to a

1   money judgment, and therefore, it was a claim that could be
2   discharged.  Now that's not our claim here, Your Honor.  We
3   have a claim under RICRA for an injunction.  We're not even
4   entitled to money damages, so even if we wanted to convert it
5   under RICRA or the Clean Water Act, we couldn't do it.
6   Another fact in Kovacs that I think swayed the Supreme Court
7   was the fact that Kovacks was essentially dispossessed of all
8   of his assets and there's really no way for him to have
9   complied with an order, an injunctive order, no matter what.
10  Here that is not the case, Your Honor.  Clearly, this debtor
11  is in a position to remediate that property.  Now, a number
12  of courts have interpreted - there's only been a handful of
13  courts, Your Honor, that have addressed this issue, one of
14  which was the Western District of Pennsylvania, which Your
15  Honor is no doubt familiar with in U.S. vs. Hubler and they
16  recognized the Kovacks case for what it was, which is, when
17  you have that unique set of circumstances, when the
18  injunctive claim sort of morphs to a damage claim, then
19  you've got a claim that can be discharged in bankruptcy.  We
20  submit the case before Your Honor is almost identical to the
21  A.M. International, Inc., vs. Data Card case mentioned by
22  counsel.  That's a case that's directly on all fours.  It was
23  a citizen suit under RICRA.  The Court in that case said, No
24  such thing as a damage claim for citizens under RICRA, it's
25  an injunction, it can't be discharged.  Now the debtor cites

$A - 536$

1  the <u>Torico</u> case, and it's not that we didn't address it, Your

2  Honor.  I mean the debtor had addressed in their pleadings,

3  we only get one pleading, but what happened in the <u>Torico</u>

4  case, Your Honor?  In the <u>Torico</u> case this is a Third Circuit

5  case where the Court held, similar to the argument we're

6  raising now, which is you have an injunctive relief.  It

7  didn't turn into a money damage claim.  It can't turn into a

8  money damage claim, and as a result, it wasn't discharged.

9  The only case, Your Honor, out there that really stands for

10  the proposition I submit that the debtor is putting forward,

11  is the <u>Craft Check vs. Excide</u> case, which counsel already

12  mentioned.  And when you look at that case, it's a thee-page

13  opinion without much analysis, but basically what they do is,

14  the Eastern District of Pennsylvania goes back to the <u>Torico</u>

15  case and says, Well, we're going to read into that case a

16  distinction of when a state is exercising essentially its

17  regulatory police powers and when a private citizen is doing

18  it under RICRA, and they draw the distinction between a state

19  moving forward under regulatory powers and a private citizen

20  and say when it's a private citizen you can't - that suit

21  can't be barred, that in fact is a claim, and I would submit,

22  Your Honor, if you look at <u>Torico</u> there's nothing in the

23  <u>Torico</u> case that makes that decision -

24          THE COURT: But there is that distinction in the

25  Bankruptcy Code in the form of automatic relief from the

PENGAD • 1-800-631-6989    FORM FED

1   automatic stay when a state is exercising regulatory powers

2   that doesn't apply to a citizen suit.

3          MR. MINUTI: I agree, Your Honor, but –

4          THE COURT: So the Bankruptcy Code itself, Congress

5   itself in the Bankruptcy Code has made that type of a

6   distinction.

7          MR. MINUTI: Well, that's correct, Your Honor,

8   except that here what we're talking about is RICRA, and what

9   RICRA says is that citizens, governments, it has a completely

10  separate section –

11         THE COURT: It does.

12         MR. MINUTI:  – that deals with citizens' suits.

13  So, clearly it's contemplated by RICRA and how you get a

14  distinction that's relevant to determining whether something

15  becomes a claim or not, I would submit, Your Honor, isn't in

16  Torico, and I don't know where they found it, but they did.

17  All I can say, Your Honor, is that I would submit that that

18  is wrong.

19         THE COURT: Well, I think it's in the Bankruptcy

20  Code.  I mean the Bankruptcy Code defines what a claim is,

21  and it talks about the fact that any claim for equitable

22  relief that can be converted essentially into claims for

23  damages is considered to be a claim.  I'm having some

24  difficulty understanding how if you can incur the costs and

25  sue the debtor for your prior costs, you can't incur future

PENGAD · 1-800-631-6989   FORM FED

1   costs and sue the debtor for your future costs.

2   MR. MINUTI: But isn't it a question, Your Honor, is

3   wether I have a claim now?  I mean that's the focus of today,

4   and today I haven't incurred the costs to sue the debtor for

5   the costs.  What I've done is, I've chosen my remedy.  My

6   remedy is under RICRA and the Clean Water Act.  It's an

7   injunction, Your Honor, that I submit hasn't been and can't

8   be transformed into a money damage, money damage claim,

9   therefore, it can't be discharged even if it was a claim -

10  we're talking about a known creditor that never got notice of

11  the plan injunction, so I don't think that can be enforced,

12  Your Honor.  You know, Your Honor, this is not a case where

13  we're trying to convert some damage claim into an injunction.

14  We don't have - For future costs, we don't have a damage

15  claim right now, Your Honor, and we don't want to have a

16  damage claim because what that would mean is, we've got to

17  spend all the money, and then we've got to pursue a claim

18  against the debtor.  We're dealing with what RICRA and the

19  Clean Water Act allows us to do, which is, seek injunction to

20  remediate an ongoing problem, Your Honor, that the debtor was

21  responsible for, and we think we can do that.  We don't think

22  it's a claim, and therefore we don't think it's barred by the

23  plan injunction of which we never got notice in the first

24  place, Your Honor.

25  THE COURT: Well, the notice issue with respect to

1  the plan injunction, as I said, may give you the basis to

2  start the process in the first place, but I think that this

3  is at least close enough to a claim that your first problem,

4  I think, is to get relief from the discharge injunction

5  because this issue appears to have been addressed by the

6  debtor in the plan.  To the extent that National Refractories

7  had the proof of claim of record and was served, and your

8  client did nothing to get that proof of claim transferred

9  into its own name, the debtors served the entity that had

10  filed the proof of claim.  I believe that's what's required.

11  That's the actual creditor for purposes of the Bankruptcy

12  Code.  Your client, if it had some disagreement with that,

13  had actual knowledge of the debtors' bankruptcy.  It's

14  required by law to follow up on that knowledge of the

15  debtors' bankruptcy.  It did not, so it hasn't to date filed

16  anything in the bankruptcy that would entitle it to get

17  actual notice, until now, until this issue.  So, I think the

18  suit violates the discharge injunction.  I think your remedy

19  is to file something here either for relief from that

20  discharge injunction or to file a late proof of claim or

21  something, whatever it is that you choose to get started

22  here, but I don't think that lawsuit is the appropriate way

23  to go about it.  I don't think the cases that are cited are,

24  in terms of the citizen suit, are going to permit the debtor

25  to exercise the state's policing regulatory powers.  So I

1  don't think they help.  I agree with you that the Supreme

2  Court in looking at _Kovacks_ I think was impressed with the

3  fact that there was a receiver in possession, and I do think

4  that the fact that the debtor was out of possession in that

5  case did affect the Supreme Court's analysis in the first

6  _Kovacks_ case.  The second was a little bit different or maybe

7  I've got the two - I'm not sure about the timing of the two

8  _Kovacks_ cases at this point, but with respect to those two

9  cases.  With respect to the _Hubler_ case in the Western

10  District of Pennsylvania, I think that it did recognize that

11  there were some unique circumstances where an injunction can

12  morph into a claim, but I think your client's in that

13  position.  So, I believe the debtor is going to be in the

14  driver's seat in this one with respect to the limited issue

15  that's before me today, which is, does the suit in California

16  violate, at this point, the discharge injunction and should

17  the remedy first start here for your client to show why it

18  should be able to prosecute that suit, and I think that's

19  your burden.

20        MR. MINUTI:  Your Honor, you know, I certainly

21  understand Your Honor's ruling, and I understand the points

22  that you've made.  I would simply make one further point for

23  the record.  Your Honor seems to have implied that the claims

24  that my client is here really arguing about today are claims

25  that we took on assignment from National Refractories or a

A – 541

1    derivative of them, and I would simply note for the record,

2    Your Honor, that these are individual claims we believe we

3    have separate from National Refractories. So, frankly, I

4    believe the proof of claim that they filed and whether we had

5    an obligation to take an assignment of that, put the debtor

6    on notice, I think that's irrelevant, Your Honor, to the two

7    claims I'm talking about today. My client's individual

8    claims under RICRA and the Clean Water Act, on those two

9    claims, Your Honor, we can disagree on whether in fact it's

10    morphed into a claim or not, but it's clear that the debtor

11    did not give us notice, and I believe we were a known

12    creditor, they haven't disputed that.

13            THE COURT: Okay, well, that's the issue and so

14    maybe I should turn to Mr. Gordon, because I don't see

15    anything in this record that indicates that the debtor did

16    know of your client's status. In fact, I understood the

17    pleadings to indicate that they gave notice to the entity

18    that it felt held claim, which had filed a proof of claim.

19    Your client did not entertain its obligation to file anything

20    before this Court that indicated that it was a known

21    creditor, so I guess I need to find out from the debtor

22    whether there was actual knowledge, because at the point at

23    this moment it seems the pot's calling the kettle black.

24            MR. GORDON: I don't know if I'm the pot or the

25    black or - anyway, I think the point is, Your Honor, that

1   National Refractories filed the claim.  We actually - What's
2   also very important that we haven't talked about is, that
3   claim was settled.  That claim was settled between Kaiser and
4   National Refractories.  As part of that settlement, National
5   Refractories represented to us that it was the owner of all
6   the claims, it had not transferred those claims to anybody.
7   So we had the party of record - Now, we were aware of the
8   sale to Mr. Agha, but to me that's beside the point.  The
9   point is, the claim that was filed in the case that related
10  to environmental contamination at Moss Landing was filed by
11  National Refractories.  It was settled with National
12  Refractories.  It was settled pursuant to an agreement where
13  National Refractories represented to us that they owned the
14  claim and hadn't transferred it, and they are the entity that
15  received notice.

16          THE COURT:  Okay, so the issue at this point is,
17  you're aware of the sale but not aware of the details of the
18  sale so you don't know at this point who assumes the
19  liability for the environmental claims under the sale.

20          MR. GORDON:  Yeah, I don't know what we knew about
21  the documentation, but we knew we had a claim on file.  We
22  also knew, Your Honor, from our perspective, this was a
23  property that had landfills but everything was in compliance,
24  as I understand it, when the property was sold.  There was
25  ongoing monitoring.  The state knew it was going on.  The EPA

$A - 543$

1   had been advised, that's in the papers.  Everybody was

2   comfortable with what was going on.  It's suggested that

3   they're a known creditor.  How are they a known creditor?  We

4   hadn't heard anything about this property or any

5   environmental issues for decades, as far as I know.  But the

6   point is, as part of a larger settlement, we settled all of

7   those claims, claims related to the environmental agreement,

8   the other agreements with National Refractories, the other

9   properties, with that representation, which we felt we had to

10   have, that they were still the owners of the claim.  I'm not

11   sure what else we're supposed to do, and the idea that the

12   consent decree isn't enforceable, I mean, think what kind of

13   precedent that sets.  We enter into a consent decree with

14   agencies who filed proofs of claim relating to these

15   properties.  We settle all these claims in a global fashion,

16   and they come in and say, well, they weren't really

17   exercising their discretion.  They weren't really enforcing

18   anything with respect to the properties, well then, what was

19   the purpose of the settlement?

20          THE COURT:  Yeah, I think there's a problem with the

21   settlement, but nonetheless, I think today I don't really

22   need to decide that because it seems on this record that

23   there may be a problem with the settlement, but that's not a

24   factual issue that I really need to decide today –

25          MR. GORDON:  Okay.

$A - 544$

1      THE COURT: - and based on evidence, there may not
2  be a problem with the settlement.  What I need to decide
3  today is whether or not the lawsuit that's pending is
4  appropriate because the motion is to enforce the plan
5  injunction, and it seems to me that at this stage, that
6  motion should be granted, and the plan injunction should be
7  enforced, that the debtor does appear to have put into its
8  plan the discharge with respect to these claims that Moss
9  Landing should be compelled to dismiss its lawsuit, although
10  the debtor's asking with prejudice.  I don't think that's
11  appropriate.  I think it should be without prejudice for this
12  reason: I think that Moss Landing has the entitlement to come
13  before this Court and attempt to prove that it should be able
14  to, if it chooses, to file a late proof of claim on whatever
15  theory it has to advance.  And if it can in fact prove that
16  the debtor knew that it was an actual creditor and didn't
17  provide notice, then, you know, we may be off to the races on
18  a different track, but nonetheless, I think its remedy in the
19  first instance is here, not in the Federal District Court.
20  So, I'm going to grant the debtor's motion in part and deny
21  it in part.  I will enforce the injunction, require the
22  complaint to be dismissed without prejudice pending some
23  further rulings by this Court if Moss Landing chooses to
24  commence some action here.  So, if you will submit a revised
25  order, Mr. Gordon, after you share it with Mr. Minuti.

$A-545$

1          MR. GORDON: We will, Your Honor, thank you.

2          THE COURT: Okay, thank you.

3          MR. MINUTI: Thank you, Your Honor.

4          THE COURT:  Thank you.

5          (Whereupon at 2:10 p.m., the hearing in this matter

6   was concluded for this date.)

7

8

9

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   _Elaine M. Ryan_                    March 3, 2008
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221


                          A – 546

# Exhibit H

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    :
                                          :   Jointly Administered
KAISER ALUMINUM CORPORATION,              :   Case No. 02-10429 (JKF)
a Delaware corporation, et al.,           :
                                          :   Chapter 11
          Debtors.                        :
                                          :
──────────────────────────────────────   :
                                          :
KAISER ALUMINUM CORPORATION,              :
et al.,                                   :
                                          :
                                          :   Hearing Date: 02/25/08 @ 11:15 a.m.
          Movants,                        :   Re: Docket Nos. 9650, 9670, 9671, 9672,
                                          :   9673, 9674 and 9675 et 9682
v.                                        :   Agenda Item No. 5
                                          :
MOSS LANDING COMMERCIAL                   :
PARK LLC,                                 :
                                          :
          Respondent.                     :

ORDER ENFORCING INJUNCTIONS ISSUED IN CONNECTION
WITH THE SECOND AMENDED JOINT PLAN OF REORGANIZATION
AND COMPELLING MOSS LANDING COMMERCIAL PARK LLC TO
DISMISS WITHOUT PREJUDICE ITS LAWSUIT AGAINST KAISER ALUMINUM
CORPORATION AND KAISER ALUMINUM & CHEMICAL CORPORATION

This matter coming before the Court on the Motion of Reorganized Debtors to

(A) Enforce Injunctions Issued in Connection with the Second Amended Joint Plan of

Reorganization and (B) Compel Moss Landing Commercial Park LLC to Dismiss, with

Prejudice, its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical

Corporation (the "Motion"), filed by the above-captioned Reorganized Debtors;[1] the Court

having (a) entered an order approving the Consent Decree, (b) entered the Confirmation Order

and (c) reviewed the Motion and all other related pleadings; the Court finding that (a) the Court

───────────────────

[1] All capitalized terms not otherwise defined herein have the meanings given to them in
the Motion.

RLF1-3261271-1

A – 547

DKT. NO. 9690
DT. FILED 3-27-08
SIGNED: 3-27-08

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, Article XIII of the Plan and Section XII of the Confirmation Order, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and (c) notice of the Motion was sufficient under the circumstances; and the Court having determined that, for the reasons set forth on the record at the hearing on the Motion, there is just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED to the extent set forth herein.

2.    Within ten days after entry of this Order, MLCP shall dismiss its lawsuit against KAC and KACC without prejudice.

3.    This Court shall retain jurisdiction over the Reorganized Debtors and MLCP with respect to any matters relating to or arising from the Motion or the implementation of this Order.

Dated: March 21ᵗʰ, 2008

_Judith K. Fitzgerald_
UNITED STATES BANKRUPTCY JUDGE
SAS

# Exhibit I

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | :   **Chapter 11** |
| | : |
| **KAISER ALUMINUM CORPORATION, a** | :   **Case No. 02-10429 (JKF)** |
| Delaware Corporation, <u>et al.</u>, | : |
| | :   **Jointly Administered** |
| Debtors. | : |
| | : |
| **KAISER ALUMINUM CORPORATION, <u>et al.</u>,** | : |
| | : |
| Movants, | : |
| | : |
| v. | : |
| | : |
| **MOSS LANDING COMMERCIAL PARK LLC,** | :   **Related to Docket No. 9690** a 9906 |
| | : |
| Respondent. | : |

MODIFIED ORDER ENFORCING INJUNCTIONS ISSUED IN CONNECTION
WITH THE SECOND AMENDED JOINT PLAN OF REORGANIZATION AND
COMPELLING MOSS LANDING COMMERCIAL PARK LLC TO DISMISS
WITHOUT PREJUDICE ITS LAWSUIT AGAINST KAISER ALUMINUM
<u>CORPORATION AND KAISER ALUMINUM & CHEMICAL CORPORATION</u>

This matter having come before the Court on The Motion of Reorganized Debtors to

(A) Enforce Injunctions Issued in Connection with the Second Amended Joint Plan of

Reorganization and (B) Compel Moss Landing Commercial Park LLC to Dismiss, with

Prejudice, its Lawsuit Against Kaiser Aluminum Corporation and Kaiser Aluminum & Chemical

Corporation (the "Motion"), filed by the above-captioned Reorganized Debtors;[1] the Court

having entered an order on March 27, 2008 granting the Motion (the "Original Order") [Docket

No. 9690]; and Moss Landing Commercial Park LLC ("Moss Landing") having filed the

(x) Emergency Motion to Stay Order Enforcing Injunctions Issued in Connection with Plan of

Reorganization and Compelling Moss Landing to Dismiss without Prejudice its Lawsuit Against

---

[1]     All capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

DKT. NO. 9713
DT. FILED 4-16-08
SIGNED: 4-16-08

A – 549

Debtor (the "Emergency Motion") [Docket No. 9693] and (y) Motion for Order Shortening Notice Period and Scheduling a Hearing on its Emergency Motion to Stay Order (the "Motion to Shorten") [Docket No. 9694]; and the Court having scheduled a hearing on the Emergency Motion for April 21, 2008 (the "Stay Hearing"); it is hereby **ORDERED** that:

1.    The Original Order is modified only as set forth herein, all other terms shall remain in full force and effect.

2.    The deadline in paragraph 2 of the Original Order for Moss Landing to dismiss its lawsuit is extended through and including the Stay Hearing.

_Judith K. Fitzgerald_
Judith K. Fitzgerald
United States Bankruptcy Judge

Dated: April 16th, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **KAISER ALUMINUM CORPORATION, a** | : | **Case No. 02-10429 (JKF)** |
| **Delaware Corporation, <u>et al.</u>,** | : | |
| | : | **Jointly Administered** |
| | : | |
| Debtors. | : | |

| | | |
|---|---|---|
| | : | |
| **MOSS LANDING COMMERCIAL PARK LLC, <u>et</u>** | : | |
| **<u>al.</u>,** | : | |
| | : | |
| Appellant, | : | |
| | : | |
| **v.** | : | |
| | : | **Case No: 08-cv-00233 (JJF)** |
| **KAISER ALUMINUM CORPORATION AND** | : | |
| **KAISER ALUMINUM & CHEMICAL** | : | |
| **CORPORATION,** | : | |
| | : | |
| Appellees. | : | |

## CERTIFICATE OF SERVICE

I, Mark Minuti, Esquire of Saul Ewing LLP hereby certify that on August 15, 2008 service

of the foregoing **Appendix to Opening Brief of Appellant Moss Landing Commercial Park, LLC**

was made on the following parties in the manner indicated.

Daniel J. DeFranceschi, Esquire
Jason M. Madron, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
**(Via Hand Delivery)**

Gregory M. Gordon, Esquire
Daniel P. Winikka, Esquire
Jones Day
2727 North Harwood Street
Dallas, TX 75201
**(Via Federal Express)**

Mark Minuti (No. 2659)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840